# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HAITIAN-AMERICANS UNITED, INC. BRAZILIAN WORKER CENTER, CHELSEA COLLABORATIVE, INC. and CENTRO PRESENTE,<br><br>    Plaintiffs,<br><br>  v.<br><br>DONALD J. TRUMP, President of the United States in his Official Capacity, UNITED STATES DEPARTMENT OF COMMERCE, UNITED STATES BUREAU OF THE CENSUS, STEVEN DILLINGHAM, Director of the U.S. Census Bureau in his Official Capacity, and WILBUR ROSS, Secretary of the Department of Commerce in His Official Capacity,<br><br>    Defendants | Civil Action No. 20-11421<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## INTRODUCTION

1. In an act of breathtaking unconstitutionality, Defendant Donald Trump seeks to undo over two hundred years of legal precedent by declaring that undocumented immigrants are not "persons" within the meaning of constitutional and statutory law. Plaintiffs urge this court to act immediately to prevent Defendant Donald Trump, Secretary of Commerce Wilbur Ross, the Department of Commerce, Director Steven Dillingham, and the Census Bureau from impeding the conduct of Census 2020 by, in violation of the United States Constitution and federal statutory law, excluding undocumented immigrants from the population data created for the purposes of congressional apportionment. Immediate intervention is necessary to enjoin Defendants' unlawful

conduct, which was intended to and has had the effect of chilling participation by immigrant communities and communities of color in Census 2020, which will in turn deprive these communities of the political representation and federal financial resources to which they are entitled.

2. On July 21, 2020, President Trump issued a Memorandum to the Secretary of Commerce titled "Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census" (hereinafter, the "July 21 Memorandum") in which he: a) states that he has determined that "respect for the law and protection of the integrity of the democratic process warrant the exclusion of illegal aliens from the apportionment base"; and b) directs the Secretary of Commerce to "take all appropriate action . . . to provide information permitting the President . . . to exercise the President's direction to carry out the policy" of excluding undocumented individuals from the apportionment base.

3. This direction is patently and unquestionably illegal. The fourth sentence of the Constitution, Article I, Section 2, as amended by Section 2 of the Fourteenth Amendment, makes clear that congressional representatives are to be apportioned among the states according to their respective numbers, "counting the whole number of persons in each State." U.S. Const. Amend. XIV. Undocumented immigrants are now and have always been persons as a matter of fact, law, and basic human decency.

4. Plaintiffs are membership-based, non-profit organizations that serve immigrants of color across the Commonwealth of Massachusetts. They seek immediate declaratory and injunctive relief to ameliorate the immense harm provoked by the July 21 Memorandum. Issued in the midst of census-taking for Census 2020 and with a national census self-response rate at just barely over 60%, the July 21 Memorandum has instilled considerable

fear and confusion in immigrant communities; it has already imperiled and threatens to further derail efforts by Plaintiffs to encourage households in hard-to-count communities to complete Census 2020.

5.  In declaring that undocumented individuals will not be counted for the purposes of congressional apportionment—in the midst of Census 2020 operations—Defendants have ensured that immigrant communities will eschew completing Census 2020, thereby depriving residents of those communities of both political representation and billions of dollars in census-linked funds and programs.

6.  Without immediate action from this Court, Plaintiffs will continue to suffer irreparable harm to their memberships and organizational interests. Their advocacy on behalf of Census 2020, which is currently ongoing, will be entirely undermined. Without an injunction from this Court, immigrants of color, non-citizens, foreign-born citizens and undocumented residents will refrain from completing Census 2020, in recognition of Defendants' open, unambiguous, and public declaration that undocumented individuals are not persons.

7.  The July 21 Memorandum is also motivated by a racially discriminatory scheme to reduce the political representation of communities of color and increase the over-representation of white voters. By complying with the July 21 Memorandum and producing population tabulations excluding undocumented individuals for congressional apportionment, Secretary of Commerce Wilbur Ross, Director Steven Dillingham, the Census Bureau and the Department of Commerce (together, the "Agency Defendants") will deny immigrants of color, foreign-born residents, undocumented residents, and non-

citizens the political representation and census-linked federal funding to which they are entitled, on the basis of their race and national origin.

8. The Court should enjoin compliance with the July 21 Memorandum as violative of the Administrative Procedure Act ("APA") for multiple reasons. First, the July 21 Memorandum instructs the Secretary of Commerce to perform an unconstitutional task contrary to law: to exclude undocumented immigrants from the congressional apportionment base, in violation of Article I, Section 2 of the Constitution, as amended by Section 2 of the Fourteenth Amendment. In addition and in the alternative, compliance with the July 21 Memorandum is intended to and will discriminate against immigrants of color, non-citizens, undocumented residents and foreign-born individuals because of their race, national origin, or alienage. Second, the Secretary of Commerce has exceeded his statutory authority over the conduct of the decennial census by declaring his intention to comply with the July 21 Memorandum, thus improperly allowing Defendant Trump to usurp the discretion delegated to the Secretary by Congress.

9. The July 21 Memorandum and compliance thereto should be enjoined because they directly contravene the Constitutional requirement to conduct an "actual Enumeration" of all persons in the United States for the purpose of congressional apportionment. U.S. Const., art. I, § 2. By declaring an intention to exclude undocumented residents from the congressional apportionment base and by complying with the unlawful memorandum, Defendants have chilled and will continue to chill immigrant participation in the ongoing 2020 Census.

10. The July 21 Memorandum and compliance thereto should additionally be enjoined because they operate and will operate in direct contravention of statutory roles of

Defendant Trump and the Secretary of Commerce as outlined in 2 U.S.C. § 2a(a) and 13 U.S.C. § 141(b).

11. Finally, the July 21 Memorandum and compliance thereto should also be enjoined because they are motivated by racial animus, are discriminatory towards immigrants of color, non-citizens, undocumented residents and foreign-born individuals, and are the result of a partisan conspiracy intended to dilute the representation of these individuals and deprive of them the financial resources to which they are entitled, in violation of the Equal Protection guarantee of the Fifth Amendment of the U.S. Constitution and 42 U.S.C. § 1985(3).

12. Accordingly, Plaintiffs seek declaratory and injunctive relief to prevent Defendants from violating the APA, the Equal Protection Clause, 13 U.S.C. § 141(b), 2 U.S.C. § 2a(a), 42 U.S.C. § 1985(3) and the Enumeration Clause.

## **PARTIES**

13. Plaintiff Haitian-Americans United, Inc. (HAU) is a non-profit, membership organization founded and incorporated in the Commonwealth of Massachusetts to improve the quality of life of Haitians and Haitian-Americans through education, community empowerment, civic engagement, and cultural development. HAU is the leading Haitian community-based advocacy organization dedicated to empowering immigrants and refugees in Greater Boston, home to the third-largest Haitian and Haitian-American community in the United States. As a focal point for the Haitian-American community, the organization frequently plans and coordinates major undertakings, advocacy work, events, programs, and activities that are widely attended by its thousands of members. In particular, HAU promotes civic education, voter engagement, and community empowerment, advocates

for consumer protection, encourages voter participation, bolsters Haitian cultural, academic and artistic activities, raises awareness of Haitian history, and creates programming for youth in the Haitian-American community.

14. Among HAU's members are a number of undocumented residents, as well as individuals in mixed-status families, where some family members are undocumented and others are not. HAU is also affiliated with multiple public and private partner organizations, including churches and other civic and community-based organizations that provide services to Haitian and Haitian-American residents.

15. Most of HAU's membership and the clients it serves are part of hard-to-count populations—which, according to the Census Bureau, include racial and ethnic minorities, undocumented individuals, individuals living in non-traditional housing, low-income individuals, and persons who "distrust the government."[1] In particular, HAU is aware that many Haitians and Haitian-Americans are mistrustful of governmental authorities, due to a long history of U.S. discriminatory immigration policies, oppression by exploitative political leaders in Haiti, stigma by federal healthcare officials during the HIV/AIDS pandemic, and their experience of racial profiling and targeting by U.S. immigration and law enforcement authorities.

16. Given the impact of the COVID-19 pandemic on Black communities in Massachusetts, particularly immigrant communities, an accurate decennial census count is critical to

---

[1] Maryann M. Chapin, *2020 Census: Counting Everyone Once, Only Once, and in the Right Place*, U.S. Census Bureau 1, 42 (2018), https://www2.census.gov/programs-surveys/decennial/2020/program-management/pmr-materials/10-19-2018/pmr-hard-to-count-2018-10-19.pdf

receiving enhanced federal funding to strengthen health care systems, workforce development programs, affordable housing, and resources for Title I schools.[2]

17. HAU has been working to mobilize Haitian-Americans to respond to Census 2020 for more than a year. The organization plans to continue doing so until the end of census-taking at the close of October 2020. Because the Haitian and Haitian-American immigrant community has historically been undercounted, HAU has dedicated a significant amount of time and staff over the past two years and invested thousands of dollars in systematic, intensive efforts to ensure immigrant community participation in Census 2020. HAU has also been engaged in strategic coordination with out-of-state partners who have assessed the devastating impact of undercounting residents of Haitian communities living in neighboring states and around the country. HAU has incorporated Census 2020 into many of their trainings, classes, and workshops. For example:

    a. In 2019, HAU launched a grassroots census outreach campaign called "Fòk Nou Tout Konte" (We Must Be Counted), which has included creating bilingual Haitian Creole-English commercials, door-knocking and connecting the census to Haitian Heritage Month (May 2019 and May 2020);

    b. HAU has been hosting virtual Town Halls every Saturday, focusing on Census 2020 and COVID-19; and

    c. HAU has gone live on Facebook every evening at 8pm from Mondays to Thursdays on community issues, including Census 2020.

---

[2] Massachusetts Public Health Association, *Press Release: COVID-19 Rate for Latinx and Black Residents Three Times that of White Residents, According to New Analysis*, Massachusetts Public Health Association 1, 1–2 (Apr. 22, 2020), https://mapublichealth.org/wp-content/uploads/2020/04/Press-Release-Data-Disparities-4.22.20-Final.pdf (stating COVID-19 rate for Latinx and Black residents triple that of White residents); Partners in Health, *COVID-19 Disproportionately Impacts Immigrants in Massachusetts*, Partners in Health (July 23, 2020), https://www.pih.org/article/covid-19-disproportionately-impacts-immigrants-massachusetts (reporting Massachusetts' "hardest hit communities are home to large immigrant populations").

18. HAU's work to engage immigrant communities, including and especially undocumented residents, in Census 2020 has been and will continue to be severely and irreparably injured by the January 21 Memorandum. HAU has dedicated and plans to continue dedicating considerable staff time and local and national resources to reaching undocumented residents who were fearful of participating in Census 2020 because of the threatened inclusion of a citizenship question, the Administration's repeated anti-immigrant rhetoric, and Executive Order 13880, which directed agencies to provide citizenship information to the Census Bureau. If the July 21 Memorandum, which operates to chill undocumented and immigrant Haitians and Haitian-Americans in Massachusetts and elsewhere from participating in Census 2020, is not declared invalid, HAU's efforts and investment of time and resources will be significantly undercut, while the confidence and dignity of both documented and undocumented residents will be shattered.

19. Plaintiff Brazilian Worker Center (BWC) is a grassroots, community-based, non-profit worker center that represents, supports, and organizes the Brazilian and wider immigrant community in Greater Boston and Massachusetts—which is home to the largest Brazilian population in the United States—to defend and advocate for their rights. Founded in 1995, BWC uses organizing, advocacy, education, leadership, and capacity building to join immigrant workers and their families in the fight against economic, social, and political marginalization and in working to create a more just society.

20. BWC provides a number of programs, trainings, and services to the Brazilian and immigrant community including training workers in leadership development, English proficiency, computer literacy and public speaking; providing Know-Your-Rights

trainings on state and federal laws regarding workplace safety; acting as a registered service to assist families with immigration applications and appeals; and obtaining restitution for workers through direct mediation, in small claims court, or through complaint referrals.

21. BWC is currently or has participated as a research partner with University of Massachusetts Boston, Boston University, Harvard University, Tufts University, Northeastern University's School of Law, the National Domestic Workers Alliance, and the Dana Farber Cancer Center on a number of projects pertaining to domestic work conditions and immigrant health, including, for example, surveys on working conditions of domestic workers in Massachusetts and Connecticut through funding from the Sociological Initiatives Foundation. All of this research relies heavily on data gathered during the decennial census.

22. Many of the individuals served by BWC are undocumented, or are members of mixed-status families, where some individuals are undocumented and others are not.

23. Most of the individuals BWC serves are part of hard-to-count populations—which, according to the Census Bureau, include racial and ethnic minorities, undocumented individuals, individuals living in non-traditional housing, low-income individuals, and persons who "distrust the government."[3] In particular, BWC is aware that many immigrants, including Brazilian immigrants, are mistrustful of governmental authorities both due to their experiences under military rule in Brazil and their experience of racial profiling and targeting by U.S. immigration and law enforcement authorities.

---

[3] Chapin, supra note 1, at 42.

24. Given the impact of the COVID-19 pandemic on Black and Latinx individuals in Massachusetts, particularly immigrants, an accurate decennial census count is critical to receiving enhanced federal funding to strengthen health care systems, workforce development programs, affordable housing, and resources for Title I schools.

25. BWC has worked to mobilize Brazilian and immigrant residents of Massachusetts for the decennial census for over a year. Because Brazilian and Brazilian-American immigrant communities have historically been undercounted, BWC has dedicated hundreds of hours and thousands of dollars to systematic, intensive efforts to ensure immigrant community participation in Census 2020. For example:

   a. BWC is a leading member of the Brazilian Census Commission 2020, whose five nonprofit member groups deeply engaged in the Brazilian community develop strategies to activate census participation among Brazilian immigrants.

   b. Since June 27, 2019, BWC has made more than thirty posts on its Facebook page, which has a reach of approximately 7,300 followers, featuring bilingual English - Portuguese educational videos and resources regarding Census 2020.

   c. On March 12, 2020, BWC hosted a training for its members and staff on the importance of the Census to the Brazilian community in partnership with a Brazilian U.S. Census Bureau Partnership Specialist; and

   d. To assist struggling families during the COVID-19 pandemic, BWC has operated a free weekly food distribution campaign called "Comida para Todos em Solidariedade." In the food bags distributed to families, BWC includes robust bilingual English-Portuguese educational materials on Census 2020.

26. BWC's work to engage immigrant communities, including and especially undocumented residents, in Census 2020 has been and will continue to be severely injured by the January 21 Memorandum. BWC has dedicated and plans to continue dedicating considerable staff time and resources to reaching undocumented residents who were fearful of participating in Census 2020 because of the threatened inclusion of a citizenship question, Defendants' repeated anti-immigrant rhetoric, and Executive Order 13880, which directed agencies to provide citizenship information to the Census Bureau. If the July 21 Memorandum, which operates to chill undocumented and immigrant Brazilian and Brazilian-American residents from participating in Census 2020, is not declared invalid, BWC's efforts and investment of time and resources will be significantly undercut.

27. Plaintiff Chelsea Collaborative, Inc. is a 501(c)(3) non-profit membership organization incorporated in and based in Chelsea, Massachusetts. The mission of the Collaborative is to enhance the social, environmental and economic health of the community and its people. The Collaborative provides numerous services to the immigrant community in Chelsea, including citizenship classes, summer employment for teenagers, landlord-tenant education, and voter mobilization.

28. The Collaborative has hundreds of members, many of whom are Latinx and are immigrants or members of mixed-status families. A considerable percentage of the Collaborative's members and the individuals and families it serves are undocumented immigrants. The Collaborative is based in Chelsea, Massachusetts, a majority-minority city that has a larger Latinx and immigrant population than Massachusetts or the United

States as a whole. Chelsea has long been a gateway city for immigrants, refugees, and asylum-seekers from Russia and Ireland to Somalia and El Salvador.

29. Chelsea residents are overwhelmingly working-class, immigrant families of color. Approximately 66.9% of residents identify as Hispanic or Latinx and over 45% of residents identify as foreign-born.[4] With over 70% of residents over the age of five speaking a language other than English at home,[5] Chelsea also has the highest share of adults speaking limited English of any city in Massachusetts, with 33% of those who speak a language other than English at home reporting that they speak English "not at all," "not well" or "well."[6] Over 18% of Chelsea residents live in poverty and the City's median household income is over $20,000 less than that of the Commonwealth as a whole.[7] Nearly 80% of Chelsea's workers were deemed "essential" under the Governor's order closing non-essential workplaces to combat the COVID-19 pandemic, serving in occupations like food service and preparation and healthcare.[8] The City's public-school system well illustrates the diversity and challenges of its population: in the 2019-20 academic year, 93% of students are children of color, 42.5% are English Language Learners, and 63.9% are economically disadvantaged.[9]

---

[4] U.S. Census Bureau, *Quick facts—Chelsea city, Massachusetts—population estimates* (last visited July 27, 2020 9:21 AM), https://www.census.gov/quickfacts/chelseacitymassachusetts.
[5] *Id.*
[6] Boston Planning & Development Agency Research Division, *Demographic profile of adult limited English speakers in Massachusetts*, Boston Planning & Development Agency 1, 3 (Feb. 2019), http://www.bostonplans.org/getattachment/dfe1117a-af16-4257-b0f5-1d95dbd575fe.
[7] U.S. Census Bureau, *supra* note 4.
[8] Nik DeCosta-Klipa, *Why the City of Chelsea has been Hit So Hard by Coronavirus*, Boston.com (Apr. 10, 2020), https://www.boston.com/news/local-news/2020/04/10/chelsea-massachusetts-coronavirus.
[9] Mass. Dep't of Elementary and Secondary Educ., *Selected Populations (2019-2020): Chelsea* (00570000), School and District Profiles (last visited July 27, 2020), http://profiles.doe.mass.edu/profiles/student.aspx?orgcode=00570000&orgtypecode=5&leftNavId=305. To qualify as "economically disadvantaged," a student or the student's family must be participating in one or more of the following programs included in the Commonwealth's direct certification system: Supplemental Nutrition Assistance program, Transitional Aid for Families with Dependent Children, Medicaid, and children under the care of the Department of Children and Families. Mass. Dep't of Elementary and Secondary Educ., *Redefining Low Income—A*

30. The above combination of factors—including but not limited to language barriers, poverty and housing instability, and lack of internet access—render Chelsea a highly hard-to-count community.[10]

31. In June 2020, the Editorial Board of *The Boston Globe* noted that Chelsea's "improbably, impossibly low" undercount in the 2010 Census has "haunted the city for a decade," depriving the "densely packed immigrant city" of its "fair share of federal health, housing and economic development funds"—all of which are tied to population—and made Chelsea "ineligible" for funding that may have assisted the City in addressing issues like "mold and lead paint in its aging housing stock."[11]

32. Given the staggeringly high rates of COVID-19 in Chelsea—the highest per capita in the entire Commonwealth—an accurate decennial census count is critical to receiving enhanced federal funding to strengthen health care systems, workforce development programs, affordable housing, and resources for Title I schools.

33. As of July 22, 2020, the Census Bureau reported that the Self-Response Rate for the City of Chelsea is only 48.9%, in contrast to the Massachusetts Self-Response Rate of 64.2%.

34. The Chelsea Collaborative has worked to mobilize residents of Chelsea and the surrounding communities for the decennial census for over three decades. Because Latinx immigrant communities have historically been undercounted, the Chelsea Collaborative has dedicated hundreds of hours and thousands of dollars to systematic, intensive efforts

---

*New Metric for K-12 Education*, Dep't of Educ. (July 6, 2015), http://www.doe.mass.edu/infoservices/data/ed.html. M.G.L. c. 71A, § 2(d) defines an "English learner" as a child who "does not speak English or whose native language is not English and who is not currently able to perform ordinary classroom work in English." Mass. Gen. Laws ch. 71A § 2(d) (2020).

[10] *See* Chapin, *supra* note 1, at 41–43 (defining hard to count populations)

[11] The Editorial Board, *Low-balling the Chelsea population threatens the state's coronavirus epicenter*, The Boston Globe (Jun. 14, 2020), https://www.bostonglobe.com/2020/06/14/opinion/an-undercounted-population-threatens-chelsea-states-coronavirus-epicenter/?p1=Article_Inline_Text_Link.

to ensure immigrant community participation in Census 2020. The Collaborative has incorporated Census 2020 into many of their trainings, classes, and workshops. For example:

a. Beginning in spring 2019, the Collaborative organized street fairs, network gatherings, canvassing, and table conversations through *Noches Sociales*, which take place every six weeks, on the topic of Census 2020.

b. In March 2020, the Collaborative and its partners mobilized hundreds of staff and volunteers for a major tri-city outreach initiative across Chelsea, Everett, and Revere, knocking on doors in every corner of the cities to provide bilingual English-Spanish information on Spanish 2020.

c. The Collaborative sponsored a Special Immigration Edition of *El Planeta* with in-depth features on Census 2020, including questions residents could expect to see on the census, common myths, and frequently asked questions about how to be counted safely.

d. In partnership with Lawyers for Civil Rights, the Collaborative has hosted over a dozen bilingual English-Spanish workshops since September 2019 educating staff and members on the financial and political necessity of a complete count. Since the COVID-19 pandemic begun, this programming has been conducted via Zoom and Facebook Live; and

e. Since June 2018, the Collaborative has created more than thirty bilingual English-Spanish posts featuring educational content about Census 2020 on its Facebook page, which has over 7,000 followers.

35. The Collaborative provides direct services connecting members with critical housing, nutrition, and childcare benefits. Many of these resources depend on federal funds directly linked to Census 2020, including Housing Choice Vouchers (also known as Section 8), Supplemental Nutrition Assistance Program (SNAP), and Special Supplemental Nutrition Program for Women, Infants, and Children (WIC).

36. The Collaborative's work to engage immigrant communities, including and especially undocumented residents, in Census 2020 has been and will continue to be severely injured by the January 21 Memorandum. The Collaborative has dedicated and plans to continue dedicating considerable staff time and resources to reaching undocumented residents who were fearful of participating in Census 2020 because of the threatened inclusion of a citizenship question, the Administration's repeated anti-immigrant rhetoric, and Executive Order 13880, which directed agencies to provide citizenship information to the Census Bureau. If the July 21 Memorandum, which operates to chill undocumented and immigrant Chelsea residents from participating in Census 2020, is not enjoined, the Collaborative's work and investment of time and resources will be severely undercut.

37. Established in 1981, Plaintiff Centro Presente is a state-wide Latin American immigrant organization dedicated to the self-determination and self-sufficiency of the Latin American immigrant community of Massachusetts. The non-profit organization was founded by Sister Rose Marie Cummings in direct response to the rapidly growing community of refugees fleeing violence during the civil war conflicts in Central American in the 1980s. Operated and led primarily by Central American immigrants, Centro Presente struggles for immigrant rights and for economic and social justice.

38. Centro Presente has hundreds of members, many of whom are Latinx and are immigrants or members of mixed-status families. A considerable percentage of Centro Presente's members and the individuals and families it serves are undocumented immigrants.

39. Centro Presente is based in East Boston, a majority-minority neighborhood that has a larger Latinx and immigrant population than Boston, Massachusetts or the United States as a whole. East Boston is home to more than 45,000 residents, most of them working-class immigrants of color. Indeed, more than half of East Boston residents identify as Hispanic or Latinx, and almost half were born outside the United States to non-citizen parents.[12] By comparison, 44.5% of Boston's overall population (and in many neighborhoods, well more than 70%) identifies as white and non-Hispanic, while only 33.2% of East Bostonians do.[13] Nearly half of East Boston's residents do not speak English as their primary language and have a limited ability to speak, read, write or understand English.[14] East Boston's median household income is almost $10,000 below that of Boston generally; nearly a third of households live on less than $35,000 per year, and 19.3% of residents live below the federal poverty line.[15] In a city where nearly half the population has earned at least a bachelor's degree, only 26.2% of East Bostonians have done so.[16]

---

[12] *See, e.g.*, Boston Planning & Development Agency Research Division, *Boston in Context: Neighborhoods*, Boston Planning & Development Agency 1, 8, 10 (Feb. 2020), http://www.bostonplans.org/getattachment/1882b00d-48fe-41bc-ac1a-6979e25dbaf1 (reporting that 56.4% of East Boston residents are Hispanic or Latino and that 49.5% are foreign born).

[13] *Id.* at 8.

[14] *See, e.g.*, City of Boston, *Language and Communications Access: Demographic Data Report—Limited English Proficiency* 1, 3 (2018), https://www.boston.gov/sites/default/files/document-file-11-2018/demographic_ data_report_-_neighborhood_depth_lep_with_accom_notice_2.pdf (reporting, based on 2011-2015 data, that 46% of East Boston residents, or more than 19,000 people, have LEP).

[15] Boston in Context: Neighborhoods, *supra* note 12, at 23, 25.

[16] *Id.* at 14.

40. Because a considerable percentage of Boston's population lives in hard-to-count tracts, the City as a whole is the "ninth hardest to count city in the nation when measured against the 100 largest U.S. cities."[17] Boston's hard-to-count tracts are concentrated in the neighborhoods of Dorchester, Roxbury, and East Boston, all of which are majority-minority communities.

41. As of July 27, 2020, Boston ranked in the bottom five cities statewide for census self-response, with just 53% of residents completing Census 2020.[18]

42. Most of the individuals Centro Presente serves are part of hard-to-count populations—which, according to the Census Bureau, include racial and ethnic minorities, undocumented individuals, individuals living in non-traditional housing, low-income individuals, and persons who "distrust the government."[19] In particular, Centro Presente is aware that many immigrants, including Latinx immigrants, are mistrustful of governmental authorities, both due to their experiences under military or dictator rule in Central American and their experience of racial profiling and targeting by U.S. immigration and law enforcement authorities.

43. Given the impact of the COVID-19 pandemic on Latinx individuals in Massachusetts, particularly immigrants, an accurate decennial census count is critical to receiving enhanced federal funding to strengthen health care systems, workforce development programs, affordable housing, and resources for Title I schools.

---

[17] Peter Ciurczak, *Census 2020, explained: how it works and what's at stake for Massachusetts*, Boston Indicators (last visited July 27, 2020), https://www.bostonindicators.org/reports/report-website-pages/census-2020.
[18] Zoe Greenberg, *Boston is usually undercounted in the census. This year may be worse,* The Boston Globe (Jul. 27, 2020).
[19] Chapin, *supra* note 1, at 42

44. Through the integration of community organizing, leadership development, and basic services, Centro Presente strives to give members a voice and to build political and community power. Encouraging and promoting resident participation in Census 2020 is a critical means of achieving that goal. In particular, Centro Presente has dedicated considerable staff time and financial resources to engaging the Latinx immigrant community in Census 2020. For example:

    a. In July 2019, Centro Presente and its partner Lawyers for Civil Rights launched a campaign called "Let's Be Counted for Census 2020" that included bilingual social media posts, videos, and other tools to inform Spanish-speaking community members about the importance of the census;

    b. Organizers with Centro Presente engaged in door-to-door campaigning in East Boston until a state of emergency was declared in Massachusetts in March 2020. Organizers are now boosting outreach through virtual community meetings, phone banking fliers, and social media;

    c. Centro Presente has been distributing bilingual fliers about the census along with food boxes to needy families; and

    d. Centro Presente has hosted bilingual English-Spanish workshops on Facebook live in partnership with both Lawyers for Civil Rights and the City of Boston to inform its members regarding how to complete Census 2020 securely and the importance of Census 2020 in funding and empowering immigrant communities.

45. Centro Presente's work to engage immigrant communities, including and especially undocumented residents, in Census 2020 has been and will continue to be severely injured by the July 21 Memorandum. Centro Presente has dedicated and plans to continue

dedicating considerable staff time and resources to reaching undocumented residents who were fearful of participating in Census 2020 because of the threatened inclusion of a citizenship question, the Administration's repeated anti-immigrant rhetoric, and Executive Order 13880, which directed agencies to provide citizenship information to the Census Bureau. If the July 21 Memorandum, which operates to chill undocumented East Boston residents from participating in Census 2020, is not declared invalid, Centro Presente's efforts and investment of time and resources will be severely undercut.

46. The "improper enumeration" threatened by the July 21 Memorandum will result in a loss of funds to Massachusetts and the communities in which Plaintiffs and their membership reside, as well as a reduction in their political power and representation. *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (noting plaintiffs "establish[] their standing" where they alleged "concrete harm in the form of . . . decreased federal funds flowing to their city and state").

47. Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

48. Defendant Department of Commerce is a department of the Executive Branch of the United States government. DOC and its component agency, the Census Bureau, has the authority to administer the decennial census.

49. Defendant Wilbur Ross is the Secretary of the Department of Commerce and as such, is responsible for overseeing all operations of the Department, including the operations of the Census Bureau. He is sued in his official capacity.

50. Defendant U.S. Census Bureau is an agency within the U.S. Department of Commerce. 13 U.S.C. § 2. The Census Bureau is responsible for conducting all census programs,

including the collection of information for and formulation of populations tabulations utilized for congressional apportionment.

51. Defendant Steven Dillingham is the Director of the U.S. Census Bureau. Defendant Dillingham oversees the 2020 decennial census operations and is responsible for ensuring the accuracy of the 2020 decennial census count. Defendant Dillingham performs census-related duties assigned by law, regulation, or the Secretary of Commerce. 13 U.S.C. § 21. He is sued in his official capacity.

## VENUE AND JURISDICTION

52. Venue in the District Court for the District of Massachusetts is proper because this is an action against an officer, employee, and/or agency of the United States, all Plaintiffs are residents of and incorporated in this judicial district, and the impacts of the July 21 Memorandum are being felt and will be felt in this judicial district. *See* 28 U.S.C. § 1391(e)(1).

53. Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1346. The Court also has jurisdiction over Plaintiffs' APA claims under 5 U.S.C. § 702 and 704. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et seq.* to grant Plaintiffs' request for declaratory and injunctive relief.

## FACTUAL ALLEGATIONS

**Congressional Apportionment Must be Based on a Decennial Census Counting All Persons**

54. The fourth sentence of the Constitution states that representatives and direct taxes "shall be apportioned among the several States . . . according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths

of all other Persons." U.S. Const. Art. I, Sec. 2. The Constitution also calls for an "actual Enumeration," to be held every ten years, to determine the number of representatives. *Id.*

55. As the U.S. Supreme Court observed in 2016, the Framers' "Great Compromise," as expressed James Madison and Alexander Hamilton, called for members of the House of Representatives to be allotted to states based on the "total population" and to "include all inhabitants—although slaves were counted as only three-fifths of a person—even though States remained free to deny many of those inhabitants" the right to vote. *Evenwel v. Abbott*, 136 S. Ct. 1120, 1127 (2016) (*citing* The Federalist No. 54, p.284 (G. Carey & J. McClellan eds. 2001) *and* 1 Records of the Federal Convention of 1787, p. 473 (M. Farrand ed. 1911)).

56. Article I, Section 2 was amended by the Section 2 of the Fourteenth Amendment, which calls for representatives to be apportioned among the states according to their respective numbers, "counting the whole number of persons in each State." U.S. Const. Amend. XIV.

57. Notably, despite defining citizenship in Section 1 of the Fourteenth Amendment as "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof," Section 2 specifically refers to "persons," rather than "citizens," in identifying who should be counted for the purposes of congressional apportionment. U.S. Const. Amend. XIV; *see also Wesberry v. Sanders*, 376 U.S. 1, 13–14 (1964) ("The debates at the Convention make at least one fact abundantly clear: that when the delegates agreed that the House should represent 'people' they intended that in allocating Congressmen the number assigned to each State should be determined solely by the number of the State's inhabitants. The Constitution embodied Edmund Randolph's proposal for a periodic

census to ensure 'fair representation of the people,' an idea endorsed by [George] Mason as assuring that 'number of inhabitants' should always be the measure of representation in the House of Representatives.").

58. Importantly, the history of Section 2 of the Fourteenth Amendment reveals that Congress considered, and rejected, allocating seats in the House of Representatives on the basis of voter population. *See Evenwel*, 136 S. Ct. at 1127-28.

59. In particular, the *Evenwel* Court cited arguments advanced by then-Representatives James. G Blaine, Roscoe Conkling, and Hamilton Ward: that population is the "true basis of representation," as "women, children and other non-voting classes may have as vital an interest in the legislation of the country as those who actually deposit the ballot" and that excluding "non-voting tax-payers" from apportionment would render those groups taxed without representation. *Id.* at 1128 (*quoting* Cong. Globe, 39th Cong., 1st Sess., 141, 434 (1866)).

60. Federal courts have consistently rejected the argument that undocumented residents must be excluded from the congressional apportionment base have been unsuccessful. For example, in *Federation for American Immigration Reform v. Klutznick*, 486 F.Supp. 564 (D.D.C. 1980), *appeal dismissed* 447 U.S. 916, the District Court for the District of Columbia described the plaintiffs' case—that undocumented residents were constitutionally required to be counted separately and excluded from the apportionment base—"very weak on the merits." *Id.* at 576. The *Klutznick* Court observed that the Constitution's language is "not ambiguous" and that there is "little on which to base a conclusion that illegal aliens should now be excluded," given that "two centuries of consistent interpretation" have yielded the same conclusion. *Id.*; *see also id.* (observing

that it was "generally accepted" in first half of twentieth century that exclusion of aliens from apportionment base "would require a constitutional amendment.").

61. As outlined in Article I, Section 2, an "actual Enumeration" is to be conducted every ten years "in such Manner as [Congress] shall by Law direct." U.S. Const. Art. I, Sec. 2.

62. This "actual Enumeration" is the decennial census, in which, every ten years, the Census Bureau sends a questionnaire to every household in the United States and requires—by law—that every resident in the United States, notwithstanding their immigration or citizenship status, reply. 13 U.S.C. § 221.

63. Beyond apportioning representatives among the states, the data gathered by the decennial census is used to draw congressional and state legislative districts, school districts, and voting precincts; to enforce voting rights and civil rights legislation; to distribute more than $1.5 trillion federal dollars in over one hundred census-linked programs to the states; to inform federal, state, tribal, and local government planning decisions; to inform business and nonprofit organization decisions and; to provide a population benchmark for nearly every other American survey and so support critical research in subjects ranging from public health to education.[20]

64. Every census, beginning in 1790, has included U.S. citizens and noncitizens—regardless of immigration status—in the country's decennial population counts. *See Klutznick*, 486 F.Supp. at 566 ("The population base used for apportionment purposes consists of a straightforward head count, as accurate as is reasonable possible, of all persons residing within a state on April 1. This has been the practice since the first census in 1790; everyone is counted except foreign diplomatic personnel living on embassy grounds

---

[20] Chapin, *supra* note 1, at 37

(which is considered 'foreign soil,' and thus not within any state) and foreign tourists, who do not 'reside' here.") (footnotes omitted).

65. On March 14, 2019, Secretary Ross testified under oath before the Committee on Oversight and Reform of the House of Representatives that the Department is "obliged" and "required" to "count every person who is here regardless of citizenship status and regardless of anything else."[21] Similarly, at a February 12, 2020 hearing before the same committee, Dr. Steven Dillingham, the Director of the Census Bureau, responded to a question about whether someone "here just illegally" is countable saying that the Bureau "count[s] everyone, wherever they are living."[22]

66. On the Census Bureau's 2020 Census website, on a page entitled "Fighting Rumors," the following information is currently visible under the headline "Setting the Record Straight": "Q: Are non-citizens counted in the census? A: YES. Everyone counts. The 2020 Census counts everyone living in the country, including non-citizens." There is no mention of any exclusion of undocumented residents.[23]

67. On the Census Bureau's 2020 Census website, on a page entitled "Who to Count," the Census Bureau provides the following guidance regarding "Foreign Citizens in the United States": "Citizens of foreign countries who are living in the United States, including members of the diplomatic community, should be counted at the U.S. residence where they live and sleep most of time. Citizens of foreign countries who are temporarily

---

[21] Secretary of Commerce Wilbur L. Ross, Jr., *Hearing with Secretary of Commerce Wilbur L. Ross, Jr. Before the Comm. on Oversight and Reform*, House Hearing, 116th Cong. 11, 1, 32 (2019), https://www.govinfo.gov/content/pkg/CHRG-116hhrg36621/html/CHRG-116hhrg36621.htm

[22] Census Bureau Director Dr. Steven Dillingham, *With Census Bureau Director, Dr. Steven Dillingham before the Comm. on Oversight and Reform*, House Hearing, 116th Cong. 91, 1, 14 (2020), https://www.govinfo.gov/content/pkg/CHRG-116hhrg39929/html/CHRG-116hhrg39929.htm

[23] U.S. Census Bureau, *Fighting 2020 Census Rumors*, U.S. Census 2020 (last visited July 27, 2020), https://2020census.gov/en/news-events/rumors.html

visiting the United States on vacation or business on April 1, 2020, should not be counted." There is no mention of any exclusion of undocumented residents.[24]

68. Congress has delegated responsibility for taking the decennial census, in "such form and content as he may determine," to the Secretary of Commerce—not to the President of the United States. 13 U.S.C. § 141(a); *see also id.* § 4 (stating the Secretary "shall perform the functions and duties imposed upon him by Title 13).

69. The Secretary may only delegate the performance of such functions and duties to "such officers and employees of the Department of Commerce as he may designate." *Id.* § 4. There is no provision for delegation to the President or any other member of the Executive Branch.

70. Within nine months after the census date, the Secretary "shall" complete the "tabulation of total population by States . . . as required for the apportionment of Representatives in Congress" and report that tabulation to the President. *Id.* § 141(b).

71. Pursuant to 2 U.S.C. § 2a(a), on the first day, or within one week thereafter of the first regular session of Congress, the President "shall" transmit to Congress a statement showing the "whole number of persons in each State" as "ascertained under" the "decennial census of the population," as well as the number of representatives to which each state would be entitled.

72. Each state in the union is "entitled" to the number of representatives "shown in" the President's transmission to Congress "until the taking effect of a reapportionment under this section or subsequent statute." 2 U.S.C. § 2a(b).

_____

[24] U.S. Census Bureau, *Who to Count*, U.S. Census 2020 (last visited July 27, 2020), https://2020census.gov/en/who-to-count.html

73. The apportionment calculation is of a "ministerial nature." *Franklin v. Mass.* 505 U.S. 788, 799 (1992). Indeed, the "plain language" of 2 U.S.C. § 2a(a) demonstrates that the President has "no substantive role in the computation of the census." *Id.* at 280 (Stevens, J., concurring).

**The July 21 Memorandum is Unconstitutional and Unlawful on Its Face and As Applied**

74. On July 17, 2020, *Politico* reported that the Trump Administration was "likely to issue an executive order today seeking to ban undocumented immigrants from being counted in the census."[25]

75. The news was soon picked up by other media, including Reuters, the New York Post, and The Independent.[26] Sources from the Trump Administration described an executive order that would ban undocumented immigrants from being included in the 2020 census count.

76. On July 21, 2020, President Trump issued a Memorandum for the Secretary of Commerce entitled "Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census."[27]

77. The July 21 Memorandum claims, erroneously, that the President "by law, makes the final determination regarding the 'whole number of persons in each State,' which determines the whole number of Representatives to be apportioned to each State."

---

[25] Jake Sherman et al., *POLITICO Playbook PM: Trump's next executive order*, Politico (July 17, 2020 12:59 PM), https://www.politico.com/newsletters/playbook-pm/2020/07/17/new-trumps-next-executive-order-489834

[26] *See, e.g.*, Jon Levine, *Trump Planning Executive Order to Exclude Illegal Immigrants from Census*, N.Y. Post (July 18, 2020 10:36 AM), https://nypost.com/2020/07/18/trump-planning-order-to-exclude-illegal-immigrants-from-census/; Steve Holland & Nicholas Brown, *Trump Expected to Exclude Undocumented Migrants from U.S. Census*, Reuters (July 17, 2020 11:24 AM), https://www.reuters.com/article/us-usa-census-migrants/trump-expected-to-exclude-undocumented-migrants-from-u-s-census-idUSKCN24I2JE; John T. Bennett, *Trump Administration Preparing Executive Order Banning Undocumented Immigrants from Being Counted in Census*, The Independent (July 17, 2020), https://www.independent.co.uk/news/world/americas/us-politics/trump-undocumented-immigrants-census-white-house-a9625516.html.

[27] Donald J. Trump, *Memorandum for the Secretary of Commerce*: *Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census* (July 21, 2020), https://www.documentcloud.org/documents/6999106-July-21-2020-Memorandum-On-Excluding-Illegal.html

78. The July 21 Memorandum also claims that the Constitution "does not specifically define which persons must be included in the apportionment base," arguing that the term "persons in each State" has been interpreted to mean only "inhabitants" of each State and that "[d]etermining which persons should be considered 'inhabitants' for the purpose of apportionment requires the exercise of judgment."

79. As an example of this "exercise of the judgment," the July 21 Memorandum notes that "certain foreign diplomatic personnel" are excluded from the apportionment base. However, as noted by the *Klutznick* Court, this is scarcely an exercise of Presidential judgment but rather, a reflection of the fact that under American and international law, foreign diplomatic personnel live on embassy grounds "which is considered 'foreign soil' and thus not within any state." *Klutznick*, 486 F.Supp. at 566.

80. The July 21 Memorandum continues to state, without any citation to any case, statute, legislative history, or regulation, that the "discretion delegated to the executive branch to determine who qualifies as an 'inhabitant' includes authority to exclude from the apportionment base aliens who are not in a lawful immigration status."

81. The President observes that with the signing of Executive Order 13880 on July 11, 2020 ("Collecting Information About Citizenship Status in Connection with the Decennial Status"), following the Administration's defeat at the Supreme Court regarding the inclusion of a citizenship question, he instructed agencies to share information with the Department of Commerce to allow the Secretary to "obtain accurate data on the number of citizens, non-citizens and illegal aliens in the country" that "could be relevant for the purpose of conducting the apportionment."

82. The July 21 Memorandum fails to observe, however, that Executive Order 13880 made no reference to *congressional* apportionment. Rather, the Order notes that it may be "open to States to design State and local legislative districts based on the population of voter-eligible citizens" as some courts have agreed that "*State* districting plans may exclude" ineligible voters.[28] There is absolutely no mention in the Order of any intention to, or basis for, excluding undocumented residents from the congressional apportionment base. Notably, an executive order "must cite the authority the president has to issue it," be it the "constitution, or a specific statute," while presidential memoranda "have no such requirement."[29]

83. Additionally, as discussed above, Executive Order 13880 did not create any new mechanism by which the Department of Commerce could collect accurate and precise data regarding the citizenship and immigration status of the country's residents. Instead, the Department must rely on the transmission of records from other agencies, which are necessarily incomplete, outdated, and non-exhaustive.

84. The July 21 Memorandum goes on to state that it is the policy of the United States to "exclude from the apportionment base aliens who are not in a lawful immigration status, under the Immigration and Nationality Act" as such a policy is "more consonant with the principles of representative democracy," as affording congressional representation and therefore formal political influence to states with populations of undocumented immigrants "undermines those principles." The Memorandum claims that increasing

---

[28] Collecting Information About Citizenship Status in Connection With the Decennial Census 84 Fed. Reg. 33821, 33823–24 (July 11, 2019), https://www.govinfo.gov/content/pkg/FR-2019-07-16/pdf/2019-15222.pdf

[29] Gregory Korte, *Presidential Memoranda vs. Executive Orders. What's the Difference?*, USA Today (Jan. 25, 2017 6:37 AM), https://www.usatoday.com/story/news/politics/onpolitics/2017/01/24/executive-order-vs-presidential-memorandum-whats-difference/96979014/

congressional representation based on the presence of undocumented residents would "create perverse incentives encouraging violations of Federal law," rewarding states "adopting policies that encourage illegal aliens to enter this country and that hobble Federal efforts to enforce the immigration laws." The Memorandum continues that the President has determined that "respect for the law and protection of the integrity of the democratic process warrant the exclusion of illegal aliens from the apportionment base."

85. Apart from a citation to the Immigration and Nationality Act, the entire "Policy" section of the July 21 Memorandum does not contain a single reference to any element of constitutional, statutory, or caselaw—nor any citation to any scholarly, social science, or other research.

86. The July 21 Memorandum then directs the Secretary of Commerce to take "all appropriate action, consistent with the Constitution and other applicable law," to, in preparing his report to the President under 13 U.S.C. § 141(b), provide "information permitting the President . . . to exercise the President's discretion to carry out the policy set forth" above.

87. Statements made by the White House following the release of the July 21 Memorandum do little to provide the document with a factual or legal basis. For example:

    a. In response to the fact that the text of the Fourteenth Amendment states that "Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed," a White House spokesperson replied that the

"phrase 'whole number of' is *not relevant* to the issue of who qualified as an 'inhabitant' of each state for purposes of apportionment."[30]

b.  In response to suggestions that the Presidential Memorandum casts considerable doubt on the Administration's insistence to the U.S. Supreme Court that the inclusion of a citizenship question on Census 2020 would bolster enforcement of the Voting Rights Act, a White House spokesperson said they were "two separate issues" and that the July 21 Memorandum "addresses the information the President wants in order to fulfill his statutory responsibility in determining apportionment."[31]

c.  In response to queries regarding how the July 21 Memorandum is lawful in light of the Supreme Court's ruling in *Plyler v. Doe* that there is no "plausible distinction with respect to Fourteenth Amendment 'jurisdiction' . . . between resident aliens whose entry into the United States was lawful and resident aliens whose entry was unlawful," a White House spokesperson responded that *Plyler* "simply addressed whether unlawfully present aliens are 'persons' within the meaning of the Fourteenth Amendment's Equal Protection Clause" and that such protection "does not require inclu[sion] in the apportionment base."

**There Exists No Accurate Measure to Count and Exclude the Number of Undocumented Residents from the Congressional Apportionment Base**

88. In addition to the indisputable fact that the Constitution and federal statutory law

preclude the exclusion of undocumented immigrants from the congressional

---

[30] Salvador Rizzo, *The Twists and Turns in Trump's Executive Order on Immigrants and the Census*, Wash. Post (July 24, 2020 12:00 AM), https://www.washingtonpost.com/politics/2020/07/24/twists-turns-trumps-executive-order-immigrants-census/
[31] *Id.*

apportionment base, the July 21 Memorandum and compliance thereto are administratively impossible.

89. The Department of Commerce does not at present have any tool, dataset, or mechanism for establishing, with accuracy and precision, the number of undocumented residents in the United States, such that they could be excluded from the congressional base.

90. Census 2020 did not contain a question regarding the citizenship of respondents or their households, or any questions regarding their immigration status.

91. As part of an ongoing lawsuit in the U.S. District Court for the District of Maryland challenging Executive Order 13880, Department of Justice Attorney Stephen Ehrlich told District Judge Paula Xinis that, with regard to producing as to the number of non-citizens, citizens, and undocumented immigrants in the country, Administration officials "don't have all the administrative records yet" and "haven't formulated a methodology for how we would do this and things of that nature," noting that there may be a need for "some statistical modeling."[32]

92. The American Community Survey (ACS), an ongoing yearly survey by the Census Bureau, does collect demographic information regarding citizenship, place of birth, and date of entry into the United States. However, the ACS uses sampling to construct its datasets; it is not and has never been a complete count of citizens and non-citizens.

93. Congress has also provided that information obtained "in any mid-decade census shall not be used for apportionment of Representatives in Congress among the several States, nor shall any such information be used in prescribing congressional districts." 13 U.S.C.

---

[32] Hansi Lo Wang, *Trump Sued Over Attempt To Omit Unauthorized Immigrants From a Key Census Count*, NPR (July 24, 2020 10:11 AM), https://www.npr.org/2020/07/24/894322040/trump-sued-for-attempt-to-omit-unauthorized-immigrants-from-a-key-census-count.

§ 141(e)(2). The Supreme Court has also been clear that the "proposed use of statistical sampling to determine population for purposes of apportioning congressional seats among the States violates the [Census] Act." *Dep't. of Com. v. U.S. House of Representatives*, 525 U.S. 316, 334 (1999).

94. Similarly, although Title 13 provides for the yearly collection of interim current data, which shall be used for the purpose of determining the amount of benefits received by state, county, or local governments, the statute also precludes the use of such interim current data with respect to any law providing that "only population or population characteristics data obtained in the most recent decennial census may be used in such determination." *Id.* § 183 (b).

95. Title 13 therefore prohibits utilizing information collected in other surveys administered by the Census Bureau, including data contained in ACS regarding citizenship and immigration, for congressional apportionment.

96. As noted by the Census Bureau in *Klutznick*, accurate methods to count undocumented residents "do not presently exist, and would take months to develop, if it could be done at all" and could not be developed in advance of the statutory deadline to transmit population data to Congress. 486 F. Supp. at 567; *see also id.* at 574 (noting that Census Bureau made a "convincing showing" that "neither the Census Bureau nor INS figures are accurate enough" to permit a calculation of the total number of undocumented residents "with any reasonable degree of accuracy").

97. Although the Census Bureau has pushed back several key deadlines because of the COVID-19 pandemic, such that census-taking is ongoing until the close of October 2020, the Bureau has yet to receive congressional permission for a four-month extension to the

current statutory deadline of December 21, 2020 for delivering the apportionment count to the President, as well as the deadline for redistricting data on March 31, 2021.[33]

98. Given that decennial census-taking is ongoing until October 2020 and the President's Memorandum was only issued on July 21, 2020, there is no time for the Department to develop and deploy any data-collection tool in time to meet the statutory deadline. *See id.* at 577 ("[W]e note that plaintiffs' complaint was filed only a few short months before the statutorily required date of the census, when any changes would inevitably result in disruption of the process, delay, and expense. Three years ago, Congress was advised of the subjects to be covered and two years ago it was provided the specific questions which would be asked. There would be no justification for our exercise of equitable powers to respond to plaintiffs' eleventh-hour challenge to those subjects and questions.").

**The July 21 Memorandum is Motivated by Racially Discriminatory Intent**

99. The July 21 Memorandum was promulgated with the intent of dissuading immigrant communities from completing Census 2020, in an effort to both reduce the political power of immigrant-rich communities, cities, and states and to prevent their access to federal financial resources. The July 21 Memorandum, and compliance thereto, form part of a conspiracy to violate the civil rights of immigrants of color, non-citizens, undocumented residents and foreign-born individuals.

100.    The July 21 Memorandum makes no mention of excluding other individuals who are ineligible to vote—including, for example, children under eighteen years of age— from the congressional apportionment base.

---

[33] Hansi Lo Wang, *The Coronavirus Crisis: 'We're Running Out of time': Census Turns to Congress to Push Deadlines*, NPR (May 27, 2020 6:03 PM), https://www.npr.org/sections/coronavirus-live-updates/2020/05/27/863290458/we-re-running-out-of-time-census-turns-to-congress-to-push-deadlines

101.     The July 21 Memorandum is but the latest in a lengthy series of attempts by Defendants to dissuade immigrants of color, non-citizens, undocumented residents and foreign-born individuals from completing Census 2020.

102.     President Trump and Secretary Ross have deliberately engaged in a pattern and practice of disenfranchising and discriminating against immigrants of color, non-citizens, undocumented residents and foreign-born individuals.

103.     For example, the Department of Commerce spent over a year arguing before multiple federal courts that it should be permitted to add a citizenship question to Census 2020, claiming that such a question could be used to support enforcement of the Voting Rights Act. This effort was challenged by a number of states, cities, and advocacy groups, which called it a "ruse to weaken the political power of heavily Democratic states with large immigrant populations."[34]

104.     As revealed by considerable evidence presented to the Southern District of New York, the Secretary of Commerce "was determined to reinstate" a citizenship question to Census 2020 "from the time he entered office; instructed his staff to make it happen; waited while Commerce officials explored whether another agency would request census-based citizenship data . . . and adopted the Voting Rights Act rationale late in the process." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2584 (2019).

105.     Writing for the majority in *Department of Commerce*, Chief Justice John Roberts called this alleged reason for seeking citizenship information in Census 2020 "contrived" and a "distraction," and affirmed the District Court's decision remanding the case to the agency. *Id*. at 2575-76.

---

[34] Rizzo, *supra* note 30.

106.     The determination to reinstate a citizenship question was motivated by a desire to depress responses by immigrant, non-citizen, foreign-born, or undocumented individuals or households.

107.     As revealed in evidence filed in federal court in May 2019, Thomas B. Hofeller, a longtime Republican strategist "played a crucial role in the Trump administration's decision to add a citizenship question to the 2020 census," following a 2015 study in which he concluded, as relevant here, that:

   a.   Without a citizenship question on the 2020 Census, the use of "citizen voting age population is functionally unworkable"; and

   b.    "A switch to the use of citizen voting age population as the redistricting population base for redistricting would be advantageous to Republicans and Non-Hispanic Whites."[35]

108.     Hofeller also wrote a "key portion" of a draft letter from the Department of Justice "claiming the [citizenship] question was needed to enforce the 1965 Voting Rights Act."[36]

109.     Christa Jones, who is now the Chief of Staff to the Director of the U.S. Census Bureau, also sent emails in 2015 to Hofeller inviting him to make comments on the Census Bureau's 2015 Content Test and noting this could be "an opportunity to mention citizenship as well."[37]

---

[35] *U.S. Dep't of Com. v. New York*, No. 18-cv-02921-JMF, Docket No. 587-1 Ex. D, at 9 (May 30, 2019) (Hofeller's study and accompanying exhibits), https://www.documentcloud.org/documents/6077735-May-30-2019-Exhibit.html#document/p63/a504019; *see also* Michael Wines, *Deceased G.O.P. Strategist's Hard Drives Reveal New Details on the Census Citizenship Question*, N.Y. Times (May 30, 2019), https://www.nytimes.com/2019/05/30/us/census-citizenship-question-hofeller.html
[36] Wines, *supra* note 35.
[37] *Kravitz v. U.S. Dep't of Com.*, 18-cv-01041-GJH, *Plaintiff's Reply in Further Support of their rule 60(B)(2) Motion for Relief from Final Judgment & Request for Indicative Ruling Under Rule 62.1(A)*, at 3 (June 14, 2019), https://www.commoncause.org/wp-content/uploads/2019/06/MD-Census-Filing.pdf

110.     There was considerable evidence demonstrating that a citizenship question would severely impact response rates[38]; indeed, three federal judges "separately found" in 2019 that adding the citizenship population would likely produce an undercount affecting states with large Latinx or immigrant populations.[39] *See also Dep't of Com.*, 139 S.Ct at 2565-66 (observing district court concluded that evidence established sufficient likelihood that citizenship question would "result in noncitizen households responding to the census at lower rates than other groups, which in turn would cause them to be undercounted").

111.     Throughout 2018 and the first half of 2019, Plaintiffs' organizing, outreach, and education efforts were considerably injured by the threat of the citizenship question. Plaintiffs repeatedly encountered members and other residents of Chelsea, Greater Boston, and Massachusetts as a whole who stated they would not participate in Census 2020 because they were afraid that responses to the citizenship question would be used to harm them. Confirming these firsthand accounts, *The Boston Globe* has reported that the effort to add a citizenship question "sent terror through immigrant communities already wary of sharing information with authorities."[40]

112.     Despite the U.S. Supreme Court's decision on June 27, 2019 in *Department of Commerce v. New York*, the President vowed to "fight on," claiming officials at the Department of Justice were at work to determine how to include a citizenship question on

---

[38] Matt Barreto et al., *Monkey Cage: New Research Shows Just How Badly a Citizenship Question Would Hurt the 2020 Census*, Wash. Post (Apr. 22, 2019 4:45 AM), https://www.washingtonpost.com/politics/2019/04/22/new-research-shows-just-how-badly-citizenship-question-would-hurt-census/ (collecting series of surveys and experiments showing that, for example, 7 to 10 percent of respondents nationally "would not respond to the census if it included a citizenship question").
[39] Rizzo, *supra* note 30.
[40] Zoe Greenberg, *Boston is usually undercounted in the census. This year may be worse,* The Boston Globe (Jul. 27, 2020).

the census, including the option of an executive order.[41] These statements caused additional fear and confusion for immigrant communities and advocates, including Plaintiffs and their members. That confusion lingered for months—in surveys conducted since the Supreme Court decision, the Latinx advocacy group NALEO found that "almost half of Latino respondents said they still thought the question would be included in census forms."[42]

113.    Finally, on July 11, 2019, President Trump held a Rose Garden ceremony where he announced that his administration was "not backing down on [their] effort to determine the citizenship status of the United States population," but that rather than add a question to Census 2020, he would instruct the government to "compile citizenship data from existing federal records instead."[43]

114.    To that end, the President signed EO 13880, *Executive Order on Collecting Information about Citizenship Status in Connection with the Decennial Status*, which commanded all federal agencies to provide the Department of Commerce the "maximum assistance permissible" in determining the "number of citizens, non-citizens, and illegal aliens in the country," for the purpose of, as relevant here, evaluating policies concerning public benefits programs,  developing a "more reliable count of the unauthorized alien

---

[41] Margaret Taley et al, *Trump Says Citizenship Query Is 'So Important for 2020 Census*, Bloomberg News (Jul. 4, 2019 5:44 AM), https://www.bloomberg.com/news/articles/2019-07-03/trump-vows-to-keep-census-fight-alive-after-supreme-court-loss.
[42] Lautaro Grinspan, *Immigrants' Fear of 2020 Census Could Cost Florida Billions in Federal Funding*, Miami Herald (Feb. 27, 2020 3:58 PM), https://www.miamiherald.com/news/local/immigration/article240622157.html; *see also* Macagnone, M*., Trump immigrant memo may cast 'long shadow' over census*, Roll Call (Jul. 22, 2020) (reporting ongoing census counting effort has been "complicated" by "lingering fears over Trump's failed attempt to add a citizenship question to the 2020 Census.").
[43] Katie Rogers et al, *Trump Says He Will Seek citizenship Information from Existing Federal Records, Not the Census*, N.Y. Times (Jul. 11, 2019), https://www.nytimes.com/2019/07/11/us/politics/census-executive-action.html.

population in the country," and providing citizenship data to states to "design State and local legislative districts based on the population of voter-eligible citizens."[44]

115.    This intertwining of citizenship status, immigration enforcement, and Census 2020 was intended to and had the effect of causing deep panic and confusion in immigrant communities. The Executive Order, and President Trump's rhetoric surrounding the census, undermined Plaintiffs' extensive advocacy and outreach aimed at convincing immigrant communities that the census was safe, easy, and confidential. By politicizing and weaponizing Census 2020, the President intended to deter immigrants of color, non-citizens, foreign-born residents, and undocumented individuals from filling out the survey, for fear the geographic and demographic data they provided would be linked to information about their citizenship or immigration status and target them for deportation, arrest, or detention.

116.    On August 14, 2019, the Department of Homeland Security (DHS) published the "Inadmissibility on Public Charge Grounds" final rule, that, as relevant here, redefines a "public charge" from someone "primarily dependent" on the government for subsistence to other non-citizens who receive common forms of federal and state assistance, even in small amounts and for a short period of time.

117.    Coalitions of states—including Massachusetts—municipalities, and advocacy groups filed lawsuits around the country to block the implementation of the public charge rule, citing considerable evidence—including declarations from healthcare organizations and community-based organizations and multiple social science reports—that the rule

---

[44] Collecting Information About Citizenship, supra note 28, at 33823.

was intended to and would chill participation in federal and state programs by non-citizens.[45]

118.     Promulgation of the public charge rule was a major component of the President and the Administration's anti-immigration agenda. As an example, in June 2018, White House Senior Advisor Stephen Miller emailed then-USCIS Director L. Francis Cissna calling the timeline of public charge "unacceptable" and stating Miller didn't care "what [Cissna] need to do to finish it on time."[46]

119.     As with the July 21 Memorandum, the public charge rule was intended to and had the effect of impacting states, cities, and communities with large numbers of immigrants of color, foreign-born residents, non-citizens, and undocumented individuals, by disincentivizing these individuals from providing any identifying information to local, state, or federal governments, for fear of negative impacts to their immigration status.[47]

120.     The public charge rule was intended to and has had the effect of chilling participation by immigrants of color, non-citizens, foreign-born residents, and undocumented individuals in Census 2020. Plaintiffs observed in the immigrant communities they serve that, as soon as the rule came into effect on February 24, 2020, immigrant families chilled from participating in public benefit programs expressed

---

[45] *See, e.g.,* Samantha Artiga et al., *Issue Brief: Estimated Impacts of the Estimated Impacts of Final Public Charge inadmissibility Rule on Immigrants and Medicaid Coverage*, The Henry J. Kaiser Family Foundation (Sept. 18, 2019), https://www.kff.org/disparities-policy/issue-brief/estimated-impacts-of-final-public-charge-inadmissibility-rule-on-immigrants-and-medicaid-coverage/ (stating rule could lead to Medicaid disenrollment rates ranging from 15 percent to 35 percent among Medicaid and CHIP enrollees living in mixed-status households, equating to between 2.1 and 4.9 million beneficiaries disenrolling from the programs).
[46] Ted Hesson, *Emails Show Miller Pressed Hard to Limit Green Cards*, Politico (Aug. 2, 2019 4:19 PM), https://www.politico.com/story/2019/08/02/stephen-miller-green-card-immigration-1630406.
[47] *See, e.g.,* Chinese for Affirmative Action, *Public Charge, Census Continues to Put Pressure on Our Communities*, CAA (Apr. 17, 2018), *https://caasf.org/2018/04/public-charge-census-continues-to-put-pressure-on-our-communities/* (noting that "anti-immigrant schemes by the Trump Administration will lead to even greater confusion and fear among immigrants and reduce participation in public services and hinder census accuracy).

immense wariness at providing sensitive personal information to the Census Bureau, for fear it would find its way into the hands of immigration authorities.

121.    Plaintiffs witnessed firsthand the extreme reluctance or outright refusal of immigrant families, especially undocumented individuals, to engage in any way with any kind of government program or activity. For example, the Chelsea Collaborative observed a significant downturn in members traveling to the Collaborative or related providers for assistance applying for benefits—even those that, like Women, Infants, and Children (WIC) or Residential Assistance for Families in Transition (RAFT) were not included in the public charge analysis. Residents reported they were fearful of sharing any identifying information with the federal government and expressed deep mistrust of the Census Bureau, citing the President's Executive Order, statements to the news media, and the public charge rule as evidence the census would be weaponized against them.

122.    In January 2020, the news media began to report that DHS had begun to share personal information with the Census Bureau from records "going back to as early as 1973," and including data such as noncitizens' full names, birth dates, addresses, Social Security numbers, alien registration numbers and travel histories.[48] The Department even sought permission to release "data about refugees and asylum seekers," even though these records are protected by federal law and cannot be shared without the individual's consent or a waiver.

123.    These reports provoked fresh terror amongst immigrant communities throughout Massachusetts. Plaintiffs directly witnessed immigrants of color, non-citizens, foreign-

---

[48] *See, e.g.,* Hansi Lo Wang, *To Produce Citizenship Data, Homeland Security To Share Records with Census*, NPR (Jan. 4, 2020 12:48 PM), https://www.npr.org/2020/01/04/793325772/to-produce-citizenship-data-homeland-security-to-share-records-with-census.

born residents, and undocumented residents repeat that they would not fill out Census 2020, as they were fearful that personal identifying information would be "matched up" with their immigration information and render them targets for immigration enforcement.

124.     These firsthand accounts parallel those observed by immigrant advocates across the country. In Fresno, California, for example, census outreach workers noted that many residents were "afraid to give information for the census . . . whether fearful for themselves or for immigrant members of their families," and that President Trump's "plan to use the census to identify noncitizens have heightened those fears."[49]

125.     Finally, the Trump Administration's decision to add two new political appointees to the Census Bureau has raised considerable concern among community-based organizations like Plaintiffs regarding "partisan interference" with Census 2020. One of the appointees, Adam Korzeniewski, served as a consultant to the political campaign of Joseph Saladino, a "social media personality known as 'Joey Salads,' who gained notoriety for staging prank videos, including racist depictions of Black people."[50]

126.     This decision is being reviewed by the Commerce Department Inspector General and the American Statistical Association have described the appointments as in "direct conflict with the bureau's mission," noting that the addition of two political appointees to a historically nonpartisan statistical agency "undermines the work of the Census Bureau and federal statistical agencies because of the lack of transparency and justification, as well as the perception—if not reality—of improper political influence."[51]

---

[49] Matt Smith & Lance Williams, *Fear of Census Undercount*, Reveal (Feb. 1, 2020), https://www.revealnews.org/article/fear-of-a-census-undercount/
[50] Hansi Lo Wang, *Trump Appointees Join Census Bureau; Democrats Concerned Over Partisan 'Games'*, NPR (June 23, 2020 10:51 PM), https://www.npr.org/2020/06/23/882433973/trump-appointees-join-census-bureau-democrats-concerned-over-partisan-games
[51] Gregory Wallace, *Government Watchdog Probing Controversial Census Hirings*, CNN (July 8, 2020 2:12 PM), https://www.cnn.com/2020/07/07/politics/census-inspector-general/index.html

127.     Taken together, these decisions by the Trump Administration were intended to and have had the effect of provoking immense fear, mistrust, and confusion in immigrant communities and chilling them from participating in Census 2020.

128.     As noted by Kenneth Prewitt, a former Census Bureau director who oversaw the 2000 census, Trump's actions—"from the citizenship question battle, to adding more political appointees to the agency, to [the July 21] order—may cast a 'long shadow over counting efforts."[52]

129.     The patently unlawful actions of the Trump Administration—up to and including the July 21 Memorandum—were intended to and have had the effect of provoking fear in immigrant communities that the Administration will disregard the confidentiality protections of Title 13 and utilize information gathered in Census 2020 to punish immigrant communities by depriving them of political representation and federal financial resources and targeting them for immigration enforcement.

**By Depressing Census Response Rates and Diminishing the Political Representation and Financial Resources for Immigrant Communities, Plaintiffs Are and Will Experience Injury**

130.     The unlawful and unconstitutional conduct outlined above has and will continue to cause injuries to Plaintiffs and their membership unless enjoined.

131.     As Hofeller noted in his 2015 study, removing undocumented immigrants from the congressional apportionment base will alienate Latinx voters and voters of color, while simultaneously diminishing the voting power of these groups.

---

[52] Macagnone, M., *Trump immigrant memo may cast 'long shadow' over census*, Roll Call (Jul. 22, 2020).

132.     As organizations and on behalf of their members, Plaintiffs have suffered dignitary harms as a result of ongoing efforts by President Trump and Secretary Ross to dilute and diminish their political representation and federal financial resources.

133.     According to the American Immigration Council, in 2016, the Commonwealth of Massachusetts was home to around 250,000 undocumented immigrants, comprising 22% of the immigrant population and 4% of the total state population.[53] Additionally, 233,035 Massachusetts residents, including 100,946 U.S. citizens, lived with "at least one undocumented family member" between 2010 and 2014.[54]

134.     According to the Center for Immigration Studies, the inclusion of all immigrants—including undocumented immigrants—in Census 2020 will be responsible for a shift of 26 House of Representatives seats, including an additional seat for Massachusetts.[55]

135.     Many of these residents live and work in communities served by Plaintiffs, including and especially Boston and Chelsea. The exclusion of these residents from the congressional apportionment base would result in the redrawing of congressional boundaries and the loss of significant financial resources in a manner that would harm Plaintiffs and the communities they serve.

### The Need for Immediate Declaratory and Injunctive Relief

136.     Plaintiffs' organizational missions have been and continue to be harmed by Defendants' actions in two key ways. First, the July 21 Memorandum has greatly undermined Plaintiffs' advocacy on behalf of Census 2020. By openly and publicly declaring

---

[53] American Immigration Council, *Fact Sheet: Immigrants in Massachusetts*, AIC (June 9, 2020), https://www.americanimmigrationcouncil.org/research/immigrants-in-massachusetts.
[54] *Id.*
[55] Camarota, Steven A. & Zeigler, Karen, *The impact of legal and illegal immigration on the apportionment of seats in the U.S. House of Representatives in 2020*, Center for Immigration Studies (Dec. 19, 2019).

that undocumented individuals do not and will not count, the Administration has greatly reduced the likelihood that immigrants of color, non-citizens, foreign-born citizens, and undocumented residents will complete Census 2020.

137.    Census-taking is ongoing and will not conclude until the end of October, reflecting a new timeline adopted by the Census Bureau in light of the COVID-19 pandemic.[56]

138.    Plaintiffs have witnessed these effects first-hand. For example, on July 24, 2020, Plaintiff HAU attempted to assist residents at a food pantry in Mattapan, a majority-minority neighborhood of Boston with a sizeable immigrant population, complete Census 2020 using Mobile Questionnaire Assistance, a nationwide operation in "low-responding areas to promote and assist with responding to the 2020 Census."[57] Numerous residents refused to participate, stating that they had heard about the July 21 Memorandum and saw no reason to complete the census.

139.    Similarly, the Chelsea Collaborative has been informed by multiple Chelsea residents and members that they will not complete Census 2020 because of the July 21 Memorandum. These residents emphasized that as they would not be counted by the Census Bureau, there was no reason to provide sensitive personal information to the federal government, as it could only be used to harm, not help, them.

140.    Plaintiffs' first-hand experiences are corroborated by news reports from across the country emphasizing that the July 21 Memorandum was "intended to discourage

---

[56] U.S. Census Bureau, *Important Dates*, United States Census 2020, https://2020census.gov/en/important-dates.html (last accessed July 25, 2020).
[57] U.S. Census Bureau, *2020 Census Mobile Questionnaire Assistance Overview*, U.S. Census Bureau (July 14, 2020), https://www.census.gov/library/fact-sheets/2020/dec/2020-mobile-questionnaire-assistance.html

participation" in Census 2020, not only by undocumented residents "but also by citizens who fear that participating would expose noncitizen family members to repercussions."[58]

141. Across Massachusetts, census self-response rates suggest "troubling disparities," as many of the Commonwealth's hardest-to-count communities, including Boston, Everett, Chelsea, and Lawrence, still "reeling from the coronavirus," threatening "serious undercounts in cities that need federal aid most." The July 21 Memorandum will "chill participation among immigrants" even further, furthering widening the gap between the counted and uncounted.[59]

142. Unless Defendants' actions are enjoined immediately, before the conclusion of census-taking, there will be an enormous undercount in the communities Plaintiffs serve. This undercount cannot be later remedied.

143. Second, because Plaintiffs' organizational missions are centered around the provision of support, advocacy, and resources to immigrant communities, the removal of undocumented immigrants from the apportionment base will reduce the federal financial resources directed to those communities through the over one hundred census-linked federal programs, including but not limited to WIC, Medicaid, Adult Education grants, career and

---

[58] NBC Boston, *Trump Signs Memo Barring Census from Counting Undocumented People*, NBC Boston (July 21, 2020 3:51 PM), https://www.nbcboston.com/news/national-international/trump-signs-memo-aimed-at-omitting-undocumented-immigrants-from-census-count/2163209/ (quoting history professor who noted that "like the citizenship question," the memorandum will "suck energy out of what the [Census] bureau is trying to do now, namely get the field enumeration going efficiently."); *see also* Todd J. Gillman et al., *Trump Order Excluding Undocumented Immigrants From Census Could Cost Texas a Seat in Congress*, Dallas Morning News (July 21, 2020 4:36 PM), https://www.dallasnews.com/news/politics/2020/07/21/new-trump-order-excluding-non-citizens-from-census-could-cost-texas-a-seat-in-congress/ (quoting Celia Cole, CEO of Austin-based Feeding Texas, who describing memorandum as a "scare tactic to keep the Texas immigrant community from getting the resources and political power it deserves").
[59] Zoe Greenberg, *Boston is usually undercounted in the census. This year may be worse,* The Boston Globe (Jul. 27, 2020).

technical education grants, English Language acquisition grants, and Section 8 housing assistance.[60] Plaintiffs rely upon these resources to carry out their missions.

144.     The COVID-19 pandemic has only highlighted the critical need for adequate, robust federal funding for low-income communities like Chelsea and Greater Boston, which have suffered immense economic harm. Without sufficient financial resources to support residents suffering from food, housing, and employment insecurity, these communities will be unable to recover from the pandemic.

145.     The harm stemming from this deprivation of critically-needed federal financial resources will continue for the next decade, until the next decennial census.

## CLAIMS FOR RELIEF

### Count I: Administrative Procedure Act, 5 U.S.C. § 706(2)(B)
### (Contrary to the Constitution)
### (As Against Department of Commerce)

146.     Plaintiffs reallege and incorporate by reference each and every allegation of the preceding paragraphs as if set forth fully herein.

147.     The APA prohibits final agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

148.     The Department of Commerce is an agency subject to the requirements of the APA. 5 U.S.C. § 701(b)(1).

149.     Compliance with the July 21 Memorandum is violative of Article I, Section 2 of the Constitution, as amended by Section 2 of the Fourteenth Amendment. The Constitution specifies that congressional apportionment must be based on a total count of

---

[60] Marisa Hotchkiss & Jessica Phelan, *Uses of Census Bureau Data in Federal Funds Distribution*, U.S. Census Bureau 1, 10 (Sept. 2017), https://www2.census.gov/programs-surveys/decennial/2020/program-management/working-papers/Uses-of-Census-Bureau-Data-in-Federal-Funds-Distribution.pdf.

all persons, not all citizens. The exclusion of undocumented immigrants is contrary to this centuries-old provision. In addition, the Department seeks to produce a tabulation of the population excluding undocumented immigrants with the purpose of discriminating against Plaintiffs and their members because of their race, national origin, or alienage. The Department's compliance with the July 21 Memorandum is thus contrary to constitutional right, power, privilege or immunity and therefore violates the APA.

150.     Plaintiffs suffered and will suffer permanent and irreparable injury unless the Department of Commerce is enjoined from complying with the July 21 Memorandum.

**Count II: Administrative Procedure Act, 5 U.S.C. § 706(2)(C)**
**(Excess of Lawful Authority)**
**(As Against Department of Commerce)**

151.     Plaintiffs reallege and incorporate by reference each and every allegation of the preceding paragraphs as if set forth fully herein.

152.     The APA prohibits final agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

153.     The Department of Commerce is an agency subject to the requirements of the APA. 5 U.S.C. § 701(b)(1).

154.     Presidential power is limited to the authority conferred on the President by Congress or the Constitution. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Constitution has accorded Congress the authority to conduct the decennial census in "such a Manner" as Congress "shall by Law direct." U.S. Const., art. I, § 2. In turn, pursuant to Title 13, Congress has delegated the duty of conducting the decennial census to the Secretary of Commerce. Neither Title 13 nor the Constitution

accord the President authority over the conduct of the census or the creation and tabulation of population data.

155.     The Secretary of Commerce will exceed his statutory authority over the conduct of the decennial census by complying with the July 21 Memorandum, thus improperly allowing the President to usurp the discretion delegated to the Secretary by Congress.

156.     As a result, the Department's compliance with the July 21 Memorandum is in excess of the Secretary's statutory jurisdiction, authority, or limitations, or short of statutory right, and therefore violates the APA and must be set aside.

157.     Plaintiffs suffered and will suffer permanent and irreparable injury unless the Department of Commerce is enjoined from complying with the July 21 Memorandum.

## Count III: Violation of Enumeration Clause
### (As Against All Defendants)

158.     Plaintiffs reallege and incorporate by reference each and every allegation of the preceding paragraphs as if set forth fully herein.

159.     The July 21 Memorandum and the Secretary of Commerce's compliance thereto directly contravene the Constitutional requirement to conduct an "actual Enumeration" of all persons in the United States for the purpose of congressional apportionment. U.S. Const., art. I, § 2.

160.     By declaring an intention to exclude undocumented residents from the congressional apportionment base and by complying with the unlawful memorandum, Defendants have chilled and will continue to chill immigrant participation in the ongoing 2020 Census.

161.     "Nothing is more existential to the preservation of the 'Republic' than requiring an 'actual Enumeration' without 'partiality or oppression.' " *NAACP v. Bureau of the Census*, 945 F.3d 183, 194 (4th Cir. 2019) (Gregory, C.J., concurring).

162.     Defendants have violated and are at imminent risk of violating the Enumeration Clause.

163.     Defendants' violation will lead to a severe undercount of immigrant communities and harm Plaintiffs and their membership. This violation will deprive Plaintiffs of their constitutional right to congressional representation and the share of federal financial resources to which they are entitled.

164.     Defendants' violation had caused and will continue to cause ongoing, irreparable harm to Plaintiffs.

## Count IV: Violation of 2 U.S.C. § 2a
### (As Against President Trump)

165.     Plaintiffs reallege and incorporate by reference each and every allegation of the preceding paragraphs as if set forth fully herein.

166.     2 U.S.C. § 2a(a) requires the President to transmit to Congress a "statement showing the whole number of persons in each State . . . as ascertained under the . . . decennial census" and the "number of Representatives to which each State would be entitled" by applying the method of equal proportions to that "whole number of persons."

167.     Nowhere in the text or legislative history of 2 U.S.C. § 2a is there any provision for the President to exercise his discretion to redefine which individuals may be counted in the congressional apportionment base. As the Supreme Court held in *Franklin*, this role is "admittedly ministerial in nature."

168.     By promulgating a Presidential memorandum stating an intention to exclude undocumented immigrants in the process of congressional apportionment, President Trump has stated his intention to violate 2 U.S.C. § 2a(a).

169.     This violation has caused and will continue to cause harm to Plaintiffs unless enjoined by this Court.

### Count V: Violation of 13 U.S.C. § 141(b)
### (As Against the Department of Commerce and Secretary Ross)

170.     Plaintiffs reallege and incorporate by reference each and every allegation of the preceding paragraphs as if set forth fully herein.

171.     13 U.S.C. § 141(b) required the Secretary of Commerce to transmit to the President the "tabulation of total population by States . . . as required for the apportionment of Representatives in Congress."

172.     Nowhere in the text or legislative history of 13 U.S.C. § 141 is there any provision for the Secretary to obey a directive from the President to transmit to the President any number other than the "total population by the States."

173.     By promulgating the July 21 Memorandum, the President has unlawfully commanded the Secretary of Commerce to violate 13 U.S.C. § 141(b).

174.     This violation has caused and will continue to cause harm to Plaintiffs unless enjoined by this Court.

### Count VI: Equal Protection Clause
### (As Against All Defendants)

175.     Plaintiffs reallege and incorporate by reference each and every allegation of the preceding paragraphs as if set forth fully herein.

176.     The Due Process Clause of the Fifth Amendment incorporates the equal protection principles of the Fourteenth Amendment. *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)).

177.     The promulgation of the July 21 Memorandum by the President and the compliance thereto by the Department of Commerce violates the Fifth Amendment because it is motivated by racial animus towards immigrants of color, non-US citizens, foreign-born individuals, and undocumented individuals.

178.     Defendants' violation has caused and will continue to cause harm to Plaintiffs.

**Count VII: Conspiracy to Violate Civil Rights under 42 U.S.C. § 1985(3)**
**(As Against All Defendants)**

179.     Plaintiffs reallege and incorporate by reference each and every allegation of the preceding paragraphs as if set forth fully herein.

180.     Motivated by racial animus towards immigrants of color, non-US citizens, foreign-born individuals, and undocumented individuals, the President and the Secretary of Commerce have conspired to collect citizenship and immigration data and produce a tabulation of the population excluding undocumented residents to reduce the political power and impair the civil rights of immigrants of color, non-US citizens, foreign-born individuals, and undocumented individuals.

181.     By taking the actions described herein, the President and Secretary of Commerce have conspired to deprive immigrants of color, non-US citizens, foreign-born individuals, and undocumented individuals of their right to equal protection of the laws in violation of 42 U.S.C. § 1985(3).

182.     Defendants' violations have caused and will continue to cause harm to Plaintiffs.

**PRAYER FOR RELIEF**

Plaintiffs respectfully ask the Court to:

(1)    Declare that the July 21, 2020 Presidential Memorandum is unconstitutional in violation of the Enumeration Clause and the Fourteenth Amendment;

(2)    Declare that any compliance with the July 21, 2020 Memorandum and order to the Census Bureau to produce tabulations of population data excluding undocumented residents for congressional apportionment by the Agency Defendants violates §§ 706(2) of the APA because it is contrary to constitutional power, right, privilege, or immunity and in excess of statutory jurisdiction and authority, and without observance of procedure required by law;

(3)    Enjoin the Agency Defendants from providing information permitting the President to exclude undocumented immigrants from the congressional apportionment base in the report of the tabulation of the total population by states to the President required under 13 U.S.C. § 141(b);

(4)    Award Plaintiffs their costs and reasonable attorneys' fees; and

(5)    Grant such further relief as the Court deems justice to require.

__/s/Lauren Sampson_____
Oren Sellstrom (BBO #569045)
Lauren Sampson (BBO #704319)
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(617) 988-0609
lsampson@lawyersforcivilrights.org

*Attorneys for Plaintiffs*

Dated: July 27, 2020