# **EXHIBIT 1**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| COMMON CAUSE, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | No. 1:20–cv–02023–CRC–GGK–DLF |

## DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT[*]

Pursuant to the Court's August 21, 2020, Minute Order, Defendants Donald J. Trump, the President of the United States; Wilbur L. Ross, Jr., the Secretary of Commerce for the United States; Steven Dillingham, the Director of the United States Census Bureau; the United States Department of Commerce; and the United States Census Bureau (collectively, "Defendants") respectfully: (i) move the Court to dismiss this action pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure; and (ii) request that the Court deny Plaintiffs' Motion for Partial Summary Judgment, or in the Alternative, Expedited Trial on the Merits (Doc. 31).

In support of this consolidated Motion and Opposition, Defendants submit the accompanying memorandum of law; a concise statement of genuine issues of material fact pursuant to Local Civil Rule 7(h)(1); and the declarations of John M. Abowd, Ph.D., and Albert E. Fontenot, Jr.

---

[*] This document is being filed twice, once as a motion and once as an opposition, pursuant to the Court's Civil ECF Filing Pointers, *available at* https://www.dcd.uscourts.gov/sites/dcd/files/CivilFilingPointers.pdf, ¶ 13.

For the reasons stated herein, Defendants respectfully request that the Court grant Defendants' Motion To Dismiss, dismiss this action, and deny Plaintiffs' Motion for Partial Summary Judgment, or in the Alternative, Expedited Trial on the Merits.

DATED: September 2, 2020                          Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

DIANE KELLEHER
BRAD P. ROSENBERG
Assistant Branch Directors

/s/ Elliott M. Davis
DANIEL D. MAULER
ELLIOTT M. DAVIS
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC 20005
Phone:   (202) 353-5639
Fax:       (202) 616-8470
E-mail:   elliott.m.davis@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMON CAUSE, *et al.*,

                Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

                Defendants.

No. 1:20–cv–02023–CRC–GGK–DLF

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION
# TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

BACKGROUND .......................................................................................................3

    A.    The Census and Apportionment Generally............................................3

    B.    The July 21, 2020, Presidential Memorandum .....................................4

    C.    Plaintiffs' Challenge ............................................................................5

ARGUMENT .............................................................................................................5

I.    THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER THIS
ACTION ...........................................................................................................5

    A.    Plaintiffs' Claims Are Not Ripe.............................................................5

        1.    It Is Currently Unknown What Numbers the Secretary May Report
to the President.............................................................................7

        2.    Other Considerations Underscore that Plaintiffs' Claims Are Not
Ripe ............................................................................................8

    B.    Plaintiffs Do Not Have Standing ........................................................11

        1.    Plaintiffs' Alleged Apportionment Injuries Are Too Speculative to
Confer Standing .........................................................................11

        2.    Plaintiffs' Allegations That the Presidential Memorandum Will
Reduce Participation in the 2020 Census Are Also Speculative,
Not Traceable to the Memorandum, and Not Redressable by a
Favorable Ruling ........................................................................13

        3.    Plaintiffs Lack Standing Based on Supposed Dignitary Harm .................17

        4.    The Organization Plaintiffs Fail To Establish Standing ...........................18

        5.    The City Plaintiffs Lack Standing.............................................................20

II.    PLAINTIFFS FAIL TO STATE A CLAIM ....................................................21

    A.    Plaintiffs Have Failed To State an Apportionment Clause Claim (Count I) .........22

        1.    Only "Inhabitants" Who Have Their "Usual Residence" in a State
Need Be Included in the Apportionment. ..................................23

2. The Executive Has Significant Discretion to Define Who Qualifies as an "Inhabitant." ...................................................................................27

3. The Apportionment Clause Does Not Require Inclusion of All Illegal Aliens as "Inhabitants" Having a "Usual Residence" in a State ..............................................................................................................31

B. Plaintiffs Have Failed To State an Equal Protection Claim for Vote Dilution and Representational Injury (Count II) ......................................................38

C. Plaintiffs Have Failed To State an Equal Protection Claim for Invidious Discrimination (Count III) .....................................................................................41

D. Plaintiffs Have Failed To State an *Ultra Vires* Claim (Count IV) .........................43

E. Plaintiffs Have Failed To State a Claim for Lack of "Actual Enumeration" or Unlawful Statistical Sampling (Count V) ........................................................47

1. Plaintiffs' Enumeration Clause Claim Fails as a Matter of Law ..............47

2. Plaintiffs Do Not Plausibly Allege a Claim for Unlawful Statistical Sampling .....................................................................................................48

3. In All Events, Plaintiffs Are Not Entitled To Partial Summary Judgment on Their Unlawful Statistical Sampling Claim .........................48

F. Plaintiffs' Demands for Relief Against the President Must Be Dismissed ..........49

III. PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF.................................49

A. Plaintiffs Cannot Establish Any Imminent and Irreparable Harm .......................50

1. Plaintiffs Cannot Establish Any Irreparable Apportionment Injury .........51

2. Plaintiffs' Allegations of Enumeration Injury Do Not Withstand Scrutiny .......................................................................................................52

B. The Remaining Factors Weigh Against an Injunction...........................................56

CONCLUSION ..................................................................................................................................56

# INTRODUCTION

Plaintiffs—seven non-profit organizations ("Organization Plaintiffs"), four U.S. cities ("City Plaintiffs"), and 24 individuals ("Individual Plaintiffs")—bring constitutional and statutory challenges to a memorandum that the President issued on July 21, 2020, titled Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census (the "Presidential Memorandum" or "Memorandum"), 85 Fed. Reg. 44,679 (July 21, 2020). The Memorandum provides that for purposes of reapportionment of Representatives in Congress following the 2020 census, "it is the policy of the United States to exclude" illegal aliens from the apportionment base "to the extent feasible and to the maximum extent of the President's discretion under the law." *Id.* at 44,680. It directs the Secretary of Commerce to submit to the President two sets of numbers in connection with the apportionment— one set of numbers follows the methodology set forth in the Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5,525 (Feb. 8, 2018) ("Residence Criteria"), and the second, "to the extent practicable," would provide information permitting the President to exclude illegal aliens from the apportionment base.

As a threshold matter, this Court lacks subject-matter jurisdiction over Plaintiffs' claims both because the claims are not ripe and because Plaintiffs lack standing to challenge the Presidential Memorandum. Plaintiffs' alleged injuries, including lost representation in Congress, decreased federal funding, and diversion of resources, are speculative. At this point it is unknown what numbers the Secretary of Commerce will provide the President. Accordingly, any allegation as to the impact of the President's apportionment decision on matters such as congressional representation or federal funding is wholly theoretical and legally insufficient to meet the ripeness and standing requirements. Plaintiffs' allegations that the Presidential Memorandum will significantly chill immigrant communities' participation in the census and that it causes "dignitary harm" to those communities likewise are speculative and conclusory. Finally, the Organization Plaintiffs have established neither organizational

nor associational standing, and the City Plaintiffs cannot assert standing on their own behalves or as *parens patriae*. The Court should therefore dismiss all of Plaintiffs' claims pursuant to Rule 12(b)(1) for lack of ripeness and standing.

In addition to these jurisdictional defects, Plaintiffs' claims are subject to dismissal for failure to state a claim pursuant to Rule 12(b)(6). Plaintiffs assert that the Presidential Memorandum violates the Apportionment Clauses of Article I and the Fourteenth Amendment, the Enumeration Clause, principles of equal protection under the Fifth and Fourteenth Amendments, 13 U.S.C. §§ 141 and 195, and 2 U.S.C. § 2a. Each of these claims fails as a matter of law.

First, Plaintiffs' claims under the Apportionment Clauses, the Enumeration Clause, 13 U.S.C. § 141, and 2 U.S.C. § 2a, are legally deficient, because they are inconsistent with the Executive Branch's longstanding discretion to define who qualifies as "inhabitants" (or "persons in each State") for purposes of apportionment. Second, Plaintiffs' equal protection claim based on purported discrimination fails because Plaintiffs mischaracterize the Presidential Memorandum and do not plausibly allege "animus" or "discriminatory intent." Third, Plaintiffs' equal protection claim based on supposed vote-dilution and representational injury is not adequately pled, and in any event is premised on the *intrastate* apportionment standard that has no application to *interstate* apportionment determinations. Fourth, Plaintiffs' claim that Defendants might resort to statistical sampling in violation of 13 U.S.C. § 195, is entirely speculative. And finally, insofar as Plaintiffs seek declaratory or injunctive relief against the President, such relief is precluded by Supreme Court precedents barring judicial intrusion on the President's exercise of policy-making discretion and D.C. Circuit case law.

For the same reasons that their complaint must be dismissed, Plaintiffs are not entitled to either partial summary judgment or injunctive relief. Plaintiffs cannot succeed on their claims because their claims are both jurisdictionally flawed *and* devoid of merit. And even if Plaintiffs had standing to bring these actions, which they do not, they have failed to plausibly assert a threat of imminent

irreparable harm from the Memorandum. Accordingly, if the Court declines to grant Defendants' Motion to Dismiss, it should deny Plaintiffs' Motion for Partial Summary Judgment and reject Plaintiffs' claims for injunctive relief.

## BACKGROUND

### A.  The Census and Apportionment Generally

The Constitution provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State." U.S. Const. amend. XIV, § 2. To make apportionment possible, the Constitution requires that the federal government conduct a census every ten years in such a manner as directed by Congress. *Id.* art. I, § 2, cl. 3. Each State's number of Representatives, together with its two Senators, also determines the number of electors for President and Vice President in the Electoral College. *See id.* art. II, § 1, cl. 2.

Congress, in turn, has by law directed the Secretary of Commerce to conduct a census of the "total population" every 10 years "in such form and content as he may determine." 13 U.S.C. § 141(a) and (b). The Census Bureau assists the Secretary of Commerce in the performance of this responsibility. *See* 13 U.S.C. §§ 2, 4. For purposes of the 2020 census, the Census Bureau has announced that field data collection will end on September 30, 2020. *See* August 3, 2020, Statement from U.S. Census Bureau Director Steven Dillingham ("Director Dillingham"): Delivering a Complete and Accurate 2020 Census Count, https://www.census.gov/newsroom/press-releases/2020/delivering-complete-accurate-count.html ("August 3, 2020, Dillingham Statement") (last visited Sept. 1, 2020). According to Director Dillingham, the Census Bureau will take various actions, such as increasing training and providing awards to census takers who maximize the hours worked, to "improve the speed of [the] count without sacrificing completeness." *Id.* The Census Bureau "intends to meet a similar level of household responses as collected in prior censuses, including outreach to hard-to-count communities." *Id.*

3

The Census Bureau has promulgated criteria to count each person for census purposes "at their usual residence, which is the place where they live and sleep most of the time." Residence Criteria, 83 Fed. Reg. at 5,533. Following completion of the 2020 census, by December 31, 2020, the Secretary of Commerce must submit to the President "[t]he tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States." 13 U.S.C. § 141(b). "On the first day, or within one week thereafter, of the first regular session of the [117th] Congress," the President must "transmit to the Congress a statement showing the whole number of persons in each State . . . and the number of Representatives to which each State would be entitled . . . by the method known as equal proportions." 2 U.S.C. § 2a(a).

### B.    The July 21, 2020, Presidential Memorandum

On July 21, 2020, the President issued a Memorandum to the Secretary of Commerce regarding the exclusion of illegal aliens from the apportionment base following the 2020 census. *See* Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census, 85 Fed. Reg. 44,679, 44,679-81 (July 21, 2020). The Presidential Memorandum states that "it is the policy of the United States to exclude" such aliens from the apportionment base "to the extent feasible and to the maximum extent of the President's discretion under the law." *Id.* at 44,680. The Presidential Memorandum directs the Secretary of Commerce to submit to the President two tabulations. One is an enumeration "tabulated according to the methodology set forth in" the Residence Criteria. *Id.* The second calls for "information permitting the President, to the extent practicable," to carry out the stated policy, i.e., an apportionment excluding illegal aliens. *Id.*

To date, the Census Bureau is still evaluating the usability of administrative records pertaining to citizenship status in connection with the decennial census, *see* Exec. Order No. 13880, 84 Fed. Reg. 33,821, 33,821-25 (July 11, 2019), and formulating a methodology for potentially excluding illegal aliens. *See* August 3, 2020, Dillingham Statement ("The Census Bureau continues its work on meeting

4

the requirements of Executive Order 13,880 issued July 11, 2019 and the Presidential Memorandum issued July 21, 2020.  A team of experts [is] examining methodologies and options to be employed for this purpose.  The collection and use of pertinent administrative data continues.").

### C.      Plaintiffs' Challenge

On July 23, 2020, two of the Organization Plaintiffs, two of the City Plaintiffs, and eight of the Individual Plaintiffs filed a complaint challenging the Presidential Memorandum.  Doc. 1. Plaintiffs amended the complaint on August 11, 2020, alleging that the Presidential Memorandum violates the Apportionment Clauses of Article I and the Fourteenth Amendment, the Enumeration Clause, principles of equal protection under the Fifth and Fourteenth Amendments, 13 U.S.C. §§ 141 and 195, and 2 U.S.C. § 2a.  *See generally* Doc. 28 ("Am. Compl.").  Plaintiffs seek declaratory and injunctive relief.  *See id.*

On August 19, 2020, Plaintiffs moved the Court for partial summary judgment on their claims based on the Apportionment Clauses, the Enumeration Clause, 13 U.S.C. §§ 141 and 195, and 2 U.S.C. § 2a.  Doc. 31-1 ("Pl. Mem.")  As explained below, the Court lacks subject-matter jurisdiction over this action, Plaintiffs fail to state a single claim, and Plaintiffs are not entitled to injunctive relief.  For these reasons, the Court should dismiss this action and deny Plaintiffs' motion for partial summary judgment.

## ARGUMENT

## I.      THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER THIS ACTION

### A.      Plaintiffs' Claims Are Not Ripe

"The ripeness doctrine generally deals with when a federal court can or should decide a case." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012).  The ripeness doctrine "is designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial

interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). Claims are "not ripe for adjudication" if they "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).[1] Ripeness "is a threshold inquiry that does not involve adjudication on the merits and which may be addressed prior to consideration of other Article III justiciability doctrines." *In re Aiken Cnty.*, 645 F.3d 428, 434 (D.C. Cir. 2011).

Ripeness incorporates both a constitutional requirement and a prudential requirement. *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010); *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). The constitutional requirement "is subsumed into the Article III requirement of standing, which requires a petitioner to allege *inter alia* an injury-in-fact that is 'imminent' or 'certainly impending.'" *Am. Petroleum Inst.*, 683 F.3d at 386. And in evaluating the prudential requirement, courts should consider: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 733; *see also Nat'l Treasury Emps.' Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996) ("In testing whether the facts of a particular case meet [the prudential] standard of ripeness, we have often applied a two-part analysis, evaluating [1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration.").

Here, Plaintiffs' claims do not meet the constitutional requirement for ripeness because their claims are, at bottom, about apportionment, not census procedures—and any alleged apportionment

---

[1]     Unless expressly included, all internal quotation and alteration marks and citations have been omitted.

injury that any Individual Plaintiff, any resident of the City Plaintiffs, and any member of the Organization Plaintiffs may or may not suffer is at this point "contingent," not "imminent."

1.    <em>It Is Currently Unknown What Numbers the Secretary May Report to the President</em>

The Presidential Memorandum states that "it is the policy of the United States to exclude" illegal aliens from the apportionment base "*to the extent feasible* and to the maximum extent of the President's discretion under the law." 85 Fed. Reg. at 44,680 (emphasis added). It directs the Secretary of Commerce to provide two sets of numbers—one tabulated "according to the methodology set forth in" the Residence Criteria for counting everyone at their usual residence, and a second "permitting the President, *to the extent practicable*," to carry out the stated policy of excluding illegal aliens from the apportionment base. *Id.* (emphasis added). The Memorandum also states that it "shall be implemented *consistent with applicable law*." *Id.* (emphasis added).

The extent to which it will be feasible for the Census Bureau to provide the Secretary of Commerce a second tabulation is, at this point, unknown. *See* Decl. of John M. Abowd, Ph.D (Sept. 1, 2020) ("Abowd Sept. Decl.") ¶ 11. As Director Dillingham recently publicly stated, the Census Bureau is still evaluating the usability of administrative records pertaining to citizenship status in connection with the decennial census and formulating a methodology for potentially excluding illegal aliens. *See* August 3, 2020, Dillingham Statement. Indeed, Plaintiffs themselves allege that "[c]onducting an 'actual Enumeration' of undocumented immigrants as part of the 2020 census is not possible" and that "Defendants do not possess any other data, gathered outside the 2020 census process, which constitutes an 'actual enumeration' of the immigration status of every person living in the United States." Am. Compl. ¶¶ 125-126.

Even more speculative is Plaintiffs' claim that Defendants will rely on unlawful statistical sampling to enumerate the illegal alien population. *Id.* ¶¶ 203-210. Plaintiffs simply hypothesize, "on information and belief," that in the absence of an actual enumeration, Defendants might resort to

unlawful statistical sampling.  *Id.* ¶ 128.  But Plaintiffs ignore that the Presidential Memorandum itself directs that it "shall be implemented consistent with applicable law," 85 Fed. Reg. at 44,680, which law necessarily includes the general prohibition on statistical sampling in the apportionment context, *see* 13 U.S.C. § 195.  In all events, as Plaintiffs' admittedly speculative concerns about unlawful statistical sampling "might actually never arise" (and in fact, will never arise, *see* Abowd Sept. Decl. ¶ 14),[2] their claim for unlawful statistical sampling "is not ripe for judicial review."  *Balt. Gas & Elec. Co. v. United States*, 817 F.2d 108, 118 n.12 (D.C. Cir. 1987).

In sum, because it is not known what the Secretary may ultimately transmit to the President, it is necessarily not yet known whether the President will be able to exclude some or all illegal aliens from the apportionment base.  As a result, Plaintiffs' apportionment claims are unripe as they "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300.  Put simply, until the Census Bureau and Secretary of Commerce transmit the information specified in the Presidential Memorandum, and until the President acts on the information, any claim of apportionment injury is speculative.

### 2. *Other Considerations Underscore that Plaintiffs' Claims Are Not Ripe*

Given that the effects of the Presidential Memorandum and any apportionment injuries to Plaintiffs are at this point unknown, other considerations, such as the hardship to the parties and the fitness of the issues for judicial consideration, also counsel against the Court's exercise of jurisdiction. *Nat'l Treasury Emps.' Union*, 101 F.3d at 1431.  For example, given the above-discussed uncertainties with respect to the effects of the Presidential Memorandum, delayed review would not cause undue

---

[2]     As discussed below, *infra* Part II.E.3, the Chief Scientist and Associate Director for Research and Methodology at the United States Census Bureau has submitted a declaration stating that "any methodology or methodologies ultimately used by the Census Bureau to implement the" Presidential Memorandum "will not involve the use of statistical sampling for apportionment purposes."  Abowd Sept. Decl. ¶ 14.

hardship to Plaintiffs. *See, e.g.*, *Ohio Forestry Ass'n*, 523 U.S. at 733-34 (challenge to agency action unripe where there is no "significant practical harm" at the present time because a number of future actions would need to occur to make the harm more "imminent" and "certain"); *Texas*, 523 U.S. at 300, 302 (claim unripe where a number of actions would need to occur to cause the alleged harm, rendering it "too speculative whether the problem . . . will ever need solving"). Further, judicial review would inappropriately interfere with the Census Bureau's ongoing process by "hinder[ing] agency efforts to refine its policies" and "to apply its expertise." *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 735-36. Finally, the Court would benefit from further real-world factual development. *See, e.g.*, *id.* at 736 (action was unripe where it would require court to engage in "time-consuming judicial consideration . . . of an elaborate, technically based plan, which predicts consequences that may affect many different parcels of land in a variety of ways," involved issues that could change in the future, and "depending upon the agency's future actions . . . review now may turn out to have been unnecessary"). The actual tabulations that are called for by the Memorandum must be reported by no later than the end of this year, assuming the statutory deadlines in § 141 and § 2a are not extended by Congress.

Perhaps unsurprisingly, census and apportionment cases generally are decided post-apportionment, when census enumeration procedures are no longer at issue and the actual apportionment figures are known. *See, e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 790-91 (1992) (challenging allocation of Department of Defense's overseas employees to particular states following census); *Dep't of Commerce v. Montana*, 503 U.S. 442, 445-46 (1992) (challenging method of equal proportions to determine representatives); *Utah v. Evans*, 536 U.S. 452, 458-59 (2002) (challenging sampling method known as "hot-deck imputation" used by Census Bureau after analyzing census figures); *Wisconsin v. City of New York*, 517 U.S. 1, 4 (1996) (challenging decision not to use particular statistical adjustment to correct an undercount).

Plaintiffs represent that "Congress found that 'it would be impracticable for . . . the courts of the United States to provide[] meaningful relief after [the census] has already been conducted.'" Pl. Mem. at 13-14 (alterations as in Plaintiffs' brief) (quoting Departments of Commerce, Justice, and State, The Judiciary, and Related Agencies Appropriations Act, 1998, § 209(a)(8), Pub. L. No. 105-119, 111 Stat. 2440, 2481-82 (1997) (codified at 13 U.S.C. § 141 note) ("1998 Appropriations Act")). But Plaintiffs' selectively excerpted and altered quotation omits crucial context. In truth, Congress stated that if "the *decennial enumeration* . . . is conducted in a manner that does not comply with" constitutional and statutory law, "it would be impracticable for . . . the courts of the United States to provide[] meaningful relief after *such enumeration* has been conducted." 1998 Appropriations Act § 209(a)(8) (emphases added). Plaintiffs are not challenging the enumeration procedures themselves, but only the hypothetical apportionment that might result from actions that might be taken pursuant to the Presidential Memorandum. *See, e.g.*, Am. Compl. ¶¶ 176-180. Consistent with *Franklin*, *Montana*, *Evans*, and *Wisconsin*, Plaintiffs' challenge should await the actual apportionment.

Plaintiffs' other argument—that "challenges to statistical methods employed in the census [should] be resolved as early as possible," Pl. Mem. at 13—fails for the same reason. Congress's concern, as reflected in the 1998 Appropriations Act, was that "the use of statistical sampling or statistical adjustment in conjunction with an actual enumeration to carry out the census . . . poses the risk of an inaccurate, invalid, and unconstitutional census." 1998 Appropriations Act § 209(a)(7). No such concern exists here because: (i) the Presidential Memorandum does not affect the conduct of the census, and (ii) the Presidential Memorandum *also* instructs the Secretary to provide the tabulation that follows the methodology set forth in the Residence Criteria. 85 Fed. Reg. at 44,680. In any event, as explained below, *infra* Part II.E, Plaintiffs have not adequately stated an unlawful-statistical sampling claim and, even if they had, the Chief Scientist and Associate Director for Research and Methodology at the United States Census Bureau has declared that "any methodology or methodologies ultimately

used by the Census Bureau to implement the" Presidential Memorandum "will not involve the use of

statistical sampling for apportionment purposes." Abowd Sept. Decl. ¶ 14.

### B. Plaintiffs Do Not Have Standing

For similar reasons, Plaintiffs lack standing to pursue their claims. The doctrine of standing

requires a plaintiff to establish three elements: (i) a concrete and particularized injury-in-fact, either

actual or imminent; (ii) a causal connection between the injury and defendants' challenged conduct,

such that the injury is "fairly traceable to the challenged action of the defendant"; and (iii) a likelihood

that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

560-61 (1992). The standing inquiry is "especially rigorous when reaching the merits of the dispute

would force [the court] to decide whether an action taken by one of the other two branches of the

Federal Government was unconstitutional." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

Plaintiffs bear the burden of establishing the required elements of standing. *Defs. of Wildlife*, 504 U.S.

at 561. And in bearing that burden, they "cannot rest on abstract or conclusory assertions of injury,

but must point to specific, concrete facts demonstrating harm." *Twin Rivers Paper Co. LLC v. SEC*,

934 F.3d 607, 612-13 (D.C. Cir. 2019). None of Plaintiffs' alleged injuries satisfy these requirements.

### 1. *Plaintiffs' Alleged Apportionment Injuries Are Too Speculative to Confer Standing*

The standing requirement of "injury in fact" requires an allegation that the plaintiff "has

sustained or is immediately in danger of sustaining a direct injury" as a result of the challenged action.

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016). The injury or threat of injury must be "concrete

and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Defs. of Wildlife*, 504

U.S. at 560. Thus, an alleged future injury must be "'certainly impending,' *or* there is a 'substantial risk'

that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*,

568 U.S. at 409 n.5). "'Allegations of possible future injury' are not sufficient." *Clapper*, 568 U.S. at

409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). And "[w]hen considering any chain of

allegations for standing purposes, [courts] may reject as overly speculative those links which are predictions of future events." *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015).

As discussed above, *see supra* Part I, Plaintiffs' alleged apportionment injuries are speculative and conclusory, and at this point in time, there is no "substantial risk" that harm will occur. *See Susan B. Anthony List*, 573 U.S. at 158. Despite the fact that the Presidential Memorandum states that it should be implemented (i) "to the extent feasible", and (ii) "consistent with applicable law," 85 Fed. Reg. at 44,680; Plaintiffs simply speculate: (i) that the Census Bureau will be able to provide the Secretary of Commerce a second tabulation, and (ii) in so doing, the Bureau (or the Department of Commerce) will—contrary to the Presidential Memorandum—violate the law in doing so. For these reasons, any supposed apportionment injury to Plaintiffs—be it in the form of loss of a Representative, loss of funding, or otherwise—is conjectural or hypothetical. *Defs. of Wildlife*, 504 U.S. at 560.

Plaintiffs argue that at least one Individual Plaintiff or unnamed Common Cause member will be "expected to lose a House seat if the Memorandum is implemented." Pl. Mem. at 10. But the expert report undergirding that analysis is premised on the speculative notion that *all* illegal aliens will be excluded from the apportionment base. *E.g.*, Warshaw Decl., Doc. 31-23, ¶ 12. In reality, it remains to be seen the extent to which the Census Bureau will be able to provide the Secretary of Commerce a second tabulation. *See* Abowd Sept. Decl. ¶ 11. Because "none of the plaintiffs" in this case "are able to allege that the weight of his or her vote in the next decade will be affected by the . . . apportion[ment] [of] congressional seats," "granting standing in this case would involve resting the requirement of injury in fact on speculation and conjecture." *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 570-71 (D.D.C. 1980) (three-judge court) ("*FAIR*"), *appeal dismissed*, 447 U.S. 916 (1980).

2. *Plaintiffs' Allegations That the Presidential Memorandum Will Reduce Participation in the 2020 Census Are Also Speculative, Not Traceable to the Memorandum, and Not Redressable by a Favorable Ruling*

Plaintiffs also allege that the Presidential Memorandum is "suppressing the census response rate among immigrant communities," which supposed suppression "will lead . . . to a number of secondary injuries, such as the loss of federal and state financial grants . . . and additional vote dilution." Am. Compl. ¶¶ 152-167. These alleged injuries are far too speculative to establish standing. And they are neither traceable to the Memorandum nor redressable by a favorable ruling from this Court.

(a) Plaintiffs' Alleged Enumeration Injuries Are Too Speculative to Confer Standing

As Judge Furman recently explained in nearly identical litigation in the Southern District of New York, "the Presidential Memorandum does not purport to change the conduct of the census itself[;] [i]nstead, it relates to the calculation of the apportionment base used to determine the number of representatives to which each state is entitled." *New York v. Trump*, No. 1:20-cv-05770-JMF, Doc. 68 at 2 (S.D.N.Y. Aug. 7, 2020). There is, facially, no reason why the Memorandum should have any effect on census response rates. To the contrary, as explained by the Census Bureau's Associate Director for Decennial Census Programs, Albert E. Fontenot, Jr., the Census Bureau's enumeration is almost complete, and the Memorandum does *not* affect how the Census Bureau is conducting its remaining enumeration operations or "the Census Bureau's commitment to count each person in their usual place of residence." Decl. of Albert E. Fontenot, Jr. ("Fontenot Decl.") ¶¶ 7, 12.

In support of their allegations, Plaintiffs cite five news articles reporting the opinions of a Philadelphia politician; the Southern Poverty Law Center; unnamed "[m]embers of the North Carolina's Latino community"; officers of an Arkansas immigrant-advocacy group; and unnamed "critics." Am. Compl. ¶ 154 n.27. But even these opinions are far from concrete. As Plaintiffs acknowledge, the Arkansas group's officers would only go so far as to say that "'the president's memo will *potentially* scare immigrant communities from taking part' in the census count." *Id.* (emphasis

added).  And although Plaintiffs attached six declarations of naturalized citizens, *see* Docs. 31-5, 31-14, 31-15, 31-17, 31-18, 31-22, none of those declarants stated that they would not participate in the census on account of the Presidential Memorandum.

In all events, Plaintiffs' alleged undercount-related injuries require assuming each of the following steps:  (i) that the July 21, 2020 Presidential Memorandum will deter a significant percentage of legal immigrants and illegal aliens from participating in the census; (ii) that this supposed lack of participation will materially degrade the census data; and (iii) that this assumed material degradation will result in an appreciable effect on apportionment, redistricting, and funding.  "Although the court must assume the truth of" Plaintiffs' "factual allegations regarding standing, 'allegations that are really predictions' may be rejected as overly speculative."  *Ineos USA LLC v. FERC*, 940 F.3d 1326, 1329 (D.C. Cir. 2019) (quoting *Arpaio*, 797 F.3d at 21).  The Court should do so here.

In fact, actual data suggest that Plaintiffs' unsupported speculation is, in fact, unfounded.  After the Supreme Court issued its opinion in the citizenship question litigation, the Census Bureau published the results of a randomized controlled trial that found *no* statistically-significant depression of response rates for households that received a test questionnaire containing a citizenship question.  *See* Decl. of John M. Abowd, Ph.D (Aug. 19, 2020), attached as Ex. A to Abowd Sept. Decl. ("Abowd Aug. Decl.") ¶ 13; *see also 2019 Census Test Report,* Census Bureau (Jan. 3, 2020), https://www2.census.gov/programs-surveys/decennial/2020/program-management/census-tests/2019/2019-census-test-report.pdf ("Census Test Report").  That study contained a sample of 480,000 housing units, and was "capable of detecting response differences as small as 0.5 percentage points."  *See* Abowd Aug. Decl. ¶ 13.  Overall, "[t]he test questionnaire with the citizenship question had a self-response rate of 51.5 percent; [while] the test questionnaire without the citizenship question had a self-response rate of 52.0 percent."  Census Test Report at ix.  And while some narrow subgroups exhibited statistically-significant lower self-response rates, *id.* at x, the Census Bureau

14

concluded that "[c]urrent plans for staffing for Nonresponse Followup would have sufficiently accounted for subgroup differences seen in this test." *Id.*; *see generally* Abowd Aug. Decl. ¶ 13.  As Dr. Abowd reports, this new finding illustrates the benefit of a randomized controlled design, which properly isolates the independent variable (there, the citizenship question) and measures its effects. Abowd Aug. Decl. ¶ 13.

> (b)  The Alleged Chilling Effect Is Not Traceable to the Memorandum

Plaintiffs also must establish "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  "Where traceability . . . depend[s] on the conduct of a third party not before the court, standing is not precluded, but it is ordinarily substantially more difficult to establish."  *Competitive Enter. Inst. v. FCC*, -- F.3d --, 2020 WL 4745272, at *5 (D.C. Cir. Aug. 14, 2020).  Indeed, "the injury has to be fairly traceable to the challenged action of the defendant, and *not* the result of the independent action of some third party not before the court."  *Defs. of Wildlife*, 504 U.S. at 560 (emphasis added).

Here, however, any diminution in census response rates cannot be said to be traceable to the Presidential Memorandum itself.  Unlike the scenario presented in the litigation over the placement of a citizenship question on the census form, the Presidential Memorandum is not directed to census respondents and does not relate to the actual conduct of the census.  Thus, to the extent that Plaintiffs' alleged diminution in census response rates actually occurs, that diminution would be caused—not by the Presidential Memorandum itself—but instead by the publicization of the interpretations and views of politicians and special-interest groups, such as those highlighted in Plaintiffs' amended complaint. Am. Compl. ¶ 154 n.27.  How those sources interpret the Memorandum should not be dispositive of the Memorandum's effects.  Put another way, the alleged injuries here depend on "a chain of causation" with multiple "discrete links, each of which 'rest[s] on [the plaintiffs'] highly speculative fear that governmental actors" would exercise their "discretion in a [] way" that would adversely affect Plaintiffs.

*See New York v. Dep't of Commerce*, 315 F. Supp. 3d 766, 787 (S.D.N.Y. 2018) (summarizing *Clapper*, 568 U.S. at 410-14, and distinguishing citizenship question case from *Clapper* partly on this basis). Such a speculative chain of causation is insufficient to establish standing.

It makes little sense for Plaintiffs to attribute whatever harm is caused by those independent actors to the Memorandum itself, particularly if their messages convey the incorrect impression that "as a result of the Memorandum, data provided in response to the census may lead to the deportation of respondents, their family, or their friends." Am. Compl. ¶ 154. Simply put, any contention or concern that the Secretary's compliance with the Memorandum will somehow facilitate immigration enforcement is contrary to established statutory provisions mandating strict confidentiality for census responses. *See generally* 13 U.S.C. § 9 (providing that personal information collected by the Census Bureau cannot be used against respondents by any government agency or court); *id.* § 214 (setting forth penalty for wrongful disclosure of information). Indeed, the Census Bureau devotes resources to educating the public about the privacy and confidentiality of census responses specifically to allay such fears of adverse use. *See, e.g.*, *Data Protection and Privacy Program*, Census Bureau, available at https://www.census.gov/about/policies/privacy.html (last visited Sept. 1, 2020); Fontenot Decl. ¶ 10. Because nothing in the Memorandum undermines these statutory protections, it is unreasonable to trace fear of immigration enforcement to the Memorandum itself, rather than to the messages conveyed by other actors, as alleged in Plaintiffs' chain of causation.

        (c)      A Favorable Ruling Would Not Redress Plaintiffs' Alleged Enumeration Injuries

Finally, even if Plaintiffs could establish the existence of a "chilling" effect traceable to the Memorandum, they still fail to establish the last prong of standing: namely, that the effect would be cured by a favorable ruling from this Court. The redressability requirement "lies at the core of the standing doctrine" because "[a]n abstract decision without remedial consequence seems merely advisory, an unnecessary expenditure of judicial resources that burdens the adversary and carries all

16

the traditional risks of making bad law and trespassing on the provinces of the executive and legislature." *E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 450 (2d Cir. 2014); *see also Hewitt v. Helms*, 482 U.S. 755, 761 (1987). Where a plaintiff requests prospective relief in the form of a declaratory judgment or injunction, the plaintiff must show that "prospective relief will remove the harm" and the plaintiff "personally would benefit in a tangible way from the court's intervention." *Warth v. Seldin*, 422 U.S. 490, 505, 508 (1975). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.*, 523 U.S. at 107.

Here, it is entirely speculative that there in fact exist people who, while currently deterred from participating in the census, would *decide* to participate if this Court granted Plaintiffs relief. And it further defies belief that—to the extent that such people exist—their fears about census participation would be alleviated based solely on a court order that is subject to possible appellate reversal.

### 3. Plaintiffs Lack Standing Based on Supposed Dignitary Harm

Plaintiffs allege that some unidentified subset of them has "suffered cognizable dignitary harm as a result of Defendants' intentional race discrimination." Am. Compl. ¶ 151. But the Federal Rules require Plaintiffs to *plausibly* plead standing, and incanting the phrase "dignitary harm" in conclusory fashion will not do. Rather, Plaintiffs have not even plausibly alleged any intentional race discrimination from the Presidential Memorandum, *see infra* Part II.C, let alone how they are "personally subject to the challenged discrimination." *Allen v. Wright*, 468 U.S. 737, 755 (1984). Plaintiffs do not plead who among them has suffered dignitary harm, nor how that dignitary harm has been manifested. This pleading deficiency alone is fatal to their dignitary-harm standing argument.

Indeed, Plaintiffs' allegations are self-defeating. Plaintiffs allege that "voters of color have suffered cognizable dignitary harm," Am. Compl. ¶ 151, but even under Plaintiffs' misinterpretation of the Presidential Memorandum, voters—who, by definition, are U.S. citizens—will be included in

17

the apportionment base. "Voters of color" are thus not "personally subject to the challenged discrimination," *Allen*, 468 U.S. at 755, and accordingly lack standing.

Finally, Plaintiffs' standing theory—taken to its logical conclusion—is that every "voter of color" has standing to challenge the Presidential Memorandum, no matter where they are located or whether the policy set forth in the Memorandum ultimately affects the representatives apportioned to their State. But to establish standing, "the [alleged] injury must affect the plaintiff in a personal and individual way." *Defs. of Wildlife*, 504 U.S. at 560 n.1. That is, "[t]here must be some connection between the plaintiff and the defendant that 'differentiates' the plaintiff so that his injury is not 'common to all members of the public.'" *Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 655 (4th Cir. 2019) (quoting *United States v. Richardson*, 418 U.S. 166, 177 (1974)); *accord, e.g.*, *Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 834 (7th Cir. 2019). This is not a case in which "voters of color" have even plausibly been discriminated against, and Plaintiffs "ha[ve] not pointed to any connection between" Defendants and themselves that would "[t]ransform[] the general harms [they] allege[] into particularized ones." *Griffin*, 912 F.3d at 655.

### 4. *The Organization Plaintiffs Fail To Establish Standing*

The Organization Plaintiffs cannot establish associational standing because none of their members would have standing. *See generally supra* Part II.A-C.

Nor have they adequately alleged or established organizational standing. Plaintiffs only specifically allege injuries to two Organization Plaintiffs: Partnership for the Advancement of New Americans ("PANA") and Common Cause. Am. Comp. ¶¶ 169-174; *see id.* ¶ 175 (alleging that "the remaining organizational plaintiffs are also suffering" "[f]or similar reasons"). In connection with their motion for partial summary judgment, Plaintiffs also submitted a declaration of Common Cause's national president, Karen Hobert Flynn, which mostly repeats the allegations in the complaint.

*Compare* Flynn Decl., Doc. 31-3, ¶¶ 7-8 *with* Am. Compl. ¶¶ 173-174.  Plaintiffs' allegations and Ms. Flynn's declaration fail to establish that any Organization Plaintiff has standing.

To adequately plead organizational standing, Plaintiffs must plausibly allege that Defendants' "action causes a concrete and demonstrable injury to [the Organization Plaintiffs] that is more than simply a setback to [their] abstract social interests." *EPIC v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017), *cert. denied*, 139 S. Ct. 791 (2019).  To determine whether the Plaintiffs' allegations of organizational standing survive a motion to dismiss, the Court must undertake a two-part inquiry—it must find that Plaintiffs plausibly alleged that: (i) Defendants' "action or omission . . . injured [Organization Plaintiffs'] interest[s];" and (ii) that Organization Plaintiffs "used [their] resources to counteract that harm." *Id.*  Plaintiffs satisfy neither prong.

To satisfy the first prong of the organizational-injury analysis, Plaintiffs must, at a minimum, allege that the Presidential Memorandum "perceptibly impaired the organization's ability to provide services." *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015).  Such "[p]erceptible impairment" requires that the Memorandum "cause[] an actual inhibition" of Organization Plaintiffs' "daily operations." *Envtl. Working Grp. v. FDA*, 301 F. Supp. 3d 165, 171 (D.D.C. 2018).  Here, Plaintiffs simply allege that "the Memorandum directly impairs and undermines" PANA's and Common Cause's "organizational mission[s]." Am. Compl. ¶¶ 171, 174; Flynn Decl., Doc. 31-3, ¶ 7. But "conflict between a defendant's conduct and an organization's mission is alone insufficient to establish Article III standing." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996).  "Frustration of an organization's objectives is the type of abstract concern that does not impart standing." *Id.*

To satisfy the second prong of the organizational-injury analysis, the Organization Plaintiffs' activities must be "perceptively impaired," which requires a "drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  Plaintiffs make no such allegations.  Instead,

they simply allege, in boilerplate fashion, that the Memorandum "requires" PANA and Common Cause "to divert [their] limited resources from projects and priorities that [they] would otherwise pursue to counter the" supposed "adverse effect of the Memorandum on [their respective] mission[s]." Am. Compl. ¶¶ 171, 174. For her part, Ms. Flynn adds that Common Cause "has increased its efforts to promote census participation among communities that are likely to be adversely affected by the Memorandum." Flynn Decl., Doc. 31-3, ¶ 8. As a threshold matter, Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. But beyond that, the Organization Plaintiffs' "alleged injury argument is puzzling." *Food & Water Watch, Inc. v. Vilsack*, 79 F. Supp. 3d 174, 202 (D.D.C. 2015), *aff'd*, 808 F.3d 905 (D.C. Cir. 2015). "[F]ar from 'wasting' [their] resources," PANA and Common Cause "presumably fulfill[] [their] very purpose when [they] undertake[] to marshal [their] resources to fight the good fight against agency action that [they] feel[] is improper and unwise." *Id.*; *see also id.* ("Consequently, rather than being a wasteful distraction that has drained [plaintiff] of resources inappropriately, the NPIS plainly has provided [plaintiff] with a cause célèbre—one that may even have been at the heart of targeted fundraising efforts—and it is peculiar at best for an organization to contend that it has been injured because it had to raise funds and devote resources to attack a proposed regulation when one of the organization's foundational principles (its raison d'être, if you will) is that it will devote time and resources toward engaging in such an attack.").

### 5. The City Plaintiffs Lack Standing

The City Plaintiffs allege that, as municipalities, they will sustain a loss of government funds. Am. Compl. ¶¶ 166-167. As explained above, City Plaintiffs lack standing to bring these undercount-related injuries. *See supra* Part II.B.

The City Plaintiffs also purport to bring claims on behalf of their residents as supposed *parens patriae*. Am. Compl. ¶¶ 147, 151, 165. But none of their residents would have standing, *see generally*

*supra* Part II.A-C, and in any event, the City Plaintiffs' *parens patriae* claims fail for two more-fundamental reasons. First, unlike States, cities and other political subdivisions "cannot sue as *parens patriae* because their power is derivative and not sovereign." *Colo. River Indian Tribes v. Town of Parker*, 776 F.2d 846, 848 (9th Cir. 1985). And even assuming that cities could sue as *parens patriae*, "no state or municipal government can sue the federal government in a *Parens patriae* capacity." *City of Rome v. United States*, 472 F. Supp. 221, 236 n.68 (D.D.C. 1979) (three-judge court), *aff'd*, 446 U.S. 156 (1980); *see City of Olmsted Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002) ("As municipalities derive their existence from the state and function as political subdivisions of the state, presumably they too cannot sue the federal government under the doctrine of *parens patriae*.").

## II. PLAINTIFFS FAIL TO STATE A CLAIM

Even assuming *arguendo* that the Court has subject-matter jurisdiction over this action, Plaintiffs fail to adequately state a single claim, and all of their claims should be dismissed as a matter of law.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* Likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.*

Although "[w]ell-pleaded factual allegations are entitled to an assumption of truth," that presumption does not apply "to a legal conclusion couched as a factual allegation." *Moore v. U.S. Dep't of State*, 351 F. Supp. 3d 76, 87 (D.D.C. 2019) (Friedrich, J.). "[U]nadorned, the defendant-unlawfully-harmed-me accusation[s]" are similarly not credited. *Id.* And the Court should not accept an allegation as true when it is "flatly contradicted by a document incorporated into the Complaint." *Redmon v. U.S. Capitol Police*, 80 F. Supp. 3d 79, 89 (D.D.C. 2015); *see Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) ("Nor must we accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice.").

"A facial challenge," like the one brought by Plaintiffs "prevails where no set of circumstances exists under which the [action at issue] would be valid." *Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 964 F.3d 1177, 1188 (D.C. Cir. 2020); *see also Daskalea v. Wash. Humane Soc'y*, 577 F. Supp. 2d 82, 88 (D.D.C. 2008) ("[T]he D.C. Circuit has invoked [the] no-set-of-circumstances test to reject facial constitutional challenges.") (citing cases). In asserting a facial challenge to the Presidential Memorandum, Plaintiffs face a "heavy burden." *Id.* Plaintiffs do not carry that heavy burden here.

### A.   Plaintiffs Have Failed To State an Apportionment Clause Claim (Count I)

Plaintiffs allege that "[b]y purporting to exclude undocumented immigrants from the basis for congressional appointment, the President has violated" the Apportionment Clauses. Am. Compl. ¶ 179. In order to prevail on this facial challenge to the Presidential Memorandum, Plaintiffs must establish that there is *no* category of illegal aliens that may be lawfully excluded from the apportionment. They cannot do so.

The operative Apportionment Clause mandates that Representatives shall be "apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2. But, after accounting for the express exclusion of "Indians not taxed," neither this Clause nor its predecessor in

Article I was ever understood to mandate the inclusion of every person present within the boundaries of each State at the time of the census. *See id.* art. I, § 2, cl. 3. To the contrary, from the time of the Founding through the ratification of the Fourteenth Amendment and continuing to the present day, the Apportionment Clause has been understood to require counting "inhabitants." Far from disputing this proposition, Plaintiffs agree, requesting that this Court, among other things, order the President to "include all of the *inhabitants* of each State, excluding Indians not taxed . . . in the enumeration and apportionment calculations that he prepares and transmits to Congress." Am. Compl. at 64, § D.2 (emphasis added).

In other words, only usual residents—those with a fixed and enduring tie to a State, as recognized by the Executive—need be deemed "persons in [that] State," U.S. Const. amend. XIV, § 2 (emphasis added). And because the word "inhabitants" is sufficiently indeterminate, the Supreme Court has recognized that the term confers significant discretion on the Executive to make legal determinations about who qualifies as an "inhabitant" without treating his physical presence in a particular jurisdiction (or lack thereof) as dispositive. *See Franklin v. Massachusetts*, 505 U.S. 788, 804-06 (1992).

This well-established framework forecloses Plaintiffs' facial challenge to the Presidential Memorandum. For Plaintiffs to succeed, they must establish that the Constitution requires including all illegal aliens in the apportionment base. But that proposition is not correct. To give just one example, nothing in the Constitution requires that illegal aliens residing in a detention facility after being arrested while crossing the border must be accounted for in the allocation of Representatives (and hence political power). This is fatal to Plaintiffs' Motion.

       1.    *Only "Inhabitants" Who Have Their "Usual Residence" in a State Need Be Included in the Apportionment.*

As the Supreme Court has explained, "'[u]sual residence,' was the gloss given the constitutional phrase 'in each State' by the first enumeration Act [of 1790] and has been used by the Census Bureau

ever since to allocate persons to their home States." *Id.* at 804. The Act also uses "other words [ ] to describe the required tie to the State: 'usual place of abode,' [and] 'inhabitant[.]'" *Id.* at 804-05. These terms "can mean more than mere physical presence, and [have] been used broadly enough to include some element of allegiance or enduring tie to a place." *Id.*

The settled understanding that only "inhabitants" who have their "usual residence" in the country must be counted stems from the drafting history of the Apportionment Clause. In the draft Constitution submitted to the Committee of Style, the Apportionment Clause required "the Legislature [to] regulate the number of representatives by the number of *inhabitants*." 2 The Records of the Federal Convention of 1787, at 566, 571 (Max Farrand ed., rev. ed. 1966) (emphasis added). The Committee of Style changed the language to provide that "Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons." U.S. Const. art. I, § 2, cl. 3. But "the Committee of Style 'had no authority from the Convention to alter the meaning' of the draft Constitution," *Utah v. Evans*, 536 U.S. 452, 474 (2002), and the Supreme Court has thus found it "abundantly clear" that, under the original Clause, apportionment "should be determined solely by the number of the State's inhabitants," *Wesberry v. Sanders*, 376 U.S. 1, 13 (1964); *see also Franklin*, 505 U.S. at 804-05 (observing that "[t]he first draft" of the Apportionment Clause "used the word 'inhabitant,' which was omitted by the Committee of Style in the final provision").

Historical sources confirm this reading. In *The Federalist*, James Madison repeatedly explained that apportionment under the new Constitution would be based on a jurisdiction's "inhabitants." *See The Federalist* No. 54, at 369 (Jacob E. Cooke ed., 1961) (observing that "the aggregate number of representatives allotted to the several States[] is to be determined by a federal rule, founded on the

aggregate number of inhabitants"); *The Federalist* No. 56, at 383 (noting that the Constitution guarantees "a representative for every *thirty thousand inhabitants*") (emphasis added); *The Federalist* No. 58, at 391 (noting that the Constitution mandates a "readjust[ment] from time to time [of] the apportionment of representatives to the number of inhabitants"); *see also Evenwel v. Abbott*, 136 S. Ct. 1120, 1127 (2016) ("[T]he basis of representation in the House was to include all inhabitants" (emphasis omitted)). Similarly, as the Supreme Court recognized, the first enumeration Act of 1790— titled "an act providing for the enumeration of the inhabitants of the United States"—directed "the marshals of the several districts of the United States" to count "the number of the inhabitants within their respective districts." Act of Mar. 1, 1790, § 1, 1 Stat. 101, 101; *see Franklin*, 505 U.S. at 803-05 (relying on the Census Act of 1790 to apply the Apportionment Clause).

This understanding of "usual residence" and "inhabitant" was enshrined in the constitutional text and incorporated by historical practice when the Fourteenth Amendment's Apportionment Clause was ratified almost 80 years later. According to Representative Roscoe Conkling, a member of the committee that drafted the Fourteenth Amendment, the operative Apportionment Clause's streamlined language—requiring apportionment based on "the whole number of persons in each State"—was meant to fully include former slaves in the apportionment base and otherwise "adhere[] to the Constitution as it is." Cong. Globe, 39th Cong., 1st. Sess. 359 (1866). The Amendment's text confirms that understanding: it underscores that a person who possesses sufficient ties to a State will be included by specifying that "the whole number of persons *in each State*" must be counted, U.S. Const. amend. XIV, § 2 (emphasis added)—a phrase that the Supreme Court later explained to be equivalent to the term "inhabitant." *Franklin*, 505 U.S. at 804-05. Indeed, the very next sentence of section 2 of the Fourteenth Amendment equates "persons in each State" with "inhabitants" by penalizing in the apportionment any State that denies the right to vote to the "male inhabitants of such State" who would otherwise be eligible to vote (principally by reason of citizenship and age).

U.S. Const. amend. XIV, § 2. Unsurprisingly, the first census after ratification of the Fourteenth Amendment was conducted in accordance with the same procedures that had been used for the 1850 census, *see* Act of May 6, 1870, ch. 87, § 1, 16 Stat. 118, 118, which, in turn had required "all [States'] inhabitants to be enumerated," Act of May 23, 1850, ch. 11, § 1, 9 Stat. 428, 428; *see also Franklin*, 505 U.S. at 804 ("'Usual residence,' was the gloss given the constitutional phrase 'in each State' by the first enumeration Act [of 1790] and has been used by the Census Bureau ever since to allocate persons to their home States.").

Reading the Apportionment Clause to contemplate apportionment of Representatives based on "inhabitants" (or "usual residents") also helps explain the historical exclusion of certain people from the apportionment base. For example, transient aliens, such as those temporarily residing here for vacation or business, are not included in the apportionment base. *See, e.g.*, Residence Criteria, 83 Fed. Reg. at 5,533 (2018); Dennis L. Murphy, Note, *The Exclusion of Illegal Aliens from the Reapportionment Base: A Question of Representation*, 41 CASE W. RES. L. REV. 969, 980 (1991). That makes sense, as such aliens were not considered "usual residents" or "inhabitants" either at the Founding or the ratification of the Fourteenth Amendment. As contemporaneous sources using the term make clear, to qualify as an "inhabitant," one had to, at a minimum, establish a fixed residence within a jurisdiction and intend to remain there. *See, e.g.*, *Bas v. Steele*, 2 F. Cas. 988, 993 (Washington, Circuit Justice, C.C.D. Pa. 1818) (No. 1088) (concluding that a Spanish subject who had remained in Philadelphia as a merchant for four months before seeking to leave, "was not an inhabitant of this country, as no person is an inhabitant of a place, but one who acquires a domicil there").[3]

---

[3]        *See also, e.g.*, *Hylton v. Brown*, 12 F. Cas. 1123, 1129 (Washington, Circuit Justice, C.C.D. Pa. 1806) (No. 6,981) (charging jury while riding circuit that a particular individual "was no more an inhabitant of this state than I am, who spend one-third of each year in this city; or any other person, who comes here to transact a certain piece of business, and then returns to his family"); *Toland v. Sprague*, 23 F. Cas. 1353, 1355 (C.C.E.D. Pa. 1834) (No. 14,076) (distinguishing an "inhabitant" from a "transient passenger"); *United States v. Laverty*, 26 F. Cas. 875, 877 (D. La. 1812) (No. 15,569A) ("An inhabitant

Likewise, foreign diplomats stationed overseas arguably remained "inhabitants" of their native countries rather than of their diplomatic posts. *See Franklin*, 505 U.S. at 805 (confirming that American diplomat stationed overseas could still qualify as an "inhabitant" who is "in" his home State for purposes of "the related context of congressional residence qualifications"); Emer de Vattel, *The Law of Nations*, ch. 19, § 213 (1817) (explaining that diplomats could not qualify as "inhabitants" because "the envoy of a foreign prince has not his settlement at the court where he resides"). And, unsurprisingly, foreign diplomatic personnel living on embassy grounds have previously been excluded from the apportionment base. Murphy, *supra*, 41 CASE W. RES. L. REV. at 980.

Tourists and diplomats may be "persons" within a State's boundaries at the time of the Enumeration, but no one seriously contends that they must be included in the apportionment base under the Constitution. Physical location does not, in short, necessarily dictate whether one is an "inhabitant" (or "usual resident") of a particular jurisdiction.

2. *The Executive Has Significant Discretion to Define Who Qualifies as an "Inhabitant."*

Crucially, the term "inhabitant"—and the concept of "usual residence"—is sufficiently ambiguous to give Congress, and by delegation the Executive, significant discretion to define the

---

is one whose domicile is here, and settled here, with an intention to become a citizen of the country."); *United States v. The Penelope*, 27 F. Cas. 486, 489 (D. Pa. 1806) (No. 16,024) ("[T]he following has always been my definition of the words 'resident,' or 'inhabitant,' which, in my view, mean the same thing. 'An inhabitant, or resident, is a person coming into a place with an intention to establish his domicil, or permanent residence; and in consequence actually resides … .'"); 41 Annals of Cong. 1595 (1824) (referring to "the common acceptation" of "inhabitant" as "the persons whose abode, living, ordinary habitation, or home" is within a particular jurisdiction); Thomas Dyche & William Pardon, *A New General English Dictionary* (16th ed. 1781) ("a person that resides or ordinarily dwells in a place or home"); 1 & 2 Samuel Johnson, *A Dictionary of the English Language s. v.* abode, inhabitant, reside, residence, resident (6th ed. 1785) (a "[d]weller," or one who "lives or resides" in a place, with the terms "reside," "residence," and "resident" defined with reference to an "abode"—*i.e.*, a "continuance in a place"); Noah Webster, *American Dictionary of the English Language* (1828) (defining "inhabitant" as a "dweller; one who dwells or resides permanently in a place, or who has a fixed residence, as distinguished from an occasional lodger or visitor").

contours of "inhabitants" for apportionment purposes. That discretion is rooted in the Constitution. Article I provides that apportionment numbers are determined by an "actual Enumeration" performed every 10 years "in such Manner as" Congress "shall by Law direct." U.S. Const. art. I, § 2, cl. 3; *see also id.* amend. XIV, § 5 (giving Congress the power to "enforce, by appropriate legislation, the provisions of" the Fourteenth Amendment, including the operative Apportionment Clause). This "text . . . vests Congress with virtually unlimited discretion in conducting the decennial 'actual Enumeration,' [and] . . . [t]hrough the Census Act, Congress has delegated its broad authority over the census to the Secretary." *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996) (citations omitted). But the Secretary is not the final word on apportionment, and indeed is not the one responsible for determining the apportionment base. Instead, by statute, the Secretary must report census numbers to the President. *See* 13 U.S.C. § 141(b). And it is the President, then, who "transmit[s] to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the seventeenth and each subsequent decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives." 2 U.S.C. § 2a(a). In doing so, the President has full "authority to direct the Secretary in making policy judgments that result in 'the decennial census'; he is not expressly required to adhere to the policy decisions reflected in the Secretary's report." *Franklin*, 505 U.S. at 799. So "the Secretary cannot act alone; she must send her results to the President, who makes the calculations and sends the final apportionment to Congress." *Id.* at 800. That "final act" by the President is "not merely ceremonial or ministerial," but remains "important to the integrity of the process." *Id.* Indeed, it is "the President's personal transmittal of the report to Congress" that "settles the apportionment" of Representatives among the States. *Id.* at 799.

Plaintiffs contend that the Constitution affords the President no discretion, arguing that "[i]f the President had inherent power to exercise 'judgment' regarding the legislative apportionment base,

he could alter the composition of the House of Representatives at his whim." Pl. Mem. at 25. But *Franklin* dispatches this strawman argument, explaining that the Executive's decisions in this area must be "consonant with . . . the text and history of the Constitution." 505 U.S. at 806. The point is that the term "inhabitants"—and the concept of "usual residence"—are sufficiently indeterminate to give the President significant discretion within constitutional bounds. *See id.* at 804-06 (discussing how the notion of "usual residence" has been applied differently over time). Indeed, Madison himself acknowledged that the word "inhabitant" was "vague" in discussing the House Qualifications Clause. 2 The Records of the Federal Convention of 1787, at 216-17; *cf. Franklin*, 505 U.S. at 805 (in the course of applying the Apportionment Clause, drawing on Madison's interpretation of the "term 'inhabitant'" in "the related context of congressional residence qualifications"). As noted above, historical evidence confirms that the term "inhabitant" was understood to require, at a minimum, a fixed residence within a jurisdiction and intent to remain there. Moreover, Founding-era sources also reflect that, especially with respect to aliens, the term could be understood to further require a sovereign's permission to enter and remain within a given jurisdiction. *See, e.g.*, *The Venus*, 12 U.S. (8 Cranch.) 253, 289 (1814) (Marshall, C.J., concurring in part and dissenting in part) (quoting Vattel for the proposition that "inhabitants, as distinguished from citizens, are strangers who are *permitted* to settle and stay in the country" (emphasis added)); *The Federalist* No. 42, at 285 (Madison) (discussing provision of the Articles of Confederation that required every State "to confer the rights of citizenship in other States … upon any whom *it may allow to become inhabitants* within its jurisdiction" (emphasis added)).

Accordingly, the Executive has wide discretion to make legal determinations about who does and does not qualify as an "inhabitant" for purposes of inclusion in or exclusion from the apportionment base. In *Franklin*, for example, the Supreme Court held that the Executive Branch could allocate over 900,000 military personnel living overseas to their home States on the basis of the Secretary's judgment that such people "had retained their ties to the States." 505 U.S. at 806. That

allocation "altered the relative state populations enough to shift a Representative from Massachusetts to Washington"—and had not been used "until 1970," save for a "one-time exception in 1900." *Id.* at 791-93. Nevertheless, as the Court explained, even though the recent approach was "not dictated by" the Constitution, it was "consonant with [its] text and history" and thus a permissible "judgment" within the Executive Branch's discretion, even where Congress had not expressly authorized this practice. *Id.* at 806. In the course of reaching this judgment, the Court also listed a number of other legal determinations of usual residency that the Executive Branch has permissibly chosen to use over the years—including determinations the Census Bureau has since abandoned. For example, "up until 1950, college students were counted as belonging to the State where their parents resided, not to the State where they attended school," and at the time the case was decided, "[t]hose persons who are institutionalized in out-of-state hospitals or jails for short terms [were] also counted in their home States." *Id.* at 805-06. Under the current Residence Criteria, however, college students who live at school during the academic year and prisoners housed in out-of-state jails, even for the short term, are counted in the State in which those institutions are located. Residence Criteria, 83 Fed. Reg. at 5,534, 5,535.

Plaintiffs do not challenge the Residence Criteria in this action. To the contrary, they affirmatively rely on it in support of their argument. *See* Am. Compl. ¶¶ 57-58; Pl. Mem. at 24. In doing so, they impliedly suggest that not even they dispute that the Executive has discretion to define "inhabitant" and to determine who meets its strictures. *See Franklin*, 505 U.S. at 804-06. Nor can they, given constitutional text, history, and Supreme Court precedent. The Presidential Memorandum is no different insofar as it reflects the Executive Branch's discretionary decision to direct the Secretary in making policy judgments that result in the decennial census. *Id.* at 799.

30

3.     *The Apportionment Clause Does Not Require Inclusion of All Illegal Aliens as "Inhabitants" Having a "Usual Residence" in a State.*

Plaintiffs maintain that the Presidential Memorandum facially violates the Apportionment Clause on the theory that *all* illegal aliens necessarily qualify as "persons in each State," and because the Memorandum contemplates the exclusion of such aliens—in some as-yet unknown number—for apportionment purposes. *E.g.*, Pl. Mem. at 26. Put differently, Plaintiffs posit that the Constitution prohibits the exclusion of *any* illegal alien from the apportionment base, and that the Memorandum's announcement of that possibility violates the Apportionment Clause. But none of the constitutional constraints on the Executive's discretion to define the contours of "inhabitants" or "usual residence" require including *all* illegal aliens in the apportionment.

For example, if the Census Bureau finds it feasible to identify unlawfully present aliens who resided in a Customs and Border Patrol (CBP) or Immigration and Customs Enforcement (ICE) facility within a State on census day after being arrested while illegally entering the country, it would be permissible to exclude them. Such individuals—like alien tourists who happen to be staying in the country for a brief period on and around census day—cannot reasonably be said to have established "the required tie to [a] State," *Franklin*, 505 U.S. at 804, or to be "inhabitants" under any definition of that term.[4]

---

[4] These populations may be significant. During fiscal year 2019, ICE held in custody an average daily population of 50,165 aliens. U.S. ICE ERO, U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report, at 5 (2019) (ICE ERO Report), https://www.ice.gov/sites/default/files/documents/Document/2019/eroReportFY2019.pdf. And on any given day in the summer of 2019, CBP held in custody between 8,000 and 12,000 detainees. U.S. Customs and Border Protection – Border Patrol Oversight: Hearing Before the H. Subcomm. on Homeland Security of the Comm. on Appropriations, 116th Cong. (2019) (testimony of Carla L. Provost, Chief, U.S. Border Patrol), https://docs.house.gov/meetings/AP/AP15/20190724/109834/HHRG-116-AP15-Wstate-ProvostC-20190724.pdf.

Likewise, if feasibly identified, the Executive may exclude aliens who have been detained for illegal entry and paroled into the country pending removal proceedings, or who are subject to final orders of removal.[5]  Such aliens do not have enduring ties to any State sufficient to become "inhabitants" with their "usual residence" in the United States.  The government has either allowed them into the country solely conditionally while it is deciding whether they should be removed, or has conclusively determined that they must be removed from the country.  In *Kaplan v. Tod*, 267 U.S. 228 (1925), for instance, the Supreme Court addressed the case of an alien minor who had been denied entry at Ellis Island in 1914 but could not be returned to Russia during the First World War and was therefore paroled into the country to live with her father in 1915.  When the case reached the Supreme Court almost ten years later in 1925, it turned entirely on the question whether the alien minor had been "dwelling in the United States" or had "begun to reside permanently" in the United States for purposes of federal immigration statutes, which would have conferred derivative citizenship on her upon her father's naturalization in 1920.  *Id.* at 230.  The Court held that, during her parole, she "never has been dwelling in the United States" and "[s]till more clearly she never has begun to reside permanently in the United States."  *Id.*  As the Court explained, she "could not lawfully have landed in the United States" because she fell within an inadmissible category of aliens, and "until she legally landed [she] 'could not have dwelt within the United States.'"  *Id.* (quoting *Zartarian v. Billings*, 204 U.S. 170, 175 (1907)).  In the Court's view, she was in "the same" position as an alien "held at Ellis Island for deportation."  *Id.* at 231; *see also, e.g.*, *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958) (holding that

---

[5]     ICE's non-detained docket surpassed 3.2 million cases in fiscal year 2019, a population large enough to fill more than four congressional districts under the 2010 apportionment.  ICE ERO Report at 10; Kristin D. Burnett, Congressional Apportionment, U.S. Census Bureau (Nov. 2011), https://www.census.gov/prod/cen2010/briefs/c2010br-08.pdf.  The non-detained docket includes aliens who are both pre- and post-final order of removal, and who have been released on parole, bond, an order of recognizance, an order of supervision, or who are in process for repatriation.  ICE ERO Report at 10.

parole cannot affect an alien's status and does not place an alien "legally 'within the United States'"). Indeed, the Supreme Court recently reaffirmed that "aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border,'" and that the same principle applies to those detained "shortly after unlawful entry." *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020).

Plaintiffs emphasize that Framers of both the original Apportionment Clause and the Fourteenth Amendment intended to include aliens in the apportionment base. Pl. Mem. at 15-18. But Plaintiffs' historical evidence about the treatment of aliens does not and cannot resolve the distinct question whether *illegal* aliens must be included—for the simple reason that there were no federal laws restricting immigration (and hence no illegal aliens) until 1875. *See Kleindienst v. Mandel*, 408 U.S. 753, 761 (1972). And Plaintiffs provide no evidence to support the proposition that by employing the concept of "inhabitants," *see* Pl. Mem. at 16, the Framers of either the original Constitution or Fourteenth Amendment were understood to have bound future generations to allocate political power on the basis of aliens living in the country in violation of federal law. To the contrary, as the Supreme Court has explained, the Framers understood the "fundamental proposition[]" that the "power to admit or exclude aliens is a sovereign prerogative." *Thuraissigiam*, 140 S. Ct. at 1982.[6] This "ancient principle[] of the international law of nation-states" is necessary to the sovereign's rights to define the polity ("the people") that make up the nation and to preserve itself, as both the Supreme Court and 19th-century international law scholars recognized.[7] It is fundamentally antithetical to those

---

[6]    *See also, e.g.*, *Landon v. Plasencia*, 459 U.S. 21, 32 (1982); *Chae Chan Ping v. United States*, 130 U.S. 581, 604 (1889); *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893).

[7]    *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972); *see, e.g.*, *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892) ("It is an accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self- preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe.") (citing Vattel and Phillimore); Vattel, *The Law of Nations*, bk. 2, §§ 94, 100

elementary principles to say that illegal aliens can arrogate to themselves the right to redistribute political power within this polity by flouting the sovereign power of the United States to define who can enter and become part of the polity. Rejecting Plaintiffs' approach is certainly "consonant with" with the terms and history of the Fourteenth Amendment. *Franklin*, 505 U.S. at 806.

In addition, the Founding generation was aware that the term "inhabitant" could be understood to require that an alien be given *permission* to settle and stay in a jurisdiction according to the definition provided by Vattel, whom the Supreme Court has extolled as the "founding era's foremost expert on the law of nations." *Franchise Tax Bd. v. Hyatt*, 139 S. Ct. 1485, 1493 (2019); *see* 1 Vattel, *The Law of Nations* ch. 19, § 213 (defining "inhabitants, as distinguished from citizens," as "foreigners, who are permitted to settle and stay in the country").[8] And in *Kaplan*, the Supreme Court held that an alien who had not effected a lawful entry into the country could not be characterized as "dwelling" in the country under the latest version of a naturalization law dating from 1790 that had

---

(explaining that the sovereign's authority to "forbid the entrance of his territory either to foreigners in general, or in particular cases," "flow[ed] from the rights of domain and sovereignty"); 1 Robert Phillimore, *Commentaries Upon International Law*, ch. 10, § CCXXIX (1854) (similar); *see also, e.g.*, *Bernal v. Fainter*, 467 U.S. 216, 221 (1984) ("The exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition. Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well: Aliens are by definition those outside of this community."); *Chae Chan Ping*, 130 U.S. at 603–04 (recognizing that a sovereign's power to "exclude aliens from its territory" is "an incident of every independent nation" and is "part of its independence," and "[i]f it could not exclude aliens it would be to that extent subject to the control of another power"); *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812) (Marshall, C.J.) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction.").

[8]     As the Supreme Court has observed: "The international jurist most widely cited in the first 50 years after the Revolution was Emmerich de Vattel. In 1775, Benjamin Franklin acknowledged receipt of three copies of a new edition, in French, of Vattel's Law of Nations and remarked that the book 'has been continually in the hands of the members of our Congress now sitting.'" *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 463 n.12 (1978) (ellipsis and citations omitted omitted).

conditioned derivative citizenship for certain aliens on their "dwelling" in the United States—a concept linked with becoming an "inhabitant" since the Founding Era. 267 U.S. at 230; *see* Act of Mar. 26, 1790, § 1, 1 Stat. 103, 104; *cf.* Noah Webster, *American Dictionary of the English Language* (1828) (defining "inhabitant" as a "dweller; one who dwells or resides permanently in a place"). Illegal aliens, however, cannot claim the relevant "enduring ties" to this country, or that they are "dwelling" in this country, precisely because they have not legally entered and as a matter of law may be removed from the country at any time. *See also Gonzalez v. Holder*, 771 F.3d 238, 245 (5th Cir. 2014) (applying *Kaplan* to an alien who "entered the United States at the age of seven, albeit illegally, and … remained in the country" for 16 years); *U.S. ex rel. De Rienzo v. Rodgers*, 185 F. 334, 338 (3d Cir. 1911) (explaining that an alien "cannot begin" to "reside permanently" in the United States "if he belongs to a class of aliens debarred from entry into the country by the act to regulate the immigration of aliens into the United States").

The debates over the Fourteenth Amendment further indicate that the rationale the Framers offered for including aliens in the apportionment base do not apply to illegal aliens. Specifically, various legislators made clear that unnaturalized aliens should be included in the apportionment base precisely because the law provided them with a direct pathway to citizenship—mainly, an oath of loyalty and five years of residence in the United States, *see* Act of Apr. 14, 1802, 2 Stat. 153. As Representative Conkling pointed out, "[t]he political disability of aliens was not for this purpose counted against them, *because it was certain to be temporary*, and they were admitted at once into the basis of apportionment." Cong. Globe, 39th Cong., 1st Sess., at 356 (1866) (emphasis added); *see also, e.g., id.* at 3035 (Senator Henderson explaining that "[t]he road to the ballot is open to the foreigner; it is not permanently barred"). Indeed, the five-year residency requirement meant that aliens could "acquire [the vote] in the current decade"—and thus unnaturalized aliens could be voting citizens before the next apportionment. *Id.* at 354 (Representative Kelley). And even an opponent of the

35

inclusion of aliens in the apportionment agreed that unnaturalized aliens were on "a short period of probation—five years; and in most of the states the great body of them are promptly admitted to citizenship." *Id.* at 2987 (Sen. Sherman). That rationale plainly does not extend to illegal aliens, who generally are prohibited by law from becoming citizens and are subject to removal. 8 U.S.C. §§ 1182(a)(9), 1227(a), 1255(a) & (c), 1427(a).

Leaving the Framers behind, Plaintiffs argue that illegal aliens "have in fact been counted in every census, and included in every congressional apportionment, since the Constitution was ratified in 1788." Pl. Mem. at 23; *see generally id.* at 18-23. But the past practice of including illegal aliens in the apportionment base does not establish that the Executive is constitutionally compelled to do so in perpetuity. Rather, such a practice would at most show that the Executive *may* include illegal aliens within the apportionment base under the Constitution, not that he *must*. After all, *Franklin* upheld the Executive's decision to scuttle a nearly unbroken 180-year-old practice of not allocating federal personnel stationed overseas to the apportionment base of their home States as "consonant with, though not dictated by, the text and history of the Constitution." 505 U.S. at 806; *see id.* at 792-93. There is no reason why the previous inclusion of illegal aliens in the apportionment base should be treated as more authoritative than the previous exclusion of overseas personnel abandoned in *Franklin*.

Selectively quoting the Supreme Court's discussion in *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016), regarding "*the Framer's* selection of total population" rather than voting population "as the basis for allocating congressional seats," *id.* at 1129 (emphasis added), Plaintiffs confusingly argue that "the Supreme Court surely had [illegal aliens] in mind as part of the 'total population' when it made this declaration." Pl. Mem. at 22 (eliding that the Court was describing historical fact, not making a "declaration"). But the fact that the apportionment base has always included inhabitants who could not vote is beside the point. Instead, the point is that illegal aliens, unlike women in 1868 or children today, can reasonably be characterized as lacking an "enduring tie to," and hence a "usual residence"

36

in, the United States—as evidenced by the fact that they can be removed from the country at any time. *Franklin*, 505 U.S. at 804. In all events, the *Evenwel* plaintiffs merely argued that a State must exclude all non-voters, not illegal aliens alone. *Evenwel*, 136 S. Ct. at 1123. Thus, the parties in *Evenwel* did not argue, and the Supreme Court did not address, whether a State must (or may) exclude illegal aliens for purposes of intrastate redistricting, let alone whether the President may exclude them for purposes of interstate apportionment. *Cf. Burns v. Richardson*, 384 U.S. 73, 93-94 (1966) (holding that a State could limit its population base to registered voters).

Plaintiffs also creatively quote *FAIR* for the supposed proposition that this Court "determined" that the apportionment base "must . . . 'include[] all persons, including aliens both lawfully and unlawfully within our borders.'" Pl. Mem. at 22 (quoting *FAIR*, 486 F. Supp. at 576) (emphasis omitted). In fact, the *FAIR* court simply noted that, as a matter of *historical practice*, "the population base for purposes of apportionment has always included all persons, including aliens both lawfully and unlawfully within our borders." *FAIR*, 486 F. Supp. at 576. To be sure, the *FAIR* court indicated that it saw "little on which to base a conclusion that illegal aliens should now be excluded" from the apportionment base. *Id.* But the *FAIR* court hardly came to a final "determination" about the permissibility of excluding them. To the contrary, the *FAIR* court "conclude[d] that [it] lack[ed] jurisdiction to decide the merits of the case because the plaintiffs lack standing to raise the issue." *Id.* at 566. Accordingly, it "ha[d] no authority to address the dispute presented." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 624 (D.C. Cir. 2017). And even if Plaintiffs' summarization of the case were, in fact, accurate, *FAIR*—the appeal from which was dismissed for lack of jurisdiction, 447 U.S. 916 (1980)— is not controlling on this Court and in all events predates *Franklin*, which controls the outcome here.

Ultimately, however, it is neither necessary nor appropriate for this Court to resolve whether any particular category of illegal aliens must be deemed "inhabitants" for purposes of the apportionment. "A facial challenge prevails where no set of circumstances exists under which the

[action at issue] would be valid." *Nat'l Ass'n of Regulatory Util. Comm'rs*, 964 F.3d at 1188. Thus, in order to prevail on this facial challenge to the Presidential Memorandum, Plaintiffs must establish that there is *no* category of illegal aliens that may be lawfully excluded from the apportionment. This they cannot do.

Plaintiffs instead ask the Court to decide a much different question—and more than is necessary to resolve this case—by seeking a holding that the Apportionment Clause would prohibit the exclusion of all categories of illegal aliens. That question is not properly presented here. The Presidential Memorandum states that it will be the policy of the United States "to exclude from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act, as amended (8 U.S.C. 1101 et seq.), to the *maximum extent feasible and consistent with the discretion delegated to the executive branch*." 85 Fed. Reg. at 44,680 (emphasis added). It further states that it "shall be implemented *consistent with applicable law*." *Id.* (emphasis added). And Plaintiffs have rushed to Court before the Census Bureau has determined which illegal aliens it may be "feasible" to exclude, before the Census Bureau has reported any numbers to the Secretary, before the Secretary has reported any numbers to the President, and before the President has reported any numbers to Congress. Because this is a facial challenge, "the Court need not fret about [such] hypotheticals" now. *Nat'l Ass'n of Regulatory Util. Comm'rs*, 964 F.3d at 1188. Accordingly, this Court need not and should not resolve whether the Apportionment Clause necessarily *excludes* or *includes* any particular category of illegal aliens from the apportionment base. Rather, for Plaintiffs to prevail, they must establish that there is *no* category of illegal aliens that could ever be excluded. As they effectively admit, they cannot do so.

**B.   Plaintiffs Have Failed To State an Equal Protection Claim for Vote Dilution and Representational Injury (Count II)**

Citing *Wesberry v. Sanders*, 376 U.S. 1 (1964), and *Reynolds v. Sims*, 377 U.S. 533 (1964), both of which concern *intrastate* apportionment decisions, Plaintiffs allege that implementation of the

Presidential Memorandum would violate the Equal Protection Clause by "requiring them to live and vote in congressional districts with a population that is higher than an equal proportion of persons as determined by the census and as required by the Constitution"; "forcing them to compete for their Representative's limited attention and resources with an artificially high number of fellow-constituents"; and "reducing the weight of [their] votes . . . in the election of the President of the United States." Am. Compl. ¶¶ 182-186. But it is entirely speculative: (i) whether the Census Bureau will provide the Secretary of Commerce a second tabulation; (ii) to the extent the Census Bureau provides such a tabulation, how many illegal aliens that tabulation will exclude; (iii) how the President will exercise his discretion in defining who qualifies as an "inhabitant" for the purposes of determining the apportionment base; (iv) how any such apportionment base will impact apportionment (if at all); and (v) how the States will draw their districts post-apportionment. Simply put, Plaintiffs' threadbare allegations do not "cross the line between possibility and plausibility" and, accordingly, Plaintiffs are "not entitled to relief." *Burnett v. Wash. Metro. Area Transit Auth.*, 58 F. Supp. 3d 104, 107 (D.D.C. 2014) (Cooper, J.).

Plaintiffs' claim also must be dismissed for a more-fundamental reason: the equal-population intrastate apportionment standard in *Wesberry* and *Reynolds* does not apply to *interstate* apportionment determinations. In *U.S. Department of Commerce v. Montana*, 503 U.S. 442 (1992), the Supreme Court considered a challenge to Congress's method of apportioning Representatives among the States. *Id.* at 444-45. The State of Montana argued that the requirement that Congress apportion Representatives to the States "according to their respective numbers" required Congress to use an apportionment method that, in its view, achieved greater equality in the distribution of Representatives among the States. *See id.* at 444-46. Montana's reapportionment challenge was therefore the closest federal analogue to the State redistricting issue in *Wesberry*, and Montana argued that the *Wesberry* standard governed the Court's review of Congress's apportionment method. *Id.* at 459-61.

The Supreme Court rejected the *Wesberry* standard as applicable in the interstate apportionment context. *Id.* at 463-64. The Court reasoned that *Wesberry* begins with a presumption that complete equality is an achievable goal for the States but that such a goal is "illusory" for the nation as a whole. *Id.* at 463. Instead of complete equality, the interstate apportionment provisions of the Constitution resulted from a compromise between the small and large States that granted Congress greater discretion to apportion the nation than the States have to draw district lines. *Id.* at 464. The Court also explained that intrastate redistricting is a "much easier task" than interstate reapportionment, *id.* at 464, and that "[r]espect for a coordinate branch of Government raises special concerns not present" in prior cases reviewing state action, *id.* at 459. The Court therefore upheld Congress's apportionment method under a far more deferential standard of review. *See id.* at 464.

Four years later, the Supreme Court reaffirmed the inapplicability of the *Wesberry* standard to Congressional apportionment determinations. In *Wisconsin v. City of New York*, 517 U.S. 1 (1996), the plaintiffs challenged the Secretary of Commerce's conduct of the census. *Id.* at 4. The Court of Appeals had applied the *Wesberry* standard to hold that the Secretary was constitutionally required to conduct a census that was "as accurate as possible." *See id.* at 12, 16-17. The Court of Appeals had reasoned that the "impossibility of achieving precise mathematical equality is no excuse for the Federal Government not making the mandated good-faith effort." *Id.* at 16. The Supreme Court reversed: "[T]he Court of Appeals erred in holding the 'one person-one vote' standard of *Wesberry* and its progeny applicable to the action at hand." *Id.*

Simply put, the Supreme Court had two opportunities to extend the *Wesberry-Reynolds* equal-population intrastate apportionment standard to interstate apportionment determinations, and the Supreme Court declined both invitations. This Court should do the same and dismiss Plaintiffs' second count as a matter of law.

### C. Plaintiffs Have Failed To State an Equal Protection Claim for Invidious Discrimination (Count III)

Plaintiffs allege that the Presidential Memorandum was impermissibly motivated by discriminatory animus based on race, ethnicity, and national origin.  Am. Compl. ¶¶ 188-193.  To make this claim, however, Plaintiffs inaccurately conflate the Memorandum's facially neutral distinction between lawful and unlawful aliens with racial or ethnicity-based disparate treatment.  Shorn of this faulty pleading device, Plaintiffs fail to allege the unlawful "animus" or "racially discriminatory intent" required to plead an equal protection violation.  *See DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) ("*Regents*") ("To plead animus, a plaintiff must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision.").

There can be no dispute that the Memorandum is facially neutral with respect to race, ethnicity, and national origin.  To the extent that it makes any distinction between persons, the Presidential Memorandum is focused on the distinction between illegal aliens and citizens and other lawful residents.  *See* 85 Fed. Reg. at 44,680.  As the Supreme Court has recognized, relying on this distinction does not require heightened scrutiny for equal protection purposes because non-citizens—much less illegal aliens—do not constitute a protected class.  *See, e.g.*, *Mathews v. Diaz*, 426 U.S. 67 (1976) (limitation on eligibility for a federal medical insurance program to citizens and long-term permanent residents did not violate Equal Protection Clause); *see also, e.g.*, *Lewis v. Thompson*, 252 F.3d 567, 583-84 (2d Cir. 2001) (upholding Welfare Reform Act's denial of prenatal care coverage to unqualified noncitizens against Equal Protection challenge); *cf. Bluman v. FEC*, 800 F. Supp. 2d 281, 287 (D.D.C. 2011) (Kavanaugh, J.) (three-judge court) ("[T]he Supreme Court has drawn a fairly clear line:  The government may exclude foreign citizens from activities intimately related to the process of democratic self-government."), *aff'd*, 565 U.S. 1104 (2012).  As the Presidential Memorandum does not target a protected class, Plaintiffs are left with only conclusory allegations of animus, *see* Am. Compl. ¶ 192, which are not sufficient to state an equal protection claim.

To the extent Plaintiffs may argue that the Presidential Memorandum imposes a disproportionate burden on members of certain racial, ethnic or national-origin groups, any such argument is foreclosed by the Supreme Court's recent *Regents* decision. As the Court recognized there, if the fact that an immigration policy would have "an outsized" impact on "Latinos" "because [they] make up a large share of the unauthorized alien population" by itself "were sufficient to state a claim," then "'virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Regents*, 140 S. Ct. at 1916. Instead, as *Regents* concluded, an allegation of disproportionate burden on a specific racial or ethnic group is, in this context, inadequate to "establish[] a plausible equal protection claim." *Id.* at 1915.

Further, to the extent that Plaintiffs seek to base their equal protection claim on a purported link between the Presidential Memorandum and the Commerce Secretary's decision to add a citizenship question to the 2020 Census, *see* Am. Compl. ¶¶ 105-108 & 111, the claim is implausible because these two actions involve separate decisions made by different decision-makers that are distinct in timing and implementation. In any event, the citizenship-question plaintiffs "failed to prove, by a preponderance of the evidence, that a discriminatory purpose motivated Defendants' decision to reinstate the citizenship question on the 2020 census questionnaire." *New York v. Dep't of Commerce*, 351 F. Supp. 3d 502, 671 (S.D.N.Y. 2019), *aff'd in part, rev'd in part and remanded*, 139 S. Ct. 2551 (2019); *see also id.* at 670 ("Plaintiffs failed to prove a sufficient nexus between President Trump and Secretary Ross's decision to make the President's statements or policies relevant to the equal protection analysis."). *Kravitz v. Dep't of Commerce*, 366 F. Supp. 3d 681, 712 (D. Md. 2019).

Finally, Plaintiffs reference certain alleged statements by Richard Hofeller and the President's reelection campaign. *E.g.*, Am. Compl. ¶¶ 96, 102. But because the President is the only decision-maker with respect to issuance of the Presidential Memorandum, statements of other individuals are

immaterial.  *See Regents*, 140 S. Ct. at 1916 (statements by non-decisionmakers "remote in time and made in unrelated contexts" are "unilluminating").

The Presidential Memorandum expressly states that the policy's purpose is to promote "the principles of representative democracy underpinning our system of Government."  85 Fed. Reg. at 44,680.  Plaintiffs have failed to plausibly allege that, notwithstanding this permissible purpose,  the Memorandum is merely a pretext for a "real reason" to discriminate against Hispanics, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993), or that it was motivated by such animus, *Pers. Admin. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).  Accordingly, Count III should be dismissed.

### D.    Plaintiffs Have Failed To State an *Ultra Vires* Claim (Count IV)

Plaintiffs argue that implementation of the Presidential Memorandum would violate 13 U.S.C. § 141 and 2 U.S.C. § 2a, and should thus be enjoined as *ultra vires*.  Am. Compl. ¶¶ 194-202.  Plaintiffs are incorrect.

An *ultra vires* claim "is essentially a Hail Mary pass" that "in court as in football . . . rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).  "[I]t is well-settled that this doctrine is narrow: '[t]here certainly is no question that nonstatutory review is intended to be of extremely limited scope.'" *Cause of Action Inst. v. Eggleston*, 224 F. Supp. 3d 63, 76 (D.D.C. 2016) (quoting *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006)).  It applies, if at all, only when a government official "acts without any authority whatever." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984).  That is, the "agency error [must] be so extreme that one may view it as jurisdictional or nearly so." *Nyunt*, 589 F.3d at 449.

Plaintiffs do not begin to approach this high standard.  Every other census and apportionment conducted under 13 U.S.C § 141 and 2 U.S.C. § 2a has been shaped by policy choices made by the Executive under this statutory scheme, and the Memorandum merely reflects another permissible policy choice made by the Executive pursuant to powers delegated by Congress.

Nothing in the statutory language of "total population," 13 U.S.C. § 141(b), or "whole number of persons in each State," 2 U.S.C. § 2a(a), requires counting every person physically present on Census Day, even if they lack "usual residence" in the United States.[9] It is, of course, true that illegal aliens are "persons." *Cf. Plyler v. Doe*, 457 U.S. 202 (1982). But § 2a does not reference only "persons"; it tracks the Fourteenth Amendment's text mandating apportionment based on the "whole number of persons *in each State*." 2 U.S.C. § 2a(a) (emphasis added). "Congress legislates against the backdrop of existing law," *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019), and that backdrop only supports the exclusion of individuals from apportionment if they do not have a "usual residence" in the United States. *Franklin*, 505 U.S. at 804. That is why no apportionment conducted under the Census Act has included literally everyone physically present in the country. *See* Br. of *Amici Curiae* Historians, Doc. 54, at 10 ("This 'usual residence rule' is consistent with the Framers' repeated emphasis on counting 'inhabitants' on United States soil . . . and has remained the guiding principle for census-taking for 230 years."). Just as the Memorandum does not violate the Constitution merely by contemplating the exclusion of some as-yet-unknown number of illegal aliens for lack of "usual residence," neither does it violate the identical language of § 2a. Indeed, as with every census, the Census Bureau had always planned to exclude some people from the 2020 Census without a "usual residence" in a particular State. *See* Residence Criteria, 83 Fed. Reg. at 5,526.

Plaintiffs protest that "the statutory scheme does not delegate the President any discretion regarding the apportionment base," Pl. Mem. at 27-30, but they largely discuss the ministerial nature apportionment *calculation* and Justice Stevens's separate *Franklin* opinion, all while conspicuously

---

[9]     Plaintiffs seem to agree that the Executive may lawfully exclude individuals from the enumeration and apportionment if they do not have a "usual residence" in a State. *E.g.*, Am. Compl. at 64 § G.1 (asking this Court to "[c]ompel[] the Secretary of Commerce to tabulate and report only the total population of each state, based only on the actual enumeration of the total population as determined by the 2020 census, including undocumented immigrants who live in the United States *as their usual residence* . . .") (emphasis added).)

ignoring *Franklin*'s majority opinion.  While the apportionment calculation itself—feeding numbers into a mathematical formula known as the "method of equal proportions"—is "admittedly ministerial," there is nothing "ministerial" about the President's role in obtaining the numbers used in that formula. *Franklin*, 505 U.S. at 799 (explaining that "the admittedly ministerial nature of the apportionment calculation itself does not answer the question [of] whether the apportionment is foreordained by the time the Secretary gives her report to the President").  To the contrary, "§ 2a does not curtail the President's authority to direct the Secretary in making policy judgments that result in 'the decennial census.'" *Id.*[10]  And that is exactly what the President has done here:  direct the Secretary to report two sets of numbers, of which the President will choose one to plug into the "method of equal proportions."  *See* 2 U.S.C. § 2a(a); 85 Fed. Reg. at 44,680.

While Plaintiffs advance Justice Stevens's position that "Congress's sole intention involving the President was 'to make the apportionment proceed automatically based on the census,'" Pl. Mem. at 28 (quoting *Franklin*, 505 U.S. at 810 (Stevens, J., concurring in the judgment)), the *Franklin* majority specifically rejected that view, explaining that "the 'decennial census' still presents a moving target even *after* the Secretary reports to the President." *Franklin*, 505 U.S. at 797 (emphasis added).  "It is not until the President submits the information to Congress that the target stops moving, because only then are the States entitled by § 2a to a particular number of Representatives." *Id.* at 798.  And

---

[10]     Other courts since *Franklin*—including the D.C. Circuit—have likewise understood that § 2a allows the President to perform a significant role beyond the mere "ministerial" calculation leading to reapportionment.  *See Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) (characterizing the Commerce Secretary's report to the President a "moving target" because "the President has statutory discretion to exercise supervisory power over the agency's action); *see also Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 860 (4th Cir. 2002) (likening an EPA report to the Secretary's § 141(b) report because it "is advisory and does not trigger the mandatory creation of legal rules, rights, or responsibilities," allowing the President "to embrace or disregard" the Secretary's report); *Alabama v. Dep't of Commerce*, 396 F. Supp. 3d 1044, 1055 (N.D. Ala. 2019) (noting that in fulfilling his responsibilities under § 2a, "the President is not necessarily bound to follow the Secretary's tabulation").

"it is the President's personal transmittal of the report to Congress" that "settles the apportionment" of Representatives, making the President "important to the integrity of the process." *Franklin*, 505 U.S. at 799-800. Plaintiffs' attempt to reduce the President to a mere calculator cannot be squared with the Supreme Court's holding that § 2a contemplates his exercise of substantial discretion.

Plaintiffs also trumpet "this Court['s]" supposed holding that "it is not plausible that Congress would have left such fundamental [apportionment] choices 'to the discretion of the [Executive Branch] without [sic; 'absent'] a more direct congressional pronouncement.'" Pl. Mem. at 27 (misquoting *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 100 (1998) (three-judge court), *aff'd*, 525 U.S. 316 (1999)). In reality, the court simply stated that "whether to use *statistical sampling* is not to be left to the discretion of the Secretary of Commerce absent a more direct congressional pronouncement." *U.S. House of Representatives*, 11 F. Supp. 2d at 100 (emphasis added).

Plaintiffs also argue that "the President has directed the Commerce Department to violate 13 U.S.C. § 141(b)" by "ordering the Commerce Department to prepare and transmit to the President a number other than 'the tabulation of total population by States.'" Pl. Mem. at 30. Not so. Article II empowers the President to supervise the conduct of subordinate officials like the Secretary, *see* U.S. Const., art. 2, § 1, and the Opinions Clause further empowers the President to "require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices," *id.*, art. 2, § 2, cl. 2. Even Justice Stevens in *Franklin* acknowledged that § 2a "does not purport to limit the President's 'accustomed supervisory powers' over the Secretary of Commerce." 505 U.S. at 813 n.11 (Stevens, J., concurring in the judgment). So Plaintiffs cannot preclude the President from obtaining information from the Secretary, nor the Secretary from providing it.

Put simply, Plaintiffs cannot manufacture an *ultra vires* claim detached from their Apportionment Clause claim. By delegation of the Census Act, the Executive stands in the shoes of

Congress and may properly exclude individuals from apportionment for lack of "usual residence"—just as he has done in every other apportionment calculated under the Census Act.

### E.    Plaintiffs Have Failed To State a Claim for Lack of "Actual Enumeration" or Unlawful Statistical Sampling (Count V)

Plaintiffs' fifth count asserts a claim for supposed violations of the Enumeration Clause, U.S. Const. art. I, § 2, cl. 3, and the general prohibition on statistical sampling, 13 U.S.C. § 195. Am. Compl. ¶¶ 203-210. According to Plaintiffs, implementation of the Presidential Memorandum necessarily involves violating the Enumeration Clause, § 195, or both.

As a threshold matter, Plaintiffs do not adequately plead this claim. Plaintiffs start with a false premise: that implementation of the Presidential Memorandum *requires* the exclusion of all illegal aliens from the apportionment base. *See* Am. Compl. ¶ 207. Building on that false premise, Plaintiffs conclude that implementing such a blanket exclusion would violate the Enumeration Clause, the prohibition on statistical sampling, or both. *Id.* ¶ 208. But this premise is wrong. As explained above, the Presidential Memorandum on its face does not necessarily require the exclusion of *all* illegal aliens from the apportionment base, and Plaintiffs' allegations to the contrary should be disregarded, and this claim dismissed. *See Kaempe*, 367 F.3d at 963; *Redmon*, 80 F. Supp. 3d at 89.

### 1.    *Plaintiffs' Enumeration Clause Claim Fails as a Matter of Law*

Plaintiffs' Enumeration Clause claim fails for the same reasons that their *ultra vires* claim fails. The Enumeration Clause provides that "[t]he actual Enumeration shall be made . . . in such Manner as [Congress] shall by Law direct." U.S. Const. art. I, § 2, cl. 3. As explained above, *supra* Part III.D, Congress has delegated authority to the Executive to conduct the enumeration and apportionment, including the authority to exclude individuals from apportionment for lack of "usual residence."

Plaintiffs' argument as to what the Enumeration Clause requires, *see* Pl. Mem. at 31-34, is fundamentally at odds with the recognition in *Franklin* that, under the statutory scheme Congress established, the President retains discretion to make policy determinations about what constitutes the

enumeration, and is not required "to adhere to the policy decisions reflected in" the report he receives from the Secretary. *Franklin*, 505 U.S. at 799. In other words, it is the President's exercise of discretion and transmittal of the report to Congress that establishes the actual enumeration—and Plaintiffs have no basis to assert that a different set of numbers must, as a constitutional matter, be used.

2.    *Plaintiffs Do Not Plausibly Allege a Claim for Unlawful Statistical Sampling*

As explained above, the Presidential Memorandum can be implemented in a manner that comports with the Apportionment and Enumeration Clauses, as well as 13 U.S.C. § 141 and 2 U.S.C. § 2a. *See supra* Parts III.A, III.D, III.E.1. Because the Presidential Memorandum can be implemented as described above without resort to statistical sampling, Plaintiffs' speculative allegations—that "*on information and belief*, any quantification method that Defendants *might* employ . . . would be based on unlawful statistical sampling" Am. Compl. ¶ 128 (emphases added)—"do[] not cross the line between possibility and plausibility" and, accordingly, Plaintiffs are "not entitled to relief" on their facial claim. *Burnett*, 58 F. Supp. 3d at 107.

3.    *In All Events, Plaintiffs Are Not Entitled To Partial Summary Judgment on Their Unlawful Statistical Sampling Claim*

Even assuming that Plaintiffs have adequately pled a violation of 13 U.S.C. § 195 (they have not), Plaintiffs are not entitled to partial summary judgment on that claim. Section 195 states that the Secretary of Commerce "shall, if he considers it feasible, authorize the use of the statistical method known as 'sampling' in carrying out the provisions of" Title 13, "[e]xcept for the determination of population for purposes of apportionment of Representatives in Congress among the several States." § 195. As explained in the accompanying declaration of John M. Abowd, Ph.D., the Chief Scientist and Associate Director for Research and Methodology at the United States Census Bureau, "any methodology or methodologies ultimately used by the Census Bureau to implement the" Presidential Memorandum, "will *not* involve the use of statistical sampling for apportionment purposes." Abowd Sept. Decl. ¶ 14 (emphasis added). To the extent that Plaintiffs' uninformed speculation could even

48

be considered a "material fact" sufficient to trigger summary judgment under Rule 56, Dr. Abowd's unqualified rejection of that speculation requires denial of summary judgment.

And even in the absence of Dr. Abowd's unqualified rejection of Plaintiffs' 13 U.S.C. § 195 claim, Plaintiffs still would not be entitled to summary judgment. As Dr. Abowd explains, the Census Bureau "is continuing its process of determining the appropriate methodologies and finalizing, to the extent possible, how it may" implement the Presidential Memorandum. Abowd Sept. Decl. ¶ 11. This not only renders Plaintiffs' claims unripe, *see supra* Part I.A, but also precludes the entry of summary judgment since the Census Bureau has not yet conclusively decided what methodology or methodologies it might employ. *See* Fed. R. Civ. P. 56(d).

### F. Plaintiffs' Demands for Relief Against the President Must Be Dismissed

Plaintiffs ask this court to enjoin the President from implementing the policy in the Presidential Memorandum, to issue a writ of mandamus to that effect, and to declare his policy decision unlawful. Am. Compl. at 63-65. In their brief, Plaintiffs represent "that the law is somewhat unclear as to whether and when the President himself may be enjoined." Pl. Mem. at 15. Not so. "With regard to the President, courts do not have jurisdiction to enjoin him." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citing *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866)). And "declaratory relief against . . . the President" is similarly "unavailable." *Id.*

## III. PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF

If the Court declines to dismiss Plaintiffs' claims, it should nonetheless deny Plaintiffs' request for the extraordinary relief of a permanent or preliminary injunction.

Although Plaintiffs seek partial summary judgment on three of their claims, they do not specify what remedy they wish to accompany that judgment. Presumably, however, Plaintiffs would have this Court enter, at minimum, a permanent injunction prohibiting Defendants from implementing the Presidential Memorandum. *See* Am. Compl. at 63-64 § D. Unlike the motion-to-dismiss context in

which Plaintiffs' well-pleaded allegations are generally accepted as true, the "extraordinary remedy" of an injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain permanent injunctive relief, Plaintiffs bear the burden of demonstrating: (i) "that they have suffered an irreparable injury"; (ii) "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (iii) "that, considering the balance of hardships between [the parties, a remedy in equity is warranted"; and (iv) "that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

As explained above, Plaintiffs' Apportionment Clause claim, their *ultra vires* claim, and their Enumeration Clause and unlawful-statistical-sampling claim all lack merit, and their request for partial summary judgment should be rejected for that reason alone. *Winter*, 555 U.S. at 32–33. Even if these claims were meritorious, however, Plaintiffs could not satisfy the remaining factors, and are thus not be entitled to either preliminary or permanent injunctive relief.

## A. Plaintiffs Cannot Establish Any Imminent and Irreparable Harm

Most significantly, Plaintiffs fail to establish that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20; *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.") (emphasis in original).

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "First, the injury must be both certain and great; it must be actual and not theoretical." *Id.* Plaintiffs "must show 'the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Id.* (emphasis in original). "Second, the injury must be beyond remediation." *Id.* "The possibility that

50

adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.* at 297-98.

Because of the "extraordinary and drastic" nature of a preliminary injunction, *Mazurek*, 520 U.S. at 972, Plaintiffs' burden to show irreparable harm is necessarily higher than what is required to establish standing. *See, e.g., id.* Here, Plaintiffs fail this test at every step—and further fail to establish that the remaining injunction factors tilt in their favor.

### 1. *Plaintiffs Cannot Establish Any Irreparable Apportionment Injury*

Because Plaintiffs rushed to Court before the Secretary has implemented the Memorandum— and before any census enumeration has even been completed—they cannot show any imminent threat of apportionment injury.

As detailed above, it is currently unknown what numbers the Secretary may ultimately transmit to the President. *See supra* Part I.A.1. Plaintiffs' expert posits only that the *wholesale* exclusion of illegal aliens may cause certain states to lose a Congressional seat. *E.g.*, Warshaw Decl., Doc. 31-23, ¶ 12. But their expert does not—and cannot—predict what apportionment injury anyone might suffer from some hypothetical smaller exclusion, assuming anyone suffers any apportionment injury at all. Given that the Secretary of Commerce has not yet transmitted his report to the President, and the President has not yet transmitted any numbers to Congress, any effort to predict the ultimate effect of the Memorandum on apportionment is entirely speculative.

More fundamentally, any purported apportionment injury that Plaintiffs could suffer is, as a legal matter, not irreparable. The Supreme Court has regularly decided census cases that, like this one, contest the relative apportionment of representatives post-apportionment, because an erroneous or invalid apportionment number can be remedied after the fact.[11] *See, e.g., Utah*, 536 U.S. at 462 (holding

---

[11] The only census cases decided by the Supreme Court pre-apportionment involved challenges to the mechanics of conducting the census, which could not be undone post-apportionment. *See Dep't*

that post-apportionment redress is possible if the apportionment calculation contains an error); *see also Franklin*, 505 U.S. at 803 (finding that a post-apportionment order against the Secretary would provide redress for plaintiffs); *Montana*, 503 U.S. at 445-46; *Wisconsin v. City of New York*, 517 U.S. 1 (1996). Indeed, in *Wisconsin*, it was not until *six years* after the 1990 census that the Court resolved an apportionment dispute based on those results. This case is no different. The Presidential Memorandum does not purport to change the conduct of the census itself. Rather, it concerns the calculation of the apportionment base used to determine the number of representatives that each State will receive. Accordingly, this Court could order adequate relief after apportionment when any injury to Plaintiffs is known with certainty—assuming there is any at all. Indeed, the very fact that the Memorandum calls for the Secretary to report two numbers—one arrived at after the Census Bureau applies its Residency Criteria, and a second that would allow the President to remove some number of illegal aliens that the Secretary is able to identify from the apportionment base—makes clear that a post-apportionment remedy would be easy to craft.

### 2. *Plaintiffs' Allegations of Enumeration Injury Do Not Withstand Scrutiny*

Plaintiffs' alternative efforts to link the Memorandum to some ongoing enumeration injury fare no better. As explained by Associate Director Fontenot, the Memorandum does *not* affect how the Census Bureau is conducting its remaining enumeration operations. *See* Fontenot Decl. ¶¶ 7, 12; *see generally* Census Bureau, *Review of 2020 Operational Plan Schedule*, Aug. 17, 2020, https://2020census.gov/content/dam/2020census/materials/news/2020-operational-plan-schedule-review.pdf ("Operational Plan") Those operations include a variety of protocols specifically designed over the course of the past decade to ensure that hard-to-count and minority communities—

---

*of Commerce v. New York*, 139 S. Ct. 2551 (2019) (challenge to a citizenship question on the 2020 Census); *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) (challenge to the use of statistical sampling in the census).

some of the core constituencies for which Plaintiffs advocate—are accurately reflected in the census. *See generally* Fontenot Decl. ¶¶ 11, 12; Operational Plan at 2-11 (describing non-response follow-up, and other efforts to achieve "acceptable level of accuracy and completeness, with a goal of resolving at least 99% of Housing Units in every state, comparable with previous censuses").[12]  Plaintiffs speculate that, notwithstanding these protocols, the Memorandum will render the enumeration less accurate—purportedly by deterring immigrant communities from participating.  Am. Compl. ¶¶ 154-155.  But these claims suffer from at least three fundamental flaws, each of which seriously undermines the causation Plaintiffs are trying to establish.

(a)  Plaintiff's Theory of Harm Relies on Attenuated Events Involving the Independent Actions of Third-Parties

As discussed in the standing section, Plaintiffs' theory for why the Memorandum may depress response rates relies on a highly attenuated chain of events.  (*See supra* Part I.B.2.)  Based solely on hearsay news reports about statements by a politician, special-interest groups, and unnamed persons, Plaintiffs allege that "the Memorandum is already causing fear, confusion, and distrust among the immigrant population and even further reducing the likelihood that immigrants (both documented and undocumented) will respond to the census."  Am. Compl. ¶ 154.  But those independent actors' messages are the product of their own interpretation, and are at odds with the plain terms of the Memorandum.

And it makes little sense to attribute whatever harm is caused by those independent actors' messaging to the Memorandum itself, particularly if their messages convey the incorrect impression that "data provided in response to the census may lead to the deportation of respondents, their family,

---

[12]     *See also* 2020 Census Detailed Operational Plan for: 18. Nonresponse Followup Operation (NRFU), Apr. 16, 2018, https://www2.census.gov/programs-surveys/decennial/2020/program-management/ planning-docs/NRFU-detailed-operational-plan.pdf; *see also* 2020 Census Research and Testing Management Plan, Dec. 28, 2015, https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/research-testing-plan.pdf, at 7.

53

or their friends." (*Id.*) Given the strong privacy protections for census response data, any suggestion that the Secretary's compliance with the Memorandum will somehow facilitate immigration enforcement is flatly wrong. *See generally* 13 U.S.C. § 9 (providing that personal information collected by the Census Bureau cannot be used against respondents by any government agency or court); *id.* § 214 (setting forth penalty for wrongful disclosure of information).

      (b)      Plaintiffs' Theory of Harm Is Limitless

Setting aside the role of independent actors, Plaintiffs' theory of harm proves too much. Plaintiffs' core claim is that the Memorandum will depress aliens' participation in the census by allegedly "causing fear, confusion, and distrust." Am. Compl. ¶ 154. But the same line of reasoning could apply to almost any government action or statement that Plaintiffs find disagreeable.

The transmission of a general policy message—like the kind Plaintiffs claim the Memorandum sends—cannot suffice to show that irreparable harm is imminent or likely. *Winter*, 555 U.S. at 12, 20. The Supreme Court has repeatedly rejected efforts to conjure irreparable injury from a hypothetical series of events that could theoretically cause a plaintiff injury. *See, e.g.*, *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983); *Rizzo v. Goode*, 423 U.S. 362, 372-73 (1976). Indeed, it has explicitly noted that allegations of "fear[]" of future harm must be assessed for reasonableness: "[i]t is the *reality* of the threat of" future harm that is relevant, "not the plaintiff's subjective apprehensions." *Lyons*, 461 U.S. at 107 n.8 (emphasis added). Where, as here, fear is based on a series of conjectures and subjective misinterpretations—tethered not to something the government has actually done, but to some different policy the government might (or might not) pursue in the future—such fear cannot form the basis for irreparable harm. *See id.* at 107. Merely harboring an objection to the President's expression of a policy preference falls far short of the standard for injunctive relief.

(c)     The Alleged Harm is at Odds with Existing Evidence

Finally, Plaintiffs' claims that the Memorandum is likely to decrease response rates is simply inconsistent with empirical evidence. As noted above, *see supra* Part I.B.2(a), a randomized control trial published by the Census Bureau after the Supreme Court issued its opinion in the citizenship question litigation found *no* statistically-significant depression of response rates for households that received a test questionnaire containing a citizenship question. *See* Abowd Aug. Decl. ¶ 13; *see also 2019 Census Test Report,* Census Bureau (Jan. 3, 2020), https://www2.census.gov/programs-surveys/decennial/2020/program-management/census-tests/2019/2019-census-test-report.pdf (Census Test Report). As explained by Dr. Abowd, this test contained a sample of 480,000 housing units, and was "capable of detecting response differences as small as 0.5 percentage points." See Abowd Aug. Decl. ¶ 13. And while some narrow subgroups did exhibit statistically-significant lower self-response rates, Census Test Report at x, the Census Bureau concluded that "[c]urrent plans for staffing for Nonresponse Followup would have sufficiently accounted for subgroup differences seen in this test." *Id.* This result was contrary to the prediction of experts who previously testified during the citizenship-question litigation. *See generally id.* As Dr. Abowd reports, this finding illustrates the benefit of a randomized controlled design, which properly isolates the independent variable (there, the citizenship question) and measures its effects. *Id.*

Plaintiffs cannot reasonably contend that the Memorandum would have a greater effect on response rates than did the citizenship question. Unlike a question on a census questionnaire, the Memorandum does not call for respondents to submit any information, and it changes nothing about the enumeration process. *See* 85 Fed. Reg. at 44,679 (directing the Secretary to make use of existing information). And Plaintiffs do not identify any rigorous survey or statistical study measuring whether this kind of internal Government action, which seeks nothing of respondents and has no connection to immigration enforcement, has any effect on response rates within immigrant communities.

Under these circumstances, Plaintiffs cannot be said to establish anything more than the abstract "possibility of irreparable injury." *Nken v. Holder*, 556 U.S. 418, 434 (2009). But, as the Supreme Court has emphasized, the "'possibility' standard is too lenient" a basis upon which to issue the drastic remedy of a preliminary injunction. *Winter*, 555 U.S. at 22. Plaintiffs' failure to establish anything more than the theoretical possibility of harm is a sufficient basis to deny the injunction they seek.

## B.     The Remaining Factors Weigh Against an Injunction

On the other side of the ledger, the harm to the government and to the public interest from an injunction would be great, and immediate. *See Nken*, 556 U.S. at 435 (explaining that harm to opposing party and weighing the public interest "merge" when relief is sought against the government). Indeed, an injunction would impede the Executive's historic discretion in conducting both the census and the apportionment, contrary to Congressional intent. *See generally Franklin*, 505 U.S. at 796-800.

## CONCLUSION

For the foregoing reasons:  (i) this action should be dismissed for lack of subject-matter jurisdiction or, in the alternative, because Plaintiffs fail to state a single claim; (ii) Plaintiffs' motion for partial summary judgment should be denied; and (iii) Plaintiffs' request for an expedited trial on the merits (which they briefed in a separate motion, *see* Doc. 32, and to which the United States will respond separately) should be denied.

DATED:  September 2, 2020            Respectfully submitted,


ETHAN P. DAVIS
Acting Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

DIANE KELLEHER
BRAD P. ROSENBERG
Assistant Branch Directors

/s/ Elliott M. Davis
DANIEL D. MAULER
ELLIOTT M. DAVIS
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC  20005
Phone:    (202) 353-5639
Fax:       (202) 616-8470
E-mail:   elliott.m.davis@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| COMMON CAUSE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | No. 1:20–cv–02023–CRC–GGK–DLF |

## DEFENDANTS' CONCISE STATEMENT
## OF GENUINE ISSUES OF MATERIAL FACT

Pursuant to Local Civil Rule 7(h)(1), Defendants submit this separate concise statement of genuine issues of material fact that suffice under Federal Rule of Civil Procedure 56 to preclude this Court from granting Plaintiffs' motion for partial summary judgment.[*]

1. The extent to which the Census Bureau will be able to provide the Secretary of Commerce a second tabulation in connection with the apportionment that would permit the President

---

[*] In support of their motion for partial summary judgment, Plaintiffs submitted a 26-page, 109-paragraph statement of material facts. Doc. 31-26. The Local Civil Rules do not require Defendants to respond on a paragraph-by-paragraph basis, *see* L. Civ. R. 7(h)(1), and doing so would be unproductive here, particularly given that: (i) Plaintiffs filed their motion at the preliminary stages of this case, before the Court has even evaluated whether it has jurisdiction and whether Plaintiffs have stated a claim upon which relief can be granted; and (ii) most of Plaintiffs' allegations are immaterial to the resolution of their motion in any event. Rather, Defendants submit this "concise statement of genuine issues," L. Civ. R. 7(h)(1) that, individually and collectively, suffice to preclude this Court from granting Plaintiffs' motion for partial summary judgment. Defendants nonetheless reserve their right to dispute Plaintiffs' facts and, to the extent that this action survives Defendants' motion to dismiss, Defendants may seek to engage in discovery on any or all of the issues presented in Plaintiffs' statement.

to carry out the Presidential Memorandum. *See* Decl. of John M. Abowd, Ph.D (Sept. 1, 2020) ("Abowd Sept. Decl.") ¶ 11.

2.      What methodology or methodologies the Census Bureau may use in determining that second tabulation. *See id.*

3.      Because the Presidential Memorandum states that it should be implemented "to the extent feasible," and "consistent with applicable law," 85 Fed. Reg. 44,679, 44,679-80 (July 21, 2020), who would be excluded from the second tabulation through any methodology or methodologies the Census Bureau may use. *See* Abowd Sept. Decl. ¶ 11.

4.      What numbers the Secretary of Commerce may report to the President. *See id.*

5.      What numbers the President may report to Congress. *See id.*

6.      Owing to the many uncertainties above, whether a hypothetical second tabulation would have any effect on congressional apportionment as compared to congressional apportionment based on the tabulation that follows the methodology set forth in the Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5,525 (Feb. 8, 2018). *See* Abowd Sept. Decl. ¶ 11.

7.      Because it is unknown whether and how implementation of the Presidential Memorandum would affect congressional apportionment, whether any State would gain or lose a representative. *See id.*

8.      Because it is unknown whether any State would gain or lose a representative, whether any Individual Plaintiff, any resident of the City Plaintiffs, or any member of the Organization Plaintiffs lives in a State that can be expected to lose a representative. *See id.*

9.      Whether any methodology or methodologies ultimately used by the Census Bureau will involve the use of statistical sampling for apportionment purposes. *See* Abowd Sept. Decl. ¶ 14 ("any methodology or methodologies ultimately used by the Census Bureau to implement the

[Presidential Memorandum] will not involve the use of statistical sampling for apportionment

purposes").

DATED:  September 2, 2020                    Respectfully submitted,


ETHAN P. DAVIS
Acting Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

DIANE KELLEHER
BRAD P. ROSENBERG
Assistant Branch Directors

/s/ Elliott M. Davis
DANIEL D. MAULER
ELLIOTT M. DAVIS
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC  20005
Phone:   (202) 353-5639
Fax:        (202) 616-8470
E-mail:   elliott.m.davis@usdoj.gov

*Counsel for Defendants*