# **EXHIBIT 4**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATALIA USECHE, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 8:20-cv-2225-PX |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL**
**SUMMARY JUDGMENT OR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................1

BACKGROUND ........................................................................................................................3

I.      The Census and Apportionment Generally .............................................................3

II.     The July 21, 2020, Presidential Memorandum .......................................................4

III.    Plaintiffs' Challenge ..............................................................................................5

ARGUMENT ............................................................................................................................6

I.      The Court Lacks Jurisdiction Because Plaintiffs' Claims Are Unripe. ...................6

        A.      It Is Currently Unknown What Numbers the Secretary May Report to the
                President. ......................................................................................................7

        B.      Other Considerations Underscore that Plaintiffs' Claims Are Not Ripe. .........8

II.     This Court Lacks Jurisdiction Because Plaintiffs Lack Standing. ...........................9

        A.      Plaintiffs' Alleged Apportionment Injuries Are Too Speculative to Confer
                Standing. .................................................................................................... 10

        B.      Plaintiffs' Allegations That the Presidential Memorandum Will Reduce
                Participation in the 2020 Census Are Speculative, Not Traceable to the
                Memorandum, and Not Redressable by a Favorable Ruling. ........................ 11

                1.      Plaintiffs' Alleged Enumeration Injuries Are Too Speculative to Confer
                        Standing. ........................................................................................... 11

                2.      The Alleged Chilling Effect Is Not Traceable to the Memorandum. .... 14

                3.      A Favorable Ruling Would Not Redress Plaintiffs' Alleged
                        Enumeration Injuries. ........................................................................ 16

III.    Plaintiffs' Motion should be Denied because Plaintiffs Fail to State a Claim. ...... 18

        A.      *Franklin* Mandates Rejection of Plaintiffs' APA Claims. ........................... 18

        B.      Plaintiffs Have Failed to Sufficiently Allege an Equal Protection Claim
                Under the Fifth Amendment. ...................................................................... 20

        C.      Plaintiffs Have Failed to State an Apportionment Clause Claim. ................. 22

                1.      Only "Inhabitants" Who Have Their "Usual Residence" in a State
                        Need Be Included in the Apportionment. ........................................... 23

2.   The Executive Has Significant Discretion to Define Who Qualifies as
an "Inhabitant." ................................................................................ 27

3.   The Apportionment Clause Does Not Require Inclusion of All Illegal
Aliens as "Inhabitants" Having a "Usual Residence" in a State. ........................... 30

D.   Plaintiffs Have Failed to State an *Ultra Vires* Claim. ............................................. 37

E.   Plaintiffs' Demands for Relief Against the President Must Be Rejected. ...................... 41

IV.   Plaintiffs are Not Entitled to a Preliminary or Permanent Injunction. .............................. 42

A.   Plaintiffs Cannot Establish Any Imminent and Irreparable Harm. ................................ 43

1.   Plaintiffs Cannot Establish Any Irreparable Apportionment Injury. ..................... 44

2.   Plaintiffs' Allegations of Enumeration Injury Do Not Withstand
Scrutiny. ................................................................................................ 45

a.   Plaintiff's Theory of Harm Relies on Attenuated Events Involving the
Independent Actions of Third-Parties. ................................................ 46

b.   Plaintiffs' Theory of Harm Is Limitless. ............................................ 47

c.   The Alleged Harm is at Odds with Existing Evidence. ........................... 48

B.   The Remaining Factors Weigh Against an Injunction. ............................................... 49

CONCLUSION ................................................................................................................. 50

## INTRODUCTION

Plaintiffs—a group of individuals ("Individual Plaintiffs") and a group of non-profit organizations ("NGO Plaintiffs")—bring constitutional and statutory challenges to a memorandum that the President issued on July 21, 2020, titled Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census (the "Presidential Memorandum" or "Memorandum"), 85 Fed. Reg. 44,679 (July 23, 2020). That Memorandum provides that for purposes of reapportionment of Representatives in Congress following the 2020 census, "it is the policy of the United States to exclude" illegal aliens from the apportionment base "to the extent feasible and to the maximum extent of the President's discretion under the law." *Id.* at 44,680. It directs the Secretary of Commerce to submit to the President two tabulations in connection with the apportionment—one tabulation includes an enumeration according to the methodology set forth in the Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5,525 (Feb. 8, 2018) ("Residence Criteria"), and the second, "to the extent practicable," requires the Secretary to provide information permitting the President to exclude illegal aliens from the apportionment base. Because Plaintiffs' various challenges to this Memorandum fail as a matter of law, Plaintiffs' Motion for Partial Summary Judgment or a Preliminary Injunction (ECF No. 19) (hereinafter, the "Motion") should be denied.

As a threshold matter, this Court lacks subject-matter jurisdiction over Plaintiffs' claims. This Court lacks jurisdiction for two reasons: 1) Plaintiffs' claims are not ripe, and 2) Plaintiffs lack standing to challenge the Presidential Memorandum. Plaintiffs' alleged injuries, including lost representation in Congress, decreased federal funding, and diversion of resources, are speculative. At this point, it is unknown what numbers the Secretary of Commerce will provide the President. Accordingly, any allegation as to the impact of the President's apportionment decision is wholly theoretical and legally insufficient.

1

Plaintiffs' allegations that the Presidential Memorandum will have a significant chilling effect on immigrant communities' participation in the census likewise are speculative, conclusory, and based on hearsay. Plaintiffs rely on affidavits from fact and expert witnesses that contain only generalized, second- or third-hand hearsay accounts of alleged harm and unsubstantiated conjectures.

In addition to these jurisdictional defects, Plaintiffs' Motion should be denied on its merits. Plaintiffs assert that the Presidential Memorandum violates the Administrative Procedure Act ("APA"), the constitutional separation of powers, principles of equal protection under the Fifth and Fourteenth Amendments, the Apportionment Clauses of Article I and the Fourteenth Amendment, 13 U.S.C. § 141, and 2 U.S.C. § 2a. Each of these claims fails as a matter of law.

First, there is no viable basis for APA review of the Presidential Memorandum—both because the President is not an "agency" under the APA and because Plaintiffs fail to allege any "final agency action" by the Secretary of Commerce. Second, Plaintiffs' claims fail because the Supreme Court in *Franklin v. Massachusetts* expressly recognized the broad scope of authority delegated by Congress to the President in relation to apportionment. 505 U.S. 788, 799 (1992). Third, Plaintiffs' equal protection claims fail because they rely on misleading characterizations of the Presidential Memorandum, without any plausible allegations of "animus" or "discriminatory intent." Fourth, Plaintiffs' claims under the Apportionment Clauses, 13 U.S.C. § 141, and 2 U.S.C. § 2a, are legally deficient, because they are inconsistent with the Executive Branch's longstanding discretion to define who qualifies as "inhabitants" (or "persons in each State") for purposes of apportionment. Finally, insofar as Plaintiffs seek an injunction against the President, such relief is precluded by Supreme Court precedents barring judicial intrusion on the President's exercise of policy-making discretion.

Plaintiffs are not entitled to either partial summary judgment or a preliminary injunction. Plaintiffs cannot succeed on their claims because of threshold jurisdictional flaws, and they are meritless in any event.

## BACKGROUND

### I.    The Census and Apportionment Generally

The Constitution provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State." U.S. Const. amend. XIV, § 2. To make apportionment possible, the Constitution requires that the federal government conduct a census every ten years in such a manner as directed by Congress. *Id.* art. I, § 2, cl. 3. Each State's number of Representatives, together with its two Senators, also determines the number of electors for President and Vice President in the Electoral College. *See id.* art. II, § 1, cl. 2.

Congress, in turn, has by law directed the Secretary of Commerce to conduct a census of the "total population" every 10 years "in such form and content as he may determine." 13 U.S.C. § 141(a) and (b). The Census Bureau assists the Secretary of Commerce in the performance of this responsibility. *See* 13 U.S.C. §§ 2, 4. For purposes of the 2020 census, the Census Bureau has announced that field data collection will end on September 30, 2020. *See* August 3, 2020, Statement from U.S. Census Bureau Director Steven Dillingham ("Director Dillingham"): Delivering a Complete and Accurate 2020 Census Count, https://www.census.gov/newsroom/press-releases/2020/delivering-complete-accurate-count.html. According to Director Dillingham, the Census Bureau will take various actions, such as increasing training and providing awards to census takers who maximize the hours worked, to "improve the speed of [the] count without sacrificing completeness." *Id.* The Census Bureau "intends to meet a similar level of household responses as collected in prior censuses, including outreach to hard-to-count communities." *Id.*

The Census Bureau has promulgated criteria to count most people for census purposes "at their usual residence, which is the place where they live and sleep most of the time." Residence Criteria, 83 Fed. Reg. at 5,533. Following completion of the 2020 census, by December 31, 2020, the Secretary of Commerce must submit to the President "[t]he tabulation of total population by States

… as required for the apportionment of Representatives in Congress among the several States."  13 U.S.C. § 141(b).  "On the first day, or within one week thereafter, of the first regular session of the [117th Congress]," the President must "transmit to the Congress a statement showing the whole number of persons in each State … and the number of Representatives to which each State would be entitled … by the method known as equal proportions."  2 U.S.C. § 2a(a).

## II.    The July 21, 2020, Presidential Memorandum

On July 21, 2020, the President issued a Memorandum to the Secretary of Commerce regarding the exclusion of illegal aliens from the apportionment base following the 2020 census.  *See* 85 Fed. Reg. at 44,679-81.  The Presidential Memorandum states that "it is the policy of the United States to exclude" such aliens from the apportionment base "to the extent feasible and to the maximum extent of the President's discretion under the law."  *Id.* at 44,680.  The Presidential Memorandum directs the Secretary of Commerce to submit to the President two tabulations.  One is an enumeration "tabulated according to the methodology set forth in" the Residence Criteria.  *Id.*  The second calls for "information permitting the President, to the extent practicable," to carry out the stated policy, *i.e.*, an apportionment excluding illegal aliens.  *Id.*

To date, the Census Bureau is still evaluating the usability of administrative records pertaining to citizenship status in connection with the decennial census, *see* Exec. Order 13880, 84 Fed. Reg. 33,821-25 (July 16, 2019), and formulating a methodology for potentially excluding illegal aliens.  *See* August      3,      2020,      Dillingham      Statement,      https://www.census.gov/ newsroom/press-releases/2020/delivering-complete-accurate-count.html  ("The Census Bureau continues its work on meeting the requirements of Executive Order 13,880 issued July 11, 2019 and the Presidential Memorandum issued July 21, 2020.  A team of experts [is] examining methodologies and options to be employed for this purpose.  The collection and use of pertinent administrative data continues.").

### III.    Plaintiffs' Challenge

On July 31, 2020, the Individual Plaintiffs filed a complaint challenging the Presidential Memorandum.  *See* ECF 1.  They amended their complaint on August 14, 2020, and added the NGO Plaintiffs as parties.  *See* ECF Nos. 18.  In their Amended Complaint, Plaintiffs allege that the Presidential Memorandum violates requirements contained in Article I; the Fifth Amendment; Fourteenth Amendment; 13 U.S.C. § 141, and 2 U.S.C. § 2a to base apportionment on the "whole number of persons in each State"; the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; and 13 U.S.C. §§ 141 and 195 with respect to the use of statistical sampling.  *See* Am. Compl. ¶¶ 115-157.

Plaintiffs further allege that if the President excludes illegal aliens from the apportionment base, the Individual Plaintiffs will be injured by "(i) causing their states to be unlawfully deprived of representation in the U.S. House of Representatives and electoral votes in the Electoral College, thereby diluting the individual Plaintiffs' votes; and (ii) causing a disproportionate undercount in the states and localities in which the individual Plaintiffs reside that will in turn result in the dilution of the individual Plaintiffs' votes, a loss of political representation, and under-allocation of federal funding to the individual Plaintiffs' communities."  Am. Compl., ¶ 91.  Meanwhile, the NGO Plaintiffs claim that they will be injured by "(i)requiring the organizational Plaintiffs to divert resources to census-related outreach from other areas critical to their mission and frustrating their mission and purposes; and (ii) causing a disproportionate undercount in the states and localities in which the organizational Plaintiffs operate and in which the organizational Plaintiffs' members reside that will in turn result in the dilution of the votes of the organizational Plaintiffs' members, a loss of political representation, and under-allocation of federal funding to the communities in which individual Plaintiffs and the organizational Plaintiffs' members reside."  *Id.* at ¶ 91.  Plaintiffs seek declaratory and injunctive relief.  *Id.* at ¶ 158.

In support of their Motion, Plaintiffs submitted declarations from Ruth Gilgenbach (ECF 19-7, the "Gilgenbach Decl."), a statistician, and from Mathew A. Barreto, Ph.D., a political science professor (ECF 19-6, the "Barreto Decl."), in addition to numerous other short declarations from the Individual Plaintiffs and executives of the NGO Plaintiffs.

## ARGUMENT

### I.   The Court Lacks Jurisdiction Because Plaintiffs' Claims Are Unripe.

The ripeness doctrine preserves the case or controversy requirement by "preventing judicial consideration of issues until a controversy is presented in 'clean-cut and concrete form.'" *Miller v. Brown*, 462 F.3d 312, 318–19 (4th Cir. 2006) (quoting *Rescue Army v. Mun. Court of L.A.*, 331 U.S. 549, 584 (1947)); *see also Texas v. United States*, 523 U.S. 296, 300 (1998).  The ripeness doctrine "is designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (internal quotation marks omitted).

Ripeness incorporates both a constitutional requirement and a prudential requirement.  *See Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, 670 n. 2 (2010); *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).  In this sense, "[a]nalyzing ripeness is similar to determining whether a party has standing." *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019) (quoting *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006)).  Just as Plaintiffs "cannot assert standing based on an alleged injury that lies at the end of a highly attenuated chain of possibilities," Plaintiffs' "claim is not ripe for judicial review if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* (citations omitted).  Under the ripeness doctrine, the Court also considers: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial

intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 733.

Here, Plaintiffs' claims do not meet the constitutional requirement for ripeness because the claims are, at bottom, about apportionment, not census procedures—and any alleged apportionment injury that States may, or may not, suffer is at this point "conjectural or hypothetical" rather than "imminent."

### A. It Is Currently Unknown What Numbers the Secretary May Report to the President.

The Presidential Memorandum states that "it is the policy of the United States to exclude" illegal aliens from the apportionment base "*to the extent feasible* and to the maximum extent of the President's discretion under the law." 85 Fed. Reg. at 44,680 (emphasis added). It directs the Secretary of Commerce to provide two sets of numbers—one tabulated "according to the methodology set forth in" the Residence Criteria for counting everyone at their usual residence, and a second "permitting the President, *to the extent practicable*," to carry out the stated policy of excluding illegal aliens from the apportionment base. *Id.* at 44,680 (emphasis added).

The extent to which it will be feasible for the Census Bureau to provide the Secretary of Commerce a second tabulation is, at this point, unknown. *See* Abowd Decl. ¶ 15. Similarly, Plaintiffs' specific claim under 13 U.S.C. §§ 141, 195—alleging that the Census Bureau will impermissibly rely on sampling to enumerate the illegal alien population (Am. Compl. ¶¶ 52-53, 139, 154)—is similarly unripe because it is conjectural and hypothetical. Plaintiffs have provided nothing other than speculation that the Census Bureau will rely on sampling. *See id.* Moreover, as shown in the Declaration of Dr. Abowd, the Census Bureau is still in the "process of determining the appropriate methodologies" (Abowd Decl. ¶ 15) and "any methodology or methodologies ultimately used by the

Census Bureau to implement the [Presidential Memo] will not involve the use of statistical sampling for apportionment purposes." *Id.* at ¶ 23.

Because it is not known what the Secretary may ultimately transmit to the President, it is necessarily not yet known whether the President will be able to exclude some or all illegal aliens from the apportionment base. As a result, Plaintiffs' apportionment claims are unripe as they depend upon contingent future events that may not occur as anticipated or may not occur at all. *See Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) ("Where an injury is contingent upon a decision to be made by a third party that has not yet acted, it is not ripe as the subject of decision in a federal court."). Put simply, until the Census Bureau and Secretary of Commerce transmit the information specified in the Presidential Memorandum, and until the President acts on the information, any claim of apportionment injury is speculative.

**B. Other Considerations Underscore that Plaintiffs' Claims Are Not Ripe.**

Given that the effects of the Presidential Memorandum and any apportionment injuries to Plaintiffs are at this point unknown, other considerations, such as the hardship to the parties and the fitness of the issues for judicial consideration, also counsel against the Court's exercise of jurisdiction. *South Carolina v. United States*, 912 F.3d at 730. For example, given the above-discussed uncertainties with respect to the effects of the Presidential Memorandum, delayed review would not cause undue hardship to Plaintiffs. *See, e.g.*, *Ohio Forestry Ass'n*, 523 U.S. at 733-34 (challenge to agency action unripe where there is no "significant practical harm" at the present time because a number of future actions would need to occur to make the harm more "imminent" and "certain"); *Texas*, 523 U.S. at 300, 302 (claim unripe where a number of actions would need to occur to cause the alleged harm, rendering it "too speculative whether the problem . . . will ever need solving"). Further, judicial review would improperly interfere with the Census Bureau's ongoing efforts to determine how to respond to the Presidential Memorandum, which are currently in progress, and could impede the apportionment,

which has not yet occurred. *See, e.g.*, *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 735 (action unripe where judicial review "could hinder agency efforts to refine its policies"). Finally, the Court would benefit from further real-world factual development. *See, e.g.*, *id.* at 736 (action was unripe where it would require court to engage in "time-consuming judicial consideration . . . of an elaborate, technically based plan, which predicts consequences that may affect many different parcels of land in a variety of ways," involved issues that could change in the future, and "depending upon the agency's future actions . . . review now may turn out to have been unnecessary"). The actual tabulations that are called for by the Memorandum must be reported by no later than the end of this year, assuming the statutory deadlines in § 141 and § 2a are not extended by Congress.

Perhaps unsurprisingly, census and apportionment cases generally are decided post-apportionment, when census enumeration procedures are no longer at issue and the actual apportionment figures are known. *See, e.g.*, *Franklin*, 505 U.S. at 790-91 (challenging allocation of Department of Defense's overseas employees to particular states following census); *Dep't of Commerce v. Montana*, 503 U.S. at 445-46 (challenging method of equal proportions to determine representatives); *Utah v. Evans*, 536 U.S. 452, 458-59 (2002) (challenging sampling method known as "hot-deck imputation" used by Census Bureau after analyzing census figures); *Wisconsin v. City of New York*, 517 U.S. 1, 4 (1996) (challenging decision not to use particular statistical adjustment to correct an undercount). Here, Plaintiffs are not challenging the enumeration procedures themselves, but only the hypothetical apportionment that *might* result from actions that might be taken pursuant to the Presidential Memorandum. *See, e.g.*, Am. Compl. ¶¶ 1-5. Consistent with this long line of Supreme Court precedent, such a challenge should await the actual apportionment.

## II.   This Court Lacks Jurisdiction Because Plaintiffs Lack Standing.

For similar reasons, Plaintiffs lack standing to pursue their claims. The doctrine of standing requires a plaintiff to establish three elements: (1) a concrete and particularized injury-in-fact, either

actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly traceable to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Defs. of Wildlife*, 504 U.S. at 560-61. The standing inquiry is "'especially rigorous when reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)). Plaintiffs bear the burden of establishing the required elements of standing. *Defs. of Wildlife*, 504 U.S. at 561. A court cannot "favor[ ] its perception of the relevant events over the narrative offered by the complaint," thereby "recasting 'plausibility' into 'probability.'" *LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 430 (4th Cir. 2015). And legal conclusions pleaded as factual allegations, "unwarranted inferences," "unreasonable conclusions," and "naked assertions devoid of further factual enhancement" are not entitled to a presumption of truth. *Id.* at 422. Here, none of the injuries Plaintiffs allege satisfy these requirements.

## A. Plaintiffs' Alleged Apportionment Injuries Are Too Speculative to Confer Standing.

The standing requirement of "injury in fact" requires an allegation that "the plaintiff has sustained or is immediately in danger of sustaining a direct injury" as a result of the challenged action. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016) (internal citations and quotation marks omitted). The injury or threat of injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Defs. of Wildlife*, 504 U.S. at 560 (internal quotation marks omitted). Thus, an alleged future injury must be "'certainly impending,' *or* there [must be] a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568 U.S. at 409 n. 5). "'Allegations of possible future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). As discussed above, Plaintiffs' alleged apportionment injuries are speculative and conclusory, and at this point in time, there is no "substantial

risk" that harm will occur. *See Susan B. Anthony List*, 573 U.S. at 158. Therefore, any injury to Plaintiffs—be it in the form of loss of a Representative, loss of funding, or otherwise—is conjectural or hypothetical. *Defs. of Wildlife*, 504 U.S. at 560.

**B.   Plaintiffs' Allegations That the Presidential Memorandum Will Reduce Participation in the 2020 Census Are Speculative, Not Traceable to the Memorandum, and Not Redressable by a Favorable Ruling.**

**1.   Plaintiffs' Alleged Enumeration Injuries Are Too Speculative to Confer Standing.**

The Presidential Memorandum does not purport to change the conduct of the census itself. Instead, it relates to the calculation of the apportionment base used to determine the number of representatives to which each state is entitled. There is, facially, no reason why such a Memorandum should have any effect on census response rates. To the contrary, as explained by the Census Bureau's Associate Director for Decennial Census Programs, Albert E. Fontenot, Jr., the Census Bureau's enumeration is almost complete, and the Memorandum does *not* affect how the Census Bureau is conducting its remaining enumeration operations or "the Census Bureau's commitment to count each person in their usual place of residence." Decl. of Albert E. Fontenot, Jr. ¶13; *see also id.* at ¶¶ 8, 10, 12. And although Plaintiffs submit a variety of declarations to purportedly bolster their claims that the Memorandum has a chilling effect on respondents, those declarations are impermissibly conjectural, conclusory, and hearsay.

For example, Dr. Barreto's declaration provides an opinion regarding the so-called "chilling effect" of the Memorandum on individuals' participation in the 2020 Census that is based on multiple levels of conjecture. Dr. Barreto cites several Spanish-language news sources as providing hearsay statements that activists and organizations are concerned about the Memorandum causing fear in Hispanic and immigrant communities; that several studies have found that immigrant communities will rely on Spanish-language news sources; and that various studies, many of them from decades ago, suggest that response rates are affected by the overall socio-political environment. Barreto Decl. ¶¶

11

15-16, 32-38. This "evidence" is insufficient to support Plaintiffs' allegations that the Memorandum will significantly reduce the number of aliens who participate in the census so as to materially affect federal funding and degrade the quality of census data. Although Dr. Barreto discusses studies reflecting concerns among aliens about citizenship information in the census generally and a citizenship question on the census specifically (*see, e.g.*, Barreto Decl. ¶¶ 24-25, 54-55, 61, 68), this is far attenuated from the issues in this case, which involve the Presidential Memorandum. This case does not involve a citizenship question on the census questionnaire or a change to the Census Bureau's process under the Residence Criteria.

Tellingly, Dr. Barreto cites no study actually addressing the Presidential Memorandum's effect on the 2020 Census. And Dr. Barreto's discussion of citizenship-question studies is grounded in inaccuracies. Notably, he fails to address, or even acknowledge, the shortcomings that the U.S. District Court for the Southern District of New York identified in the very study Dr. Barreto now cites for the proposition that the placement of a citizenship question on a census questionnaire would depress response rates. *Compare* Barreto Decl. ¶ 68 *with New York v. Department of Commerce*, 351 F. Supp. 3d 502, 581 n.36 (S.D.N.Y. 2019) (noting that the Court would place "only limited weight on Dr. Barreto's study" because it had a flawed design, and did not weigh the resulting data "to match the population totals").

Further, Dr. Barreto fails to consider the results of the randomized controlled trial published by the Census Bureau after the Supreme Court issued its opinion in the citizenship question litigation, which found *no* statistically-significant depression of response rates for households that received a test questionnaire containing a citizenship question. *See* Abowd Decl. ¶ 13; *see also 2019 Census Test Report,* Census Bureau (Jan. 3, 2020), https://www2.census.gov/programs-surveys/decennial/2020/program-management/census-tests/2019/2019-census-test-report.pdf (Census Test Report). That study contained a sample of 480,000 housing units, and was "capable of

12

detecting response differences as small as 0.5 percentage points." *See* Abowd Decl. ¶ 13.  Overall, "[t]he test questionnaire with the citizenship question had a self-response rate of 51.5 percent; [while] the test questionnaire without the citizenship question had a self-response rate of 52.0 percent." Census Test Report at ix.  And while some narrow subgroups exhibited statistically-significant lower self-response rates, *id.* at x, the Census Bureau concluded that "[c]urrent plans for staffing for Nonresponse Followup would have sufficiently accounted for subgroup differences seen in this test." *Id.  See generally* Abowd Decl. ¶ 13.  As Dr. Abowd reports, this new finding illustrates the benefit of a "randomized controlled design," which properly isolates the independent variable (there, the citizenship question) and measures its effects.  Abowd Decl. ¶ 13.

Likewise, the various fact witness declarations offer nothing to show that the Presidential Memorandum will have a chilling effect on participation of immigrants in the 2020 census.  For example, many of the declarations provide no support whatsoever for the Plaintiffs' assertions.  *See, e.g.*, ECF No. 19-3 (collecting 11 short declarations that merely state that the declarants live in particular places, intend to vote where they reside, and regularly drive on local highways).  Two other declarations from the directors of community organizations say they heard from unspecified "members of the community" that the Presidential Memorandum was decreasing participation among immigrants.  ECF No. 19-4, ¶ 9 (Gilfillan Decl.).  *See also* ECF No. 19-5, ¶ 10 (Rodriguez Decl.).  But other than generalized hearsay and subjective opinions, these two declarations provide no specific examples to support their allegations.  *See, e.g.*, ECF No. 19-4, ¶¶ 8-12 (Gilfillan Decl.); ECF No. 19-5, ¶¶ 8-11 (Rodriguez Decl.).  They certainly do not provide sufficient support that the Presidential Memorandum would have an appreciable effect on the participation of illegal aliens in the remaining months of the 2020 census—for which field operations are to be completed by September 30, 2020.

Simply put, Plaintiffs' alleged injuries all depend on (i) the assumption that a significant percentage of illegal aliens who otherwise would have participated in the census will be deterred from

doing so despite outreach by the Census Bureau, and (ii) this lack of participation will materially degrade the census data, which will (iii) result in an appreciable effect on apportionment, redistricting, and funding. Plaintiffs fail to allege sufficient facts that the above sequence of events will occur with any likelihood.

### 2. The Alleged Chilling Effect Is Not Traceable to the Memorandum.

Separate from the question of injury, the materials submitted by Plaintiffs fail to show that any diminution in census response rates is fairly traceable to the Memorandum. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 03 (1998) (for plaintiff to establish standing "there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant"). To satisfy the "traceability" or "causation" prong of the Article III standing test, allegations must provide more than "unadorned speculation" to "connect their injury to the challenged actions." *Simon v. Eastern Kentucky Welf. Rights. Org.*, 426 U.S. 26, 44-45 (1976). Where a theory of injury rests on a "highly attenuated chain of possibilities," *Clapper v. Amnesty Int'l*, 568 U.S. 398, 410 (2013), a plaintiff's jurisdictional claims are unfounded. *Frank Krasner Enter., Ltd. v. Montgomery Cty.*, 401 F.3d 230, 236 (4th Cir. 2005) (Plaintiffs' purported injury "is not directly linked to the challenged [conduct] because an intermediary . . . stands directly between the plaintiffs and the challenged conduct in a way that breaks the causal chain."); *see also Lane v. Holder*, 703 F.3d 668, 673–74 (4th Cir. 2012).

Here, as noted above, the primary basis for linking the Memorandum to response rates comes from Plaintiffs' expert Dr. Barreto. He opines that immigrant communities are less likely to respond to the census after the Memorandum because (1) immigrant communities' trust in the government and willingness to share information was undermined, Barreto Decl. ¶¶ 14, 19, by (2) third-party reports featuring "immigrants, as well as individuals who worked with community-based organizations that serve immigrants, and even journalists, all stat[ing] that they believed the July 21 Memorandum was an effort to sow confusion and distrust, and to reduce the count of Latinos and immigrants on

the 2020 Census," Barreto Decl. ¶¶ 33, 15, which were carried on (3) various media sources, particularly Spanish-language ones, which are highly influential in the immigrant and Latino communities, Barreto Decl. ¶¶ 16, 32.  Dr. Barreto posits this chain as an unbroken line.  But the media, and the community activists they feature, are *independent actors*; those entities' messages about the Memorandum are the product of their own interpretations and views, many of which are at odds with the plain terms of the Memorandum.  *See, e.g.*, Barreto Decl. ¶ 33 (listing media messages characterizing the Memorandum as something "intended to promote fear").

It makes little sense for Plaintiffs to attribute whatever harm is caused by those independent actors to the Memorandum itself, particularly if their messages convey the incorrect impression that the Memorandum increases the "risk of [individuals'] information being linked to immigration records and [those individuals] facing immigration enforcement."  Barreto Decl. ¶ 62, *see* ECF No. 19-5, ¶ 9 (Rodriguez Decl.) (acknowledging "that census information is not shared with immigration enforcement agencies and is kept confidential").  Any contention or concern that the Secretary's compliance with the Memorandum will somehow facilitate immigration enforcement is contrary to established statutory provisions mandating strict confidentiality for census responses.  *See generally* 13 U.S.C. § 9 (providing that personal information collected by the Census Bureau cannot be used against respondents by any government agency or court); *id.* § 214 (setting forth penalty for wrongful disclosure of information).  Indeed, the Census Bureau devotes resources to educating the public about the privacy and confidentiality of census responses specifically to allay such fears of adverse use. *See, e.g.*, *Data Protection and Privacy Program*, Census Bureau, available at https://www.census.gov/about/policies/privacy.html (last visited August 17, 2020); Fontenot Decl. ¶ 11.  Because nothing in the Memorandum undermines these statutory protections, it is unreasonable to trace fear of immigration enforcement to the Memorandum itself, rather than to the messages conveyed by other actors in Plaintiffs' chain of causation.  *See, e.g.*, Barreto Decl. ¶ 46 (noting that

immigrants "may not do the full research to realize they can still fill out the Census safely, *because they hear the news which is connecting* the July 21 [Memorandum] to Trump's longstanding desire to increase deportation of undocumented immigrants" (emphasis added)).

The presence of such independent sources distinguishes this case from the litigation over the placement of a citizenship question on the census form, in which the Supreme Court found that the placement of such a question could predictably cause lower self-response rates among certain communities. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019). That case presented a situation not found here: namely, the direct collection of information from respondents. The Memorandum is not itself directed at census respondents and appears, even in Plaintiffs' telling, to be filtered to them through third-party intermediary sources. How those sources interpret the Memorandum should not be dispositive of the Memorandum's effects. Put another way, the alleged injuries here depend on "a chain of causation" with multiple "discrete links, each of which 'rest[s] on [the plaintiffs'] highly speculative fear that governmental actors" would exercise their "discretion in a [] way" that would adversely affect Plaintiffs. *See Dep't of Commerce*, 315 F. Supp. 3d at 787 (summarizing *Clapper*, 568 U.S. at 410-14, and distinguishing citizenship question case from *Clapper* partly on this basis). Such a speculative chain of causation is insufficient to establish standing.

### 3.  A Favorable Ruling Would Not Redress Plaintiffs' Alleged Enumeration Injuries.

Finally, even if Plaintiffs could establish the existence of a "chilling" effect traceable to the Memorandum, they still fail to establish the last prong of standing: namely, that the effect would be cured by a favorable ruling from this Court. "Federal courts may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (alterations and citations omitted). Where a plaintiff requests prospective relief in the form of a declaratory judgment or injunction, the plaintiff must show that "prospective relief will remove the harm" and the plaintiff

16

"personally would benefit in a tangible way from the court's intervention." *Warth v. Seldin,* 422 U.S. 490, 505, 508 (1975). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.*, 523 U.S. at 107.

Here, it is entirely speculative that there are enough aliens who, while currently deterred from participating in the census, would *decide* to participate if this Court granted Plaintiffs relief, particularly when any relief granted by this Court would be subject to appeal. Indeed, nothing that Plaintiffs have submitted speaks to this issue with any particularity. The closest Plaintiffs come is Dr. Barreto's report discussing research studies from 2018 that endeavored to predict how the removal of a citizenship question from the census questionnaire would affect response rates. Barreto Decl. ¶¶ 68–69. But, as noted above, those studies are inconsistent with the large, and statistically rigorous, study published in 2020 by the Census Bureau, which showed no statistically-significant diminution of response rates in the first instance. Abowd Decl. ¶¶ 13, 17. Further, there is no reason to expect the Memorandum, which asks nothing of respondents, to have a significant effect on response rates—and even less reason to expect that any people deterred from responding to the census would change their mind if the Memorandum were enjoined, especially since the census would conclude long before any such injunction would become final on appeal.

If anything, the declarations proffered by Plaintiffs tend to paint the opposite picture. The declarations repeatedly allege a macro environment of mistrust around immigration. *See, e.g.*, Barreto Decl. ¶ 46. It is hard to imagine that precluding the Secretary from complying with a Memorandum that does not implicate immigration enforcement or change census operations would alter the kind of mistrust that Plaintiffs allege to be in effect currently.

***

The Supreme Court has emphasized that standing is not an "ingenious academic exercise in the conceivable." *Summers v. Earth Island Institute*, 555 U.S. 488, 499 (2009). Plaintiffs cannot "establish

17

standing simply by claiming that they experienced a 'chilling effect' that resulted from a governmental policy that does not regulate, constrain, or compel any action on their part." *Clapper*, 568 U.S. at 419. Rather, Plaintiffs can establish standing only by shouldering the substantial burden of establishing that the Court, in a real way, can remedy an injury Plaintiffs have suffered as a result of some action Defendants took. *Id.* Because Plaintiffs have failed to make that showing here, this Court should deny Plaintiffs' Motion without even reaching the merits of Plaintiffs' claims.

### III.     Plaintiffs' Motion Should Be Denied because Plaintiffs Fail to State a Claim.

Even if the Court concludes that it has subject-matter jurisdiction over Plaintiffs' claims, Plaintiffs' failure to adequately plead any claim serves as an independent, additional basis for the Court to deny Plaintiffs' Motion.

#### A. *Franklin* Mandates Rejection of Plaintiffs' APA Claims.

Plaintiffs seek APA review of both the President's policy directives in the Presidential Memorandum and steps that the Secretary of Commerce may have taken to prepare and transmit a set of "total population numbers for each state that exclude undocumented immigrants . . . to the President" in accordance with the Presidential Memorandum. *See* Am. Compl. ¶¶ 148-57 (asserting APA claim against "Defendants"). Their pleadings, however, challenge conduct by the President that is not subject to review under the APA and, in any event, fail to identify any act that satisfies the "final agency action" standard set forth in *Franklin*, 505 U.S. at 796-801 (applying the definition of final agency action in 5 U.S.C. § 704 to the apportionment context); *see also State of Cal. v. Dep't of Justice*, 114 F.3d 1222, 1225 (D.C. Cir. 1997) ("No final administrative action, no judicial review"). Accordingly, Plaintiffs' APA claims fail.

First, insofar as Plaintiffs seek review of the President's action under the APA, the law is clear that the APA does not provide a basis for such review. In *Franklin*, for example, the Supreme Court held that because "the APA does not expressly allow review of the President's actions," such "actions

are not subject to [the APA's] requirements."  505 U.S. at 800; *accord Dalton*, *v. Specter*, 511 U.S. 462, 468 (1994).

Second, to the extent that Plaintiffs also seek APA review of a "directive" that they believe the Secretary of Commerce has given to the Census Bureau to effectuate the Memorandum's policy of excluding undocumented immigrants from the census as well as the report the Secretary of Commerce is expected to submit to the President, that claim fails as well because there is no final agency action.  In *Franklin*, the Supreme Court directly confronted the question whether a "statutory basis [existed] … under the APA" for judicial review of the Secretary of Commerce's report to the President regarding the decennial census data under 13 U.S.C. § 141(b).  *See* 505 U.S. at 796-800.  The Court concluded that the Secretary's report to the President is "not final and therefore not subject to [APA] review" because it "serves more like a tentative recommendation than a final and binding determination."  *Id.* at 798.  More specifically, the Court identified two prerequisites for an agency action to be deemed "final" for APA purposes — *one*, that "the agency has completed its decisionmaking process," and, *two*, that "the result of that process is one that will directly affect the parties."  *Id.* at 797.

Here, both the alleged directive from the Secretary of Commerce and his submission of a report to the President are the acts "of a subordinate official" preceding "the final action" to be taken by the President.  *See Franklin*, 505 U.S. at 796-97.  Neither type of action by the Secretary of Commerce, therefore, is "final agency action" subject to review under the APA.  *See id.* at 797.[1]

---

[1] *See also Dalton*, 511 U.S. at 470 (holding the Secretary of Defense's implementation of the President's decision to close a naval yard is not a "final agency action" reviewable under the APA); *Public Citizen v. U.S. Trade Rep.*, 5 F.3d 549, 551-52 (D.C. Cir. 1994) (holding that the NAFTA trade agreement negotiated by the Trade Representative is not a "final agency action" subject to APA review because it was up to the President to decide whether to submit the agreement to Congress); *see also Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA*, 313 F.3d 852, 860-61 (4th Cir. 2003) ("even when agency action significantly impacts the choices available to the final decisionmaker, this distinction does not transfer [a] challenged action into reviewable agency action under the APA").

**B. Plaintiffs Have Failed to Sufficiently Allege an Equal Protection Claim Under the Fifth Amendment.**

Plaintiffs allege that the Presidential Memorandum was impermissibly motivated by discriminatory animus based on race, ethnicity, and national origin.  *See* Am. Compl. ¶¶ 66, 82, 126; Pls.' Br. 21-24.  To make these claims, however, Plaintiffs rely on a faulty pleading device—they inaccurately conflate the Memorandum's facially neutral distinction between lawful and unlawful aliens with racial or ethnicity-based disparate treatment.  Shorn of this device, Plaintiffs fail to allege the unlawful "animus" or "racially discriminatory intent" required to plead an equal protection violation.  *See Dep't of Homeland Security v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) ("*Regents*") ("To plead animus, a plaintiff must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision.").

Notwithstanding Plaintiffs' suggestion to the contrary, there can be no dispute that the Memorandum is facially neutral with respect to race, ethnicity, and national origin.  To the extent that it makes any distinction between persons, the Presidential Memorandum is focused on the distinction between illegal aliens and citizens and other lawful residents.  *See* 85 Fed. Reg. at 44,680.  As the Supreme Court has recognized, relying on this distinction does not require heightened scrutiny for equal protection purposes because non-citizens—much less illegal aliens—do not constitute a protected class.  *See, e.g.*, *Mathews v. Diaz*, 426 U.S. 67 (1976) (limitation on eligibility for a federal medical insurance program to citizens and long-term permanent residents did not violate Equal Protection Clause).

Without the benefit of this pleading device, Plaintiffs are left with only conclusory allegations of animus, *see* Am. Compl. ¶¶ 66, 82, 126; Pls.' Br. 21-24, which are not sufficient to state an equal protection claim.  Specifically, insofar as Plaintiffs rest their claim on a supposedly disproportionate burden on Hispanics and immigrant communities of color, this argument is foreclosed by the Supreme Court's recent *Regents* decision.  As the Court recognized there, if the fact that an immigration policy

would have "an outsized" impact on "Latinos" "because [they] make up a large share of the unauthorized alien population" by itself "were sufficient to a state a claim," then "'virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Regents*, 140 S. Ct. at 1916. Instead, as *Regents* concluded, an allegation of disproportionate burden on a specific racial or ethnic group is, in this context, inadequate to "establish[] a plausible equal protection claim." *Id.* at 1915.

Further, to the extent that Plaintiffs seek to base their equal protection claim on a purported link between the Presidential Memorandum and the Commerce Secretary's decision to add a citizenship question to the 2020 Census, *see* Pls.' Br. 23-24, the claim is implausible because these two actions involve separate decisions made by different decisionmakers that are distinct in timing and implementation. In any event, Plaintiffs cannot bootstrap their equal protection claim here to the earlier decision by the Secretary of Commerce because the plaintiffs in the previous case "failed to prove, by a preponderance of the evidence, that a discriminatory purpose motivated Defendants' decision to reinstate the citizenship question on the 2020 census questionnaire." *New York*, 351 F. Supp. 3d at 671; *see also Kravitz v. Dep't of Commerce*, 366 F. Supp. 3d 681, 712 (D. Md. 2019).[2]

Finally, Plaintiffs cite a number of alleged statements by the President and other individuals. *See* Pls.' Br. 23-24 (citing statements by Richard Hofeller). At the outset, because the President is the only decision-maker with respect to issuance of the Presidential Memorandum, statements of other individuals are immaterial. *See Regents*, 140 S. Ct. at 1916 (statements by non-decisionmakers "remote in time and made in unrelated contexts" are "unilluminating"). Moreover, to the extent that Plaintiffs

---

[2] In a decision that later became moot, a district court in the citizenship-question context concluded that "newly discovered evidence" raised a "substantial issue" because it suggested "that Dr. Hofeller was motivated to recommend the addition of a citizenship question to the 2020 Census to advantage Republicans by diminishing Hispanics' political power." *Kravitz v. Dep't of Commerce*, No. 18-cv-1041 (D. Md. June 3, 2019), ECF No. 162-1 at 1.

discuss the President's statements, *see* Am. Compl., ¶ 82, they fail to draw any specific link between those statements and the specific policy announced in the Presidential Memorandum. Thus, those statements cannot plausibly serve as evidence for the President's subjective motivations in issuing that discrete policy.

The Presidential Memorandum plainly states that the policy's purpose is to promote "the principles of representative democracy underpinning our system of Government." 85 Fed. Reg. at 44,630. Plaintiffs have failed to plausibly allege that, notwithstanding this permissible purpose, the Memorandum was merely a pretext for a "real reason" to discriminate against Hispanics, *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993), or that it was motivated by such animus, *Pers. Admin. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Accordingly, the Equal Protection claim should be rejected.

## C. Plaintiffs Have Failed to State an Apportionment Clause Claim.

The operative Apportionment Clause mandates that Representatives shall be "apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2. But, after accounting for the express exclusion of "Indians not taxed," neither this Clause nor its predecessor in Article I was ever understood to mandate the inclusion of every person present within the boundaries of each State at the time of the census. *See id.* art. I, § 2, cl. 3. To the contrary, from the time of the Founding through the ratification of the Fourteenth Amendment and continuing to the present day, the Apportionment Clause has been understood to require counting "inhabitants." In other words, only usual residents—those with a fixed and enduring tie to a State, as recognized by the Executive— need be deemed "persons *in [that] State*," *id.* amend. XIV, § 2 (emphasis added). And because the word "inhabitants" is sufficiently indeterminate, the Supreme Court has recognized that the term confers significant discretion on the Executive to make legal determinations about who qualifies as an

"inhabitant" without treating his physical presence in a particular jurisdiction (or lack thereof) as dispositive. *See Franklin*, 505 U.S. at 804-06.

This well-established framework plainly forecloses Plaintiffs' facial challenge to the Presidential Memorandum. For Plaintiffs to succeed, they must establish that the Constitution requires including *all* illegal aliens in the apportionment base. But that is obviously incorrect. To give just one example, nothing in the Constitution requires that illegal aliens residing in a detention facility after being arrested while crossing the border must be accounted for in the allocation of Representatives (and hence political power). This is fatal to Plaintiffs' Motion.[3]

> **1. Only "Inhabitants" Who Have Their "Usual Residence" in a State Need Be Included in the Apportionment.**

As the Supreme Court has explained, "'[u]sual residence,' was the gloss given the constitutional phrase 'in each State' by the first enumeration Act [of 1790] and has been used by the Census Bureau ever since to allocate persons to their home States." *Franklin*, 505 U.S. at 804. The Act also uses "other words [ ] to describe the required tie to the State: 'usual place of abode,' [and] 'inhabitant[.]'" *Id.* at 804-05. These terms "can mean more than mere physical presence, and [have] been used broadly enough to include some element of allegiance or enduring tie to a place." *Id.*

The settled understanding that only "inhabitants" who have their "usual residence" in the country must be counted stems from the drafting history of the Apportionment Clause. In the draft

---

[3] Plaintiffs cite *FAIR v. Klutznick*, 486 F. Supp. 564 (D.D.C. 1980) and the arguments raised in that case by the government for the supposed proposition that the apportionment base must include illegal aliens. *See* Pls.' Br. 12-13. In *FAIR*, the court simply noted that, as a matter of historical practice, "the population base for purposes of apportionment has always included all persons, including aliens both lawfully and unlawfully within our borders." *FAIR*, 486 F. Supp. at 576. To be sure, the court indicated that it saw "little on which to base a conclusion that illegal aliens should now be excluded" from the apportionment base. *Id.* But the court hardly came to a final "determination." To the contrary, the court "conclude[d] that [it] lack[ed] jurisdiction to decide the merits of the case because the plaintiffs lack standing to raise the issue." *Id.* at 566. Further, the direct appeal from the three-judge *FAIR* Court to the Supreme Court was dismissed for lack of jurisdiction, 447 U.S. 916 (1980). Moreover, *FAIR* is not controlling on this Court and, in all events, predates *Franklin*, which controls the outcome here.

Constitution submitted to the Committee of Style, the Apportionment Clause required "the Legislature [to] regulate the number of representatives by the number of *inhabitants*." 2 The Records of the Federal Convention of 1787, at 566, 571 (Max Farrand ed., rev. ed. 1966) (emphasis added). The Committee of Style changed the language to provide that "Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons." U.S. Const. art. I, § 2, cl. 3. But "the Committee of Style 'had no authority from the Convention to alter the meaning' of the draft Constitution," *Utah v. Evans*, 536 U.S. 452, 475 (2002), and the Supreme Court has thus found it "abundantly clear" that, under the original Clause, apportionment "should be determined solely by the number of the State's inhabitants," *Wesberry v. Sanders*, 376 U.S. 1, 13 (1964); *see also Franklin*, 505 U.S. at 804-05 (observing that "the first draft" of the Apportionment Clause "used the word 'inhabitant,' which was omitted by the Committee of Style in the final provision").

Historical sources confirm this reading. In *The Federalist*, James Madison repeatedly explained that apportionment under the new Constitution would be based on a jurisdiction's "inhabitants." *See The Federalist* No. 54, at 369 (Jacob E. Cooke ed., 1961) (observing that "the aggregate number of representatives allotted to the several States[] is to be determined by a federal rule founded on the aggregate number of inhabitants"); *The Federalist* No. 56, at 383 (noting that the Constitution guarantees "a representative for every *thirty thousand inhabitants*"); *The Federalist* No. 58, at 391 (noting that the Constitution mandates a "readjust[ment] from time to time [of] the apportionment of representatives to the number of inhabitants"); *see also Evenwel v. Abbott*, 136 S. Ct. 1120, 1127 (2016) ("[T]he basis of representation in the House was to include all inhabitants" (emphasis omitted)). Similarly, as the Supreme Court recognized, the first enumeration Act of 1790—titled "an act

24

providing for the enumeration of the inhabitants of the United States"—directed "the marshals of the several districts of the United States" to count "the number of the inhabitants within their respective districts." Act of Mar. 1, 1790, § 1, 1 Stat. 101, 101; *see Franklin*, 505 U.S. at 803-05 (relying on the Census Act of 1790 to apply the Apportionment Clause).

This understanding of "usual residence" and "inhabitant" was enshrined in the constitutional text and incorporated by historical practice when the Fourteenth Amendment's Apportionment Clause was ratified almost 80 years later. According to Representative Roscoe Conkling, a member of the committee that drafted the Fourteenth Amendment, the operative Apportionment Clause's streamlined language—requiring apportionment based on "the whole number of persons in each State"—was meant to fully include former slaves in the apportionment base and otherwise "adhere[] to the Constitution as it is." Cong. Globe, 39th Cong., 1st. Sess. 359 (1866). The Amendment's text confirms that understanding: it underscores that a person who possesses sufficient ties to a State will be included by specifying that "the persons *in each State*" must be counted, U.S. Const. amend. XIV, § 2 (emphasis added)—a phrase that the Supreme Court later explained to be equivalent to the term "inhabitant." *Franklin*, 505 U.S. at 804-05. Indeed, the very next sentence of section 2 of the Fourteenth Amendment equates "persons in each State" with "inhabitants" by penalizing in the apportionment any State that denies the right to vote to the "male inhabitants of such State" who would otherwise be eligible to vote (principally by reason of citizenship and age). *Id.* Unsurprisingly, the first census after ratification of the Fourteenth Amendment was conducted in accordance with the same procedures that had been used for the 1850 census, *see* Act of May 6, 1870, ch. 87, § 1, 16 Stat. 118, 118, which, in turn had required "all [States'] inhabitants to be enumerated," Act of May 23, 1850, ch. 11, § 1, 9 Stat. 428, 428; *see also Franklin*, 505 U.S. at 804 ("'Usual residence,' was the gloss given the constitutional phrase 'in each State' by the first enumeration Act [of 1790] and has been used by the Census Bureau ever since to allocate persons to their home States.").

Reading the Apportionment Clause to contemplate apportionment of Representatives based on "inhabitants" (or "usual residents") also helps explain the historical exclusion of certain people from the apportionment base.  For example, transient aliens, such as those temporarily residing here for vacation or business, are not included in the apportionment base.  *See, e.g.*, *Final 2020 Census Residence Criteria and Residence Situations*, 83 Fed. Reg. 5,526, 5,533 (2018) (Residence Criteria); Dennis L. Murphy, Note, *The Exclusion of Illegal Aliens from the Reapportionment Base: A Question of Representation*, 41 CASE W. RES. L. REV. 969, 980 (1991).  That makes sense, as such aliens were not considered "usual residents" or "inhabitants" either at the Founding or the ratification of the Fourteenth Amendment.  As contemporaneous sources using the term make clear, to qualify as an "inhabitant," one had to, at a minimum, establish a fixed residence within a jurisdiction and intend to remain there.  *See, e.g.*, *Bas v. Steele*, 2 F. Cas. 988, 993 (Washington, Circuit Justice, C.C.D. Pa. 1818) (No. 1088) (concluding that a Spanish subject who had remained in Philadelphia as a merchant for four months before seeking to leave, "was not an inhabitant of this country, as no person is an inhabitant of a place, but one who acquires a domicil there").[4]

---

[4]  *See also, e.g, Hylton v. Brown*, 12 F. Cas. 1123, 1129 (Washington, Circuit Justice, C.C.D. Pa. 1806) (No. 6,981) (charging jury while riding circuit that a particular individual "was no more an inhabitant of this state than I am, who spend one-third of each year in this city; or any other person, who comes here to transact a certain piece of business, and then returns to his family"); *Toland v. Sprague*, 23 F. Cas. 1353, 1355 (C.C.E.D. Pa. 1834) (No. 14,076) (distinguishing an "inhabitant" from a "transient passenger"); *United States v. Laverty*, 26 F. Cas. 875, 877 (D. La. 1812) (No. 15,569A) ("An inhabitant is one whose domicile is here, and settled here, with an intention to become a citizen of the country."); *United States v. The Penelope*, 27 F. Cas. 486, 489 (D. Pa. 1806) (No. 16,204) ("[T]he following has always been my definition of the words 'resident,' or 'inhabitant,' which, in my view, mean the same thing. 'An inhabitant, or resident, is a person coming into a place with an intention to establish his domicil, or permanent residence; and in consequence actually resides … .'"); 41 Annals of Cong. 1595 (1824) (referring to "the common acceptation" of "inhabitant" as "the persons whose abode, living, ordinary habitation, or home" is within a particular jurisdiction); Thomas Dyche & William Pardon, *A New General English Dictionary* (16th ed. 1781) ("a person that resides or ordinarily dwells in a place or home"); 1 & 2 Samuel Johnson, *A Dictionary of the English Language s. v.* abode, inhabitant, reside, residence, resident (6th ed. 1785) (a "[d]weller," or one who "lives or resides" in a place, with the terms "reside," "residence," and "resident" defined with reference to an "abode"—*i.e.*, a "continuance in a place"); Noah Webster, *American Dictionary of the English Language* (1828) (defining "inhabitant" as

Likewise, foreign diplomats stationed overseas arguably remained "inhabitants" of their native countries rather than of their diplomatic posts. *See Franklin*, 505 U.S. at 805 (confirming that American diplomat stationed overseas could still qualify as an "inhabitant" who is "in" his home State for purposes of "the related context of congressional residence qualifications"); Emer de Vattel, *The Law of Nations*, ch. 19, § 213 (1817) (explaining that diplomats could not qualify as "inhabitants" because "the envoy of a foreign prince has not his settlement at the court where he resides").   And unsurprisingly, foreign diplomatic personnel living on embassy grounds have previously been excluded from the apportionment base.  Murphy, *supra*, at 980.

Tourists and diplomats may be "persons" within a State's boundaries at the time of the Enumeration, but no one seriously contends that they must be included in the apportionment base under the Constitution.  Physical location does not, in short, necessarily dictate whether one is an "inhabitant" (or "usual resident") of a particular jurisdiction.

### 2.   The Executive Has Significant Discretion to Define Who Qualifies as an "Inhabitant."

Crucially, the term "inhabitant"—and the concept of "usual residence"—is sufficiently ambiguous to give Congress, and by delegation the Executive, significant discretion to define the contours of "inhabitants" for apportionment purposes.  That discretion is rooted in the Constitution. Article I provides that apportionment numbers are determined by an "actual Enumeration" performed every 10 years "in such Manner as" Congress "shall by Law direct."  U.S. Const. art. I, § 2, cl. 3; *see also id.* amend. XIV, § 5 (giving Congress the power to "enforce, by appropriate legislation, the provisions of" the Fourteenth Amendment, including the operative Apportionment Clause).  This "text vests Congress with virtually unlimited discretion in conducting the 'actual Enumeration,' [and] … [t]hrough the Census Act, Congress has delegated its broad authority over the census to the

---

a "dweller; one who dwells or resides permanently in a place, or who has a fixed residence, as distinguished from an occasional lodger or visitor").

Secretary." *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996) (citations omitted). But the Secretary is not the final word on apportionment, and indeed is not the one responsible for determining the apportionment base. Instead, by statute, the Secretary must report census numbers to the President. *See* 13 U.S.C. § 141(b). And it is the President, then, who "transmit[s] to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the seventeenth and each subsequent decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives." 2 U.S.C. § 2a(a). In doing so, the President has full "authority to direct the Secretary in making policy judgments that result in 'the decennial census'; he is not expressly required to adhere to the policy decisions reflected in the Secretary's report." *Franklin*, 505 U.S. at 799. So "the Secretary cannot act alone; she must send her results to the President, who makes the calculations and sends the final apportionment to Congress." *Id.* at 800. That "final act" by the President is "not merely ceremonial or ministerial," but remains "important to the integrity of the process." *Id.* Indeed, it is "the President's personal transmittal of the report to Congress" that "settles the apportionment" of Representatives among the States. *Id.* at 799.

Of course, the Executive's decisions in this area must be "consonant with … the text and history of the Constitution," *Franklin*, 505 U.S. at 806, but the term "inhabitants"—and the concept of "usual residence"—are sufficiently indeterminate to give him significant discretion within constitutional bounds. *See id.* at 804-06 (discussing how the notion of "usual residence" has been applied differently over time). Indeed, Madison himself acknowledged that the word "inhabitant" was "vague" in discussing the House Qualifications Clause. 2 The Records of the Federal Convention of 1787, at 216-17; *cf. Franklin*, 505 U.S. at 805 (in the course of applying the Apportionment Clause, drawing on Madison's interpretation of the "term 'inhabitant'" in "the related context of congressional residence qualifications"). As noted above, historical evidence confirms that the term "inhabitant"

28

was understood to require, at a minimum, a fixed residence within a jurisdiction and intent to remain there. Moreover, Founding-era sources also reflect that, especially with respect to aliens, the term could be understood to further require a sovereign's permission to enter and remain within a given jurisdiction. *See, e.g.*, *The Venus*, 12 U.S. (8 Cranch.) 253, 289 (1814) (Marshall, C.J., concurring in part and dissenting in part) (quoting Vattel for the proposition that "inhabitants, as distinguished from citizens, are strangers who are *permitted* to settle and stay in the country" (emphasis added)); *The Federalist* No. 42, at 285 (Madison) (discussing provision of the Articles of Confederation that required every State "to confer the rights of citizenship in other States … upon any whom *it may allow to become inhabitants* within its jurisdiction" (emphasis added)).

Accordingly, the Executive has wide discretion to make legal determinations about who does and does not qualify as an "inhabitant" for purposes of inclusion in or exclusion from the apportionment base. In *Franklin*, for example, the Supreme Court held that the Executive Branch could allocate over 900,000 military personnel living overseas to their home States on the basis of the Secretary's judgment that such people "had retained their ties to the States." 505 U.S. at 806. That allocation "altered the relative state populations enough to shift a Representative from Massachusetts to Washington"—and had not been used "until 1970," save for a "one-time exception in 1900." *Id.* at 791-93. Nevertheless, as the Court explained, even though the recent approach was "not dictated by" the Constitution, it was "consonant with [its] text and history" and thus a permissible "judgment" within the Executive Branch's discretion, even where Congress had not expressly authorized this practice. *Id.* at 806. In the course of reaching this judgment, the Court also listed a number of other legal determinations of usual residency that the Executive Branch has permissibly chosen to use over the years—including determinations the Census Bureau has since abandoned. For example, "up until 1950, college students were counted as belonging to the State where their parents resided, not to the State where they attended school," and at the time the case was decided, "[t]hose persons who are

29

institutionalized in out-of-state hospitals or jails for short terms [were] also counted in their home States." *Id.*  Under the current Residence Criteria, however, college students who live at school during the academic year and prisoners housed in out-of-state jails, even for the short term, are counted in the State in which those institutions are located.  Residence Criteria, 83 Fed. Reg. at 5,534, 5,535.

Plaintiffs have never challenged the Residence Criteria in court.  Nor can they, given constitutional text, history, and Supreme Court precedent.  The Presidential Memorandum is no different insofar as it reflects the Executive Branch's discretionary decision to direct the Secretary in making policy judgments that result in the decennial census.  *Franklin*, 505 U.S. at 799.

### 3.   The Apportionment Clause Does Not Require Inclusion of All Illegal Aliens as "Inhabitants" Having a "Usual Residence" in a State.

Plaintiffs maintain that the Presidential Memorandum facially violates the Apportionment Clause because *all* illegal aliens necessarily qualify as "persons in each State," and because the Memorandum contemplates the exclusion of such aliens—in some as-yet unknown number—for apportionment purposes.  Put differently, Plaintiffs posit that the Constitution prohibits the exclusion of *any* illegal alien from the apportionment base, and that the Memorandum's announcement of that possibility violates the Apportionment Clause.  But none of the constitutional constraints on the Executive's discretion to define the contours of "inhabitants" or "usual residence" require including *all* illegal aliens in the apportionment.

For example, if the Census Bureau finds it feasible to identify unlawfully present aliens who resided in a Customs and Border Patrol (CBP) or Immigration and Customs Enforcement (ICE) facility within a State on census day after being arrested while illegally entering the country, it would be permissible to exclude them.  Such individuals—like alien tourists who happen to be staying in the country for a brief period on and around census day—cannot reasonably be said to have established

"the required tie to [a] State," *Franklin*, 505 U.S. 804, or to be "inhabitants" under any definition of that term.[5]

Likewise, if feasibly identified, the Executive may exclude aliens who have been detained for illegal entry and paroled into the country pending removal proceedings, or who are subject to final orders of removal.[6]   Such aliens do not have enduring ties to any State sufficient to become "inhabitants" with their "usual residence" in the United States.   The government has either allowed them into the country solely conditionally while it is deciding whether they should be removed, or has conclusively determined that they must be removed from the country.   In *Kaplan v. Tod*, 267 U.S. 228 (1925), for instance, the Supreme Court addressed the case of an alien minor who had been denied entry at Ellis Island in 1914 but could not be returned to Russia during the First World War and was therefore paroled into the country to live with her father in 1915.   When the case reached the Supreme Court almost ten years later in 1925, it turned entirely on the question whether the alien minor had been "dwelling in the United States" or had "begun to reside permanently" in the United States for purposes of federal immigration statutes, which would have conferred derivative citizenship on her upon her father's naturalization in 1920.   *Id.* at 230.   The Court held that, during her parole, she "never

---

[5] These populations may be significant.   During fiscal year 2019, ICE held in custody an average daily population of 50,165 aliens.   U.S. ICE ERO, *U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report*, at 5 (2019) (ICE ERO Report), https://www.ice.gov/sites/default/files/documents/Document/2019/eroReportFY2019.pdf.   And on any given day in the summer of 2019, CBP held in custody between 8,000 and 12,000 detainees. *U.S. Customs and Border Protection – Border Patrol Oversight: Hearing Before the H. Subcomm. on Homeland Security of the Comm. on Appropriations*, 116th Cong. (2019) (testimony of Carla L. Provost, Chief, U.S. Border Patrol), https://docs.house.gov/meetings/AP/AP15/20190724/109834/HHRG-116-AP15-Wstate-ProvostC-20190724.pdf.

[6] ICE's non-detained docket surpassed 3.2 million cases in fiscal year 2019, a population large enough to fill more than four congressional districts under the 2010 apportionment.   ICE ERO Report at 10; Kristin D. Burnett, *Congressional Apportionment*, U.S. Census Bureau (Nov. 2011), https://www.census.gov/prod/cen2010/briefs/c2010br-08.pdf.   The non-detained docket includes aliens who are both pre- and post-final order of removal, and who have been released on parole, bond, an order of recognizance, an order of supervision, or who are in process for repatriation.   ICE ERO Report at 10.

has been dwelling within the United States" and "[s]till more clearly she never has begun to reside permanently in the United States." *Id.* As the Court explained, she "could not lawfully have landed in the United States" because she fell within an inadmissible category of aliens, and "until she legally landed [she] 'could not have dwelt within the United States.'" *Id.* (quoting *Zartarian v. Billings*, 204 U.S. 170, 175 (1907)). In the Court's view, she was in "the same" position as an alien "held at Ellis Island for deportation." *Id.* at 230; *see also, e.g.*, *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958) (holding that parole cannot affect an alien's status and does not place an alien "legally 'within the United States'"). Indeed, the Supreme Court recently reaffirmed that "aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border,'" and that the same principle applies to those detained "shortly after unlawful entry." *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020).

Plaintiffs emphasize that Framers of both the original Apportionment Clause and the Fourteenth Amendment intended to include aliens in the apportionment base. Pls.' Br. 9-12. But Plaintiffs' historical evidence about the treatment of aliens does not and cannot resolve the distinct question whether *illegal* aliens must be included—for the simple reason that there were no federal laws restricting immigration (and hence no illegal aliens) until 1875. *See Kleindienst v. Mandel*, 408 U.S. 753, 761 (1972). And Plaintiffs provide no evidence to support the proposition that by employing the concepts of "inhabitants" and "usual residence," the Framers of either the original Constitution or Fourteenth Amendment were understood to have bound future generations to allocate political power on the basis of aliens living in the country in violation of federal law. To the contrary, as the Supreme Court has explained, the Framers understood the "fundamental proposition[]" that the "power to admit or exclude aliens is a sovereign prerogative." *Thuraissigiam*, 140 S. Ct. at 1982.[7] This "ancient

---

[7] *See also, e.g.*, *Landon v. Plasencia*, 459 U.S. 21, 32 (1982); *Chae Chan Ping v. United States*, 130 U.S. 581, 604 (1889); *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893).

principle[] of the international law of nation-states" is necessary to the sovereign's rights to define the polity ("the People") that make up the nation and to preserve itself, as both the Supreme Court and 19th-century international law scholars recognized.[8]   It is fundamentally antithetical to those elementary principles to say, as Plaintiffs do, that illegal aliens can arrogate to themselves the right to redistribute "political power" within this polity by flouting the sovereign power of the United States to define who can enter and become part of the polity.  Pls.' Br. 9-13.  As Representative Conkling explained, "political representation does not belong to those who have no political existence.  The government of a free political society belongs to its members, and does not belong to others."  Cong. Globe, 39th Cong., 1st Sess., at 356 (1866); *see also id.* at 2962 (Sen. Poland) (advocating that representation be based on "all the members of a State or community" because "they are all subject to its laws; they must all share its burdens; and they are all interested in legislation and government").  Nothing in the debates suggests that the Framers of the Fourteenth Amendment

---

[8]  *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972); *see, e.g.*, *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892) ("It is an accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self- preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe.") (citing Vattel and Phillimore); Vattel, *The Law of Nations*, bk. 2, §§ 94, 100 (explaining that the sovereign's authority to "forbid the entrance of his territory either to foreigners in general, or in particular cases," "flow[ed] from the rights of domain and sovereignty"); 1 Robert Phillimore, *Commentaries Upon International Law*, ch. 10, § CCXIX (1854) (similar); *see also, e.g.*, *Bernal v. Fainter*, 467 U.S. 216, 221 (1984) ("The exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition. Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well: Aliens are by definition those outside of this community."); *Chae Chan Ping*, 130 U.S. at 603–04 (recognizing that a sovereign's power to "exclude aliens from its territory" is "an incident of every independent nation" and is "part of its independence," and "[i]f it could not exclude aliens it would be to that extent subject to the control of another power"); *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812) (Marshall, C.J.) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself.  Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction.").

would have treated aliens whose very presence in this country is forbidden by federal law as "members" of the "political society." Rejecting Plaintiffs' approach is certainly "consonant with" with the terms and history of the Fourteenth Amendment. *Franklin*, 505 U.S. at 806.

If anything, the debates over the Fourteenth Amendment on which Plaintiffs rely indicate that the rationale the Framers offered for including aliens in the apportionment base do not apply to illegal aliens. Specifically, various legislators made clear that unnaturalized aliens should be included in the apportionment base precisely because the law provided them with a direct pathway to citizenship—mainly, an oath of loyalty and five years of residence in the United States, *see* Act of Apr. 14, 1802, 2 Stat. 153. As Representative Conkling pointed out, "[t]he political disability of aliens was not for this purpose counted against them, *because it was certain to be temporary*, and they were admitted at once into the basis of apportionment." Cong. Globe, 39th Cong., 1st Sess., at 356 (1866) (emphasis added); *see also, e.g., id.* at 3035 (Senator Henderson explaining that "[t]he road to the ballot is open to the foreigner; it is not permanently barred"). Indeed, the five-year residency requirement meant that aliens could "acquire [the vote] in the current decade"—and thus unnaturalized aliens could be voting citizens before the next apportionment. *Id.* at 354 (Representative Kelley). And even an opponent of the inclusion of aliens in the apportionment agreed that unnaturalized aliens were on "a short period of probation—five years; and in most of the states the great body of them are promptly admitted to citizenship." *Id.* at 2987 (Sen. Sherman). That rationale plainly does not extend to illegal aliens, who generally are prohibited by law from becoming citizens and are subject to removal. 8 U.S.C. §§ 1182(a)(9), 1227(a), 1255(a) & (c), 1427(a).

Plaintiffs are also wrong in arguing that *Plyler v. Doe*, 457 U.S. 202 (1982), requires the inclusion of illegal aliens in the apportionment base. Pls.' Br. 9, 17. *Plyler* held only that illegal aliens are "persons within the jurisdiction" of a State for purposes of the Equal Protection Clause, 457 U.S. at 210, which is inapposite here. In contrast to the Apportionment Clause, the Equal Protection Clause has never

been understood to be limited to "inhabitants" or "usual residents" of a State.  That is why no one seriously contends that alien tourists visiting the United States should be included in the apportionment base, even though they are undoubtedly "persons" protected by the Equal Protection Clause.  *See also Mathews v. Diaz*, 426 U.S. 67, 78 (1976) ("The fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship or, indeed, to the conclusion that all aliens must be placed in a single homogeneous legal classification.").

Indeed, Plaintiffs' reading of *Plyler*—that *all* illegal aliens must be included in the apportionment base—is at odds with history and precedent.  Likewise, Plaintiffs' reliance on a redistricting decision, *Evenwel v. Abbott*, for the proposition that "the basis of representation in the House was to include all inhabitants," 136 S. Ct. 1120, 1127 (2016); Pls.' Br. 9, 17, does not dispose of this case as Plaintiffs contend, but rather begs the central question here as to the limits on how "inhabitant" may be defined.  Nothing in the terms "inhabitants" or "usual residence" suggests that this concept covers all illegal aliens.  Rather, as noted above, the Supreme Court has observed that the term "'[u]sual residence' … has been used broadly enough to include some element of allegiance or enduring tie to a place."  *Franklin* 505 U.S. at 804.  In addition, the Founding generation was aware that the term "inhabitant" could be understood to require that an alien be given *permission* to settle and stay in a jurisdiction according to the definition provided by Vattel, whom the Supreme Court has extolled as the "founding era's foremost expert on the law of nations."  *Franchise Tax Board v. Hyatt*, 139 S. Ct. 1485, 1493 (2019); *see* 1 Vattel, *The Law of Nations* ch. 19, § 213 (defining "inhabitants, as distinguished from citizens," as "foreigners, who are permitted to settle and stay in the country").[9]

---

[9]  As the Supreme Court has observed: "The international jurist most widely cited in the first 50 years after the Revolution was Emmerich de Vattel.  In 1775, Benjamin Franklin acknowledged receipt of three copies of a new edition, in French, of Vattel's Law of Nations and remarked that the book 'has

And in *Kaplan*, the Supreme Court held that an alien who had not effected a lawful entry into the country could not be characterized as "dwelling" in the country under the latest version of a naturalization law dating from 1790 that had conditioned derivative citizenship for certain aliens on their "dwelling" in the United States—a concept linked with becoming an "inhabitant" since the Founding Era.  267 U.S. at 230; *see* Act of Mar. 26, 1790, § 1, 1 Stat. 103, 104; *cf.* Noah Webster, *American Dictionary of the English Language* (1828) (defining "inhabitant" as a "dweller; one who dwells or resides permanently in a place").  Illegal aliens, however, cannot claim the relevant "enduring ties" to this country, or that they are "dwelling" in this country, precisely because they have not legally entered and as a matter of law may be removed from the country at any time.  *See also Gonzalez v. Holder*, 771 F.3d 238, 245 (5th Cir. 2014) (applying *Kaplan* to an alien who "entered the United States at the age of seven, albeit illegally, and … remained in the country" for 16 years); *U.S. ex rel. De Rienzo v. Rodgers*, 185 F. 334, 338 (3d Cir. 1911) (explaining that an alien "cannot begin" to "reside permanently" in the United States "if he belongs to a class of aliens debarred from entry into the country by the act to regulate the immigration of aliens into the United States").

Ultimately, however, it is neither necessary nor appropriate for this Court to resolve whether any particular category of illegal aliens must be deemed "inhabitants" for purposes of the apportionment.  In order to prevail on this facial challenge to the Presidential Memorandum, Plaintiffs must establish that there is *no* category of illegal aliens that may be lawfully excluded from the apportionment.  *See, e.g.*, *United States v. Brehm*, 691 F.3d 547, 550 n. 3 (4th Cir. 2012) ("To prevail on a facial challenge, [a plaintiff] would be compelled to demonstrate 'that no set of circumstances exists' under which [a challenged provision] could be constitutionally valid.").  Plaintiffs have not, and indeed cannot, make that showing.  Rather than facing that question, Plaintiffs divert attention by asking the

---

been continually in the hands of the members of our Congress now sitting.'"  *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 463 n.12 (1978) (ellipsis and citations omitted).

Court to decide a much different question—and more than is necessary to resolve this case—by seeking a holding that the Apportionment Clause would prohibit the exclusion of all categories of illegal aliens. That question is not properly presented here. The Presidential Memorandum states that it will be the policy of the United States "to exclude from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act, as amended (8 U.S.C. 1101 et seq.), to the *maximum extent feasible and consistent with the discretion delegated to the executive branch*." 85 Fed. Reg. at 44,679 (emphasis added). And Plaintiffs have rushed to Court before the Census Bureau has determined which illegal aliens it may be "feasible" to exclude, before the Census Bureau has reported any numbers to the Secretary, before the Secretary has reported any numbers to the President, and before the President has reported any numbers to Congress. Accordingly, this Court need not and should not resolve whether the Apportionment Clause necessarily *excludes* or *includes* any particular category of illegal aliens from the apportionment base. For Plaintiffs to prevail, they must establish that there is *no* category of illegal aliens that could ever be excluded. They cannot do so.

### D. Plaintiffs Have Failed to State an *Ultra Vires* Claim.

Plaintiffs posit that the Memorandum directs the President and the Secretary of Commerce to perform unlawful, *ultra vires* actions. *See* Pls.' Br. 1, 15, 19. However characterized, this claim fails. Every other census and apportionment conducted under 13 U.S.C § 141 and 2 U.S.C. § 2a has been shaped by policy choices made by the Executive under this statutory scheme, and the Memorandum merely reflects another permissible policy choice made by the Executive pursuant to powers delegated by Congress.

Nothing in the statutory language of "total population," 13 U.S.C. § 141(b), or "whole number of persons in each State," 2 U.S.C. § 2a(a), requires counting every person physically present on Census Day, even if they lack "usual residence" in the United States. It is, of course, true that the word "person" in § 2a makes no distinction based on citizenship or immigration status. And no one disputes

that aliens (legal or illegal) are "persons." *Cf. Plyler*, 457 U.S. 202. But § 2a does not reference only "persons"; it tracks the Fourteenth Amendment's text mandating apportionment based on the "whole number of persons *in each State*." 2 U.S.C. § 2a(a) (emphasis added). Congress is presumed to legislate with familiarity of the legal backdrop for its legislation, and that legal backdrop *supports* the exclusion of individuals from apportionment if they do not have a "usual residence" in the United States. *Franklin*, 505 U.S. at 804. Indeed, it is not even clear what authority Congress would have to authorize a different definition of the apportionment base than the one prescribed by the Constitution. That is why no apportionment conducted under the Census Act has included literally everyone physically present in the country. Just as the Memorandum does not violate the Constitution merely by contemplating the exclusion of some as-yet-unknown number of illegal aliens for lack of "usual residence," neither does it violate the identical language of § 2a.[10]

Nor does it matter that the President is making an independent choice in the apportionment process. While the apportionment calculation itself—feeding numbers into a mathematical formula known as the "method of equal proportions"—is "admittedly ministerial," there is nothing "ministerial" about the President's role in obtaining the numbers used in that formula. *Franklin*, 505 U.S. at 799 (explaining that "the admittedly ministerial nature of the apportionment calculation itself does not answer the question [of] whether the apportionment is foreordained by the time the Secretary gives her report to the President"). To the contrary, "§ 2a does not curtail the President's authority to direct the Secretary in making policy judgments that result in 'the decennial census.'" *Id.*[11] And

---

[10] This "usual residence" approach is consistent with the approach taken in the Census Bureau's 2018 Residence Criteria. As with every census, the Census Bureau always planned to exclude some people from the 2020 Census without a "usual residence" in a particular State. *See Final 2020 Census Residence Criteria and Residence Situations*, 83 Fed. Reg. 5525, 5526 (Feb. 8, 2018).

[11] Other courts since *Franklin* have likewise understood that § 2a allows the President to perform a significant role beyond the mere "ministerial" calculation leading to reapportionment. *See Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 860 (4th Cir. 2002) (likening an EPA report to the Secretary's § 141(b) report because it "is advisory and does not trigger the mandatory creation of

that is exactly what the President has done here: direct the Secretary to report two sets of numbers, of which the President will choose one to plug into the "method of equal proportions." *See* 2 U.S.C. § 2a(a); 85 Fed. Reg. at 44,680.

Plaintiffs' position is incompatible with the Supreme Court's view of the President's role as more than merely ceremonial or ministerial. *See Franklin*, 505 U.S. at 789. "[I]t is the President's personal transmittal of the report to Congress" that "settles the apportionment" of Representatives, making the President "important to the integrity of the process." *Id.* at 799–800. Plaintiffs' attempt to reduce the President to mere statistician cannot be squared with the Supreme Court's holding that § 2a contemplates his exercise of substantial discretion.[12]

Plaintiffs also seek to contravene Supreme Court precedent (and 230 years of history) by arguing that the numbers used for apportionment must be derived solely from individual responses to the census questionnaire. *See* Pls.' Br. 19-20. The Census Bureau has *never* tallied the total number of "usual residents" based only on questionnaire responses. In fact, for the first 170 years of American census taking, no census questionnaire existed because all enumeration was done in person. *See New York v. Dep't of Commerce*, 351 F. Supp. 3d 502, 520 (S.D.N.Y.) (Furman, J.), *aff'd in part, rev'd in part and*

---

legal rules, rights, or responsibilities," allowing the President "to embrace or disregard" the Secretary's report); *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) (characterizing the Commerce Secretary's report to the President a "moving target" because "the President has statutory discretion to exercise supervisory power over the agency's action); *Alabama v. Dep't of Commerce*, 396 F. Supp. 3d 1044, 1055 (N.D. Ala. 2019) (noting that in fulfilling his responsibilities under § 2a, "the President is not necessarily bound to follow the Secretary's tabulation").

[12] Plaintiffs also seem to suggest that that the Memorandum is unlawful merely because the President has directed the Secretary to provide information about illegal aliens. *See, e.g.*, Pls.' Br. 14. But that contention also fails. Article II empowers the President to supervise the conduct of subordinate officials like the Secretary, *see* U.S. Const., art. 2, § 1, and the Opinions Clause further empowers the President to "require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices," *id.*, art. 2, § 2, cl. 2. In *Franklin*, even the dissenting Justices acknowledged that § 2a "does not purport to limit the President's 'accustomed supervisory powers' over the Secretary of Commerce." 505 U.S. at 813 n.11 (Stevens, J., dissenting). So Plaintiffs cannot preclude the President from obtaining information from the Secretary, nor the Secretary from providing it.

*remanded,* 139 S. Ct. 2551 (2019).  And for the 2020 Census, individuals have been, and will be, enumerated through (1) census-questionnaire responses online, by mail, or by phone; (2) in-person visits by enumerators; (3) "proxy" responses given by those such as a neighbor or landlord; (4) high-quality administrative records from other federal agencies; and, as a last resort, (5) filling gaps in data collected by imputing other data from the same area.  *Id.* at 521.  In the citizenship-question litigation, extensive testimony on each of those enumeration methods was elicited, but neither the court nor the parties ever suggested that any of them violated the Census Act.  *See generally id.* at 572–626.  Indeed, the Supreme Court has *specifically approved* the use of purported "non-census data"—like administrative records and imputation—in apportionment without remotely hinting that either one was unlawful. *See Franklin*, 505 U.S. at 794–96, 803–06 (approving the Census Bureau's use of "home of record" information from Defense Department personnel files for apportionment); *Utah v. Evans*, 536 U.S. 452, 457–59, 473–79 (2002) (approving the Census Bureau's use of "hot-deck imputation" for apportionment).

In any event, it is entirely premature for Plaintiffs to surmise that the President "will rely on population counts generated separately from the decennial census" if he is going to exclude some as-yet-unknown number of illegal aliens from apportionment. Pls.' Br. 20.  As discussed above, it is not yet known what numbers the Secretary will transmit to the President pursuant to the Presidential Memorandum.  And Plaintiffs cannot assume that those numbers will be derived from improper sources.

Plaintiffs' attempt to manufacture an *ultra vires* claim detached from their Apportionment Clause claim is unavailing.  By delegation of the Census Act, the Executive stands in the shoes of Congress and may properly exclude individuals from apportionment for lack of "usual residence"—just as he has done in every other apportionment calculated under the Census Act.

**E.  Plaintiffs' Demands for Relief Against the President Must Be Rejected.**

Plaintiffs ask this court to enjoin the President from implementing the policy in the Presidential Memorandum.  *See* Am. Compl., ¶158(f) (requesting relief that would "[m]andate that the President transmit to the Congress . . . ."); Pls.' Br. 20 (arguing for an injunction against all Defendants).  As the Supreme Court has long recognized, however, federal courts cannot exercise injunctive authority over the President's discretionary policy judgments.  *See Mississippi v. Johnson*, 4 Wall 475, 501 (1867) (the judicial branch has "no jurisdiction of a bill to enjoin the President in the performance of his official duties").  In *Franklin*, the Supreme Court reaffirmed this constitutional principle.  *See* 505 U.S. at 802 (noting that "grant of injunctive relief against the President [] is extraordinary, and should have raised judicial eyebrows").  Plaintiffs may contend that their injunctive claims fit within a narrow exception that the Supreme Court potentially left open for injunctive claims that seek to direct the President to perform "ministerial" functions.  *See Franklin*, 505 U.S. at 802-03 (noting that *Mississippi v. Johnson* "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty"); *see also Mississippi v. Johnson*, 4 Wall at 500 (defining "ministerial duty" as "one in respect to which nothing is left to discretion").

*Franklin*, however, forecloses that argument in this case.  Specifically, the Supreme Court recognized that under 2 U.S.C. § 2a, "the Secretary [of Commerce] cannot act alone"; instead, the President has the "authority to direct the Secretary in making policy judgments."  *Franklin*, 505 U.S. at 799-800.  This "clear[ly]" demonstrates Congress's belief that "it was important to involve a constitutional officer," *i.e.*, the President, "in the apportionment process."  *Id.* at 799.  The President's role and "duties" in the congressional apportionment process, therefore, "are not merely ceremonial or ministerial."  *Id.* at 800.

Even if *Franklin* and *Mississippi v. Johnson* could be read to allow injunctive claims seeking performance of purely ministerial functions, that possible exception has no application here—because

41

the President's implementation of the Presidential Memorandum is part of his duties under 2 U.S.C. § 2a, which "are not merely ceremonial or ministerial." *Franklin* applies squarely to Plaintiffs' injunctive claims against the President and requires the dismissal of those claims. 505 U.S. at 802-03.

Moreover, and at a minimum, even if injunctive relief against the President in the performance of his statutory duties were theoretically available, *Franklin* makes clear that it "would require an express statement by Congress" authorizing such relief. *Franklin*, 505 U.S. at 801. Plaintiffs have identified no such "express statement" and none exists.

Declaratory relief against the President is also inappropriate. The D.C. Circuit, following *Franklin*, has determined that "declaratory relief" against the President for his non-ministerial conduct "is unavailable." *Newdow v. Roberts*, 603 F.3d 1002, 1012–13 (D.C. Cir. 2010). This is because "a court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions." *Id.* at 1012 (emphasis added) (citing *Mississippi*, 71 U.S. at 499); *see also Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) ("Sound separation-of-power principles counsel the Court against granting [injunctive and declaratory] relief against the President directly."). Thus, "similar considerations regarding a court's power to issue [injunctive] relief against the President himself apply to [a] request for a declaratory judgment." *Swan v. Clinton*, 100 F.3d at 973, 978 (D.C. Cir. 1996).

## IV.    Plaintiffs are Not Entitled to a Preliminary or Permanent Injunction.

Although Plaintiffs seek summary judgment on four of their five counts in the Amended Complaint, they do not specify what remedy they wish to accompany that judgment. Presumably, however, Plaintiffs would have this Court enter, at minimum, a permanent injunction prohibiting Defendants from excluding illegal aliens from the apportionment base following the 2020 Census. The "extraordinary remedy" of an injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

42

To obtain permanent injunctive relief, Plaintiffs bear the burden of demonstrating (1) that they have suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

While Plaintiffs appear to understand that these factors are required to obtain a *preliminary* injunction, they fail to acknowledge that these same factors must be met to obtain permanent relief as well. Insofar as Plaintiffs believe they are entitled to any form of injunctive relief without satisfying other factors, they are incorrect. *Winter*, 555 U.S. at 32 ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."); *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."). As explained above, Plaintiffs' claims lack merit and their request for summary judgment and an injunction should be rejected for that reason alone. *Winter*, 555 U.S. at 32–33. Even if their claims were meritorious, however, Plaintiffs cannot satisfy the remaining factors, so they are not entitled to either preliminary or permanent injunctive relief.

**A. Plaintiffs Cannot Establish Any Imminent and Irreparable Harm.**

Most significantly, Plaintiffs fail to establish that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20; *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (internal quotes and citations omitted; emphasis in original)). To establish a likelihood of irreparable harm, a plaintiff "must make a clear showing that it will suffer harm that is 'neither remote nor speculative, but actual and imminent'" and the "harm must be irreparable, meaning that it cannot be fully rectified by the

final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (internal quotation marks and citations omitted). Because of the drastic nature of the preliminary injunction remedy, Plaintiffs' burden to show irreparable harm is necessarily higher than what is required to establish standing. *See, e.g.*, *Mazurek*, 520 U.S. at 972. Here, Plaintiffs fail this test at every step—and further fail to establish that the remaining injunction factors tilt in their favor.

### 1. Plaintiffs Cannot Establish Any Irreparable Apportionment Injury.

Because Plaintiffs filed suit before the Secretary has implemented the Memorandum—and before any census enumeration has even been completed—Plaintiffs cannot show any imminent threat of apportionment injury.

As detailed above, it is currently unknown what numbers the Secretary may ultimately transmit to the President. *See, e.g.*, Abowd Decl. ¶ 15. Plaintiffs' expert declarations posit only that the *wholesale* exclusion of illegal aliens may cause certain states to lose a Congressional seat. *See* Pls.' Br. 22, 26-27; *see generally* Gilgenbach Decl. But those experts do not—and cannot—predict what apportionment injury any state might suffer from some hypothetical smaller exclusion, assuming a state suffers any injury at all. Given that the Secretary of Commerce has not yet transmitted his report to the President, and the President has not yet transmitted any numbers to Congress, any effort to predict the ultimate effect of the Memorandum on apportionment, or the resulting political power of Plaintiffs, is entirely speculative.

More fundamentally, any purported apportionment injury that Plaintiffs could suffer is, as a legal matter, not irreparable. The Supreme Court has regularly decided census cases that, like this one, contest the relative apportionment of representatives post-apportionment, because an erroneous or invalid apportionment number can be remedied after the fact.[13] *See, e.g., Utah*, 536 U.S. at 462 (holding

---

[13] The only census cases decided by the Supreme Court pre-apportionment involved challenges to the mechanics of conducting the census, which could not be undone post-apportionment. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) (challenge to a citizenship question on the 2020 Census);

that post-apportionment redress is possible if the apportionment calculation contains an error); *see also Franklin*, 505 U.S. at 803 (finding that a post-apportionment order against the Secretary would provide redress for plaintiffs); *Dep't of Commerce v. Montana*, 503 U.S. 445-46 (1992); *Wisconsin v. City of New York*, 517 U.S. 1 (1996).  Indeed, in *Wisconsin*, it was not until *six years* after the 1990 census that the Court resolved an apportionment dispute based on those results.  This case is no different.  Accordingly, this Court could order adequate relief after apportionment when any injury to Plaintiffs is known with certainty, assuming there is any at all.  Indeed, the very fact that the Memorandum calls for the Secretary to report two numbers—one arrived at after the Census Bureau applies its Residency Criteria, and another that would allow the President to remove some number of illegal aliens that the Secretary is able to identify from the apportionment base—makes clear that a post-apportionment remedy would be easy to craft.

### 2.   Plaintiffs' Allegations of Enumeration Injury Do Not Withstand Scrutiny.

Plaintiffs' alternative efforts to link the Memorandum to some ongoing enumeration injury fare no better.  As explained by Associate Director Fontenot, the Memorandum does *not* affect how the Census Bureau is conducting its remaining enumeration operations.  *See* Fontenot Decl. ¶¶ 8, 12-13; *see generally* Census Bureau, *Review of 2020 Operational Plan Schedule*, Aug. 17, 2020, https://2020census.gov/content/dam/2020census/materials/news/2020-operational-plan-schedule-review.pdf ("Operational Plan").  Those operations include a variety of protocols specifically designed over the course of the past decade to ensure that hard-to-count and minority communities—some of the core constituencies for which Plaintiffs advocate—are accurately reflected in the census.  *See generally* Fontenot Decl. ¶¶ 8-13; Operational Plan at 2-11 (describing non-response follow-up, and

---

*Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) (challenge to the use of statistical sampling in the census).

other efforts to achieve "acceptable level of accuracy and completeness, with a goal of resolving at least 99% of Housing Units in every state, comparable with previous censuses").[14]  Plaintiffs speculate that, notwithstanding these protocols, the Memorandum will render the enumeration less accurate— purportedly by deterring immigrant communities from participating.  Pls. Br. 28-29.  But these claims suffer from at least three fundamental flaws, each of which seriously undermines the causation Plaintiffs are trying to establish.

### a. Plaintiff's Theory of Harm Relies on Attenuated Events Involving the Independent Actions of Third-Parties.

As discussed above in the standing section, Plaintiffs' theory for why the Memorandum may depress response rates relies on a highly attenuated chain of events.  Plaintiffs' expert, Dr. Barreto, opines that immigrant communities are less likely to respond to the census because of how that Memorandum is discussed in the media and by community activists.  Barreto Decl. ¶¶ 15-16, 32.  But those independent actors' messages are the product of their own interpretation, and often at odds with the plain terms of the Memorandum.  *See, e.g.*, Barreto Decl. ¶ 33 (listing media messages characterizing the Memorandum as something "intended to promote fear"); *id.* ¶ 46 (noting that aliens "may not do the full research to realize they can still fill out the Census safely, *because they hear the news which is connecting* the July 21 [Memorandum] to Trump's longstanding desire to increase deportation of undocumented immigrants" (emphasis added)).  It makes little sense to attribute whatever harm is caused by those independent actors' messaging to the Memorandum itself, particularly if their messages convey the incorrect impression that the Memorandum increases the "risk of [individuals'] information being linked to immigration records and [those individuals] facing immigration

---

[14]  *See also 2020 Census Detailed Operational Plan for: 18. Nonresponse Followup Operation (NRFU)*, Apr. 16, 2018, https://www2.census.gov/programs-surveys/decennial/2020/program-management/ planning-docs/NRFU-detailed-operational-plan.pdf; *see also 2020 Census Research and Testing Management Plan*, Dec. 28, 2015, https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/research-testing-plan.pdf, at 7.

enforcement." Barreto Decl. ¶¶ 62.  Given the strong privacy protections for census response data, any suggestion that the Secretary's compliance with the Memorandum will somehow facilitate immigration enforcement is flatly wrong.  *See generally* 13 U.S.C. § 9 (providing that personal information collected by the Census Bureau cannot be used against respondents by any government agency or court); *id.* § 214 (setting forth penalty for wrongful disclosure of information).

### b.  Plaintiffs' Theory of Harm Is Limitless.

Setting aside the role of independent actors, Plaintiffs' theory of harm proves too much. Plaintiffs' core claim is that the Memorandum will depress certain groups' participation in the census. *See, e.g.*, Pls. Br. 28-29; Barreto Decl. ¶ 14.  But the same line of reasoning could apply to almost any government action or statement that Plaintiffs find disagreeable.  Their theory would recognize harm sufficient for standing (and presumably for a preliminary injunction) based on a President's mere statements suggesting that he is exploring new legislation that would permit the Census Bureau to share data with immigration enforcement agencies.  That makes little sense.

The transmission of a general policy message—like the kind Plaintiffs claim the Memorandum sends—cannot suffice to show that irreparable harm is imminent or likely.  *Winter*, 555 U.S. at 12, 20. The Supreme Court has repeatedly rejected efforts to conjure irreparable injury from a hypothetical series of events that could theoretically cause a plaintiff injury.  *See, e.g.*, *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983); *Rizzo v. Goode*, 423 U.S. 362, 372–73 (1976).  Indeed, it has explicitly noted that allegations of "fear[]" of future harm must be assessed for reasonableness:  "[i]t is the *reality* of the threat of" future harm that is relevant, "not the plaintiff's subjective apprehensions."  *Lyons*, 461 U.S. at 107 n.8 (emphasis added).  Where, as here, fear is based on a series of conjectures and subjective misinterpretations—tethered not to something the government has actually done, but to some different policy the government might (or might not) pursue in the future—such fear cannot form the

basis for irreparable harm. *See id.* at 107. Merely harboring an objection to the President's expression of a policy preference falls far short of the standard for injunctive relief.

### c. The Alleged Harm is at Odds with Existing Evidence.

Plaintiffs' claims that the Memorandum is likely to decrease response rates is simply inconsistent with empirical evidence. Plaintiffs try to analogize the Memorandum to a citizenship question on a census questionnaire. *See, e.g.*, Barreto Decl. ¶¶ 14, 18, 24, 28, 57, 68, 86. But, as noted above, a randomized control trial published by the Census Bureau after the Supreme Court issued its opinion in the citizenship question litigation found *no* statistically-significant depression of response rates for households that received a test questionnaire containing a citizenship question. *See* Abowd Decl. ¶ 13; *see also 2019 Census Test Report,* Census Bureau (Jan. 3, 2020), https://www2.census.gov/programs-surveys/decennial/2020/program-management/census-tests/2019/2019-census-test-report.pdf (Census Test Report). As explained by Dr. Abowd, this test contained a sample of 480,000 housing units, and was "capable of detecting response differences as small as 0.5 percentage points." *See* Abowd Decl. ¶ 13. And while some narrow subgroups did exhibit statistically-significant lower self-response rates, Census Test Report at x, the Census Bureau concluded that "[c]urrent plans for staffing for Nonresponse Followup would have sufficiently accounted for subgroup differences seen in this test." *Id.* This result was contrary to the prediction of experts who previously testified during the citizenship-question litigation, and some of whose declarations Plaintiffs again submit now. *See generally* Abowd Decl. ¶ 13; *see, e.g.*, Barreto Decl. ¶ 68. As Dr. Abowd reports, this finding illustrates the benefit of a "randomized controlled design," which properly isolates the independent variable (there, the citizenship question) and measures its effects. Abowd Decl. ¶ 13.

Plaintiffs cannot reasonably contend that the Memorandum would have a greater effect on response rates than did the citizenship question. Unlike a question on a census questionnaire, the

Memorandum does not call for respondents to submit any information, and it changes nothing about the enumeration process.  *See* 85 Fed. Reg. at 44,679 (directing the Secretary to make use of existing information).  Indeed, neither Dr. Barreto nor any other declarant proffered by Plaintiffs identifies a rigorous survey or statistical study measuring whether this kind of internal Government action, which seeks nothing of respondents and has no connection to immigration enforcement, has any effect on response rates within immigrant communities.  *See generally* Barreto Decl. ¶¶ 39-86.  And nothing Plaintiffs submit purports to statistically measure the effect of the Memorandum itself on response rates.  *See generally id.* at ¶¶ 39-86.

Under these circumstances, Plaintiffs cannot be said to establish anything more than the abstract "possibility of irreparable injury."  *Nken*, 556 U.S. at 434.  But, as the Supreme Court has emphasized, the "'possibility' standard is too lenient" a basis upon which to issue the drastic remedy of a preliminary injunction.  *Winter*, 555 U.S. at 22.  Given that irreparable harm is one of the most important prerequisites for the issuance of a preliminary injunction, *see Feller v. Brock*, 802 F.2d 722, 727 (4th Cir. 1986), Plaintiffs' failure to establish anything more than the theoretical possibility of harm is sufficient basis to deny the injunction they seek.

### B.  The Remaining Factors Weigh Against an Injunction.

On the other side of the ledger, the harm to the government and to the public interest from an injunction would be great and immediate.  *See Nken*, 556 U.S. at 435 (explaining that harm to opposing party and weighing the public interest "merge" when relief is sought against the government).  In particular, an injunction would impede the Executive's historic discretion in conducting both the census and the apportionment, contrary to Congressional intent.  *See generally Franklin*, 505 U.S. at 796-800.

Plaintiffs' conception of the balance and hardship and public interest collapses those two parts of the traditional four-part injunction test into the very first prong:  merits.  As the Supreme Court

49

has emphasized, however, that should not be done. *See Winter*, 555 U.S. at 32. The public interest prong is a stand-alone requirement that must be met separately and cannot be short-circuited at plaintiffs' whim. *Id.*

Plaintiffs imply that enjoining the Memorandum would allegedly remedy Defendants' supposed misinformation. Pls. Br. 33. But the only misinformation Plaintiffs have identified in this case is the misinterpretation of the Memorandum by the various activists and news sources that their expert, Dr. Barreto, and their other declarants describe in their declarations. *See* Barreto Decl. ¶¶ 66-69; ECF No. 19-5, ¶ 9 (Rodriguez Decl.) (acknowledging "that census information is not shared with immigration enforcement agencies and is kept confidential"). Plaintiffs have never identified one piece of "misinformation" that the Defendants disseminated about the Memorandum. Any attempt to remedy misinformation would therefore require an injunction against some other entity. The public interest may favor that injunction, but it does not favor an injunction against Defendants here.

## CONCLUSION

For the foregoing reasons, the Court should deny the Plaintiffs' Motion for Partial Summary Judgment or a Preliminary Injunction.

Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

DAVID MORRELL
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

DIANE KELLEHER
BRAD P. ROSENBERG
Assistant Branch Directors

/s/ Daniel D. Mauler
DANIEL D. MAULER
ELLIOTT M. DAVIS
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC  20005
Phone:     (202) 616-0773
Fax:          (202) 616-8470
E-mail:     dan.mauler@usdoj.gov

*Counsel for Defendants*