# **EXHIBIT 5**

K93TSTAC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

STATE OF NEW YORK, et al.,

                 Plaintiffs,

         v.                          20 CV 5770 (RCW)(PWH)(JMF)

DONALD J. TRUMP, *in his*
*official capacity as President*
*of the United States*, et al.,

                 Defendants.

------------------------------x

                                     New York, N.Y.
                                     September 3, 2020
                                     10:00 a.m.

Before:

                    HON. RICHARD C. WESLEY,
                                     Circuit Judge

                     HON. PETER W. HALL,
                                     Circuit Judge

                    HON. JESSE M. FURMAN,
                                     District Judge


                    APPEARANCES (Telephonic)

OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL
     Attorneys for Governmental Plaintiffs
BY:  JUDITH VALE

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
     Attorneys for NGO Plaintiffs
BY:  DALE HO

U.S. DEPARTMENT OF JUSTICE
OFFICE OF SOLICITOR GENERAL
     Attorneys for Defendants
BY:  SOPAN JOSHI


                    SOUTHERN DISTRICT REPORTERS, P.C.

                         (212) 805-0300

K93TSTAC

1              (Via telephone)

2              JUDGE FURMAN:  Good morning and welcome.  Since the

3    panel is now here, we can get started.

4              Let me go over a few ground rules before we take

5    appearances.  First, this is Judge Furman.  Let me ask that if

6    you're not speaking that you mute your line, although remember

7    to unmute yourself if you want to say anything, and I will do

8    the same when I'm not speaking.

9              I will also try to model this, but I would ask that

10   anytime anyone says anything, please begin by saying your name,

11   just so that the court reporter and the Court know who is

12   speaking and that is clear.  There shouldn't be any chimes

13   during our call.  In theory, everybody who is on the speaking

14   line should already be here, but if you hear a chime and you're

15   speaking, just pause for a moment so that I can take stock of

16   who has either joined or left, as the case may be, and make

17   sure that everybody is still with us.

18             A reminder to everyone, whether you're on the

19   listen-only line or the speaking line, that you are prohibited

20   from recording this conference, and a reminder, of course, that

21   it is a public conference as it would be if it were being held

22   in open court.

23             With that, I will take appearances from counsel,

24   beginning with counsel for the plaintiffs.

25             Let me start with the governmental plaintiffs.

K93TSTAC

1          MS. VALE:  Yes, your Honor, this is Judith Vale for

2     the governmental plaintiffs.

3          JUDGE FURMAN:  Good morning, Ms. Vale.

4          And for the NGO plaintiffs?

5          MR. HO:  Good morning, your Honors, Dale Ho for the

6     non-governmental plaintiffs.

7          JUDGE FURMAN:  Good morning to you.

8          And finally for the defendants?

9          MR. JOSHI:  Good morning, your Honor, Sopan Joshi for

10    the defendants.

11         JUDGE FURMAN:  Good morning to you and Mr. Ho as well.

12         All right.  With that, unless my colleagues have

13    anything they want to add by way of preliminaries, I think we

14    can get started.  As indicated in our order, basically each

15    side will have something in the neighborhood of 20 to 30

16    minutes.  I don't think that we need to set a strict time limit

17    per se, but hopefully we will continue along if it's helpful to

18    us.

19         We'll begin with the plaintiffs since they filed the

20    initial motion.  I think you can probably guess from some of

21    our questions that you should focus in the first instance on

22    the jurisdiction and justiciability issues of standing and

23    ripeness.  Those are obviously threshold issues in any event,

24    but if you want to begin by addressing those, I think that

25    would be helpful.

K93TSTAC

1          Before you do that, let me check with Judges Wesley

2    and Hall to see if there's anything that they want to say

3    before I turn it over.

4          Judge Hall?

5          JUDGE HALL:  Nothing for me.  Thank you, Judge Furman.

6          JUDGE FURMAN:  And Judge Wesley?

7          JUDGE WESLEY:  No, I'm fine.  Thank you very much,

8    Judge Furman.

9          JUDGE FURMAN:  I don't know, Mr. Ho or Ms. Vale, which

10   of you intends to go in the first instance, but I will turn it

11   over to one of you.

12         MS. VALE:  Yes, your Honor, this is Judith Vale for

13   the governmental plaintiffs.

14         If the Court is amenable, I would like to start with

15   the justiciability issues for the apportionment harms, and

16   particularly with ripeness.  And then I will turn it over to

17   Mr. Ho for justiciability issues on the census count harms,

18   including traceability and redressability, and then turn to

19   merits with myself addressing constitutional apportionment

20   claims.  And then I will turn it back to Mr. Ho for the

21   statutory claims plus the Courts' questions about scope of

22   relief, and we would also appreciate an opportunity for a short

23   rebuttal on the summary judgment motion.

24         JUDGE FURMAN:  All right.  You may proceed.

25         MS. VALE:  Thank you, your Honor.  This case is ripe

K93TSTAC

1    because plaintiffs are substantially likely to be injured by

2    the categorical and blatantly unconstitutional exclusion of

3    undocumented immigrants from the apportionment base.  That

4    likely injury provides standing and constitutional ripeness,

5    and there is no prudential reason for the Court to wait to

6    decide the purely legal questions presented rather than

7    resolving them now and preventing the injury and disruption and

8    uncertainty that will otherwise hang over the apportionment of

9    seats in the House of Representatives and the plaintiffs'

10   redistricting processes.

11           The memorandum itself makes clear that at least some

12   of the plaintiffs are substantially likely to lose House seats

13   and Electoral College electors by the subtraction of

14   undocumented immigrants from the apportionment base.  As the

15   memo says, that is defendants' express intention, to have some

16   states with many undocumented immigrants lose House seats.

17           And the memo itself predicts that excluding

18   undocumented immigrants will likely result in California losing

19   at least one seat.  The same result is exceedingly likely in

20   Texas.  Defendants' own predictions are enough for ripeness,

21   but the undisputed declaration of Dr. Warshaw confirms that

22   there is a 98 percent likelihood that Texas will lose a seat, a

23   72 percent likelihood that California will lose a seat, and a

24   70 percent likelihood the New Jersey will lose a seat.

25   Defendants have provided no evidence to rebut that, so there is

K93TSTAC

1    no issue of disputed fact here about the substantial likelihood

2    of injury.

3           That's more than enough for ripeness, because

4    substantial likelihood is enough, as the Supreme Court and this

5    Court has made clear in cases like *Department of Commerce* and

6    *House of Representatives*, the latter of which was decided on a

7    summary judgment motion before the census or apportionment had

8    happened.  Those cases make clear that a predicted future

9    injury is enough as long as it's substantially likely.  You do

10   not need a literal certainty, just enough to have a concrete

11   rather than purely hypothetical stake in the matter.

12          JUDGE FURMAN:  Let me stop you, Ms. Vale.  This is

13   Judge Furman.

14          Number one, do you agree that those harms could be

15   remedied after the President submits his report to Congress, as

16   was the case for instance in *Utah v. Evans*; and number two, are

17   you not ignoring the language in the Presidential Memorandum

18   that directs the Secretary of Commerce to provide information

19   only if it is, quote, unquote, "feasible?"  That is to say, we

20   don't yet know whether and to what extent he will provide the

21   information being requested.

22          MS. VALE:  To take the first question first, your

23   Honor, while the plaintiffs think that it is at least possible

24   for the Court to provide relief after January, it's not certain

25   that defendants agree.  It seems like there will at least be a

K93TSTAC

1    substantial question as to whether and how long it would take

2    defendants to fix the apportionment after the fact, given that

3    they are here arguing that no injunction can be issued against

4    the President at all.  Under their theory, it seems like the

5    case cannot be ripe until the President issues his report.  But

6    once he does so it is at least unclear how the Court will

7    provide effective relief without ordering the injunction that

8    defendants say is not possible.

9            But even assuming that it is possible, as we think, to

10   get relief, that's not the standard for ripeness.  Even though

11   it might be possible to get relief, there will still be

12   hardship and disruption and uncertainty to plaintiffs and the

13   public because plaintiffs' redistricting processes start right

14   after the apportionment reports go out.  The data to the States

15   starts to roll out in February.  By statute, all the data has

16   to be out by March, and States can and do start at that point a

17   long process that has many steps that will be disrupted if it

18   turns out that everyone is working off an unconstitutional

19   apportionment.

20           And by "disruption," I mean for example that States

21   like New York and California have robust public participation

22   processes that are required that involve public meetings in

23   cities and counties all around the State, opportunities for the

24   public to send in maps based on the apportionment that has been

25   done.  In New York, the public needs to receive draft maps that

1    the officials have done.  And this is all real work that takes

2    time and resources and is important for the legitimacy of the

3    process.

4             JUDGE WESLEY:  Ms. Vale, this is Judge Wesley.  But

5    that's not to say, having once participated in a redistricting

6    process in a former life of the legislature, it's necessarily

7    pleasant and often long and drawn out, but that's not to say

8    that because these things are difficult that they couldn't be

9    done if a court at some point in time ultimately said that the

10   numbers that the Secretary of Commerce propose or identifies to

11   send to the President would constitute *ultra vires* or

12   inappropriate data from which the President could then perform

13   his ministerial functions, would it?

14        What keeps us from waiting, from a prudential

15   standpoint, waiting until the Secretary of Commerce comes up

16   and says "Okay, Homeland Security tells me there are 1.5

17   illegal aliens living in so and so," and then isn't it crystal

18   clear to everybody what the nature of the dispute is and

19   whether that number could or could not be used by the

20   President?

21            MS. VALE:  Yes, your Honor, this is Judith Vale.  I

22   agree that it might still be physically possible to redistrict

23   again and start the process again if it needs to be changed,

24   but there would be substantial hardship and disruption to the

25   process.  And when we're talking about ripeness, especially in

K93TSTAC

1    an area like redistricting, which is critical for elections,

2    there's a strong principle in cases like *Purcell* that we should

3    resolve these disputes earlier rather than later before we

4    start getting even close to deadlines because so many

5    stakeholders, including officials and candidates and residents,

6    need more time rather than less, or at least benefit from more

7    time rather than less.

8              Turning to the issue --

9              JUDGE WESLEY:  Excuse me, this is Judge Wesley again.

10   Did the States identify any injuries to them from the census

11   undercount other than with regard to reapportionment?

12             MS. VALE:  Yes, your Honor.  The undermining of the

13   census count itself also harms the State, the undermining that

14   is happening right now because of the memorandum, because

15   States use the census data to do redistricting and for many

16   other things as well.

17             JUDGE WESLEY:  Wait a second.  Federal funds with

18   regard to clean waters, federal funds with regard to

19   transportation, highway/bridge repair, all kinds of local aid

20   that goes out from the State that is funneled through the State

21   is premised on census data, isn't it?

22             MS. VALE:  Many things are premised on census data,

23   correct.

24             JUDGE WESLEY:  I don't understand then why the census

25   count isn't a more immediate injury to you as opposed to the

K93TSTAC

1    reapportionment.

2            MS. VALE:  I agree that the census count harm is more

3    immediate in time and quite serious because so many things flow

4    from the census count.  I will defer I think to my colleague

5    Mr. Ho on some of the issues about the census count harm, but I

6    certainly agree that that is also a very immediate and serious

7    injury that also provides both standing and ripeness, and that

8    needs to be resolved as soon as possible.

9            And I do want to touch on two other things.  Going to

10   Judge Furman's second question about defendants' speculation

11   that they might not be able to do what the President has

12   directed, the possibility that defendants might do a bad job at

13   doing what the President has commanded is not the type of

14   future contingency that can defeat ripeness.  The memorandum

15   says, quote, "It is the policy of the United States to exclude

16   from the apportionment base aliens who are not in a lawful

17   immigration status."  It is not a suggestion to do research

18   about this, it is a final policy and a directive from the

19   President, and defendants admit that they are doing everything

20   that they can to exclude all undocumented immigrants.  Dr.

21   Abowd's declaration says that the Census Bureau is working on

22   implementing this right now.  Director Dillingham testified to

23   the same in Congress.  This is what they want to do, they want

24   to exclude all undocumented immigrants, not a sliver.

25           Now it is always possible that the government, having

1

K93TSTAC

1    made a final decision, may change course later if it turns out

2    that what they have finally decided to do turns out not to be

3    feasible.  That's always a possibility, and it does not

4    undermine ripeness.  And the courts have made that clear in

5    cases like *Central Delta* and this Court's decision in

6    *Department of Commerce* where OMB had to review the citizenship

7    question and could have rejected it, could have said we're not

8    doing this.  But that didn't undermine ripeness because

9    Secretary Ross had already made that decision.  That decision

10   was effected and was being implemented.  And the same thing is

11   true here.  Even if it's possible that defendants might abandon

12   it if it turns out that they can't do what they want to do, the

13   President has already decided that this is the final policy and

14   defendants are already implementing it.

15          JUDGE FURMAN:  Let me interject.  I would say, unless

16   my colleagues have additional questions on this round, I would

17   propose that we shift gears and let Mr. Ho address the census

18   harms.

19          Let me check with Judge Wesley, any further questions

20   from you?

21          JUDGE WESLEY:  I'm good, thank you.

22          JUDGE FURMAN:  Judge Hall?

23          JUDGE HALL:  Thanks, I'm fine.

24          JUDGE FURMAN:  So with the apologies to you, Ms. Vale,

25   let me turn to Mr. Ho and pick up with the second serious harm.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

K93TSTAC

1          Go ahead, Mr. Ho.

2          MR. HO:  May it please the Court, Dale Ho on behalf of

3     the non-governmental plaintiffs.

4          The defendants' policy of excluding undocumented

5     immigrants from the census is causing ongoing injury to the

6     plaintiffs because it is deterring census responses now.  By

7     undermining the Census Bureau's core outreach message that

8     everyone counts in the census, that is degrading the quality of

9     census data that's used for a wide variety of purposes, and

10    it's causing our clients, in particular seven immigrant sites

11    organizations, to divert resources to combat these negative

12    effects, resources that could be rerouted to other

13    organizational priorities.  These facts establish standing

14    under the Supreme Court's decision in the citizenship question

15    case last year where the Court held that injury due to

16    government action that predictably reduces census responses is

17    traceable back to the government and redressable via an

18    injunction.  Not a single justice dissented on that point.

19          And because these census count injuries are occurring

20    now, we seek immediate relief from this Court.  We believe that

21    summary judgment on standing is appropriate, as these injuries

22    are not genuinely disputed given the absence of contrary

23    evidence about the quality of the census count.  And for

24    purposes of appellate review, we would also request that this

25    Court further find that if preliminary fact finding is

K93TSTAC

1    necessary on these threshold issues that the preponderance of

2    the evidence establishes standing on the basis of this census

3    count injury.

4         If I could go into a bit more detail, there's really

5    no genuine dispute that the Presidential Memo is suppressing

6    census responses now.  There are two reasons why it's doing

7    that.  The first is that it communicates directly that census

8    participation is a futile act for undocumented immigrants.  And

9    that sows confusion in the broader immigrant community and, as

10   I mentioned, undermines not only the Census Bureau's core

11   outreach message but the outreach work of non-governmental

12   organizations like the plaintiffs on whom the Census Bureau

13   relies to ensure an accurate count.  Second, it triggers

14   mistrust in immigrant communities by signaling that lawful

15   status is a component of census participation.

16        Again, these two reasons that the Presidential Memo

17   undermines census participation are essentially uncontradicted

18   in the record.  The former Census Bureau Director John

19   Thompson, who submitted two declarations on our behalf,

20   Exhibits 57 and 66, explains these points in some detail, as

21   well as declarations from our clients.  Those are at Exhibits

22   14, 18, 26, 36, and 43.  And I think it's somewhat ironic that

23   the government discounts their testimony kind of with a wave of

24   a hand, given that as Judge Furman found in your Honor's trial

25   decision last year, the Census Bureau itself relies on

K93TSTAC

1    organizations like the NGO plaintiffs to ensure a successful

2    census.

3              And it's not just our clients' testimony.  The notion

4    that excluding undocumented immigrants from the census will

5    harm the accuracy of the census is actually consistent with the

6    defendants' own longstanding position going back decades.  As

7    far back as 1989, Commerce Secretary Mosbacher wrote a letter

8    to Congress opposing an effort to exclude undocumented

9    immigrants from the census, noting that it would, quote,

10   "jeopardize the accuracy of the census."  We neglected to cite

11   that in our brief, but it is referenced in our amended

12   complaint with a hyperlink to the letter at paragraph 171.  And

13   just a few weeks ago, former Census Bureau Director Vincent

14   Barabba, who oversaw the 1980 census, testified before Congress

15   that immigrants will be, quote, "less likely to fill out the

16   census because of the Presidential Memo."  That's cited in

17   paragraph 173 of our amended complaint.

18             And the timing for this couldn't be worse.  The

19   enumeration period is set to end at the end of this month.  So

20   these injuries are occurring now, they're degrading the quality

21   of the census data now, and we need immediate relief from this

22   Court to avoid those injuries.

23             JUDGE FURMAN:  Mr. Ho, this is Judge Furman.  Let me

24   jump in and ask you to address the issues of traceability and

25   redressability, which obviously are independent requirements

K93TSTAC

1    for standing.  The defendants argue that the harms that you're

2    describing are not traceable to the memorandum but rather the

3    misreporting about the memorandum.  That is, in essence, the

4    argument.

5          And number two, particularly to the extent that you're

6    relying on the diversion of resources needed for the NGOs to

7    convey the message that everybody does in fact count, et

8    cetera, would a judicial ruling in your favor actually redress

9    that harm, and would you actually need to spend more when your

10   organizations have to divert even more resource to essentially

11   make sure that everybody was aware of the Court's ruling and

12   that everybody does count?

13         MR. HO:  Thank you for those questions, Judge Furman.

14   With respect to the question of traceability, the Supreme Court

15   explained in *Lujan* that traceability simply requires a causal

16   connection between the government's challenged action and the

17   injury that the plaintiffs are asserting.  And as the Supreme

18   Court held in the citizenship question case last year, the

19   predictable effect of government action on the decisions of

20   third parties is traceable back to the government.  There was a

21   citizenship question which predicably reduced census

22   participation.  Here it's the decision to exclude undocumented

23   immigrants.  Again, that's a predictable outcome of the

24   government taking an official position that census

25   participation for undocumented immigrants is a futile act

because the core purpose of the census, the apportionment of

political representation, the participation of undocumented

immigrants will ultimately be irrelevant to that core

constitutional function of the census. It not only

communicates futility to them, it creates confusion in the

broader community about whether or not census participation is

actually required for everyone, because the Census Bureau's

core message has been everyone counts in the census

unequivocally, categorially, and now there's a lot of

widespread confusion about that.

            I don't think that's because of media misreporting,

but even if this Court were to determine that there were other

factors that were contributing to the effect of the

Presidential Memo on census responses, that wouldn't destroy

traceability. As your Honor put it in your trial decision,

even in a dry season it is fair to trace the fire to arsonist.

The Presidential Memo is undoubtedly the cause of the reduction

in census participation that our clients testified about in

their declarations, and that's supported by not just the former

Census Director John Thompson's declaration, but also the

declaration of political scientist Matt Barreto, on whom we

relied at trial last year.

            If I could turn to your second question, these

injuries are also redressable here. In order for a plaintiff

to establish redressability the Supreme Court explained in

17

K93TSTAC

1    *Larson v. Valente* that the relief requested will remedy, quote,

2    "an injury to the plaintiff, not every injury to the

3    plaintiff."

4         And two basic facts establish redressability here.

5    First, as Former Bureau Director Thompson testified, enjoining

6    the Presidential Memo would mitigate its damage and, quote,

7    "improve the effectiveness of census outreach efforts."  That's

8    in his supplemental declaration at Exhibit 66.  And then the

9    supplemental declarations of three of our clients, Exhibits 62

10   through 64, all indicate that if their outreach were made more

11   effective because of an injunction against the Presidential

12   Memo, that would free up significant time and resources that

13   could then be rerouted to their pre-existing organizational

14   priorities, such as Covid relief.

15        Now these facts, they're not genuinely disputed by the

16   defendants.  There isn't any evidence that the defendants have

17   put in, for example, that the Presidential Memo is having no

18   effect on census outreach efforts.  And I think that's telling.

19   The Census Bureau represents I think repeatedly throughout

20   litigation that the decennial census is the largest peacetime

21   mobilization of federal personnel that the country engages in.

22   There are census takers all throughout the country right now

23   and field operation supervisors out there.  And it's I think

24   telling that not a single one of them has submitted a

25   declaration saying that the Presidential Memo hasn't affected

1    their work in any way.  The only thing we have is a declaration

2    from Mr. Lamas who says that the Census Bureau isn't changing

3    its operation in any way in response to the Presidential Memo.

4    But I think that only shows precisely why what the Census

5    Bureau is doing right now is inadequate to mitigate the damage

6    of the Presidential Memo because they're not doing anything to

7    account for the deterrent effect that the memo is having.

8              JUDGE HALL:  Mr. Ho, this is Judge Hall.  Could you

9    address, for me at least, why the burden that the NGOs have

10   taken on with respect to the census, which are causing them now

11   as a result of the memorandum as alleged and supported by data,

12   causing them to do more work, why that isn't a self-imposed

13   burden?

14             MR. HO:  Thank you, Judge Hall.

15             JUDGE HALL:  Why they couldn't just shift their

16   resources anyway to deal with Covid cases and those sorts of

17   things.

18             JUDGE FURMAN:  Mr. Ho, hold on one second.  This is

19   Judge Furman, and let me just add to that the following

20   question, which is:  Could we rely solely on the diversion of

21   resources, a *Havens Realty* theory of standing, if you will, in

22   the wake of *Clapper*, or does *Clapper* not stand for the

23   proposition that the expenditure of resources is a

24   self-inflicted harm unless it is intended to prevent a harm

25   that would itself constitute Article III injury?

19

K93TSTAC

1         MR. HO:  Thank you, Judges Hall and Furman.  If I

2    could start by addressing Judge Hall's question, the notion

3    that the diversion of resources to account for the deterrent

4    effect of the government's action on census responses, the

5    notion that that is a form of self-inflicted injury.  I think

6    the Supreme Court's decision in the citizenship question

7    litigation last year forecloses that particular argument.

8    Advocacy on behalf of immigrants and immigrant communities is a

9    central core aspect of our clients' missions.  That work has

10   been made harder by virtue of the government's action.  And

11   under *Havens Realty*, the diversion of resources from other

12   organizational priorities in order to account for the negative

13   effects of government action, that's cognizable injury and it's

14   not deemed self-inflicted.

15        In response to your question, Judge Furman, about

16   whether or not *Clapper* changes the equation there, I don't

17   think it does.  *Clapper* did not overrule *Havens Realty sub*

18   *silentio*.  I think what *Clapper* is best understood as stating

19   is that resource diversion is not a cognizable injury where

20   it's in response to a speculated or assumed harm.  In *Clapper*,

21   the plaintiffs didn't know whether or not they were actually

22   being surveilled by the government, they simply assumed that

23   they were and diverted resources to try to account for that.

24        Here, by contrast, there isn't any speculation about

25   the need for resource diversion, and there are two reasons why

K93TSTAC

1    that's the case.  The first is that the deterrent effect on

2    census responses is happening now.  It's being observed now in

3    the communities where census outreach is happening.  It's not

4    something that is speculated or assumed.  And second, the

5    government's policy is not speculated or assumed, it's

6    unequivocal and categorical that the policy of the United

7    States is to exclude from the apportionment base aliens who are

8    quote, "not in lawful status under the INA," and it's being

9    implemented now, as the government's own submissions indicated.

10            And I think in response to the third bullet point from

11    the Court's order as to whether or not the underlying harm for

12    which the plaintiffs are diverting resources, whether or not

13    that underlying harm itself must be sufficiently imminent and

14    impending to satisfy Article III requirements, I don't think it

15    does, because as Judge Furman noted in your Honor's trial

16    decision last year, it would be illogical to recognize that

17    organizations may be injured and have cognizable standing by

18    virtue of expenditures, but only in cases where that would be

19    superfluous because they're also suffering a separate

20    underlying injury which itself satisfies Article III

21    requirements.

22            Organizational plaintiffs asserting *Havens Realty*

23    standing have never been required to do that.  The plaintiffs

24    in *Havens Realty* itself did not suffer an underlying cognizable

25    injury for which they diverted resources.  That case I believe,

K93TSTAC

1    as I'm sure the Court recalls, was a case about housing

2    discrimination.  The plaintiffs themselves did not suffer from

3    housing discrimination but they were first forced to divert

4    resources in order to respond to a pattern of housing

5    discrimination in their community.  And the Supreme Court held

6    and has not since departed from the holding that that kind of

7    resource version is cognizable, it's traceable to challenged

8    conduct, and it's redressable by an injunction blocking that

9    conduct.

10          JUDGE WESLEY:  Mr. Ho, this is Judge Wesley.  In light

11   of your answer there, where do we look and what assurances do

12   the NGO plaintiffs make with regard to the fact that an

13   injunction would somehow remedy the situation and thwart the

14   undercount in any significant way?  And how significant need it

15   be for it to meet the test of redressability?

16          MR. HO:  Well, I don't think there's a bright line

17   that the Court can point to below which a certain percentage of

18   the injury would somehow defeat standing.  I would just look to

19   Supreme Court's language in *Larson v. Valente* that as long as

20   an injury to the plaintiff is remedied, that establishes

21   redressability.  We don't have to redress every injury to the

22   plaintiff.  In *Larson* the plaintiffs were religious

23   organizations who challenged one of several requirements to

24   obtain a religious organization exemption from certain

25   governmental reporting requirements.  The defendants argued

K93TSTAC

1    look, if the court enjoins one of these requirements, the

2    plaintiffs will still have to satisfy all of the other ones.

3    There's no guarantee they will be able to do that, they may end

4    up in the same place as a practical matter even after relief is

5    ordered.  And the Supreme Court held:  Look, that doesn't

6    defeat redressability.  Their job is now easier, and they may

7    not ultimately obtain the religious organization exemption, but

8    it will be easier for them to do so and that is meaningful

9    relief.

10          And I think the same holds true here.  We have

11   uncontroverted testimony from a former director of the Census

12   Bureau who says census outreach will be made easier if this

13   Court issues declaration that it is unlawful under federal law

14   to exclude undocumented immigrants from the census count.  And

15   we have three declarations, the supplemental declarations that

16   I mentioned earlier at Exhibit 62 through 64 from three of our

17   clients, FIEL in Texas, Make The Road in New York, and ARI in

18   Southern California, all of them stating that if their census

19   outreach efforts could be more effective in the remaining

20   non-response follow-up period that would not only help them

21   advance their organizational missions but it would free up a

22   significant amount of staff time and resources which they could

23   then reroute to their existing programmatic work.

24          JUDGE FURMAN:  Thank you, Mr. Ho.  Unless my

25   colleagues have any other questions, I propose that we move on

K93TSTAC

1    to next area, which I think is the merits.

2             But let me check, Judge Wesley, anything from you?

3             JUDGE WESLEY:  No, thank you very much.

4             JUDGE FURMAN:  Judge Hall?

5             JUDGE HALL:  Thank you, I'm fine.

6             JUDGE FURMAN:  All right.  So I think Ms. Vale had

7    said that she was going to address the constitutional issues,

8    if I remember correctly.

9             MS. VALE:  Yes, Judge Furman, I will.  If I could add

10   just one new thing on the census count harm that I just want to

11   stress, which is that it is not just diversion of resources

12   that is a harm from the census count harm, but also, as Judge

13   Wesley was suggesting, much funding for many, many programs

14   with federal funding comes from the census count, and that

15   flows through the states and then to the counties who are

16   plaintiffs here.  And the census data is also used for

17   redistricting.  So there are severe harms that do come from the

18   census count in addition to diversion of resources, and that

19   injury is shown through the detailed declaration that

20   defendants have not even tried to capture.

21            JUDGE FURMAN:  This is Judge Furman.  Let me ask you a

22   question on the merits, sort of threshold question, which is

23   that both sides have focused on the constitutional claims and

24   arguments, but shouldn't we first look at the statute?  And if

25   we can decide the case on statutory grounds without needing to

K93TSTAC

1    reach constitutional issues, shouldn't we do that?

2            And to the extent there is any doubt about how to

3    construe the statute, should the doctrine of constitutional

4    avoidance not play some role?

5            MS. VALE:  Yes, your Honor, this is Judith Vale.

6    Certainly if the Court thinks that excluding all undocumented

7    immigrants -- I might agree that it does, that that is another

8    basis to invalidate this memorandum, but we don't think that

9    the principle of constitutional avoidance holds that much sway

10   here for a couple of reasons.  One is, as mentioned before,

11   because we are talking about something as important as

12   redistricting that affects elections, there is also a strong

13   legal principle that those decisions should be decided early

14   and that we shouldn't wait or hesitate to resolve issues that

15   affect something like elections.  And I think that principle

16   sort of counteracts constitutional avoidance here.

17           And we don't think this is a difficult constitutional

18   question.  We think that the categorical exclusion of

19   undocumented immigrants who undisputedly live here blatantly

20   violates the Constitution and the Census Act.  As this Court

21   said in *Department of Commerce*, the Constitution requires the

22   apportionment base to include every single person residing

23   here, whether living here with legal status or without.  And

24   that command in the Constitution is crystal clear from the

25   terms of the 14th Amendment which requires the inclusion of the

K93TSTAC

1  whole person of numbers in each state, and more than 200 years

2  of history, practice, judicial precedent, including the *Evans*

3  decision and defendants' own representations in past

4  litigation.

5          Defendants simply have no authority, no discretion to

6  subtract millions of undocumented immigrants even though they

7  have every indicia of usually residing here.  They in fact do

8  live here most of the time.  They have done so for a long time.

9  For example, DHS estimated that in 2015 9.6 million

10  undocumented immigrants have lived in the United States for

11  more than ten years.  Millions of these undocumented immigrants

12  intend to keep living here, and in fact will keep living here,

13  even if defendants wish that it were otherwise.

14          And defendants themselves are going to make the

15  essentially factual finding under the residence rule that

16  millions of undocumented immigrants do usually reside here, and

17  they are going to count them in the actual enumeration because

18  they usually reside here.  And the memorandum is directing

19  defendants to simply ignore all of that, simply disregard that

20  millions of undocumented immigrants usually reside here, ignore

21  that, even though it is the lodestar of the 14th Amendment and

22  apportionment, and subtract them based solely on their

23  undocumented status.  And that is just blatantly --

24          JUDGE FURMAN:  Let me interrupt, this is Judge Furman.

25  Could you address the defendants' argument that you are

K93TSTAC

1    bringing a facial challenge, and as such that you have to

2    demonstrate that it is unlawful to exclude essentially all

3    categories of illegal aliens, including, for instance, illegal

4    aliens apprehended at the border who are being held in

5    detention pending removal?  Do you agree with that, and if you

6    don't, do you have authority that would support your

7    proposition on that front?

8          MS. VALE:  We don't agree with that characterization

9    of this case at all.  I think that characterization of this

10   sort of facial challenge is really getting this case precisely

11   backwards.  We are challenging the memorandum that exists, and

12   the memorandum that exists says that it is the policy to

13   exclude all undocumented immigrants based on their lack of

14   immigration status.  That is the action of the government that

15   is challenged here.

16         And so it is defendants that have to somehow justify

17   that categorical exclusion of everyone, including undocumented

18   immigrants who undisputedly live here.  The memorandum is not

19   remotely targeted at folks who are physically crossing the

20   border on census day or who are in a car being transported back

21   over the border on census day.  That is just not what this case

22   is about.  And those kinds of sort of fringe hypotheticals, I

23   think it's no accident that what they're really talking about

24   are folks who, when maybe there is a serious question as to

25   whether they usually reside here, there could be a question as

K93TSTAC

1    to whether someone who arrives yesterday usually resides here.

2    But those kinds of questions exist for folks who are

3    undocumented, who are legal permanent residents, or who are

4    citizens.  And this case is not about that, because even

5    defendants agree they are going to decide that millions of

6    undocumented immigrants do live here.  They usually reside here

7    and they are going to count them and then they're going to

8    exclude them anyway.

9         So that is what this case is about, and these fringe

10   examples I think are really a red herring and get this

11   backwards.  What the memorandum is doing and declaring is

12   directing the defendants to do what the framers forbid.  The

13   framers were very purposeful in requiring apportionment be

14   based on living here, on your usual residence, on your abode,

15   and you cannot ignore that and exclude people based only on a

16   legal status that doesn't have anything really to do with

17   whether you usually reside here or not.

18        And I would like to touch --

19        JUDGE FURMAN:  This is Judge Furman.  I was going to

20   check if Judge Hall or Judge Wesley have any questions, and

21   otherwise propose that we give Mr. Ho a little time to address

22   the statutory arguments.

23        JUDGE HALL:  Not me, I'm good.

24        JUDGE WESLEY:  No, that would be fine, thank you.

25        JUDGE FURMAN:  All right.  Mr. Ho, why don't you turn

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

K93TSTAC

1    to the statutes then.

2              MR. HO:  Thank you, Judge Furman.  Dale Ho for the

3    non-governmental plaintiffs.

4              13 USC 141 and 2 USC 2(a) set forth an interlocking

5    statutory structure governing the census and congressional

6    apportionment.  The defendants have violated this statutory

7    scheme in two distinct respects.  First, the statutes require

8    including the total population and the whole number of persons

9    in the apportionment base.  That includes undocumented

10   immigrants, and defendants' arguments to the contrary just

11   torture the plain language of the statute.

12             Second, the statutes require using the decennial

13   census for apportionment, which in 2020 undisputedly includes

14   undocumented immigrants.  That is, even if defendants were

15   correct that *ex ante* they have some discretion to exclude

16   certain populations of undocumented immigrants from the census,

17   this particular census does not exclude undocumented

18   immigrants, and defendants are under a ministerial duty to use

19   the actual census for purposes of apportionment.

20             If I could address that second argument for a moment,

21   the text of Section 141(b) clearly provides that the Commerce

22   Secretary in his report to the President must use, quote,

23   "total population for the apportionment," and that calculation

24   must be based on the decennial census.  Section 2(a) provides

25   that the President's report to Congress must similarly use the

K93TSTAC

1    whole number of persons ascertained under the decennial census.

2                   Now the legislative history to 1929 Census Act I think

3    makes very clear that once the census is complete there can

4    only be, quote, "one mathematical answer."  That's from the

5    Senate report.  So once the census is complete, the President

6    does not have discretion *ex post* to manipulate the census data

7    to his liking, add or subtract other kinds of data from the

8    census count and use different kinds of calculations to arrive

9    at a different apportionment number.  The statutory and

10   constitutional function of the enumeration is that it is used

11   for apportionment, and if the President could simply revise or

12   alter the census results and adjust them as he sees fit after

13   the census is complete, there's no real limit on what he can't

14   do, as I think Justice Thomas' separate opinion in *Utah v.*

15   *Evans* goes to some length to explain why granting the President

16   that kind of discretion would be problematic.

17                  To Judge Furman's first question about I think

18   resolving this case empirically on statutory grounds, the Court

19   could certainly look at the statutory claims first.  We do

20   think, given the exigencies here and the likelihood of quick

21   appellate review if this Court were to rule quickly, that for

22   purposes of completeness of the record and to facilitate

23   appellate review the better course would be to resolve both

24   sets of claims, the statutory and constitutional ones.

25                  JUDGE FURMAN:  All right.  Why don't we spend a few

K93TSTAC

1    minutes on the remedies and then we'll hear from defendants,

2    unless either Judge Hall or Judge Wesley have a question on the

3    statute.

4            So Judge Wesley?

5            JUDGE WESLEY:  No, thank you.

6            JUDGE FURMAN:  Judge Hall?

7            JUDGE HALL:  Nothing here, thank you.

8            JUDGE FURMAN:  All right.  So I can't remember who was

9    planning to address the remedies questions, but let me start by

10   posing a question and whoever is addressing it can answer,

11   which is assuming that we agree with you on jurisdiction and

12   the merits and intend to grant some relief, do we need to

13   address the question of whether such relief would need to

14   extend to the President or would it not suffice to enter an

15   injunction barring the Secretary from sharing the information

16   with the President that he's directed to share in the memo?

17           And then let me actually throw out a second question

18   that you can address in the meantime.  Defendants argue in a

19   footnote in their brief that such an injunction would violate

20   the opinions clause of the Constitution.  Could you address

21   that as well?

22           MR. HO:  Thank you, Judge Furman.  In response to your

23   first question, we would agree that effective relief is

24   possible even without relief against the President, that this

25   Court could order an injunction which enjoins the other

K93TSTAC

defendants in this case from taking any action in furtherance
of the Presidential Memo's policy of excluding undocumented
immigrants from the census.  That would provide us with
effective relief, but we do think that the better course would
be to order relief against the President.  Declaratory relief I
think, for example, is available under Second Circuit precedent
under the *Knight Institute* decision affirming declaratory
relief against the President.

And with respect to injunctive relief, I would just
simply say that the defendants don't deny that if the
President's duties here are in fact ministerial, then an
injunction would be proper, and we think that the duty that the
President has that we're asserting he's violated are in fact
ministerial.  There is a constitutional requirement to include
all people living in the United States.  The President has no
discretion to depart from that.  And there's a statutory duty
to use the census numbers for purposes of apportionment, which
the Supreme Court in *Franklin* noted is a, quote, "admittedly
ministerial task."  So we think that relief against the
President is available, and we think it would be the better
course to sort of ensure the finality of relief that's
effective.

To your second question, Judge Furman, I think this
case could be different if the President's Memo had simply
directed the Census Bureau to conduct a research assignment,

K93TSTAC

1    tell us how many undocumented immigrants or non-citizens there

2    are in each state.  But that's not what has happened here.

3    What happened here is the President has declared an official

4    policy of the United States which is unequivocal and in direct

5    contravention of the Constitution and statutory requirements.

6    And in that circumstance, the work that the defendants,

7    including Congress and the Census Bureau are undertaking in

8    furtherance of that memo, are properly enjoined.  It could be a

9    different story with a different kind of directive from the

10   President, but that's just not the case that we're presented

11   with here.

12           JUDGE FURMAN:  All right.  Thank you.

13           Unless Judge Hall or Judge Wesley want to ask

14   anything, I think we can switch to defendants.  Judge Wesley?

15           JUDGE WESLEY:  Thank you very much.

16           JUDGE FURMAN:  Judge Hall?

17           JUDGE HALL:  Thank you.  We're ready to switch to

18   defendants.

19           JUDGE FURMAN:  All right.  So Mr. Joshi, if you want

20   to pick it up and start with the issues of standing and

21   ripeness, please.

22           MR. JOSHI:  Thank you, Judge Furman, and may it please

23   the Court.

24           The Court should dismiss this case at the outset

25   because plaintiffs don't have standing for any of the injuries.

K93TSTAC

1    So let me just take them in order.  I think the apportionment

2    injury is not imminent or even ripe for review because the

3    memorandum asks the Secretary to transmit information and a

4    second set of numbers, if you will, to the extent feasible and

5    the maximum extent feasible.  And the Secretary has not yet

6    determined what is feasible or presented any information

7    breaking down what categories of aliens who don't have lawful

8    status under the INA could be accounted for and excluded from

9    the enumeration that would serve as the apportionment base.

10         In fact, I think plaintiffs in their complaint, and I

11   am looking here at paragraph 175 to 179 of the NGO plaintiffs,

12   amended complaint 137 to 141 of the governmental plaintiffs --

13         JUDGE WESLEY:  Mr. Joshi, this is Judge Wesley.  Are

14   you shuffling papers?

15         MR. JOSHI:  No, I'm not.

16         JUDGE WESLEY:  Someone is shuffling papers.  If you

17   could stop.

18         JUDGE FURMAN:  Judge Furman here.  Just a reminder, if

19   you're not speaking -- and Mr. Joshi should be the only one

20   speaking at the moment -- place yourself on mute, please.

21         MR. JOSHI:  Thank you, this is Sopan Joshi again.

22         So I think plaintiffs in their complaint have actually

23   alleged that it will prove completely infeasible to count and

24   exclude such aliens, in which case the two sets of numbers the

25   Secretary will present will be the same and there will be no

K93TSTAC

 1    apportionment injury at all.  So in some ways --

 2              JUDGE WESLEY:  Mr. Joshi, this is Judge Wesley.  I

 3    don't know that that will deter the Secretary of Commerce.  It

 4    may present a difference of opinion with regard to whether the

 5    numbers are in any way reliable, but isn't the law issue a

 6    little bit more distinct already?  What is indefinite about the

 7    posited intent to exclude illegal aliens from the delivery of

 8    numbers to the Congress?  It's the policy of this

 9    administration.  What is indefinite about that?  What's so

10    indefinite about that?

11              MR. JOSHI:  So your Honor, I think what is

12    indefinite --

13              JUDGE WESLEY:  It sounds definite to me.

14              MR. JOSHI:  I'm sorry, I didn't catch that last part.

15              JUDGE WESLEY:  I said it sounds definite to me.

16              MR. JOSHI:  So the memorandum by its own terms and the

17    policy by its own terms is to exclude such aliens, quote, "to

18    the maximum extent feasible and consistent with the discretion

19    delegated to the executive branch."  So the memorandum

20    statement of policy is itself self-limiting, and it includes a

21    condition of feasibility that the Secretary needs to determine

22    first.

23              JUDGE WESLEY:  Let me ask you this:  Is it your view

24    that the Secretary could get a number from the Department of

25    Homeland Security as a number of people currently subject to

K93TSTAC

1    orders of removal in which their appeals have been exhausted

2    from the Bureau of Immigration appeals and/or any petitions

3    before the circuits, and that number of people, those people

4    still remain in the United States, could the Secretary get that

5    number and then deliver it to the President?

6          MR. JOSHI:  So my understanding is yes, under the

7    Executive Order 13880.

8          JUDGE WESLEY:  And in your view, that would not

9    violate Section 2(a), is that your view?

10          MR. JOSHI:  So 2(a), we think the substantive standard

11    encompassed in 2(a) is identical to the constitutional

12    standard.

13          JUDGE WESLEY:  So your answer is no, it doesn't

14    violate it then, is that it?

15          MR. JOSHI:  If hypothetically that were what were done

16    then that may well be the case.  I think our point on

17    standing --

18          JUDGE WESLEY:  Stick with me on the question for a few

19    minutes, Mr. Joshi.  Is it your view that that would not

20    violate Section 2(a)?

21          MR. JOSHI:  Yes, that would be a proper exercise of

22    executive discretion to --

23          JUDGE WESLEY:  So let me ask you this:  Have you been

24    in touch with the Secretary of Commerce to determine to what

25    extent he has at the present time formulated methodologies with

K93TSTAC

1  regard to counting and those other agencies that he's contacted
2  persistent to the President's directive?
3  		MR. JOSHI:  The Secretary of Commerce has not yet
4  stated what he will or --
5  		JUDGE WESLEY:  I didn't ask you that question.  I
6  asked if you have been in touch with him before this oral
7  argument to determine how far along that was such that you
8  could report to this Court how much more definite the Secretary
9  was with regard to his ability to fulfill the order of the
10  President?
11  		MR. JOSHI:  So we have been in touch with the Commerce
12  Department but we have not received any definite information as
13  to what will or won't be feasible at this time.
14  		JUDGE WESLEY:  You received no information -- you're
15  telling me right now as an officer of this Court you have
16  received no information with regard to any particular set of
17  figures that the Secretary proposes to deliver to the
18  President?
19  		MR. JOSHI:  That is correct.  As I stand here today I
20  have not received that.
21  		JUDGE WESLEY:  All right.  Thank you.
22  		MR. JOSHI:  And I think, given that uncertainty, we
23  think the dispute right now isn't ripe because we dispute
24  plaintiffs' characterization of the memorandum as being --
25  		JUDGE WESLEY:  Well, this is Judge Wesley again.  Did

K93TSTAC

1    you receive an estimate as to when you might receive that

2    information?

3        MR. JOSHI:  No, I have not, your Honor.

4        JUDGE WESLEY:  Did you ask?  The issuance of the order

5    is the person who determines the definiteness of this,

6    according to your theory.  It's kind of easy to hide the ball,

7    isn't it?

8        MR. JOSHI:  Fair enough, your Honor, but I point out

9    the Supreme Court's decision --

10       JUDGE WESLEY:  The uncertainty can't be self-induced,

11   can it?

12       MR. JOSHI:  Well, it can, in this sense, and let me

13   explain, if I might:  The Supreme Court in *Franklin* made very

14   clear that the Secretary could deliver numbers for the very

15   first time at the deadline, December 31st, and the President

16   could turn around and say, "No, I disagree.  I have a policy

17   disagreement with whom you decided to count or not count in

18   this enumeration, go back and redo the numbers."

19       JUDGE WESLEY:  I will absolutely give you that,

20   Mr. Joshi.  In fact, quite frankly, I agree with you.  But what

21   about the census count itself, and what about the immediate

22   effect with regard to the diminution in the overall numbers and

23   the effect that that then has on agent localities, the types of

24   injuries that flow from that you yourself, your side doesn't

25   even contest?

K93TSTAC

1          MR. JOSHI:  So I dispute that we don't contest it.  So

2    if we're moving to the census count injury, I think first and

3    foremost it is simply not traceable or redressable under

4    *Clapper*.  As even the citizenship question case last year and

5    even right now I think we all agree that that census count

6    injury would have to be traceable to the memoranda.  And so

7    it's incumbent on plaintiffs here to identify some subset of

8    people who would not have been chilled and were not chilled

9    from answering the census between April 1st and July 21st, then

10   became chilled on July 21st after the memorandum was issued,

11   and then will be unchilled in the next 27 days by an order of

12   this Court that the government would vigorously contest and

13   that would remain reviewable on appeal.

14         JUDGE HALL:  This is Judge Hall.  How many people have

15   to be unchilled in order for your hypothetical or your

16   discussion to bear fruit and provide standing?  One?  If the

17   plaintiff showed one person was, "Ah-hah, I read this and now I

18   will answer the census," is that enough?

19         MR. JOSHI:  It would have to to be non-speculative,

20   whatever the number is.

21         JUDGE HALL:  One seems to be pretty non-speculative.

22         MR. JOSHI:  But you would then, I would assume, have

23   to identify it and provide a reason and make sure that that is

24   actually fairly traceable to the memoranda.  It can't just be

25   self-inflicted, as I think *Clapper* tells us.  And *Clapper* also

K93TSTAC

1    tells us that governmental actions that don't directly, quote,

2    "regulate, constrain or compel any action" are simply not the

3    source, as a matter of law, as being the fairly traceable

4    source of an alleged injury.

5         JUDGE FURMAN:  This is Judge Furman.  Didn't you

6    effectively make and lose that argument in the citizenship

7    question litigation, that is to say, the theory of harm in the

8    citizenship question litigation was that people would not

9    respond to the census out of essentially fear that their

10   identities would become known to the government.  That was

11   based on a misunderstanding or a misimpression that census

12   responses and census data would be available to immigration

13   authorities or the like, that is to say it was premised on a

14   misunderstanding.  Yet both I and the Supreme Court found that

15   because there was a predictable effect on the third parties

16   that ultimately caused harm to the plaintiffs that that

17   sufficed for standing.  So why does that argument not hold

18   here?

19        MR. JOSHI:  For two reasons, Judge Furman.  First is

20   that I think in that case it was still the question was:  Is it

21   traceable to the citizenship question's inclusion on the form?

22   Here it's:  Is it traceable to the memoranda?  And the

23   difference between those two is that the census count injury

24   right now is happening in the middle of the census.  So you

25   would have to show someone who was not chilled from April 1st

K93TSTAC

1    to July 21st and then became chilled, and then on

2    redressability would become unchilled in the next 27 days, even

3    though the order would still remain reviewable on appeal.

4    That's the difference.

5         JUDGE FURMAN:  Let me interrupt for a second.  The

6    President made the decision to wait until July 21st to issue

7    this memorandum.  If he had issued it on March 30, prior to

8    census technically beginning altogether, would you still be

9    making this argument, or is this argument essentially dependent

10   on the fact that the President, for whatever reason he may or

11   may not have had, waited until the census was near over?  And

12   indeed, the Census Bureau decided to shorten the period of the

13   census.  So in other words, can it be that the President's

14   decision to essentially truncate the amount of time that is

15   remaining with this memorandum in place, that that undermines

16   the ability of the plaintiffs to challenge this?

17        MR. JOSHI:  I will directly answer that question, but

18   let me just recite the premise a little bit.  Under *Franklin* he

19   could have done this in the ten days between December 31 and

20   January 10.  In fact, I would say it was laudable this was

21   announced in advance and allows the Secretary to do work in a

22   less expedited timeframe.  And *Franklin* makes clear that that's

23   a perfectly permissible way to go.

24        JUDGE FURMAN:  Mr. Joshi, that's not what he did, and

25   also had he done that, had he waited until October 1st when the

K93TSTAC

1    census is technically over, there would have been no argument

2    that this could affect the ongoing census count itself.

3    Instead, he made the decision to issue this memorandum with

4    essentially only one month remaining, but time remaining

5    nonetheless.  So we're now confronted with declarations that

6    say this is having a demonstrable effect on the ongoing census

7    count.  You haven't countered those declarations.  You didn't

8    ask for a deposition of those witnesses.  Are we not required,

9    in essence, to rely on that, that it is having ongoing harm?

10            MR. JOSHI:  No, for two reasons.  One, to answer your

11    earlier question, I think we would be making the same

12    traceability argument in the sense that there's a meaningful

13    difference here between someone who looks at the citizenship

14    question and being asked to answer it, and then as a result

15    chooses not to answer the question and to throw away the form,

16    and someone who is looking at the census form and is concerned

17    about an entirely different document that deals with

18    post-processing of the census data.

19            But to your second question, in terms of the

20    declarations, I do think we have evidence in the record.

21    Dr. Abowd's declaration helps us in two ways:  Number one, on

22    the summary judgment posture, if that's what you're considering

23    right now, you have to take the facts in the light most

24    favorable to us.  And two, Dr. Abowd's declaration makes clear

25    that when the census citizenship question was actually put to

K93TSTAC

1    the test by the bureau, and plaintiffs' experts don't even

2    address this study, it showed no statistically significant

3    decrease in response rates.  So we think if you take that in

4    the light most favorable to us *a fortiori* the memorandum, which

5    is not even on the census, it's a completely separate statement

6    of policy, will not result in a substantial decrease in

7    non-response rate, which then shows that the census count

8    injury won't occur and is not traceable to the memorandum.

9              And of course I think as your Honor's questions

10   earlier on the diversion of resources under *Clapper* suggest, we

11   agree that you can't have a self-inflicted diversion of

12   resources injury if that diversion of resources are not

13   intended to counter something that is itself not a cognizable

14   injury.  And here, as the census count injury is not cognizable

15   because it's neither traceable nor redressable, so too the

16   diversion of resources falls with it.

17             JUDGE FURMAN:  This is Judge Furman.  Let me follow up

18   on that particular point.  Would that not render *Havens Realty*

19   essentially a dead letter or a null set?  That is to say, how

20   could one ever have organizational standing by virtue of the

21   diversion of resources in the absence of another form of injury

22   that would itself suffice for standing purposes?

23             MR. JOSHI:  I don't think so, your Honor, for a couple

24   of reasons.  One, it's not that you have to have suffered the

25   other injuries, it's that the other injury, had it

K93TSTAC

1    materialized, would be cognizable, so hence the diversion.

2    You're not penalized for having prevented that.  And I think

3    that's the principle that *Clapper* was getting at.  It doesn't

4    undermine *Havens* because remember in *Havens* they had already

5    suffered the injury and then they were expending resources to

6    try to prevent the additional suffering of the injury,

7    including the informational injury in *Havens*.  So *Havens* is

8    perfectly consistent with *Clapper*, and both of those cases

9    together do not support a diversion theory here.

10          Now if I might move on to -- I think that addresses

11   the standing and the ripeness issue, so I will move on to the

12   merits unless there are further questions on it.

13          So on the merits we're considering, of course, both

14   plaintiffs' summary judgment motion and our motion to dismiss.

15   So at the threshold, which I think is proper to start with, we

16   believe all the claims against the President and all of the APA

17   claims should be dismissed under *Franklin*; the APA claims

18   because there's no final agency action yet and the President is

19   not an agency, and then the claims against the President I

20   suppose we can talk about later in the relief, but under

21   *Mississippi v. Johnson* and under *Franklin* there simply can't be

22   the sort of relief against the President in the conduct of his

23   official act.

24          JUDGE FURMAN:  Mr. Joshi, could I interrupt and ask

25   you:  Can you address the facial challenge question?  In your

K93TSTAC

1    brief you argue that it's the plaintiffs' burden to demonstrate

2    that, in essence, any or every illegal alien who would not be

3    counted, that that would be unlawful.  Doesn't that get it

4    backwards, as Ms. Vale said?  Isn't the question whether

5    there's anyone under the President's memorandum who would be

6    excluded who it would be unlawful to exclude; and if there is,

7    then the memorandum is either in violation of the statute or

8    the Constitution?

9               MR. JOSHI:  With respect, I disagree, as you might

10   have expected.  The memorandum itself is self-limiting.  It

11   says to the maximum extent feasible and consistent with the

12   discretion delegated to the executive branch.  And so as I said

13   when we were discussing ripeness, plaintiffs' choice to

14   challenge it right now means they have to show that if the

15   Secretary were to find it feasible to exclude only those aliens

16   without lawful status who have been paroled while waiting for

17   their removal to be effectuated, if that's all he finds then

18   that would be the question before the Court, whether that is

19   consistent with the discretion delegated to the executive

20   branch.  By bringing the challenge now before we know what is

21   feasible and what the President has determined is within the

22   extent of his discretion, they are bringing a facial challenge,

23   and they have to show that there would be no set of such alien

24   whom the President could exercise its discretion to exclude

25   from the apportionment base if the Secretary were to find it

K93TSTAC

1    feasible.

2           So it really is a facial challenge, and I think *Texas*

3    *v. United States* is most on point.  There Texas passed a

4    statute and what they wanted was to say:  Look, which way we

5    apply this statute, there would be no circumstances under which

6    it would affect voting, and therefore we don't need Section 5

7    preclearance for it.  And the Supreme Court said:  No, we're

8    not going to evaluate that right now, because I think the quote

9    was, "We don't have sufficient confidence in our powers of

10   imagination to affirm such a negative, and that the operation

11   of the statute is better grasped when viewed in light of a

12   particular application."  So too here, we need to first see the

13   application of this memorandum, we need to see what the

14   Secretary finds is feasible and then see exactly what the

15   President then excludes from the apportionment base.  And then

16   you will have an actual target, an actual application to

17   evaluate.  So I disagree.

18           JUDGE FURMAN:  On the merits -- this is Judge

19   Furman -- the Court has repeatedly looked to history in forming

20   its understanding of constitutional provisions and, for that

21   matter, statutory provisions.  Can you identify any historical

22   instance where the executive branch or the legislative branch

23   or the judicial branch, for that matter, had taken the position

24   that it would be lawful to exclude illegal immigrants from the

25   census count or the apportionment base?

K93TSTAC

1        And I would note I think the Department of Justice

2    took the position that it would be unlawful in the 1980 *FAIR*

3    litigation.  In the *Ridge v. Verity* litigation in 1989 there is

4    a six-page fairly thorough letter from an assistant attorney

5    general in the Department of Justice in 1988 commenting on a

6    bill that would have excluded illegal aliens from the

7    reapportionment count and explicitly took the position that

8    would be unconstitutional.  There was a 1989 letter when the

9    current Attorney General was the assistant Attorney General for

10   the Office of Legal Counsel reaffirming that position.  There's

11   an opinion of the Senate legal counsel in 1929, the year that

12   Congress passed the sort of modern Census Act, stating that it

13   would be unconstitutional.  Is there any instance, any support

14   for the proposition that you are pressing here today in the

15   historical record?

16        MR. JOSHI:  We have not been able to identify any.

17   But in *Franklin* there was a nearly unbroken 180-year history of

18   not including service members in the count, and nevertheless

19   Secretary Mosbacher made a different determination.  And he did

20   so in the wake of at least nine bills that had been presented

21   in the 100th and 101st Congresses proposing to include such

22   service members, none of which made it very far.  And

23   nevertheless, he exercised his discretion to do so, and the

24   President agreed, and the Supreme Court upheld that decision.

25        In this case I think what we point to is the original

K93TSTAC

1    meaning of "inhabitants" and the legal concept of "usual

2    residents" that the Supreme Court has explicated that we say

3    could be read, and in fact is most fairly read to exclude

4    aliens who don't have permission to stay and settle in the

5    country, that's the definition of "inhabitant," or who don't

6    have enduring ties because they could be removed at any time by

7    the sovereign.

8        On the other hand, I agree with you, plaintiffs' best

9    argument is history, and that cuts the other way.  But I think

10    in the end when you compare those two together what it really

11    means is that the concept of persons in each state or

12    inhabitants or usual residents or those with allegiance or

13    enduring ties, all of these concepts are not particularly well

14    defined and therefore leave a considerable amount of room to

15    the executive to exercise his discretion.

16        Now the fact is the executive did not exercise that

17    discretion in the way that the memorandum here is exercising

18    it, but that doesn't make the exercise unlawful.  There's no

19    laches on executive discretion or, for that matter,

20    congressional discretion over defenses.  Of course the

21    executive branch's nearly unlimited discretion -- to use the

22    phrase in *Wisconsin* -- over the census operation is by

23    delegation from Congress.  And Congress, of course, can take

24    back that delegation in whole or in part, temporarily or

25    permanently, at any time.  So if this memorandum -- if the

K93TSTAC

1    President acts in accordance with this memorandum and delivers

2    the apportionment to Congress on January 10, they can

3    disapprove it.  They can pass a bill and they can exercise the

4    discretion that the Constitution grants them.

5         JUDGE FURMAN:  Mr. Joshi, this is Judge Furman.

6    Hasn't Congress already exercised that discretion in US Code

7    Section 2(a), that is, by directing the President to use the

8    whole number of persons in each state, quote, "as ascertained

9    under the decennial census of the population" to determine

10   apportionment?  And by definition isn't it the case that if the

11   President uses anything other than the number given to him

12   pursuant to the residence rule, that is, subtracting any

13   category of illegal immigrant from that number, isn't it by

14   definition not consistent with that statute?

15        MR. JOSHI:  No, for several reasons, and let me walk

16   through them, if I might.  First, the substantive standard in

17   2(a) simply echoes the constitutional text, and I think it

18   would be a mistake to read it as being anything different from

19   the constitutional text, as far as the substantive standard.

20        As far as like whom to count, I think, with respect,

21   that just begs the question here, because remember in *Franklin*

22   the Supreme Court was very clear that the enumeration, the

23   thing that is the enumeration used to calculate the

24   apportionment is not final until the President says it is.  And

25   so if you think about a case like *Franklin*, if the Secretary

K93TSTAC

1    delivers the census result that counted all the people he

2    thinks should have been counted to the President, and the

3    President turns around and says, "No, I disagree" -- so let's

4    say Secretary Mosbacher in *Franklin* had submitted a census that

5    included the overseas service members -- as he did, in fact --

6    and then had President Bush turned and said, "You know what?  I

7    disagree with that policy.  I'm going with what we have done

8    for 180 years, with very few exceptions, I don't want to

9    include them at all," Secretary Mosbacher would have gone back

10   within those ten days, subtracted those service members, sent

11   the new results back to the President, and he would have used

12   that in the apportionment.  That's exactly what is happing

13   here.  So it begs the question to say you're taking the --

14           JUDGE WESLEY:  Mr. Joshi, there's a significant

15   difference though.  The Secretary had made the allocation

16   determination and had counted service members and decided where

17   they were to be counted under the census.  Here, the stated

18   policy is to draw a number outside of the census from data not

19   collected by the census itself and reduce the allocation as

20   determined by the census.  This is not the President

21   disagreeing with some data that is within the census, this is

22   the President reducing the census.  The census does not count

23   illegal aliens, does it?

24           When I filled out my questionnaire, it didn't ask me

25   if I was an illegal alien.

K93TSTAC

40

1       MR. JOSHI:  No, I don't understand --

2       JUDGE WESLEY:  This is completely different.  This

3  isn't *Franklin v. Massachusetts*, and I wonder why we have to

4  wait.  The stated purpose is to draw a number outside of the

5  census and take it from the number that is produced by the

6  Secretary.  It's not a disagreement with what the Secretary

7  provides to the President and then an alteration by the

8  President.  He can do that, I agree with you, that's *Franklin*

9  *v. Massachusetts*, and it's not ripe until he makes that

10 decision.  This is the stated policy that illegal aliens are

11 not to be counted, and yet they are counted, and now the

12 President is trying to find a way to take them out of the

13 number, but not from the data collected by the Census

14 Department, correct?

15      MR. JOSHI:  No, I don't agree with that.

16      JUDGE WESLEY:  Where is he getting the data from?

17 Where's he getting the data from?  He's not getting it from

18 Census Bureau data, is he?

19      MR. JOSHI:  With respect, your Honor, the Census

20 Bureau maintains and gets administrative records that Congress

21 has directed that they do to the maximum extent possible.

22      JUDGE WESLEY:  Just answer my question, with respect,

23 please.  Is the Census Bureau maintaining records in the

24 allocation and enumeration of illegal aliens?

25      MR. JOSHI:  It is attempting to collect the

K93TSTAC

1    information.

2             JUDGE WESLEY:  I didn't ask you that, I said:  Is it

3    maintaining records?  I'm not asking whether it's asking other

4    agencies.  Did it count illegal aliens as part of the census?

5             The answer is yes.

6             MR. JOSHI:  So far, yeah.

7             JUDGE WESLEY:  Right.  Because they didn't ask anybody

8    if you were an illegal alien, did they?

9             MR. JOSHI:  Correct.

10            JUDGE WESLEY:  So now they're looking to figure out if

11   there's other data outside of the census to provide to the

12   President from which he could then deduce that there are

13   illegal aliens within the census count, is that correct?

14            MR. JOSHI:  That is correct.

15            JUDGE WESLEY:  And that is not *Franklin v.*

16   *Massachusetts*, is it?

17            MR. JOSHI:  I disagree there.

18            JUDGE WESLEY:  It is?  You disagree why?  Because in

19   *Franklin v. Massachusetts* the service members were counted, it

20   was the question of where they were to be allocated, wasn't it?

21            MR. JOSHI:  So two responses to that, your Honor, if I

22   might, and I hope I can clear up some misunderstandings here.

23   Number one, the decision and the discretion that we're talking

24   about here is always binary, include or exclude, and it can't

25   possibly be that the executive discretion works only one way

K93TSTAC

1    like a ratchet.  The decision to include is just the same kind

2    of exercise of discretion as the decision to exclude.

3              JUDGE FURMAN:  Well, Mr. Joshi, let me --

4              MR. JOSHI:  Sorry, I just want to clarify something,

5    if I might.  I really apologize, but it's important.

6              In *Franklin* there was not a census taken of those

7    overseas service members.  There was going to be an attempt to

8    do it and then DOD said in fact it wound up being infeasible,

9    so they counted those service members both to include in the

10   first place and then to allocate based on separate records

11   outside the census.  So I disagree that it's anything unusual

12   here, it is just like *Franklin*.  I just wanted to clear up that

13   misunderstanding.

14             I'm sorry, Judge Furman.

15             JUDGE FURMAN:  Well, perhaps that answers the

16   question, but I wanted to tether it to language of Section 2

17   which requires the President to use the whole number of persons

18   as ascertained under the census.  Isn't the case if the whole

19   number is determined by taking the census number, that is the

20   number as ascertained under the census, and subtracting a

21   number based on something totally unrelated to the census, that

22   it is no longer using the whole number of persons as

23   ascertained under the census?

24             MR. JOSHI:  No, for the same reason I think I just

25   mentioned in *Franklin*.  If you're taking the census and then

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

K93TSTAC

1    adding, based on administrative records overseas service

2    members, you've done the same thing.  Likewise, in *Utah v.*

3    *Evans* you're taking the numbers from the census and then you're

4    looking at gaps and then you're just imputing people into it

5    based on other administrative records and statistical formulas,

6    et cetera.

7           JUDGE FURMAN:  But Mr. Joshi, you've made two

8    arguments repeatedly in your briefs.  One is that the census

9    has never been conducted solely on the basis of questionnaires,

10   that the Census Bureau uses other things, administrative

11   records, imputation, et cetera, to produce the whole number of

12   persons.  So in essence that's what happened in *Utah v. Evans*

13   and that's what happened in *Franklin*.

14          The second argument that you've made is the

15   President's memo has nothing to do with the census, that the

16   census is being conducted as it was prior to July 21st, and

17   that the Census Bureau will produce a whole number of persons

18   as ascertained under the census pursuant to the residence rule

19   and provide that information to the President.  Doesn't it

20   follow *a fortiori* that if the Secretary provides another number

21   that it is not a number that is ascertained under the census?

22          MR. JOSHI:  No, it doesn't, with respect, and here's

23   why:  If this had proceeded as if under *Franklin*, let's say the

24   Secretary applies the residence criteria, delivers that number

25   to the President, the President turns and says, "I disagree, I

K93TSTAC

1    want you to give me a new number, to the maximum extent

2    feasible and consistent with the discretion delegated to me, to

3    exclude aliens who don't have lawful status under the INA."

4    The Secretary goes back, redoes the numbers using the

5    administrative records, just like in *Franklin* using the DOD

6    records, sends the new number back to the President.  The

7    President says, "Ah-hah, yes, I like this, this is the now the

8    enumeration and the apportionment."  What *Franklin* says is

9    that's when you get the actual census enumeration and

10   apportionment.  The only difference here is that the Secretary

11   is providing both numbers in parallel rather than seriatim.

12   That's the only difference.  But I don't think that's a

13   difference that violates Section 2(a).

14          JUDGE FURMAN:  Unless Judge Wesley or Judge Hall have

15   other questions on the merits, maybe you should have a brief

16   word on remedies and then we'll go back for a brief rebuttal

17   from plaintiffs.

18          Judge Wesley?

19          JUDGE WESLEY:  I'm fine, thank you.

20          JUDGE FURMAN:  Judge Hall?

21          JUDGE HALL:  I'm fine as well.

22          JUDGE FURMAN:  Why don't you wrap up, Mr. Joshi, by

23   addressing the remedies question.

24          MR. JOSHI:  I'm happy to do that.  If I might just add

25   one sentence, I think since we do have our motion to dismiss

K93TSTAC                                                        5

1    here as well, I would just say that the Section 195 sampling

2    claim should be dismissed because the memorandum says nothing

3    about sampling.  The Tenth Amendment claims I think should be

4    dismissed because it doesn't coerce or even ask States to do

5    anything.  And we think equal protections claims are deficient

6    under the *Regents* case because it tends to bootstrap statements

7    that are far removed in time and context.

8         So on remedies, as I mentioned earlier briefly, we

9    think there's no relief possible against the President under

10   *Franklin* and under *Mississippi v. Johnson* because there cannot

11   be such relief against the President in the conduct of his

12   official duty.

13        Now there is an open question, and I disagree with my

14   friend Mr. Ho that we conceded, but there is an open question

15   as to whether such relief could lie for purely ministerial

16   acts.  But this is not ministerial, as *Franklin* makes clear.

17   Although the mathematical formula might be ministerial, picking

18   what number you plug into that formula is certainly not

19   ministerial, and that's what we have here.  We're picking what

20   number goes in based on a policy judgment about who should be

21   included.  So under those cases, no relief against the

22   President.

23        JUDGE FURMAN:  This is Judge Furman.  Does that not

24   open the door to precisely the political chicanery, to use

25   Justice Thomas' language, that the Census Act was prevented to

K93TSTAC

1    prevent?  In other words, my understanding of the history if

2    not the language of the statute is that Congress wanted this

3    performed by a constitutional officer but effectively limited

4    that role to one that could be done with simple arithmetic.

5        If you're saying that as a matter of policy the

6    President could basically decide only people from red states

7    count in the census and that's a policy decision, doesn't that

8    precisely result in the political chicanery that the act was

9    intended to prevent?

10        MR. JOSHI:  I disagree for a couple of reasons.  One,

11   I think there's a difference between determining the

12   enumeration based on policy judgments.  And then the second

13   step from enumeration from apportionment, there is a different

14   policy judgment that's involved there, and I think the

15   *Department of Commerce v. Montana* case probed that aspect.

16   What Congress has done is exercised its discretion and made the

17   policy judgment as to that second theme, as to the enumeration

18   to apportionment calculation, but it is still left to the

19   President the discretion on policy for determining the

20   enumeration itself, as *Franklin* and *Utah v. Evans* makes clear.

21        But there are also -- as we said, the President has

22   discretion, and *Wisconsin* calls it virtually unlimited, but it

23   is not unlimited, and it might be limited by other

24   constitutional doctrines, of course.  So if the President says,

25   "I refuse to count any one of a certain race or religion," we

K93TSTAC

1    think that would be not within his discretion.  That's far

2    removed from, obviously, the situation here.

3            Now in terms of the final question that the Court

4    issued, which is if there is no relief against the President

5    could there be any other effective relief, I think that is a

6    difficult question.  But ultimately we agree that in *Evans* the

7    court found it sufficient to presume that the President would

8    be substantially likely to abide by an injunction against the

9    Secretary, even though he wouldn't be bound by it, and nothing

10   in the record here would cast doubt on that presumption.  So

11   although the government obviously already did the opposite in

12   *Evans* and *Franklin*, we think this Court would just follow the

13   course there.  But it is important to say, in answer to the

14   Court's question, assuming you were to get this on the

15   threshold issue then the merits, which we don't think you

16   should, what such relief might look like.

17           And I think it's important to note that any such

18   injunction, preliminary injunction against the Secretary, could

19   not prevent him from providing the information that the

20   memorandum asks him to provide.  In fact, if you read the

21   actual memorandum, what it directs the Secretary to do is,

22   quote, "The Secretary shall take all appropriate action,

23   consistent with the Constitution and other applicable law, to

24   provide information permitting the President, to the extent

25   practicable, to exercise discretion to carry out the policy."

K93TSTAC

1    And under the opinions clause, the President can demand in

2    writing the opinion on any subject relating to the duties of

3    the office, and this would plainly qualify under that.

4             JUDGE FURMAN:  Mr. Joshi, let me ask you one final

5    question, unless my colleagues have a question on that.  You

6    invoke the opinions clause in a footnote in your brief.  I

7    think this Court, the Second Circuit and the Supreme Court have

8    generally taken the view that that's not sufficient to present

9    an argument.  Why should we not view that argument as having

10   been waived?

11            MR. JOSHI:  Because, your Honor, first of all, we did

12   raise it in our affirmative motion.  It was a combined brief,

13   of course, so it's hard to separate.

14            JUDGE FURMAN:  In a footnote.

15            MR. JOSHI:  That is true, it was in a footnote, but we

16   didn't take necessarily plaintiffs to be asking to prevent the

17   transmittal of even information, we take plaintiffs to be

18   asking -- and we think an injunction would have to be so

19   limited to simply saying that the second set of numbers cannot

20   properly serve as the enumeration for the apportionment

21   purposes.  That would be the limits of what the injunction

22   could do.  It couldn't actually prevent the Secretary from

23   doing the work to provide the information.

24            In this respect, Judge Furman, I respectfully point to

25   the decision in the prior census litigation.  I think at the

59

K93TSTAC

1    end of that trial there you were clear in your order, or I

2    thought it was, that the government could not actually include

3    the citizenship question on the census questionnaire, but you

4    clearly said that we were not enjoined from taking other

5    preparatory steps to prepare to include it as long as we didn't

6    take that final step.  And I think that would be analogous to

7    this situation here.

8         And really I think I would like to close by saying an

9    injunction that said:  Secretary, the second set of numbers

10   called for by the memorandum would be unconstitutional or *ultra*

11   *vires* if it were to serve as the enumeration number for

12   purposes of the apportionment base.  I think just saying that

13   demonstrates the problem with this case, which is you don't

14   have the second set of numbers and you couldn't possibly say

15   exactly what the problem with it is.

16        And I think that just underscores why this case is not

17   ripe at this moment.  We should wait to see what is feasible,

18   what those numbers are, and then the case can proceed exactly

19   as *Franklin* proceeded, exactly as *Evans* proceeded, exactly as

20   *Wisconsin v. New York* proceeded.  And the one case that

21   plaintiffs have identified that was litigated beforehand was

22   *Department of Commerce v. House of Representatives* dealing with

23   statistical sampling which expressly provides a cause of action

24   pre-enumeration.

25        So for all those reasons we think you should dismiss

K93TSTAC

1    the case at the threshold, but at a minimum no relief against

2    the President and only limited preliminary injunctive relief

3    against the Secretary if you disagree.

4            THE COURT:  Thank you, Mr. Joshi.

5            We'll hear briefly from Ms. Vale and/or Mr. Ho, but I

6    emphasize "briefly."

7            MS. VALE:  Yes, your Honor, this is Judith Vale.  I

8    will try to be brief.

9            First, I do want to touch on the point that another

10   reason why the memorandum is both unconstitutional and a

11   violation of the statute is that defendants are untethering the

12   apportionment from the actual enumeration.  That is what they

13   are doing, and it is what they have said they are doing.

14   Director Dillingham in his sworn testimony to Congress said

15   that the memorandum has nothing to do with our operation right

16   now with the census, we're counting everybody, it has to do

17   with the tabulation that has been requested on apportionment.

18           In the joint letter that we submitted earlier,

19   defendants also said, unlike the citizenship question,

20   plaintiffs are not challenging a procedure that will be used in

21   the actual census but an apportionment number that will be

22   chosen by the President after the census is complete.  And that

23   is quite different from what happened in either *Franklin* or

24   *Utah* where it is true that in *Franklin* and *Utah*, and during the

25   census process of counting who usually resides here, the Census

K93TSTAC

1  Bureau does use information from administrative records or

2  imputation, but that was as part of deciding who usually

3  resides here.

4        And that's not what is going on here.  That is not

5  what defendants have represented that they are doing.  They are

6  going to do the count, they are going to find out who usually

7  resides here.  They are going to count undocumented immigrants

8  as usually residing here using not just the questionnaire but

9  all of the census processes that they use, and then when that

10 is done they're going to give that number to the President.

11 And separate from that, they are getting another number that

12 the President will use to subtract.  That is unconstitutional

13 because I think it is undisputed that the actual enumeration

14 has to be the basis for apportionment, and it also violates the

15 statute.

16       The second point I just want to hit quickly is on the

17 claim about this being infeasible, and in particular that

18 plaintiff has said it might be infeasible.  What we said is

19 that we don't think defendants can do this accurately.  We

20 don't think they can actually accurately do a head count of

21 every single undocumented immigrant.  But doing it,

22 implementing it and doing it well are not the same thing.  And

23 I think we have every indication from both the citizenship

24 question case and what defendants have said so far that they

25 will go forward even if there are serious questions about

K93TSTAC

1    whether their numbers are accurate.  They said they might only

2    abandon course if it's infeasible.  They have not said they

3    would abandon course if there were questions about accuracy.

4            In any event, it's really rank speculation from

5    defendants to suggest that they are actually going to give the

6    President some small subset of numbers rather than do

7    everything that they can to count as many undocumented

8    immigrants as they can.  And they have provided no proof, no

9    information whatsoever to suggest that they are going to

10   provide a subset of numbers.  And that absence of proof is

11   entirely self-inflicted during the time that's gone by when

12   presumably the Census Bureau has been working on this, as

13   Dr. Abowd and Director Dillingham have said.  They have

14   provided no evidence whatsoever to suggest that what is really

15   going to happen is a smaller number.

16           And so the question of what the memo says right now on

17   its face is that the decision of the President as of right now

18   is to exclude all undocumented immigrants.  And even if that is

19   some sort of facial challenge, which we obviously disagree

20   with, there is no set of circumstances under which excluding

21   undocumented immigrants based solely on their immigration

22   status rather than their usual residence is constitutional or

23   lawful.

24           JUDGE FURMAN:  Thank you, Ms. Vale.

25           MS. VALE:  The last thing I was going to say was just

K93TSTAC

1    on ripeness that we should also balance not just the hardship

2    to the plaintiffs but the fact that there is no hardship to

3    defendants from resolving this now and getting it right the

4    first time.

5              JUDGE FURMAN:  Thank you, Ms. Vale.

6              Let me check with my fellow panelists to see if they

7    have any final questions, and otherwise we'll wrap up.  Judge

8    Wesley?

9              JUDGE WESLEY:  No, thank you very much, counsel.

10   Thank you all, counsel.  I gave you a rough time at times but I

11   appreciate your honest answers.  Thank you.

12             JUDGE FURMAN:  Judge Hall?

13             JUDGE HALL:  No.  My thanks to counsel as well, but no

14   further questions.  Thank you.

15             JUDGE FURMAN:  In that case, let me close by thanking

16   counsel as well for your very helpful briefs and oral argument,

17   and we will reserve decision and try to give you a ruling as

18   soon as we can.  And with that, I wish everybody a good day and

19   stay safe.  Thank you very much.

20             (Adjourned)

21

22

23

24

25