# **EXHIBIT 6**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | No. 20 Civ. 5770 (JMF) |
| NEW YORK IMMIGRATION COALITION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | No. 20 Civ. 5781 (JMF) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR STAY OF JUDGMENT PENDING APPEAL**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

I.     Defendants are Likely to Succeed on the Merits. ............................................................. 2

    A.   The Judgment is Not Tailored to the Purported Injury. ................................................ 2

    B.   The Court Erred in Concluding the Secretary's Use of Administrative Records Is "Outside" of "the Census" Given the Secretary's Statutory Discretion to Use Such Records in Conducting the Enumeration. .................................................................... 4

    C.   The Court Erred in Concluding that Section 2a Requires Inclusion of All Illegal Aliens who Reside in this Country, Regardless of Whether the President has Discretion to Conclude Otherwise under the Constitution. ............................................................. 5

II.    The Defendants May Suffer Irreparable Injury Without a Stay of the Judgment. ............ 6

III.   The Risk of Harm to the Plaintiffs is Minimal. ................................................................ 7

IV.   The Public Interest is Best Served by a Stay. ................................................................... 7

CONCLUSION ............................................................................................................................... 8

## INTRODUCTION

The federal governmental defendants (the "Defendants") respectfully move to stay pending appeal the Court's September 10, 2020 Final Judgment and Permanent Injunction order (the "Judgment"), ECF No. 165.[1] That Judgment specifically enjoined (and declared unlawful) the Secretary of Commerce, the Census Bureau, and any employees of the Commerce Department "from including in the Secretary's report to the President pursuant to Section 141(b) any information permitting the President to exercise the President's discretion to carry out the policy set forth in section 2" of the July 21, 2020, Memorandum on Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census (the "Presidential Memorandum")—*i.e.*, to "exclude from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act . . . to the maximum extent feasible and consistent with the discretion delegated to the executive branch." *See* Presidential Memorandum, § 2; *see also* Judgment at 2.

On September 16, 2020, the Defendants filed a Notice of Appeal, which appeals the Judgment to the Supreme Court of the United States. *See* ECF No. 169.[2] This appeal is of right to the Court. 28 U.S.C. § 1253.

The Defendants seek a stay of the Judgment while the Supreme Court considers their appeal, and the well-known stay factors support such relief. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). The Defendants are likely to succeed on the merits because, among other things, the Judgment is not tailored to the purported injury: Even assuming that the Presidential Memorandum is causing some individuals not to participate in the census, preventing the Secretary from providing information to

---

[1] All citations to the CM/ECF docket are to case 1:20-cv-05770-JMF, which has been consolidated with case 1:20-cv-5770-JMF.

[2] In an abundance of caution, *cf.* Op. 86 n.21, the government also filed a notice of appeal to the Second Circuit. *See* ECF No. 170. The government intends to move to hold that appeal in abeyance.

1

the President *in December* cannot redress that purported injury occurring *now*. Any "chilling effect" will persist due to the prospect of appellate reversal before December; indeed, as soon as census field operations conclude (which will be well before December), the purported injury will be *moot* and the injunction thus will need to be vacated before it ever actually constrains the actions of Defendants. Accordingly, the Plaintiffs will not be harmed by a stay that would permit Defendants to implement the Memorandum in December—long after the conclusion of census field operations. And finally, the public interest is served when the government is able to pursue its legitimate and preferred policies, especially given the likelihood of success on appeal to the Supreme Court.

## ARGUMENT

In considering whether to grant a stay pending appeal, the Court must consider four factors: (1) the applicant's likelihood of success on the merits; (2) whether the applicant will suffer irreparable injury; (3) the balance of hardships to other parties interested in the proceeding; and (4) the public interest. *Nken*, 556 U.S. at 434. Those factors favor a stay here.

### I. Defendants are Likely to Succeed on the Merits.

#### A. The Judgment is Not Tailored to the Purported Injury.

As a predicate to finding Article III standing and granting injunctive and declaratory relief, the Court determined that the Presidential Memorandum caused a "chilling effect," which will supposedly discourage certain individuals from participating in the census. *See, e.g.*, Op. 39-41. But the relief the Court ordered was to prevent the Secretary from including in his "report to the President pursuant to Section 141(b)" the requested information. Judgment 2. That report will not be sent until December 31, 2020. *See* 13 U.S.C. 141(a), (b). Yet field operations for the census are scheduled to conclude by

2

September 30, 2020.[3] There is therefore a mismatch between the asserted injury on which the Court relied (the chilling effect) and the relief that it ordered (an injunction of conduct after census field operations end). For one thing, even assuming that there are some number of census respondents who are chilled by the Memorandum, plaintiffs did not identify any non-speculative number of those respondents who then would become unchilled merely by this Court's entry of the Judgment, even though their fears could still be realized if the Judgment is reversed on appeal—let alone that there are sufficient numbers of such hypothesized respondents to cause plaintiffs to lose funding or suffer other harms. The Court's relief thus would not redress the asserted injury. Moreover, as even the Court appeared to recognize (*see* Op. 39, 57), the chilling injury will cease to exist when field operations end. At that point, there would no longer be *any* basis to support the Court's order of injunctive and declaratory relief, for there would no longer be any continuing or future injury that the relief could or would redress. In such circumstances, the relief becomes legally untenable and must be vacated. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39-40 (1950).

Given that the Court's relief will indisputably become moot before it ever actually constrains Defendants' actions, the Judgment is improper. Put differently, federal courts cannot redress "chilling effects" by issuing *advisory opinions* to assuage the fears of the public. They can do so only by issuing *relief* that will likely redress such injuries through their legal effect on the defendants—and here, the relief itself (separate and apart from the court's opinion) will not and cannot redress any such injuries because they will have been realized (to whatever extent they may occur) well before the relief ever even goes into effect—as is evidenced by the fact that there would be no real-world difference if the Court had issued its legal opinion rejecting the Presidential Memorandum but denying all relief because

---

[3] Litigation in California could potentially lead to extending field operations through the end of October, *see* Order Granting Motion for Temporary Restraining Order, ECF No. 84, *Nat'l Urban League v. Ross*, Case No. 5:20-cv-05799-LHK (N.D. Cal.), but in no event will field operations still be ongoing by December 31, 2020, given the need to tabulate the results of the field operations.

3

the Memorandum will not be implemented until after census field operations conclude. Accordingly, Defendants are very likely to succeed on appeal in obtaining reversal of the Judgment, especially once census field operations conclude.

### B. The Court Erred in Concluding the Secretary's Use of Administrative Records Is "Outside" of "the Census" Given the Secretary's Statutory Discretion to Use Such Records in Conducting the Enumeration.

The Court's opinion indicates that the Court mistakenly believes that using administrative records to identify aliens without lawful status under the Immigration and Nationality Act for possible exclusion from the apportionment base ventured outside "the census." But that misunderstands both the statutory structure and the history of the census.

The statutory structure provides wide discretion to the Secretary of Commerce to utilize administrative records. The Constitution directs that the census shall be performed "in such Manner as [Congress] shall by Law direct. U.S. Const. art. I, § 2, cl. 3. Congress has delegated authority over the census to the President and the Secretary of Commerce, including authorizing the Secretary to administer the census "in such form and content as he may determine." 13 U.S.C. § 141(a); *see also* 2 U.S.C. § 2a(a).

Exercising such long-standing delegated authority, the Secretary of Commerce (through the Census Bureau) has long considered and used administrative records when conducting the enumeration. As the Court itself recognized (Op. 68 n.15), in 1990, the Bureau counted overseas armed-services members and federal civilian employees *solely* by relying on administrative data; no questionnaires or in-person field operations were conducted to count those individuals. *See Franklin v. Massachusetts*, 505 U.S. 788, 794–96, 803–06 (1992); *see also* U.S. Census Bureau, 2020 Census Detailed Operational Plan for Federally Affiliated Count Overseas Operation (FACO), at 3 (May 28, 2019) (explaining that "[i]n the 1990 and 2000 censuses," the counts of overseas members of the armed forces, federal civilian employees, and their dependents living with them "were obtained from federal

4

departments and agencies and were principally based on administrative records"). And as explained in *Utah v. Evans*, 536 U.S. 452 (2002), the Bureau uses administrative records to impute persons who were *never counted* using the questionnaires or in-person follow-ups. *See id.* at 457–59, 473–79. Yet those indisputably were part of the "census." If using administrative records to *add* people not counted by field operations is permissible, then using administrative records to *subtract* people who are counted but who the Executive has determined to exclude from the apportionment base must be part of "the census," too. Indeed, the Court did not explain (*cf.* Op. 68 n.15) why the former would be within the Secretary's discretion to conduct the decennial census "in such form and content as he may determine," 13 U.S.C. 141(a), but the latter would not be.

This significant misunderstanding about how "the census" is conducted and the numbers tallied undermines the justification for issuing injunctive relief. This misunderstanding is likely to be corrected during further appellate review, and it further militates in favor of staying the Judgment during that review.

### C. The Court Erred in Concluding that Section 2a Requires Inclusion of All Illegal Aliens who Reside in this Country, Regardless of Whether the President has Discretion to Conclude Otherwise under the Constitution.

In its Opinion, the Court mistakenly suggested (*see* Op. 73-74 & n.17) that the meaning of 2 U.S.C. § 2a is different from the substantive standard under the Constitution. But the statutory text is identical to the constitutional text, and thus they presumptively mean the same thing. *Compare* 2 U.S.C. § 2a(a) *with* U.S. Const. amend. XIV. There is no basis to override that presumption. *Cf. Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018) ("[I]f a word is obviously transplanted from another legal source, … it brings the old soil with it.") (citation omitted). Indeed, not even Plaintiffs contend that the President must include *literally* every "person[] in each State," 2 U.S.C. 2a, such as foreign tourists and visitors. Instead, the enumeration should count only "inhabitants" or "usual residents." The Supreme Court has made clear that "usual residence" generally "include[s] some element of allegiance or

5

enduring tie to a place," *Franklin*, 505 U.S. at 804 (citation omitted), and the Founders were familiar with Vattel's definition of "inhabitants" as "foreigners, who are permitted to settle and stay in the country," 1 Emer de Vattel, *The Law of Nations*, ch. 19, § 213 (1817). Unlike lawfully admitted aliens, an alien who is here unlawfully cannot be said to have an "enduring tie" to, or to have been "permitted to settle and stay in," this country. At the very least, the historical record indicates that "inhabitancy" at the Founding was an unsettled concept, especially as applied to the unconsidered issue of whether aliens in the country unlawfully may be considered "inhabitants." Thus, under *Franklin*, there is discretion to define the bounds of the term "inhabitant" and Vattel's definition is at least one permissible view of inhabitancy. Although the Court emphasized that the views of the 1929 Congress are dispositive here, it, like Plaintiffs, appeared to rely (Op. 74-75) on statements suggesting a view only that *aliens* (writ large) cannot be excluded from the enumeration count for apportionment; that, however, does not answer the question whether a smaller subset—some or all aliens *who are here unlawfully*—may be excluded.

This precise question is at the heart of this case, and it likely will be answered favorably to the government by the Supreme Court. This, again, militates in favor of staying the Judgment pending that review.

**II.     The Defendants May Suffer Irreparable Injury Without a Stay of the Judgment.**

Injunctive relief is an extraordinary remedy. It is more so in this case considering the relief directly interferes with a once-in-a-decade duty that is assigned (by both the Constitution and congressionally-enacted statutes) to coordinate branches of the government. This warrants, at the least, a respectful hesitation. That respectful hesitation is best served by a stay of the Injunction while the Supreme Court conducts its review.

The Court's Judgment prevents the Secretary of Commerce from complying with the reporting requirements set forth in the Presidential Memorandum. And the information to be

6

reported by the Secretary in December is necessary to effectuate the policy goal of the Memorandum.

The serious problem here for the Defendants is one of timing. The Secretary of Commerce is statutorily required to report the census results to the President by December 31, 2020. *See* 13 U.S.C. § 141(b). The President uses that information to develop the apportionment of the House of Representatives, and the President is then statutorily required to submit that apportionment to Congress "within one week" after the first session of Congress. 2 U.S.C. §2a(a). With Congress scheduled to convene on January 3, 2021, the President's statutory deadline will likely fall on January 10, 2021. Absent timely relief from the Judgment, Congress's statutory deadlines will be undermined, because the Secretary and the President will be forced to make reports by those deadlines that do not reflect the President's policy judgment, and then changes may be necessary afterward if the government subsequently prevails in the Supreme Court. *Cf. Utah*, 536 U.S. at 462 (holding that post-apportionment redress is possible if the apportionment calculation contains an error); *see also Franklin*, 505 U.S. at 803 (finding that a post-apportionment order against the Secretary would provide redress for plaintiffs).

### III. The Risk of Harm to the Plaintiffs is Minimal.

Here, the Plaintiffs face no cognizable harm if the Judgment is stayed because the Court's relief only prohibits activity by Defendants that will not take place until December—long after census operations are completed. As discussed above, this Court's *relief* does not actually redress any "chilling effect"—it is at most the advisory impact of this Court's opinion that affects census respondents, and thus any impact on census respondents from staying the relief is both speculative and legally immaterial.

### IV. The Public Interest is Best Served by a Stay.

A stay of the Judgment best serves the public interest. As explained above, the Plaintiffs will not be harmed by the issuance of a stay. At the same time, a stay serves the public interest by allowing

7

the government's preferred and legitimate policy to be put into effect. That is a fundamental value in our constitutional republic. If the Defendants prevail before the Supreme Court, then they are legally entitled to put into effect their preferred policy. Without a stay, however, it becomes difficult for the administration to meet the December 31, 2020, and January 10, 2021, statutory deadlines with reports that reflect the administration's preferred policy choices. It would be an unfortunate and needless occurrence if Defendants succeed in the Supreme Court but their preferred policy—along with their ability to comply with congressionally-mandated statutory deadlines—was interfered with by the lack of a stay in the interim.

Additionally, a stay serves the public interest by promoting clarity for the public (and for the parties) as to exactly what will happen in the upcoming census process in December, 2020. As described above, the injunction ordered in the Judgment must be vacated once the ground for relief (the alleged chilling effect) becomes moot. That chilling effect becomes moot once census field operations are concluded. Yet the Census Bureau faces a December 31st statutory deadline to report to the President. Thus, the legally-untenable injunction would continue to apply during this critical phase. Staying the Judgment would eliminate this uncertainty and provide clarity for the public and the parties while the Supreme Court considers this appeal.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to stay the Judgment pending the resolution of the Defendants' appeal to the Supreme Court.

8

Dated: September 16, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

ALEXANDER K. HAAS
Branch Director

DIANE KELLEHER
BRAD P. ROSENBERG
Assistant Branch Directors


 /s/ *Daniel D. Mauler*
DANIEL D. MAULER (VA Bar No. 73190)
ELLIOTT M. DAVIS (NY Reg. No. 4596755)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20005
Phone: (202) 616-0773
Fax:  (202) 616-8470
E-mail: dan.mauler@usdoj.gov

*Counsel for Defendants*