**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| HAITIAN-AMERICANS UNITED, INC., *et al.*,<br><br>                    Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States in his Official Capacity, *et al.*,<br><br>                    Defendants. | Civil Action No. 1:20–cv–11421–DPW |

**MEMORANDUM OF LAW IN SUPPORT**
**OF DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    A.    The Census and Apportionment Generally ........................................................ 2

    B.    The July 21, 2020, Presidential Memorandum ................................................. 3

    C.    Plaintiffs' Challenge ......................................................................................... 4

ARGUMENT ...................................................................................................................... 4

I.     THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER THIS ACTION ................... 4

    A.    Plaintiffs Lack Standing .................................................................................. 4

         1.    Plaintiffs Have Not Adequately Pled Associational Standing ..................... 6

         2.    Plaintiffs Have Not Adequately Pled Organizational Standing.................... 14

    B.    Plaintiffs' Enumeration Claims Are Moot ...................................................... 16

    C.    Plaintiffs' Apportionment Claims Are Not Ripe ............................................. 17

II.    PLAINTIFFS FAIL TO STATE A CLAIM ........................................................................ 19

    A.    Plaintiffs' Administrative Procedure Act Claims Must Be Dismissed (Counts I & II) .......... 19

         1.    Plaintiffs' APA Claims Should Be Dismissed for Lack of Final Agency Action ................ 20

         2.    The Memorandum's Directive Does Not Violate the Apportionment Clause ................ 21

         3.    The Secretary of Commerce Will Not Exceed His Statutory Authority by Complying with the Memorandum ................ 37

    B.    Plaintiffs Have Failed To State a Claim under the Enumeration Clause (Count III) ............. 38

    C.    Plaintiffs Have Failed To State Claims for Violations of 13 U.S.C. § 141 and 2 U.S.C. § 2a (Counts IV & V) ................ 40

    D.    Plaintiffs Have Failed To State an Equal Protection Claim for Invidious Discrimination (Count VI) ................ 44

    E.    Plaintiffs Have Failed to State a Claim under 42 U.S.C. § 1985(3) ............................... 47

CONCLUSION ................................................................................................................... 50

## INTRODUCTION

In this action, four non-profit organizations bring constitutional and statutory challenges to a memorandum that the President issued on July 21, 2020, titled Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census (the "Presidential Memorandum" or "Memorandum"), 85 Fed. Reg. 44,679 (July 21, 2020).  The Memorandum provides that for purposes of reapportionment of Representatives in Congress following the 2020 census, "it is the policy of the United States to exclude" illegal aliens from the apportionment base "to the extent feasible and to the maximum extent of the President's discretion under the law."  *Id.* at 44,680.  It directs the Secretary of Commerce to submit to the President two sets of numbers in connection with the apportionment—one set of numbers follows the methodology set forth in the Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5,525 (Feb. 8, 2018) ("Residence Criteria"), and the second, "to the extent practicable," would provide information permitting the President to exclude illegal aliens from the apportionment base.

As a threshold matter, this Court lacks subject-matter jurisdiction over Plaintiffs' claims.  Initially, Plaintiffs lack standing to bring any of their claims.  Moreover, Plaintiffs' claims, as they relate to supposed enumeration harms, are moot (as census enumeration will end, at the latest, in a few short weeks); and their claims, as they relate to supposed apportionment harms, are not prudentially ripe (as apportionment claims are typically brought after the apportionment is calculated, and thus after any harm is known).

In addition to these jurisdictional defects, Plaintiffs' claims should be dismissed for failure to state a claim pursuant to Rule 12(b)(6).  Plaintiffs assert that the Presidential Memorandum violates the Administrative Procedure Act, the Enumeration Clause, 13 U.S.C. § 141, 2 U.S.C. § 2a, principles of equal protection under the Fifth and Fourteenth Amendments, and 42 U.S.C. § 1985(3).  Each of these claims fails as a matter of law.

First, there is no viable basis for Plaintiffs' APA claim against the Department of Commerce because Plaintiffs fail to allege any "final agency action" by the Department or the Secretary of Commerce.  Second, Plaintiffs' claims regarding the Apportionment Clauses (which they bring solely under the APA), 13 U.S.C. § 141, and 2 U.S.C. § 2a, are all legally deficient, because they are inconsistent with the Executive Branch's longstanding discretion to define who qualifies as "inhabitants" (or "persons in each State") for purposes of apportionment.  Third, Plaintiffs' claim under the Enumeration Clause fails because the Enumeration Clause concerns the method of conducting the census and does not confer a right to be counted or a right to a perfectly accurate census.  Fourth, Plaintiffs' equal protection claim fails because Plaintiffs mischaracterize the Presidential Memorandum and do not plausibly allege "animus" or "discriminatory intent."  Finally, Plaintiffs' claim under 42 U.S.C. § 1985(3) fails for myriad reasons:  (i) the only defendants to this suit are federal agencies and individuals sued in their *official* capacities, none of which are "persons" for the purposes of § 1985(3); (ii) section 1985(3) allows only money damages (which Plaintiffs here do not seek) and does not allow for injunctive or other equitable relief; (iii) section 1985(3) claims against the federal government are barred by sovereign immunity; and (iv) Plaintiffs have not plausibly pled any of the elements of a § 1985(3) conspiracy—let alone pled them with the particularity required.

## BACKGROUND

### A.    The Census and Apportionment Generally

The Constitution provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State."  U.S. Const. amend. XIV, § 2.  To make apportionment possible, the Constitution requires that the federal government conduct a census every ten years in such a manner as directed by Congress.  *Id.* art. I, § 2, cl. 3.  Each State's number of Representatives, together with its two Senators, also determines the number of electors for President and Vice President in the Electoral College.  *See id.* art. II, § 1, cl. 2.

Congress, in turn, has by law directed the Secretary of Commerce to conduct a census of the "total population" every 10 years "in such form and content as he may determine." 13 U.S.C. § 141(a) and (b). The Census Bureau assists the Secretary of Commerce in the performance of this responsibility. *See* 13 U.S.C. §§ 2, 4. Census field operations are currently scheduled to run through "the end of October," Compl. ¶ 137, although pending litigation may "even further truncate[]" that deadline. Pl. Mem., Doc. 19, at 3.

The Census Bureau has promulgated criteria to count each person for census purposes "at their usual residence, which is the place where they live and sleep most of the time." Residence Criteria, 83 Fed. Reg. at 5,533. Following completion of the 2020 census, the Secretary of Commerce must submit to the President "[t]he tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States." 13 U.S.C. § 141(b). "On the first day, or within one week thereafter, of the first regular session of the [117th] Congress," the President must "transmit to the Congress a statement showing the whole number of persons in each State . . . and the number of Representatives to which each State would be entitled . . . by the method known as equal proportions." 2 U.S.C. § 2a(a).

### B.    The July 21, 2020, Presidential Memorandum

On July 21, 2020, the President issued a Memorandum to the Secretary of Commerce regarding the exclusion of illegal aliens from the apportionment base following the 2020 census. *See* Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census, 85 Fed. Reg. 44,679, 44,679-81 (July 21, 2020). The Presidential Memorandum states that "it is the policy of the United States to exclude" such aliens from the apportionment base "to the extent feasible and to the maximum extent of the President's discretion under the law." *Id.* at 44,680. The Presidential Memorandum directs the Secretary of Commerce to submit to the President two tabulations. One is an enumeration "tabulated according to the methodology set forth in" the Residence Criteria. *Id.* The

second calls for "information permitting the President, to the extent practicable," to carry out the stated policy, i.e., an apportionment excluding illegal aliens. *Id.* The Memorandum also states that it "shall be implemented consistent with applicable law." *Id.*

To date, the Census Bureau is still evaluating the usability of administrative records pertaining to citizenship status in connection with the decennial census, *see* Exec. Order No. 13880, 84 Fed. Reg. 33,821, 33,821-25 (July 11, 2019), and formulating a methodology for potentially excluding illegal aliens.

### C.    Plaintiffs' Challenge

Plaintiffs filed this Complaint over ten weeks ago, on July 27, 2020.  Doc. 1 ("Compl."). Plaintiffs expressly "urge[d] this court to act *immediately* to prevent" Defendants from supposedly "impeding the conduct of Census 2020."  Compl. ¶ 1 (emphasis added).  "Without *immediate* action from this Court," Plaintiffs alleged, they "will continue to suffer irreparable harm to their memberships and organizational interests."  *Id.* ¶ 6 (emphasis added).  And "[u]nless Defendants' actions are enjoined *immediately*, before the conclusion of census-taking, there will be an enormous undercount in the communities Plaintiffs serve.  This undercount cannot be later remedied."  *Id.* ¶ 142 (emphasis added).

To date, Plaintiffs have not moved the Court for any injunctive relief.

## ARGUMENT

## I.    THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER THIS ACTION

### A.    Plaintiffs Lack Standing

"Standing doctrine assures respect for the Constitution's limitation of '[t]he judicial Power' to 'Cases' and 'Controversies.'"  *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 731 (1st Cir. 2016) (quoting U.S. Const. art. III, § 2, cl. 1).  "At bottom, that doctrine reflects concern about the proper—and

properly limited—role of the courts in a democratic society." *Id.*[1] "The heartland of constitutional standing is composed of the familiar amalgam of injury in fact, causation, and redressability." *Id.* And the standing inquiry is "especially rigorous" where, as here, "reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Blum v. Holder*, 744 F.3d 790, 797 (1st Cir. 2014).

"[A]t the pleading stage, the plaintiff bears the burden of establishing sufficient factual matter to plausibly demonstrate his standing to bring the action." *Hochendoner*, 823 F.3d at 730. And "where," as here, "standing is at issue, heightened specificity is obligatory at the pleading stage." *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir. 1992). "Neither conclusory assertions nor unfounded speculation can supply the necessary heft." *Hochendoner*, 823 F.3d at 731. "To the contrary, the proponent's pleadings must be something more than an ingenious academic exercise in the conceivable." *AVX Corp.*, 962 F.2d at 115. "The complainant must set forth reasonably definite factual allegations, either direct or inferential, regarding each material element needed to sustain standing." *Id.* And "the facts necessary to support standing must clearly appear in the record and cannot be inferred argumentatively from averments in the pleadings." *Id.*

Plaintiffs allege that they "are membership-based, non-profit organizations that serve immigrants of color across the Commonwealth of Massachusetts." Compl. ¶ 4. Membership-based organizations may premise standing under one of two theories: (i) associational standing, where the organization sues on behalf of its members, *see AVX Corp.*, 962 F.2d at 116; and (ii) organizational standing, where the organization sues on its own behalf, *see Equal Means Equal v. Dep't of Educ.*, 450 F. Supp. 3d 1, 7 (D. Mass. 2020) (Saris, J.), *appeal filed*, No. 20–1429 (1st Cir. 2020). Plaintiffs satisfy neither standing theory.

---

[1]    Unless expressly included, all internal quotation and alteration marks and citations have been omitted.

### 1.    *Plaintiffs Have Not Adequately Pled Associational Standing*

"An association has standing to sue on behalf of its members when three requisites have been fulfilled:  (1) at least one of the members possesses standing to sue in his or her own right; (2) the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed; and (3) neither the claim asserted nor the relief demanded necessitates the personal participation of affected individuals." *AVX Corp.*, 962 F.2d at 116.  Assuming *arguendo* that the latter two associational-standing prerequisites can be fulfilled, Plaintiffs have not sufficiently pled that "at least one of the[ir] members possesses standing to sue in his or her own right." *Id.*

### (a)    Plaintiffs Have Not Identified a Single Injured Member

Associational standing "requires, among other things, that at least one of the group's members have standing as an individual." *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016).  "To satisfy this requirement, the association must, at the very least, 'identify a member who has suffered the requisite harm.'" *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)).  This identification requirement applies even "at the pleading stage" because plaintiffs are obligated to "'set forth reasonably definite factual allegations . . . regarding each material element needed to sustain standing.'" *Id.* (quoting *AVX Corp.*, 962 F.2d at 115).

Plaintiffs, however, have not identified even a single member who has been injured or who is at substantial risk of being injured.  Instead, Plaintiffs generically allege "harm to their *memberships*." Compl. ¶ 6 (emphasis added); *accord id.* ¶¶ 130, 132, 163.  Such hazy pleading does not satisfy the longstanding obligation "to identify members who have suffered the requisite harm." *Summers*, 555 U.S. at 499.

### (b)    Plaintiffs' Alleged Enumeration Injuries Do Not Support Standing

Plaintiffs allege that the Memorandum "operates to chill" certain illegal aliens and immigrant groups from completing the census, *see* Compl. ¶¶ 18, 26, 36, 45, and that a supposed undercount of

those populations "will result in a loss of funds to Massachusetts and the communities in which Plaintiffs and their membership reside, as well as a reduction in their political power and representation." *Id.* ¶ 46; *accord id.* ¶ 135. These alleged injuries: (i) are neither concrete nor particularized; (ii) are not traceable to the Memorandum; and (iii) cannot be redressed by a favorable ruling from this Court.

*Plaintiffs' alleged undercount injuries are neither concrete nor particularized.* To support standing, a plaintiff's injury "must be both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Hochendoner*, 823 F.3d at 731. "The Supreme Court recently has emphasized that concreteness and particularization are distinct requirements." *Id.* (citing *Spokeo v. Robins*, 136 S. Ct. 1540, 1543 (2016)). Plaintiffs satisfy neither of these distinct requirements.

"An injury is 'concrete' if it is real, and not abstract." *Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020). Plaintiffs' alleged enumeration injuries require assuming each of the following steps: (i) that the Presidential Memorandum will deter a significant percentage of legal immigrants and illegal aliens from participating in the census; (ii) that this supposed lack of participation will materially degrade the census data; and (iii) that this assumed material degradation will result in an appreciable effect on funding and representation. Plaintiffs do not plead any of these steps in a plausible fashion. At most, Plaintiffs vaguely allege that "[n]umerous" and "multiple" unidentified people indicated that they would not participate in the census because of the Memorandum. *See* Compl. ¶¶ 138 & 139. But the Court cannot infer from those allegations that a *significant percentage* of legal immigrants and illegal aliens will refrain from participating in the census— let alone make the even greater inferential leap that such reluctance to participate in the census will materially degrade the census data, and that such supposed degradation will have an appreciable effect on funding and representation. Again, "the facts necessary to support standing *must* clearly appear in

the record and *cannot* be inferred argumentatively from averments in the pleadings." *AVX Corp.*, 962 F.2d at 115 (emphases added).

If anything, Plaintiffs' allegations undercut this theory of standing. Plaintiffs allege that the Memorandum "is but the latest in a lengthy series of attempts by Defendants to dissuade" certain groups of people "from completing Census 2020." Compl. ¶ 101. To wit, they allege that the following events "have had the effect of provoking immense fear, mistrust, and confusion in immigrant communities and chilling them from participating in Census 2020," Compl. ¶ 127: (i) the possibility that a citizenship question would appear on the 2020 census questionnaire, *see id.* ¶¶ 103–112; (ii) the executive order on collecting information about citizenship status, *see id.* ¶¶ 114–115; (iii) the Department of Homeland Security's public-charge rule, *see id.* ¶¶ 116–124; and (iv) "the Trump Administration's decision to add two new political appointees to the Census Bureau," *id.* ¶¶ 125–126. Under Plaintiffs' enumeration-harm theory, the Memorandum would need to chill a significant percentage of illegal aliens and legal immigrants who were *not already chilled* by the specter of the citizenship question, the executive order, the public-charge rule, and the addition of two political appointees to the Census Bureau. Plaintiffs have not pled—let alone plausibly pled—any such allegations.

Plaintiffs' alleged enumeration injuries—which comprise a loss of funds and representation to "the communities in which . . . their membership reside," Compl. ¶ 46—are also not particularized. "The particularization element of the injury-in-fact inquiry reflects the commonsense notion that the party asserting standing must not only allege injurious conduct attributable to the defendant but also must allege that he, himself, is among the persons injured by that conduct." *Hochendoner*, 823 F.3d at 731–32. In part because Plaintiffs have failed to identify even a single injured member as First Circuit precedent requires, *see supra* Part I.A.1(a), Plaintiffs—like the plaintiffs in *Hochendoner* who did not adequately plead standing—have "offer[ed] only scattered descriptions of generalized harms" and,

"[t]ellingly," offer "no specific information" about any harm that "has befallen" or may imminently befall even one of their alleged members. *Hochendoner*, 823 F.3d at 732. In support of their standing theory, Plaintiffs cite a single sentence in the Second Circuit's forty-year-old decision in *Carey v. Klutznick*, 637 F.2d 834 (2d Cir. 1980). *See* Compl. ¶ 46. To the extent that the Second Circuit's thinly-reasoned conclusion—that individual plaintiffs can establish standing based solely on allegations regarding "decreased federal funds flowing to their city and state" *Carey*, 637 F.2d. at 838—was correct when it was decided, that holding does not survive *Spokeo*, which made clear that alleged injuries must be concrete *and* particularized in order to demonstrate standing.

*Plaintiffs' alleged undercount injuries are not traceable to the Memorandum.* Plaintiffs also must establish "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). And "the injury has to be fairly traceable to the challenged action of the defendant, and *not* the result of the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (emphasis added).

Here, however, any diminution in census response rates cannot be said to be traceable to the Presidential Memorandum itself. Unlike the scenario presented in the litigation over the placement of a citizenship question on the census form, the Presidential Memorandum is not directed to census respondents and does not relate to the actual conduct of the census. Thus, to the extent that Plaintiffs' alleged diminution in census response rates actually occurs, that diminution would be caused—not by the Presidential Memorandum itself—but instead by the publicization of misinterpretations of third parties, as reflected in Plaintiffs' complaint. *See* Compl. ¶ 140 & n.58. How third parties interpret the Memorandum should not be dispositive of the Memorandum's effects. Put another way, the alleged injuries here depend on "a chain of causation" with multiple "discrete links, each of which 'rest[s] on [the plaintiffs'] highly speculative fear that governmental actors" would exercise their "discretion in a

9

[] way" that would adversely affect Plaintiffs. *See New York v. Dep't of Commerce*, 315 F. Supp. 3d 766, 787 (S.D.N.Y. 2018) (summarizing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410–14 (2013), and distinguishing citizenship question case from *Clapper* partly on this basis). Such a speculative chain of causation is insufficient to establish standing.

It makes little sense for Plaintiffs to attribute whatever harm is caused by those independent actors to the Memorandum itself, particularly if their messages convey the incorrect impression that, as a result of the Memorandum, participation in the census "'would expose noncitizen family members to repercussions.'" Compl. ¶ 140. Simply put, any contention or concern that the Secretary's compliance with the Memorandum will somehow facilitate immigration enforcement is contrary to established statutory provisions mandating strict confidentiality for census responses. *See generally* 13 U.S.C. § 9 (providing that personal information collected by the Census Bureau cannot be used against respondents by any government agency or court); *id.* § 214 (setting forth penalty for wrongful disclosure of information). Indeed, the Census Bureau devotes resources to educating the public about the privacy and confidentiality of census responses specifically to allay such fears of adverse use. *See, e.g., Data Protection and Privacy Program*, Census Bureau, https://www.census.gov/about/policies/privacy.html (last visited Oct. 6, 2020). Because nothing in the Memorandum undermines these statutory protections, it is unreasonable to trace fear of immigration enforcement to the Memorandum itself, rather than to the messages conveyed by other actors.

In this manner, *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019)—the citizenship-question case—is distinguishable. In that litigation, the plaintiffs "met their burden of showing that third parties will likely react in predictable ways to the citizenship question" and the Supreme Court thus upheld standing based "on the predictable effect of *Government action* on the decisions of third parties." *Id.* at 2566 (emphasis added). Here, however, the Presidential Memorandum is not directed

to census respondents and does not relate to the actual conduct of the census. Accordingly, unlike in the citizenship-question litigation, Plaintiffs' traceability argument is based on the effect of *third-party* action on the decisions of *other third parties*.

*Plaintiffs' alleged undercount injuries cannot be redressed by an order of this Court.* The redressability requirement "lies at the core of the standing doctrine" because "[a]n abstract decision without remedial consequence seems merely advisory, an unnecessary expenditure of judicial resources that burdens the adversary and carries all the traditional risks of making bad law and trespassing on the provinces of the executive and legislature." *E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 450 (2d Cir. 2014); *see also Hewitt v. Helms*, 482 U.S. 755, 761 (1987). Where a plaintiff requests prospective relief in the form of a declaratory judgment or injunction, the plaintiff must show that "prospective relief will remove the harm" and the plaintiff "personally would benefit in a tangible way from the court's intervention." *Warth v. Seldin,* 422 U.S. 490, 505, 508 (1975). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.*, 523 U.S. at 107.

Here, it is entirely speculative that there in fact exist people who, while currently deterred from participating in the census because of the Memorandum (and not because of the specter of the citizenship question, the executive order collecting citizenship information, the public-charge rule, and so forth), would *decide* to participate if this Court granted Plaintiffs relief. And it further defies belief that—to the extent that such people exist—their fears about census participation would be alleviated based solely on a court order that is subject to possible appellate reversal.

Moreover, any supposed chilling effect will no longer exist once census field operations have ended sometime this month; yet the Secretary's report containing the requested information will not be completed until long after that time. *See* 13 U.S.C. § 141(b). Accordingly, by the time any relief

11

this Court could issue against that report would have coercive legal effect, the injury it is supposed to redress will no longer exist. That is the very definition of non-redressability.

(c)    Plaintiffs Have Not Alleged Any Apportionment Injury

In parallel litigation, other plaintiffs have alleged apportionment-related injuries based on the theory that an "expected loss of a Representative to the United States Congress . . . satisfies the injury-in-fact requirement of Article III standing." *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331 (1999). Plaintiffs here, however, do not plausibly allege any apportionment-related injury. To the contrary, Plaintiffs' allegations only show that their members will sustain *no* apportionment injury.

Plaintiffs allege that "[a]ccording to the Center for Immigration Studies, the inclusion of *all immigrants*—including undocumented immigrants—in Census 2020 will be responsible for a shift of 26 House of Representatives seats, including an additional seat for Massachusetts." Compl. ¶ 134 (emphasis added). But nothing in the Memorandum calls for the exclusion of *all immigrants* from the apportionment base. Rather, the Memorandum simply directs the exclusion of *illegal* aliens from the apportionment base—and only to the extent feasible, practicable, and consistent with law and the President's discretion.

The Court need not dwell long on what might be, say, feasible or practicable, because even assuming *arguendo* that *all* illegal aliens will be excluded from the apportionment base, Plaintiffs have not alleged that the exclusion of *all* illegal aliens would have any effect on the number of Representatives allotted to Massachusetts. In fact, the article that they reference in their apportionment allegation indicates that the exclusion of "[i]llegal immigrants alone" in the 2020 census would only cause a loss of representation in California, New York, and Texas—and thus will not cause *any* loss of representation in Massachusetts. *See* Steven A. Camarota & Karen Zeigler, *The Impact of Legal and Illegal Immigration on the Apportionment of Seats in the U.S. House of Representatives in 2020* (Dec.

19, 2019), https://cis.org/Report/Impact-Legal-and-Illegal-Immigration-Apportionment-Seats-US-House-Representatives-2020 (last visited Oct. 6, 2020).[2]  Not only have Plaintiffs failed to plausibly plead any apportionment injury, their Complaint only proves that they will suffer no apportionment injury at all.

Plaintiffs' Complaint undercuts any supposed apportionment harm in yet another way.  Again, the Memorandum directs the exclusion of illegal aliens from the apportionment base only to the extent feasible, practicable, and consistent with law and the President's discretion.  Plaintiffs, however, have alleged that "compliance" with the Memorandum is "administratively impossible."  Compl. ¶ 88 (emphasis added); see generally id. ¶¶ 88–98.  On this motion to dismiss, the Court should accept this allegation as true, and hold that—because, in Plaintiffs' telling, the Memorandum cannot be implemented—there is no possibility of Plaintiffs' or their members' sustaining any apportionment-related harm.

(d)    Plaintiffs Lack Standing Based on Supposed Dignitary Harm

Without any elaboration, Plaintiffs allege that their membership has "suffered dignitary harms as a result of ongoing efforts by President Trump and Secretary Ross to dilute and diminish their political representation and federal financial resources."  Compl. ¶ 132.  But the Federal Rules require Plaintiffs to *plausibly* plead standing, and incanting the phrase "dignitary harm" in conclusory fashion will not do.  Rather, Plaintiffs have not even plausibly alleged any intentional race discrimination from the Presidential Memorandum, *see infra* Part II.D, let alone how they or their members are "personally subject to the challenged discrimination."  *Allen v. Wright*, 468 U.S. 737, 755 (1984).  Plaintiffs do not

---

[2]    In evaluating a motion to dismiss, district courts may "augment the[] facts and inferences" from the Complaint with, *inter alia*, "data points gleaned from documents incorporated by reference into the complaint."  *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011).

plead who among their members has suffered dignitary harm, nor how that dignitary harm has manifested. This pleading deficiency alone is fatal to their dignitary-harm standing theory.

### 2.    *Plaintiffs Have Not Adequately Pled Organizational Standing*

An organization does not have standing to sue based on "a mere 'interest in a problem,' no matter how longstanding the interest and . . . how qualified the organization is in evaluating the problem." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). However, "[t]he Supreme Court has held that an advocacy organization may achieve standing if its mission has been 'frustrated' by the challenged conduct *and* it has expended resources to combat it." *Equal Means Equal*, 450 F. Supp. 3d at 7 (emphasis in original) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)).

As to the first organizational-standing element—frustration—Plaintiffs must show that the Memorandum has "perceptibly impaired" their services. *Havens Realty*, 455 U.S. at 379. "An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an inhibition of the organization's daily operations." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). And "an organization does not suffer an injury in fact where it expend[s] resources to educate its members and others unless doing so subjects the organization to operational costs beyond those normally expended." *Id.* at 920. Plaintiffs do not allege that the Memorandum perceptibly impaired or otherwise inhibited their daily operations. To the contrary, Plaintiffs' allegations indicate that Plaintiffs' work in engaging immigrant communities with the census has remained constant both before and after the Memorandum was issued. *See* Compl. ¶¶ 18, 26, 36, 45 (alleging that each Plaintiff "has dedicated and plans to continue dedicating considerable staff time and . . . resources to reaching undocumented residents who were fearful of participating in Census 2020").

In an effort to show harm to their organizational missions, Plaintiffs allege that the Memorandum "has greatly undermined Plaintiffs' advocacy on behalf of Census 2020." Compl. ¶ 136.

But organizational standing cannot be premised on an alleged "impair[ment] [of] pure issue-advocacy—the very type of activity distinguished by *Havens*." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005). That is because "[a] mere interest in an event—no matter how passionate or sincere the interest and no matter how charged with public import the event—will not substitute for an actual injury." *AVX Corp.*, 962 F.2d at 114. Plaintiffs also allege that "the removal of undocumented immigrants from the apportionment base will reduce the federal financial resources directed to" the communities they serve. Compl. ¶ 143. Even assuming *arguendo* that: (i) all illegal aliens will be excluded from the apportionment base (despite the fact that Plaintiffs have deemed such exclusion to be "administratively impossible," *id.* ¶ 88), and (ii) this exclusion would result in a loss of federal funds to the communities served by Plaintiffs (a completely speculative result supported by no plausible allegations), all Plaintiffs have alleged is an injury to those *communities*. This allegation does not suffice to show an injury to *Plaintiffs*.

Nor have Plaintiffs pled—let alone plausibly pled—the second organizational-standing element: a "consequent" expenditure of resources to "combat" the Memorandum. *Havens Realty*, 455 U.S. at 379; *Equal Means Equal*, 450 F. Supp. 3d at 7. Instead, each of the four Plaintiffs simply allege, in boilerplate fashion, that if the Memorandum "is not declared invalid," its "efforts and investment of time and resources will be significantly undercut." Compl. ¶¶ 18, 26, 36, 45. But this does not constitute an allegation that Plaintiffs have "expended resources to *combat*" the Memorandum. *Equal Means Equal*, 450 F. Supp. 3d at 7 (emphasis added). To the contrary, Plaintiffs' allegations suggest that they have not changed anything about their activities in light of the Memorandum—a far cry from plausibly pleading the necessary "*consequent* drain on [their] resources" as required to establish organizational standing. *Havens Realty*, 455 U.S. at 379 (emphasis added).

Finally, even assuming *arguendo* that Plaintiffs have plausibly pled an injury-in-fact that is traceable to the Memorandum, they still cannot demonstrate that this Court can redress that injury for the same reasons described above. *See supra* at 11–12.

**B.    Plaintiffs' Enumeration Claims Are Moot**

"Article III considerations require that an actual case or controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Ramirez v. Sanchez Ramos*, 438 F.3d 92, 100 (1st Cir. 2006). "[A] federal court is duty bound to dismiss the claim as moot if subsequent events unfold in a manner that undermines any one of the three pillars on which constitutional standing rests: injury in fact, causation, and redressability." *Id.* Plaintiffs' own Complaint demonstrates that their inexplicable delay in prosecuting this case has rendered their enumeration-related claims moot.

On July 27, 2020, Plaintiffs alleged in their Complaint that "[u]nless Defendants' actions are *enjoined immediately*, before the conclusion of census-taking, there will be an enormous undercount in the communities Plaintiffs serve" and that "[t]his undercount *cannot be later remedied*." Compl. ¶ 142 (emphases added). Plaintiffs did not move "immediately"—or ever—for preliminary injunctive relief. Plaintiffs are thus correct: any supposed undercount "cannot be later remedied," *id.*, and their enumeration-claims are thus moot.

Census field operations are currently scheduled to run through "the end of October," *id.* ¶ 137, although pending litigation may "even further truncate[]" that deadline. Pl. Mem., Doc. 19, at 3. Despite this timeline—which has been known to Plaintiffs since they filed this action—Plaintiffs (unlike all of the other sets of plaintiffs in all of the other parallel actions) have never moved for summary judgment or even a preliminary injunction. Indeed, briefing on this motion to dismiss will not even conclude until *October 28*, *see* Scheduling Order, Doc. 16. Meanwhile, Plaintiffs have only very recently moved for expedited discovery, with proposed return dates of October 14 and 16. *See*

Docs. 19 & 20. "[F]ollowing review of the discovery materials," only then might they "fil[e] a motion for preliminary injunction or summary judgment." *See* Joint Notice, Doc. 15, at 2.

Plaintiffs do not explain why they sat on their hands for over two months. *Cf. Bassett v. Jensen*, No. 18–cv–10576, 2019 WL 5457771, at *2 (D. Mass. Oct. 24, 2019) (Saris, C.J.) ("Her delay undercuts any argument she is at risk of suffering irreparable harm."). In all events, Plaintiffs' delay cements the fact that, even assuming *arguendo* that the Memorandum will cause an undercount, any such undercount "cannot be remedied." Compl. ¶ 142. Plaintiffs' allegation should be accepted as true on this motion to dismiss and, accordingly, Plaintiffs' enumeration-related claims must be dismissed as moot.

### C.    Plaintiffs' Apportionment Claims Are Not Ripe

"The ripeness doctrine generally deals with when a federal court can or should decide a case." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012). The ripeness doctrine "is designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). Claims are "not ripe for adjudication" if they "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). Ripeness "is a threshold inquiry that does not involve adjudication on the merits and which may be addressed prior to consideration of other Article III justiciability doctrines." *In re Aiken Cnty.*, 645 F.3d 428, 434 (D.C. Cir. 2011).

Ripeness incorporates both a constitutional requirement and a prudential requirement. *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010); *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). The constitutional requirement "is subsumed into the Article III

requirement of standing, which requires a petitioner to allege *inter alia* an injury-in-fact that is 'imminent' or 'certainly impending.'" *Am. Petroleum Inst.*, 683 F.3d at 386. And in evaluating the prudential requirement, courts should consider: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 733.

Here, Plaintiffs' claims relating to supposed apportionment harms do not meet the constitutional requirement for ripeness because, as explained above, *supra* Part I.A.1(c), Plaintiffs' Complaint effectively alleges that they and their members will suffer no apportionment-related injuries, even assuming *arguendo* that every single illegal immigrant will excluded from the apportionment base.

But even assuming that Plaintiffs had plausibly pled that they or their members might suffer some future apportionment harm (and they have not), any such apportionment injuries are at this point unknown, and other considerations, such as the hardship to the parties and the fitness of the issues for judicial consideration, also counsel against the Court's exercise of jurisdiction. *See, e.g.*, *Ohio Forestry Ass'n*, 523 U.S. at 733–34 (challenge to agency action unripe where there is no "significant practical harm" at the present time because a number of future actions would need to occur to make the harm more "imminent" and "certain"); *Texas*, 523 U.S. at 300, 302 (claim unripe where a number of actions would need to occur to cause the alleged harm, rendering it "too speculative whether the problem . . . will ever need solving").

Perhaps unsurprisingly, census and apportionment cases generally are decided post-apportionment, when census enumeration procedures are no longer at issue and the actual apportionment figures are known. *See, e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 790-91 (1992) (challenging allocation of Department of Defense's overseas employees to particular states following census); *Dep't of Commerce v. Montana*, 503 U.S. 442, 445-46 (1992) (challenging method of equal

proportions to determine representatives); *Utah v. Evans*, 536 U.S. 452, 458-59 (2002) (challenging sampling method known as "hot-deck imputation" used by Census Bureau after analyzing census figures); *Wisconsin v. City of New York*, 517 U.S. 1, 4 (1996) (challenging decision not to use particular statistical adjustment to correct an undercount). Consistent with *Franklin*, *Montana*, *Evans*, and *Wisconsin*, any claims related to hypothetical future apportionment harms should await the actual apportionment.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM

Even assuming *arguendo* that the Court has subject-matter jurisdiction over this action, Plaintiffs fail to adequately state a single claim, and all of their claims should be dismissed as a matter of law.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* Likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.*

### A.    Plaintiffs' Administrative Procedure Act Claims Must Be Dismissed (Counts I & II)

Plaintiffs assert two Administrative Procedure Act claims against the Department of Commerce, asserting that the Department's "compliance with" the Presidential Memorandum would violate the APA in various respects. Compl. ¶¶ 146–157. In particular, Plaintiffs allege that the

Department of Commerce violates the APA under the theory that "[c]ompliance with the" Memorandum "is violative of" the Apportionment Clause. *Id.* ¶ 149.[3]  Plaintiffs APA claims should be dismissed.

### 1. *Plaintiffs' APA Claims Should Be Dismissed for Lack of Final Agency Action*

"Under the APA, a party must obtain a 'final agency decision' prior to seeking judicial review of an agency action." *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 69 (1st Cir. 2007). Plaintiffs' APA claims fail because the Department of Commerce's implementation of the Memorandum does not constitute "final agency action" as required for APA review.  *See Franklin*, 505 U.S. at 796–801 (applying the definition of final agency action in 5 U.S.C. § 704 to the apportionment context); *see also California v. Dep't of Justice*, 114 F.3d 1222, 1225 (D.C. Cir. 1997) ("No final administrative action, no judicial review").  Accordingly, Plaintiffs' APA claims should be dismissed for lack of jurisdiction.  *See Commonwealth of Puerto Rico*, 490 F.3d at 70 ("The issue of whether there was final agency action implicates the jurisdiction of the federal courts . . . .").

In *Franklin*, the Supreme Court directly confronted the question whether a "statutory basis [existed] . . . under the APA" for judicial review of the Secretary of Commerce's report to the President regarding the decennial census data under 13 U.S.C. § 141(b).  *See* 505 U.S. at 796–800.  The Court concluded that the Secretary's report to the President is "not final and therefore not subject to [APA] review" because it "serves more like a tentative recommendation than a final and binding determination."  *Id.* at 798.  More specifically, the Court identified two prerequisites for an agency

---

[3]      Plaintiffs do not bring a standalone Apportionment Clause claim; instead, they only raise a supposed Apportionment Clause violation in the context of their APA claim.  The Court should not read into Plaintiffs' Complaint a claim that they, for whatever reason, have not brought.  After all, "[t]he plaintiff is generally considered the master of his own complaint." *Brawn v. Coleman*, 167 F. Supp. 2d 145, 148 (D. Mass. 2001) (Saris, J.).

action to be deemed "final" for APA purposes: (i) that "the agency has completed its decisionmaking process," and (ii) that "the result of that process is one that will directly affect the parties." *Id.* at 797.

The Department of Commerce's role in the apportionment process satisfies neither prong because "the action that creates an entitlement to a particular number of Representatives and has a direct effect on the reapportionment is the President's statement to Congress, not the Secretary's report to the President." *Id.* "Because the [Secretary of Commerce's] report to the President carries no direct consequences for the reapportionment, it serves more like a tentative recommendation than a final and binding determination." *Id.* at 798. Accordingly, the Department of Commerce's actions are "not final and therefore not subject to [APA] review." *Id.*[4]

### 2. *The Memorandum's Directive Does Not Violate the Apportionment Clause*

Even assuming *arguendo* that the Department's implementation of the Memorandum could be subject to APA review, the Memorandum does not—contrary to Plaintiffs' allegation, *see* Compl. ¶ 149—violate the Apportionment Clause.

The operative Apportionment Clause mandates that Representatives shall be "apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2. But, after accounting for the express exclusion of "Indians not taxed," neither this Clause nor its predecessor in Article I was ever understood to mandate the inclusion of every person present within the boundaries

---

[4] *See also Dalton v. Specter*, 511 U.S. 462, 470 (1994) (holding the Secretary of Defense's implementation of the President's decision to close a naval yard is not a "final agency action" reviewable under the APA); *Public Citizen v. U.S. Trade Rep.*, 5 F.3d 549, 551-52 (D.C. Cir. 1994) (holding that the NAFTA trade agreement negotiated by the Trade Representative is not a "final agency action" subject to APA review because it was up to the President to decide whether to submit the agreement to Congress); *see also Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA*, 313 F.3d 852, 860-61 (4th Cir. 2003) ("even when agency action significantly impacts the choices available to the final decisionmaker, this distinction does not transfer [a] challenged action into reviewable agency action under the APA").

of each State at the time of the census.  *See id.* art. I, § 2, cl. 3.  To the contrary, from the time of the Founding through the ratification of the Fourteenth Amendment and continuing to the present day, the Apportionment Clause has been understood to require counting "inhabitants."  In other words, only usual residents—those with a fixed and enduring tie to a State, as recognized by the Executive— need be deemed "persons *in [that] State*," *id.* amend. XIV, § 2 (emphasis added).  And because the word "inhabitants" is sufficiently indeterminate, the Supreme Court has recognized that the term confers significant discretion on the Executive to make legal determinations about the "usual residence" of an individual without treating his physical presence in a particular jurisdiction (or lack thereof) as dispositive.  *See Franklin*, 505 U.S. at 804–06.

This well-established framework forecloses Plaintiffs' facial challenge to the Presidential Memorandum.  For Plaintiffs to succeed, they must establish that the Constitution requires including all illegal aliens in the apportionment base.  But that proposition is not correct.  To give just one example, nothing in the Constitution requires that illegal aliens residing in a detention facility after being arrested while crossing the border must be accounted for in the allocation of Representatives (and hence political power).  This is fatal to Plaintiffs' Apportionment Clause theory.

> (a)  Only "Inhabitants" Who Have Their "Usual Residence" in a State Need Be Included in the Apportionment

As the Supreme Court has explained, "'[u]sual residence,' was the gloss given the constitutional phrase 'in each State' by the first enumeration Act [of 1790] and has been used by the Census Bureau ever since to allocate persons to their home States."  *Id.* at 804.  The Act also uses "other words [ ] to describe the required tie to the State: 'usual place of abode,' [and] 'inhabitant[.]'"  *Id.* at 804–05.  These terms "can mean more than mere physical presence, and [have] been used broadly enough to include some element of allegiance or enduring tie to a place."  *Id.*

The settled understanding that only "inhabitants" who have their "usual residence" in the country must be counted stems from the drafting history of the Apportionment Clause.  In the draft

Constitution submitted to the Committee of Style, the Apportionment Clause required "the Legislature [to] regulate the number of representatives by the number of *inhabitants*." 2 The Records of the Federal Convention of 1787, at 566, 571 (Max Farrand ed., rev. ed. 1966) (emphasis added). The Committee of Style changed the language to provide that "Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons." U.S. Const. art. I, § 2, cl. 3. But "the Committee of Style 'had no authority from the Convention to alter the meaning' of the draft Constitution," *Utah v. Evans*, 536 U.S. 452, 474 (2002), and the Supreme Court has thus found it "abundantly clear" that, under the original Clause, apportionment "should be determined solely by the number of the State's inhabitants," *Wesberry v. Sanders*, 376 U.S. 1, 13 (1964); *see also Franklin*, 505 U.S. at 804-05 (observing that "[t]he first draft" of the Apportionment Clause "used the word 'inhabitant,' which was omitted by the Committee of Style in the final provision").

Historical sources confirm this reading. In *The Federalist*, James Madison repeatedly explained that apportionment under the new Constitution would be based on a jurisdiction's "inhabitants." *See The Federalist* No. 54, at 369 (Jacob E. Cooke ed., 1961) (observing that "the aggregate number of representatives allotted to the several States[] is to be determined by a federal rule, founded on the aggregate number of inhabitants"); *The Federalist* No. 56, at 383 (noting that the Constitution guarantees "a representative for every *thirty thousand inhabitants*") (emphasis added); *The Federalist* No. 58, at 391 (noting that the Constitution mandates a "readjust[ment] from time to time [of] the apportionment of representatives to the number of inhabitants"); *see also Evenwel v. Abbott*, 136 S. Ct. 1120, 1127 (2016) ("[T]he basis of representation in the House was to include all inhabitants" (emphasis omitted)). Similarly, as the Supreme Court recognized, the first enumeration Act of 1790—

titled "an act providing for the enumeration of the inhabitants of the United States"—directed "the marshals of the several districts of the United States" to count "the number of the inhabitants within their respective districts." Act of Mar. 1, 1790, § 1, 1 Stat. 101, 101; *see Franklin*, 505 U.S. at 803-05 (relying on the Census Act of 1790 to apply the Apportionment Clause).

This understanding of "usual residence" and "inhabitant" was enshrined in the constitutional text and incorporated by historical practice when the Fourteenth Amendment's Apportionment Clause was ratified almost 80 years later. According to Representative Roscoe Conkling, a member of the committee that drafted the Fourteenth Amendment, the operative Apportionment Clause's streamlined language—requiring apportionment based on "the whole number of persons in each State"—was meant to fully include former slaves in the apportionment base and otherwise "adhere[] to the Constitution as it is." Cong. Globe, 39th Cong., 1st. Sess. 359 (1866). The Amendment's text confirms that understanding: it underscores that a person who possesses sufficient ties to a State will be included by specifying that "the whole number of persons *in each State*" must be counted, U.S. Const. amend. XIV, § 2 (emphasis added)—a phrase that the Supreme Court later explained to be equivalent to the term "inhabitant." *Franklin*, 505 U.S. at 804-05. Indeed, the very next sentence of section 2 of the Fourteenth Amendment equates "persons in each State" with "inhabitants" by penalizing in the apportionment any State that denies the right to vote to the "male inhabitants of such State" who would otherwise be eligible to vote (principally by reason of citizenship and age). U.S. Const. amend. XIV, § 2. Unsurprisingly, the first census after ratification of the Fourteenth Amendment was conducted in accordance with the same procedures that had been used for the 1850 census, *see* Act of May 6, 1870, ch. 87, § 1, 16 Stat. 118, 118, which, in turn had required "all [States'] inhabitants to be enumerated," Act of May 23, 1850, ch. 11, § 1, 9 Stat. 428, 428; *see also Franklin*, 505 U.S. at 804 ("'Usual residence,' was the gloss given the constitutional phrase 'in each State' by the first

enumeration Act [of 1790] and has been used by the Census Bureau ever since to allocate persons to their home States.").

Reading the Apportionment Clause to contemplate apportionment of Representatives based on "inhabitants" (or "usual residents") also helps explain the historical exclusion of certain people from the apportionment base.  For example, transient aliens, such as those temporarily residing here for vacation or business, are not included in the apportionment base. *See, e.g.*, Residence Criteria, 83 Fed. Reg. at 5533 (2018); Dennis L. Murphy, Note, *The Exclusion of Illegal Aliens from the Reapportionment Base: A Question of Representation*, 41 CASE W. RES. L. REV. 969, 980 (1991).  That makes sense, as such aliens were not considered "usual residents" or "inhabitants" either at the Founding or the ratification of the Fourteenth Amendment.  As contemporaneous sources using the term make clear, to qualify as an "inhabitant," one had to, at a minimum, establish a fixed residence within a jurisdiction and intend to remain there.  *See, e.g.*, *Bas v. Steele*, 2 F. Cas. 988, 993 (Washington, Circuit Justice, C.C.D. Pa. 1818) (No. 1088) (concluding that a Spanish subject who had remained in Philadelphia as a merchant for four months before seeking to leave, "was not an inhabitant of this country, as no person is an inhabitant of a place, but one who acquires a domicil there").[5]

---

[5]    *See also, e.g, Hylton v. Brown*, 12 F. Cas. 1123, 1129 (Washington, Circuit Justice, C.C.D. Pa. 1806) (No. 6,981) (charging jury while riding circuit that a particular individual "was no more an inhabitant of this state than I am, who spend one-third of each year in this city; or any other person, who comes here to transact a certain piece of business, and then returns to his family"); *Toland v. Sprague*, 23 F. Cas. 1353, 1355 (C.C.E.D. Pa. 1834) (No. 14,076) (distinguishing an "inhabitant" from a "transient passenger"); *United States v. Laverty*, 26 F. Cas. 875, 877 (D. La. 1812) (No. 15,569A) ("An inhabitant is one whose domicile is here, and settled here, with an intention to become a citizen of the country."); *United States v. The Penelope*, 27 F. Cas. 486, 489 (D. Pa. 1806) (No. 16,024) ("[T]he following has always been my definition of the words 'resident,' or 'inhabitant,' which, in my view, mean the same thing. 'An inhabitant, or resident, is a person coming into a place with an intention to establish his domicil, or permanent residence; and in consequence actually resides … .'"); 41 Annals of Cong. 1595 (1824) (referring to "the common acceptation" of "inhabitant" as "the persons whose abode, living, ordinary habitation, or home" is within a particular jurisdiction); Thomas Dyche & William Pardon, *A New General English Dictionary* (16th ed. 1781) ("a person that resides or ordinarily dwells in a place or home"); 1 & 2 Samuel Johnson, *A Dictionary of the English Language s. v.* abode, inhabitant, reside, residence, resident (6th ed. 1785) (a "[d]weller," or one who "lives or resides" in a place, with the

Likewise, foreign diplomats stationed overseas arguably remained "inhabitants" of their native countries rather than of their diplomatic posts. *See Franklin*, 505 U.S. at 805 (confirming that American diplomat stationed overseas could still qualify as an "inhabitant" who is "in" his home State for purposes of "the related context of congressional residence qualifications"); Emmerich de Vattel, *The Law of Nations*, ch. 19, § 213 (1817) (explaining that diplomats could not qualify as "inhabitants" because "the envoy of a foreign prince has not his settlement at the court where he resides"). And, unsurprisingly, foreign diplomatic personnel living on embassy grounds have previously been excluded from the apportionment base. Murphy, *supra*, 41 CASE W. RES. L. REV. at 980.

Tourists and diplomats may be "persons" within a State's boundaries at the time of the Enumeration, but no one seriously contends that they must be included in the apportionment base under the Constitution. Physical location does not, in short, necessarily dictate whether one is an "inhabitant" (or "usual resident") of a particular jurisdiction.

(b)    The Executive Has Significant Discretion to Define Who Qualifies as an "Inhabitant"

Crucially, the term "inhabitant"—and the concept of "usual residence"—is sufficiently ambiguous to give Congress, and by delegation the Executive, significant discretion to define the contours of "inhabitants" for apportionment purposes. That discretion is rooted in the Constitution. Article I provides that apportionment numbers are determined by an "actual Enumeration" performed every 10 years "in such Manner as" Congress "shall by Law direct." U.S. Const. art. I, § 2, cl. 3; *see also id.* amend. XIV, § 5 (giving Congress the power to "enforce, by appropriate legislation, the provisions of" the Fourteenth Amendment, including the operative Apportionment Clause). This

---

terms "reside," "residence," and "resident" defined with reference to an "abode"—*i.e.*, a "continuance in a place"); Noah Webster, *American Dictionary of the English Language* (1828) (defining "inhabitant" as a "dweller; one who dwells or resides permanently in a place, or who has a fixed residence, as distinguished from an occasional lodger or visitor").

"text . . . vests Congress with virtually unlimited discretion in conducting the decennial 'actual Enumeration,' [and] . . . [t]hrough the Census Act, Congress has delegated its broad authority over the census to the Secretary." *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996) (citations omitted). But the Secretary is not the final word on apportionment, and indeed is not the one responsible for determining the apportionment base. Instead, by statute, the Secretary must report census numbers to the President. *See* 13 U.S.C. § 141(b). And it is the President, then, who "transmit[s] to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the seventeenth and each subsequent decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives." 2 U.S.C. § 2a(a). In doing so, the President has full "authority to direct the Secretary in making policy judgments that result in 'the decennial census'; he is not expressly required to adhere to the policy decisions reflected in the Secretary's report." *Franklin*, 505 U.S. at 799. So "the Secretary cannot act alone; she must send her results to the President, who makes the calculations and sends the final apportionment to Congress." *Id.* at 800. That "final act" by the President is "not merely ceremonial or ministerial," but remains "important to the integrity of the process." *Id.* Indeed, it is "the President's personal transmittal of the report to Congress" that "settles the apportionment" of Representatives among the States. *Id.* at 799.

Of course, the Executive's decisions in this area must be "consonant with . . . the text and history of the Constitution," *Franklin*, 505 U.S. at 806, but the term "inhabitants"—and the concept of "usual residence"—are sufficiently indeterminate to give him significant discretion within constitutional bounds. *See id.* at 804–06 (discussing how the notion of "usual residence" has been applied differently over time). Indeed, Madison himself acknowledged that the word "inhabitant" was "vague" in discussing the House Qualifications Clause. 2 The Records of the Federal Convention of 1787, at 216-17; *cf. Franklin*, 505 U.S. at 805 (in the course of applying the Apportionment Clause,

drawing on Madison's interpretation of the "term 'inhabitant'" in "the related context of congressional residence qualifications").  As noted above, historical evidence confirms that the term "inhabitant" was understood to require, at a minimum, a fixed residence within a jurisdiction and intent to remain there.  Moreover, Founding-era sources also reflect that, especially with respect to aliens, the term could be understood to further require a sovereign's permission to enter and remain within a given jurisdiction.  *See, e.g.*, *The Venus*, 12 U.S. (8 Cranch.) 253, 289 (1814) (Marshall, C.J., concurring in part and dissenting in part) (quoting Vattel for the proposition that "inhabitants, as distinguished from citizens, are strangers who are *permitted* to settle and stay in the country" (emphasis added)); *The Federalist* No. 42, at 285 (Madison) (discussing provision of the Articles of Confederation that required every State "to confer the rights of citizenship in other States … upon any whom *it may allow to become inhabitants* within its jurisdiction" (emphasis added)).

Accordingly, the Executive has wide discretion to make legal determinations about who does and does not qualify as an "inhabitant" for purposes of inclusion in or exclusion from the apportionment base.  In *Franklin*, for example, the Supreme Court held that the Executive Branch could allocate over 900,000 military personnel living overseas to their home States on the basis of the Secretary's judgment that such people "had retained their ties to the States."  505 U.S. at 806.  That allocation "altered the relative state populations enough to shift a Representative from Massachusetts to Washington"—and had not been used "until 1970," save for a "one-time exception in 1900."  *Id.* at 791–93.  Nevertheless, as the Court explained, even though the recent approach was "not dictated by" the Constitution, it was "consonant with [its] text and history" and thus a permissible "judgment" within the Executive Branch's discretion, even where Congress had not expressly authorized this practice.  *Id.* at 806.  In the course of reaching this judgment, the Court also listed a number of other legal determinations of usual residency that the Executive Branch has permissibly chosen to use over the years—including determinations the Census Bureau has since abandoned.  For example, "up until

28

1950, college students were counted as belonging to the State where their parents resided, not to the State where they attended school," and at the time the case was decided, "[t]hose persons who are institutionalized in out-of-state hospitals or jails for short terms [were] also counted in their home States." *Id.* at 805–06. Under the current Residence Criteria, however, college students who live at school during the academic year and prisoners housed in out-of-state jails, even for the short term, are counted in the State in which those institutions are located. Residence Criteria, 83 Fed. Reg. at 5534, 5535.

Plaintiffs do not challenge the Residence Criteria in this action. To the contrary, they affirmatively (albeit indirectly) rely on it in support of their complaint. *See* Compl. ¶ 67 & n.24. In doing so, they impliedly suggest that not even they dispute that the Executive has discretion to define "inhabitant" and to determine who meets its strictures. *See Franklin*, 505 U.S. at 804–06. Nor can they, given constitutional text, history, and Supreme Court precedent. The Presidential Memorandum is no different insofar as it reflects the Executive Branch's discretionary decision to direct the Secretary in making policy judgments that result in the decennial census. *Id.* at 799.

(c)    The Apportionment Clause Does Not Require Inclusion of All Illegal Aliens as "Inhabitants" Having a "Usual Residence" in a State

Plaintiffs maintain that the Presidential Memorandum facially violates the Apportionment Clause on the theory that *all* illegal aliens necessarily qualify as "persons in each State," and because the Memorandum contemplates the exclusion of such aliens—in some as-yet unknown number—for apportionment purposes. *E.g.*, Compl. ¶¶ 3, 8. Put differently, Plaintiffs posit that the Constitution prohibits the exclusion of *any* illegal alien from the apportionment base, and that the Memorandum's announcement of that possibility violates the Apportionment Clause. But none of the constitutional constraints on the Executive's discretion to define the contours of "inhabitants" or "usual residence" require including *all* illegal aliens in the apportionment.

For example, if the Census Bureau finds it feasible to identify unlawfully present aliens who resided in a Customs and Border Patrol (CBP) or Immigration and Customs Enforcement (ICE) facility within a State on census day after being arrested while illegally entering the country, it would be permissible to exclude them. Such individuals—like alien tourists who happen to be staying in the country for a brief period on and around census day—cannot reasonably be said to have established "the required tie to [a] State," *Franklin*, 505 U.S. at 804, or to be "inhabitants" under any definition of that term.[6]

Likewise, if feasibly identified, the Executive may exclude aliens who have been detained for illegal entry and paroled into the country pending removal proceedings, or who are subject to final orders of removal.[7] Such aliens do not have enduring ties to any State sufficient to become "inhabitants" with their "usual residence" in the United States. The government has either allowed them into the country solely conditionally while it is deciding whether they should be removed, or has conclusively determined that they must be removed from the country. In *Kaplan v. Tod*, 267 U.S. 228 (1925), for instance, the Supreme Court addressed the case of an alien minor who had been denied

---

[6]     These populations may be significant. During fiscal year 2019, ICE held in custody an average daily population of 50,165 aliens. U.S. ICE ERO, U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report, at 5 (2019) (ICE ERO Report), https://www.ice.gov/sites/default/files/documents/Document/2019/eroReportFY2019.pdf. And on any given day in the summer of 2019, CBP held in custody between 8,000 and 12,000 detainees. U.S. Customs and Border Protection – Border Patrol Oversight: Hearing Before the H. Subcomm. on Homeland Security of the Comm. on Appropriations, 116th Cong. (2019) (testimony of Carla L. Provost, Chief, U.S. Border Patrol), https://docs.house.gov/meetings/AP/AP15/ 20190724/109834/HHRG-116-AP15-Wstate-ProvostC-20190724.pdf.

[7]     ICE's non-detained docket surpassed 3.2 million cases in fiscal year 2019, a population large enough to fill more than four congressional districts under the 2010 apportionment. ICE ERO Report at 10; Kristin D. Burnett, Congressional Apportionment, U.S. Census Bureau (Nov. 2011), https://www.census.gov/prod/cen2010/briefs/c2010br-08.pdf. The non-detained docket includes aliens who are both pre- and post-final order of removal, and who have been released on parole, bond, an order of recognizance, an order of supervision, or who are in process for repatriation. ICE ERO Report at 10.

entry at Ellis Island in 1914 but could not be returned to Russia during the First World War and was therefore paroled into the country to live with her father in 1915. When the case reached the Supreme Court almost ten years later in 1925, it turned entirely on the question whether the alien minor had been "dwelling in the United States" or had "begun to reside permanently" in the United States for purposes of federal immigration statutes, which would have conferred derivative citizenship on her upon her father's naturalization in 1920. *Id.* at 230. The Court held that, during her parole, she "never has been dwelling in the United States" and "[s]till more clearly she never has begun to reside permanently in the United States." *Id.* As the Court explained, she "could not lawfully have landed in the United States" because she fell within an inadmissible category of aliens, and "until she legally landed [she] 'could not have dwelt within the United States.'" *Id.* (quoting *Zartarian v. Billings*, 204 U.S. 170, 175 (1907)). In the Court's view, she was in "the same" position as an alien "held at Ellis Island for deportation." *Id.* at 231; *see also, e.g.*, *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958) (holding that parole cannot affect an alien's status and does not place an alien "legally 'within the United States'"). Indeed, the Supreme Court recently reaffirmed that "aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border,'" and that the same principle applies to those detained "shortly after unlawful entry." *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020).

Plaintiffs emphasize that Framers of both the original Apportionment Clause and the Fourteenth Amendment intended to include aliens in the apportionment base. Compl. ¶¶ 55–59. But Plaintiffs' historical evidence about the treatment of *aliens in general* does not and cannot resolve the distinct question whether *illegal* aliens must be included—for the simple reason that there were no federal laws restricting immigration (and hence no illegal aliens) until 1875. *See Kleindienst v. Mandel*, 408 U.S. 753, 761 (1972). And Plaintiffs provide no evidence to support the proposition that by employing the concept of "inhabitants," *see* Compl. ¶¶ 55 & 57, the Framers of either the original

Constitution or Fourteenth Amendment were understood to have bound future generations to allocate political power on the basis of aliens living in the country in violation of federal law. To the contrary, as the Supreme Court has explained, the Framers understood the "fundamental proposition[]" that the "power to admit or exclude aliens is a sovereign prerogative." *Thuraissigiam*, 140 S. Ct. at 1982.[8]  This "ancient principle[] of the international law of nation-states" is necessary to the sovereign's rights to define the polity ("the people") that make up the nation and to preserve itself, as both the Supreme Court and 19th-century international law scholars recognized.[9]  It is fundamentally antithetical to those elementary principles to say that illegal aliens can arrogate to themselves the right to redistribute political power within this polity by flouting the sovereign power of the United States to define who can enter and become part of the polity.  As Representative Conkling explained, "political representation does not belong to those who have no political existence.  The government

---

[8]     *See also, e.g., Landon v. Plasencia*, 459 U.S. 21, 32 (1982); *Chae Chan Ping v. United States*, 130 U.S. 581, 604 (1889); *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893).

[9]     *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972); *see, e.g., Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892) ("It is an accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self- preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe.") (citing Vattel and Phillimore); Vattel, *The Law of Nations*, bk. 2, §§ 94, 100 (explaining that the sovereign's authority to "forbid the entrance of his territory either to foreigners in general, or in particular cases," "flow[ed] from the rights of domain and sovereignty"); 1 Robert Phillimore, *Commentaries Upon International Law*, ch. 10, § CCXIX (1854) (similar); *see also, e.g., Bernal v. Fainter*, 467 U.S. 216, 221 (1984) ("The exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition. Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well: Aliens are by definition those outside of this community."); *Chae Chan Ping*, 130 U.S. at 603–04 (recognizing that a sovereign's power to "exclude aliens from its territory" is "an incident of every independent nation" and is "part of its independence," and "[i]f it could not exclude aliens it would be to that extent subject to the control of another power"); *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812) (Marshall, C.J.) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself.  Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction.").

of a free political society belongs to its members, and does not belong to others." Cong. Globe, 39th Cong., 1st Sess., at 356 (1866); *see also id.* at 2962 (Sen. Poland) (advocating that representation be based on "all the members of a State or community" because "they are all subject to its laws; they must all share its burdens; and they are all interested in legislation and government"). Nothing in the debates suggests that the Framers of the Fourteenth Amendment would have treated aliens whose very presence in this country is forbidden by federal law as "members" of the "political society." Rejecting Plaintiffs' approach is certainly "consonant with" the terms and history of the Fourteenth Amendment. *Franklin*, 505 U.S. at 806.

In addition, the Founding generation was aware that the term "inhabitant" could be understood to require that an alien be given *permission* to settle and stay in a jurisdiction according to the definition provided by Vattel, whom the Supreme Court has extolled as the "founding era's foremost expert on the law of nations." *Franchise Tax Bd. v. Hyatt*, 139 S. Ct. 1485, 1493 (2019); *see* 1 Vattel*, The Law of Nations* ch. 19, § 213 (defining "inhabitants, as distinguished from citizens," as "foreigners, who are permitted to settle and stay in the country").[10] And in *Kaplan*, the Supreme Court held that an alien who had not effected a lawful entry into the country could not be characterized as "dwelling" in the country under the latest version of a naturalization law dating from 1790 that had conditioned derivative citizenship for certain aliens on their "dwelling" in the United States—a concept linked with becoming an "inhabitant" since the Founding Era. 267 U.S. at 230; *see* Act of Mar. 26, 1790, § 1, 1 Stat. 103, 104; *cf.* Noah Webster, *American Dictionary of the English Language* (1828) (defining "inhabitant" as a "dweller; one who dwells or resides permanently in a place"). Illegal aliens,

---

[10]    As the Supreme Court has observed: "The international jurist most widely cited in the first 50 years after the Revolution was Emmerich de Vattel. In 1775, Benjamin Franklin acknowledged receipt of three copies of a new edition, in French, of Vattel's Law of Nations and remarked that the book 'has been continually in the hands of the members of our Congress now sitting.'" *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 462 n.12 (1978) (ellipsis and citations omitted omitted).

however, cannot claim the relevant "enduring ties" to this country, or that they are "dwelling" in this country, precisely because they have not legally entered and as a matter of law may be removed from the country at any time. *See also Gonzalez v. Holder*, 771 F.3d 238, 245 (5th Cir. 2014) (applying *Kaplan* to an alien who "entered the United States at the age of seven, albeit illegally, and … remained in the country" for 16 years); *U.S. ex rel. De Rienzo v. Rodgers*, 185 F. 334, 338 (3d Cir. 1911) (explaining that an alien "cannot begin" to "reside permanently" in the United States "if he belongs to a class of aliens debarred from entry into the country by the act to regulate the immigration of aliens into the United States").

The debates over the Fourteenth Amendment further indicate that the rationale the Framers offered for including aliens in the apportionment base do not apply to illegal aliens. Specifically, various legislators made clear that unnaturalized aliens should be included in the apportionment base precisely because the law provided them with a direct pathway to citizenship—mainly, an oath of loyalty and five years of residence in the United States, *see* Act of Apr. 14, 1802, 2 Stat. 153. As Representative Conkling pointed out, "[t]he political disability of aliens was not for this purpose counted against them, *because it was certain to be temporary*, and they were admitted at once into the basis of apportionment." Cong. Globe, 39th Cong., 1st Sess., at 356 (1866) (emphasis added); *see also, e.g.*, *id.* at 3035 (Senator Henderson explaining that "[t]he road to the ballot is open to the foreigner; it is not permanently barred"). Indeed, the five-year residency requirement meant that aliens could "acquire [the vote] in the current decade"—and thus unnaturalized aliens could be voting citizens before the next apportionment. *Id.* at 354 (Representative Kelley). And even an opponent of the inclusion of aliens in the apportionment agreed that unnaturalized aliens were on "a short period of probation—five years; and in most of the states the great body of them are promptly admitted to citizenship." *Id.* at 2987 (Sen. Sherman). That rationale plainly does not extend to illegal aliens, who

generally are prohibited by law from becoming citizens and are subject to removal.  8 U.S.C. §§ 1182(a)(9), 1227(a), 1255(a) & (c), 1427(a).

Leaving the Framers behind, Plaintiffs allege that "[e]very census . . . has included U.S. citizens and noncitizens—regardless of immigration status."  Compl. ¶ 64.  But the past practice of including illegal aliens in the apportionment base does not establish that the Executive is constitutionally compelled to do so in perpetuity.  Rather, such a practice would at most show that the Executive *may* include illegal aliens within the apportionment base under the Constitution, not that he *must*.  After all, *Franklin* upheld the Executive's decision to scuttle a nearly unbroken 180-year-old practice of not allocating federal personnel stationed overseas to the apportionment base of their home States as "consonant with, though not dictated by, the text and history of the Constitution."  505 U.S. at 806; *see id.* at 792–93.  There is no reason why the previous inclusion of illegal aliens in the apportionment base should be treated as more authoritative than the previous exclusion of overseas personnel abandoned in *Franklin*.

Citing *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016), Plaintiffs assert that "Congress considered, and rejected, allocating seats in the House of Representatives on the basis of voter population."  Compl. ¶ 58.  But the fact that the apportionment base has always included inhabitants who could not vote is beside the point.  Instead, the point is that illegal aliens, unlike women in 1868 or children today, can reasonably be characterized as lacking an "enduring tie to," and hence a "usual residence" in, the United States—as evidenced by the fact that they can be removed from the country at any time. *Franklin*, 505 U.S. at 804.  In all events, the *Evenwel* plaintiffs merely argued that a State must exclude all non-voters, not illegal aliens alone.  *Evenwel*, 136 S. Ct. at 1123.  Thus, the parties in *Evenwel* did not argue, and the Supreme Court did not address, whether a State must (or may) exclude illegal aliens for purposes of intrastate redistricting, let alone whether the President may exclude them for purposes of

interstate apportionment. *Cf. Burns v. Richardson*, 384 U.S. 73, 93-94 (1966) (holding that a State could limit its population base to registered voters).

Plaintiffs also argue that the Memorandum violates the Apportionment Clause because "[u]ndocumented immigrants are . . . persons," and the Apportionment Clause requires "'counting the whole number of persons in each State.'" Compl. ¶ 3 (quoting U.S. Const. amend. XIV). It is, of course, true that illegal aliens are "persons." *Cf. Plyler v. Doe*, 457 U.S. 202 (1982). But not all illegal aliens are necessarily "persons *in [a] State*," which phase, as Defendants have explained, *supra* Part II.A.2(a), "can mean more than mere physical presence, and has been used broadly enough to include some element of allegiance or enduring tie to a place." *Franklin*, 505 U.S. at 804–05.

Ultimately, however, it is neither necessary nor appropriate for this Court to resolve whether any particular category of illegal aliens must be deemed "inhabitants" for purposes of the apportionment. Plaintiffs argue that the Memorandum "is unconstitutional and unlawful on its face." Compl. at 26 & ¶¶ 74–87 (initial capitalization omitted).[11] But "a plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which the [law] would be valid, *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). Thus, in order to prevail on this facial challenge to the Presidential Memorandum, Plaintiffs must establish that there is *no* category of illegal aliens that may be lawfully excluded from the apportionment. This they cannot do.

Plaintiffs instead ask the Court to decide a much different question—and more than is necessary to resolve this case—by seeking a holding that the Apportionment Clause would prohibit the exclusion of all categories of illegal aliens. That question is not properly presented here. The

---

[11]    Plaintiffs also argue that the Memorandum is unconstitutional and unlawful "as applied," Compl. at 26 & ¶¶ 74–87 (initial capitalization omitted), but they cannot assert an as-applied challenge because they do not allege that the Memorandum's implementation has been finalized.

Presidential Memorandum states that it will be the policy of the United States "to exclude from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act, as amended (8 U.S.C. 1101 et seq.), to the *maximum extent feasible and consistent with the discretion delegated to the executive branch*." 85 Fed. Reg. at 44,680 (emphasis added). It further states that it "shall be implemented *consistent with applicable law*." *Id.* (emphasis added). And Plaintiffs have rushed to Court before the Census Bureau has finally determined which illegal aliens it may be "feasible" to exclude, before the Census Bureau has reported any numbers to the Secretary, before the Secretary has reported any numbers to the President, and before the President has reported any numbers to Congress. Because this is a facial challenge, the Court should not consider hypothetical applications of the Memorandum. In fact, the Supreme Court has specifically explained that courts "must be careful not to go beyond the [law's] facial requirements and speculate about 'hypothetical' or 'imaginary' cases" when "determining whether a law is facially invalid." *Wash. State Grange*, 552 U.S. at 449–50. Accordingly, this Court need not and should not resolve whether the Apportionment Clause necessarily *excludes* or *includes* any particular category of illegal aliens from the apportionment base. Rather, for Plaintiffs to prevail, they must establish that there is *no* category of illegal aliens that could ever be excluded. They cannot do so.

3.     *The Secretary of Commerce Will Not Exceed His Statutory Authority by Complying with the Memorandum*

Nor, contrary to Plaintiffs' meritless APA allegations, *see* Compl. ¶¶ 154–156, is the President forbidden by statute from supervising the Secretary of Commerce in connection with the census. Article II empowers the President to supervise the conduct of subordinate officials like the Secretary. *See* U.S. Const., art. 2, § 1. And in the specific context of the census, the Supreme Court made clear in *Franklin* that the President is empowered to "instruct[] . . . the Secretary to reform the census." 505 U.S. at 798. Indeed, "[i]t is hard to imagine a purpose for involving the President" in the

apportionment process "if he is to be prevented from exercising his accustomed supervisory powers over his executive officers." *Id.* at 800.

### B. Plaintiffs Have Failed To State a Claim under the Enumeration Clause (Count III)

Plaintiffs claim that—by supposedly "chill[ing] immigrant participation in the ongoing 2020 Census"—the Memorandum violates the Enumeration Clause. Compl. ¶¶ 158–164. Plaintiffs misunderstand the Enumeration Clause.

The Constitution's reference to "actual Enumeration" is simple: population is to be determined by a person-by-person headcount, rather than through estimates or conjecture. Prior to the first census in 1790, the Framers settled on an interim number of Representatives allocated to each State. U.S. Const. art. I, § 2, cl. 3 (providing the number of Representatives for each State "until such enumeration shall be made" within "three Years after the first Meeting of the Congress of the United States"). This allocation was based on "estimates" of the population derived from "materials ranging from relatively complete enumerations . . . to fragmentary data such as contemporary local population estimates, militia registrations, tax records, church records, and official vital statistics." U.S. Dep't of Commerce, Historical Statistics of the United States, 1789–1945, at 16 (1949).

Given that context, "Article I makes clear that the original allocation of seats in the House was based on a kind of 'conjectur[e],' in contrast to the deliberately taken count that was ordered for the future. What was important was that contrast—rather than the particular phrase used to describe the new process." *Evans*, 536 U.S. at 475; *see id.* at 493 (Thomas, J., concurring in part and dissenting in part) ("[A]t the time of the founding, 'conjecture' and 'estimation' were often contrasted with the actual enumeration that was to take place pursuant to the Census Clause."); *House of Representatives*, 525 U.S. at 363 (Stevens, J., dissenting) ("The words 'actual Enumeration' require post-1787 apportionments to be based on actual population counts, rather than mere speculation or bare estimate."); Thomas R. Lee, *The Original Understanding of the Census Clause: Statistical Estimates and the*

*Constitutional Requirement of an "Actual Enumeration,"* 77 Wash. L. Rev. 1, 20 (2002) (providing an in-depth examination of this contrast and its historical context).

In short, the Enumeration Clause concerns the *method* of conducting the census. It does not confer "a right to be counted" or "a right to a perfectly accurate census." *Nat'l Law Ctr. on Homelessness & Poverty*, No. 92–cv–2257, 1994 WL 521334, at *8 (D.D.C. Sept. 15, 1994); *accord, e.g.*, *Confederacion de la Raza Unida v. Brown*, 345 F. Supp. 909, 910 (N.D. Cal. 1972). In fact, the Supreme Court has declined to infer "a requirement that the Federal Government conduct a census that is as accurate as possible," explaining that "[t]he Constitution itself provides no real instruction" on what metrics to use to measure "accuracy" in the census. *Wisconsin*, 517 U.S. at 17–18.

Indeed, if Plaintiffs' position were correct, the Supreme Court's decision in *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019)—the citizenship-question case—would have come out much differently. In that case, the state government respondents argued that "the Secretary's decision to add a citizenship question to the 2020 census violated the Enumeration Clause because it would affirmatively undermine the accuracy of the enumeration." Br. for Government Resp'ts in *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), 2019 WL 1468270, at *64. "[T]he addition of a citizenship question," they claimed, "would lead to a differential undercount severe enough to cause several States to lose congressional seats, among other injuries" and "[s]uch loss of representation," they argued, "is precisely the type of injury that the Enumeration Clause was designed to prevent." *Id.* But the Supreme Court did not adopt that position. Although the Court ultimately affirmed the district court's judgment to the respondents on their APA claims, the Court held that the Secretary's decision to include a citizenship question on the census question did *not* violate the Enumeration Clause. *See Department of Commerce v. New York*, 139 S. Ct. at 2566–67.

Plaintiffs advance no allegation that could conceivably implicate the Enumeration Clause, much less violate it. But even assuming that a plaintiff could state an Enumeration Clause claim based

on some vague "chill" of an unknown number of people in unknown areas with an unknown (and possibly inconsequential) impact on the census, "[t]he plausibility requirement demands something more than facts showing that a claim is conceivable." *In re Curran*, 855 F.3d 19, 27 (1st Cir. 2017). Plaintiffs' allegations on this front are entirely conclusory, *see* Compl. ¶¶ 160, 163, making their threadbare claim wholly insufficient to survive a motion to dismiss.

C.    **Plaintiffs Have Failed To State Claims for Violations of 13 U.S.C. § 141 and 2 U.S.C. § 2a (Counts IV & V)**

Plaintiffs claim that implementation of the Presidential Memorandum would violate 13 U.S.C. § 141 and 2 U.S.C. § 2a. Compl. ¶¶ 165–174. Neither statute includes a private right of action and, accordingly, they impliedly preclude private review. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017) ("If the statute does not itself so provide, a private cause of action will not be created through judicial mandate.").

Nor would these claims be cognizable under "the limited circumstances [in] which nonstatutory review is available," *i.e.*, the *ultra vires* doctrine. *R.I. Dep't of Envtl. Mgmt. v. United States*, 304 F.3d 31, 42–43 (1st Cir. 2002). An *ultra vires* claim "is essentially a Hail Mary pass" that "in court as in football . . . rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.). It applies, if at all, only when a government official "acts without any authority whatever." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984). That is, the "agency error [must] be so extreme that one may view it as jurisdictional or nearly so." *Nyunt*, 589 F.3d at 449.

Plaintiffs do not begin to approach this high standard. Plaintiffs wrongly contend that 2 U.S.C. § 2a does not allow "the President to exercise his discretion to redefine which individuals may be counted in the congressional apportionment base," Compl. ¶ 167, and that 13 U.S.C § 141 does not permit the Secretary of Commerce "to transmit to the President any number other than the 'total population by the [sic] States,'" *id.* ¶ 172 (misquoting 13 U.S.C. § 141). Every other census and

apportionment conducted under 13 U.S.C. § 141 and 2 U.S.C. § 2a has been shaped by policy choices made by the Executive under this statutory scheme, and the Memorandum merely reflects another permissible policy choice made by the Executive pursuant to powers delegated by Congress.

Nothing in the statutory language of "total population," 13 U.S.C. § 141(b), or "whole number of persons in each State," 2 U.S.C. § 2a(a), requires counting every person physically present on Census Day, even if they lack "usual residence" in the United States.[12]  As Defendants explained above, illegal aliens are certainly "persons."  But § 2a does not reference only "persons."  Rather, § 2a(a)'s directive that the President's report include "the whole number of persons in each State" (excluding untaxed Indians), 2 U.S.C. § 2a(a), repeats verbatim the Fourteenth Amendment, *see* U.S. Const. amend. XIV, § 2, which in turn modified Article I's Apportionment Clause to end the infamous three-fifths compromise, *see* U.S. Const. art. I, § 2, cl. 3.  And "if a word is obviously transplanted from another legal source," it generally "brings the old soil with it."  *Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018); *see also Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019) ("Congress legislates against the backdrop of existing law.").  And as explained above, *supra* Part II.A.2, that "old soil"—the Apportionment Clause—only supports the exclusion of individuals from apportionment if they do not have a "usual residence" in the United States.  *Franklin*, 505 U.S. at 804.  Had the Congress that enacted § 2a in 1929 meant to mandate that congressional representation be allocated on the basis of aliens who remain in the country in ongoing defiance of federal law, it presumably would have given a clearer indication that it was taking such an important step rather than merely copying into the U.S.

---

[12]    Plaintiffs do not appear to contest that the Executive may lawfully exclude individuals from the enumeration and apportionment if they do not have a "usual residence" in a State.  *See* Compl. ¶ 67 (noting Census Bureau website indicating that citizens of foreign countries who are temporarily visiting the United States on vacation or business on Census Day should not be counted).

Code the constitutional text "persons in each State," which had never been understood to compel such a result.[13]

That is why no apportionment conducted under the Census Act has included literally everyone physically present in the country. *See supra* note 12. Just as the Memorandum does not violate the Constitution merely by contemplating the exclusion of some as-yet-unknown number of illegal aliens for lack of "usual residence," neither does it violate the identical language of § 2a. Indeed, as with every census, the Census Bureau had always planned to exclude some people from the 2020 Census without a "usual residence" in a particular State. *See* Residence Criteria, 83 Fed. Reg. at 5526.

Plaintiffs contend that the President lacks discretion "to redefine which individuals may be counted in the congressional apportionment case" and claim that the President's "role" in this regard "is 'admittedly ministerial in [sic] nature.'" Compl. ¶ 167 (misquoting *Franklin*, 505 U.S. at 799). Plaintiffs are wrong. While the apportionment calculation itself—feeding numbers into a mathematical formula known as the "method of equal proportions"—is "admittedly ministerial," there is nothing "ministerial" about the President's role in obtaining the numbers used in that formula. *Franklin*, 505 U.S. at 799 (explaining that "the admittedly ministerial nature of the apportionment calculation itself does not answer the question [of] whether the apportionment is foreordained by the

---

[13]    Other plaintiffs have argued that § 2a's legislative history compels a different result. But to the extent that such legislative history could overcome the old-soil canon (and it cannot), the 1929 legislative history merely reveals that the 1929 Congress (like the Framers of the Fourteenth Amendment) had rejected amendments to exclude *all* aliens from the apportionment base, and that the Senate's legislative counsel opined that such an exclusion would violate the Fourteenth Amendment. That legislative history, however, does not answer whether the 1929 Congress prohibited the President from excluding *illegal* aliens from the apportionment base. Although aliens who are "permitted to settle and stay in the country," 1 Emmerich de Vattel, The Law of Nations, Ch. 19, § 213 (1760), may well qualify as "inhabitants," that in no way resolves the question here: whether aliens who are *not* permitted to settle, and remain subject to *removal* by the government, nevertheless are "inhabitants" of, with an "enduring tie" to and a "'usual residence'" in, the United States. *Franklin*, 505 U.S. at 804.

time the Secretary gives her report to the President"). To the contrary, *Franklin* confirmed that "§ 2a does *not* curtail the President's authority to direct the Secretary in making policy judgments that result in 'the decennial census.'" *Id.* (emphasis added).[14] And that is exactly what the President has done here: direct the Secretary to report two sets of numbers, of which the President will choose one to plug into the "method of equal proportions." *See* 2 U.S.C. § 2a(a); 85 Fed. Reg. at 44,680.

Reducing the President to a mere calculator cannot be squared with *Franklin*, which expressly contemplates the President's exercise of substantial discretion. "[T]he 'decennial census' still presents a moving target, even *after* the Secretary reports to the President." *Franklin*, 505 U.S. at 797 (emphasis added). "It is not until the President submits the information to Congress that the target stops moving, because only then are the States entitled by § 2a to a particular number of Representatives." *Id.* at 798. And "it is the President's personal transmittal of the report to Congress" that "settles the apportionment" of Representatives, making the President "important to the integrity of the process." *Franklin*, 505 U.S. at 799–800.[15]

---

[14]    Other courts since *Franklin* have likewise understood that § 2a allows the President to perform a significant role beyond the mere "ministerial" calculation leading to reapportionment. *See Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 860 (4th Cir. 2002) (likening an EPA report to the Secretary's § 141(b) report because it "is advisory and does not trigger the mandatory creation of legal rules, rights, or responsibilities," allowing the President "to embrace or disregard" the Secretary's report); *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) (characterizing the Commerce Secretary's report to the President a "moving target" because "the President has statutory discretion to exercise supervisory power over the agency's action"); *Alabama v. Dep't of Commerce*, 396 F. Supp. 3d 1044, 1055 (N.D. Ala. 2019) (noting that in fulfilling his responsibilities under § 2a, "the President is not necessarily bound to follow the Secretary's tabulation").

[15]    In Count IV, Plaintiffs seemingly ask the Court to enjoin the President, *see* Compl. ¶ 169, even though in their prayer for relief, they exclude the President from their injunction request. *See id.* at 52 ¶ 3 (seeking an injunction against "Agency Defendants"); *id.* ¶ 7 (excluding the President from the definition of "Agency Defendants"). In all events, "[w]ith regard to the President, courts do not have jurisdiction to enjoin him." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citing *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866)).

Plaintiffs also claim that the Department of Commerce and Secretary Ross would violate 13 U.S.C. § 141(b) by "transmit[ting] to the President any number other than the 'total population by the [sic] States." Compl. ¶ 172 (misquoting 13 U.S.C. § 141(b)). Not so, for two reasons.

*First*, Article II empowers the President to supervise the conduct of subordinate officials like the Secretary, *see* U.S. Const., art. 2, § 1, and the Opinions Clause further empowers the President to "require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices," *id.*, art. 2, § 2, cl. 1. Even Justice Stevens in *Franklin* acknowledged that § 2a "does not purport to limit the President's 'accustomed supervisory powers' over the Secretary of Commerce." 505 U.S. at 813 n.11 (Stevens, J., concurring in the judgment). So Plaintiffs cannot preclude the President from obtaining information from the Secretary, nor the Secretary from providing it.

*Second*, as explained above, *Franklin* confirmed that the President may instruct the Secretary to "reform the census," including by changing the data considered when enumerating individuals. 505 U.S. at 797–98. That is, there is nothing illegal about the Secretary transmitting two tabulations *seriatim*. The Memorandum simply streamlines that process by requesting two tabulations simultaneously.

Put simply, Plaintiffs cannot manufacture an *ultra vires* claim detached from the Apportionment Clause. By delegation of the Census Act, the Executive stands in the shoes of Congress and may properly exclude individuals from apportionment for lack of "usual residence"— just as he has done in every other apportionment calculated under the Census Act.

### D.    Plaintiffs Have Failed To State an Equal Protection Claim for Invidious Discrimination (Count VI)

Plaintiffs allege that the Presidential Memorandum was "motivated by racial animus towards immigrants of color, non-US citizens, foreign-born individuals, and undocumented individuals." Compl. ¶ 177. To make this claim, however, Plaintiffs inaccurately conflate the Memorandum's facially neutral distinction between lawful and unlawful aliens with racial- or ethnicity-based disparate

44

treatment.  Shorn of this faulty pleading device, Plaintiffs fail to allege the unlawful "animus" or "racially discriminatory intent" required to plead an equal protection violation.  *See DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) (plurality opinion) ("*Regents*") ("To plead animus, a plaintiff must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision.").

There can be no dispute that the Memorandum is facially neutral with respect to race, ethnicity, and national origin.  To the extent that it makes any distinction between persons, the Presidential Memorandum is focused on the distinction between illegal aliens and citizens and other lawful residents.  *See* 85 Fed. Reg. at 44,680.  As the Supreme Court has recognized, relying on this distinction does not require heightened scrutiny for equal protection purposes because non-citizens—much less illegal aliens—do not constitute a protected class.  *See, e.g.*, *Mathews v. Diaz*, 426 U.S. 67 (1976) (limitation on eligibility for a federal medical insurance program to citizens and long-term permanent residents did not violate Equal Protection Clause); *see also, e.g.*, *Lewis v. Thompson*, 252 F.3d 567, 583-84 (2d Cir. 2001) (upholding Welfare Reform Act's denial of prenatal care coverage to unqualified noncitizens against Equal Protection challenge); *Bluman v. FEC*, 800 F. Supp. 2d 281, 287 (D.D.C. 2011) (Kavanaugh, J.) (three-judge court) ("[T]he Supreme Court has drawn a fairly clear line:  The government may exclude foreign citizens from activities intimately related to the process of democratic self-government."), *aff'd*, 565 U.S. 1104 (2012).  As the Presidential Memorandum does not target a protected class, Plaintiffs are left with only conclusory allegations of animus, *see, e.g.*, Compl. ¶¶ 99, 102, 106, 120, which are not sufficient to state an equal protection claim.

To the extent Plaintiffs argue that the Presidential Memorandum imposes a disproportionate burden on members of certain racial, ethnic or national-origin groups, any such argument is foreclosed by the Supreme Court's recent *Regents* decision.  As the Court recognized there, if the fact that an immigration policy would have "an outsized" impact on "Latinos" "because [they] make up a large

share of the unauthorized alien population" by itself "[w]ere sufficient to state a claim," then "virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Regents*, 140 S. Ct. at 1916 (plurality opinion). Rather, an allegation of disproportionate burden on a specific racial or ethnic group is, in this context, inadequate to "establish[] a plausible equal protection claim." *Id.* at 1915 (plurality opinion).

Further, to the extent that Plaintiffs seek to base their equal protection claim on purported links between the Presidential Memorandum, the Commerce Secretary's decision to add a citizenship question to the 2020 Census, and the Department of Homeland Security's promulgation of the public-charge rule, *see* Compl. ¶¶ 101–123, such a claim is implausible because these three actions involve separate decisions made by different decision-makers that are distinct in timing and implementation. In any event, the citizenship-question plaintiffs "failed to prove, by a preponderance of the evidence, that a discriminatory purpose motivated Defendants' decision to reinstate the citizenship question on the 2020 census questionnaire." *New York v. Dep't of Commerce*, 351 F. Supp. 3d 502, 671 (S.D.N.Y. 2019), *aff'd in part, rev'd in part and remanded*, 139 S. Ct. 2551 (2019); *see also id.* at 670 ("Plaintiffs failed to prove a sufficient nexus between President Trump and Secretary Ross's decision to make the President's statements or policies relevant to the equal protection analysis.").

Plaintiffs do not allege that Defendants made any discriminatory statements. Plaintiffs reference certain alleged statements by Thomas Hofeller, a political strategist. *E.g.*, Compl. ¶ 107. But because the President is the only decision-maker with respect to issuance of the Presidential Memorandum, statements of other individuals, such as Mr. Hofeller, are immaterial. *See Regents*, 140 S. Ct. at 1916 (plurality opinion) (statements by non-decisionmakers "remote in time and made in unrelated contexts" are "unilluminating").

The Presidential Memorandum expressly states that the policy's purpose is to promote "the principles of representative democracy underpinning our system of Government." 85 Fed. Reg. at

44,680.  Plaintiffs have failed to plausibly allege that, notwithstanding this permissible purpose,  the Memorandum is merely a pretext for a "real reason" to discriminate against Hispanics, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993), or that it was motivated by such animus, *Pers. Admin. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).  Accordingly, Plaintiffs' equal protection claim should be dismissed.

### E.    Plaintiffs Have Failed to State a Claim under 42 U.S.C. § 1985(3)

Plaintiffs assert that the Defendants have conspired to violate the civil rights "of immigrants of color, non-US citizens, foreign-born individuals, and undocumented individuals" in violation of 42 U.S.C. § 1985(3).  Compl. ¶¶ 179–182.  Their § 1985(3) claim must be dismissed for several independent reasons.

*First*, § 1985(3) "confers a private right of action for injuries occasioned when 'two or more *persons* . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . .'" *Aulson v. Blanchard*, 83 F.3d 1, 3 n.2 (1st Cir. 1996) (emphasis added) (quoting 42 U.S.C. § 1985(3)).  But Plaintiffs have not sued any "persons."  Rather, the Defendants in this action are all federal agencies.  Indeed, President Trump, Secretary Ross, and Director Dillingham are all sued in their *official* capacities, *see* Compl. ¶¶ 47, 49 & 51, and "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity" "of which [the] officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).  "It is *not* a suit against the official personally, for the real party in interest is the entity." *Id.* at 166.  And the Supreme Court has further made clear that "[i]n the absence of an express statutory definition, the Court applies a longstanding interpretive presumption that 'person' does not include the sovereign, and thus excludes a federal agency." *Return Mail, Inc. v. U.S. Postal Serv.*, 139 S. Ct. 1853, 1861–62 (2019).  For these reasons, Plaintiffs' § 1985(3) claim must be dismissed. *See, e.g., Smith v. Arkansas*, No. 3:16–CV–00025, 2016 WL 8715581, at *3 (E.D. Ark. Feb. 19, 2016) ("§ 1985(3) imposes liability upon a 'person,' and a federal agency is not a 'person'

within the meaning of these provisions."); *Cobb v. U.S. Dep't of Educ. Office for Civil Rights*, 487 F. Supp. 2d 1049, 1056 (D. Minn. 2007) ("Section 1985(3) does not confer liability on a federal agency because the United States is not a 'person' within the meaning of § 1985(3).").

*Second*, § 1985 only authorizes courts to award damages, not the injunctive relief Plaintiffs seek here. *See* Compl. at 52 (prayer for relief). By its terms, § 1985(3) provides only that a plaintiff "may have an action *for the recovery of damages* . . . against any one or more of the conspirators." 42 U.S.C. § 1985(3) (emphasis added). The statute says nothing about injunctive relief. In stark contrast, § 1985(3)'s companion provision, also enacted as part of the Ku Klux Klan Act of 1871, authorizes "action[s] at law, *suit[s] in equity*, or other proper proceeding[s] for redress." *Id.* § 1983 (emphasis added). As this comparison reveals, Congress both considered and authorized differing remedies under two statutory provisions of the same act: a violation of § 1983 may incur damages or injunction relief, while a violation of § 1985(3) can incur only damages. And "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). The Court should therefore conclude that "the statutory relief available under § 1985 'is limited to the recovery of damages'" and that, in requesting only injunctive relief, Plaintiffs' claim fails. *Tufano v. One Toms Point Lane Corp.*, 64 F. Supp. 2d 119, 133 (E.D.N.Y. 1999) (quoting *Cuban v. Kapoor Bros., Inc.*, 653 F. Supp. 1025, 1033 (E.D.N.Y. 1986), *aff'd*, 229 F.3d 1136 (2d Cir. 2000)).[16]

---

[16]    Neither the Supreme Court nor the First Circuit have decided whether § 1985(3) authorizes injunctive relief. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 285 n.16 (1993). To be sure, two other circuits have indicated that injunctive relief is available under § 1985(3). *See Action v. Gannon*, 450 F.2d 1227, 1237–38 (8th Cir. 1971) (en banc); *Mizell v. N. Broward Hosp. Dist.*, 427 F.2d 468, 473 (5th Cir. 1970). Neither case is persuasive. *Action* simply relied on *Mizell*. And *Mizell* relied on dicta in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 414 (1968), and on *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 238–40 (1969), both of which interpreted a statute (42 U.S.C. § 1982) that—unlike § 1985(3)—confers substantive rights without specifying a remedy. By contrast, § 1985(3) is solely

*Third*, Plaintiffs' § 1985(3) claim also fails because it is barred by sovereign immunity. Sovereign immunity prohibits cases against the federal government unless Congress has unequivocally consented to suit. *United States v. Testan*, 424 U.S. 392, 399 (1976). Sovereign immunity is not limited to cases naming the United States as a defendant; it also bars cases against federal officials in their official capacities because the relief requested would run against the federal government. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949). Civil rights statutes like 42 U.S.C. § 1985(3) do not waive the federal government's sovereign immunity. *Unimex, Inc. v. Dep't of Housing & Urban Dev.*, 594 F.2d 1060, 1061 (5th Cir. 1979) (per curiam). Sovereign immunity thus "bars []§ 1985(3) . . . suits brought against the United States and its officers acting in their official capacity." *Davis v. U.S. Dep't of Justice*, 204 F.3d 723, 726 (7th Cir. 2000); *accord Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282, 286 (5th Cir. 1999).

While a § 1985(3) suit against federal officers in their *individual capacities* might be permissible if Plaintiffs alleged that the officers acted beyond their statutory powers and that the powers themselves, or their exercise, were constitutionally void, *see Dugan v. Rank*, 372 U.S. 609, 621 (1963), Plaintiffs have sued Defendants only in their official capacities. Compl. ¶¶ 47, 49 & 51. So their § 1985(3) claim is barred by sovereign immunity.

*Finally*, even if Plaintiffs' § 1985(3) claim were viable, their allegations are entirely conclusory and fail to state a claim. "To state a claim under § 1985(3) a plaintiff must allege the existence of (1) a conspiracy, (2) a conspiratorial purpose to deprive a person or class of persons, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an overt act in furtherance of the conspiracy, and (4) either (a) an injury to person or property, or (b) a deprivation of a constitutionally protected right or privilege." *Aulson*, 83 F.3d at 3. And the Supreme

---

remedial, see *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 833 (1983), and that remedy is limited to damages.

Court has "effectively add[ed] a fifth requirement": that "a plaintiff may recover thereunder only when the conspiratorial conduct of which he complains is propelled by some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Id.* Plaintiffs are required to plead a § 1985(3) "with sufficient particularity." *Moreno-Perez v. Toledo-Davila*, 764 F. Supp. 2d 351, 358 (D.P.R. 2011) (quoting, *inter alia*, *Francis-Sobel v. Univ. of Me.*, 597 F.2d 15, 17 (1st Cir. 1979)); *see also, e.g.*, *Johnson v. Perdue*, 862 F.3d 712, 717–18 (8th Cir. 2017) ("To state a claim for conspiracy under 42 U.S.C. § 1985(3), the plaintiff must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement.").

Plaintiffs' allegations fail at every step. First, even assuming that the intracorporate exception to conspiracy does not apply to § 1985(3) claims, *cf. Stathos v. Bowden*, 728 F.2d 15, 20–21 (1st Cir. 1984) (leaving that question open), at most, Plaintiffs allege that Secretary Ross attempted to add a citizenship question to the 2020 census questionnaire, *see* Compl. ¶¶ 103–104; President Trump signed an executive order to collect information on citizenship, *see id.* ¶ 112; and President Trump issued the Memorandum at issue in this litigation. Plaintiffs may disagree with President Trump's and Secretary Ross's policy judgments, but taking executive action hardly amounts to a civil-rights conspiracy. Second, Plaintiffs have not alleged any racially discriminatory, conspiratorial purpose to deprive Plaintiffs of equal protection rights. Indeed, Plaintiffs have not even stated an equal-protection claim. *See supra* Part II.D. And finally, Plaintiffs have not alleged any overt act that has injured them. As explained above, *see supra* Part I.A, the issuance of the Memorandum has not caused any injury to Plaintiffs whatsoever.

## CONCLUSION

For the foregoing reasons this action should be dismissed for lack of subject-matter jurisdiction or, in the alternative, because Plaintiffs fail to state a single claim.

DATED:  October 7, 2020                        Respectfully submitted,


                                               JEFFREY BOSSERT CLARK
                                               Acting Assistant Attorney General

                                               JOHN V. COGHLAN
                                               Deputy Assistant Attorney General

                                               ALEXANDER K. HAAS
                                               Branch Director

                                               DIANE KELLEHER
                                               BRAD P. ROSENBERG
                                               Assistant Branch Directors

                                               /s/ Elliott M. Davis
                                               ELLIOTT M. DAVIS
                                               Trial Attorney
                                               Civil Division, Federal Programs Branch
                                               U.S. Department of Justice
                                               1100 L St. NW
                                               Washington, DC  20005
                                               Phone:    (202) 353-5639
                                               Fax:       (202) 616-8470
                                               E-mail:   elliott.m.davis@usdoj.gov

                                               *Counsel for Defendants*