**No.**

# In the Supreme Court of the United States

————————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL., APPELLANTS

*v.*

STATE OF NEW YORK, ET AL.

————————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK*

————————

**JURISDICTIONAL STATEMENT**

————————

JEFFREY B. WALL
  *Acting Solicitor General*
  *Counsel of Record*
JEFFREY BOSSERT CLARK
  *Acting Assistant Attorney*
  *General*
HASHIM M. MOOPPAN
  *Counselor to the Solicitor*
  *General*
SOPAN JOSHI
  *Senior Counsel to the*
  *Assistant Attorney General*
NICOLE FRAZER REAVES
BRINTON LUCAS
  *Assistants to the Solicitor*
  *General*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## QUESTIONS PRESENTED

Congress has provided that, for purposes of apportioning seats in the House of Representatives, the President shall prepare "a statement showing the whole number of persons in each State  * * *  as ascertained under the  * * *  decennial census of the population." 2 U.S.C. 2a(a).  It has further provided that the Secretary of Commerce shall take the decennial census "in such form and content as he may determine," 13 U.S.C. 141(a), and shall tabulate the results in a report to the President, 13 U.S.C. 141(b).  The President has issued a Memorandum instructing the Secretary to include within that report information enabling the President to implement a policy decision to exclude illegal aliens from the base population number for apportionment "to the maximum extent feasible and consistent with the discretion delegated to the executive branch." 85 Fed. Reg. 44,679, 44,680 (July 23, 2020).  At the behest of plaintiffs urging that the exclusion of illegal aliens would unconstitutionally alter the apportionment and chill some persons from participating in the census, a three-judge district court declared the Memorandum unlawful and enjoined the Secretary from including the information in his report.  The questions presented are:

1. Whether the relief entered satisfies the requirements of Article III of the Constitution.

2. Whether the Memorandum is a permissible exercise of the President's discretion under the provisions of law governing congressional apportionment.

(I)

## PARTIES TO THE PROCEEDING

Appellants (defendants in the district court) are Donald J. Trump, in his official capacity as President of the United States; the United States Department of Commerce; Wilbur L. Ross, Jr, in his official capacity as Secretary of Commerce; the United States Census Bureau, an agency within the United States Department of Commerce; and Steven Dillingham, in his official capacity as Director of the United States Census Bureau.

Appellees are the State of New York; the State of Colorado; the State of Connecticut; the State of Delaware; the District of Columbia; the State of Hawaii; the State of Illinois; the State of Maryland; the Commonwealth of Massachusetts; the State of Michigan; the State of Minnesota; the State of Nevada; the State of New Jersey; the State of New Mexico; the State of North Carolina; the State of Oregon; the Commonwealth of Pennsylvania; the State of Rhode Island; the State of Vermont; the Commonwealth of Virginia; the State of Washington; the State of Maine; the State of Wisconsin; the City of Central Falls; the City of Chicago; the City of Columbus; the City of New York; the City of Philadelphia; the City of Phoenix; the City of Pittsburg; the City of Providence; the City and County of San Francisco; the City of Seattle; the County of Cameron; the County of El Paso; the County of Hidalgo; the County of Monterey; Howard County; and the United States Conference of Mayors (collectively, plaintiffs in the district court in No. 18-cv-5770).

Appellees also include the New York Immigration Coalition; CASA; the American-Arab Anti-Discrimination Committee; ADC Research Institute; Make the Road New York, Casa; FIEL Houston, Inc.; and AHRI for Justice (collectively, plaintiffs in the district court in No. 20-cv-5781).

(II)

**RELATED PROCEEDINGS**

United States District Court (S.D.N.Y.) (three-judge district court):

> *State of New York* v. *Trump*, No. 18-cv-5770 (Sept. 10, 2020)

> *The New York Immigration Coalition* v. *Trump*, No. 20-cv-5781 (Sept. 10, 2020)

United States Court of Appeals (2d Cir.):

> *State of New York* v. *Trump*, No. 20-2630 (Aug. 10, 2020) (assigning three-judge district court)

> *State of New York* v. *Trump*, No. 20-3142 (notice of appeal filed Sept. 16, 2020)

(III)

## TABLE OF CONTENTS

Page

Opinions below .......................................................................... 1
Jurisdiction ............................................................................... 1
Constitutional and statutory provisions involved ..................... 2
Statement .................................................................................. 2
Reasons for noting probable jurisdiction ................................. 8
   I.   Appellees fail to satisfy Article III's requirements ... 12
   II.  The Presidential Memorandum does not violate
       federal statutes governing the census and
       apportionment ................................................................. 18
       A.  The district court's holding that the
           Memorandum requires using information
           that is not based on the census contravenes
           the statutory framework, longstanding
           practice, and this Court's decisions ....................... 18
       B.  The district court's holding that the President
           lacks any discretion to exclude illegal aliens
           from the apportionment base conflicts with
           text, history, and precedent ................................... 23
Conclusion ............................................................................. 34
Appendix A — District court opinion and order
               (Sept. 10, 2020) ............................................ 1a
Appendix B — District court final judgment and
               permanent injunction (Sept. 10, 2020) .. 105a
Appendix C — District court notice of appeal
               (Sept. 18, 2020) ........................................ 108a
Appendix D — Court of appeals designation of the
               three-judge panel pursuant to
               28 U.S.C. § 2284(b) (Aug. 10, 2020) ........ 110a
Appendix E — District court request to the chief judge
               of the U.S. court of appeals for the
               Second Circuit for appointment of a
               three-judge panel pursuant to 28 U.S.C.
               § [2284](b) (Aug. 7, 2020) ....................... 112a
Appendix F — Constitutional and statutory provisions .... 117a

(V)

VI

## TABLE OF AUTHORITIES

Cases:                                                   Page

*Arizonans for Official English* v. *Arizona,*
   520 U.S. 43 (1997) ............................................................. 12

*Bas* v. *Steele*, 2 F. Cas. 988 (C.C.D. Pa. 1818).................... 27

*Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398 (2013).... 16, 17

*Department of Commerce* v. *New York,*
   139 S. Ct. 2551 (2019) .................................................. 11, 17

*Department of Homeland Sec.* v. *Thuraissigiam,*
   140 S. Ct. 1959 (2020) ................................................... 29

*Franchise Tax Bd.* v. *Hyatt*, 139 S. Ct. 1485 (2019) .......... 27

*Franklin* v. *Massachusetts*, 505 U.S. 788 (1992)....... *passim*

*Genesis Healthcare Corp.* v. *Symczyk,*
   569 U.S. 66 (2013) ............................................................. 14

*Hall* v. *Hall*, 138 S. Ct. 1118 (2018)................................ 24, 32

*Kaplan* v. *Tod*, 267 U.S. 228 (1925)................................ 30, 31

*Lujan* v. *Defenders of Wildlife*, 504 U.S. 555 (1992).... 12, 16

*New York* v. *United States Dep't of Commerce,*
   351 F. Supp. 3d 502 (S.D.N.Y.), aff'd in part,
   rev'd in part, and remanded, 139 S. Ct. 2551 (2019).... 4, 21

*O'Shea* v. *Littleton*, 414 U.S. 488 (1974) ............................ 14

*Reno* v. *Flores*, 507 U.S. 292 (1993) .................................... 30

*Steel Co.* v. *Citizens for a Better Env't,*
   523 U.S. 83 (1998) ............................................................. 15

*Susan B. Anthony List* v. *Driehaus*, 573 U.S. 149
   (2014)................................................................................. 12

*The Venus*, 12 U.S. (8 Cranch) 253 (1814)........................... 28

*United States* v. *Munsingwear, Inc.*, 340 U.S. 36
   (1950) ................................................................................ 15

*United States Dep't of Commerce* v. *Montana,*
   503 U.S. 442 (1992)............................................................ 18

VII

Cases—Continued:                                            Page

*United States Steel Corp.* v. *Multistate Tax Comm'n,*
  434 U.S. 452 (1978).......................................................27, 28
*Utah* v. *Evans*, 536 U.S. 452 (2002)..........................18, 22, 25
*Warth* v. *Seldin*, 422 U.S. 490 (1975)...................................12
*Wisconsin* v. *City of New York*, 517 U.S. 1 (1996)... 18, 19, 20

Constitution and statutes:

  U.S. Const.:
    Art. I, § 2, Cl. 3
      (Apportionment Clause) ............................2, 7, 24, 25
    Art. III................................................................ *passim*
    Amend. XIV .................................................7, 24, 25, 32
      § 2 ....................................................................2, 24, 25, 28
  Act of Mar. 1, 1790, § 1, 1 Stat. 101 .....................................25
  Act of May 6, 1870, ch. 87, 16 Stat. 118..............................25
  Act of May 23, 1850, ch. 11, 9 Stat. 428................................25
  2 U.S.C. 2a......................................................................7, 8, 119a
  2 U.S.C. 2a(a) .....................................................*passim*, 119a
  13 U.S.C. 141 ....................................................................... 7
  13 U.S.C. 141(a) ................................................2, 19, 23, 121a
  13 U.S.C. 141(b) .............................................................3, 121a
  28 U.S.C. 2284(b) ..................................................................5

Miscellaneous:

  Cong. Globe, 39th Cong., 1st Sess.:
    (1865) ................................................................................32
    (1866) ................................................................................25
  Exec. Order No. 13,880, 84 Fed. Reg. 33,821
    (July 16, 2019) .....................................................................5
  Timothy Farrar, *Manual of the Constitution of the
    United States of America* (1867).......................................24

VIII

Miscellaneous—Continued:                                          Page

83 Fed. Reg. 5525 (Feb. 8, 2018) ............................................. 3

85 Fed. Reg. 44,679 (July 23, 2020) ............................ 4, 5, 29

Samuel Johnson, *A Dictionary of the English
  Language* (6th ed. 1785):

  Vol. 1 ................................................................................ 31

  Vol. 2 ................................................................................ 31

Letter from John Adams to M. Dumas (Nov. 3, 1784),
  *reprinted in* 8 John Adams & Charles Francis
  Adams, *The Works of John Adams, Second
  President of the United States* (1853) ............................ 26

*Merriam-Webster's Collegiate Dictionary*
  (10th ed. 1997) ................................................................ 28

*The Federalist* (Jacob E. Cooke ed., 1961)
  (James Madison):

  *No. 42* .............................................................................. 28

  *No. 54* .............................................................................. 25

  *No. 56* .............................................................................. 25

  *No. 58* .............................................................................. 25

2 *The Records of the Federal Convention of 1787*
  (Max Farrand ed., 1911) ............................................ 24, 26

The White House, *Statement from the Press Secre-
  tary* (Sept. 18, 2020), https://go.usa.gov/xGQh2 .............. 16

U.S. Census Bureau, U.S. Dep't of Commerce:

  *2020 Census Detailed Operational Plan for:  20.
    Federally Affiliated Count Overseas Opera-
    tion (FACO)* (May 28, 2019),
    https://go.usa.gov/xGR2r ........................................ 21

  Press Release, *Statement from U.S. Census Bu-
    reau Director Steven Dillingham:  Delivering
    a Complete and Accurate 2020 Census Count*
    (Aug. 3, 2020), https://go.usa.gov/xGR2C ................ 4

IX

Miscellaneous—Continued:                                    Page

U.S. Immigration & Customs Enforcement, *Fiscal
    Year 2019 Enforcement and Removal Operations
    Report* (2019), https://go.usa.gov/xG8vT. ........................ 29

1 Emmerich de Vattel, *The Law of Nations* (1760) ..... 27, 32

1 Noah Webster, *An American Dictionary of the
    English Language* (1828)............................................. 26, 30

*Webster's New International Dictionary of the
    English Language* (2d ed. 1942) ...................................... 31

# In the Supreme Court of the United States

———————

No.

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL., APPELLANTS

*v.*

STATE OF NEW YORK, ET AL.

———————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK*

———————

**JURISDICTIONAL STATEMENT**

———————

The Acting Solicitor General, on behalf of President Donald J. Trump, et al., respectfully requests that the Court note probable jurisdiction or summarily reverse the judgment of the three-judge panel of the United States District Court for the Southern District of New York.

**OPINIONS BELOW**

The opinion of the three-judge district court (App., *infra*, 1a-104a) is not yet reported but is available at 2020 WL 5422959.

**JURISDICTION**

Under 28 U.S.C. 2284, a three-judge district court was required to be convened because appellees' suit challenged on constitutional (and other) grounds the President's determination concerning standards for including individuals in the apportionment base for reapportioning congressional districts. See App., *infra*,

(1)

2

112a-114a; D. Ct. Doc. 34, at 39-41 (Aug. 3, 2020), D. Ct. Doc. 62, at 64-67, 72-80 (Aug. 6, 2020).[1]  The judgment of the three-judge district court, which included a permanent injunction, was entered on September 10, 2020. App., *infra*, 105a-107a.  The government filed notices of appeal on September 18, 2020.  The jurisdiction of this Court is invoked under 28 U.S.C. 1253.  See *Dothard* v. *Rawlinson*, 433 U.S. 321, 324 n.5 (1977); *White* v. *Regester*, 412 U.S. 755, 760-761 (1973).

### CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Pertinent constitutional and statutory provisions are reproduced in the appendix to this pleading.  App., *infra*, 117a-121a.

### STATEMENT

1. The Constitution provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State."  U.S. Const. Amend. XIV, § 2.  To make apportionment possible, the Constitution requires the federal government to conduct an "actual Enumeration" every ten years in "such manner as" directed by Congress.  Art. I, § 2, Cl. 3.

Congress, in turn, has directed the Secretary of Commerce to conduct "a decennial census of population * * * in such form and content as he may determine." 13 U.S.C. 141(a).  Following completion of the 2020 census, by December 31, 2020, the Secretary must submit to the President "[t]he tabulation of total population by States * * * as required for the apportionment of Representatives in Congress among the several States."

---

[1]  All citations of district court documents are to those filed in No. 18-cv-5770.

3

13 U.S.C. 141(b) (the Secretary's report or the report). By January 10, 2021, the President must "transmit to the Congress a statement showing the whole number of persons in each State  * * *  as ascertained under the * * * decennial census of the population, and the number of Representatives to which each State would be entitled  * * *  by the method known as the method of equal proportions."  2 U.S.C. 2a(a).

While the President's role in applying the equal-proportions calculation to the apportionment population base is ministerial, his role in determining the population base itself is not.  As this Court has recognized, "§ 2a does not curtail the President's authority to direct the Secretary in making policy judgments that result in 'the decennial census.'"  *Franklin* v. *Massachusetts*, 505 U.S. 788, 799 (1992).  Notably, one such "judgment" is whether a person should be deemed an "'inhabitant'" or "'usual resident'" of a State, which is "the gloss" that has historically been given to the constitutional and statutory phrase "persons 'in' each State."  *Id.* at 803-804, 806 (brackets and citations omitted).

The Census Bureau has promulgated criteria to enumerate most people for decennial census purposes "at their usual residence," which it defines as "the place where they live and sleep most of the time."  83 Fed. Reg. 5525, 5533 (Feb. 8, 2018) (Residence Criteria). "Citizens of foreign countries living in the United States" are "[c]ounted at the U.S. residence where they live and sleep most of the time."  *Ibid.* (emphasis omitted).  Foreign citizens visiting the United States (such as individuals on a vacation or business trip) are not counted under the Residence Criteria.  *Ibid.*  For the 2020 census, individuals are being enumerated through (1) census-questionnaire responses online, by mail, or

4

by phone; (2) in-person visits by enumerators; (3) proxy responses given by individuals such as a neighbor or landlord; (4) high-quality administrative records from other federal agencies; and (5) potentially, imputed data from the same area (used as a last resort to fill data gaps). *New York* v. *United States Dep't of Commerce*, 351 F. Supp. 3d 502, 521 (S.D.N.Y.), aff'd in part, rev'd in part, and remanded, 139 S. Ct. 2551 (2019).

Although field operations for the 2020 census were originally scheduled to end on July 31, 2020, the Census Bureau has extended field data collection through September 30, 2020, due to the COVID-19 pandemic. See Press Release, U.S. Census Bureau, U.S. Dep't of Commerce, *Statement from U.S. Census Bureau Director Steven Dillingham: Delivering a Complete and Accurate 2020 Census Count* (Aug. 3, 2020), https://go.usa.gov/xGR2C (Dillingham Statement). The Census Bureau "intends to meet a similar level of household responses as collected in prior censuses, including outreach to hard-to-count communities." *Ibid.* In separate litigation, there are plaintiffs seeking to prevent the Census Bureau from winding down its field operations until October 31, 2020. See, *e.g.*, *National Urban League* v. *Ross*, No. 20-cv-5799 (N.D. Cal.).

2. On July 21, 2020, the President issued a Memorandum to the Secretary of Commerce regarding the exclusion of illegal aliens from the apportionment population base determined under the 2020 census. 85 Fed. Reg. 44,679 (July 23, 2020). The Memorandum states that "it is the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act, as amended, to the maximum extent feasible

5

and consistent with the discretion delegated to the executive branch." *Id.* at 44,680 (citation omitted). The Memorandum directs the Secretary to submit to the President two tabulations in the Secretary's report. One is an enumeration "tabulated according to the methodology set forth in" the Residence Criteria. *Ibid.* The second consists of "information permitting the President, to the extent practicable," to carry out the stated policy of excluding illegal aliens from the apportionment "to the maximum extent of the President's discretion under the law." *Ibid.*

The Census Bureau is still evaluating the extent to which, as a practical matter, administrative records pertaining to immigration status can be used to identify and exclude illegal aliens from the apportionment population count, see Exec. Order No. 13,880, 84 Fed. Reg. 33,821 (July 16, 2019), and is currently formulating a methodology for potentially accomplishing that, see Dillingham Statement ("A team of experts [is] examining methodologies and options to be employed for this purpose. The collection and use of pertinent administrative data continues.").

3. On July 24, 2020, appellees—a group of States and localities and a separate group of non-profit organizations—filed complaints challenging the Memorandum on various constitutional and statutory bases; the district court consolidated the cases. See App., *infra*, 4a, 20a-21a. At appellees' request, a three-judge district court was convened pursuant to 28 U.S.C. 2284(b). See App., *infra*, 21a, 110a-111a.

4. On September 10, 2020, the district court granted partial summary judgment to appellees, held that the Memorandum violates federal law, and entered declaratory and injunctive relief. App., *infra*, 1a-104a.

6

a. The district court began by holding that appellees satisfied Article III's requirements to seek relief. App., *infra*, 24a-68a. Although the district court thought that appellees' first theory of harm from the Memorandum —based on a hypothetical future change to apportionment —was likely too speculative, it held that appellees had standing based on their second theory of harm: that the Memorandum would "chill" participation in the census. *Id.* at 38a. The court concluded that "in the wake of the Presidential Memorandum, some number of people will not participate in, and thus not be counted in, the census" because (1) various individuals are afraid of providing the federal government with information about their citizenship status and (2) illegal aliens may see no reason to participate if they think they ultimately may not be counted. *Id.* at 47a; see *id.* at 30a-35a. The court determined that this "chilling effect" would harm the State and local government appellees by degrading census data used for apportioning certain federal funds and for other purposes, and was harming the non-profit organizations because they were diverting resources to correct misunderstandings regarding the Memorandum. *Id.* at 47a-59a. The court further held that those injuries were fairly traceable to the Memorandum, rejecting the government's argument that the causal link was based on disinformation about the Memorandum and general fear among immigrant communities. *Id.* at 59a-63a.

The district court then concluded that a judgment in appellees' favor would redress their harm by "reduc[ing] to some extent their risk of suffering injuries relating to the census." App., *infra*, 65a (internal quotation marks omitted). The court so held notwithstanding that any person purportedly chilled by the Memorandum from responding to the census would not and

7

could not know whether the court's judgment prohibiting the Secretary from complying with the Memorandum would be reversed on appeal after the census response period closed but before the Secretary actually sent his report to the President. *Id.* at 67a-68a.

b. Turning to the merits, the district court held that the Memorandum violates 2 U.S.C. 2a and 13 U.S.C. 141 by purportedly calling for an apportionment that is not "based on the results of the census alone." App., *infra*, 74a (capitalization and emphasis omitted). The court read those statutes as requiring that the Secretary "report a single set of numbers"—one tabulation of the total population of each State—based on "the data from the decennial census," and that "once the final decennial census data is in hand, the President's role is purely ministerial." *Id.* at 75a (citations and internal quotation marks omitted). In the court's view, the Memorandum violates those requirements because the second requested tabulation "will necessarily be derived from something other than the census itself, as the 2020 census is not gathering information concerning citizenship or immigration status." *Id.* at 78a. The court so held notwithstanding that the Census Bureau has long used administrative records, with this Court's blessing, as part of the decennial census. *Id.* at 81a n.15.

The district court also held that the Memorandum violates 2 U.S.C. 2a(a) by purportedly "defining 'the whole number of persons in each State' to categorically exclude illegal aliens residing in each State." App., *infra*, 83a. The court recognized that this statutory phrase is identical to the terms of the Fourteenth Amendment, which in turn echoes language in Article I's Apportionment Clause, but it declined to examine the history of

8

those constitutional provisions to determine the meaning of their terms at the times they were adopted. *Id.* at 87a. The court instead looked to what it perceived to be legislators' "*understanding* of the constitutional language" in 1929, when Congress adopted 2 U.S.C. 2a. App., *infra*, 87a. Relying largely on legislative history concerning proposals to exclude *all* aliens from the apportionment base, the court concluded that the President lacks "discretion to exclude illegal aliens on the basis of their legal status, without regard for their residency." *Id.* at 92a; see *id.* at 87a-90a.

c. The district court determined that, because the Memorandum violates federal law, the President's actions were *ultra vires* and appellees are entitled to summary judgment. App., *infra*, 93a-94a. Finding the permanent-injunction factors satisfied, *id.* at 94a-100a, the court enjoined all defendants other than the President "from including in the Secretary's report to the President * * * any information concerning the number of aliens in each State 'who are not in a lawful immigration status,'" *id.* at 99a (citation omitted). The court also entered a declaratory judgment stating that the Memorandum is unlawful. *Id.* at 100a-102a.

## REASONS FOR NOTING PROBABLE JURISDICTION

The district court erred in holding that appellees satisfy Article III's requirements and that the Memorandum violates federal law. Its decision contravenes the relevant statutes, this Court's decisions, and historical practice. If not promptly corrected, the decision will harm the ability of the Secretary of Commerce to provide a complete report to the President by the December 31, 2020, statutory deadline. This Court should note probable jurisdiction or summarily reverse.

9

The district court erred at the outset in holding that the relief awarded will likely redress a cognizable Article III injury to appellees that is fairly traceable to the Memorandum. There is a fundamental mismatch between the court's award of *relief in the future* (prohibiting the Secretary from including information in his report to the President) and a *speculative present injury* (the Memorandum's alleged "chilling effect" on participation in the census). Most important, and as the court appeared to recognize (App., *infra*, 46a-47a), even assuming that the Memorandum is chilling participation in the census, that alleged injury will no longer exist once field data collection ends (currently scheduled for September 30); the judgment thus will be moot before it ever actually takes effect to constrain the Secretary's December 31 report. That alone is sufficient basis to vacate the judgment, at least once field data collection ends.

That defect underscores why the relief is not likely to redress the asserted injury at all. Given that the relief may be reversed for mootness or other reasons before the Secretary provides his report to the President, it is implausible that it would provide sufficient certainty in the present to any person who otherwise would be "chilled" by the Memorandum from participating in the census. Neither appellees nor the court have provided a basis to find that there are any individuals, let alone a material number, who would otherwise be deterred by the Memorandum but now are willing to participate in the census, merely because of the court's judgment and despite the realistic prospect that it may be reversed on appeal. Indeed, appellees have failed to show that the Memorandum is actually causing a "chilling effect" injury in the first place, as that alleged

10

harm rests on a chain of contingencies that is far too speculative and attenuated to satisfy Article III.

In any event, the district court also erred in its merits holdings. Congress has vested discretion in the Secretary to determine, subject to the President's supervision and direction, how to conduct the decennial census—and the Executive Branch has long exercised that discretion by considering administrative records and data in addition to that obtained by the census questionnaire. See *Franklin* v. *Massachusetts*, 505 U.S. 778, 794-795, 797-799 (1992). That is what the Memorandum instructs the Secretary to do here. In holding that this use of administrative records would somehow cause the apportionment no longer to be "based on the results of the census alone," App., *infra*, 74a (capitalization and emphasis omitted), the district court fundamentally misunderstood the statutory framework governing the decennial census, subjected the government to an unworkable and illogical standard that has never before been imposed in the history of the census, and contravened this Court's precedent. Indeed, the district court acknowledged that, in *Franklin*, "overseas personnel * * * were counted using administrative records rather than a questionnaire," *id.* at 81a n.15, yet provided no coherent explanation as to why the use of administrative records here is nevertheless impermissible.

Similarly, under the constitutional and statutory provisions governing apportionment, it has long been understood that the phrase "persons in each State" means "inhabitants" (or "usual residents") and also vests discretion in the Executive Branch to ascertain how that indeterminate standard applies to particular categories of persons with debatable ties to a State. See

11

*Franklin*, 505 U.S. at 804-806.  Here, there is ample historical and structural evidence supporting the President's policy determination that the standard does not apply to all aliens living within a jurisdiction without the sovereign's permission to settle there.  Contrary to the district court's conclusion, legislative history from 1929 does not establish the remarkable proposition that Congress broke new ground by requiring the President to include within the apportionment base for congressional representation all aliens living in this country in ongoing violation of federal law.

Because the district court's erroneous judgment interferes with the Secretary's ability to meet the December 31, 2020, statutory deadline while executing the President's policy decision, this Court should summarily reverse or note probable jurisdiction.  For the same reason, the government is separately filing a motion to expedite the appeal, has sought a stay pending appeal from the district court, D. Ct. Doc. 171 (Sept. 16, 2020), and intends to seek a stay pending appeal from this Court if the district court denies that request.[2]

---

[2] Although the three-judge district court was properly convened and entered an appealable order, see pp. 1-2, *supra*, this Court could avoid any questions in that regard by alternatively construing this jurisdictional statement as a petition for a writ of certiorari before judgment and granting it.  Cf. *Department of Commerce* v. *New York*, 139 S. Ct. 2551, 2565 (2019) (considering the inclusion of a citizenship question on the census questionnaire after granting a writ of certiorari before judgment); D. Ct. Doc. 170 (Sept. 16, 2020) (government's protective notice of appeal to the U.S. Court of Appeals for the Second Circuit); App., *infra*, 103a n.21 (district court likewise alternatively issuing its judgment as a single-judge court).

12

## I. APPELLEES FAIL TO SATISFY ARTICLE III'S REQUIREMENTS

The decision below contains numerous Article III errors that each independently justifies a reversal, and all of which stem from a basic mismatch between the ordered remedy and the identified injury. Most important, the judgment will become moot before it ever has any constraining legal effect on the government. As discussed in more detail below, this alone is a sufficient basis for summary reversal, and the related Article III errors made by the district court confirm the need for this Court's prompt intervention.

A. Under Article III, a plaintiff must establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a fairly traceable causal connection between the injury and defendants' challenged conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). Where, as here, a plaintiff seeks prospective relief, the injury element requires the plaintiff to demonstrate that the alleged injury is "certainly impending," or at least that "there is a substantial risk that the harm will occur." *Susan B. Anthony List* v. *Driehaus*, 573 U.S. 149, 158 (2014) (citation and internal quotation marks omitted). And the redressability element requires the plaintiff to demonstrate that "prospective relief will remove the harm" or that the plaintiff "personally would benefit in a tangible way from the court's intervention." *Warth* v. *Seldin*, 422 U.S. 490, 505, 508 (1975). Article III's standing requirements must be satisfied at the outset of the case and throughout the entire litigation, including on appeal. *Arizonans for Official English* v. *Arizona*, 520 U.S. 43, 67 (1997).

13

B. The district court's theory of Article III juris-
diction, see App., *infra*, 47a-59a, rests on a multi-step
sequence of events.  First, appellees assert that there
are a material number of aliens who still have not res-
ponded to the census questionnaire but who would do so
before census field operations close were it not for the
"chilling effect" of the Memorandum—even though the
Memorandum does not purport to change the question-
naire or the field data-gathering process, the question-
naire is not collecting information on citizenship or
immigration status, and any data it does collect cannot
be shared with immigration enforcement.   Second,
appellees assert that the lack of participation will not be
accounted for by other means during the census enu-
meration (for example, proxy responses given by other
individuals such as a neighbor or landlord, administra-
tive records from other agencies, and possibly impu-
tation).  Third, appellees assert that the degradation in
census data will have an appreciable adverse impact on
them with respect to funding, apportionment, or re-
districting.   And finally, appellees assert that relief
prohibiting the Secretary from complying with the
Memorandum in his December 31 report to the Presi-
dent will likely redress the Memorandum's "chilling
effect" on census participation before field operations
close—notwithstanding that such relief cannot current-
ly protect "chilled" individuals from the risk that the
relief may well be reversed on appeal before the Sec-
retary will send his report to the President.

That theory reflects a fundamental mismatch be-
tween the court's award of *relief in the future* (prohib-
iting the Secretary from including information in his re-
port to the President) and a *speculative present injury*

14

(the Memorandum's alleged "chilling effect" on participation in the census).  That mismatch gives rise to multiple independent Article III defects.

1.  Most fundamentally, the district court's judgment will become moot before it ever goes into effect.  Even assuming that the Memorandum is chilling participation in the census, that asserted injury will necessarily cease once census field data collection ends, as no one will be responding to census questionnaires or follow-up operations.  But while the Census Bureau will end field data collection on September 30, 2020 (or possibly October 31, see p. 4, *supra*), the district court's relief will take effect only when it prohibits the Secretary from including the requested information in his report to the President on December 31.

Thus, before the relief awarded ever actually takes effect to constrain the government's conduct, there will be no injury to redress at all—and no basis, at a minimum, for continuing the relief past the conclusion of census field operations.  Cf. *O'Shea* v. *Littleton*, 414 U.S. 488, 495-496 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief  * * *  if unaccompanied by any continuing, present adverse effects.").  Indeed, the district court itself recognized that once field data collection "end[s]," appellees' "arguments about harms to the census count itself would  * * *  become moot."  App., *infra*, 46a-47a; cf. *Genesis Healthcare Corp.* v. *Symczyk*, 569 U.S. 66, 72 (2013) ("If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot.") (citation and internal quotation marks omitted).  Although the court nevertheless

15

awarded relief based on those very harms, that inevitable mootness will at the very least be sufficient basis to vacate the court's judgment. See *United States* v. *Munsingwear, Inc.*, 340 U.S. 36, 37 (1950).

2. In addition, the fact that the district court's relief will inevitably become moot before it ever has any constraining legal effect on the government reveals a deeper Article III problem. Absent "relief [that] will redress the alleged injury" by altering a defendant's unlawful conduct, the court's legal determination is "the same thing as an advisory opinion." *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 101, 103 (1998). Here, the court's *judgment* will not and cannot provide redress because any possible injuries will have been realized well before the relief ever goes into effect. Indeed, because the relief ultimately may well be reversed on mootness or other grounds before the Secretary reports to the President, it is implausible that the relief currently would provide sufficient comfort to any person otherwise "chilled" by the Memorandum from participating in the census.

For the entire time field operations continue and aliens have to make the choice about whether to respond to the census, it will remain uncertain whether the relief prohibiting the Secretary from complying with the Memorandum will actually be in effect on December 31—because the order will remain under review on appeal. Insofar as any alien has been chilled from participating in the census by the Memorandum—notwithstanding that the Memorandum in no way penalizes participation—it is implausible that the district court's relief alone would be likely to eliminate that chill. Any such alien would remain well aware that the President still "intends to vindicate [his] policy

16

determination before [this] Court" on appeal and then "implement [that] policy decision" in his statement to Congress. The White House, *Statement from the Press Secretary* (Sept. 18, 2020), https://go.usa.gov/xGQh2. At a minimum, neither appellees nor the district court have provided any evidence to conclude that a material number of otherwise-chilled aliens are likely to become un-chilled by a district court decision subject to a realistic prospect of appellate reversal. See *Lujan*, 504 U.S. at 566 ("Standing is not an ingenious academic exercise in the conceivable.") (citation and internal quotation marks omitted).[3]

The district court rejected that redressability objection based on the misimpression that it would imply a court could *never* enjoin a future act. See App., *infra*, 67a-68a. In typical cases, future acts are enjoined to redress a future injury, and so the prospect of appellate reversal in the interim is immaterial to redressability: so long as the future relief is ultimately affirmed, it will prevent the future injuries. In this unusual case, by contrast, the future relief purports to redress only present injury from a "chilling effect." But the prospect of appellate reversal in the interim renders it implausible that it will actually redress any chill now. Neither the district court nor appellees cited any precedent for finding redressability in these unique circumstances.

---

[3] For similar reasons, even if the district court's relief were to lead the non-profit appellees to stop diverting their resources to counteract the Memorandum's asserted effect on census participation, see App., *infra*, 35a-38a, 57a-59a, that would not satisfy Article III. They "cannot manufacture standing by choosing to make [and then cease] expenditures" based on speculation about how third parties may react to the government's conduct and the court's relief. *Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 402 (2013).

17

3. In fact, the Memorandum's alleged "chilling effect" on census participation is too speculative to constitute cognizable Article III injury in the first place. The "highly attenuated chain of possibilities" that appellees rely on, see pp. 13-14, *supra*, does not "satisfy the requirement that threatened injury must be certainly impending." *Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Even if some individuals would be "chilled" from responding to the questionnaire based on the Memorandum, neither the district court nor appellees provided any non-speculative basis to find a sufficient likelihood that the second and third steps of the chain will materialize—that lack of participation will not be accounted for by other means *and* that degradation in census data will have a legally relevant impact. And as for the threshold step, it is far more speculative than the premise that this Court accepted in *Department of Commerce* v. *New York*, 139 S. Ct. 2551 (2019), which involved whether a question on the census questionnaire regarding citizenship could reduce census participation. See *id.* at 2565-2566. Here, in contrast, the alleged "chilling effect" is not premised on an actual question on the census—or any changes to the questionnaire or field data collection—but rather on a statement from the President regarding how he intends to tally the total base number for apportionment following the conclusion of census field data collection.

C. In light of the fatal Article III problems with the district court's judgment, this Court should summarily vacate it—either immediately or at least once field data collection ends. A prompt vacatur will prevent harm to the government by ensuring that the Secretary is able to submit his report to the President in compliance with the December 31, 2020, statutory deadline, including

18

both tabulations requested by the Memorandum.  It will also avoid any need for this Court to expedite consideration of this appeal for resolution before December 31.  Conversely, as discussed, it will cause no injury to appellees, as any "chilling effect" is not currently being redressed by the district court's judgment—and in any event there will be no activities to "chill" once census field data collection ends.

To the extent that appellees wish to challenge the actual apportionment that occurs in 2021, such a challenge is properly brought *after* the President submits the apportionment to Congress. Appellees then can file a new suit if they claim to be injured, and the courts can review the statutory and constitutional validity of the apportionment and order relief if appropriate.  That would accord with this Court's normal approach:  to decide such cases post-apportionment, when the actual apportionment figures are known, and any purported injuries are no longer speculative. See, *e.g.*, *Utah* v. *Evans*, 536 U.S. 452, 458-459 (2002); *Wisconsin* v. *City of New York*, 517 U.S. 1, 10-11 (1996); *Franklin*, 505 U.S. at 790-791; *United States Dep't of Commerce* v. *Montana*, 503 U.S. 442, 445-446 (1992).

## II. THE PRESIDENTIAL MEMORANDUM DOES NOT VIOLATE FEDERAL STATUTES GOVERNING THE CENSUS AND APPORTIONMENT

### A. The District Court's Holding That The Memorandum Requires Using Information That Is Not Based On The Census Contravenes The Statutory Framework, Longstanding Practice, And This Court's Decisions

The district court erred in holding that using administrative records to implement the Memorandum's policy would mean that the apportionment was no longer "based on the results of the census alone." App., *infra*,

19

74a (capitalization and emphasis omitted). The Secretary undoubtedly may choose to make use of administrative records as part of the form and content of conducting the census tabulation of the number of persons in each State—especially when, as here, he is instructed to do so by the President, as the user of the Secretary's report under the statutory scheme and the supervisor of the Secretary in the constitutional scheme.

1. As this Court has confirmed, "[t]he text of the Constitution vests Congress with virtually unlimited discretion in conducting the decennial 'actual Enumeration,' [and] * * * Congress has delegated its broad authority over the census to the Secretary." *Wisconsin*, 517 U.S. at 19 (citations and footnotes omitted). In particular, while Congress directed the President to ascertain each State's apportionment base "under the * * * decennial census of the population," 2 U.S.C. 2a(a), it gave the Secretary the authority, subject to the President's direction and supervision, to take the "decennial census of population * * * in such form and content as he may determine," 13 U.S.C. 141(a). Here, the Memorandum has directed the Secretary, as part of conducting the census and preparing his report, to supplement data gathered from the census questionnaires with data from administrative records concerning the immigration status of census respondents.

This Court in *Franklin* explicitly rejected the assertion that the Secretary's initial choices as to the contents of his report must be deemed the one true "decennial census." See App., *infra*, 75a. *Franklin* confirmed that the President may instruct the Secretary to "reform the census," including by changing the data considered when enumerating individuals. 505 U.S. at 797-798. "[T]he 'decennial census'" thus "still presents a

20

moving target, even after the Secretary reports to the President," and "[i]t is not until the President submits the information to Congress that the target stops moving." *Ibid.* Accordingly, the district court erred in holding that the Secretary's tabulation based on the Census Bureau's Residence Criteria contains the only "results of the census." App., *infra*, 79a. *Franklin* makes clear that the President has full authority to direct a different approach—just as the Secretary may overrule the subordinate Census Bureau, see *Wisconsin*, 517 U.S. at 23 ("[T]he mere fact that the Secretary's decision overruled the views of some of his subordinates is by itself of no moment in any judicial review of his decision.").

The district court also believed that "once the final decennial census data is in hand, the President's role is purely 'ministerial.'" App., *infra*, 75a (citation omitted). Based on that premise, the court concluded that the President has an extremely limited role in determining the base population for apportionment. See *id.* at 74a-78a. Again, that reasoning flatly contradicts *Franklin*. There, the Court made clear that the President's role is ministerial *only* insofar as *applying the mathematical formula* for apportioning representatives, after he has exercised discretion in supervising the Secretary's determination of the appropriate population base:

> The admittedly ministerial nature of the apportionment calculation itself does not answer the question whether the apportionment is foreordained by the time the Secretary gives her report to the President. To reiterate, § 2a *does not curtail the President's authority to direct the Secretary in making policy judgments that result in "the decennial census"*; he is not expressly required to adhere to the policy decisions reflected in the Secretary's report.

21

*Franklin*, 505 U.S. at 799 (emphasis added).

2. Pursuant to the Executive Branch's discretion, the decennial census has never tallied the total population for the apportionment based solely on questionnaire responses, and it has often taken into account information from administrative records to correct or supplement the field data collection process. For the first 170 years of American census taking, no census questionnaire for self-response existed because all enumeration was done in person. See *New York* v. *United States Dep't of Commerce*, 351 F. Supp. 3d 502, 520 (S.D.N.Y.), aff'd in part, rev'd in part, and remanded, 139 S. Ct. 2551 (2019). And for the 2020 census, individuals have been and will be enumerated through a variety of means in addition to census-questionnaire responses. See pp. 3-4, *supra*.

The history of the census contains numerous examples of the practice of using administrative records or similar data when tabulating a State's population for purposes of apportionment. For example, "[i]n the 1990 and 2000 censuses," the counts of overseas members of the armed forces, federal civilian employees, and their dependents living with them—which were at issue in *Franklin*—"were obtained from federal departments and agencies and *were principally based on administrative records*." U.S. Census Bureau, U.S. Dep't of Commerce, *2020 Census Detailed Operational Plan for: 20. Federally Affiliated Count Overseas Operation (FACO)* 3 (May 28, 2019) (emphasis added), https://go.usa.gov/xGR2r; see *Franklin*, 505 U.S. at 794-795. Similarly, the Census Bureau has filled gaps in enumeration data with imputed data that does not result directly from questionnaire responses. For example, during the

22

2000 census, the Census Bureau imputed a variety of information about unresponsive addresses from similar addresses that had been personally surveyed by enumerators during field operations. See *Evans*, 536 U.S. at 458-459.

It is thus commonplace for the Census Bureau to use data other than that collected as part of the questionnaire responses or other field operations (such as nonresponse follow-up), and any other approach would be unworkable and degrade the quality of the census. An enumeration based *solely* on questionnaire responses would be underinclusive because it would fail to enumerate a variety of individuals who reasonably may be considered inhabitants (*e.g.*, those who refuse to respond and those who are temporarily outside the United States). Such a limited enumeration would also be overinclusive because there would be no way for the Census Bureau to correct mistakes or take account of factual developments (*e.g.*, a response that accidentally counts a foreign tourist as a resident or mistakenly reports residents who moved after April 1 at their current address rather than their address on census day).

3. Indeed, the district court acknowledged that the 1990 census at issue in *Franklin* used "administrative records rather than a questionnaire" to count overseas personnel in the first place (not merely to allocate them among the States). App., *infra*, 81a-82a n.15. But the court failed to explain its conclusory assertion that the administrative records used in *Franklin* were "part of the census itself," *ibid.*, but the administrative records that would be used under the Memorandum are "something other than the census itself," *id.* at 78a.

Insofar as the court suggested that the President here has directed the Secretary to go beyond the census

23

questionnaire whereas the Secretary in *Franklin* had independently chosen to do so at the outset of the census process, that distinction is immaterial given *Franklin*'s holding that the President may direct the Secretary's exercise of policy judgment in conducting the census. And insofar as the court suggested that administrative records may be used to *add* people to "the census" for whom there were no questionnaire responses (as in *Frankin*), but may not be used to *remove* people from "the census" who were improperly included in questionnaire responses (as in the Memorandum), that is a distinction without a difference under the statute's delegation of authority to the Secretary to determine the "form and content" of the census. 13 U.S.C. 141(a).

### B. The District Court's Holding That The President Lacks Any Discretion To Exclude Illegal Aliens From The Apportionment Base Conflicts With Text, History, And Precedent

The district court also erred in holding that 2 U.S.C. 2a(a)'s directive to report "the 'whole number of persons in each State'" deprives the President of any "discretion to exclude illegal aliens on the basis of their legal status." App., *infra*, 92a. As the court acknowledged, in the apportionment context, the phrase "'persons in each State'" has long been understood to cover only a State's "'inhabitants,'" a term whose application "call[s] for 'the exercise of judgment.'" *Id.* at 83a-84a (citation omitted). And as text, history, and precedent reveal, the term "inhabitants" does not completely bar the President from exercising discretion to exclude illegal aliens.

1. a. Section 2a(a)'s directive that the President's report include "the whole number of persons in each

24

State" (excluding untaxed Indians), 2 U.S.C. 2a(a), repeats verbatim the Fourteenth Amendment, see U.S. Const. Amend. XIV, § 2, which in turn modified Article I's Apportionment Clause to end the infamous three-fifths compromise, see U.S. Const. Art. I, § 2, Cl. 3. And "if a word is obviously transplanted from another legal source," it generally "brings the old soil with it." *Hall* v. *Hall*, 138 S. Ct. 1118, 1128 (2018) (citation omitted).

The phrase "persons in each State" has never been understood in the apportionment context to cover all persons physically in the country on census day, such as foreign tourists. See, *e.g.*, Timothy Farrar, *Manual of the Constitution of the United States of America* § 405, at 403 (1867) ("'The whole number of persons in each State' cannot mean everybody on the soil at the particular time."). Rather, the person must be an "'inhabitant'" or "'usual resident'" of the State, as that is "the gloss" that has historically been given to the phrase "'persons in each State'" in this context. *Franklin*, 505 U.S. at 803-804 (brackets and citation omitted).

That construction is consistent with the Clause's drafting history. See *Franklin*, 505 U.S. at 804-805 & n.3. The draft Constitution submitted to the Committee of Style required Congress to "regulate the number of representatives by the number of inhabitants, according to the rule hereinafter made for direct taxation," which in turn rested on "the whole number of free citizens and inhabitants  * * *  and three fifths of all other persons not comprehended in the foregoing description, (except Indians not paying taxes)." 2 *The Records of the Federal Convention of 1787*, at 566, 571 (Max Farrand ed., 1911) (*Federal Convention*). Consistent with that background, James Madison repeatedly explained in *The Federalist* that apportionment would be based on

25

the number of each State's "inhabitants." *E.g.*, *The Federalist No. 54*, at 369 (Jacob E. Cooke ed., 1961); see *id. No. 56*, at 383; *id. No. 58*, at 391.

Although the Committee of Style changed the draft language to provide that apportionment should be based on each State's population "determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons," U.S. Const. Art. I, § 2, Cl. 3, it "'had no authority from the Convention to alter the meaning' of the draft Constitution," *Evans*, 536 U.S. at 474 (citation omitted). Accordingly, the first enumeration act—titled "an act providing for the enumeration of the inhabitants of the United States"—directed "the marshals of the several districts of the United States" to count "the number of the inhabitants within their respective districts." Act of Mar. 1, 1790, § 1, 1 Stat. 101.

The understanding that the apportionment base was limited to "inhabitants" was incorporated into the Fourteenth Amendment, which modified the Apportionment Clause to turn on "the whole number of persons in each State, excluding Indians not taxed," U.S. Const. Amend. XIV, § 2. As a member of the committee that drafted the Amendment explained, this revision was meant to fully include former slaves in the apportionment base but otherwise "adhere[] to the Constitution as it is." Cong. Globe, 39th Cong., 1st Sess. 359 (1866) (Rep. Conkling). The first census following the Fourteenth Amendment's ratification was thus conducted in accordance with the same procedures that had been used for the 1850 census, see Act of May 6, 1870, ch. 87, 16 Stat. 118, which had required "all the inhabitants to be enumerated," Act of May 23, 1850, ch. 11, 9 Stat. 428.

26

b. Although the phrase "persons in each State" thus clearly refers to "inhabitants," the term "inhabitant" is itself an indeterminate one. See *Federal Convention* 216-217 (recording Madison's acknowledgement that "'inhabitant'" was a "vague" word). Consistent with that indeterminacy, this Court has given the Executive Branch significant latitude in defining who constitutes an "inhabitant" for apportionment purposes. In *Franklin*, the Court upheld the Executive Branch's decision to end its longstanding practice of excluding federal personnel overseas from the apportionment bases of their home States. 505 U.S. at 806. As the Court explained, the Executive Branch had "made a judgment, consonant with, though not dictated by, the text and history of the Constitution," that such individuals "had retained their ties to the States," *ibid.*, even though that overseas population had been excluded from their States' apportionment bases since 1790 (with two exceptions in 1900 and 1970), *id.* at 792-793.

The Memorandum here reflects a similar judgment. During the Founding era, no single definition resolved the circumstances when an alien constituted an "inhabitant." Rather, as John Adams explained to a European correspondent, "[d]ifferent States have different definitions of this word," and "every stranger who has been in the United States, or who may be there at present, is not an inhabitant." Letter from John Adams to M. Dumas (Nov. 3, 1784), *reprinted in* 8 John Adams & Charles Francis Adams, *The Works of John Adams, Second President of the United States* 214 (1853). At a minimum, one had to establish a fixed residence within a jurisdiction and an intent to remain there. See, *e.g.*, *ibid.* (noting that "[t]he domicil and the '*animus habitandi*' is necessary in all" definitions); 1 Noah Webster,

27

*An American Dictionary of the English Language* 110 (1828) (defining "inhabitant" as a "dweller; one who dwells or resides permanently in a place, or who has a fixed residence, as distinguished from an occasional lodger or visitor") (capitalization omitted); *Bas* v. *Steele*, 2 F. Cas. 988, 993 (C.C.D. Pa. 1818) (No. 1088) (Washington, Circuit Justice) (concluding that a Spanish subject who had remained in Philadelphia as a merchant for four months "was not an inhabitant of this country, as no person is an inhabitant of a place, but one who acquires a domicil there").  That baseline helps explain the exclusion of certain categories of aliens in previous apportionments, such as those temporarily residing here for vacation or business as well as certain foreign diplomatic personnel. See, *e.g.*, J.A. at 80, 103, *Franklin*, *supra* (No. 91-1502); cf. *Franklin*, 505 U.S. at 805 (discussing history confirming that an American diplomat stationed overseas could still qualify as an "inhabitant" of his home State) (citation omitted).

But with respect to aliens specifically, the term "inhabitant" could be understood to further require a sovereign's permission to remain within the jurisdiction. Notably, Emmerich de Vattel defined "inhabitants, as distinguished from citizens," as "strangers, who are permitted to settle and stay in the country."  1 Emmerich de Vattel, *The Law of Nations*, Ch. 19, § 213 (1760).  As this Court has observed, Vattel was the "founding era's foremost expert on the law of nations," *Franchise Tax Bd.* v. *Hyatt*, 139 S. Ct. 1485, 1493 (2019), and "[t]he international jurist most widely cited in the first 50 years after the Revolution," *United States Steel Corp.* v. *Multistate Tax Comm'n*, 434 U.S. 452, 462 n.12 (1978).  Unsurprisingly, prominent figures such as Franklin, Madison, and Marshall were familiar with

28

Vattel generally, see *ibid.*, and with his understanding of "inhabitants" specifically, see, *e.g.*, *The Venus*, 12 U.S. (8 Cranch) 253, 289 (1814) (Marshall, C.J., concurring and dissenting in part) (quoting Vattel's definition); *The Federalist No. 42*, at 285-286 (James Madison) (discussing provision of the Articles of Confederation that required every State "to confer the rights of citizenship in other States * * * upon any whom *it may allow to become inhabitants*") (emphasis added).

That definition of "inhabitants" is also consistent with this Court's observation that the concepts of "'inhabitan[ce]'" or "'[u]sual residence'" can require "more than mere physical presence, and ha[ve] been used broadly enough to include some element of allegiance or enduring tie to a place." *Franklin*, 505 U.S. at 804; see U.S. Const. Amend. XIV, § 2 (apportioning representatives "among the several States according to *their* respective numbers") (emphasis added). Concepts of allegiance and enduring ties necessarily place limits on illegal aliens' qualifying as "inhabitants," given that they are subject to removal by the government. Accordingly, the requirement to include each State's "inhabitants" in the apportionment base, whether constitutional or statutory, does not completely eliminate the President's discretion to exclude illegal aliens.

2. The district court nevertheless deemed the Memorandum facially invalid because, in its view, "the ordinary definition of the term 'inhabitant' is 'one that occupies a particular place regularly, routinely, or for a period of time,'" and that definition "surely encompasses illegal aliens who live in the United States." App., *infra*, 84a (quoting *Merriam-Webster's Collegiate Dictionary* 601 (10th ed. 1997)). But to conclude that the Presi-

29

dent's policy—of excluding illegal aliens "to the maximum extent feasible and consistent with the discretion delegated to the executive branch," 85 Fed. Reg. at 44,680—is unlawful in all of its applications, the court had to demonstrate that the term "inhabitants" both encompasses *all* illegal aliens and does so *unambiguously*. The court did neither.

a. To begin, the district court never explained how certain categories of illegal aliens living in the country must be considered "inhabitants" under any relevant definition. Even a broad one would not require including, say, aliens residing in a detention facility after being arrested while crossing the border, aliens who have been detained for illegal entry and paroled into the country pending removal proceedings, or aliens who are subject to final orders of removal. It is far from evident that such aliens have an "enduring tie to" a particular State, *Franklin*, 505 U.S. at 804, when the government has detained them upon entry, allowed them into the country on a conditional basis while considering whether to remove them, or conclusively determined that they must be removed.[4]

Rather, as this Court recently reaffirmed, aliens "detained shortly after unlawful entry" or who "arrive at ports of entry—even those paroled [into] the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" *Department of Homeland Sec.* v. *Thuraissigiam*, 140 S. Ct.

---

[4] These examples likely include significant populations. During fiscal year 2019, there were over 3.2 million aliens on ICE's "non-detained docket," and over 50,000 aliens in ICE custody on an average day. U.S. Immigration & Customs Enforcement, *Fiscal Year 2019 Enforcement and Removal Operations Report* 5, 10 (2019), https://go.usa.gov/xG8vT.

1959, 1982 (2020) (citation omitted). Similarly, in *Kaplan* v. *Tod*, 267 U.S. 228 (1925), this Court held that an alien who had been denied admission but paroled into the country in 1915, where she lived for the next ten years, had not been "dwelling in the United States" or "resid[ing] permanently" in the country for purposes of naturalization. *Id.* at 230. As the Court explained, she "could not lawfully have landed in the United States" because she fell within an inadmissible category, and "until she legally landed [she] 'could not have dwelt within the United States.'" *Ibid.* (citation omitted). Instead, she was in "the same" position as an alien "held at Ellis Island for deportation." *Id.* at 231.

The district court provided no reason why longstanding precedents governing whether particular aliens "dwell," "reside permanently," or are otherwise "in" the United States must be ignored in determining whether they constitute "inhabitants." Cf. 1 Webster 110 (defining "inhabitant" as one who "dwells or resides permanently" in a location) (capitalization omitted). Instead, the court observed that "many" aliens "intercepted at the border" or in "removal proceedings" "ultimately obtain lawful status." App., *infra*, 86a. But that does not mean that the President must treat *all* of them as "inhabitants" *now*. The court also brushed off such examples as irrelevant on the theory that the usual standard for facial challenges does not apply to a claim that the "President has exceeded the authority granted to him by Congress." *Id.* at 84a n.16. To the contrary, a facial challenge contending that a regulation "exceeds" the statutory "authority" of even a subordinate executive official must "'establish that no set of circumstances exists under which the regulation would be valid.'" *Reno*

31

v. *Flores*, 507 U.S. 292, 300-301 (1993) (brackets and citation omitted). The court provided no justification for its upside-down suggestion that a facial challenge contending that *the President* exceeded his statutory authority should be held to a *less* demanding standard.

b. In any event, the district court failed to articulate why its definition of "inhabitants," drawn from a 1997 dictionary, is the only one available under 2 U.S.C. 2a(a), which, again, copies the constitutional phrase "persons in each State." The court never addressed that figures such as Marshall, Madison, and Vattel were aware of a definition of "inhabitants" that turned on the sovereign's permission to remain in the country. See pp. 26-28, *supra*. The court also did not address this Court's reasoning in cases like *Kaplan* that an alien who has not effected a lawful entry is not "dwelling" or "resid[ing] permanently" in the country. 267 U.S. at 230. And while the court acknowledged "that the terms 'usual residence' and 'inhabitant' have 'been used broadly enough to include some element of allegiance or enduring tie to a place,'" App., *infra*, 85a-86a (quoting *Franklin*, 505 U.S. at 804), it gave no explanation for how every illegal alien necessarily has such a connection to the United States. At most, it assumed that the term "usual," viewed in isolation, referred exclusively to frequency of residence. But the term also connotes regularity. See, *e.g.*, *Webster's New International Dictionary of the English Language* 2807 (2d ed. 1942) (defining "usual" as "customary; ordinary"; synonymous with "regular"); 1 & 2 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) (defining "[u]sual" as "customary," defined in turn as "[c]onformable to established custom, according to prescription"). And it is far from evident that those who adopted the Constitution,

32

the Fourteenth Amendment, or 2 U.S.C. 2a(a) would have thought there was anything "usual," "customary," or "regular" about aliens living in the country in continual violation of federal law's prescriptions.

Rather than "delve into the meaning of the terms 'inhabitant' and 'usual residence' at the time of the Founding or of the Reconstruction Amendments," the district court looked to the legislative history surrounding 2 U.S.C. 2a(a) to discern its drafters' "*understanding* of the constitutional language" in 1929. App., *infra*, 87a-88a & n.17. The court gave no reason for departing from the presumption that when "a word is obviously transplanted from another legal source," it "brings the old soil with it." *Hall*, 138 S. Ct. at 1128 (citation omitted). And anyway, the court failed to identify evidence indicating that in 1929, Congress conclusively settled that all illegal aliens were "inhabitants" or "usual residents" for apportionment purposes.

The district court merely observed that the 1929 Congress (like the Framers of the Fourteenth Amendment) had rejected amendments to exclude *all* aliens from the apportionment base, and that the Senate's legislative counsel had opined that such an exclusion would be unconstitutional. App., *infra*, 87a-88a; cf. Cong. Globe, 39th Cong., 1st Sess. 10 (1865) (Rep. Stevens). That legislative history, however, does not answer whether the 1929 Congress prohibited the President from excluding *illegal* aliens from the apportionment base. Although aliens who are "permitted to settle and stay in the country," Vattel Ch. 19, § 213, may well qualify as "inhabitants," that in no way resolves the question here: whether aliens who are *not* permitted to settle, and remain subject to *removal* by the government, nevertheless are "inhabitants" of, with an "enduring tie to"

33

and a "'usual residence'" in, the United States. *Franklin*, 505 U.S. at 804. If the 1929 Congress meant to mandate that congressional representation be allocated on the basis of aliens who remain in the country in ongoing defiance of federal law, it presumably would have given a clearer indication of such a remarkable step than merely copying into the U.S. Code the constitutional text "persons in each State," which had never been understood to compel such a result.

The district court also relied on Executive Branch statements from the 1980s opining that the exclusion of illegal aliens from the apportionment base would be unlawful. App., *infra*, 90a-91a. But those assertions did not rest on any sustained historical analysis of whether all illegal aliens are necessarily "inhabitants" as that term was originally understood. They also predated this Court's decision in *Franklin*, which confirms that physical residence is neither necessary nor sufficient for inclusion within the apportionment base: the Executive has significant discretion in determining whether individuals possess the necessary "ties to the States" to "be counted toward their States' representation," 505 U.S. at 806, even in the face of divergent historical practice, see *id.* at 792-793. Contrary to the district court's suggestion, nothing in *Franklin* or in logic supports a ratchet in which the Executive may exercise discretion to "*include*" individuals not physically living in a State who still could reasonably be deemed to be "inhabitants" there, but not to "*exclude*" individuals physically living in a State who still could reasonably be deemed to lack status as "inhabitants" there. App., *infra*, 86a.

34

## CONCLUSION

The Court should note probable jurisdiction or summarily reverse.

Respectfully submitted.

JEFFREY B. WALL
*Acting Solicitor General*
JEFFREY BOSSERT CLARK
*Acting Assistant Attorney*
*General*
HASHIM M. MOOPPAN
*Counselor to the Solicitor*
*General*
SOPAN JOSHI
*Senior Counsel to the*
*Assistant Attorney General*
NICOLE FRAZER REAVES
BRINTON LUCAS
*Assistants to the Solicitor*
*General*

SEPTEMBER 2020