## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ )<br><br>HAITIAN-AMERICANS UNITED, INC., )<br>BRAZILIAN WORKER CENTER, )<br>CHELSEA COLLABORATIVE, INC., )<br>CENTRO PRESENTE, )<br>GLADYS VEGA, NORIELIZ DEJESUS, )<br>ROY AVELLANEDA, DIEUFORT )<br>FLEURISSAINT, MARTHA FLORES, )<br>and JESSICA ARMIJO, )<br><br>            Plaintiffs, )<br><br>    v. )<br><br>DONALD J. TRUMP, President of the )<br>United States in his Official Capacity, )<br>UNITED STATES DEPARTMENT OF )<br>COMMERCE, UNITED STATES )<br>BUREAU OF THE CENSUS, STEVEN )<br>DILLINGHAM, Director of the U.S. )<br>Census Bureau in his Official Capacity, )<br>and WILBUR ROSS, Secretary of the )<br>Department of Commerce in his Official )<br>Capacity, )<br><br>            Defendants. )<br>_____) | <br><br><br><br><br><br><br><br><br><br><br><br><br>Case No. 20-11421-DPW-BMS-PBS<br><br>**FIRST AMENDED COMPLAINT<br>FOR DECLARATORY,<br>INJUNCTIVE, AND MANDAMUS<br>RELIEF** |

## INTRODUCTION

1.      Defendant Donald Trump is seeking to undo over two hundred years of legal precedent by declaring that undocumented immigrants are not "persons" within the meaning of the United States Constitution and of statutory law. Plaintiffs urge this Court to act to prevent President Trump and his co-Defendants—Secretary of Commerce Wilbur Ross, the Department of Commerce, Director Steven Dillingham, and the Census Bureau—from violating the Constitution and federal statutory law by excluding undocumented immigrants from the population data created for the purposes of congressional apportionment. Judicial intervention is

1

necessary to enjoin Defendants' unlawful conduct, which was intended to and has had the effect of chilling participation by immigrant communities and communities of color in Census 2020, and which will in turn deprive these communities of the political representation and federal financial resources to which they are entitled.

2.      On July 21, 2020, President Trump issued a Memorandum to the Secretary of Commerce titled "Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census" (hereinafter, the "July 21 Memorandum") in which he: a) stated that he has determined that "respect for the law and protection of the integrity of the democratic process warrant the exclusion of illegal aliens from the apportionment base"; and b) directed the Secretary of Commerce to "take all appropriate action . . . to provide information permitting the President . . . to exercise the President's direction to carry out the policy" of excluding undocumented individuals from the apportionment base.

3.      This direction is patently and unquestionably illegal. The fourth sentence of the Constitution, Article I, Section 2, as amended by Section 2 of the Fourteenth Amendment, makes clear that congressional representatives are to be apportioned among the states according to their respective numbers, "counting the whole number of persons in each State." U.S. Const. Amend. XIV. Undocumented immigrants are now and have always been persons as a matter of fact, law, and basic human decency.

4.      Plaintiffs are membership-based, non-profit organizations that serve immigrants of color across the Commonwealth of Massachusetts and individual voters of color who live in urban communities with a disproportionate number of immigrants of color and undocumented immigrants, including but not limited to Boston, Chelsea, Everett, Randolph, Brockton, and Somerville. Boston is a majority-minority city: 66% of residents are non-White and 28% are

foreign-born, with 90.8% of the region's new population growth since 1990 coming from international immigration.[1] The top five sending countries are China, the Dominican Republic, Brazil, India, and Haiti.[2] Randolph, Brockton, and Everett are, respectively, the first, third, and sixth most diverse cities in Massachusetts; indeed, Brockton is 27% foreign born and 41% of its Black residents are foreign-born.[3] The number of Haitian, Latinx and other immigrants in these communities far exceeds the state average. As a whole, Massachusetts is 71.1% Non-Hispanic White and foreign-born persons comprise only 16.5% of the total population.[4] The state's racial and ethnic diversity is "concentrated in eastern Massachusetts," specifically Greater Boston— only twelve communities in Massachusetts, including Boston, Malden, Lowell, Brockton, and Chelsea—are "majority people of color."[5]

5.      Plaintiffs seek declaratory, injunctive, and mandamus relief to ameliorate the immense harm created by the July 21 Memorandum, including but not limited to intrastate and interstate vote dilution, loss of political representation, loss of funding, and dignitary harms caused by the exclusion of undocumented immigrants from the congressional apportionment base and the use of improper, overbroad, and inaccurate methodologies to effectuate such an exclusion.

6.      By declaring that undocumented individuals will not be counted for the purposes of congressional apportionment—in the midst of Census 2020 operations—Defendants discouraged many immigrant community members from participating in Census 2020, thereby

---

[1] Mark Melnik, Gail Waterhouse & Luc Shuster, *Overview and Regional Analysis: Changing Faces of Greater Boston*, Boston Indicators, at 11 (2019).

[2] *Id*.

[3] Tim Jones, *Diversity in Massachusetts: The 25 most diverse towns and cities of 2019*, MassLive (Aug. 26, 2019); Meghan E. Irons, *Immigration has transformed Greater Boston over the last three decades*, The Boston Globe (May 8, 2019).

[4] U.S. Census Bureau, *Quick Facts: Massachusetts* (July 1, 2019).

[5] Melnik et al., *supra* note 1, at 8.

depriving residents of those communities of both political representation and billions of dollars in census-linked funds and programs.

7. Because no legal methodology currently exists to identify, locate, and exclude undocumented immigrants from the congressional apportionment base, the implementation of the July 21 Memorandum would necessarily involve the use of statistical sampling and the attendant misidentification, mislabeling, and exclusion of U.S. citizens, legal permanent or conditional residents, and other legal aliens from the congressional apportionment base, including and especially the household members of undocumented immigrants, who are overwhelmingly Black and Latinx.

8. This would have dire effects for Plaintiffs, their members, and their client communities, ranging from the potential loss of a congressional seat, to the redrawing of congressional boundaries, to impacts on intrastate redistricting, as Massachusetts is required to use the decennial census in its redistricting. *See, e.g.,* Mass. Const. Amend. art. CIX ("[E]very person shall be considered an inhabitant of the city or town of his usual place of residence in accordance with standards used by the United States from time to time in conducting the federal census required by Section 2 of Article I of the Constitution."); *id.*, art. CXVII, CXIX (stating federal census "shall be the basis" for determining representative, senatorial, and councilor districts for the ten year period).

9. The July 21 Memorandum is part of a racially discriminatory scheme to reduce the political representation of communities of color and increase the over-representation of white voters. By complying with the July 21 Memorandum and producing population tabulations excluding undocumented individuals for congressional apportionment, Secretary of Commerce Wilbur Ross, Director Steven Dillingham, the Census Bureau, and the Department of Commerce

4

(together, the "Agency Defendants") will deny immigrants of color, foreign-born residents, undocumented residents, and non-citizens the political representation and census-linked federal funding to which they are entitled, on the basis of their race and national origin.

10.    The July 21 Memorandum directs the Agency Defendants to violate the Administrative Procedure Act ("APA") in multiple ways. First, the July 21 Memorandum instructs the Secretary of Commerce to exclude undocumented immigrants from the congressional apportionment base, in violation of Article I, Section 2 of the Constitution, as amended by Section 2 of the Fourteenth Amendment. Second, the Agency Defendants' compliance with the July 21 Memorandum is intended to and will discriminate against Black and Latinx immigrants, non-citizens, undocumented residents, and foreign-born individuals because of their race, national origin, or alienage. Third, by declaring his intention to comply with the July 21 Memorandum, the Secretary of Commerce is improperly allowing Defendant Trump to usurp the discretion delegated to the Secretary by Congress, and thus has exceeded his statutory authority over the conduct of the decennial census.

11.    The Court should enjoin the Agency Defendants' compliance with the July 21 Memorandum because the Memorandum directly contravenes the Constitutional requirement to conduct an "actual Enumeration" of all persons in the United States for the purpose of congressional apportionment and to apportion representatives among the states according to their respective numbers based on a count of "the whole number of persons in each state" (U.S. Const., art. I, § 2, cl. 3), and will require the Department and the Bureau to use statistical sampling in the determination of population for purposes of apportionment, in violation of 13 U.S.C. § 195.

12.     The Court should also enjoin compliance with the July 21 Memorandum because it operates and will operate in direct contravention of the roles that the President and the Secretary of Commerce are directed and authorized by statute to play in connection with the census, as described in 2 U.S.C. § 2a(a) and 13 U.S.C. § 141(b).

13.     Finally, the Court should also enjoin compliance with the July 21 Memorandum because it is motivated by racial animus, discriminates against Black and Latinx immigrants, undocumented residents and foreign-born individuals, and is intended to dilute the representation of individuals in those protected classifications and to deprive them of the financial resources to which they are entitled, in violation of the Equal Protection guarantee of the Fifth Amendment of the U.S. Constitution.

14.     Accordingly, Plaintiffs seek declaratory, injunctive, and mandamus relief to prevent Defendants from violating Article I, Section 2, Clause 3 of the U.S. Constitution, the Equal Protection Clause of the U.S. Constitution, the Administrative Procedure Act, 13 U.S.C. § 195, 13 U.S.C. § 141(b), and 2 U.S.C. § 2a(a).

## PARTIES

15.     Plaintiff Haitian-Americans United, Inc. (HAU) is a non-profit, membership organization founded and incorporated in the Commonwealth of Massachusetts to improve the quality of life of Haitians and Haitian-Americans through education, community empowerment, civic engagement, and cultural development. HAU is the leading Haitian community-based advocacy organization dedicated to empowering immigrants and refugees in Greater Boston, home to the third-largest Haitian and Haitian-American community in the United States. As a focal point for the Haitian-American community, the organization frequently plans and coordinates major undertakings, advocacy work, events, programs, and activities that are widely

6

attended by its thousands of members. In particular, HAU promotes civic education, voter

engagement, and community empowerment, and encourages voter participation.

16.    For example, on October 24, 2020, HAU is joining with twelve other Haitian-

American organizations in twelve other states to hold a non-partisan rally in support of National

Early Vote Day, the purpose of which is to present a "united front" to encourage citizens—

including and especially citizen members of HAU—to exercise their right to vote and to "further

engage immigrant communities in future local, regional, and national electoral processes."

17.    Among HAU's members are a number of undocumented residents, as well as

individuals in mixed-status families, i.e., families that include some members who are

documented and others who are undocumented. HAU also has many members who are U.S.

citizens who regularly exercise their right to vote. HAU is also affiliated with multiple public and

private partner organizations, including churches and other civic and community-based

organizations that provide services to Haitian and Haitian-American residents.

18.    Haitians are the third-largest ethnic group in the City of Boston, and they also

have a significant presence in Everett, Brockton, and Randolph.

19.    An accurate census count, including Haitian immigrants who are undocumented

and the household members of undocumented Haitian immigrants, is crucial to ensuring that the

Haitian members of HAU and of the communities that it serves are represented on city councils

in these cities, as well as in the Massachusetts State House and in congressional districts.

20.    HAU uses census data—and will use data from Census 2020—in connection with

its application for grants, in order to demonstrate the need for funding to help Haitian immigrants

and non-immigrants in the communities that it serves. The last census indicated that there are

56,000 Haitians in Massachusetts, but HAU believes (based on its own data and experience

working in those communities) that the actual number of Haitians in Massachusetts is close to 87,000.

21.     A count of the Haitians present in Massachusetts that does not include undocumented immigrants will prevent HAU from securing the funding needed to help its members, and other members of the Haitian-American community in Massachusetts.

22.     The President's Memorandum sends a clear message to undocumented immigrants—including undocumented immigrants who are members HAU or of the communities that HAU serves—that they do not count, and that so far as the U.S. government is concerned they are not considered "persons." This message harms the dignity of those persons, denies them their civil rights, and undermines the HAU's message to its immigrant-members, documented and otherwise, (i) that they are welcome in the United States, (ii) that the U.S. government cares about them, (iii) that they should apply for the government benefits to which they are entitled, and (iv) that they matter in this society.

23.     Most of HAU's membership and the clients it serves are part of hard-to-count populations—which, according to the Census Bureau, include racial and ethnic minorities, undocumented individuals, individuals living in non-traditional housing, low-income individuals, and persons who "distrust the government."[6] In particular, HAU is aware that many Haitians and Haitian-Americans are mistrustful of governmental authorities, due to a long history of U.S. discriminatory immigration policies, oppression by exploitative political leaders in Haiti, stigma by federal healthcare officials during the HIV/AIDS pandemic, and their experience of racial profiling and targeting by U.S. immigration and law enforcement authorities.

---

[6] Maryann M. Chapin, *2020 Census: Counting Everyone Once, Only Once, and in the Right Place*, U.S. Census Bureau 1, 42 (2018), https://www2.census.gov/programs-surveys/decennial/2020/program-management/pmr-materials/10-19-2018/pmr-hard-to-count-2018-10-19.pdf .

24.     Given the impact of the COVID-19 pandemic on Black communities in Massachusetts, particularly immigrant communities, an accurate decennial census count is critical to the receipt of enhanced federal funding to strengthen health care systems, workforce development programs, affordable housing, and resources for Title I schools.[7]

25.     HAU worked to mobilize Haitian-Americans to respond to Census 2020 for more than a year before the Census Bureau prematurely concluded its self-response and field data operations for the 2020 Census on October 15, 2020. Because the Haitian and Haitian-American immigrant community has historically been undercounted, HAU dedicated a significant amount of time and staff and invested thousands of dollars in systematic, intensive efforts to ensure immigrant community participation in Census 2020. HAU has also been engaged in strategic coordination with out-of-state partners who have assessed the devastating impact of undercounting residents of Haitian communities living in neighboring states and around the country. HAU has incorporated Census 2020 into many of their trainings, classes, and workshops. For example:

a.   In 2019, HAU launched a grassroots census outreach campaign called "Fòk Nou Tout Konte" (We Must Be Counted), which included creating bilingual Haitian Creole-English commercials, door-knocking and connecting the census to Haitian Heritage Month (May 2019 and May 2020);

b.   HAU hosted virtual Town Halls every Saturday, focusing on Census 2020 and COVID-19; and

[7] Massachusetts Public Health Association, *Press Release: COVID-19 Rate for Latinx and Black Residents Three Times that of White Residents, According to New Analysis*, Massachusetts Public Health Association 1, 1–2 (Apr. 22, 2020), https://mapublichealth.org/wp-content/uploads/2020/04/Press-Release-Data-Disparities-4.22.20-Final.pdf (stating COVID-19 rate for Latinx and Black residents triple that of White residents); Partners in Health, *COVID-19 Disproportionately Impacts Immigrants in Massachusetts*, Partners in Health (July 23, 2020), https://www.pih.org/article/covid-19-disproportionately-impacts-immigrants-massachusetts (reporting Massachusetts' "hardest hit communities are home to large immigrant populations").

     c.   HAU went live on Facebook every evening at 8pm from Mondays to Thursdays on community issues, including Census 2020.

26.    HAU's work to engage immigrant communities, including and especially undocumented residents, in Census 2020 was severely and irreparably harmed by the July 21 Memorandum. HAU dedicated considerable staff time and local and national resources to reaching undocumented residents who were fearful of participating in Census 2020 because of the July 21 Memorandum. The Memorandum had the effect of discouraging immigrant Haitians and Haitian-Americans in Massachusetts and elsewhere from participating in Census 2020, thus undercutting HAU's efforts and investment of time and resources and undermining the confidence and dignity of both documented and undocumented residents.

27.    The implementation of the July 21 Memorandum will severely threaten and impair HAU's mission of empowering Haitian-American communities through civic action, as it will dilute the voting power of Haitian-American communities, precluding them from receiving the representative and political power to which they are entitled at the local, municipal, state, and federal level. In addition, the labeling of undocumented immigrants as "non-persons" has and will continue to create fear and dignitary harm in the Haitian-American immigrant communities, making it considerably more difficult for HAU to encourage political and civic engagement and to encourage members to trust the federal government.  HAU has been forced to divert scarce resources from other programming to counter these harms, which has put an inordinate strain on the organization in the midst of the COVID-19 pandemic.

28.    The implementation of the July 21 Memorandum will also dilute the voting and political power of HAU's U.S. citizen members. Because these members overwhelmingly reside in the Mattapan neighborhood of Boston, as well as Everett, Randolph, and Brockton, where the

number of Haitian, undocumented, and other immigrant residents far exceeds the Massachusetts state average, the implementation of the July 21 Memorandum will cause HAU's members to be deprived of political power and funding that will instead go to other regions of the Commonwealth.

29.     Plaintiff Brazilian Worker Center (BWC) is a grassroots, community-based, non-profit worker center that represents, supports, and organizes the Brazilian and wider immigrant community in Greater Boston and Massachusetts—which is home to the largest Brazilian population in the United States—to defend and advocate for their rights. Founded in 1995, BWC uses organizing, advocacy, education, leadership, and capacity building to join immigrant workers and their families in the fight against economic, social, and political marginalization and in working to create a more just society.

30.     BWC provides a number of programs, trainings, and services to the Brazilian and immigrant community including training workers in leadership development, English proficiency, computer literacy and public speaking; providing Know-Your-Rights trainings on state and federal laws regarding workplace safety; acting as a registered service to assist families with immigration applications and appeals; and obtaining restitution for workers through direct mediation, in small claims court, or through complaint referrals.

31.     BWC is currently participating or has in the past participated as a research partner with the University of Massachusetts Boston, Boston University, Harvard University, Tufts University, Northeastern University's School of Law, the National Domestic Workers Alliance, and the Dana Farber Cancer Center on projects pertaining to domestic work conditions and immigrant health, including, for example, surveys on working conditions of domestic workers in

Massachusetts and Connecticut through funding from the Sociological Initiatives Foundation. All of this research relies heavily on data gathered during the decennial census.

32.    BWC serves large Brazilian-immigrant communities in, among others, the following Massachusetts municipalities: Revere, Everett, East Boston, Watertown, Somerville, Framingham, Stoughton, Rockland, Brockton, Roslindale, Hyannis, Canton, and Martha's Vineyard. Many of the individuals served by BWC are undocumented, or are members of mixed-status families, i.e., families that include individuals who are undocumented and others who are not. BWC also serves hundreds of individuals who are U.S. citizens and who regularly exercise their right to vote.

33.    The Brazilian-immigrant communities in these municipalities are politically underrepresented and under-resourced. If the undocumented Brazilian immigrants in those communities are not counted in the Census, and thus are excluded from the population base for purposes of apportionment, the Brazilian-immigrant communities that BWC serves will suffer a greater reduction in political power, and in the resources available to their communities.

34.    The President's Memorandum sends a clear message to undocumented immigrants—including undocumented immigrants who are members of the communities that BWC serves—that they do not count, and that so far as the U.S. government is concerned they are not considered "persons." This message harms the dignity of those persons, denies them their civil rights, and undermines the BWC's message to its immigrant-members, documented and otherwise, that they should apply for the government benefits to which they are entitled.

35.    Most of the individuals BWC serves are part of hard-to-count populations—which, according to the Census Bureau, include racial and ethnic minorities, undocumented individuals, individuals living in non-traditional housing, low-income individuals, and persons who "distrust

the government."[8] In particular, many Brazilian immigrants are mistrustful of governmental authorities both due to their experiences under military rule in Brazil and their experience of racial profiling and targeting by U.S. immigration and law enforcement authorities.

36.     Particularly in light of the impact of the COVID-19 pandemic on Black and Latinx individuals in Massachusetts, especially Black and Latinx immigrants, an accurate decennial census count is critical to receiving enhanced federal funding to strengthen health care systems, workforce development programs, affordable housing, and resources for Title I schools.

37.     BWC worked to mobilize Brazilian and immigrant residents of Massachusetts for the decennial census for over a year before the Census Bureau prematurely concluded its self-response and field data operations for the 2020 Census on October 15, 2020. Because Brazilian and Brazilian-American immigrant communities have historically been undercounted, BWC dedicated hundreds of hours and thousands of dollars to systematic, intensive efforts to encourage members of those communities to participate in Census 2020. For example:

     a.   BWC is a leading member of the Brazilian Census Commission 2020, whose five nonprofit member groups deeply engaged in the Brazilian community to develop strategies to activate census participation among Brazilian immigrants.

     b.   After June 27, 2019, BWC made more than thirty posts on its Facebook page, which has a reach of approximately 7,300 followers, featuring bilingual English - Portuguese educational videos and resources regarding Census 2020.

     c.   On March 12, 2020, BWC hosted a training for its members and staff on the importance of the Census to the Brazilian community in partnership with a Brazilian U.S. Census Bureau Partnership Specialist; and

---

[8] Chapin, *supra* note 6, at 42.

d. To assist struggling families during the COVID-19 pandemic, BWC operated a free weekly food distribution campaign called "Comida para Todos en Solidariedade." In the food bags distributed to families, BWC included robust bilingual English-Portuguese educational materials on Census 2020.

38. BWC's work to engage immigrant communities, including and especially undocumented residents, in Census 2020 was severely harmed by the July 21 Memorandum. BWC dedicated considerable staff time and resources to reaching undocumented residents who were fearful of participating in Census 2020 because of the July 21 Memorandum. The Memorandum had the effect of discouraging undocumented and immigrant Brazilian and Brazilian-American residents in Massachusetts and elsewhere from participating in Census 2020, thus undercutting BWC's efforts and investment of time and resources and undermining the confidence and dignity of both documented and undocumented residents.

39. The implementation of the July 21 Memorandum will cause the cities in which BWC works to be harmed by diminished representation in the Massachusetts House of Representatives. Thousands of residents in cities like Somerville and Boston will not be included in the population count, and those counts must, under the Massachusetts Constitution, be used to draw the legislative districts that will remain in place for the next ten years. The effect of a loss of representation in the state legislature will result in inequitable influence, funding, and resources for communities served by BWC. In the absence of this financial support, BWC will be forced to dedicate and divert resources beyond their regular programming to meeting the needs of their immigrant clients.

40. Plaintiff Chelsea Collaborative, Inc. is a 501(c)(3) non-profit membership organization incorporated in and based in Chelsea, Massachusetts. The mission of the

Collaborative is to enhance the social, environmental and economic health of the community and its people. The Collaborative provides numerous services to the immigrant community in Chelsea, including citizenship classes, summer employment for teenagers, landlord-tenant education, and voter mobilization.

41.    The Collaborative has hundreds of members, many of whom are Latinx and are immigrants or members of mixed-status families. A considerable percentage of the Collaborative's members and the individuals and families it serves are undocumented immigrants. The Collaborative is based in Chelsea, Massachusetts, a majority-minority city that has a larger Latinx and immigrant population than Massachusetts or the United States as a whole. Chelsea has long been a gateway city for immigrants, refugees, and asylum-seekers from Russia and Ireland to Somalia and El Salvador. The Collaborative also has many members who are U.S. citizens who regularly exercise their right to vote.

42.    Chelsea residents are overwhelmingly working-class, immigrant families of color. Approximately 66.9% of residents identify as Hispanic or Latinx and over 45% of residents identify as foreign-born.[9] With over 70% of residents over the age of five speaking a language other than English at home,[10] Chelsea also has the highest share of adults speaking limited English of any city in Massachusetts, with 33% of those who speak a language other than English at home reporting that they speak English less than "very well."[11] Over 18% of Chelsea residents live in poverty and the City's median household income is over $20,000 less than that of the

---

[9] U.S. Census Bureau, *Quick facts—Chelsea city, Massachusetts—population estimates* (last visited July 27, 2020 9:21 AM), https://www.census.gov/quickfacts/chelseacitymassachusetts.

[10] *Id.*

[11] Boston Planning & Development Agency Research Division, *Demographic profile of adult limited English speakers in Massachusetts*, Boston Planning & Development Agency 1, 3 (Feb. 2019), http://www.bostonplans.org/getattachment/dfe1117a-af16-4257-b0f5-1d95dbd575fe.

Commonwealth as a whole.[12] Nearly 80% of Chelsea's workers were deemed "essential" under the Governor's order closing nonessential workplaces to combat the COVID-19 pandemic, serving in occupations like food service and preparation and healthcare.[13] The City's public-school system well illustrates the diversity and challenges of its population: in the 2019-20 academic year, 93% of students are children of color, 42.5% are English Language Learners, and 63.9% are economically disadvantaged.[14]

43.     The City of Chelsea self-identifies as a "sanctuary city" and has worked closely with the Chelsea Collaborative to deprioritize local law enforcement participation in federal civil immigration enforcement in an effort to promote public safety and confidence in local law enforcement. In February 2017, the City of Chelsea, along with the City of Lawrence, brought a lawsuit against the President and members of the administration challenging the constitutionality of the President's executive order threatening to withdraw federal funding from "sanctuary jurisdictions."

44.     The above combination of factors—including but not limited to language barriers, poverty and housing instability, and lack of internet access—render Chelsea a highly hard-to-count community.[15]

---

[12] U.S. Census Bureau, *supra* note 9.

[13] Nik DeCosta-Klipa, *Why the City of Chelsea has been Hit So Hard by Coronavirus*, Boston.com (Apr. 10, 2020), https://www.boston.com/news/local-news/2020/04/10/chelsea-massachusetts-coronavirus.

[14] , Mass. Dep't of Elementary and Secondary Educ., *Selected Populations (2019-2020): Chelsea* (00570000), School and District Profiles (last visited July 27, 2020), http://profiles.doe.mass.edu/profiles/student.aspx?orgcode=00570000&orgtypecode=5&leftNavId=305. To qualify as "economically disadvantaged," a student or the student's family must be participating in one or more of the following programs included in the Commonwealth's direct certification system: Supplemental Nutrition Assistance program, Transitional Aid for Families with Dependent Children, Medicaid, and children under the care of the Department of Children and Families. Mass. Dep't of Elementary and Secondary Educ., Redefining Low Income—A New Metric for K-12 Education, Dep't of Educ. (July 6, 2015), http://www.doe.mass.edu/infoservices/data/ed.html. M.G.L. c. 71A, § 2(d) defines an "English learner" as a child who "does not speak English or whose native language is not English and who is not currently able to perform ordinary classroom work in English." Mass. Gen. Laws ch. 71A § 2(d) (2020).

[15] *See* Chapin, *supra* note 6, at 41–43 (defining hard to count populations).

45.     In June 2020, the Editorial Board of the *Boston Globe* noted that Chelsea's "improbably, impossibly low" undercount in the 2010 Census has "haunted the city for a decade," depriving the "densely packed immigrant city" of its "fair share of federal health, housing and economic development funds"—all of which are tied to population—and made Chelsea "ineligible" for funding that may have assisted the City in addressing issues like "mold and lead paint in its aging housing stock."[16]

46.     Particularly in light of the staggeringly high rates of COVID-19 in Chelsea—the highest per capita in the entire Commonwealth—an accurate and complete decennial census count is critical to receiving enhanced federal funding to strengthen health care systems, workforce development programs, affordable housing, and resources for Title I schools. Chelsea receives approximately 8% of its annual budget from federal funding.[17]

47.     The Chelsea Collaborative has worked to mobilize residents of Chelsea and the surrounding communities for the decennial census for over three decades. Because Latinx immigrant communities have historically been undercounted, the Chelsea Collaborative dedicated hundreds of hours and thousands of dollars to systematic, intensive efforts to ensure immigrant community participation in Census 2020. The Collaborative incorporated Census 2020 into many of their trainings, classes, and workshops. For example:

    a.     Beginning in spring 2019, the Collaborative organized street fairs, network gatherings, canvassing, and table conversations through *Noches Sociales* on the topic of Census 2020.

---

[16] The Editorial Board, *Low-balling the Chelsea population threatens the state's coronavirus epicenter*, The Boston Globe (Jun. 14, 2020), https://www.bostonglobe.com/2020/06/14/opinion/an-undercounted-population-threatens-chelsea-states-coronavirus-epicenter/?p1=Article_Inline_Text_Link.

[17] Shannon Dooling, *In Chelsea, suing Trump is about more than protecting federal dollars*, WBUR (Apr. 13, 2017).

b.   In March 2020, the Collaborative and its partners mobilized hundreds of staff and
     volunteers for a major tri-city outreach initiative across Chelsea, Everett, and
     Revere, knocking on doors in every corner of the cities to provide bilingual
     English-Spanish information on Spanish 2020.

c.   The Collaborative sponsored a Special Immigration Edition of *El Planeta* with in-
     depth features on Census 2020, including questions residents could expect to see on
     the census, common myths, and frequently asked questions about how to be
     counted safely.

d.   In partnership with Lawyers for Civil Rights, the Collaborative hosted over a
     dozen bilingual English-Spanish workshops since September 2019 educating staff
     and members on the financial and political necessity of a complete count. After
     the COVID-19 pandemic began, that programming was conducted via Zoom and
     Facebook Live; and

e.   Since June 2018, the Collaborative has created more than thirty bilingual English-
     Spanish posts featuring educational content about Census 2020 on its Facebook
     page, which has over 7,000 followers.

48.   The Collaborative provides direct services connecting members with critical
housing, nutrition, and childcare benefits. Many of these resources depend on federal funds
directly linked to Census 2020, including Housing Choice Vouchers (also known as Section 8),
Supplemental Nutrition Assistance Program (SNAP), and Special Supplemental Nutrition
Program for Women, Infants, and Children (WIC).

49.   The Collaborative's work to engage immigrant communities, including and
especially undocumented residents, in Census 2020 was severely undermined by the July 21

Memorandum. The Collaborative dedicated considerable staff time and resources to reaching

undocumented residents who were fearful of participating in Census 2020 because of July 21

Memorandum. The Memorandum had the effect of discouraging undocumented and immigrant

Chelsea residents from participating in Census 2020, thus undercutting Chelsea Collaborative's

efforts and investment of time and resources and undermining the confidence and dignity of both

documented and undocumented residents.

50.     The implementation of the July 21 Memorandum and the exclusion of

undocumented immigrants from the congressional apportionment base will cause real and

devastating harm to the Collaborative, its members, and the individuals it serves.

51.     The July 21 Memorandum directly contradicted the messaging of the

Collaborative and the City of Chelsea by stating that not everyone counts, that not everyone is a

"person" within the meaning of the Constitution, and that undocumented immigrants can and

will be identified in order to be removed from the apportionment count. This contradiction has

contributed to immigrants' distrust of the federal government, as well as their local municipal

government, even though the City of Chelsea has self-identified as a sanctuary city.. This has

undermined and frustrated the Collaborative's mission of providing city-specific services,

including in education, criminal justice, and housing, as immigrants are wary of providing their

information even to local government.

52.     The removal from the congressional base of undocumented immigrants—and any

individuals wrongly excluded because of the use of statistical sampling or other inaccurate

methodologies—will result in insufficient funds, data, and political representation for the

Collaborative to adequately address the ongoing public health crisis and their ability to provide

necessary and life-saving healthcare and economic support for residents.

53.     Based on its long experience serving the City of Chelsea, the Collaborative estimates that there are between 15,000 and 20,000 individuals residing in the City of Chelsea who are undocumented or who have Temporary Protected Status (TPS) or Deferred Action for Childhood Arrivals (DACA). The Collaborative estimates that around 13,000 individuals are undocumented.

54.     Chelsea Collaborative relies heavily on Community Development Block Grant funding – the amount of which, going forward, will be based on the Census 2020 numbers for the communities that Chelsea Collaborative serves. Accordingly, a count of the persons in those communities that does not include undocumented immigrants will prevent Chelsea Collaborative from securing the funding needed to serve those communities, which are among those that have been most heavily impacted by the COVID-19 pandemic.

55.     The Collaborative also receives funding from MassHire and Common Corp., which it uses to fund its youth programming. The amount of funding that it receives from these sources, also, will be based the number of young people in Chelsea based on the Census 2020 numbers. Thus, an undercount of the young people in Chelsea, and a failure to include young people who are undocumented immigrants in the count, will decrease the amount of such funding that the Collaborative receives to provide programming for young people in Chelsea.

56.     The Collaborative has dedicated considerable resources to diversifying civic leadership in Chelsea, including through a partnership with the MassInc Gateway Cities Innovation Institute. This work has included creating a pipeline of immigrant leaders from the community, know your rights presentations, leadership training, campaign development, mobilization, year-round voter education and mobilization, and engaging residents on local and state policy and legislative campaigns.

57.    The City of Chelsea currently shares representation in the Massachusetts legislature with the Charlestown neighborhood of Boston, Saugus, and Ward 6 in Revere. The residents of these areas are primarily white and non-Latinx, and their interests often differ from those of Chelsea's predominantly Latinx residents. If the total population of Chelsea were to be included in the congressional apportionment base, including undocumented immigrants, Chelsea could have its own representative in the Massachusetts legislature, who would better represent the interests of Chelsea's Latinx community.

58.    Going forward, the district boundaries for the City of Chelsea's city council and school committee will be determined based on the results of Census 2020. Currently, 6 of 11 City Council members are Latinx, as are 7 of the 9 School Committee members. However, if undocumented immigrants are not included in the Census 2020 count, those districts will be redrawn based on inaccurate numbers. The effect will be to shift political power to the White-dominated sections of the City, while stripping neighborhoods in which Latinx immigrants primarily reside of the power that they have been building due in considerable part to the engagement and mobilization efforts of the Collaborative to get Latinx people elected to the city council and school committee.

59.    The President's Memorandum sends a clear message to undocumented immigrants—including undocumented immigrants who are members of the Collaborative—that they do not count, and that so far as the U.S. government is concerned they are not considered "persons." This message harms the dignity of those persons, denies them their civil rights, and undermines the Collaborative's message to its immigrant-members, documented and otherwise, that they should apply for the government benefits to which they are entitled.

21

60.     For example, the Collaborative has an active Tenants' Council and provides numerous housing services to its members and to individuals within the community. The Memorandum's clear statement that undocumented individuals are not persons within the meaning of the Constitution has and will continue to undermine the Collaborative's assistance to and support of individuals facing harassment, unsafe living conditions, or unlawful evictions from landlords who threaten to report them to ICE if they assert their rights under state law.

61.     The Collaborative has seen firsthand that the July 21 Memorandum has conveyed and will continue to convey to undocumented residents of Chelsea that their lives are worthless; they must live in the shadows and cannot access any government benefit or service.

62.     The implementation of the July 21 Memorandum will also dilute the voting and political power of the Collaborative's U.S. citizen members. Because these members overwhelmingly reside in Chelsea, where the number of Latinx, immigrant, and undocumented residents far exceeds the Massachusetts state average, the implementation of the July 21 Memorandum will cause the Collaborative's members to be deprived of political power and funding that will instead go to other regions of the Commonwealth.

63.     Established in 1981, Plaintiff Centro Presente is a state-wide Latin American immigrant organization dedicated to the self-determination and self-sufficiency of the Latin American immigrant community of Massachusetts. The non-profit organization was founded by Sister Rose Marie Cummings in direct response to the rapidly growing community of refugees fleeing violence during the civil war conflicts in Central American in the 1980s. Operated and led primarily by Central American immigrants, Centro Presente struggles for immigrant rights and for economic and social justice.

64.    Centro Presente has hundreds of members, many of whom are Latinx and are immigrants or members of mixed-status families. A considerable percentage of Centro Presente's members and the individuals and families it serves are undocumented immigrants. Centro Presente also has many members who are U.S. citizens who regularly exercise their right to vote.

65.    Centro Presente is based in East Boston, a majority-minority neighborhood that, by percentage, has a larger Latinx and immigrant population than Boston, Massachusetts or the United States as a whole. East Boston is home to more than 45,000 residents, most of them working-class immigrants of color. More than half of East Boston residents identify as Hispanic or Latinx, and almost half were born outside the United States to non-citizen parents.[18] By comparison, 44.5% of Boston's overall population (and in many neighborhoods, well more than 70%) identifies as white and non-Hispanic, while only 33.2% of East Bostonians do.[19] Nearly half of East Boston's residents do not speak English as their primary language and have a limited ability to speak, read, write or understand English.[20] East Boston's median household income is almost $10,000 below that of Boston generally; nearly a third of households live on less than $35,000 per year, and 19.3% of residents live below the federal poverty line.[21] In a city where nearly half the population has earned at least a bachelor's degree, only 26.2% of East Bostonians have done so.[22]

---

[18] *See, e.g.*, Boston Planning & Development Agency Research Division, *Boston in Context: Neighborhoods*, Boston Planning & Development Agency 1, 8, 10 (Feb. 2020), http://www.bostonplans.org/getattachment/1882b00d-48fe-41bc-ac1a-6979e25dbaf1 (reporting that 56.4% of East Boston residents are Hispanic or Latino and that 49.5% are foreign born).

[19] *Id.* at 8.

[20] *See, e.g.*, City of Boston, *Language and Communications Access: Demographic Data Report—Limited English Proficiency* 1, 3 (2018), https://www.boston.gov/sites/default/files/document-file-11-2018/demographic_ data_report_-_neighborhood_depth_lep_with_accom_notice_2.pdf (reporting, based on 2011-2015 data, that 46% of East Boston residents, or more than 19,000 people, have limited English proficiency).

[21] Boston in Context: Neighborhoods, *supra* note 18, at 23, 25.

[22] *Id.* at 14.

66.     Because a considerable percentage of Boston's population lives in hard-to-count tracts, the City as a whole is the "ninth hardest to count city in the nation when measured against the 100 largest U.S. cities."[23] Boston's hard-to-count tracts are concentrated in the neighborhoods of Dorchester, Roxbury, and East Boston, all of which are majority-minority communities.

67.     As of July 27, 2020, Boston ranked in the bottom five cities statewide for census self-response, with just 53% of residents completing Census 2020.[24]

68.     Most of the individuals Centro Presente serves are part of hard-to-count populations— which, according to the Census Bureau, include racial and ethnic minorities, undocumented individuals, individuals living in non-traditional housing, low-income individuals, and persons who "distrust the government."[25] In particular, many immigrants, including the Latinx immigrants who Centro Presente includes and serves, are mistrustful of governmental authorities, both due to their experiences under military or dictator rule in Central America and their experience of racial profiling and targeting by U.S. immigration and law enforcement authorities.

69.     Particularly in light of the impact of the COVID-19 pandemic on Latinx individuals (and especially Latinx immigrants) in Massachusetts, an accurate decennial census count is critical to receiving enhanced federal funding to strengthen health care systems, workforce development programs, affordable housing, and resources for Title I schools.

---

[23] Peter Ciurczak, *Census 2020, explained: how it works and what's at stake for Massachusetts*, Boston Indicators (last visited July 27, 2020), https://www.bostonindicators.org/reports/report-website-pages/census-2020.

[24] Zoe Greenberg, Boston is usually undercounted in the census. This year may be worse, The Boston Globe (Jul. 27, 2020).

[25] Chapin, *supra* note 6, at 42.

70.     Through community organizing, leadership development, and basic services, Centro Presente works to give its members a voice and to build political and community power. Encouraging and promoting resident participation in Census 2020 was a critical means of achieving that goal. In particular, Centro Presente dedicated considerable staff time and financial resources to engaging the Latinx immigrant community in Census 2020. For example:

    a.   In July 2019, Centro Presente and its partner Lawyers for Civil Rights launched a campaign called "Let's Be Counted for Census 2020" that included bilingual social media posts, videos, and other tools to inform Spanish-speaking community members about the importance of the census;

    b.   Organizers with Centro Presente engaged in door-to-door campaigning in East Boston until a state of emergency was declared in Massachusetts in March 2020. Organizers sought to boost participation through virtual community meetings, phone banking fliers, and social media;

    c.   Centro Presente distributed bilingual fliers about the census along with food boxes to needy families; and

    d.   Centro Presente hosted bilingual English-Spanish workshops on Facebook live in partnership with both Lawyers for Civil Rights and the City of Boston to inform its members regarding how to complete Census 2020 securely and the importance of Census 2020 in funding and empowering immigrant communities.

71.     Centro Presente's work to engage immigrant communities, including and especially undocumented residents, in Census 2020 was severely harmed by the July 21 Memorandum. Centro Presente dedicated considerable staff time and resources to reaching undocumented residents who were fearful of participating in Census 2020 because of the July 21

Memorandum. The Memorandum had the effect of discouraging undocumented and immigrant East Boston residents from participating in Census 2020, thus undercutting Centro Presente's efforts and investment of time and resources and undermining the confidence and dignity of both documented and undocumented residents.

72.     The East Boston community that Centro Presente serves, and in which its members live, currently shares representative on the Boston City Council with the Charlestown and North End neighborhoods of Boston. The residents of Charlestown and the North End are primarily white and non-Latinx, and their interests often differ from those of East Boston's predominantly Latinx residents. With an accurate Census 2020 count of all persons in East Boston, including undocumented immigrants, East Boston could have its own representative on the Boston City Council, who would better-represent the interests of East Boston's Latinx community.

73.     The President's Memorandum sends a clear message to undocumented immigrants—including undocumented immigrants who are members of or are served by Centro Presente—that they do not count, and that so far as the U.S. government is concerned they are not considered "persons." This message harms the dignity of those persons, deprives them of their civil rights, and undermines Centro Presente's message to its immigrant-members, documented and otherwise, that they should apply for the government benefits to which they are entitled.

74.     The implementation of the July 21 Memorandum will severely threaten and impair Centro Presente's mission of empowering Latinx communities through civic action, as it will dilute the voting power of Latinx communities, precluding them from receiving the representative and political power to which they are entitled at the local, municipal, state, and

federal level. In addition, the labeling of undocumented immigrants as "non-persons" has and will continue to create fear and dignitary harm in Latinx immigrant communities, making it considerably more difficult for Centro Presente to encourage political and civic engagement and to encourage members to trust the federal government.  Centro Presente has been forced to divert scarce resources from other programming to counter these harms, which has put an inordinate strain on the organization in the midst of the COVID-19 pandemic.

75.    The implementation of the July 21 Memorandum will also dilute the voting and political power of Centro Presente's U.S. citizen members. Because these members overwhelmingly reside in East Boston, where the number of Latinx, immigrant, and undocumented residents far exceeds the Massachusetts state average, the implementation of the July 21 Memorandum will cause Centro Presente's members to be deprived of political power and funding that will instead go to other regions of the Commonwealth.

76.    Plaintiff Gladys Vega is a U.S. citizen, the Executive Director of the Chelsea Collaborative, and a resident of Chelsea, Massachusetts. She is of Latina ethnicity and originally from Puerto Rico. She is a registered voter and regularly exercises her right to vote.

77.    Plaintiff Norieliz DeJesus is a U.S. citizen, the Director of Policy and Organizing at the Chelsea Collaborative, and a resident of Chelsea, Massachusetts. She is of Latina ethnicity. She is a registered voter and regularly exercises her right to vote.

78.    Plaintiff Roy Avellaneda is a U.S. citizen, a resident of Chelsea, Massachusetts, and the President of the Chelsea City Council. He is of Latino ethnicity. He is a registered voter and regularly exercises his right to vote.

79.    Plaintiff Dieufort Fleurissaint is a naturalized U.S. citizen, a member of HAU, and a resident of the neighborhood of Mattapan in Boston, Massachusetts. He is of African American

ethnicity and Haitian national origin. He is a registered voter and regularly exercises her right to vote.

80.    Plaintiff Martha Flores is a naturalized U.S. citizen, a member of the Chelsea Collaborative, and a resident of Chelsea, Massachusetts. She is of Latina ethnicity and of El Salvadoran national origin. She regularly exercises her right to vote.

81.    Plaintiff Jessica Armijo is a naturalized U.S. citizen, a member of the Chelsea Collaborative, and a resident of Chelsea, Massachusetts. She is of Latina ethnicity and Honduran national origin. She regularly exercises her right to vote.

82.    The July 21 Memorandum will result in a loss of funds to Massachusetts and the communities in which Plaintiffs and their membership reside, as well as a reduction in their political power and representation. *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (noting plaintiffs "establish[] their standing" where they alleged "concrete harm in the form of . . . decreased federal funds flowing to their city and state" as well as "in the form of dilution of their votes"); *Department of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331-32 (1999) (holding that "expected intrastate vote dilution satisfies the injury-in-fact, causation, and redressability requirements.").

83.    Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

84.    Defendant U.S. Department of Commerce ("DOC," or the "Department") is a department of the Executive Branch of the United States government. DOC and its component agency, the U.S. Census Bureau, have the authority to administer the decennial census.

85.     Defendant Wilbur Ross is the Secretary of the DOC and as such, is responsible for overseeing all operations of the Department, including the operations of the Census Bureau. He is sued in his official capacity.

86.     Defendant U.S. Census Bureau is an agency within the DOC. 13 U.S.C. § 2. The Census Bureau is responsible for conducting all census programs, including the collection of information for and formulation of population tabulations utilized for congressional apportionment.

87.     Defendant Steven Dillingham is the Director of the U.S. Census Bureau. Defendant Dillingham oversees the 2020 decennial census operations and is responsible for ensuring the accuracy of the 2020 decennial census count. Defendant Dillingham performs census-related duties assigned by law, regulation, or the Secretary of Commerce. 13 U.S.C. § 21. He is sued in his official capacity.

## VENUE AND JURISDICTION

88.     Venue in the District Court for the District of Massachusetts is proper because this is an action against an officer, employee, and/or agency of the United States, all Plaintiffs are residents of and/or incorporated in this judicial district, and the impacts of the July 21 Memorandum are being felt and will be felt in this judicial district. *See* 28 U.S.C. § 1391(e)(1).

89.     Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1346. The Court also has jurisdiction over Plaintiffs' APA claims under 5 U.S.C. § 702 and 704. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et seq.*, and under 28 U.S.C. § 1361, to grant Plaintiffs' requests for declaratory, mandamus, and injunctive relief.

## FACTUAL ALLEGATIONS

I.     **Congressional Apportionment Must be Based on a Decennial Census Counting All Persons.**

90.     The fourth sentence of the Constitution states that representatives and direct taxes "shall be apportioned among the several States . . . according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons." U.S. Const. Art. I, Sec. 2. The Constitution also calls for an "actual Enumeration," to be held every ten years, to determine the number of representatives. *Id*.

91.     As the U.S. Supreme Court observed in 2016, the Framers' "Great Compromise," as expressed James Madison and Alexander Hamilton, called for members of the House of Representatives to be allotted to states based on the "total population" and to "include all inhabitants—although slaves were counted as only three-fifths of a person—even though States remained free to deny many of those inhabitants" the right to vote. *Evenwel v. Abbott*, 136 S. Ct. 1120, 1127 (2016) (*citing* The Federalist No. 54, p.284 (G. Carey & J. McClellan eds. 2001) *and* 1 Records of the Federal Convention of 1787, p. 473 (M. Farrand ed. 1911)).

92.     Article I, Section 2 was amended by Section 2 of the Fourteenth Amendment, which calls for representatives to be apportioned among the states according to their respective numbers, "counting the whole number of persons in each State." U.S. Const. Amend. XIV.

93.     Although Section 1 of the Fourteenth Amendment limits U.S. citizenship to "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof," Section 2 specifically refers to "persons," rather than "citizens," in identifying who must be counted for the purposes of congressional apportionment. U.S. Const. Amend. XIV; *see also Wesberry v. Sanders*, 376 U.S. 1, 13–14 (1964) ("The debates at the Convention make at least one fact abundantly clear:

30

that when the delegates agreed that the House should represent 'people' they intended that in allocating Congressmen the number assigned to each State should be determined solely by the number of the State's inhabitants. The Constitution embodied Edmund Randolph's proposal for a periodic census to ensure 'fair representation of the people,' an idea endorsed by [George] Mason as assuring that 'number of inhabitants' should always be the measure of representation in the House of Representatives.").

94.    Importantly, the history of Section 2 of the Fourteenth Amendment reveals that Congress considered, and rejected, allocating seats in the House of Representatives on the basis of voter population. *See Evenwel*, 136 S. Ct. at 1127-28.

95.    In particular, the *Evenwel* Court cited arguments advanced by then-Representatives James G. Blaine, Roscoe Conkling, and Hamilton Ward: that population is the "true basis of representation," as "women, children and other non-voting classes may have as vital an interest in the legislation of the country as those who actually deposit the ballot" and that excluding "non-voting tax-payers" from apportionment would render those groups taxed without representation. *Id.* at 1128 (*quoting* Cong. Globe, 39th Cong., 1st Sess., 141, 434 (1866)).

96.    Federal courts have consistently rejected the argument that undocumented residents must be excluded from the congressional apportionment base. For example, in *Federation for American Immigration Reform v. Klutznick*, 486 F. Supp. 564 (D.D.C. 1980), *appeal dismissed* 447 U.S. 916, the District Court for the District of Columbia described the plaintiffs' case—that undocumented residents were constitutionally required to be counted separately and excluded from the apportionment base—"very weak on the merits." *Id.* at 576. The *Klutznick* Court observed that the Constitution's language is "not ambiguous" and that there is "little on which to base a conclusion that illegal aliens should now be excluded," given that

"two centuries of consistent interpretation" have yielded the same conclusion. *Id.*; *see also id.* (observing that it was "generally accepted" in first half of twentieth century that exclusion of aliens from apportionment base "would require a constitutional amendment.").

97.      Article I, Section 2 of the Constitution requires that an "actual Enumeration" be conducted every ten years "in such Manner as [Congress] shall by Law direct." U.S. Const. Art. I, Sec. 2. Although apportionment is the only purpose given for the census in the Constitution itself, census data is also used for a number of other purposes, In addition to providing the basis for apportioning representatives among the states, the data gathered by the decennial census is used to draw congressional and state legislative districts, to draw school districts and voting precincts, to enforce voting rights and civil rights legislation, to distribute more than $1.5 trillion federal dollars in over one hundred census-linked programs to the states, to inform federal, state, tribal, and local government planning decisions, to inform business and nonprofit organization decisions, and to provide a population benchmark for nearly every other American survey and so support critical research in subjects ranging from public health to education.[26]

98.      The Constitution tasks Congress with passing legislation to "direct" the "manner" in which the census shall occur, subject to the requirements set forth in the Constitution itself. *See* U.S. Const., art. I, § 2, cl. 3; *Franklin v. Massachusetts*, 505 U.S. 788, 791 (1992).

99.      Congress has delegated responsibility for taking the decennial census, in "such form and content as he may determine," to the Secretary of Commerce—not to the President of the United States. 13 U.S.C. § 141(a); *see also id.* § 4 (stating the Secretary "shall perform the functions and duties imposed upon him by Title 13).

---

[26] Chapin, *supra* note 6, at 37.

100.    The Secretary may only delegate the performance of such functions and duties to "such officers and employees of the Department of Commerce as he may designate." *Id*. § 4. There is no provision for delegation to the President or any other member of the Executive Branch. The Secretary has delegated the authority for establishing procedures to conduct the census to the Census Bureau.

101.    To that end, every ten years the Census Bureau sends a questionnaire to every household in the United States, to which every resident in the United States—notwithstanding their immigration or citizenship status—is legally required to respond. 13 U.S.C. § 221. The Census Bureau then counts the responses from every household to determine the population count in the various states.

102.    Within nine months of the census date, the Secretary of Commerce is required by statute to report to the President "the tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States." 13 U.S.C. § 141(b).

103.    Thereafter, the President is required by statute to transmit to Congress two sets of numbers. First, the President must provide "a statement showing ***the whole number of persons*** in each State, excluding Indians not taxed, as ascertained under the . . . decennial census of the population." 2 U.S.C. § 2a(a) (emphasis added).

104.    Second, based on the census count of the whole number of persons in each State, the President must specify "the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, no State to receive less than one Member." *Id.* The apportionment calculation is of a "ministerial nature." *Franklin v. Massachusetts*, 505 U.S. 788,

799 (1992). Indeed, the "plain language" of 2 U.S.C. § 2a(a) demonstrates that the President has "no substantive role in the computation of the census." *Id.* at 280 (Stevens, J., concurring).

105.    "Each State" shall thereupon "be entitled" to the number of representatives "shown in" the President's statement to Congress, "until the taking effect of a reapportionment under" Section 2a "or subsequent statute." 2 U.S.C. § 2a(b). It is the "duty of the Clerk of the House of Representatives, within fifteen calendar days after the receipt of [the President's] statement, to send to the executive of each State a certificate of the number of Representatives to which each State is entitled . . . ." *Id.*; *see Franklin*, 505 U.S. at 792.

106.    The governing statute does not authorize the Secretary of Commerce to transmit to the President a number other than "the whole number of persons in each State," as determined by the census. Nor does it vest the President with discretion to base the apportionment calculation that he or she transmits to Congress on something other than "the whole number of persons in each State."

107.    Every census, beginning in 1790, has included U.S. citizens and noncitizens— regardless of immigration status—in the country's decennial population counts. *See Klutznick*, 486 F. Supp. at 566 ("The population base used for apportionment purposes consists of a straightforward head count, as accurate as is reasonable possible, of all persons residing within a state on April 1. This has been the practice since the first census in 1790; everyone is counted except foreign diplomatic personnel living on embassy grounds (which is considered 'foreign soil,' and thus not within any state) and foreign tourists, who do not 'reside' here.") (footnotes omitted).

108.    As part of its preparation for Census 2020, the Census Bureau formally adopted a rule—pursuant to a notice-and-comment rulemaking process—regarding, among other things,

how noncitizens should be counted. *See* Final 2020 Census Residence Criteria and Residence

Situations (the "Residence Rule"), 83 Fed. Reg. 5525 (Feb. 8, 2018). The Residence Rule

provides that the criteria set forth in the rule must be used "to apportion the seats in the U.S.

House of Representatives among the states." *Id.* at 5526 n.1.

109.    The Residence Rule further provides that "[c]itizens of foreign countries living in

the United States" must be "[c]ounted at the U.S. residence where they live and sleep most of the

time." *Id.* at 5533. As part of the notice-and-comment process, the Census Bureau considered and

rejected a comment that "expressed concern about the impact of including undocumented people

in the population counts for redistricting," opting to count all foreign citizens who "live and sleep

most of the time" in the United States.

110.    On March 14, 2019, Secretary Ross testified under oath before the Committee on

Oversight and Reform of the House of Representatives that the Department is "obliged" and

"required" to "count every person who is here regardless of citizenship status and regardless of

anything else."[27] Similarly, at a February 12, 2020 hearing before the same committee, Dr.

Steven Dillingham, the Director of the Census Bureau, responded to a question about whether

someone "here just illegally" is countable saying that the Bureau "count[s] everyone, wherever

they are living."[28]

111.    On the Census Bureau's 2020 Census website, on a page entitled "Fighting

Rumors," the following information is visible under the headline "Setting the Record Straight":

"Q: Were non-citizens counted in the census? A: YES. The 2020 Census counted everyone

---

[27] Secretary of Commerce Wilbur L. Ross, Jr., *Hearing with Secretary of Commerce Wilbur L. Ross, Jr. Before the Comm. on Oversight and Reform*, House Hearing, 116th Cong. 11, 1, 32 (2019), https://www.govinfo.gov/content/pkg/CHRG-116hhrg36621/html/CHRG-116hhrg36621.htm.

[28] Census Bureau Director Dr. Steven Dillingham, *With Census Bureau Director, Dr. Steven Dillingham before the Comm. on Oversight and Reform*, House Hearing, 116th Cong. 91, 1, 14 (2020), https://www.govinfo.gov/content/pkg/CHRG-116hhrg39929/html/CHRG-116hhrg39929.htm.

living in the country, including non-citizens." There is no mention of any exclusion of undocumented residents.[29]

112.    On the Census Bureau's 2020 Census website, on a page entitled "Who to Count," the Census Bureau provides the following guidance regarding "Foreign Citizens in the United States": "Citizens of foreign countries who are living in the United States, including members of the diplomatic community, should be counted at the U.S. residence where they live and sleep most of time. Citizens of foreign countries who are temporarily visiting the United States on vacation or business on April 1, 2020, should not be counted." There is no mention of any exclusion of undocumented residents.[30]

113.    The President has no inherent power or discretion to modify how congressional seats are apportioned, beyond the purely ministerial powers which Congress has expressly granted to him by statute. The Constitution places the task of apportionment within Article I, which deals with Congress's powers, since that task determines the composition of the legislative branch. By contrast, Article II, which addresses the President's powers, says nothing at all about legislative apportionment.

114.    That allocation of power and discretion is no accident. The Framers were deeply concerned about the "concentration of the several powers [of government] in the same department," and they drafted the Constitution not to authorize or facilitate such encroachments, but to resist them. See James Madison, Federalist No. 51 (1988). As Madison emphasized, "each department should have a will of its own," and "the members of each [department] should have as little agency as possible in the appointment of the members of the others." *Id.* Giving the

---

[29] U.S. Census Bureau, Fighting 2020 Census Rumors, U.S. Census 2020 (last visited October 21, 2020), https://2020census.gov/en/news-events/rumors.html .

[30] U.S. Census Bureau, *Who to Count*, U.S. Census 2020 (last visited October 21, 2020), https://2020census.gov/en/who-to-count.html .

President inherent authority to change the composition of the House of Representatives at his discretion would have been anathema to the Framers. The Constitution contains no such explicit or implicit grant of power.

## II.    The July 21 Memorandum is Unconstitutional and Unlawful on Its Face and As Applied.

115.    On July 21, 2020, President Trump issued a Memorandum for the Secretary of Commerce entitled "Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census."[31]

116.    The July 21 Memorandum claims, erroneously, that the President "by law, makes the final determination regarding the 'whole number of persons in each State,' which determines the whole number of Representatives to be apportioned to each State."

117.    The July 21 Memorandum also claims that the Constitution "does not specifically define which persons must be included in the apportionment base," arguing that the term "persons in each State" has been interpreted to mean only "inhabitants" of each State and that "[d]etermining which persons should be considered 'inhabitants' for the purpose of apportionment requires the exercise of judgment."

118.    As an example of this "exercise of the judgment," the July 21 Memorandum erroneously notes that "certain foreign diplomatic personnel" are excluded from the apportionment base. In fact, as the Supreme Court noted in *Klutznick*, the exclusion of certain foreign diplomatic personnel is not an exercise of Presidential judgment, but rather a reflection of the fact that foreign diplomatic personnel live on embassy grounds, which under American

---

[31] Donald J. Trump, *Memorandum for the Secretary of Commerce*: *Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census* (July 21, 2020), .https://www.documentcloud.org/documents/6999106-July-21-2020-Memorandum-On-Excluding-Illegal.html.

and international law, "is considered 'foreign soil" and thus not within any state." *Klutznick*, 486
F. Supp. at 566.

119.    The July 21 Memorandum continues to state, without citation to any case, statute,
legislative history, or regulation, that the "discretion delegated to the executive branch to
determine who qualifies as an 'inhabitant' includes authority to exclude from the apportionment
base aliens who are not in a lawful immigration status."

120.    The President further observes in the July 21 Memorandum that with the signing
of Executive Order 13880 on July 11, 2020 ("Collecting Information About Citizenship Status in
Connection with the Decennial Status"), following the Administration's defeat at the Supreme
Court regarding the inclusion of a citizenship question, he instructed agencies to share
information with the Department of Commerce to allow the Secretary to "obtain accurate data on
the number of citizens, non-citizens and illegal aliens in the country" that "could be relevant for
the purpose of conducting the apportionment."

121.    The July 21 Memorandum fails to observe, however, that Executive Order 13880
made no reference to *congressional* apportionment. Rather, the Order notes that it may be "open
to States to design State and local legislative districts based on the population of voter-eligible
citizens" as some courts have agreed that "*State* districting plans may exclude" ineligible
voters.[32] There is absolutely no mention in the Order of any intention to, or basis for, excluding
undocumented residents from the congressional apportionment base. An executive order must
cite the authority the president has to issue it, whether that authority is the constitution, or a
specific statute; no such requirement applies, however, to presidential memoranda.

---

[32] Collecting Information About Citizenship Status in Connection With the Decennial Census 84 Fed. Reg. 33821,
33823–24 (July 11, 2019), https://www.govinfo.gov/content/pkg/FR-2019-07-16/pdf/2019-15222.pdf .

122.    Executive Order 13880 did not create any new mechanism by which the Department of Commerce could collect accurate and precise data regarding the citizenship and immigration status of the country's residents. Instead, to implement the Executive Order, the Department must rely on the transmission of records from other agencies, which are necessarily incomplete, outdated, and non-exhaustive.

123.    The July 21 Memorandum goes on to state that it is the policy of the United States to "exclude from the apportionment base aliens who are not in a lawful immigration status, under the Immigration and Nationality Act" as such a policy is "more consonant with the principles of representative democracy," as affording congressional representation and therefore formal political influence to states with populations of undocumented immigrants "undermines those principles." The Memorandum asserts that increasing congressional representation based on the presence of undocumented residents would "create perverse incentives encouraging violations of Federal law," rewarding states "adopting policies that encourage illegal aliens to enter this country and that hobble Federal efforts to enforce the immigration laws." The Memorandum continues that the President has determined that "respect for the law and protection of the integrity of the democratic process warrant the exclusion of illegal aliens from the apportionment base."

124.    Apart from a citation to the Immigration and Nationality Act, the "Policy" section of the July 21 Memorandum does not contain a single reference to any provision of the Constitution, or to any statute, court decision, or even any social science or other scholarly research.

125.    The July 21 Memorandum then directs the Secretary of Commerce to take "all appropriate action, consistent with the Constitution and other applicable law," to, in preparing his

39

report to the President under 13 U.S.C. § 141(b), provide "information permitting the President . . . to exercise the President's discretion to carry out the policy set forth" in the Memorandum.

126.    Statements made by the White House following the release of the July 21 Memorandum do nothing to provide the document with a factual or legal basis. For example:

a.    In response to the fact that the text of the Fourteenth Amendment states that "Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed," a White House spokesperson replied that the "phrase 'whole number of' is *not relevant* to the issue of who qualified as an 'inhabitant' of each state for purposes of apportionment."[33]

b.    In response to suggestions that the Presidential Memorandum casts considerable doubt on the Administration's insistence to the U.S. Supreme Court that the inclusion of a citizenship question on Census 2020 would bolster enforcement of the Voting Rights Act, a White House spokesperson said they were "two separate issues" and that the July 21 Memorandum "addresses the information the President wants in order to fulfill his statutory responsibility in determining apportionment."[34]

c.    In response to questions regarding how the July 21 Memorandum is lawful in light of the Supreme Court's ruling in *Plyler v. Doe* that there is no "plausible distinction with respect to Fourteenth Amendment 'jurisdiction' . . . between resident aliens whose entry into the United States was lawful and resident aliens whose entry was unlawful," a White House spokesperson responded that *Plyler* "simply addressed whether unlawfully present aliens are 'persons' within

---

[33] Salvador Rizzo, The Twists and Turns in Trump's Executive Order on Immigrants and the Census, Wash. Post (July 24, 2020 12:00 AM), https://www.washingtonpost.com/politics/2020/07/24/twists-turns-trumps-executive-order-immigrants-census/ .

[34] *Id.*

40

the meaning of the Fourteenth Amendment's Equal Protection Clause" and that such protection "does not require inclu[sion] in the apportionment base."

127.    Two days after President Trump issued the Memorandum, his reelection campaign sent a mass e-mail to supporters characterizing the Memorandum as an "EXECUTIVE ORDER BLOCKING ILLEGAL ALIENS FROM BEING COUNTED IN [THE] U.S. CENSUS." The e-mail went on to state that "President Trump just signed an Executive Order that will block illegal aliens from receiving congressional representation, and ultimately, being counted in the U.S. Census." The e-mail once again linked the Memorandum to the President's own nativist views, asserting that it was an "Executive Order" that was needed because "Democrats are prioritizing dangerous, unlawful immigrants over American Citizens."

128.    Since then, the Director of the Census Bureau (Defendant Dillingham) stated in sworn testimony to Congress that the Secretary of Commerce has already given the Bureau "the directive . . . to proceed with the requirements of the Presidential memorandum," and that that "process is underway."

129.    The President is not free to substitute his own personal judgment for the judgments that have already been made by the Congress that enacted 2 U.S.C. § 2a and by the framers and ratifiers of Article I, § 2 and the Fourteenth Amendment. The President's duty in preparing and transmitting the apportionment calculations to Congress is purely ministerial. There is no room under the statutory scheme for his exercise of judgment concerning what is most "consonant with the principles of representative democracy." And even if the statutory scheme permitted the President to exercise such judgment—which it does not—he would of course be restrained by the Constitution's clear command that representatives be apportioned among the States according to

their respective numbers, "counting the whole number of persons in each State." *See* U.S. Const. Amend. XIV.

130.    In a September 2020 filing to the U.S. Supreme Court in *Trump v. New York*, Defendants have stated that they now intend to utilize "administrative records" to remove undocumented immigrants not simply from the congressional apportionment base, but from the "census tabulation," which will unquestionably reduce census-linked federal funding to the communities in which Plaintiffs and their members reside. *See* Appellants' Jurisdictional Statement, *Trump v. New York*, No. 20-366, 2020 WL 5645736, at *19 (U.S. Sept. 22, 2020) ("Jurisdictional Statement"); *see also id.* at *23 (discussing delegation of authority to Secretary to "*remove* people from 'the census' who were improperly included in the questionnaire responses (as in the Memorandum)" (emphasis in original)); *see Dep't. of Commerce*, 139 S. Ct. at 2565 (determining loss of federal funds distributed on basis of state population a "sufficiently concrete and imminent injury to satisfy Article III").

**III.    To Implement the Memorandum, Defendants Must Violate the Constitution's Requirement of Actual Enumeration, or the Statutory Bar on Sampling.**

131.    From the beginning, Article I, § 2, cl. 3 of the U.S. Constitution has provided that the numbers used in congressional apportionment "shall be determined" by an "actual Enumeration."

132.    Ratification-era dictionaries "demonstrate that an 'enumeration' requires an actual counting, and not just an estimation of number." *U.S. House of Representatives*, 525 U.S. at 346-47 (Scalia, J., concurring). Thus, as the Supreme Court has observed, "the Framers expected census enumerators to seek to reach each individual household" when making determinations that bear on apportionment. *Utah v. Evans*, 536 U.S. 452, 477 (2002). To the extent that other

"methods substitute for any such effort, it may be argued that the Framers did not believe that the Constitution authorized their use." *Id.*

133.    Defendants have recently conceded this point. When the State of New York and others challenged the addition of a citizenship question to the 2020 census as a violation of, among other things, the Enumeration Clause, the Department of Justice—appearing on behalf of Defendants—recognized that "the Constitution's reference to 'actual Enumeration' is simple: population is to be determined [for purposes of apportionment] is to be determined through a person-by-person headcount, rather than through estimates or conjecture." Brief in Support of Defendants' Motion to Dismiss (ECF No. 155) at 30, *New York v. Department of Commerce*, No. 1:18-cv-02921-JMF (S.D.N.Y. May 25, 2018); *see also id.* at 25 (arguing that the Enumeration Clause 'provides a simple judicial standard for determining the constitutionality" of a practice used in creating data used for apportionment, and that "the Secretary must perform a person-by-person headcount, rather than an estimate of the population").

134.    Consistent with the Constitution's demand for an "actual Enumeration," starting "[f]rom the very first census" in 1790, "Congress has prohibited the use of statistical sampling in calculating the population for purposes of apportionment." *House of Representatives*, 525 U.S. at 335. Instead, it has required that "enumeration . . . be made by an actual inquiry at every dwelling-house . . . and not otherwise." *Id.* (quoting Act of March 26, 1810, § 1, 2 Stat. 565-66); *see also New York*, 351 F. Supp. 3d at 520 ("Since 1790, the government has conducted the required 'actual enumeration' through questions—initially asked in person by U.S. Marshals and 'specially appointed agents' and later by means of written questionnaire— . . . of those living in each American household.").

135.     Both the Supreme Court and the Defendants themselves have recognized "the importance of [this] historical practice when examining Enumeration Clause issues." Br. in Support of Defendants' Motion to Dismiss (ECF No. 1550 at 32, *New York v. Department of Commerce*, No. 1:18-cv-02921-JMF (S.D.N.Y. May 25, 2018) (*citing Wisconsin v. City of N.Y.*, 517 U.S. 1, 51 (1996); *Franklin*, 505 U.S. at 803-06); *see also Dep't. of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019).

136.     In 1957, in response to a request by the Secretary of Commerce, Congress authorized the Census Bureau to use statistical sampling for the first time. That grant of permission, however, was limited to "gathering supplemental, nonapportionment census information regarding population, unemployment, housing, and other matters collected in conjunction with the decennial census." *House of Representatives*, 526 U.S. at 336-37.

137.     Congress expressly excluded "the determination of population for apportionment purposes" from the list of permitted uses of statistical sampling. *Id.* (quoting 13 U.S.C. § 195 (1970 ed.)); *see also id.* at 338 (holding that 13 U.S.C. "§ 195 directly prohibits the use of sampling in the determination of population for purposes of apportionment"); *New York*, 139 S. Ct. at 2600-01 (Alito, J., concurring in part and dissenting in part) ("Section 195 . . . prohibits the use of sampling 'for the determination of population for purposes of apportionment of Representatives in Congress.'"). Therefore, all information used for apportionment purposes must still be gathered through actual inquiry and counting via the census outreach process. *House of Representatives*, 526 U.S. at 337.

138.     In 1997, Congress reiterated that the Constitution and 13 U.S.C. § 195 both prohibit the use of "statistical sampling or adjustment in conjunction with an actual enumeration," and found that the use of such techniques "to carry out the census with respect to any segment of

the population poses the risk of an inaccurate, invalid, and unconstitutional census." Departments of Commerce, Justice, and State, The Judiciary, and Related Agencies Appropriations Act of 1998, § 209(a)(7), Pub. L. No. 105-119, 111 Stat. 2440, 2481-82 (1997) (codified at 13 U.S.C. § 141).

139.    To be lawful, methods used as part of the census and apportionment process must be accurate. *See Evans*, 536 U.S. at 478 (noting that the Enumeration Clause embodies a "strong constitutional interest in accuracy"); *Franklin*, 505 U.S. at 819-20 (Stevens, J., concurring) (noting that the "statutory command" to count the "whole number of persons in each State . . . also embodies a duty to conduct a census that is accurate"); *New York*, 351 F. Supp. 3d at 614 ("it is, of course, the federal government's job to collect and distribute accurate federal decennial census data"); *City of Willacoochee v. Baldrige*, 556 F. Supp. 551, 555 (S.D. Ga. 1983) (Necessarily implicit in the Census Act is the command that the census be accurate"); *see also* Pub L. No. 105-119, § 209(a)(6), 111 Stat. at 2481 ("Congress finds that . . . [i]t is essential that the decennial enumeration of the population be as accurate as possible, consistent with the Constitution and laws of the United States").

140.    In the Memorandum, the President orders the Secretary of Commerce "to provide information permitting the President" to determine the number of undocumented immigrants in each state so that those persons may be removed from the congressional apportionment base. Memorandum at § 3. Even if it were permissible under the Constitution and laws of the United States to exclude undocumented immigrants from the apportionment base at all—and it is not— the only lawful way to implement the Memorandum consistent with the Enumeration Clause and the Census Act would be to actually "enumerate"—i.e., to attempt to personally reach and identify—each undocumented immigrant. Defendants could not lawfully employ methods of

quantifying undocumented immigrants for removal from the apportionment base other than

"actual enumeration," including but not limited to statistical sampling, modeling, inference,

estimation, or resort to other administrative records or data.

141.    Conducting an "actual Enumeration" of undocumented immigrants as part of the

2020 census is not possible. As part of the 2020 Census, Defendants have not inquired about

whether noncitizen respondents are "in a lawful immigration status under the Immigration and

Nationality Act," and the Census Bureau has completed its self-response and field data

operations for the 2020 Census. Memorandum at § 2; Defendants' Notice of Supplemental

Authority (ECF No. 32) at 1 & Exh. B. Nor could such a question lawfully have been added in

light of the Supreme Court's decision prohibiting Defendants from inquiring about citizenship.

142.    On information and belief, Defendants do not have (a) any other data, gathered

outside the 2020 census process, which constitutes an "actual enumeration" of the immigration

status of every person living in the United States, or (b) any tool, dataset, or mechanism for

establishing, with accuracy and precision, the number of undocumented residents in the United

States, such that they could be excluded from the congressional base.

143.    In connection with a lawsuit pending in the U.S. District Court for the Northern

District of Alabama, a Census Bureau Senior Advisor represented in March 2020 that the Census

Bureau lacked even "accurate estimates of the resident undocumented population" on a state-by-

state basis. Defendants' Supplemental Rule 26(a)(1) Disclosures and Rule 26(a)(2)(C)

Disclosures, *Alabama v. Department of Commerce*, Case No. 2:18-cv-00772-RDP (N.D. Ala.

March 13, 2020).

144.    In connection with a lawsuit in the U.S. District Court for the District of Maryland

challenging Executive Order 13880, Department of Justice Attorney Stephen Ehrlich told

District Judge Paula Xinis that, with regard to producing documents showing the number of non-citizens, citizens, and undocumented immigrants in the country, Administration officials "don't have all the administrative records yet" and "haven't formulated a methodology for how we would do this and things of that nature," noting that there may be a need for "some statistical modeling."[35]

145.    At a congressional hearing in August 2020, when asked how the Census Bureau intends to calculate the number of undocumented immigrants in each State, the Census Bureau's current Director, Defendant Steven Dillingham, responded that the Bureau's "experts" would "look at our administrative data and any [other] data that we have," including data obtained from outside sources, and would then "determine . . . the [President's desired statistic" by applying unspecified "methodologies" to that data.

146.    The American Community Survey (ACS), an ongoing yearly survey by the Census Bureau, does collect demographic information regarding citizenship, place of birth, and date of entry into the United States. However, the ACS uses sampling to construct its datasets; it is not and has never been a complete and accurate count of citizens and non-citizens.

147.    Congress has also provided that information obtained "in any mid-decade census shall not be used for apportionment of Representatives in Congress among the several States, nor shall any such information be used in prescribing congressional districts." 13 U.S.C. § 141(e)(2). The Supreme Court has also held that the "proposed use of statistical sampling to determine population for purposes of apportioning congressional seats among the States violates the [Census] Act." *U.S. House of Representatives*, 525 U.S. at 334.

---

[35] Hansi Lo Wang, *Trump Sued Over Attempt To Omit Unauthorized Immigrants From a Key Census Count*, NPR (July 24, 2020 10:11 AM), https://www.npr.org/2020/07/24/894322040/trump-sued-for-attempt-to-omit-unauthorized-immigrants-from-a-key-census-count.

148.    Similarly, although Title 13 provides for the yearly collection of interim current data, which shall be used for the purpose of determining the amount of benefits received by state, county, or local governments, the statute also precludes the use of such interim current data with respect to any law providing that "only population or population characteristics data obtained in the most recent decennial census may be used in such determination." *Id*. § 183 (b).

149.    Title 13 therefore prohibits the use of information collected in other surveys administered by the Census Bureau, including data contained in ACS regarding citizenship and immigration, for congressional apportionment.

150.    As the Census Bureau stated in *Klutznick*, accurate methods to count undocumented residents "do not presently exist, and would take months to develop, if it could be done at all" and could not be developed in advance of the statutory deadline to transmit population data to Congress. 486 F. Supp. at 567; *see also id.* at 574 (noting that the Census Bureau had made a "convincing showing" that "neither the Census Bureau nor INS figures are accurate enough" to permit a calculation of the total number of undocumented residents "with any reasonable degree of accuracy").

151.    The Census Bureau has not received from Congress a four-month extension to the current statutory deadlines for delivering the apportionment count to the President (December 31, 2020). Nor has Congress extended the President's deadline for providing redistricting data (March 31, 2021).[36]

152.    Because actual enumeration of undocumented immigrants is not possible, any quantification of undocumented immigrants that the Secretary would provide to the President

---

[36] Hansi Lo Wang, *The Coronavirus Crisis: 'We're Running Out of time': Census Turns to Congress to Push Deadlines*, NPR (May 27, 2020 6:03 PM), https://www.npr.org/sections/coronavirus-live-updates/2020/05/27/863290458/we-re-running-out-of-time-census-turns-to-congress-to-push-deadlines .

pursuant to the Memorandum, or that the President would thereafter rely upon in preparing

apportionment tables for transmitting to Congress, would violate the Enumeration Clause.

153.    In addition, on information and belief, any quantification method that Defendants

might employ in determining the number of undocumented immigrants to subtract from the

apportionment base would be based on unlawful statistical sampling. Indeed, in the District of

Maryland litigation referred to above, U.S. Department of Justice attorney Stephen Ehrlich told

the district court that carrying out the orders in President Trump's Memorandum may require

"some statistical modeling."

154.    Further, on information and belief, any quantification method that Defendants

might employ in determining the number of undocumented immigrants to subtract from the

apportionment base, other than actual enumeration (which is impossible) and statistical sampling

(which is illegal) would itself by unconstitutionally and unlawfully inaccurate.

155.    On September 28, 2020, Ron S. Jarmin, Ph.D.—the Deputy Director of the U.S.

Census Bureau—informed Secretary Ross that unless the Census Bureau completed its field work

on October 5, 2020, it would not be able to meet the statutory deadline of December 31, 2020. Dr.

Jarmin further informed Secretary Ross that if the Census Bureau completed its field work on

October 5, 2020, and "assuming all goes well," the Bureau could "finish the processing of the

resident population, federally affiliated overseas and, *if requested*, unlawful aliens in ICE

Detention Centers by 12/31" (emphasis added).

156.    It thus appears that, unless Secretary Ross so requests, the Census Bureau does not

intend to "finish the processing of . . . unlawful aliens in ICE Detention." That would be

inconsistent with the rule established in the Final 2020 Census Residence Criteria and Residence

Situations (the "Criteria"), under which all such persons are to be counted, and with the

Presidential Memorandum, which directs the Secretary to provide the President information in accordance with the Criteria.

157.    A leaked Census Bureau document, shared with the House of Representatives Committee on Oversight and reported in the media in early September 2020, warned that the Bureau's September 30, 2020 deadline for completing field operations (later extended to October 15, 2020) could undermine the census, stating that "[a] compressed review period creates the risk for serious errors not being discovered in the data—thereby significantly decreasing data quality." The author(s) of the leaked document also stated that "serious errors discovered in the data may not be fixed—due to lack of time to research and understand the root cause or to re-run and re-review one or multiple state files."

158.    On August 3, 2020, the Census Bureau issued a memorandum for the purpose of implementing the President's policy, as announced in the July 21, 2020 Memorandum, or excluding undocumented non-citizens from the apportionment base (the "Implementation Memorandum").

159.    The Implementation Memorandum orders a Census Bureau working group "to design methodological options that comply with the Presidential Memorandum" and directs the working group to "report [its] progress to the Census Director/senior leadership on a weekly basis." To identify undocumented non-citizens, the Census Memorandum instructs the working group to "[d]evelop methodological option(s) that would utilize available administrative records to verify and tabulate the legal status of individuals within the decennial census so far as possible (i.e. citizen, legal alien, and illegal alien)." The Implementation Memorandum further directs the working group to devise methodological options "to verify and tabulate sub-categories within the illegal alien category so far as possible (e.g., overstay, detention center, released pending hearing,

deportation order, etc.)." The working group was likewise ordered to "[p]rovide additional suggestions for methodologically and legally valid ways to better establish or feasibly estimate the legal status of those whose legal status cannot be determined by administrative records."

160.    The use of statistical sampling, the extremely compressed review period, and the gaps in available administrative records create a near-certainty that in effectuating the policy of the July 21 Memorandum, Defendants will misidentify and exclude U.S. citizens, legal permanent or conditional residents, and other legal aliens from the congressional apportionment base, including and especially the household members of undocumented immigrants, who are overwhelmingly Black and Latinx. This exclusion will unlawfully and unconstitutionally dilute the voting power and political representation of these individuals and communities.

161.    On October 2, 2020, Defendants informed the U.S. Supreme Court in parallel litigation challenging the July 21 Memorandum that if expedited relief in that case is granted— and the injunction in *National Urban League v. Ross* is stayed, which occurred on October 13, 2020—that the Bureau "currently anticipates that, by December 31, it *will* provide the President with information regarding any 'unlawful aliens in ICE Detention Centers' whom the President could, consistent with the discretion delegated to him by law, exclude from the apportionment base, thereby partially implementing his Memorandum." *See* Appellants' Supplemental Brief, *Trump v. New York*, No. 20-366, 2020 WL 5992086, at *6 (U.S. Oct. 2, 2020) ("Appellants' Supplemental Brief") (emphasis added). In addition, the Bureau currently plans to provide the President with "'[o]ther [Presidential Memorandum] related outputs' by Monday, January 11, 2021, and would continue to work on a quicker timetable to implement that aspect of the Memorandum sooner if feasible." *See id.* (alterations in original).

162.    Defendants' implementation of the President's July 21 Memorandum constitutes final agency action that is justiciably reviewable under the Administrative Procedure Act, 5 U.S.C. §§ 704, 706.

## IV.    The July 21 Memorandum is Motivated by an Intent to Discriminate on the Basis of Race, National Origin, and Alienage.

163.    As evidenced by the disparate impact of the July 21 Memorandum on Black and Latino immigrants, the historical background of the Memorandum—including a "series of official actions taken for invidious purposes"—the Administration's "[d]epartures from the normal procedural sequence, and "contemporary statements," the July 21 Memorandum was promulgated with the racially discriminatory intent of dissuading immigrant communities from completing Census 2020, in an effort to both reduce the political power of immigrant-rich communities, cities, and states, to dilute the votes of Black and Latinx citizens of color, and to prevent their access to federal financial resources. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977).

164.    Implementation of the July 21 Memorandum violates the civil rights of Black and Latinx immigrants of color, non-citizens, undocumented residents and foreign-born individuals.

165.    The July 21 Memorandum makes no mention of excluding other individuals who are ineligible to vote—including, for example, children under eighteen years of age— from the congressional apportionment base.

166.    The July 21 Memorandum is but the latest in a lengthy series of attempts by Defendants to dissuade Black and Latinx immigrants, non-citizens, undocumented residents and foreign-born individuals from completing Census 2020.

167.    President Trump and Secretary Ross have deliberately engaged in a pattern and practice of disenfranchising and discriminating against Black and Latinx immigrants, non-citizens, undocumented residents and foreign-born individuals.

168.    For example, the Department of Commerce spent over a year arguing before multiple federal courts that it should be permitted to add a citizenship question to Census 2020, claiming that that question could be used to support enforcement of the Voting Rights Act. Its effort to do so was challenged by a number of states, cities, and advocacy groups, which called it a "ruse to weaken the political power of heavily Democratic states with large immigrant populations."[37]

169.    The evidence presented to the Southern District of New York showed that the Secretary of Commerce "was determined to reinstate" a citizenship question to Census 2020 "from the time he entered office; instructed his staff to make it happen; waited while Commerce officials explored whether another agency would request census-based citizenship data . . . and adopted the Voting Rights Act rationale late in the process." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2584 (2019).

170.    Writing for the majority in *Department of Commerce*, Chief Justice John Roberts called the Department's purported rationale for seeking citizenship information in Census 2020 "contrived" and a "distraction," and affirmed the District Court's decision remanding the case to the Department. *Id*. at 2575-76.

171.    The Defendants' determination to reinstate a citizenship question was motivated by a desire to depress responses by immigrant, non-citizen, foreign-born, or undocumented individuals or households, particularly Latinx individuals and households.

---

[37] Rizzo, *supra* note 33.

172.     Evidence filed in federal court in May 2019, revealed that Thomas B. Hofeller, a longtime Republican strategist, "played a crucial role in the Trump administration's decision to add a citizenship question to the 2020 census," following a 2015 study in which he concluded, as relevant here, that:

  a.  Without a citizenship question on the 2020 Census, the use of "citizen voting age population is functionally unworkable"; and

  b.  "A switch to the use of citizen voting age population as the redistricting population base for redistricting would be advantageous to Republicans and Non-Hispanic Whites."[38]

173.     Hofeller also wrote a "key portion" of a draft letter from the Department of Justice "claiming the [citizenship] question was needed to enforce the 1965 Voting Rights Act."[39]

174.     Christa Jones, who is now the Chief of Staff to the Director of the U.S. Census Bureau, also sent emails in 2015 to Hofeller inviting him to make comments on the Census Bureau's 2015 Content Test and noting this could be "an opportunity to mention citizenship as well."[40]

175.     In January 2018, Kris Kobach, a one-time Vice-Chair of Defendant Trump's now-defunct Presidential Commission on Election Integrity, wrote for *Breitbart* that a

---

[38] *U.S. Dep't of Com. v. New York*, No. 18-cv-02921-JMF, Docket No. 587-1 Ex. D, at 9 (May 30, 2019) (Hofeller's study and accompanying exhibits), https://www.documentcloud.org/documents/6077735-May-30-2019-Exhibit.html#document/p63/a504019; *see also* Michael Wines, *Deceased G.O.P. Strategist's Hard Drives Reveal New Details on the Census Citizenship Question*, N.Y. Times (May 30, 2019), https://www.nytimes.com/2019/05/30/us/census-citizenship-question-hofeller.html .

[39] Wines, *supra* note 38.

[40] *Kravitz v. U.S. Dep't of Commerce*, 18-cv-01041-GJH, Plaintiff's Reply in Further Support of their Rule 60(b)(2) Motion for Relief from Final Judgment & Request for Indicative Ruling Under Rule 62.1(A), at 3 (June 14, 2019), https://www.commoncause.org/wp-content/uploads/2019/06/MD-Census-Filing.pdf .

citizenship question on Census 2020 was necessary so that Congress would be able to "consider excluding illegal aliens from the apportionment process," in order to both reduce the political power of congressional districts with undocumented immigrants and provide the federal government with "information about the movement of people in and out of the country."[41]

176.    There was considerable evidence demonstrating that a citizenship question would severely impact response rates[42]; indeed, three federal judges "separately found" in 2019 that adding the citizenship population would likely produce an undercount affecting states with large Latinx or immigrant populations.[43] *See also Dep't of Commerce*, 139 S. Ct at 2565-66 (observing that the district court had concluded that the evidence established a sufficient likelihood that the proposed citizenship question would "result in noncitizen households responding to the census at lower rates than other groups, which in turn would cause them to be undercounted").Throughout 2018 and the first half of 2019, Plaintiffs' organizing, outreach, and education efforts were considerably injured by the threat of the citizenship question. Plaintiffs repeatedly encountered members and other residents of Chelsea, Greater Boston, and Massachusetts as a whole who stated they would not participate in Census 2020 because they were afraid that responses to the citizenship question would be used to harm them. Confirming these firsthand accounts, the *Boston Globe* has reported that the effort to add a citizenship

---

[41] Kris Kobach, Exclusive—Kobach: Bring the Citizenship Question Back to the Census, Breitbart, Jan. 30, 2018, http://www.breitbart.com/big-government/2018/01/30/exclusive-kobach-bring-citizenship-question- back-census/.

[42] Matt Barreto et al., *Monkey Cage: New Research Shows Just How Badly a Citizenship Question Would Hurt the 2020 Census*, Wash. Post (Apr. 22, 2019 4:45 AM), https://www.washingtonpost.com/politics/2019/04/22/new-research-shows-just-how-badly-citizenship-question-would-hurt-census/ (collecting series of surveys and experiments showing that, for example, 7 to 10 percent of respondents nationally "would not respond to the census if it included a citizenship question").

[43] Rizzo, *supra* note 33.

question "sent terror through immigrant communities already wary of sharing information with authorities."[44]

177.    Despite the U.S. Supreme Court's decision on June 27, 2019 in *Department of Commerce v. New York*, the President vowed to "fight on," claiming officials at the Department of Justice were at work to determine how to include a citizenship question on the census, including the option of an executive order.[45] These statements caused additional fear and confusion for immigrant communities and advocates, including Plaintiffs and their members. That confusion lingered for months—in surveys conducted since the Supreme Court decision, the Latinx advocacy group NALEO found that "almost half of Latino respondents said they still thought the question would be included in census forms."[46]

178.    On July 11, 2019, President Trump held a Rose Garden ceremony during which he announced that his administration was "not backing down on [its] effort to determine the citizenship status of the United States population," but that rather than add a question to Census 2020, he would instruct the government to "compile citizenship data from existing federal records instead."[47]

179.    To that end, the President signed EO 13880, *Executive Order on Collecting Information about Citizenship Status in Connection with the Decennial Status*, which commanded

---

[44] Zoe Greenberg, Boston is usually undercounted in the census. This year may be worse, The Boston Globe (Jul. 27, 2020).

[45] Margaret Taley et al, *Trump Says Citizenship Query Is 'So Important for 2020 Census*, Bloomberg News (Jul. 4, 2019 5:44 AM), https://www.bloomberg.com/news/articles/2019-07-03/trump-vows-to-keep-census-fight-alive-after-supreme-court-loss.

[46] Lautaro Grinspan, *Immigrants' Fear of 2020 Census Could Cost Florida Billions in Federal Funding*, Miami Herald (Feb. 27, 2020 3:58 PM), https://www.miamiherald.com/news/local/immigration/article240622157.html; *see also* Macagnone, M., *Trump immigrant memo may cast 'long shadow' over census*, Roll Call (Jul. 22, 2020) (reporting ongoing census counting effort has been "complicated" by "lingering fears over Trump's failed attempt to add a citizenship question to the 2020 Census.").

[47] Katie Rogers et al, *Trump Says He Will Seek citizenship Information from Existing Federal Records, Not the Census*, N.Y. Times (Jul. 11, 2019), https://www.nytimes.com/2019/07/11/us/politics/census-executive-action.html.

all federal agencies to provide the Department of Commerce the "maximum assistance permissible" in determining the "number of citizens, non-citizens, and illegal aliens in the country," for the purpose of, as relevant here, evaluating policies concerning public benefits programs, developing a "more reliable count of the unauthorized alien population in the country," and providing citizenship data to states to "design State and local legislative districts based on the population of voter-eligible citizens."[48]

180.    This intertwining of citizenship status, immigration enforcement, and Census 2020 was intended to and had the effect of causing deep panic and confusion in Black and Latinx immigrant communities. The Executive Order, and President Trump's rhetoric surrounding the census, undermined Plaintiffs' extensive advocacy and outreach aimed at convincing immigrant communities that the census was safe, easy, and confidential. By politicizing and weaponizing Census 2020, the President intended to deter Black and Latinx immigrants, non-citizens, foreign-born residents, and undocumented individuals from filling out the survey, for fear that the geographic and demographic data they provided would be linked to information about their citizenship or immigration status and target them for deportation, arrest, or detention.

181.    On August 14, 2019, the Department of Homeland Security (DHS) published the "Inadmissibility on Public Charge Grounds" final rule, that, as relevant here, redefines a "public charge" from someone "primarily dependent" on the government for subsistence to other non-citizens who receive common forms of federal and state assistance, even in small amounts and for a short period of time.

182.    Coalitions of states—including Massachusetts—municipalities, and advocacy groups filed lawsuits around the country to block the implementation of the public charge rule,

---

[48] Collecting Information About Citizenship, *supra* note 32, at 33823.

citing considerable evidence—including declarations from healthcare organizations and community-based organizations and multiple social science reports—that the rule was intended to and would chill participation in federal and state programs by non-citizens and would primarily impact immigrants from Asia, Africa, and Latin America.[49]

183.     Promulgation of the public charge rule was a major component of the President and the Administration's anti-immigration agenda. As an example, in June 2018, White House Senior Advisor Stephen Miller emailed then-USCIS Director L. Francis Cissna calling the timeline of public charge "unacceptable" and stating that Miller didn't care "what [Cissna] need[ed] to do to finish it on time."[50]

184.     As with the July 21 Memorandum, the public charge rule was intended to and had the effect of harming states, cities, and communities with large numbers of Black and Latinx immigrants, foreign-born residents, non-citizens, and undocumented individuals, by disincentivizing these individuals from providing any identifying information to local, state, or federal governments, for fear of negative impacts to their immigration status.[51]

185.     The public charge rule was intended to and has had the effect of chilling participation by Black and Latinx immigrants, non-citizens, foreign-born residents, and undocumented individuals in Census 2020. Plaintiffs observed in the immigrant communities they

---

[49] *See, e.g.,* Samantha Artiga et al., *Issue Brief: Estimated Impacts of the Estimated Impacts of Final Public Charge inadmissibility Rule on Immigrants and Medicaid Coverage*, The Henry J. Kaiser Family Foundation (Sept. 18, 2019), https://www.kff.org/disparities-policy/issue-brief/estimated-impacts-of-final-public-charge-inadmissibility-rule-on-immigrants-and-medicaid-coverage/ (stating rule could lead to Medicaid disenrollment rates ranging from 15 percent to 35 percent among Medicaid and CHIP enrollees living in mixed-status households, equating to between 2.1 and 4.9 million beneficiaries disenrolling from the programs).

[50] Ted Hesson, *Emails Show Miller Pressed Hard to Limit Green Cards*, Politico (Aug. 2, 2019 4:19 PM), https://www.politico.com/story/2019/08/02/stephen-miller-green-card-immigration-1630406.

[51] *See, e.g.,* Chinese for Affirmative Action, *Public Charge, Census Continues to Put Pressure on Our Communities*, CAA (Apr. 17, 2018), *https://caasf.org/2018/04/public-charge-census-continues-to-put-pressure-on-our-communities/* (noting that "anti-immigrant schemes by the Trump Administration will lead to even greater confusion and fear among immigrants and reduce participation in public services and hinder census accuracy).

serve that, as soon as the rule came into effect on February 24, 2020, immigrant families chilled from participating in public benefit programs expressed immense wariness at providing sensitive personal information to the Census Bureau, for fear that it would find its way into the hands of immigration authorities.

186.    Plaintiffs witnessed firsthand the extreme reluctance or outright refusal of Black and Latinx immigrant families, especially undocumented individuals, to engage in any way with any kind of government program or activity. For example, the Chelsea Collaborative observed a significant downturn in members traveling to the Collaborative or related providers for assistance applying for benefits—even those that, like Women, Infants, and Children (WIC) or Residential Assistance for Families in Transition (RAFT) were not included in the public charge analysis. Residents reported they were fearful of sharing any identifying information with the federal government and expressed deep mistrust of the Census Bureau, citing the President's Executive Order, statements to the news media, and the public charge rule as evidence the census would be weaponized against them.

187.    In January 2020, the news media reported that DHS had begun to share personal information with the Census Bureau from records "going back to as early as 1973," and including data such as noncitizens' full names, birth dates, addresses, Social Security numbers, alien registration numbers and travel histories.[52] The Department even sought permission to release "data about refugees and asylum seekers," even though these records are protected by federal law and cannot be shared without the individual's consent or a waiver.

---

[52] *See, e.g.,* Hansi Lo Wang, *To Produce Citizenship Data, Homeland Security To Share Records with Census*, NPR (Jan. 4, 2020 12:48 PM), https://www.npr.org/2020/01/04/793325772/to-produce-citizenship-data-homeland-security-to-share-records-with-census.

188.    These reports provoked fresh terror among immigrant communities throughout Massachusetts. Plaintiffs witnessed Black and Latinx immigrants, non-citizens, foreign-born residents, and undocumented residents repeat that they would not fill out Census 2020, as they were fearful that personal identifying information would be "matched up" with their immigration information and render them targets for immigration enforcement.

189.    These firsthand accounts parallel those observed by immigrant advocates across the country. In Fresno, California, for example, census outreach workers noted that many residents were "afraid to give information for the census . . . whether fearful for themselves or for immigrant members of their families," and that President Trump's "plan to use the census to identify noncitizens have heightened those fears."[53]

190.    Finally, the Trump Administration's decision to add two new political appointees to the Census Bureau has raised considerable concern among community-based organizations like Plaintiffs regarding partisan interference with Census 2020. One of the appointees, Adam Korzeniewski, served as a consultant to the political campaign of Joseph Saladino, a "social media personality known as 'Joey Salads,' who gained notoriety for staging prank videos, including racist depictions of Black people."[54]

191.    This decision is being reviewed by the Commerce Department Inspector General, and the American Statistical Association has described the appointments as in "direct conflict with the bureau's mission," noting that the addition of two political appointees to a historically nonpartisan statistical agency "undermines the work of the Census Bureau and federal statistical

---

[53] Matt Smith & Lance Williams, *Fear of Census Undercount*, Reveal (Feb. 1, 2020), https://www.revealnews.org/article/fear-of-a-census-undercount/

[54] Hansi Lo Wang, *Trump Appointees Join Census Bureau; Democrats Concerned Over Partisan 'Games'*, NPR (June 23, 2020 10:51 PM), https://www.npr.org/2020/06/23/882433973/trump-appointees-join-census-bureau-democrats-concerned-over-partisan-games .

agencies because of the lack of transparency and justification, as well as the perception—if not reality—of improper political influence."[55]

192.    Within Massachusetts, President Trump has blamed sanctuary cities like Boston, Lawrence, and Chelsea for the national opioid epidemic, referring to sanctuary cities as the homes of "MS-13 gang members" and calling on Congress to "block funds" for these cities and "close the deadly loopholes that allow criminals back in our country," prompting Boston Mayor Martin Walsh to criticize the President for "painting all undocumented immigrants as criminals."[56] In February 2020, the Administration announced it would deploy tactical units from the southern border to target undocumented immigrants in diverse, immigrant-rich, sanctuary cities like Boston, that have limited cooperation with federal immigration enforcement.[57]

193.    Taken together, these decisions by the Trump Administration were intended to and had the effect of provoking immense fear, mistrust, and confusion in Black and Latinx immigrant communities, and of discouraging members of those communities from participating in Census 2020.

194.    The patently unlawful actions of the Trump Administration—up to and including the July 21 Memorandum—were intended to and have had the effect of provoking fear in Black and Latinx immigrant communities that the Administration will disregard the confidentiality protections of Title 13 and use information gathered in Census 2020 to punish immigrant communities by depriving them of political representation and federal financial resources and targeting them for immigration enforcement.

---

[55] Gregory Wallace, *Government Watchdog Probing Controversial Census Hirings*, CNN (July 8, 2020 2:12 PM), https://www.cnn.com/2020/07/07/politics/census-inspector-general/index.html .

[56] N.A., *Trump targets Massachusetts sanctuary city as source of opioid problem*, WCVB (Mar. 19, 2018).

[57] Christian M. Wade, *Plan for sanctuary cities blasted: ICE redeployment of border agents draws criticism*, The Salem News (Feb. 17, 2020).

195.    The unlawful series of actions of the Administration—up to and including the July 21 Memorandum—were motivated by discriminatory animus towards Black and Latinx people and in response to the growing population of immigrant communities of color, compared with the shrinking of White communities. 86.7% of immigrants in the United States are people of color and 44.9% are Latinx.[58] Across the country, population growth is driven almost exclusively by growth in the non-White population; by contrast, as of 2016, "white deaths outnumbered white births nationwide," as well as in twenty-six individual states.[59]

196.    The July 21 Memorandum was motivated by a desire to harm Black and Latinx individuals and communities by reducing their political representation and access to federal resources, as well as by labelling them "non-persons" under the U.S. Constitution.

**V.    Plaintiffs Have Been and Will Be Injured by the Challenged Conduct.**

197.    Congress has expressly provided a private right of action for declaratory, injunctive, and other appropriate relief to "[a]ny person aggrieved by the use of any statistical method in violation of the Constitution or any provision of law . . . in connection with the . . . decennial census." Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, § 209(b), Pub. L. No. 105-119, 111 Stat. 2440, 2481-82 (1997) (codified at 13 U.S.C. § 141). An "aggrieved person" is defined to include "any resident of a State whose congressional representation or district could be changed as a result of the use of a statistical method." *Id.*, § 209(d)(1).

198.    The unlawful conduct alleged herein has caused, is causing, and (unless enjoined) will cause Plaintiffs to suffer various injuries in fact.

---

[58] 2016 State Immigration Data Profiles, Migration Policy Institute (Oct. 17, 2020), https://www.migrationpolicy.org/data/state-profiles/state/demographics/US .

[59] Melnik et al, *supra* note 1, at 10.

A. **Injuries based on vote dilution and diminished representation.**

199.    The stated purpose of the July 21 Memorandum is to reduce the number of congressional representatives of states with higher-than-average populations of undocumented immigrants. The shrinking, redrawing, redistribution, or restructuring of the congressional delegations in the states where Plaintiffs (or their members or residents) live and vote, without more, is "undoubtedly" a cognizable injury-in-fact. *House of Representatives*, 525 U.S. at 331-32 (holding that Indiana resident's "expected loss of a Representative to the United States Congress undoubtedly satisfied the injury-in-fact requirement of Article III standing" because "[w]ith one fewer Representative, Indiana residents' votes will be diluted"); *see also New York*, 351 F. Supp. 3d at 607 (noting that "[t]he Supreme Court has squarely held that the loss of a seat or seats in the House of Representatives 'undoubtedly satisfies the injury-in-fact- requirement of Article III standing' because of the dilution of political power that results from such an apportionment loss.").

200.    For example, the size of a state's congressional delegation is directly linked to the number of electors that the state receives in the Electoral College. *See* U.S. Const., Art. II, § 1, cl. 2 ("Each State shall appoint . . . a Number of Electors, equal to the whole number of Senators and Representatives to which the State may be entitled in the Congress"). The reduction in size of a state's congressional delegation therefore reduces the number of electors to which that state is entitled, and diminishes the weight of that state's plebiscite—and the weight of each of its voters' individual votes—in the selection of the President and the Vice President.

201.    According to the American Immigration Council, in 2016, the Commonwealth of Massachusetts was home to around 250,000 undocumented immigrants, comprising 22% of the

immigrant population and 4% of the total state population.[60] Additionally, 233,035 Massachusetts residents, including 100,946 U.S. citizens, lived with "at least one undocumented family member" between 2010 and 2014.[61] These individuals are not evenly distributed throughout the Commonwealth, but overwhelmingly live and work in communities served by Plaintiffs, including and especially Boston and Chelsea.

202.    The exclusion of these residents from the congressional apportionment base, as well as the over-exclusion of their household and family members and other immigrants and foreign-born residents identified through the use of inaccurate or incomplete statistical sampling, will result in the redrawing, redistribution, or restructuring of congressional boundaries and the loss of significant financial resources in a manner that would harm Plaintiffs and the communities they serve.

203.    The July 21 Memorandum also poses considerable harm to documented immigrants and organizations, like Organizational Plaintiffs, that serve and protect their interests. For example, the Massachusetts Seventh Congressional District, of which Chelsea, East Boston, and Somerville are a part, is home to 13,900 TPS and DACA recipients, which represent the highest concentration of TPS and DACA recipients in the state. Due to fluctuations in federal immigration policy beyond their control, these individuals may imminently lose their immigration protections and become undocumented, thus subjecting them to removal from the apportionment base.

204.    On information and belief, if Defendants succeed in excluding undocumented immigrants from the apportionment base, Massachusetts will lose one or more seats in the House

---

[60] American Immigration Council, *Fact Sheet: Immigrants in Massachusetts*, AIC (June 9, 2020), https://www.americanimmigrationcouncil.org/research/immigrants-in-massachusetts.

[61] *Id.*

of Representatives, and one or more corresponding electors in the Electoral College. According to the Center for Immigration Studies, if undocumented and other immigrants are not included in the Census 2020 count, Massachusetts will be apportioned one less seat in the House of Representatives than it would have if those persons were properly counted.[62]

205.    In addition, the exclusion of undocumented immigrants from the apportionment base will affect state and municipal redistricting within the Commonwealth of Massachusetts, to the detriment of the members of Plaintiffs HAU, Chelsea Collaborative, and Centro Presente, and of the members of the communities served by the Organizational Plaintiffs. Under the Massachusetts Constitution, the Commonwealth is required to use the population data provided by the United States Census Bureau identical to those from the actual enumeration conducted by the Bureau for the apportionment of the Representatives of the U.S. House of Representatives following the decennial census for the purpose of redrawing the boundaries of congressional and state legislative districts. *See* Mass. Const. Amend. Art. CI, §§ 1, 2, arts. CIX, CXVII, and CXIX; *see also U.S. House of Representatives*, 525 U.S. at 331-32 (holding, where states "require[d] use of federal decennial census population numbers for their state legislative redistricting" that plaintiffs' claims of "expected intrastate vote dilution satisfie[d] the injury-in-fact, causation, and redressability requirements.").

206.    As alleged above, the individual Plaintiffs live and vote in Massachusetts, specifically in Chelsea, Massachusetts and Boston, Massachusetts. Plaintiffs HAU, Chelsea Collaborative, and Centro Presente all have members residing in Massachusetts, Plaintiff Chelsea Collaborative has members residing in Chelsea, Massachusetts, and both HAU and Centro Presente have members residing in East Boston, Massachusetts.

---

[62] Camarota, Steven A. & Zeigler, Karen, *The impact of legal and illegal immigration on the apportionment of seats in the U.S. House of Representatives in 2020*, Center for Immigration Studies (Dec. 19, 2019).

207.    The diminution in the size of Massachusetts's Congressional delegation directly results in the dilution of the vote of every resident of the Commonwealth, and in the selection of the President and the Vice President. *See House of Representatives*, 525 U.S. at 331-32; *New York*, 351 F. Supp. 3d at 607.

208.    The shrinking of a state's congressional delegation also means that the affected state's total population must be divided up into a smaller number of congressional districts. Because the Constitution commands "that congressional districts be drawn with equal populations," *Evenwel*, 136 S. Ct. at 1123, the Memorandum will have the effect of artificially increasing the number of residents in every congressional district in Massachusetts. As a result, all citizens of the Commonwealth will suffer diminished weight of their personal vote within their congressional district, and all citizens of Massachusetts will have to compete with a larger number of fellow-constituents for his or her representative's limited attention and resources.

209.    Even if Massachusetts does not lose a seat in Congress because of the Memorandum, citizens of the Commonwealth will suffer vote dilution as a result of the Memorandum. In particular, urban areas having an above-average number of undocumented immigrants compared to the Commonwealth as a whole—e.g., Chelsea and Boston—will be placed in overpopulated districts, while rural areas having a below-average number of undocumented immigrants will be placed in underpopulated districts. Citizens who live in the overpopulated urban districts will therefore suffer vote dilution as compared with citizens in the underpopulated rural districts. Citizens in the overpopulated urban districts will also have to compete with a larger number of fellow-constituents for their Representative's limited attention and resources than will citizens in the underpopulated rural districts.

210.    All of the Individual Plaintiffs, and many members of the Organizational Plaintiffs, live in urban areas with an above-average number of undocumented immigrants. For this reason alone, these persons will suffer vote dilution and diminished representational rights if Defendants' challenged actions are not enjoined.

211.    As the U.S. Department of Justice has argued in past litigation, "[i]t would be patently unfair to penalize" the citizen-voters of Massachusetts and the citizen-voters of urban areas within Massachusetts "by depriving them of fair representation in Congress" and diluting their voting strength merely because "a certain number of members of their community are . . . in the class of potentially deportable aliens." Federal Defendants' Post-Argument Memorandum at 12, *FAIR v. Klutznick*, No. 79-3269 (D.D.C. Feb. 15, 1980).

212.    As Defendants recently argued to the U.S. Supreme Court, providing a remedy after apportionment, rather than prior to the December 31, 2020 statutory deadline, would "undermine the point of the deadlines established by Congress, which is to provide prompt notice to the Nation about the new apportionment that will govern the next congressional elections." *See* Appellants' Motion for Expedited Consideration of the Jurisdictional Statement, *Trump v. New York*, No. 20-366, 2020 WL 5645737, at *6 (U.S. Sept. 22, 2020).

**B.    Injuries based on racial discrimination and dignitary harms.**

213.    The Memorandum is part of a concerted, intentional effort on the part of the Defendants and others to diminish the political power of voters of color—chiefly, but not exclusively, Latinos—and to transfer their political power to non-Hispanic whites.

214.    As Hofeller noted in his 2015 study, removing undocumented immigrants from the apportionment base "alienat[es] Latino voters" and other voters of color, who perceive that removal "as an attempt to diminish their voting strength."

215.    In addition to inflicting alienation, removing undocumented immigrants from the apportionment base will in fact diminish the voting strength of these groups—just as it was intended to do.

216.    Further, the Individual Plaintiffs, and the Organizational Plaintiffs (as organizations and on behalf of their members), have suffered, are suffering, and (if the Defendants' unlawful conduct is not enjoined, will continue to suffer) dignitary harms as a result of ongoing efforts by President Trump and Secretary Ross to dilute and diminish their political representation and federal financial resources.

217.    The President's July 21 Memorandum also frustrates and undermines the Organizational Plaintiffs' larger mission and purpose, including by depriving their states and communities, which include relatively higher percentages of immigrants, non-citizens, and individuals of Latinx origin, of funding, political power, and representation.

218.    The July 21 Memorandum has forced the Organizational Plaintiffs to divert resources that would ordinarily have been spent on other programming.

219.    All of the Individual Plaintiffs, and many members of the Organizational Plaintiffs, are voters of color. These voters include Latinos, African-Americans, and voters of other racial and ethnic backgrounds. These voters of color have suffered cognizable harm as a result of Defendants' intentional race discrimination. They, and the racial and ethnic communities to which they belong, are also certain to suffer diminished voting strength and political power if Defendants' unlawful actions are not enjoined.

**C.    Injuries based on the loss of government funds.**

220.    "A large number of federal domestic financial assistance programs rely on census data to allocate money. In fiscal year 2016, for example, at least 320 such programs allocated about $900 billion using census-derived data." *New York*, 351 F. Supp. 3d at 596.

221.    Any reduction in a state's population as calculated by the census consequently results in fewer financial resources being directed to that state—and, by extension, to cities, municipalities, community organizations, and residents within that state. That is so whether or not the state in question actually loses a representative in Congress as a result of the undercount. *See New York*, 351 F. Supp. 3d at 596-98 (listing ways in which a "net undercount of people who live in noncitizen households" would "cause states (and their residents) to lose access to federal funding"); *New York*, 139 S. Ct. at 2565 ("Several state respondents here have shown that if noncitizen households are undercounted by as little as 2% . . . they will lose out on federal funds that are distributed on the basis of state population").

222.    In addition, many federal funding programs provide direct funding to localities based on census-derived information, including the Community Development Block Grant program (which, as noted above Plaintiff Chelsea Collaborative relies on), the Emergency Solutions Grant program, and the HOME Investment Partnerships Program. *New York*, 351 F. Supp. 3d at 598. These programs "provide funding to cities and counties based at least in part on such jurisdictions' share of the overall population count relative to other metropolitan areas." *Id.* Thus, any undercount in a particular locality will result in a smaller amount of federal funding to that locality, and to its residents and the community organizations that, like Plaintiff Chelsea Collaborative, rely on such funding.

223.    As the U.S. Department of Justice recognized in the *Klutznick* litigation, removing undocumented immigrants from the apportionment base requires residents of areas with an above-average number of undocumented immigrants—including residents who are U.S. citizens—"to assume a greater burden of the cost of state and municipal services" merely because the President has "determined that a certain percentage of the residents of their community do not exist for

purposes of allocation of federal census-based fiscal assistance." Federal Defendants' Post-

Argument Memorandum at 12, *FAIR v. Klutznick*, No. 79-3269 (D.D.C. Feb. 15, 1980).

224.    The U.S. Supreme Court and lower federal courts have held that such a loss of

government funding due to census undercount is sufficient to confer Article III standing. *See New

York*, 139 S. Ct. at 2565; *see also Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) ("citizens

who challenge a census undercount on the basis . . . that improper enumeration will result in loss

of funds to their city have established [standing]"); *New York*, 351 F. Supp. 3d at 608-09.

225.    As described in the Jurisdictional Statement to the Supreme Court in *Trump v. New

York*, the implementation of the July 21 Memorandum will result in the exclusion of

undocumented immigrants—as well as the improper exclusion of other individuals due to

inaccurate methodologies—from the "census tabulation," as well as the congressional

apportionment base.

226.    All of the Individual Plaintiffs, and many members of the Organizational

Plaintiffs, live in regions of Massachusetts that have an above-average number of undocumented

immigrants. Because those regions are currently suffering and will continue to suffer from

differential undercounting as a result of the Memorandum, these persons are certain to suffer

financial burdens, including increases in the costs of state and municipal services, if the

Defendants' unlawful actions are not enjoined.

227.    Those increased costs will be felt especially acutely by the Individual Plaintiffs

(and members of the Organizational Plaintiffs) who reside in urban areas, which must necessarily

provide municipal services to citizens, documented immigrants, and undocumented immigrants

on an equal basis. *See, e.g.*, *Plyler*, 457 U.S. 202, 230 (1982) (holding that the right to a free

public education extends to minor undocumented immigrants); *Holt Civic Club v. Tuscaloosa*,

439 U.S. 60, 74 (1978) (noting that "police, fire, and health protection" are "basic municipal services" whose delivery to all residents is a "city's responsibility").

## VI.    The Need for Declaratory and Injunctive Relief.

228.    Plaintiffs' organizational mission has been and will continue to be harmed by the Defendants' actions. Because Plaintiffs' organizational missions are centered around the provision of support, advocacy, and resources to immigrant communities, the removal of undocumented immigrants from the apportionment base will reduce the federal financial resources directed to those communities through the over one hundred census-linked federal programs, including but not limited to WIC, Medicaid, Adult Education grants, career and technical education grants, English Language acquisition grants, and Section 8 housing assistance.[63] Plaintiffs rely upon these resources to carry out their missions.

229.    The COVID-19 pandemic has highlighted the critical need for adequate, robust federal funding for low-income communities like Chelsea and Greater Boston, which have suffered immense economic harm. Without sufficient financial resources to support residents suffering from food, housing, and employment insecurity, these communities will be unable to recover from the pandemic.

230.    The harm stemming from this deprivation of critically-needed federal financial resources will continue for the next decade, until the next decennial census.

---

[63] Marisa Hotchkiss & Jessica Phelan, *Uses of Census Bureau Data in Federal Funds Distribution*, U.S. Census Bureau 1, 10 (Sept. 2017), https://www2.census.gov/programs-surveys/decennial/2020/program-management/working-papers/Uses-of-Census-Bureau-Data-in-Federal-Funds-Distribution.pdf.

## CLAIMS FOR RELIEF

### Count I: Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### (Agency Action that is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law) (Against Defendant U.S. Department of Commerce, Defendant U.S. Census Bureau, Defendant Wilbur Ross, and Defendant Steven Dillingham)

231.    Plaintiffs reallege and incorporate by reference each and every allegation of the preceding paragraphs as if set forth fully herein.

232.    As federal administrative agencies, the Department of Commerce and the Census Bureau are subject to the Administrative Procedure Act ("APA"). 5 U.S.C. § 701(b)(1).

233.    The APA requires courts to find unlawful and to set aside any final agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

234.    Following receipt of the Presidential Memorandum, the Department of Commerce and the Census Bureau have issued directives, constituting final agency action, to implement the policy of excluding undocumented non-citizens from the decennial census count used for congressional apportionment, as set forth in the Presidential Memorandum.

235.    Defendants' implementation of the July 21 Memorandum departs from longstanding policy without any reasoned basis and disregards the lack of reliable statistical methods to exclude undocumented individuals—identified through administrative records collected outside the decennial census process—from the apportionment base. In addition, contrary to the requirements of OMB policy directors and Census Bureau governing guidelines, the data collected by the Census Bureau about undocumented non-citizens pursuant to the Presidential Memorandum will not be reliable, clear, or complete. Thus, the Defendants' actions are arbitrary and capricious, in violation of the APA. 5 U.S.C. § 706(2)(A).

236.    These violations of the APA have caused, are causing, and unless Defendant is enjoined from complying with the July 21 Memorandum, will continue to cause Plaintiffs to suffer multiple injuries-in-fact.

**Count II: Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**
**(Agency Action Contrary to Constitutional Right, Power, Privilege, or Immunity)**
**(Against Defendant U.S. Department of Commerce, Defendant U.S. Census**
**Bureau, Defendant Wilbur Ross, and Defendant Steven Dillingham)**

237.    Plaintiffs reallege and incorporate by reference each and every allegation of the preceding paragraphs as if set forth fully herein.

238.    As federal administrative agencies, the Department of Commerce and the Census Bureau are subject to the APA. 5 U.S.C. § 701(b)(1).

239.    The APA requires courts to find unlawful and to set aside any final agency action that is, among other things, "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

240.    Following receipt of the Presidential Memorandum, the Department of Commerce and the Census Bureau have issued directives, constituting final agency action, to implement the policy of excluding undocumented non-citizens from the decennial census count used for congressional apportionment, as set forth in the Presidential Memorandum.

241.    Defendants' implementation of the July 21 Memorandum is contrary to constitutional right, power, privilege, or immunity, and therefore violates the APA, because it contravenes the unambiguous command, articulated in Article I, Section 2, Clause 3 of the Constitution, as revised by the Fourteenth Amendment, that the "whole number of persons in each State" be counted for the apportionment of congressional seats pursuant to an "actual Enumeration." 5 U.S.C. § 706(2)(B).

242.    This violation of the APA has caused, is causing, and unless Defendant is enjoined from complying with the July 21 Memorandum, will continue to cause Plaintiffs to suffer multiple injuries-in-fact.

**Count III: Administrative Procedure Act, 5 U.S.C. § 706(2)(C)**
**(Agency Action that is in Excess of Statutory Jurisdiction, Authority, or Limitations, or Short of a Statutory Right) (Against Defendant U.S. Department of Commerce, Defendant U.S. Census Bureau, Defendant Wilbur Ross, and Defendant Steven Dillingham)**

243.    Plaintiffs reallege and incorporate by reference each and every allegation of the preceding paragraphs as if set forth fully herein.

244.    As federal administrative agencies, the Department of Commerce and the Census Bureau are subject to the APA. 5 U.S.C. § 701(b)(1).

245.    The APA requires courts to find unlawful and to set aside any final agency action that is, among other things, "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

246.    Following receipt of the Presidential Memorandum, the Department of Commerce and the Census Bureau have issued directives, constituting final agency action, to implement the policy of excluding undocumented non-citizens from the decennial census count used for congressional apportionment, as set forth in the Presidential Memorandum.

247.    Defendants' implementation of the July 21 Memorandum is in excess of clear statutory authority because the Census Act requires the Secretary of Commerce to report a "tabulation of total population by States" and forbids him from relying on statistical sampling for purposes of reporting population figures to be used for congressional apportionment. 5 U.S.C. § 706(2)(C).

248.     This violation of the APA has caused, is causing, and unless Defendant is enjoined from complying with the July 21 Memorandum, will continue to cause Plaintiffs to suffer multiple injuries-in-fact.

**Count IV: Administrative Procedure Act, 5 U.S.C. § 706(2)(D)**
**(Agency Action that is Without Observance of Procedure Required by Law)**
**(Against Defendant U.S. Department of Commerce, Defendant U.S. Census Bureau,**
**Defendant Wilbur Ross, and Defendant Steven Dillingham)**

249.     Plaintiffs reallege and incorporate by reference each and every allegation of the preceding paragraphs as if set forth fully herein.

250.     As federal administrative agencies, the Department of Commerce and the Census Bureau are subject to the APA. 5 U.S.C. § 701(b)(1).

251.     The APA requires courts to find unlawful and to set aside any final agency action that is, among other things, "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

252.     Following receipt of the Presidential Memorandum, the Department of Commerce and the Census Bureau have issued directives, constituting final agency action, to implement the policy of excluding undocumented non-citizens from the decennial census count used for congressional apportionment, as set forth in the Presidential Memorandum.

253.     Defendants' implementation of the July 21 Memorandum violates the APA because it departs from the 2020 Residence Rule that the Census Bureau adopted after notice-and-comment rulemaking, without observance of the procedure required by law. 5 U.S.C. § 706(2)(D).

254.     This violation of the APA has caused, is causing, and unless Defendant is enjoined from complying with the July 21 Memorandum, will continue to cause Plaintiffs to suffer multiple injuries-in-fact.

**Count V: Violation of U.S. Const., Art. I, § 2, cl. 3 and 13 U.S.C. 195**
**(Lack of Actual Enumeration & Unlawful Statistical Sampling)**
**(Against All Defendants)**

255.    Plaintiffs reallege and incorporate by reference each and every allegation of the preceding paragraphs as if set forth fully herein.

256.    Article I, Section 2, Clause 3 of the U.S. Constitution provides that "Representatives . . . shall be apportioned among the several States . . . according to their respective Numbers, which shall be determined" via an "actual Enumeration."

257.    The July 21 Memorandum and the Secretary of Commerce's compliance therewith directly contravene the Constitutional requirement to conduct an "actual Enumeration" of all persons in the United States for the purpose of congressional apportionment. "Nothing is more existential to the preservation of the 'Republic' than requiring an 'actual Enumeration' without 'partiality or oppression.'" *NAACP v. Bureau of the Census*, 945 F.3d 183, 194 (4th Cir. 2019) (Gregory, C.J., concurring).

258.    In addition, the Census Act, 13 U.S.C. § 195, "directly prohibits the use of sampling in the determination of population for purposes of apportionment." *House of Representatives*, 525 U.S. at 338.

259.    The Constitution and the Census Act both require that any method of counting the population for apportionment purposes be accurate.

260.    It is impossible for Defendants to conduct an "actual Enumeration" of the number of undocumented immigrants in each state in connection with the 2020 Census. Thus, any implementation of the Memorandum will inevitably and necessarily violate the Enumeration Clause.

76

261.    Any manner of implementing the Memorandum that could possibly be available to Defendants would necessarily involve unlawful statistical sampling, would be unlawfully inaccurate or overbroad, or both.

262.    Defendants' violations will lead to a severe undercount of immigrant communities and harm Plaintiffs and their membership. These violations will deprive Plaintiffs of their constitutional right to congressional representation and the share of federal financial resources to which they are entitled, and have caused, are causing, and unless Defendants are enjoined, will continue to cause Plaintiffs to suffer multiple injuries-in-fact.

263.    Congress has provided a private right of action for declaratory, injunctive, and other appropriate relief to "[a]ny person aggrieved by the use of any statistical method in violation of the Constitution or any provision of law . . . in connection with the . . . decennial census." Departments of Commerce, Justice, and State, The Judiciary, and Related Agencies Appropriations Act of 1998, § 209(a)(7), Pub. L. No. 105-119, 111 Stat. 2440, 2481-82 (1997) (codified at 13 U.S.C. § 141). An "aggrieved person" includes "any resident of a State whose congressional representation or district could be changed as a result of the use of a statistical method." *Id.* at § 209(d)(1). Plaintiffs are "aggrieved persons" within the meaning of this provision.

264.    Accordingly, Plaintiffs are entitled to a declaration, injunction, and writ of mandamus against Defendants' violations of the Enumeration Clause and 13 U.S.C. 195 in connection with their implementation of the July 21 Memorandum.

**Count VI: Violation of U.S. Const., Art. I, § 2, cl. 3 & U.S. Const., amend XIV, § 2**
**("Whole Number of Persons)**
**(Against all Defendants)**

265.    Plaintiffs reallege and incorporate by reference each and every allegation of the preceding paragraphs as if set forth fully herein.

266.    Art. I, § 2, cl. 3, as modified by Section 2 of the Fourteenth Amendment, provides that "Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed."

267.    Since the nation's founding, all three branches of the federal government have agreed that "the whole number of persons in each state" includes non-citizens, irrespective of their immigration status—and consequently, the non-citizens must be counted in the census and included in the basis for congressional apportionment.

268.    By directing the Department to exclude undocumented immigrants from the basis for congressional apportionment, the President has violated Art. I, § 2, cl. 3 of the U.S. Constitution and Section 2 of the Fourteenth Amendment to the U.S. Constitution.

269.    These violations have caused, are causing, and unless Defendants are enjoined, will continue to cause Plaintiffs to suffer multiple injuries-in-fact.

### Count VII: Violation of 2 U.S.C. § 2a
### (Against Donald J. Trump, President of the United States)

270.    Plaintiffs reallege and incorporate by reference each and every allegation of the preceding paragraphs as if set forth fully herein.

271.    2 U.S.C. § 2a(a) requires the President to transmit to Congress a "statement showing the whole number of persons in each State . . . as ascertained under the . . . decennial census" and the "number of Representatives to which each State would be entitled" by applying the method of equal proportions to that "whole number of persons." This statute does not authorize the President to calculate the apportionment based on any number other than the "whole number of persons in each State . . . as ascertained under the . . . decennial census."

272.    Nowhere in the text or legislative history of 2 U.S.C. § 2a is there any provision for the President to exercise his discretion to redefine which individuals may be counted in the

congressional apportionment base. As the Supreme Court held in *Franklin*, the President's role under Section 2a is "ministerial in nature." 505 U.S. at 799.

273.    The statute neither calls for nor permits the President to exercise discretion with regard to the proper apportionment basis or the proper underlying theory of democratic representation. Likewise, the President has no inherent authority under the Constitution to exercise discretion or to make policy determinations in this process; nor does he have any other authority beyond that which Congress has expressly delegated to him, since the Constitution expressly assigns all power over apportionment to Congress, not the President.

274.    By purporting to require the Secretary of Commerce to transmit to the President population figures concerning or adjusted to exclude undocumented immigrants, and by purporting to exclude undocumented immigrants in the apportionment of congressional representatives, the President has violated or will imminently violate 2 U.S.C. § 2a(a).

275.    Because President Trump has acted or will act beyond the scope of his statutory authority, he is acting *ultra vires*, and his actions are null and void.

276.    By and through the policy set forth in the Memorandum, President Trump is failing and will fail to perform his clear legal duties to, among other things, (a) calculate the whole number of persons in each state and the number of U.S. House seats to which each seat is entitled based on data from the decennial census that includes all persons who live in the United States as their usual residence, and (b) transmit to Congress the whole number of persons in each state and the number of U.S. House seats to which each state is entitled based on data from the decennial census that includes all persons who live in the United States as their usual residence.

277.    These violations have caused, are causing, and unless Defendants are enjoined, will continue to cause Plaintiffs to suffer multiple injuries-in-fact.

## Count VIII: Violation of 13 U.S.C. § 141(b)
### (Against Defendants U.S. Department of Commerce and Wilbur Ross, Secretary of the U.S. Department of Commerce)

278.    Plaintiffs reallege and incorporate by reference each and every allegation of the preceding paragraphs as if set forth fully herein.

279.    13 U.S.C. § 141(b) requires the Secretary of Commerce to transmit to the President the "tabulation of total population by States . . . as required for the apportionment of Representatives in Congress." The statute does not authorize the Secretary of Commerce to calculate or transmit to the President for purposes of apportionment any number other than the "total population by States," such as the number of undocumented immigrants in each State.

280.    Nowhere in the text or legislative history of 13 U.S.C. § 141 is there any provision for the Secretary to obey a directive from the President to transmit to the President any number other than the "total population by the States."

281.    By purporting to require the Secretary of Commerce to transmit to the President population figures concerning or adjusted to exclude undocumented immigrants, and by purporting to exclude undocumented immigrants in the apportionment of congressional representatives, the President has ordered the Secretary of Commerce and the U.S. Department of Commerce to violate, and the Secretary and the Department have violated or will imminently violate 13 U.S.C. § 141(b).

282.    Because the Secretary of Commerce and the U.S. Department of Commerce have acted or will act beyond the scope of their authority, they are acting *ultra vires*, and their actions are null and void.

283.    As a result of the July 21 Memorandum, the Secretary and the Department will fail to perform their clear legal duties to, among other things, tabulate the total populations of the

80

States based on data from the decennial census that includes all persons who live in the United States as their usual residence.

284.    These violations have caused, are causing, and unless Defendants are enjoined, will continue to cause Plaintiffs to suffer multiple injuries-in-fact.

### Count IX: Violation of the Equal Protection Clause
### (Vote Dilution and Representational Injury)
### (Against All Defendants)

285.    Plaintiffs reallege and incorporate by reference each and every allegation of the preceding paragraphs as if set forth fully herein.

286.    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, made applicable to the federal government via the Due Process Clause of the Fifth Amendment, provides that the government may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1, cl. 2; *see United States v. Windsor*, 570 U.S. 744, 769-70 (2013) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)).

287.    In particular, the Equal Protection Clause prohibits the government from taking action in the apportionment process that dilutes or debases the weight of a voter's vote based on where that voter lives. *See Reynolds v. Sims*, 377 U.S. 533 (1964); *Wesberry v. Sanders*, 376 U.S. 1 (1964).

288.    By purporting to exclude undocumented immigrants from the congressional apportionment base, Defendants have unlawfully diluted Plaintiffs' votes (or the votes of their members) by requiring them to live and vote in congressional districts with a population that is higher than an equal proportion of persons as determined by a lawful census and as required by the Constitution.

289.    By purporting to exclude undocumented immigrants from the congressional apportionment base, Defendants have caused Plaintiffs (or their members) to suffer

representational injury by forcing them to compete for their Representative's limited attention and resources with an artificially high number of fellow-constituents.

290.    By purporting to exclude undocumented immigrants from the congressional apportionment base, Defendants will reduce the size of the congressional delegations in Massachusetts, thereby reducing the number of electors to which Massachusetts is entitled in the Electoral College, and accordingly reducing the weight of the Plaintiffs' votes (or the votes of their members) in the election of the President of the United States and the Vice President of the United States.

291.    These violations have caused, are causing, and unless Defendants are enjoined, will continue to cause Plaintiffs to suffer multiple injuries-in-fact.

### Count X: Violation of Equal Protection Clause
### (Invidious Discrimination)
### (Against All Defendants)

292.    Plaintiffs reallege and incorporate by reference each and every allegation of the preceding paragraphs as if set forth fully herein.

293.    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, made applicable to the federal government via the Due Process Clause of the Fifth Amendment, provides that the government may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1, cl. 2; *see United States v. Windsor*, 570 U.S. 744, 769-70 (2013) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)).

294.    The Equal Protection Clause prohibits the government from taking adverse action against any person on the basis of race, ethnicity, or national origin. This prohibition extends to the apportionment process, and encompasses not only "explicit racial classifications, but also . . . laws neutral on their face but 'unexplainable on any grounds other than race.'" *Miller v. Johnson*, 515 U.S. 900, 905 (1995).

295.    Like the rest of the Fifth Amendment's Due Process Clause, its Equal Protection component "applies to all persons within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

296.    The President's July 21, 2020 Memorandum is the culmination of a years-long effort to transfer political power from voters of color—primarily, but not exclusively, Latinx voters—to "Republicans and non-Hispanic whites." The Memorandum and the policy changes that it embodies was motivated by intentional invidious discrimination on the basis of race, ethnicity, or national origin.

297.    These violations have caused, are causing, and unless Defendants are enjoined, will continue to cause Plaintiffs to suffer multiple injuries-in-fact.

## PRAYER FOR RELIEF

Plaintiffs respectfully ask that the Court issue the following:

(1) A declaration that the July 21, 2020 Memorandum, and the other actions challenged herein, are unauthorized by, contrary to, and in violation of the Constitution and laws of the United States, and that those actions therefore are null, void, and without force;

(2) A declaration that Defendants' exclusion of undocumented immigrants from (a) the tabulation of the total population of the states, (b) the calculation and statement of the whole number of persons in each state, and (c) the calculation and statement of the apportionment of the House of Representatives among the states, is unauthorized by and violates the Constitution and laws of the United States;

(3) A declaration that Defendants' use of statistical sampling or other methods that do not qualify as "actual Enumeration" in connection with the determination of congressional apportionment is unauthorized by, contrary to, and in violation of the Constitution and laws of the United States;

(4) A declaration that any compliance by the Agency Defendants with the July 21, 2020 Memorandum and its order to the Census Bureau to produce tabulations of population data excluding undocumented residents for congressional apportionment violates §§ 706(2) of the APA because it is arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law, contrary to constitutional power, right, privilege, or immunity, in excess of statutory jurisdiction, authority, or limitations, and without observance of procedure required by law;

(5) A preliminary injunction and permanent injunction halting and restraining Defendants' violations of the U.S. Constitution and laws of the United States as alleged herein, by ordering:

- That Defendants Ross, Defendant U.S. Department of Commerce, Defendant Census Bureau, Defendant Dillingham, and their employees and agents, and all others acting in concert with them, (a) not collect, assemble, prepare, or transmit to the President any data or analysis regarding citizenship or immigration status, (b) not collect, assemble, prepare, or transmit to the President any census-related data or calculation other than the whole number of persons residing in each State, excluding Indians not taxed, (c) provide no support or assistance of any kind to the President in carrying out the exclusion of persons from his enumeration and apportionment determinations on the basis of citizenship or immigration status; and (d) make no use of statistical sampling, modeling, estimation, or other techniques or methodologies other than "actual Enumeration," or any data generated, prepared, or calculated using such techniques, in connection with the census or any data or analysis based thereon; and

- That Defendant Trump, and all others acting in concert with him, (a) include all of the inhabitants of each State, excluding Indians not taxed, without respect to each inhabitants' citizenship or immigration status, in the enumeration and apportionment calculations that he prepares and transmits to Congress, (b) make no use of statistical sampling, modeling, estimation, or other techniques or methodologies other than "actual Enumeration," or any data generated, prepared, or calculated using such techniques, in connection with the enumeration and apportionment calculations that he prepares and transmits to Congress.

(6) A writ of mandamus

- Compelling the Secretary of Commerce to tabulate and report only the total population of each state, based only on the actual enumeration of the total population as determined by the 2020 Census, including undocumented immigrants who live in the United States as their usual residence, without employing statistical sampling, modeling, estimation, or other techniques or methodologies other than "actual Enumeration,' or any data generated, prepared, or calculated using such techniques; and

- Compelling the President to prepare and transmit apportionment tables to Congress using only the total population of each state, based only on the actual enumeration of the total population as determined by the 2020 Census, including undocumented immigrants who live in the United States as their usual residence, without employing statistical sampling, modeling, estimation, or other techniques or methodologies other than "actual Enumeration," or any data generated, prepared, or calculated using such techniques.

(7) An award to Plaintiffs of their reasonable fees (including attorneys' fees), costs, and expenses, pursuant to 28 U.S.C. 2412; and

(8) An order granting to Plaintiffs such other and further relief as the Court deems just and proper.

**HAITIAN-AMERICANS UNITED, INC.,
BRAZILIAN WORKER CENTER,
CHELSEA COLLABORATIVE, INC.,
CENTRO PRESENTE, GLADYS VEGA,
NORIELIZ DEJESUS, ROY AVELLANEDA,
DIEUFORT FLEURISSAINT, MARTHA
FLORES, and JESSICA ARMIJO**

By their attorneys,

*/s/ Patrick M. Curran, Jr.*
Neil V. McKittrick (BBO #551386)
Patrick M. Curran, Jr. (BBO #659322)
Anna B. Rao (BBO #703843)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Boston Place, Suite 3500
Boston, MA  02110
Tel: (617) 994-5700
Fax: (617) 994-5701
neil.mckittrick@ogletreedeakins.com
patrick.curran@ogletreedeakins.com
anna.rao@ogletreedeakins.com

Oren Sellstrom (BBO #569045)
Lauren Sampson (BBO #704319)
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(617) 988-0609
lsampson@lawyersforcivilrights.org

Dated:  October 21, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Patrick M. Curran, Jr.*
Patrick M. Curran, Jr.

44654929.1