# EXHIBIT A

JEFFREY B. CLARK
Acting Assistant Attorney General
JOHN V. COGHLAN
Deputy Assistant Attorney General
AUGUST E. FLENTJE
Special Counsel to the Assistant Attorney General
ALEXANDER K. HAAS
Branch Director
DIANE KELLEHER
BRAD P. ROSENBERG
Assistant Branch Directors
M. ANDREW ZEE
ALEXANDER V. SVERDLOV
STEPHEN EHRLICH
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
450 Golden Gate Avenue
San Francisco, CA 94102
Phone: (415) 436-6646
E-mail: m.andrew.zee@usdoj.gov

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| NATIONAL URBAN LEAGUE, *et al*., | Case No. 5:20-cv-05799-LHK |
| Plaintiff, | **DEFENDANTS' NOTICE OF MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT; MEMORANDUM IN SUPPORT** |
| v. | |
| WILBUR L. ROSS, JR., *et al.*, | Hearing Date: December 17, 2020 |
| Defendants. | Time: 1:30 p.m. |
| | Judge: Hon. Lucy H. Koh |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 3

I.    LEGAL FRAMEWORK .............................................................................. 3

II.   PROCEDURAL HISTORY.......................................................................... 3

III.  PLAINTIFFS' SECOND AMENDED COMPLAINT................................... 5

LEGAL STANDARD............................................................................................ 5

ARGUMENT ........................................................................................................ 5

I.    THE POLITICAL QUESTION DOCTRINE BARS PLAINTIFFS' CLAIMS................ 5

II.   PLAINTIFFS LACK STANDING ............................................................... 10

      A.    Plaintiffs' Alleged Injuries are Not Redressable by a Court Order ..................... 11

      B.    Plaintiffs' Alleged Injuries are Not Traceable to Defendants' Actions................ 13

      C.    Plaintiffs' Injuries are Too Speculative to Confer Standing................................. 14

III.  PLAINTIFFS' CLAIMS, EVEN IF JUSTICIABLE, ARE NOT RIPE.......................... 17

IV.   JURISDICTION IS LACKING OVER PLAINTIFFS' APA CLAIMS ......................... 19

      A.    The Replan is Not Final Agency Action and Therefore Is Not Reviewable. ....... 20

            1.    The Replan is not "agency action" under the APA................................... 20

            2.    The Replan is not "final agency action" subject to judicial review.......... 22

      B.    The Bureau's Choices Regarding How to Meet Its Statutory Obligations to Complete the Census are Committed to Agency Discretion, and are Therefore Unreviewable ................................................................................ 23

CONCLUSION..................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Alperin v. Vatican Bank*,
  410 F.3d 532 (9th Cir. 2005) ........................................................................... 6

*Baker v. Carr*,
  369 U.S. 186 (1962) ..................................................................................... 6, 7

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................ 20

*Biodiversity Legal Found. v. Badgley*,
  309 F.3d 1166 (9th Cir. 2002) ....................................................................... 11

*California v. Ross*,
  362 F. Supp. 3d 727 (N.D. Cal. 2018) ........................................................... 25

*Carey v. Klutznick*,
  508 F. Supp. 420 (S.D.N.Y. 1980) ................................................................. 12

*Carey v. Klutznick*,
  637 F.2d 834 (2d Cir. 1980) ........................................................................... 12

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ........................................................................................ 23

*Citizens United v. FEC*,
  558 U.S. 310 (2010) ........................................................................................ 11

*City of Phila. v. Klutznick*,
  503 F. Supp. 663 (E.D. Pa. 1980) .................................................................. 24

*City of Willacoochee v. Baldrige*,
  556 F. Supp. 551 (S.D. Ga. 1983) .................................................................. 24

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................... 10, 14, 17

*Clark v. City of Seattle,*
  899 F.3d 802 (9th Cir. 2018) ............................................................... 18

*Confederacion de la Raza Unida v. Brown,*
  345 F. Supp. 909 (N.D. Cal. 1972) ........................................................ 22

*Corrie v. Caterpillar, Inc.,*
  503 F.3d 974 (9th Cir. 2007) ................................................................. 6

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ........................................................ 7, 8, 10, 24

*Dep't of Commerce v. U.S. House of Representatives,*
  525 U.S. 316 (1999) ............................................................................. 8

*Dist. of Columbia v. U.S. Dep't of Commerce,*
  789 F. Supp. 1179 (D.D.C. 1992) ......................................................... 25

*El–Shifa Pharm. Indus. Co. v. United States,*
  378 F.3d 1346 (Fed. Cir. 2004) ............................................................ 6

*Fed'n for Am. Immigration Reform v. Klutznick,*
  486 F. Supp. 564 (D.D.C. 1980) ........................................................... 15

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ................................................................. 8, 13, 22

*Gaffney v. Cummings,*
  412 U.S. 735 (1973) ............................................................................. 17

*Gilligan v. Morgan,*
  413 U.S. 1 (1973) ................................................................................. 6

*Gonzalez v. Gorsuch,*
  688 F.2d 1263 (9th Cir. 1982) .............................................................. 11

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ............................................................................. 23

*ICC v. Bhd. of Locomotive Eng'rs,*
  482 U.S. 270 (1987) ............................................................................. 23

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,

   478 U.S. 221 (1986) .......................................................................................... 5, 9

*Karcher v. Daggett*,

   462 U.S. 725 (1983) ........................................................................................ 10, 17

*Klutznick v. Carey*,

   449 U.S. 1068 (1980) ............................................................................................. 12

*Klutznick v. Young*,

   No. A-533 (Dec. 24, 1980) .................................................................................... 12

*Lujan v. Defs. of Wildlife*,

   504 U.S. 555 (1992) ................................................................................... 10, 13, 14

*Lujan v. Nat'l Wildlife Fed'n*,

   497 U.S. 871 (1990) ............................................................................................... 20

*Made in the USA Found. v. United States*,

   242 F.3d 1300 (11th Cir. 2001) .............................................................................. 6

*McConnell v. FEC*,

   540 U.S. 93 (2003) ................................................................................................. 11

*Indep. Mining Co. v. Babbitt*,

   105 F.3d 502 (9th Cir. 1997) ................................................................................. 21

*NAACP v. Bureau of the Census*,

   382 F. Supp. 3d 349 (D. Md. 2019) ...................................................................... 25

*NAACP v. Bureau of the Census*,

   399 F. Supp. 3d 406 (D. Md. 2019), *aff'd in part, rev'd on other grounds*, 945 F.3d 183

   (4th Cir. 2019) .......................................................................................... 7, 21, 22

*NAACP v. Bureau of the Census*,

   945 F.3d 183 (4th Cir. 2019) ........................................................................... 17, 21

*Nat'l Law Ctr. on Homelessness & Poverty v. Brown*,

   CIV. A. 92-2257-LFO, 1994 WL 521334 (D.D.C. Sept. 15, 1994) ...................... 22

*Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*,

   91 F.3d 178 (D.C. Cir. 1996) ........................................................................... 12, 13, 15

*Nat'l Urban Leage v. Ross*,

   977 F.3d 770 (9th Cir. 2020) ............................................................................ 4, 12, 19

*Nat'l Urban League v.* Ross,

   977 F.3d 698 (9th Cir. 2020) ................................................................................ *passim*

*Norton v. S. Utah Wilderness All.* ("*SUWA*"),

   542 U.S. 55 (2004) ............................................................................................... 20, 21

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,

   465 F.3d 977 (9th Cir. 2006) ....................................................................................... 22

*Pac. Nw. Generating Co-op. v. Bonneville Power Admin.*,

   596 F.3d 1065 (9th Cir. 2010) ..................................................................................... 23

*Raines v. Byrd*,

   521 U.S. 811 (1997) .............................................................................................. 10, 11

*Renne v. Geary*,

   501 U.S. 312 (1991) ...................................................................................................... 5

*Ridge v. Verity*,

   715 F. Supp. 1308 (W.D. Pa. 1989) ........................................................................... 15

*Ross v. Nat'l Urban League*,

   --- S. Ct. ---, 2020 WIL 6041178 (Oct. 13, 2020) ....................................................... 4

*Rucho v. Common Cause*,

   139 S. Ct. 2484 (2019) .................................................................................................. 6

*Safe Air for Everyone v. Meyer*,

   373 F.3d 1035 (9th Cir. 2004) ..................................................................................... 10

*San Luis Unit Food Producers v. United States*,

   709 F.3d 798 (9th Cir. 2013) ....................................................................................... 20

*Schneider v. Kissinger*,

   412 F.3d 190 (D.C. Cir. 2005) ...................................................................................... 6

*Sharrow v. Brown,*

　447 F.2d 94 (2d Cir. 1971) ................................................................. 15

*Simon v. E. Ky. Welfare Rights Org.,*

　426 U.S. 26 (1976) ............................................................................ 14

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care,*

　968 F.3d 738 (9th Cir. 2020) ............................................................. 18

*Spokeo, Inc. v. Robins,*

　136 S. Ct. 1540 (2016) ....................................................................... 14

*State v. U.S. Dep't of Commerce,*

　315 F. Supp. 3d 766 (S.D.N.Y. 2018) ............................................... 25

*Steel Co. v. Citizens for a Better Env't,*

　523 U.S. 83 (1998) .............................................................................. 5

*Summers v. Earth Island Inst.,*

　555 U.S. 488 (2009) .......................................................................... 14

*Thomas v. Anchorage Equal Rts. Comm'n,*

　220 F.3d 1134 (9th Cir. 2000) ........................................................... 18

*Tucker v. U.S. Dep't of Commerce,*

　958 F.2d 1411 (7th Cir. 1992) ....................................................... 9, 24

*U.S. Dep't of Commerce v. Montana,*

　503 U.S. 442 (1992) .......................................................................... 14

*United States v. Munoz-Flores,*

　495 U.S. 385 (1990) ............................................................................ 6

*Utah v. Evans,*

　536 U.S. 452 (2002) ....................................................................... 8, 19

*Vieth v. Jubelirer,*

　541 U.S. 267 (2004) ............................................................................ 6

*Warth v. Seldin,*

　422 U.S. 490 (1975) .......................................................................... 11

*Whitmore v. Arkansas*,

    495 U.S. 149 (1990)...........................................................................................14

*Wild Fish Conservancy v. Jewell*,

    730 F.3d 791 (9th Cir. 2013) ...................................................................... 20, 22

*Wisconsin v. City of New York*,

    517 U.S. 1 (1996)......................................................................................*passim*

*Zivotofsky ex rel. Zivotofsky v. Clinton*,

    566 U.S. 189 (2012)............................................................................................6

**Constitutional Provisions**

U.S. Const. art. I, § 2, cl. 3............................................................3, 6, 11, 23

**Statutes**

2 U.S.C. § 2a ..........................................................................................*passim*

5 U.S.C. § 551 .................................................................................................20

5 U.S.C. § 701 .................................................................................................23

5 U.S.C. § 704 .................................................................................................20

13 U.S.C. § 2 .....................................................................................................3

13 U.S.C. § 4 .....................................................................................................3

13 U.S.C. § 6 ...................................................................................................24

13 U.S.C. § 141 .......................................................................................*passim*

42 U.S.C. § 1396d ..........................................................................................15

49 U.S.C. § 5305 ............................................................................................15

An Act Providing for the Taking of the [S]eventh and [S]ubsequent Censuses,

    9 Stat. 445 (1850)..............................................................................................7

Census Act of 1790, 1 Stat. 101 (1790) ...........................................................7

Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13 ......7

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ............................................................... 1, 2, 5

**Other Authorities**

13A Charles Alan Wright et al., *Federal Practice & Procedure* § 3531.6 (3d ed. Apr. 2018

   update)............................................................................................................... 11

https://www.census.gov/topics/public-sector/congressional-

   apportionment/about/computing.html............................................................... 14

Total Response Rates by State,

   https://2020census.gov/en/responserates/nrfu.html .............................................. 16

1

**NOTICE OF MOTION**

2

PLEASE TAKE NOTICE that Defendants, by and through their counsel, hereby move to

3

dismiss Plaintiffs' Second Amended Complaint pursuant to Federal Rule of Civil Procedure

4

12(b)(1). Defendants respectfully request that this motion be heard on December 17, 2020, at 1:30

5

p.m., or at the Court's next available date thereafter.

6

**INTRODUCTION**

7

In prior proceedings in this case, the Court issued preliminary relief to Plaintiffs and

8

enjoined Defendants from implementing their plan—the Replan—to complete the 2020 Census

9

within the statutory time period established by Congress. Defendants sought appellate relief, and

10

those efforts culminated in the Supreme Court's decision to stay the preliminary injunction in full.

11

Shortly thereafter, the Census Bureau concluded its field operations and is now processing the data

12

it collected so that it can prepare the Secretary's final report to the President. Those efforts should

13

not be disturbed yet again.

14

The claims Plaintiffs press in their Second Amended Complaint are no different from the

15

claims they pressed in seeking a preliminary injunction, and are based on the same flawed logic

16

that the Supreme Court rejected in granting a stay. This Court should therefore revisit its prior

17

assessment of Defendants' jurisdictional defenses in this matter in light of the Supreme Court's

18

stay. *See* ECF No. 96. Specifically, because the Supreme Court found that a judicially-imposed

19

impediment to the Bureau's completion of the census was inappropriate, this Court has ample basis

20

to reevaluate the threshold jurisdictional defenses Defendants present below. Moreover, at least

21

one of the Ninth Circuit judges to have reviewed the preliminary injunction has thoroughly

22

embraced the non-justiciability of the dispute Plaintiffs present here. This analysis is correct.

23

Because the Court lacks subject matter jurisdiction over Plaintiffs' claims, their Second Amended

24

Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(1).[1]

25

First, the manner and means of conducting the census is constitutionally committed to

26

Congress. Congress, in turn has delegated the duty of conducting the decennial census to the

27

28

[1] Although Defendants further that Plaintiffs' claims lack substantive merit, Defendants at this time move to dismiss only under Rule 12(b)(1).

DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT
Case No. 5:20-cv-05799-LHK

Bureau pursuant to 13 U.S.C. § 141, and neither the Constitution nor any other statute sets forth a judicially discoverable or manageable standard for evaluating the Bureau's complex operational plans for a decennial census. Article III tribunals are simply not equipped to weigh and evaluate the myriad decisions and complicated tradeoffs that define how a census is to be performed—in the midst of a pandemic or otherwise. Plaintiffs' attempt to remove from the province of the Census Bureau's expertise complex decisions about how to complete a census, and instead submit them for judicial resolution is contrary to the constitutional design and should be dismissed.

Second, even if disputes about census operations were theoretically justiciable, Plaintiffs' claims are not cognizable here, because they fail to establish standing. Specifically, because all of Plaintiffs' alleged harms arise from the statutory timeline under which the Bureau must complete the census—a statutory timeline they do not challenge, and which the Ninth Circuit has explicitly recognized as valid and binding on the agency—Plaintiffs fail to establish an injury that is traceable to the Bureau's actions, or redressable by a favorable ruling. Further, Plaintiffs' injury is neither concrete nor particularized, resting on speculation about the alleged *inaccuracy* of a count that far exceeded anticipated completion metrics. And even assuming accuracy could somehow be ascertained for a census that is not yet complete, Plaintiffs have not plausibly alleged that any inaccuracy would produce a *differential* undercount, which is the only injury that could possibly sustain Plaintiffs' claim to standing.

Third, and for similar reasons, Plaintiffs' claims contesting the accuracy of the census are not ripe. If judicial inquiry into the accuracy of the census would ever be appropriate, it would not be until the census is complete and the effects of any alleged inaccuracy on apportionment or federal funding can be concretely ascertained. And because the apportionment results will be known within months, there is no harm to Plaintiffs in awaiting those developments, particularly when the Supreme Court (and the Ninth Circuit in this very case) has explained that post-apportionment relief is available in census litigation.

Beyond these overall threshold defects, Plaintiffs' claims under the Administrative Procedure Act also cannot proceed to judicial review and should be dismissed under Rule 12(b)(1). The APA permits review only of final agency action that is circumscribed and discrete; as other

courts have recognized, the Bureau's general operational plans do not fit that framework. Moreover, because no statute or regulation provides a meaningful judicial standard against which the Bureau's operational decisions can be evaluated, the operational components of the Replan are committed to agency discretion by law and therefore beyond the scope of judicial review.

## BACKGROUND

## I.    LEGAL FRAMEWORK

This Court is already familiar with the legal framework governing the Census from the prior submissions and proceedings in this case. As a first principle, the Constitution's Enumeration Clause requires that an "actual Enumeration" of the population be conducted every ten years and vests Congress with the authority to conduct that census "in such Manner as they shall by Law direct." U.S. Const. art. I, § 2, cl. 3. Under that constitutional authority, Congress enacted two statutes governing completion of the census. First, through the Census Act, Congress charged the Secretary of Commerce with the responsibility to conduct the decennial census "in such form and content as he may determine." 13 U.S.C. § 141(a). The Census Bureau assists the Secretary in the performance of this responsibility. *See id.* §§ 2, 4. "[W]ithin 9 months after the census date," which is defined as April 1 of the census year, Congress required the Secretary to provide in a report to the President the "tabulation of total population by States." 13 U.S.C. § 141(b). Second, after receiving the Secretary's report, the President, using the "method of equal proportions," calculates "the number of Representatives to which each State would be entitled," and transmits the resulting information to Congress. 2 U.S.C. § 2a(a). For the 2020 Census, the President is obligated to make this transmission "within one week" of "the first day . . . of the first regular session of" the 117th Congress. *Id.*

## II.    PROCEDURAL HISTORY

Plaintiffs filed this action on August 18, 2020, and amended their Complaint on September 1, 2020. ECF Nos. 1, 61. Plaintiffs sought, and on September 24, 2020, obtained, a preliminary injunction enjoining them from implementing two deadlines contained in the Replan: the "September 30, 2020 deadline for the completion of data collection and December 31, 2020 deadline for reporting the tabulation of the total population to the President." ECF No. 208 at 78.

1   On October 1, 2020, this Court clarified its prior preliminary injunction, and reinstated by court

2   order the deadlines from the Bureau's COVID-19 Plan: "October 31, 2020 for the completion of

3   data collection and April 30, 2021 for reporting the tabulation of total population to the President."

4   ECF No. 288 at 14.

5            Defendants appealed the Court's rulings, and sought an expedited stay of the preliminary

6   injunction.  ECF No. 210.  On September 30, 2020, a divided panel of the Ninth Circuit denied an

7   administrative stay of the preliminary injunction.  *Nat'l Urban League v. Ross*, 977 F.3d 698 (9th

8   Cir. 2020), ECF No. 277 (*NUL I*).  Judge Bumatay dissented.  He concluded not only that a stay

9   would be warranted, but that Plaintiffs' action was not justiciable, noting that "courts are not

10  empowered to swoop in and rescue the elected branches from themselves."  *Id.* at 23.[2]  On October

11  7, 2020, the Ninth Circuit granted a partial stay of the preliminary injunction.  *Nat'l Urban League

12  v. Ross*, 977 F.3d 770 (9th Cir. 2020), ECF No. 320 (*NUL II*).  Although the panel declined to

13  modify this Court's directive that the Bureau continue field operations through October 31, 2020,

14  it stayed that part of the Court's clarified preliminary injunction that would have required the

15  Secretary and the Bureau—following the COVID-19 Plan—to report the tabulation in April 2021,

16  *after* the statutory deadline December 31, 2020.  *Id.* at 18-21.  The panel observed that even if

17  "data processing cannot be completed by December 31 as a practical matter, that does not mean

18  that missing the putative statutory deadline should be required by a court.  Serious separation of

19  powers concerns arise when a court seeks to override a congressional directive to an Executive

20  Branch agency."  *Id.* at 20-21.

21           On October 13, 2020, the Supreme Court granted Defendants' application for a stay.  *Ross

22  v. Nat'l Urban League*, --- S. Ct. ---, 2020 WIL 6041178 (Oct. 13, 2020) (*NUL III*).  Unlike the

23  Ninth Circuit, and over a lone dissent from Justice Sotomayor, the Supreme Court stayed the

24  preliminary injunction in full pending disposition of the appeal in the Ninth Circuit.  Plaintiffs filed

25  their Second Amended Complaint on October 27, 2020.  ECF No. 352 ("SAC").

26

27

28         [2] Defendants' citations to the Ninth Circuit opinions in this case are to the slip opinions on
    the district court ECF docket.

## III.    PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs assert three claims in their Second Amended Complaint, all unchanged from their prior Complaint.  First, Plaintiffs assert that Defendants' implementation of the Replan and "decision to curtail crucial 2020 Census operations" violate the Enumeration Clause.  SAC ¶ 465. Second, Plaintiffs assert that Defendants' decision to implement the Replan and comply with their statutory obligations is arbitrary and capricious in violation of the Administrative Procedure Act. *Id.* ¶¶ 474-75.   Third and finally, Plaintiffs assert that Defendants' compliance with statutory requirements is "mere pretext" for racial and political discrimination in the conduct of the 2020 Census.  *Id.* ¶¶ 479-83.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(1), "the party invoking federal jurisdiction bears the burden of establishing its existence."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998).  This Court must determine whether it has subject matter jurisdiction before addressing the merits of the complaint, *see id.* at 93-95, and should "presume that [it] lack[s] jurisdiction unless the contrary appears affirmatively from the record," *Renne v. Geary*, 501 U.S. 312, 316 (1991) (quotation omitted).

## ARGUMENT

## I.    THE POLITICAL QUESTION DOCTRINE BARS PLAINTIFFS' CLAIMS

Plaintiffs' claims rest on their view that the Bureau's efforts to conduct the 2020 Census, including its efforts to fulfill the statutory deadlines that govern the census, will lead to an incomplete or inaccurate count.  *See, e.g.*, SAC ¶¶ 1, 13, 464, 474, 481.  But determining how best to conduct the census, including what operational components and timetables will ensure sufficient accuracy for the census, is an inherently political question committed to the other branches, and not appropriate for judicial review.

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  The doctrine is "primarily a function of the separation

of powers," *Baker v. Carr*, 369 U.S. 186, 210 (1962), and "is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government," *United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990). The Supreme Court has identified several defining hallmarks of non-justiciable political questions. *Id.* Foremost among these are "[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving" the dispute. *Vieth v. Jubelirer*, 541 U.S. 267, 277-78 (2004) (internal citation omitted); *see also Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012); *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) (finding partisan gerrymandering not justiciable for lack of discernible and administrable standards to apply). Although either hallmark alone renders a case nonjusticiable, *see Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005), Plaintiffs' claims run headlong into both.

As a textual matter, the Enumeration Clause grants Congress the authority to conduct the required "actual Enumeration" "in such Manner as they shall by Law direct." U.S. Const. art. I, § 2, cl. 3. This language is remarkable in its breadth, and Courts routinely recognize the nonjusticiability of cases grounded in far less explicit constitutional language. *See, e.g.*, *Made in the USA Found. v. United States*, 242 F.3d 1300, 1313-14 (11th Cir. 2001) (explaining that the Constitutional commitment of "foreign relations . . . to the executive and legislative" rests on various textual provisions and established case law); *El–Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1367 (Fed. Cir. 2004) (holding that the Constitution, "in its text and by its structure, commits to the President the power to make extraterritorial enemy property designations"); *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 983 (9th Cir. 2007) ("Whether to grant military or other aid to a foreign nation is a political decision inherently entangled with the conduct of foreign relations."); *Alperin v. Vatican Bank*, 410 F.3d 532, 545 (9th Cir. 2005) (surveying cases applying the political question doctrine in the foreign-relations context). But where, as here, the Constitution explicitly commits an issue to Congress or the Executive, the political-question determination is straightforward. *See, e.g.*, *Gilligan v. Morgan*, 413 U.S. 1, 5-11 (1973) (noting Congress's explicit power to "organiz[e]. . . the Militia" in holding that a suit to restrain the Governor's use of National Guard troops presented a nonjusticiable political question).

As the Supreme Court has recognized, the text of the Enumeration Clause "vests Congress with virtually unlimited discretion in conducting the decennial 'actual Enumeration.'" *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996); *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019) (Congress has "broad authority over the census, as informed by long and consistent historical practice"); *see also NAACP v. Bureau of the Census*, 399 F. Supp. 3d 406, 418 (D. Md. 2019) ("[T]he Founders clearly intended Congress to have paramount authority in both the design and execution of the census"), *aff'd in part, rev'd on other grounds*, 945 F.3d 183 (4th Cir. 2019). Congress has historically exercised this authority in a variety of ways from the earliest days of our Republic. *See, e.g.*, Census Act of 1790, 1 Stat. 101 (1790) (directing that the census would commence on August 2, 1790 and end on May 2, 1791); An Act Supplementary to the Act Entitled "An Act Providing for the Taking of the [S]eventh and [S]ubsequent Censuses," 9 Stat. 445 (1850). And while the Census Act now delegates many aspects of Congress's "broad authority over the census to the Secretary," *Wisconsin*, 517 U.S. at 5, 19, Congress continues to exercise ultimate control over the census by, among other things, setting the level of funding available and the date by which the Secretary must report the results, so that it can reapportion House seats and provide redistricting information to the States. *See, e.g.*, 13 U.S.C. § 141(b); 2 U.S.C. § 2a; *see also* Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13 (appropriating $3.5 billion to the Census Bureau for use through 2021).

Dissenting from the denial of an administrative stay of the preliminary injunction in this very case, Judge Bumatay rightly observed that "[d]eciding whether the census meets a free-floating concept of 'accuracy' is exactly the type of political question that courts are powerless to adjudicate." *NUL I* (dissent) at 11. The very exercise of commencing the inquiry into whether a given census was sufficiently "accurate" would require this Court to undertake "'an initial policy determination of the kind clearly for nonjudicial discretion.'" *Id.* at 12 (quoting *Baker v. Carr*, 369 U.S. at 217). Yet Plaintiffs would have this Court not only second-guess the Bureau's overall policy for how to conduct the census, but also impose the Court's own view of how innumerable minutiae of the census should proceed. For example, Plaintiffs chide the Bureau for using what they view as "low[er]-quality data" after a certain number of contact days for a particular

household in the Nonresponse Followup (NRFU) phase of data collection.  *See* SAC ¶ 300.  But how is this Court to determine what amounts to sufficient data "quality," let alone when the Bureau should be allowed to rely on that data, and how the NRFU operation should be conducted in the context of the Bureau's overall, comprehensive plan for conducting an accurate census?  There is no standard, and the Judiciary is not equipped to make such policy decisions.

In prior cases involving the census, courts entertained challenges to discrete statistical methodologies or data-collection decisions made by the Secretary.  *See, e.g.*, *New York*, 139 S. Ct. 2551 (evaluating re-instatement of citizenship question on census form); *Utah v. Evans*, 536 U.S. 452, 452 (2002) (holding that "hot-deck imputation"—a process which imputes characteristics of households based upon the characteristics of neighbors—does not violate the Enumeration Clause); *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) (holding that statistical sampling violates the Census Act and declining to reach the Enumeration Clause claim); *Wisconsin v. City of New York*, 517 U.S. 1 (1996) (holding that Secretary did not violate Enumeration Clause by declining to correct a census undercount with data from a post-enumeration survey); *Franklin v. Massachusetts*, 505 U.S. 788 (1992) (confirming that allocating federal employees serving overseas to their home States did not violate the Constitution).  Each of those cases involved a discrete policy choice that could be juxtaposed against an alternative—*e.g.*, to omit a citizenship question, to forego imputation, to decline the use of a statistical adjustment.  *See NUL I* (dissent) at 14 (noting that prior cases "cases treating such challenges as justiciable involved narrow and deferential review—not a freewheeling inquisition into the 'accuracy' of the census").  And nearly all of those disputes could be resolved by examining whether the calculation methodology at issue was a permissible person-by-person count (an "actual Enumeration") or an unlawful statistical estimate. *See, e.g.*, *Utah*, 536 U.S. at 473 ("Utah's constitutional claim rests upon the words 'actual Enumeration' as those words appear in the Constitution's Census Clause."); *House of Representatives*, 525 U.S. at 346–49 (Scalia, J., concurring in part) ("For reasons of text and tradition . . . a strong case can be made that an apportionment census conducted with the use of 'sampling techniques' is not the 'actual Enumeration' that the Constitution requires."); *id.* at 362 (Stevens, J., dissenting) (concluding that an "actual Enumeration" does not preclude "the use

of sampling procedures to supplement data obtained through more traditional census methods");
*Wisconsin*, 517 U.S. at 24 (examining the Secretary's decision that an "'actual Enumeration' would best be achieved without the [ ] statistical adjustment of the census"). Plaintiffs' challenges are not similarly limited to discrete statistical methodologies or data-collection decisions made by the Secretary.

Plaintiffs' challenge to the census's alleged inaccuracy would entail the Court reviewing the careful and complex balancing of numerous considerations such as cost, testing, training, effectiveness, timing, and informational need. But these tradeoffs are quintessentially "policy choices and value determinations constitutionally committed for resolution to the halls of Congress [and] the confines of the Executive Branch." *Japan Whaling*, 478 U.S. at 230. A litigant could *always* posit, as Plaintiffs do here, that some alleged deficiency can be cured with more time, staff, money, or by a better design. But such hypotheticals do not provide any vehicle by which a court (as opposed to Congress, or an agency to which Congress has delegated authority) can evaluate the myriad of policy choices and tradeoffs that Congress has made to establish a deadline and the Bureau has made in designing a census to meet that deadline. Nor does it illuminate any constitutional floor or standard which a Court could deem to be violated. *Cf. Tucker v. U.S. Dep't of Commerce*, 958 F.2d 1411, 1418 (7th Cir. 1992) (Plaintiffs seeking statistical adjustment "are asking [courts] to take sides in a dispute among statisticians, demographers, and census officials concerning the desirability of making a statistical adjustment to the census headcount"). As a result, there is no rule or standard that a Court could apply to determine when census operations are too limited, too curtailed, or otherwise deficient. Indeed, "you might as well turn [this case] over to a panel of statisticians and political scientists and let them make the decision, for all that a court could do to add to its rationality or fairness." *Id.* at 1417-18.

Plaintiffs seem to suggest that the Court may decide this case because the Enumeration Clause demands accuracy at all costs. But the Supreme Court has never embraced such a theory. Because no census is ever perfect—and every census can, presumably, be made better with more time or resources—any choice of how to deploy finite resources could be viewed as undermining the ineffable constitutional standard of accuracy Plaintiffs advance, just as setting *any* deadline

could be deemed improper under Plaintiffs' erroneous view of the law. *See, e.g.*, *Wisconsin*, 517 U.S. at 6; *see also Karcher v. Daggett*, 462 U.S. 725, 732 (1983). Yet Congress has long delegated to the Bureau how to make resource allocation decisions, just as Congress has long set deadlines by which a census should be completed, and Defendants are unaware of any case finding those deadlines improper. The Court should "decline [Plaintiffs'] invitation to measure the constitutionality" of a census plan "by a standard that would seem to render every census since 1790 unconstitutional." *New York*, 139 S. Ct. at 2567.

Given the explicit textual commitment of the means of conducting the census to Congress and the lack of any discernible standards, this Court should not wade into the territory of evaluating the propriety of the Replan or its various components, or of measuring the Replan against some unknowable minimum of constitutional "accuracy" which Plaintiffs allege to exist. "Determining what level of accuracy is sufficient is simply not something that the judicial branch is equipped to do." *NUL I* (dissent) at 16. Plaintiffs' claims present issues barred by the political question doctrine, and their Second Amended Complaint should be dismissed.

## II. PLAINTIFFS LACK STANDING

Even if disputes about the timing of census operations were theoretically justiciable, Plaintiffs would still not be entitled to any remedy here, because they have failed to establish standing. The "irreducible constitutional minimum" of standing under Article III has three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs bear the burden of establishing each of these elements, *id.*, and the Court "may review evidence beyond the complaint" to determine whether Plaintiffs have carried that burden. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). The standing inquiry is "'especially rigorous when reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v.*

*Byrd*, 521 U.S. 811, 819-20 (1997)).  Faced with that heavy burden, Plaintiffs in their Second Amended Complaint fail to meet any of the required elements.

### A.  Plaintiffs' Alleged Injuries are Not Redressable by a Court Order

Plaintiffs must establish redressability by demonstrating "that some personal benefit will result from a remedy *that the court is prepared to give*."  13A Charles Alan Wright et al., *Federal Practice & Procedure* § 3531.6 (3d ed. Apr. 2018 update) (emphasis added).  That is, a plaintiff must show that "the court has the power to right or to prevent the claimed injury."  *Gonzalez v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982) (Kennedy, J.).  Where a plaintiff requests prospective relief in the form of an injunction, the plaintiff must show that "prospective relief will remove the harm" and the plaintiff "personally would benefit in a tangible way from the court's intervention."  *Warth v. Seldin,* 422 U.S. 490, 505, 508 (1975).  If the court cannot order relief that would remedy the plaintiff's alleged injury, redressability—and thus Article III standing—are lacking.  *See McConnell v. FEC*, 540 U.S. 93, 229 (2003) (no redressability because court "has no power to adjudicate a challenge to the [allegedly unconstitutional] FECA limits in this litigation"), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010).

Plaintiffs here have not mounted a challenge to either 13 U.S.C. § 141 or 2 U.S.C. § 2a, the statutory deadlines Congress has established governing completion of the census and the apportionment of Representatives.  *See generally* SAC ¶¶ 460-90.  And wisely so.  The "virtually unlimited discretion" that the Constitution vests in Congress to "conduct[] the decennial" census, *Wisconsin*, 517 U.S. at 19, includes the power to set deadlines for bringing that project to a close.  Indeed, setting such a deadline is part and parcel of establishing the "Manner" of conducting the census, which the Constitution grants Congress the power to "direct."  U.S. Const. art. I, § 2, cl. 3.  Yet the relief Plaintiffs seek—violation of those deadlines by court-ordered reinstatement of the COVID-19 Plan, *see* SAC ¶¶ 487-88—is not redress the Court can provide, as the Supreme Court's decision in this case makes clear.

Granting relief that compels the Bureau to miss Congress's deadline "would be an affront to our tradition of legislative supremacy and constitutionally separated powers."  *Id.*; *see also Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002).  It would be an

"unprecedented expansion of the judicial power" to grant Plaintiffs' requested relief, because "a district court has no authority to order an Executive agency to disobey a Congressional statute." *NUL I* (dissent) at 17-18. Indeed, there have been three occasions where a district court has ordered the Census Bureau to disregard Congress's statutory deadline, and all three of those decisions were stayed by the Supreme Court.

It happened in this case, when the Supreme Court stayed this Court's preliminary injunction, and thereby rejected the notion that Congress's deadlines can be overridden by judicial fiat. Moreover, the Ninth Circuit, reviewing this Court's order enjoining the Bureau from meeting its obligation under 13 U.S.C. § 141(b), recognized that "[s]erious separation of powers concerns arise when a court seeks to override a congressional directive to an Executive Branch agency." *NUL II* at 20-21. And it happened twice before. In *Carey v. Klutznick*, 637 F.2d 834, 837-38 (2d Cir. 1980), the Second Circuit affirmed a district court order—later made permanent—that required the Census Bureau to take actions "to compensate for [a] disproportionate undercount" and declared § 141(b)'s December 31 deadline "directory and not mandatory." 508 F. Supp. 420, 433 (S.D.N.Y. 1980). Within days, the Supreme Court reinstated the statutory deadline. Just as it did in this case, the Supreme Court stayed the district court's order that precluded the Bureau "from certifying to the President the population totals for New York and the state-by-state census tabulations, on December 31, 1980, as mandated by 13 U.S.C. § 141(b)." *Klutznick v. Carey*, 449 U.S. 1068, 1068 (1980). In *Klutznick v. Young*, No. A-533 (Dec. 24, 1980), the Supreme Court did the same, rejecting the district court's conclusion that the statute could be disregarded in light of competing considerations. These decisions illustrate that the deadlines Congress has established to govern completion of the census and transmission of the results to Congress cannot be overridden by a judicial remedy.

For all their criticism of the Replan, Plaintiffs have never once offered an alternative proposal for how the Bureau should conduct a better census while also complying with its statutory obligations. They offered no such plan at the outset of the case, and they offer none now. That failure alone forecloses standing. *See Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 183 (D.C. Cir. 1996) (alleged enumeration injury not redressable where plaintiffs "do

not even ask that [] alternative methodologies . . . be employed in a recount" and the court has no basis to find "that a commission of as-yet unnamed persons, using as-yet unidentified methodologies, will devise a better [] count that will redound to appellants' benefit").  Rather than grapple with Congress's deadlines, Plaintiffs pretend that those obligations simply do not exist, urging instead that the Bureau flout Congress's requirements and "[t]ak[e] the modest additional time necessary to ensure an accurate census."  SAC ¶ 326.  As the Ninth Circuit and Supreme Court recognized when they stayed this Court's invalidation of the deadline, what Plaintiffs seek is not an option.

### B. Plaintiffs' Alleged Injuries are Not Traceable to Defendants' Actions

For similar reasons, Plaintiffs fail to establish the requisite "causal connection between" their alleged injury and the Replan they challenge.  *Defs. of Wildlife*, 504 U.S. at 560.  To establish such a connection, Plaintiffs must show more than that their populations may be undercounted under the plan the Bureau has developed.  They must establish that their populations will be "improperly undercounted by [a particular] methodology *as compared to a feasible, alternative methodology*," *Kantor*, 91 F.3d at 183 (emphasis in original)—and further, that the difference resulting from the two methodologies would be sufficiently large to produce some kind of harm, *id.* at 185-86.  *See also Franklin*, 505 U.S. at 802 (plurality) (challengers to the allocation of overseas employees among states had "neither alleged nor shown . . . that [they] would have had an additional Representative if the allocation had been done using some other source of 'more accurate' data" and accordingly did not have standing "to challenge the accuracy of the data used in making that allocation").  Plaintiffs have not done so.

As noted above, while Plaintiffs surmise that the census will result in an undercount of people in their communities, they have identified *no* other feasible method by which the Government could meet the deadlines of 13 U.S.C. § 141 and 2 U.S.C. § 2a—much less one that can produce a supposedly more-accurate result.  Absent such an alternative, Plaintiffs cannot meaningfully contend that any alleged undercount of their communities is, in fact, caused by the Bureau's plan, rather than by some independent factor, such as the COVID-19 pandemic, the statutory deadlines, or both.

In fact, all of Plaintiffs' efforts to extol an alternative plan that *disregards* the statutory deadlines only emphasize that their alleged injuries derive, first and foremost, from *Congress's* decision not to modify the timetable, rather than from the Bureau's adoption of the Replan. That is fatal to their standing. *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976) (Federal courts have jurisdiction only if the plaintiff's injury "fairly can be traced to the challenged [conduct] of the defendant, and [does] not … result[] from the independent action of some third party not before the court."). So long as the applicable deadlines remain unchanged, the Bureau cannot lawfully reinstate the COVID-19 Plan—which contemplates completing the census well after those deadlines will have come and gone—as Plaintiffs request. *See* SAC ¶¶ 487-88. Since the congressional timetable is the source of their alleged injuries, Plaintiffs cannot establishing standing and cannot seek redress against the Bureau for choosing to follow the law.

## C. Plaintiffs' Injuries are Too Speculative to Confer Standing

Separate from redressability and causation, Article III also requires that Plaintiffs establish "injury in fact" by showing that they "ha[ve] sustained or [are] immediately in danger of sustaining a direct injury" as a result of the challenged action. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016). The injury must be "concrete and particularized," *Defs. of Wildlife*, 504 U.S. at 560, and not "merely 'conjectural' or 'hypothetical' or otherwise speculative." *Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009). An alleged future injury must be "*certainly impending*" and cannot rely on a "highly attenuated chain of possibilities"; '"[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409, 410 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

To establish injury-in-fact here, Plaintiffs must show not only an inaccurate count in the census, but an inaccuracy that affects them disproportionally—that is, a differential undercount that harms them. The number of congressional seats for each geographical area is affected not only by that area's *own* total population, but also by the population of *every other* area in the country. *See* 2 U.S.C. § 2a(a); https://www.census.gov/topics/public-sector/congressional-apportionment/about/computing.html; *U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 461 (1992). Likewise, the allocation of federal funds, which Plaintiffs allege they stand to lose, *see*

SAC ¶¶ 430-41, is not directly proportional to population; instead, it is a function of multiple factors, often including the populations of *other* geographic areas. *See, e.g.*, 42 U.S.C. § 1396d(b) (Medicaid formula measuring a State's per capita income against the national average per capita income); 49 U.S.C. § 5305(d)(1) (apportioning public transit funds to States based on the population of urbanized areas in each State compared to the total population of urbanized areas in all States). An undercount may thus be immaterial if it is replicated elsewhere or does not exceed a certain threshold. *See, e.g.*, *Kantor*, 91 F.3d at 183. So to have standing, Plaintiffs must plausibly allege that any undercount will be so severe and disproportionate that it will cause them to lose legislative seats or funding. *Id.* at 185 (no standing because court could not determine "what effect any methodology for counting the homeless would have on the federal funding of any particular appellant," since "if a more accurate count would have enlarged some communities' shares, it likely would have reduced the shares of other communities"); *Ridge v. Verity*, 715 F. Supp. 1308, 1318 (W.D. Pa. 1989) (no standing because "none of the plaintiffs in this case can show which states would gain and which would lose representation in Congress"); *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 570 (D.D.C. 1980) (no standing because "none of the plaintiffs are able to allege that the weight of his or her vote in the next decade will be affected" since plaintiffs "can do no more than speculate as to which states might gain and which might lose representation," which depends on "the interplay of all the other population factors which affect apportionment"); *see also Sharrow v. Brown*, 447 F.2d 94, 97 (2d Cir. 1971) (no standing to challenge apportionment method because plaintiff "would have to show, at least approximately, the apportionment his interpretation . . . would yield, not only for New York but *for every other State as well*" (emphasis added)). Plaintiffs fail to satisfy this requisite showing of injury-in-fact.

Whereas Plaintiffs originally predicated their claims of harm on a theory that the Replan would not allow sufficient time to complete the count at all, in their SAC Plaintiffs have now shifted to speculating that the actual *completed* enumeration was somehow insufficiently accurate. In particular, Plaintiffs concede, as they must, that the Bureau has reached completion rates of greater than 99% in every State and in the District of Columbia. SAC ¶ 34. Indeed, the Bureau has reached in all but one State a completion rate of 99.9%, resulting in one of the highest overall

1    national address resolution rates in history of 99.98%.  *See* Total Response Rates by State,

2    https://2020census.gov/en/responserates/nrfu.html.    However, Plaintiffs assert that these

3    "completion metrics are inflated" and "misleading" and "riddled with potential problems."  SAC

4    ¶¶ 34, 35, 39.  For these allegations, Plaintiffs appear to rely principally on submissions from

5    enumerators which Defendants have already rebutted under oath.  SAC ¶ 39; *see* ECF Nos. 127-

6    1, 133-1, 219-1, 234-1, 244-1, 260-1, 266-1, 278-1, 283-1.  Plaintiffs also advance a theory that

7    the Bureau has utilized an "artificially low" denominator in calculating its completion rate.  SAC

8    ¶ 35.  These allegations are facially insufficient.

9            Any claim of harm from inaccurate completion metrics is, by Plaintiffs' admission,

10   "depend[ent] on the location of the additional housing units artificially excluded," and only

11   "might" lower the completion rate in certain regions below 99%.  *Id.*  Besides an apparent

12   conflation of completion rate with accuracy of the count, this type of speculative allegation cannot

13   confer standing because it does not establish a *differential* undercount, let alone one that affects

14   Plaintiffs.  The same goes for Plaintiffs' critique of an October 21 media call held by the Bureau,

15   SAC ¶ 36—nowhere do Plaintiffs explain how the data referenced on that call relates to a

16   differential undercount.  Finally, Plaintiffs' efforts to "read[] between the lines" to "triangulat[e]"

17   standing based on perceived comparative differences in the use of proxies and administrative

18   records, *see* SAC ¶ 37, also fall short.  Again, Plaintiffs do not plausibly allege anything about the

19   relative "accuracy" of these methods, where they were used, or whether that use would create a

20   *differential* undercount necessary for standing.  In any event Defendants have explained under oath

21   the extent to which they relied on particular methods during the NRFU process. *See* Fourth

22   Declaration of Albert E. Fontenot, Jr., ECF No. 323-1.  The Bureau even explicitly stated that it

23   "has no indication at this point that the data it has collected in the NRFU operation is of inferior

24   quality to prior censuses."  *Id.* ¶ 11.

25           Plaintiffs' allegations thus leave the Court with nothing to evaluate but guesswork, even

26   were the Court to venture into the inchoate task of assessing the "accuracy" of the 2020 Census

27   before it has been completed.  And even if Plaintiffs plausibly alleged disproportionate inaccuracy,

28   the Court would further have to guess whether and how those inaccuracies could affect Plaintiffs.

Such guesswork does not support jurisdiction. *See Clapper*, 568 U.S. at 414 n.5 (no Article III standing exists if a plaintiff's theory of injury rests on an "attenuated chain of inferences necessary to find harm").

To be sure, Plaintiffs contend that the possibility of *any* inaccuracy or undercount in the census is injurious because it (1) decreases the quality of data they use for various purposes, and (2) leads them to expend additional resources in an attempt to mitigate the undercounting. SAC ¶¶ 449-59. But Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. As discussed above, whether any inaccuracies will appear in the final census data, and whether those inaccuracies will have any effect on Plaintiffs, are purely speculative. And in any event, Plaintiffs' preference for using census data for other non-statutory purposes is not a basis for showing harm. Indeed, on that basis, any entity that uses census data for any purpose would have standing to bring suits challenging every detail of census operations that could conceivably affect accuracy. *See, e.g.*, *Wisconsin*, 517 U.S. at 6 (noting that "[d]espite consistent efforts to improve the quality of the count, errors persist" and that "no census is recognized as having been wholly successful in achieving" accuracy); *Karcher v. Daggett*, 462 U.S. 725, 732 (1983) (recognizing that "census data are not perfect," and that "population counts for particular localities are outdated long before they are completed"); *Gaffney v. Cummings*, 412 U.S. 735, 745 (1973) (census data "are inherently less than absolutely accurate"); *NAACP v. Bureau of the Census*, 945 F.3d 183, 186 (4th Cir. 2019) ("[I]it is widely acknowledged that each decennial Census inevitably results in an 'undercount' of the American public.").

## III. PLAINTIFFS' CLAIMS, EVEN IF JUSTICIABLE, ARE NOT RIPE

In addition to their standing defects, Plaintiffs' claims are not ripe for adjudication before the 2020 Census has been completed and its results reported. Put simply, Plaintiffs cannot assail the supposed inaccuracy of a count that has not yet been fully completed, let alone one that has yet to be processed through the apportionment formula for determining congressional representation. Only *after* the 2020 Census is complete, the apportionment results confirmed and transmitted to Congress, will it conceivably be possible to evaluate Plaintiffs' claims of harm from the alleged

1   deficiencies of the Replan. For certain of Plaintiffs' claims of harm—for example those related to

2   alleged overall inaccuracy, *see* SAC ¶¶ 449-53—even more detailed data of the type that

3   accompanies the redistricting data sent to States would be required.

4   "Article III of the Constitution empowers [courts] to adjudicate only 'live cases or

5   controversies,' not 'to issue advisory opinions [or] to declare rights in hypothetical cases.'" *Clark*

6   *v. City of Seattle*, 899 F.3d 802, 808 (9th Cir. 2018) (quoting *Thomas v. Anchorage Equal Rts.*

7   *Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000)). The ripeness doctrine is thus "designed to 'prevent

8   the courts, through avoidance of premature adjudication, from entangling themselves in abstract

9   disagreements.'" *Id.* Ripeness includes both a constitutional and a prudential component. The

10  constitutional component of ripeness "is often treated under the rubric of standing because ripeness

11  coincides squarely with standing's injury in fact prong." *Id.* (citation omitted). Thus, for the same

12  reasons that Plaintiffs have not sufficiently alleged injury-in-fact—because their assertion of a

13  "disproportionate[] undercount," SAC ¶ 423, is inherently speculative—their claims fail to satisfy

14  constitutional ripeness requirements.

15  Even were the Court to disagree, however, Plaintiffs would nonetheless fail to meet the

16  "two overarching considerations" governing prudential ripeness: "the fitness of the issues for

17  judicial decision and the hardship to the parties of withholding court consideration." *Skyline*

18  *Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 751 (9th Cir. 2020)

19  (quotation omitted). Evaluating Plaintiffs' claims of inaccuracy and disproportionate undercount

20  at this juncture is not an inquiry fit for judicial decision because the existence or extent of any

21  purported undercount—let alone whether it is differential or disproportionate—is unknowable

22  until, at the earliest, apportionment data have been finalized and published. The Court presently

23  lacks any basis to determine whether the ongoing process of completing the census is somehow

24  "inaccurate," and that task, if it is justiciable at all, would be substantially aided by an

25  understanding of how the 2020 Census ultimately affects apportionment (as well as any federal

26  funding formulas that depend on the final results of the census).

27  Moreover, there is no conceivable hardship to Plaintiffs from withholding consideration of

28  their claims until such developments have occurred. First, transmission of apportionment data is

DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT  
Case No. 5:20-cv-05799-LHK

scheduled to occur in approximately two months (with redistricting data sent to the States approximately three months after that). Second, even if the Court were to identify some flaw in the Bureau's completion of the census, it could presumably provide relief after the fact by, for example, ordering some appropriate measure of corrective data processing. The Ninth Circuit assumed as much when it reinstated the statutory deadline for completing the census: "If the Bureau meets the December 31 date by using procedures that violate any accuracy requirement embedded in the Enumeration Clause, or proceeds in an arbitrary and capricious manner, *existing data can be reprocessed more easily than data collection can be restarted*." *NUL II* at 20 (emphasis added). And the Supreme Court has repeatedly decided census cases in the same posture, explaining that post-apportionment remedies are available. *See, e.g.*, *Utah*, 536 U.S. at 463 ("Victory [for Utah] would mean a declaration leading, or an injunction requiring, the Secretary to substitute a new 'report' for the old one.").

While Plaintiffs attack the alleged inaccuracy of the 2020 Census, their claims necessarily rest on speculation about what the actual results of the census will be. But those results are not yet known, and any potential injury that could ensue from those results will not be known, at the earliest, until the final apportionment figures are reported to Congress by the President. Accordingly, even if they could clear the other justiciability hurdles, Plaintiffs' claims are not yet ripe for adjudication, and this Court should refrain from deciding them.

## IV.   JURISDICTION IS LACKING OVER PLAINTIFFS' APA CLAIMS

Even assuming Plaintiffs could overcome the political question doctrine and the lack of Article III standing and ripeness, their APA claims should nonetheless be dismissed. To start, Plaintiffs have launched a wholesale programmatic attack on the Census Bureau's plans to complete the 2020 Census, which fails both the discreteness and finality requirements for judicial review under the APA. And there is furthermore no standard in the Census Act by which the Court could determine, for example, whether the timetables and operational components the Bureau chose when developing the Replan, as opposed to some other timetables or operational choices, are contrary to law.

**A.      The Replan is Not Final Agency Action and Therefore Is Not Reviewable.**

"To maintain a cause of action under the APA, a plaintiff must challenge 'agency action' that is 'final.'" *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800 (9th Cir. 2013) (citing *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 61-62 (2004)).  Congress defined "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  And "final" agency action within the meaning of § 704 of the APA, requires that two conditions be met: "First, the action must mark the 'consummation' of the agency's decision–making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).  The Replan is neither "agency action" nor, of necessity, "final agency action," and Plaintiffs' APA claims therefore fail at the outset.

*1.      The Replan is not "agency action" under the APA.*

The Supreme Court has held that, to satisfy the "agency action" requirement, 5 U.S.C. § 551(13), the matter at issue must be a "circumscribed, discrete agency action[]" that exhibits a "characteristic of discreteness."  *SUWA*, 542 U.S. at 62-63.  This statutory limitation, the Court explained, "precludes [a] broad programmatic attack" on an agency's operations.  *Id.* at 64.  Thus, the APA does not permit a plaintiff to attack an agency program "consisting principally of . . . many individual actions" simply by characterizing it as "agency action" under the APA.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990).  A plaintiff seeking improvement or changes to an agency program must seek it in "the halls of Congress, where programmatic improvements are normally made," rather than by "court decree."  *Id.* at 891; *see also San Luis Unit Food Producers v. United States*, 709 F.3d 798, 808 (9th Cir. 2013) (holding that "a broad, programmatic challenge to [an agency's] operation and management of [a statutory obligation] . . . [is] not cognizable under the APA").

That Plaintiffs have leveled an improper, programmatic attack on the Bureau's efforts to conduct the 2020 Census could not be more obvious.  As this Court now knows, the conduct of the census is a dynamic, ever-changing process comprised of numerous decisions.  The APA does

not permit Plaintiffs to have this Court dictate, according to Plaintiffs' preferences, how the Bureau carries out and completes the census, *see* SAC ¶ 488 (demanding that Court enjoin Defendants from "unlawfully interfering with the COVID-19 Plan"). That the Supreme Court stayed the previous issuance of such relief—necessarily concluding that Plaintiffs were not likely to succeed on the merits of their APA claims—suggests its unavailability as a matter of law. Moreover, like similar attempts to wrest operational control of the census away from the Bureau, Plaintiffs' requested emergency relief would undoubtedly entail "a sweeping overhaul to the [Replan], which exceeds the scope of reviewable 'agency action.'" *NAACP*, 399 F. Supp. 3d at 422 (D. Md.), *aff'd in part, rev'd in part on other grounds and remanded*, 945 F.3d 183 (4th Cir. 2019)

The Fourth Circuit recently rejected a strikingly similar challenge to the Census Bureau's operational plan for the 2020 Census because the challenged actions were not "'circumscribed' and 'discrete.'" *NAACP*, 945 F.3d at 190. The operational plans that the plaintiffs there sought to set aside were, the court concluded, not cognizable discrete agency actions because "the various 'design choices' being challenged expressly are tied to one another." *Id.* at 191. "'Setting aside' one or more of these 'choices' necessarily would impact the efficacy of the others, and inevitably would lead to court involvement in 'hands-on' management of the Census Bureau's operations." *Id.* (citing *SUWA*, 542 U.S. at 66-67). That outcome, the court concluded, "is precisely the result that the 'discreteness' requirement of the APA is deigned to avoid." *Id.* (rejecting the "broad, sweeping nature of the allegations that the plaintiffs have elected to assert under the APA").

Precisely the same conclusion is warranted here. As prior proceedings in this case amply demonstrate, entertaining Plaintiffs' challenge to the Replan would embroil the Court not only in difficult—indeed, unanswerable—questions concerning what operational and scheduling measures the law purportedly requires, but also in monitoring of the Bureau's efforts going forward. *See Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 506 (9th Cir. 1997) (denying relief "which would require reaching into an agency of the executive branch and dictating the details of its internal operations" (quotation omitted)). And Plaintiffs can point to no discrete requirements to conduct field operations or data processing for a certain duration, to maintain staffing at certain levels, or to rely to some specified degree on a certain number of in-person follow-up visits rather

1    than administrative records, proxies, or imputation—let alone any requirement to do all of these

2    things. *NAACP*, 399 F. Supp. 3d at 423 (challenged actions by Census Bureau neither "discrete in

3    character" not "required by law" and therefore not proper subjects of APA relief).

4                   2.    *The Replan is not "final agency action" subject to judicial review*

5            Even if all the various facets of the Replan could be considered an "agency action," it is

6    not "final" agency action that is subject to judicial review under § 704.  In *Franklin*, the Supreme

7    Court held that the Secretary's transmission of a final census report to the President under 13

8    U.S.C. § 141—a report compiled after the execution of the overall census operational plan—is

9    *itself* not final agency action.  505 U.S. at 797 ("[T]he 'decennial census' still presents a moving

10   target, even after the Secretary reports to the President.").  Given this holding, it would make no

11   sense to find the Bureau's antecedent operations judicially reviewable, when those operations are

12   still being implemented and will only lead to a report that is itself non-final.

13           Similarly, the Replan does not affect legal rights and obligations.  The Replan does not

14   affect any legal right because a respondent has no individualized legal "right" to any particular

15   timetable to respond to the census questionnaire, and Plaintiffs identify none.  And insofar as

16   Plaintiffs would resort to a more inchoate "right" to be counted, the Bureau will account for non-

17   responding households through imputations, administrative records, or other methods, just as it

18   would have done under the COVID-19 Plan.  *See Confederacion de la Raza Unida v. Brown*, 345

19   F. Supp. 909, 910 (N.D. Cal. 1972) ("Plaintiffs do not contend, and correctly so, that they have an

20   absolute right to be counted [in the census].");  *Nat'l Law Ctr. on Homelessness & Poverty v.*

21   *Brown*, CIV. A. 92-2257-LFO, 1994 WL 521334, at *8 (D.D.C. Sept. 15, 1994) ("The Constitution

22   does not provide individuals with a right to be counted . . . .").  In any event, the data collection

23   phase of the 2020 Census has already concluded.

24           In sum, the Replan sets protocols for the Census Bureau's own internal operations, and

25   does not require anyone to do, or not do, anything.  *See Wild Fish Conservancy*, 730 F.3d at 801

26   ("day-to-day operations that merely implement operational plans" are not final); *Or. Nat. Desert*

27   *Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 987 (9th Cir. 2006) (action can be final if it "has the

28   status of law or comparable legal force, and whether immediate compliance with its terms is

expected").  Because final agency action is lacking, the Court lacks jurisdiction over Plaintiffs'
APA claims.

      **B.**      **The Bureau's Choices Regarding How to Meet Its Statutory Obligations to Complete the Census are Committed to Agency Discretion, and are Therefore Unreviewable**

      Even assuming a plaintiff has challenged final agency action, APA review is nonetheless
unavailable when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).
"An agency action is 'committed to [its] discretion by law' where a 'statute is drawn so that a court
would have no meaningful standard against which to judge the agency's exercise of discretion'—
*i.e.*, where it is 'drawn in such broad terms that in a given case there is no law to apply.'" *Pac.
Nw. Generating Co-op. v. Bonneville Power Admin.*, 596 F.3d 1065, 1075 n.7 (9th Cir. 2010)
(quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).  This bar against judicial review applies,
moreover, even when "the agency gives a 'reviewable' reason for otherwise unreviewable action."
*ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987).

      In the Census Act, Congress directed the Secretary to "take a decennial census of
population . . . in such form and content as he may determine," 13 U.S.C. § 141(a), thereby
providing the Secretary, and in turn the Census Bureau, with abundant discretion in how to carry
out the census.  As the Supreme Court has put it, "Congress has delegated its broad authority over
the census to the Secretary," which entails Congress's "virtually unlimited discretion in conducting
the decennial 'actual Enumeration.'" *Wisconsin*, 517 U.S. at 19 (quoting U.S. Const., art. I, § 2,
cl. 3).  Wholly absent from the Census Act or any other statute is a "meaningful standard' against
which this Court could assess the legality of the multiple discretionary planning choices by the
Census Bureau that Plaintiffs challenge here.  Neither the Census Act nor any of the Census
Bureau's or Commerce Department's regulations has anything to say about timetables for field
operations, the details of non-response follow-up procedures, data processing requirements,
staffing levels, budgetary implications or staff training requirements—and Plaintiffs tellingly fail
to cite any such provision.  It is difficult to imagine a statute that could more easily meet the test
of being "'drawn in such broad terms that . . . there is no law to apply.'" *Citizens to Preserve
Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971); *cf. NUL I* (dissent) at 10 ("[T]he 'accuracy'

1   requirement is a general duty arising from the Census Act, not a specific statutory or constitutional

2   mandate.").

3          Courts considering challenges to the broad operations of census-taking agree.  As the

4   Seventh Circuit explained, "[i]t might be different if the apportionment clause, the census statutes,

5   or the Administrative Procedure Act contained guidelines for an accurate decennial census[.] . . .

6   There is nothing of that sort, and the inference is that these enactments do not create justiciable

7   rights." *Tucker*, 958 F.2d at 1417.  In fact, the court addressed Plaintiffs' design-of-the-census

8   allegations, explaining that the census statutes simply "specify a timetable, and a procedure for

9   translating fractional into whole seats" but "they say nothing about *how to conduct a census* or

10  what to do about undercounts." *Id.* (emphasis added); *see id.* at 1419 (Ripple, J., concurring)

11  (stating that the census decision at issue was "committed to agency discretion").  True, the

12  Supreme Court in *New York* held the decision to add a citizenship question was *not* committed to

13  agency discretion.  139 S. Ct. at 2568-69.  But there, the Court relied on specific statutory

14  provisions that spoke, for example, to limitations on the Secretary's power "to collect information

15  through direct inquiries when administrative records are available." *Id.* at 2568 (citing 13 U.S.C.

16  § 6(c)).  Here, by contrast, Plaintiffs do not rely on this provision or any other that meaningfully

17  constrains or dictates to the Census Bureau how it should conduct the operations, timing, staffing,

18  or sequencing of census data collection, or the processing of data—except, that is, the deadlines to

19  deliver the final census report to the President by December 31, and, in turn, the apportionment

20  data to Congress in early January.  Plaintiffs ask, in effect, for the Court to require the Bureau to

21  ignore those deadlines, and there is no meaningful standard by which to review that request.

22         Even district courts that (improperly) found census-related issues reviewable under the

23  APA—like the accuracy of the final census count—have recognized that the mechanics of actually

24  conducting the census are committed to agency discretion. *See City of Willacoochee v. Baldrige*,

25  556 F. Supp. 551, 555 (S.D. Ga. 1983) (noting that the accuracy of the count is not committed to

26  agency discretion, but that "the grant of discretion in 13 U.S.C. § 141(a) appears to encompass the

27  methods used by the defendants to compile the census"); *City of Phila. v. Klutznick,* 503 F. Supp.

28  663, 678 (E.D. Pa. 1980) (dismissing a claim that the Census Bureau failed to hire skilled

enumerators as committed to agency discretion because "[r]eview of this allegation would involve the [c]ourt in second-guessing the managerial decisions of the Bureau").[3]

The Court should follow these cases and hold that Plaintiffs' APA claims are unreviewable because they are committed to agency discretion by law. As the district court in *NAACP* pointed out last year in a challenge to the Bureau's original Operational Plan, there has never been a lawsuit that "has resulted in the sweeping relief" of a judicially-enforceable directive to conduct the census in a particular manner, which "speaks volumes about the authority (not to mention ability) of courts to second-guess the Secretary's planning of the decennial census as it is taking place, or the standards under which they might attempt to do so." *NAACP v. Bureau of the Census*, 382 F. Supp. 3d 349, 373 (D. Md. 2019).

## CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' Second Amended Complaint.

DATED: November 10, 2020          Respectfully submitted,

                                         JEFFREY B. CLARK
                                         Acting Assistant Attorney General

                                         JOHN V. COGHLAN
                                         Deputy Assistant Attorney General

                                         AUGUST E. FLENTJE
                                         Special Counsel to the
                                         Assistant Attorney General

                                         ALEXANDER K. HAAS
                                         Branch Director

---

[3] Although other courts have concluded that the APA permits judicial review of certain census-related actions, none of those decisions involved the sweeping nature of Plaintiffs' request here—to dictate, through a judicial injunction, to the Census Bureau that it cannot exercise its discretion to plan and complete the 2020 Census. *See, e.g.*, *California v. Ross*, 362 F. Supp. 3d 727, 746 (N.D. Cal. 2018) (reviewing addition of citizenship question to 2020 census questionnaire); *State v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 796 (S.D.N.Y. 2018) (same); *Dist. of Columbia v. U.S. Dep't of Commerce*, 789 F. Supp. 1179, 1188 n.16 (D.D.C. 1992) (reviewing decision to count as in-state residents inmates held in a prison in a different state).

DIANE KELLEHER
BRAD P. ROSENBERG
Assistant Branch Directors

*/s/ M. Andrew Zee*
M. ANDREW ZEE (CA Bar No. 272510)
ALEXANDER V. SVERDLOV
   (NY Bar No. 4918793)
STEPHEN EHRLICH (NY Bar No. 5264171)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
450 Golden Gate Avenue
San Francisco, CA 94102
Phone: (415) 436-6646
E-mail: m.andrew.zee@usdoj.gov

*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

NATIONAL URBAN LEAGUE, *et al*.,

       Plaintiff,

    v.

WILBUR L. ROSS, JR., *et al.*,

       Defendants.

Case No. 5:20-cv-05799-LHK

**[PROPOSED] ORDER**

Upon consideration of Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint, it is hereby

ORDERED that Defendants' motion is GRANTED and that Plaintiffs' Second Amended Complaint is DISMISSED.

IT IS SO ORDERED.

Date:_____

_____

LUCY H. KOH

United States District Judge