# EXHIBIT A

No.

# In the Supreme Court of the United States

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL., APPELLANTS

*v.*

NATALIA USECHE, ET AL.

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND*

## JURISDICTIONAL STATEMENT

JEFFREY B. WALL
  *Acting Solicitor General
  Counsel of Record*
JEFFREY BOSSERT CLARK
  *Acting Assistant Attorney
  General*
HASHIM M. MOOPPAN
  *Counselor to the Solicitor
  General*
SOPAN JOSHI
  *Senior Counsel to the
  Assistant Attorney General*
NICOLE FRAZER REAVES
BRINTON LUCAS
  *Assistants to the Solicitor
  General*

  *Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

## QUESTIONS PRESENTED

Congress has provided that, for purposes of apportioning seats in the House of Representatives, the President shall prepare "a statement showing the whole number of persons in each State * * * as ascertained under the * * * decennial census of the population." 2 U.S.C. 2a(a). It has further provided that the Secretary of Commerce shall take the decennial census "in such form and content as he may determine," 13 U.S.C. 141(a), and shall tabulate the results in a report to the President, 13 U.S.C. 141(b). The President has issued a Memorandum instructing the Secretary to include within that report information enabling the President to implement a policy decision to exclude illegal aliens from the base population number for apportionment "to the maximum extent feasible and consistent with the discretion delegated to the executive branch." 85 Fed. Reg. 44,679, 44,680 (July 23, 2020). At the behest of plaintiffs urging that the exclusion of illegal aliens would unconstitutionally alter the apportionment, a three-judge district court declared the Memorandum unlawful and enjoined the Secretary from including the information in his report. The questions presented are:

1. Whether the relief entered satisfies the requirements of Article III of the Constitution.

2. Whether the Memorandum is a permissible exercise of the President's discretion under the provisions of law governing congressional apportionment.

## PARTIES TO THE PROCEEDING

Appellants (defendants in the district court) are Donald J. Trump, in his official capacity as President of the United States; the United States Department of Commerce; Wilbur L. Ross, Jr., in his official capacity as Secretary of Commerce; the United States Census Bureau, an agency within the United States Department of Commerce; and Steven Dillingham, in his official capacity as Director of the United States Census Bureau.

Appellees (plaintiffs in the district court) are Natalia Useche; Joyce Brown; Amit Dodani; Natalie Hernandez; Michael Kagan; Angela Kang; Angel Lira; Charles Park; Angel Ulloa; Kathi White; Katelyn Cohen; the Arizona Center for Empowerment; and the Florida Immigrant Coalition.

**RELATED PROCEEDINGS**

United States District Court (D. Md.) (three-judge district court):

> *Useche* v. *Trump*, No. 20-cv-2225 (Aug. 26, 2020) (assigning three-judge district court)

> *Useche* v. *Trump*, No. 20-cv-2225 (Nov. 6, 2020) (entering final judgment and granting permanent injunction and declaratory judgment)

United States Court of Appeals (4th Cir.):

> *Useche* v. *Trump*, No. 20-2207 (notice of appeal filed Nov. 6, 2020)

## TABLE OF CONTENTS

Page

Opinion below.............................................................. 1
Jurisdiction................................................................. 1
Constitutional and statutory provisions involved..................... 2
Statement .................................................................. 2
Reasons for noting probable jurisdiction .................................. 9
Conclusion ................................................................ 11
Appendix A — District court memorandum opinion
                (Nov. 6, 2020) .............................................. 1a
Appendix B — District court final judgment
                (Nov. 6, 2020) ............................................ 37a
Appendix C — District court notice of appeal
                (Nov. 6, 2020) ............................................ 39a
Appendix D — Designation of the three-judge panel
                pursuant to 28 U.S.C. § 2284(b)
                (Aug. 26, 2020) .......................................... 41a
Appendix E — District court request to the chief judge
                of the U.S. court of appeals for the
                Fourth Circuit to convene a three-
                judge court under 28 U.S.C. § 2284
                (Aug. 17, 2020) .......................................... 43a
Appendix F — Constitutional and statutory provisions..... 47a

## TABLE OF AUTHORITIES

Cases:

    *Franklin* v. *Massachusetts*, 505 U.S. 788 (1992)................. 4
    *New York* v. *Trump*, No. 20-cv-5770, 2020 WL
       5422959 (S.D.N.Y. Sept. 10, 2020)....................................... 8
    *New York* v. *United States Dep't of Commerce*,
       351 F. Supp. 3d 502 (S.D.N.Y.), aff'd in part,
       rev'd in part, and remanded, 139 S. Ct. 2551 (2019)...... 4, 5

VI

Constitution and statutes:                                     Page

U.S. Const.:

 Art. I, § 2, Cl. 3 ................................................................. 3

 Art. III............................................................... 6, 9, 10

 Amend. XIV, § 2 .............................................................. 3

2 U.S.C. 2a(a) ......................................................... 3, 49a

13 U.S.C. 141(a) ..................................................... 3, 51a

13 U.S.C. 141(b) ..................................................... 3, 51a

28 U.S.C. 2284(b) ........................................................ 6

Miscellaneous:

83 Fed. Reg. 5525 (Feb. 8, 2018) ........................................ 4

85 Fed. Reg. 44,679 (July 23, 2020)................................. 2, 5

Press Release, U.S. Census Bureau, U.S. Dep't of
 Commerce, *Statement from U.S. Census Bureau
 Director Steven Dillingham:  Delivering a
 Complete and Accurate 2020 Census Count*
 (Aug. 3, 2020), https://go.usa.gov/xGR2C.......................... 5

# In the Supreme Court of the United States

————

No.

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL., APPELLANTS

*v.*

NATALIA USECHE, ET AL.

————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND*

————

**JURISDICTIONAL STATEMENT**

————

The Acting Solicitor General, on behalf of President Donald J. Trump, et al., respectfully files this jurisdictional statement on appeal from the judgment of the three-judge panel of the United States District Court for the District of Maryland.

### OPINION BELOW

The opinion of the three-judge district court (App., *infra*, 1a-36a) is not published in the Federal Supplement but is available at 2020 WL 6545886.

### JURISDICTION

Under 28 U.S.C. 2284, a three-judge district court was required to be convened because appellees' suit challenged on constitutional (and other) grounds the President's determination concerning standards for including individuals in the apportionment base for reapportioning congressional districts. See App., *infra*, 23a; D. Ct. Doc. 18, at 31-35 (Aug. 14, 2020). The judgment of the three-judge district court, which included a permanent injunction, was entered on November 6, 2020.

(1)

2

App., *infra*, 37a-38a.  The government filed notices of appeal on November 6, 2020.  The jurisdiction of this Court is invoked under 28 U.S.C. 1253.  See *Dothard* v. *Rawlinson*, 433 U.S. 321, 324 n.5 (1977) (holding that an appeal lies under Section 1253 where a properly convened three-judge district court grants an injunction on antecedent statutory grounds); *White* v. *Regester*, 412 U.S. 755, 760-761 (1973) (holding that where an injunction is appealable under Section 1253, so is an accompanying declaratory judgment).

### CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Pertinent constitutional and statutory provisions are reproduced in the appendix to this pleading.  App., *infra*, 47a-51a.

### STATEMENT

This case is one of several challenges to a Memorandum from the President to the Secretary of Commerce regarding the exclusion of illegal aliens from the apportionment population base determined under the 2020 census.  85 Fed. Reg. 44,679 (July 23, 2020).  In one of those cases, the government appealed to this Court from an order entered by the United States District Court for the Southern District of New York that prevented the Secretary from complying with the Memorandum.  J.S. App. at 1a-107a, *Trump* v. *New York*, No. 20-366 (filed Sept. 22, 2020).  This Court postponed consideration of jurisdiction and expedited the appeal on October 16, 2020, setting oral argument for November 30, 2020.  After the Court did so, the United States District Court for the Northern District of California issued essentially the same relief on very similar grounds; the government appealed from that decision to this Court, requesting that the Court hold the appeal

3

pending its decision in *New York*. See J.S. at 10-11, *Trump* v. *City of San Jose* (No. 20-561) (filed Oct. 29, 2020). Following the district court decisions in *New York* and *San Jose*, the district court in this case issued essentially the same relief, and on the same grounds, as did the *New York* court. App., *infra*, 1a-38a.

1. The Constitution provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State." U.S. Const. Amend. XIV, § 2. To make apportionment possible, the Constitution requires the federal government to conduct an "actual Enumeration" every ten years in "such Manner as" directed by Congress. Art. I, § 2, Cl. 3.

Congress has directed the Secretary of Commerce to conduct "a decennial census of population * * * in such form and content as he may determine." 13 U.S.C. 141(a) (Census Act). Following completion of the 2020 census, by December 31, 2020, the Secretary must submit to the President "[t]he tabulation of total population by States * * * as required for the apportionment of Representatives in Congress among the several States." 13 U.S.C. 141(b) (the Secretary's report or the report). After receiving the Secretary's report, the President must "transmit to the Congress a statement showing the whole number of persons in each State * * * as ascertained under the * * * decennial census of the population, and the number of Representatives to which each State would be entitled * * * by the method known as the method of equal proportions," within one week of the first day of the next Congress's first regular session. 2 U.S.C. 2a(a) (Reapportionment Act).

4

While the President's role in applying the equal-proportions calculation to the apportionment population base is ministerial, his role in determining the population base itself is not. As this Court has recognized, "§ 2a does not curtail the President's authority to direct the Secretary in making policy judgments that result in 'the decennial census.'" *Franklin* v. *Massachusetts*, 505 U.S. 788, 799 (1992). Notably, one such "judgment" is whether a person should be deemed an "'inhabitant'" or "'usual resident'" of a State, which is "the gloss" that has historically been given to the constitutional and statutory phrase "persons 'in' each State." *Id.* at 803-804, 806 (brackets and citations omitted).

In 2018, the Census Bureau promulgated criteria to enumerate most people "at their usual residence," which it defines as "the place where they live and sleep most of the time." 83 Fed. Reg. 5525, 5533 (Feb. 8, 2018) (Residence Criteria). "Citizens of foreign countries living in the United States" are "[c]ounted at the U.S. residence where they live and sleep most of the time." *Ibid.* (emphasis omitted). Foreign citizens visiting the United States (such as individuals on a vacation or business trip) are not counted under the Residence Criteria. *Ibid.*

The Bureau uses a number of methods to ensure that individuals are counted as part of the decennial census. For the 2020 census, individuals are being enumerated through (1) census-questionnaire responses online, by mail, or by phone; (2) visits by enumerators; (3) proxy responses given by knowledgeable individuals such as neighbors or landlords; (4) high-quality administrative records from other federal agencies; and (5) potentially, data imputed from the same area (used as a last resort to fill data gaps). *New York* v. *United States Dep't of*

5

*Commerce*, 351 F. Supp. 3d 502, 521 (S.D.N.Y.), aff'd in part, rev'd in part, and remanded, 139 S. Ct. 2551 (2019).

2. On July 21, 2020, the President issued a Memorandum to the Secretary of Commerce regarding the exclusion of illegal aliens from the apportionment population base under the 2020 census. 85 Fed. Reg. at 44,679-44,681. The Memorandum states that "it is the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act, as amended, to the maximum extent feasible and consistent with the discretion delegated to the executive branch." *Id.* at 44,680 (citation omitted). The Memorandum directs the Secretary to submit to the President two tabulations in the Secretary's report. One is an enumeration "tabulated according to the methodology set forth in" the Residence Criteria. *Ibid.* The second consists of "information permitting the President, to the extent practicable," to carry out the policy of excluding illegal aliens from the apportionment "to the maximum extent of the President's discretion under the law." *Ibid.*

The Census Bureau is evaluating the extent to which, as a practical matter, administrative records pertaining to immigration status can be used to identify and exclude illegal aliens from the apportionment population count. "A team of experts [is] examining methodologies and options to be employed for this purpose." Press Release, U.S. Census Bureau, U.S. Dep't of Commerce, *Statement from U.S. Census Bureau Director Steven Dillingham: Delivering a Complete and Accurate 2020 Census Count* (Aug. 3, 2020), https://go.usa.gov/xGR2C. That process continues, and the "Bureau does not know exactly what numbers the Secretary may report to the

6

President." Doc. 84-1, at 4, *City of San Jose* v. *Trump*, No. 20-cv-5167 (N.D. Cal. Sept. 10, 2020).

3. On July 31, 2020, appellees—a group of individuals and nonprofit organizations—filed a complaint challenging the Memorandum. App., *infra*, 6a-7a. Appellees alleged, among other things, that the Memorandum violates the Census Act and the Reapportionment Act. *Id.* at 7a. At appellees' request, a three-judge district court was convened to consider this case pursuant to 28 U.S.C. 2284(b). See App., *infra*, 7a n.1, 45a-46a.

4. On November 6, 2020, the district court held that the Memorandum violates the Census Act and Reapportionment Act, granted partial summary judgment and a final judgment to appellees on those claims, and entered declaratory and injunctive relief. App., *infra*, 1a-36a. The court's decision frequently referred to, and at some points relied heavily on, the *New York* district court's decision, which likewise had found that the Memorandum violates the Census Act and Reapportionment Act. See, *e.g.*, *id.* at 22a (noting that it "agree[d] with" the *New York* district court's decision and "incorporate[d]" its "detailed reasoning to the extent the issues are presented identically here").

a. The district court below began by holding that appellees satisfied Article III's requirements to seek relief. App., *infra*, 10a-22a. The court found that appellees have standing on the theory that implementation of the Memorandum "creates a 'substantial risk' that states in which at least some of the individual [appellees] reside"—namely, California and Texas—"will lose congressional seats." *Id.* at 13a. The court rejected the government's argument that appellees' asserted apportionment injury is too speculative to support injury-in-fact because it is unknown how many illegal aliens the President may be able to exclude from the population

7

base for apportionment, and thus whether any appellee lives in a State that would suffer the loss of a congressional seat. See *id.* at 10a, 13a-18a. The court concluded that despite language in the Memorandum setting forth a policy of excluding illegal aliens only "'to the maximum extent feasible,'" the Memorandum "makes 'abundantly clear' its intent to exclude not some but all undocumented immigrants from the apportionment base, and 'unambiguously commands action' to achieve that goal." *Id.* at 15a (citations omitted). The court also faulted the government for failing to produce "any evidence" that the Secretary "cannot comply fully with the Memorandum." *Id.* at 18a. And relying on evidence that the Bureau plans to provide the Secretary with the number of "'unlawful aliens in ICE Detention Centers'" and "'other'" unspecified information to implement the Memorandum, the court concluded that the Secretary plans "to provide the President with a number approximating the total number of undocumented immigrants in each state." *Id.* at 16a (citations omitted).

The district court also declined to postpone consideration of the case until after apportionment has been completed, holding that there were no prudential ripeness concerns. App., *infra*, 18a-22a. The court concluded that the question "whether the government has the lawful authority to * * * exclude the maximum possible number of undocumented immigrants from the apportionment base * * * is 'purely legal,' and involves no aspect that would 'benefit from further factual development.'" *Id.* at 19a (citations omitted). While acknowledging that "it may be *possible* to remedy an apportionment harm after the fact," the court found it "hard to see why it would be desirable here," because "[w]e know now, before actual apportionment, who would be injured." *Id.* at 21a.

8

b.  Turning to the merits, the district court, like the *New York* court, held that the "Memorandum deviates from the governing federal statutes both by excluding undocumented immigrants from the apportionment base solely because of their legal status and by directing the use of non-census data for apportionment."  App., *infra*, 22a-23a.  Accordingly, the court below, "like the *New York* court, decline[d] to reach the plaintiffs' constitutional claims."  *Id.* at 23a.

"Like [the] *New York*" court, the district court concluded that, for purposes of the Census Act and Reapportionment Act, illegal aliens "are 'inhabitants' of the states where they live as surely as they are 'persons in' those states."  App., *infra*, 24a.  In the court's view, "[t]he ordinary meaning of an inhabitant is 'one that occupies a particular place regularly, routinely, or for a period of time,'" and that definition covers all "'illegal aliens who live in the United States.'"  *Id.* at 25a (citations omitted).  The court declined to "'delve into the meaning of the terms "inhabitant" and "usual residence" at the time of the Founding or of the Reconstruction Amendments,'" choosing instead to rely on the 1929 Congress's failure to enact "amendments that would have excluded non-citizens" from the apportionment base.  *Id.* at 26a & n.8 (quoting *New York* v. *Trump*, No. 20-cv-5770, 2020 WL 5422959, at \*30 n.17 (S.D.N.Y. Sept. 10, 2020)).

The district court further agreed with the "*New York* court[]" that the "Memorandum violates a second statutory requirement:  that the congressional apportionment be based on the results of the census and *only* the results of the census."  App., *infra*, 29a.  In the court's view, the Memorandum contravenes that requirement because the second requested tabulation "will not be a

9

product of the census." *Id.* at 30a. The court acknowledged that "the Census Bureau may use administrative records and data as part of the actual enumeration," but concluded that the Memorandum "requires the administrative records be used to calculate a number other than the actual census enumeration upon which apportionment will be based." *Id.* at 32a n.9.

c. The district court granted appellees summary judgment on their Census Act and Reapportionment Act claims. App., *infra*, 33a, 37a. Finding the permanent-injunction factors satisfied, *id.* at 33a-34a, the court enjoined all defendants other than the President "from transmitting to the President any data or information on the number of undocumented immigrants in each state to be used for reapportionment," *id.* at 38a. The injunction that the district court below entered closely tracks the injunction entered by the district court in *New York*, but expands on the scope of the latter injunction to prevent the transmission of such data "intended for use in apportionment" "after the statutory deadline for the Section 141(b) report." *Id.* at 35a. And like the *New York* court, the court below entered a declaratory judgment that the Memorandum is unlawful. *Id.* at 35a, 37a-38a.

### REASONS FOR NOTING PROBABLE JURISDICTION

The district court held that Article III was satisfied and, on the merits, held that the Memorandum violates the statutory provisions governing congressional apportionment. For the reasons set forth in the government's merits brief in this Court in *Trump* v. *New York*, No. 20-366 (Oct. 30, 2020), the district court's conclusions regarding Article III and the statutory claims are incorrect. This Court is poised to resolve those same questions on an expedited basis in *New York*, which is

10

scheduled for argument on November 30, 2020. Accordingly, the government respectfully requests that the Court hold this jurisdictional statement pending its decision in *New York* and then dispose of it as appropriate in light of that decision.

Although the district court here relied on an apportionment injury not relied upon by the *New York* district court to find that appellees had Article III standing, that theory of standing is fairly presented in *New York*. The *New York* appellees have invoked that same speculative injury as an alternative ground for supporting Article III jurisdiction there, and the government has responded to that argument in its merits brief. See Gov't Br. at 18-21, *New York*, *supra* (No. 20-366); NY Immigration Coal. Mot. to Dismiss or Affirm at 32-35, *New York*, *supra* (No. 20-366); NY Mot. to Affirm at 17-20, *New York*, *supra* (No. 20-366). Accordingly, there is no need to grant plenary review of this parallel appeal on an even more expedited basis, because the Court can resolve that Article III argument in *New York* itself.

11

**CONCLUSION**

The Court should hold the jurisdictional statement pending disposition of *Trump* v. *New York*, No. 20-366 (filed Sept. 22, 2020), and then dispose of it as appropriate in light of the Court's decision in that case.

Respectfully submitted.

JEFFREY B. WALL
    *Acting Solicitor General*
JEFFREY BOSSERT CLARK
    *Acting Assistant Attorney*
    *General*
HASHIM M. MOOPPAN
    *Counselor to the Solicitor*
    *General*
SOPAN JOSHI
    *Senior Counsel to the*
    *Assistant Attorney General*
NICOLE FRAZER REAVES
BRINTON LUCAS
    *Assistants to the Solicitor*
    *General*

NOVEMBER 2020

**APPENDIX A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

————————

No. 8:20-cv-02225-PX-PAH-ELH

NATALIA USECHE, ET AL., PLAINTIFFS

*v.*

DONALD J. TRUMP, ET AL., DEFENDANTS

————————

Filed:   Nov. 6, 2020

————————

**MEMORANDUM OPINION**

————————

PER CURIAM.

Since the first census in 1790, every census and apportionment has accounted for the total persons in each state, without respect to immigration status.   And until July 2020, no branch of the federal government ever had taken the position that non-citizen residents of the United States could lawfully be excluded, based on their immigration status, from the apportionment base.

The Presidential Memorandum before us, issued on July 21, 2020, upends that 230-year history.   The Memorandum declares that it now "is the policy of the United States to exclude" undocumented immigrants "from the apportionment base   .  .  .   to the maximum extent feasible."   Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census, 85 Fed. Reg. 44,679, 44,680 (July 23, 2020).   To effectuate that pol-

(1a)

2a

icy, the Memorandum directs the Secretary of Commerce to provide the President with two sets of numbers: the customary count of all residents of each state, according to the census; and a new and second count from which undocumented immigrants have been subtracted, to be used for the apportionment of congressional seats.   And even though the Memorandum leaves to the Secretary how best to calculate the "maximum" number of undocumented immigrants in each state, it makes clear the purpose and expected result of this exercise.   Some states with large immigrant populations will lose congressional seats—the Memorandum goes so far as to highlight California as one—and other states will gain them.

We are the third three-judge district court to address this Memorandum, and we substantially agree with our colleagues.   Like the court in *City of San Jose v. Trump*, No. 20-CV-05167, 2020 WL 6253433 (N.D. Cal. Oct. 22, 2020), we conclude that the claims before us are justiciable given the substantial risk that states in which several plaintiffs reside will lose congressional representation under the Memorandum.   Similarly, as in *City of San Jose* and *New York v. Trump*, No. 20-CV-5770, 2020 WL 5422959 (S.D.N.Y. Sept. 10, 2020), we find that the Presidential Memorandum violates the statutes governing the census and apportionment in two respects: by wholly excluding undocumented immigrants from the total population count used to apportion congressional seats; and by requiring the Secretary of Commerce to provide the President with data collected outside the decennial census for use in apportionment.   We therefore enjoin all defendants, except for the President himself,

3a

from providing the President with information regarding the number of undocumented immigrants in each state for purposes of reapportionment.

## I.

We begin with a brief review of the relevant constitutional and statutory provisions, the Presidential Memorandum at the heart of this case, and the plaintiffs' challenge to that Memorandum.

## A.

The Constitution establishes the principle that congressional apportionment must be based on the "whole number" of persons in each state, as determined by the decennial census.   Article I of the Constitution provides that an "actual Enumeration" of the population shall be conducted every ten years "in such Manner as [Congress] shall by Law direct," so that congressional representatives may be "apportioned among the several States."   U.S. Const. art. I, § 2, cl. 3.   The Fourteenth Amendment next requires that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." *Id.* amend. XIV, § 2.   The number of Representatives apportioned to each state also determines that state's share of electors in the Electoral College.   *See id.* art. II, § 1, cl. 2.

Congress, pursuant to its authority to direct the "Manner" of the census, has enshrined these principles into law.   The Census Act directs the Secretary of Commerce (the "Secretary") to "take a decennial census of population as of the first day of April."   13 U.S.C. § 141(a).   Section 141(b) of the Act then requires that

4a

the Secretary report to the President within nine months of the census date "[t]he tabulation of total population by States" as ascertained under the census and "as required for the apportionment of Representatives in Congress among the several States." *Id.* § 141(b). Therefore, in his Section 141(b) report, the Secretary must provide one number to the President—the tabulation of the whole number of persons in each state obtained from the decennial census. *Id.* The statute provides for no other number to be transmitted.

Once the President receives that number, he must "transmit to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, . . . and the number of Representatives to which each State would be entitled." 2 U.S.C. § 2a(a). This number is used for reapportionment and must be "ascertained under the . . . census of the population." *Id.* After the President has transmitted the number, the Clerk of the House of Representatives sends to the executive of each state the number of representatives to which his or her state is entitled. *Id.* § 2a(b).

The Census Bureau, under the authority delegated to it by Congress, has also established final rules for the 2020 Census, including the rule for how and where individuals will be enumerated. *See* Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5525 (Feb. 8, 2018) (the "Residence Rule"). Under the Residence Rule, the "specific location" at which a person is counted for purposes of the census is determined by the "concept of 'usual residence,' which is defined by the Census Bureau as the place where a person lives and sleeps most of the time." *Id.* at 5526. "This

5a

concept of 'usual residence' is grounded in the law providing for the first census, the Act of March 1, 1790, expressly specifying that persons be enumerated at their 'usual place of abode.'" *Id.* (citation omitted).

The Residence Rule applies to citizens and non-citizens alike, regardless of their legal status. "Citizens of foreign countries living in the United States" are "[c]ounted at the U.S. residence where they live and sleep most of the time." *Id.* at 5533. Although one commenter "expressed concern" during the notice and comment period "about the impact of including undocumented people in the population counts for redistricting because these people cannot vote," the Census Bureau explained that it would "retain the proposed residence situation guidance for foreign citizens in the United States." *Id.* at 5530. That means undocumented persons must be counted in the 2020 Census under the Residence Rule "if, at the time of the census, they are living and sleeping most of the time at a residence in the United States." *Id.*

**B.**

The Residence Rule became final in February 2018, and the Census Bureau began conducting the 2020 decennial census on January 21, 2020. *See Important Dates*, U.S. Census Bureau, https://2020census.gov/en/important-dates.html (last visited Nov. 3, 2020). Exactly six months into the census count, on July 21, 2020, the President issued a Presidential Memorandum titled "Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census." 85 Fed. Reg. 44,679 (July 23, 2020) (the "Presidential Memorandum" or "Memorandum"). The Presidential Memorandum declares that "it is the policy of the United States to exclude from the

6a

apportionment base aliens who are not in a lawful immigration status . . . to the maximum extent feasible and consistent with the discretion delegated to the executive branch." *Id.* at 44,680. Under the Memorandum, the Secretary must first "take all appropriate action" in compiling his Section 141(b) report "to provide information permitting the President, to the extent practicable, to exercise the President's discretion to carry out the policy set forth in [the Memorandum]." *Id.* Second, "[t]he Secretary shall also include in that report information tabulated according to the methodology set forth in" the Residence Rule. *Id.*

As the government explains, this language "direct[s] the Secretary to report two sets of numbers" to the President. ECF No. 36 ("Defs.' Opp'n"), at 38. One is an "enumeration" of the population of each state tabulated according to the Residence Rule. *Id.* at 4. The other consists of "'information permitting the President, to the extent practicable,' to carry out the stated policy, *i.e.*, an apportionment excluding illegal aliens," *id.* (citation omitted)—or, in short, a population tabulation from which undocumented immigrants, "to the maximum extent feasible," have been excluded. *See* Presidential Memorandum, 85 Fed. Reg. at 44,680.

## C.

On July 31, 2020, 11 individuals and two nongovernmental organizations brought this case against the government, naming as defendants President Donald J. Trump, Secretary of Commerce Wilbur L. Ross, Jr.,

7a

Census Bureau Director Steven Dillingham, the Department of Commerce, and the Census Bureau.[1]   In their amended complaint, the plaintiffs contend that the Presidential Memorandum is unlawful because it violates (1) the Fourteenth Amendment's requirement that apportionment be based on the whole number of persons in each state; (2) Article I's requirement that the apportionment be based on an "actual Enumeration" taken every ten years in the manner Congress directs; (3) the relevant census- and apportionment-related statutes— 13 U.S.C. §§ 141, 195 and 2 U.S.C. § 2a; and (4) 5 U.S.C. § 706(2) of the Administrative Procedure Act.   The amended complaint also alleges that the Memorandum discriminates against Hispanic communities and immigrant communities of color in violation of the Fifth Amendment's Due Process clause.   As relief, plaintiffs ask this Court to declare the Presidential Memorandum unlawful, to issue writs of mandamus requiring the Secretary and the President to comply with federal law, and to enjoin the defendants from excluding undocumented immigrants from the apportionment base.

Although the amended complaint is far-reaching, we consider today a more limited motion for partial summary judgment.   Summary judgment is warranted when the court, viewing the evidence in the light most favorable to the non-moving party, finds "no genuine dispute as to any material fact and the movant is entitled

---

[1]  This case initially was assigned to Judge Xinis.   On August 17, 2020, at the plaintiffs' request and without objection from the government, Judge Xinis sought appointment of a three-judge district court pursuant to 28 U.S.C. § 2284.   *See* ECF Nos. 17, 21.   On August 26, 2020, the Honorable Roger L. Gregory, Chief Judge of the Fourth Circuit, added Judges Harris and Hollander to form this three-judge court.   *See* ECF No. 29.

8a

to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).

The plaintiffs maintain that they are entitled to summary judgment as to two claims. First, they argue that by excluding undocumented immigrants from the apportionment base, the Presidential Memorandum violates, as a matter of law, the requirement set out in the Fourteenth Amendment, 13 U.S.C. § 141(b), and 2 U.S.C. § 2a that the "whole number of persons in each State" or "total population by States" be used for apportionment. *See* ECF No. 19-1 ("Pls.' Mem."), at 7-18. Second, they argue that the Presidential Memorandum also violates Article I, 13 U.S.C. § 141(b), and 2 U.S.C. § 2a(a) by requiring the use of non-census data in the Secretary's Section 141(b) report and for apportionment. *Id.* at 18-20.[2]

---

[2] Alternatively, the plaintiffs move for a preliminary injunction on the ground that the Presidential Memorandum violates the equal protection component of the Fifth Amendment because it is part of a sustained campaign that began with an unsuccessful attempt to add a citizenship question to the census and then continued by other means to dilute the voting power of non-white and Hispanic communities. Pls.' Mem. at 20-35. In support, they point to the recently

9a

In support of standing, the plaintiffs argue that the Presidential Memorandum creates a substantial risk that they will suffer an apportionment harm because certain states in which they reside will lose congressional seats. ECF No. 39 ("Pls.' Reply"), at 5-6. According to the plaintiffs, this harm is to be expected; the Presidential Memorandum is "expressly *intended* to reduce representation in states with large numbers of undocumented immigrants," singling out California—where some of the plaintiffs live—as a state that should lose congressional seats under the new policy. *Id.* The plaintiffs buttress their claim with the uncontested expert report of economist Dr. Ruth Gilgenbach, showing that "under an exceptionally broad range of assumptions and accounting for significant statistical uncertainty," California and also Texas—where other plaintiffs live—each are "virtually certain" to lose a congressional seat if the Presidential Memorandum's policy is implemented. *Id.* at 9-10.[3]

---

disclosed study of Dr. Thomas Hofeller, who worked closely on census issues with a trusted advisor to the Secretary. The Hofeller study concludes that removing undocumented immigrants from the redistricting process would advantage "Republicans and Non-Hispanic Whites." *Kravitz v. U.S. Dep't of Commerce*, 382 F. Supp. 3d 393, 398-400 (D. Md. 2019) (citation omitted). Because we grant summary judgment on other grounds, we need not consider the plaintiffs' alternative request for a preliminary injunction. Declining to reach the argument, however, in no way casts doubt on its validity.

[3] Alternatively, plaintiffs contend that they have standing because the Presidential Memorandum substantially risks voter dilution and loss of federal funds and impairs the activities of the organizational plaintiffs by deterring census participation. *See* Pls.' Reply at 11-16. The plaintiffs in *New York v. Trump*, No. 20-CV-5770, 2020 WL 5422959, at *15-23 (S.D.N.Y. Sept. 10, 2020), successfully advanced this argument while the census count still was ongoing. But

10a

## II.

We begin with the government's contention that plaintiffs lack standing and, relatedly, that their claims are not ripe for adjudication.   The government asserts that it is not yet clear how the Memorandum will be implemented or even whether it will be implemented at all. This is because, according to the government, "[t]he extent to which it will be feasible for the Census Bureau to provide the Secretary of Commerce a second tabulation" wholly excluding undocumented immigrants from the apportionment base "is, at this point, unknown."   Defs.' Opp'n at 7.   Thus, says the government, any apportionment injury is too speculative to constitute the requisite "injury in fact" for standing purposes.   And because "[a]nalyzing ripeness is similar to determining whether a party has standing," *Miller v. Brown*, 462 F.3d 312, 318-19 (4th Cir. 2006), the government argues that the plaintiffs' claims are not ripe for the same reasons.

We disagree.   There may have been a time when the government plausibly could argue that it was "not known" whether any apportionment harm would befall the plaintiffs, because "the Secretary ha[d] not yet determined how he w[ould] calculate the number of illegal aliens in each State or *even whether it [wa]s feasible to do so at all.*"   *New York*, 2020 WL 5422959, at *15 (emphasis added); *see also* ECF No. 36-2 ("Abowd Decl.") ¶ 15 (declaring, on September 1, 2020, that "the Census Bureau is in the process of determining the appropriate

---

the Census Bureau's counting operations ceased on the day after oral argument in this case, *see* ECF No. 44, raising questions as to the continued validity of this theory.   We do not and need not rely on it here, given that the plaintiffs before us have standing based on their impending apportionment harms.

11a

methodologies" to comply with the Presidential Memorandum). But the record now before us documents the Census Bureau's concrete plans to implement fully the Memorandum, and so the plaintiffs have shown the requisite "substantial risk," *see Susan B. Anthony List v. Dreihaus*, 573 U.S. 149, 158 (2014) (citation omitted), that they will suffer the very apportionment harms the Memorandum is intended to inflict.[4]

We begin with the basics. So long as at least one plaintiff in front of us has standing, then a justiciable controversy exists. *Dep't of Commerce v. New York* ("*Commerce v. New York*"), 139 S. Ct. 2551, 2565 (2019). Plaintiffs have standing if they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The government challenges only the first prong, injury in fact.

An injury in fact is sufficient to confer Article III standing when a plaintiff "has sustained or is immediately in danger of sustaining a direct injury." *Id.* at 1552 (Thomas, J., concurring) (citation omitted).

---

[4] In this respect, we do not confront the same record that was before the court in *New York*, which suggested, without deciding, that an apportionment injury like the one alleged here was too speculative, in early September of 2020, to confer Article III standing. *See* 2020 WL 5422959, at *15. That same court indeed recognized that as the Census Bureau and Department of Commerce continued census data collection and processing, the alleged apportionment injuries might "no longer be [too] speculative" to support Article III jurisdiction. *See* Opinion and Order Denying Stay, *New York*, No. 20-CV-2770, at 11 n.8 (S.D.N.Y. Sept. 29, 2020). In our considered judgment, that time has come.

12a

There is no dispute that a future injury, like the plaintiffs' alleged apportionment harms, may suffice. As the parties agree, so long as an alleged future injury is "'certainly impending' or there is a 'substantial risk' that the harm will occur," then Article III standing is satisfied. *See Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)); *see also* Defs.' Opp'n at 10; Pls.' Reply at 5.[5] Likewise, no genuine dispute exists that the "expected loss of a Representative" through reapportionment "satisfies the injury-in-fact requirement of Article III standing." *Dep't of Commerce v. U.S. House of Representatives* ("*Commerce v. House*"), 525 U.S. 316, 331 (1999). When a state "anticipate[s] losing a seat in Congress," that "diminishment of political representation" is a concrete injury suffered by both the state itself, *see Commerce v. New York*, 139 S. Ct. at 2565, and its citizens, *see Commerce v. House*, 525 U.S. at 331-32.

---

[5] *Clapper v. Amnesty International USA*, 568 U.S. 398, 414 n.5 (2013), suggests in a footnote that, at least in some cases, it may be appropriate to focus exclusively on the "certainly impending" formulation. Since *Clapper*, however, the Supreme Court has continued to apply the disjunctive standard embraced by both parties here, asking whether there is *either* a "substantial risk" of injury *or* a "certainly impending" injury. *See Commerce v. New York*, 139 S. Ct. at 2565; *Susan B. Anthony List*, 573 U.S. at 158. And this case involves none of the "foreign affairs" concerns that counseled in favor of emphasizing the "certainly impending" standard in *Clapper*. *See* 568 U.S. at 409. Equally important, as in *Clapper*, *id.* at 414 n.5, the precise terminology makes no difference. However the inquiry is framed, the plaintiffs' alleged apportionment harms are not so "conjectural or hypothetical" that they fail to confer Article III standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation and internal quotation marks omitted).

13a

Squarely before us is whether implementing the Presidential Memorandum creates a "substantial risk" that states in which at least some of the individual plaintiffs reside will lose congressional seats if undocumented immigrants are excluded from the apportionment base.   Reviewing the record in the light most favorable to the government, *see Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 650 (4th Cir. 2017), the plaintiffs have met their burden of establishing that substantial risk.   *See Commerce v. House*, 525 U.S. at 330; *City of San Jose*, 2020 WL 6253433, at *22.

The government does not materially contest that once implemented, the Memorandum's policy of excluding undocumented immigrants from the apportionment base to the "maximum extent feasible," *see* Presidential Memorandum, 85 Fed. Reg. at 44,680, almost certainly will cause both California and Texas—states in which multiple plaintiffs reside—to lose congressional seats in the upcoming apportionment.   *See* ECF No. 19-7 ("Gilgenbach Decl.") at 12-13 ¶¶ 22-23; *see also* ECF No. 19-3 ("Kang Decl."), at 1 ¶¶ 3-4; ECF No. 19-3 ("Dodani Decl."), at 4 ¶¶ 3-4; ECF No. 19-3 ("Lira Decl."), at 7 ¶¶ 3-6; ECF No. 19-3 ("Ulloa Decl."), at 9 ¶¶ 3-4.   This is true no matter the precise methodology used by the Secretary or the exact number he provides the President.   Even under a wide range of assumptions and accounting for statistical uncertainty, California and Texas are "highly likely to lose a congressional seat if undocumented immigrants [are] removed from congressional apportionment calculations."   Gilgenbach Decl. ¶ 23; *see also id.* ¶¶ 9-39.   And of course, that is to be expected.   The Presidential Memorandum announced expressly that its goal is to reduce representation in states with significant numbers of undocumented immigrants.

14a

*See* Presidential Memorandum, 85 Fed. Reg. at 44,680 (explaining that states with large numbers of undocumented immigrants should not be "rewarded with greater representation in the House of Representatives"). Indeed, as the government clarified at oral argument, the unnamed state singled out by the Memorandum that is likely to lose two or three congressional seats as a result of the Memorandum is California, ECF No. 47 ("Oral Arg. Tr."), at 24, in which several plaintiffs live.

None of this is genuinely disputed. The government does *not* argue that there is no "substantial risk" that, if implemented, the Memorandum would produce the intended apportionment harms. Instead, the government stakes its argument on a different proposition: that there is no "substantial risk" that the Memorandum actually *will* be implemented, or at least fully *enough* implemented to bring about the desired shift of congressional seats. In support of this argument, the government highlights that the Memorandum calls for the exclusion of undocumented immigrants only to the extent "feasible" or "practicable," *see* 85 Fed. Reg. at 44,680, and perhaps it will not prove "feasible" to identify all or even any undocumented immigrants for subtraction from the apportionment base. Defs.' Opp'n at 8. Or maybe, the government suggests, it will be "practicable" to identify only some "hypothetical smaller" subset of undocumented immigrants whose exclusion might not suffice to cost California or Texas a congressional seat. *Id.* at 44. In short, the government argues, whether the Presidential Memorandum will be implemented as intended remains so "conjectural [and] hypothetical" that the plaintiffs cannot show a "substantial risk" of injury. *Id.* at 10 (citations omitted).

15a

Like the court in *City of San Jose*, *see* 2020 WL 6253433, at \*17-20, we disagree. On its face, the Memorandum makes "abundantly clear" its intent to exclude not some but all undocumented immigrants from the apportionment base, and "unambiguously commands action" to achieve that goal. *Id.* at \*18 (internal quotation marks omitted). The Memorandum plainly states that "it is the policy of the United States to exclude" undocumented immigrants from the apportionment base "to the maximum extent feasible." Presidential Memorandum, 85 Fed. Reg. at 44,680. And if there were any doubt that what is contemplated is to exclude *all* undocumented immigrants from the apportionment count, the Memorandum dispels it by explicitly referencing the "more than 2.2 million illegal aliens" living in California, *id.*, an estimate of the *total* number of undocumented immigrants in that state.[6] Given the Memorandum's plain text and stated purpose, the "presumption of regularity" that attaches to agency action means that we presume, in the absence of contrary evidence, that the Secretary and Census Bureau will take the steps necessary to exclude not some but all undocumented immigrants from the apportionment base. *See United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926); *see also U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001).

At oral argument in mid-October, the government took the position that notwithstanding the rapidly ap-

---

[6] *Unauthorized immigrant population trends for states, birth countries and regions*, Pew Rsch. Ctr. (June 12, 2019), https://www.pewresearch.org/hispanic/interactives/unauthorized-trends/ (estimating 2.2 million undocumented immigrants resided in California in 2016).

16a

proaching end-of-year deadline for the Secretary's report, agency planning under the Memorandum remained so preliminary and "dynamic" that it was impossible to say what the Secretary might be able to produce.   Oral Arg. Tr. 8-10.   But the supplemented record in this case, based on the government's own sworn declarations and filings in parallel litigation, is replete with evidence of concrete plans to provide the President with a number approximating the total number of undocumented immigrants in each state.   Specifically, the Census Bureau will start by providing the Secretary, by December 31, 2020, with the number of all "unlawful aliens in ICE Detention Centers."   Decl. of Albert E. Fontenot, Jr. ¶ 8, *La Unión Del Pueblo Entero v. Trump*, No. 8:19-cv-2710 (D. Md. Oct. 2, 2020), ECF No. 126-1.   Next, the Bureau, by January 11, 2021, will "provide the Secretary with other Presidential Memorandum-related outputs." *Id.*   Critically, these "outputs" will be submitted as "necessary to *fully implement* the Presidential Memorandum."   *See* Decl. of Albert E. Fontenot, Jr. ¶ 26, *Nat'l Urb. League v. Ross*, No. 5:20-cv-05799 (N.D. Cal. Oct. 1, 2020), ECF No. 284-1 (emphasis added).

This is not some inchoate plan, so vague that it presents no "substantial risk" of coming to fruition.   As discussed, the Bureau has provided exact dates for the provision of information.   *See* Fontenot Decl. ¶ 8, *La Unión Del Pueblo Entero*, No. 8:19-cv-2710, ECF No. 126-1.   And the Bureau is certain enough of exactly what will be entailed in the collection of that information that it can quantify—to the day—how long such collection will take.   Postponing the provision of additional "Memorandum-related outputs" until January of 2021, the Census Bureau has attested, will save it precisely five days of work in December, which it now can devote

17a

to "post-data collection processing" for the 2020 Census. *Id.* ¶ 4. The meticulousness of the agency's calculations belies any suggestion that the Bureau has yet to determine whether and how it will transmit to the Secretary the data necessary to "fully implement" the Presidential Memorandum. Fontenot Decl. ¶ 26, *Nat'l Urb. League*, No. 5:20-cv-05799, ECF No. 284-1.

The government has offered no counterweight to this evidence. It has provided no reason why it would *not* be feasible for the Bureau and the Secretary to tabulate the total number of undocumented immigrants in each state. *See City of San Jose*, 2020 WL 6253433, at *19-20. Nor is one readily apparent. As of July 2019, the Census Bureau possessed records that would allow it to identify the citizenship status of 90 percent of the United States population. *See* Exec. Order No. 13,880, 84 Fed. Reg. 33,821, 33,821 (July 16, 2019). The President also issued an Executive Order on "Collecting Information About Citizenship Status in Connection with the Decennial Census," in which he instructed agencies to share with the Department of Commerce—in time for use in conjunction with the 2020 Census—any additional records that would identify citizenship status so as to "generate a more reliable count of the unauthorized alien population in the country." *Id.* at 33,823; *see also id.* at 33,824. And since then, the Bureau has made significant progress toward implementing the Presidential Memorandum, obtaining additional administrative records that will allow it, in the government's words, to "ascertain the illegal alien population." *See City of San Jose*, 2020 WL 6253433, at *19-20 (quoting defendants' statement at court hearing).

18a

Simply stated, the plaintiffs have shown the requisite "substantial risk" that the Presidential Memorandum will be implemented as intended, causing the intended apportionment harms.   If any evidence exists that the Census Bureau or Secretary will not or cannot comply fully with the Memorandum, the government has yet to share such evidence with us.   *See id.* at *20 n.11.   Any speculative and theoretical possibility that the agency may fall short in its efforts to carry out the Memorandum's announced policy does not negate the plaintiffs' showing of "substantial risk" sufficient to confer standing.   *See id.* at *17-20.

We next turn to ripeness.   Because both standing and ripeness flow from Article III's case or controversy requirement, *see South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019), "[a]nalyzing ripeness is similar to determining whether a party has standing" in that it "prevents judicial consideration of issues until a controversy is presented in 'clean-cut and concrete form,'" *Miller*, 462 F.3d at 318-19 (quoting *Rescue Army v. Mun. Ct. of L.A.*, 331 U.S. 549, 584 (1947)).   The "basic rationale" of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies."   *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).   For reasons similar to those previously discussed, the plaintiffs face a substantial risk of a direct and imminent apportionment injury, and thus their claims are ripe for adjudication.

In urging us to find the claims unfit for adjudication, the government puts forward the same who-knows-

19a

what-will-happen argument, and we likewise reject it here. The Bureau and Secretary soon will "fully implement" the Presidential Memorandum, *see* Fontenot Decl. ¶ 26, *Nat'l Urb. League*, No. 5:20-cv-05799, ECF No. 284-1, causing the plaintiffs an actual and imminent apportionment harm. The only question presented is whether the government has the lawful authority to do what it has repeatedly reaffirmed it will: exclude the maximum possible number of undocumented immigrants from the apportionment base. That question is "purely legal," *Miller*, 462 F.3d at 319, and involves no aspect that would "benefit from further factual development." *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). Of course it is true, as the government points out, that "[w]here an injury is contingent upon a decision to be made by a third party that has not yet acted, it is not ripe." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013). But the government is not a third-party actor. And it plainly has acted here, taking numerous concrete steps to fully implement the Memorandum's policy of maximum exclusion.

The government nonetheless urges us to defer review to avoid "improperly interfer[ing] with the Census Bureau's ongoing efforts to determine how to respond to the Presidential Memorandum" and "imped[ing] the apportionment." Defs.' Opp'n at 8. But it has put forward no reasonable argument that hearing this case now will disturb the 2020 Census. In fact, the government has stressed repeatedly that the Presidential Memorandum is concerned with apportionment only and has no impact on the census or census procedures. *See id.* at 11; ECF No. 36-1 ("Fontenot Decl.") ¶ 13.

20a

Nor will judicial review interfere with ongoing agency action. The Census Bureau can go forward with its count of undocumented immigrants while we resolve the "clean-cut and concrete" questions presented, *Miller*, 462 F.3d at 319 (citation omitted), and, if warranted, enjoin the Secretary from providing the President with the results. *Cf. New York*, 2020 WL 5422959, at *35 (allowing agency to "continu[e] to study whether and how it would be feasible to calculate the number of illegal aliens in each State" while enjoining transmittal of data to the President). And the government's argument that judicial review will impede the apportionment process only stands if it succeeds on the merits: If the government cannot exclude undocumented immigrants from the apportionment base as a matter of law, then judicial review only "imped[es]" the government from violating federal law or the Constitution. *See City of San Jose*, 2020 WL 6253433, at *23. The plaintiffs' claims are thus "fit for judicial review" and ripe under Article III. *South Carolina*, 912 F.3d at 730.

The government, however, has a fallback argument. Even if we *could* hear this case now, it suggests that we wait because "census and apportionment cases generally are decided post-apportionment," and following that practice here would cause the plaintiffs no harm. Defs.' Opp'n at 9. But we need not consider whether waiting visits appreciably more or less harm to the plaintiffs. Their claims are plainly fit for review now, with no risk that adjudication will interfere with agency efforts and no need for further factual development, and so there is nothing against which to balance any costs of delay. *See South Carolina*, 912 F.3d at 730; *City of San Jose*, 2020 WL 6253433, at *24; *see also Miller*, 462 F.3d at

21a

319 (courts should balance the fitness of issues for deci-sion against the hardship to parties in waiting when they are in conflict).    And while it may be *possible* to remedy an apportionment harm after the fact, *see Utah v. Ev-ans*, 536 U.S. 452, 459 (2002), it is not required, *see Com-merce v. House*, 525 U.S. at 328-34 (considering preap-portionment challenge), and it is hard to see why it would be desirable here.

This is *not* a situation where plaintiffs chose to raise claims post-apportionment, once the nature of the claims and consequent injuries became clear.    *See City of San Jose*, 2020 WL 6253433, at *22 & n.13 (discussing cases); *cf. Utah*, 536 U.S. at 458.    We know now, before actual apportionment, who would be injured were the Presi-dential Memorandum implemented—California and Texas, at a minimum, along with their residents, *see* Gilgenbach Decl. ¶ 23—so there is no need to wait. And as the government itself has stressed in parallel lit-igation, "a post-apportionment remedy, while available, would undermine the point of the deadlines established by Congress, which is to provide prompt notice to the Nation about the new apportionment that will govern the next congressional elections."    Motion for Expe-dited Consideration of the Jurisdictional Statement at 6, *Trump v. New York*, No. 20-366 (U.S. Sept. 22, 2020); *see also* Defs.' Opp'n at 9 (asserting tabulations "called for by the Memorandum must be reported by no later than the end of this year").    A post-apportionment remedy also runs the risk of frustrating the efforts of states to complete their own redistricting on schedule. *See Commerce v. House*, 525 U.S. at 333-34; *City of San Jose*, 2020 WL 6253433, at *24.    And it needlessly would introduce certain complexities regarding the fashioning of relief:    Once the Secretary delivers his tabulation of

22a

undocumented immigrants to the President, the most obvious remedy would be an injunction not against the Secretary—whose primary role in apportionment would have ended—but against the President, an "extraordinary" form of relief, *see Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992), that courts normally should avoid where possible.  *See New York*, 2020 WL 5422959, at *34 (citing *Nixon v. Sirica*, 487 F.2d 700, 709 (D.C. Cir. 1973) (en banc)).

In light of these considerations, we cannot agree with the government that the circumstances here counsel against the exercise of jurisdiction.   No good reason exists to postpone consideration of the legal questions presented by the Presidential Memorandum, where waiting to grant relief would mean undoing an apportionment already completed.   A "federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging," *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (citation and internal quotation marks omitted), and so we turn next to the merits of the plaintiffs' partial summary judgment motion.

### III.

Two three-judge panels already have thoroughly canvassed the merits of the plaintiffs' claims.   Both held that the Presidential Memorandum is unlawful.   *See City of San Jose*, 2020 WL 6253433, at *25-26; *New York*, 2020 WL 5422959, at *2, *25-32.   We agree with both decisions and incorporate their detailed reasoning to the extent the issues are presented identically here.

Like both *City of San Jose* and *New York*, we conclude that the Presidential Memorandum deviates from

23a

the governing federal statutes both by excluding undocumented immigrants from the apportionment base solely because of their legal status and by directing the use of non-census data for apportionment. Because of these clear statutory violations, we, like the *New York* court, decline to reach the plaintiffs' constitutional claims. *See New York*, 2020 WL 5422959, at *25 (citing *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)). We of course agree with *City of San Jose* that the relevant constitutional provisions and history inform the meaning of the statutes, *see* 2020 WL 6253433, at *25, and our decision to rest on statutory grounds alone in no way calls into question that court's constitutional holding.

### A.

We start with the straightforward statutory scheme governing who must be included in the apportionment base. Section 141(b) requires that the Secretary report to the President "[t]he tabulation of total population by States . . . as required for the apportionment of Representatives in Congress." 13 U.S.C. § 141(b). Section 2a then mandates that the President use that tabulation for apportionment: The President must transmit to Congress "the whole number of persons in each State . . . as ascertained under the . . . decennial census" and use that number to apportion congressional seats. 2 U.S.C. § 2a(a).

The government, appropriately, does not dispute that undocumented immigrants are "persons" under the meaning of Section 2a. *Cf. Plyler v. Doe*, 457 U.S. 202, 210 (1982) (holding that "persons" under the Fourteenth Amendment includes all persons regardless of their "status under the immigration laws"). Nor does it

24a

spend much time focusing on the modifier "in," Defs.' Opp'n at 22, 37-38:   Based on the ordinary meaning of "in," as well as accepted canons of statutory interpretation, the phrase "persons in each state" cannot reasonably be read to exclude "undocumented immigrants living in each state."   *See City of San Jose*, 2020 WL 6253433, at *43.

Instead, the government pins its hope for success on the Supreme Court's use and treatment of the term "inhabitant" in connection with the census and apportionment.   *See Franklin*, 505 U.S. at 803-05 (noting that, since the first census in 1790, Congress and the Census Bureau counted persons as "in" each state if the state was their "usual residence" or if they were an "inhabitant" of the state (citations omitted)); *Wesberry v. Sanders*, 376 U.S. 1, 13 (1964) (apportionment is determined by "the number of the State's inhabitants").

From this, the government derives the principle that "the whole number of persons in each State," 2 U.S.C. § 2a(a), means the whole number of inhabitants of each state, and that Congress has vested the Executive with significant discretion to decide who qualifies as an "inhabitant" of a state.   *See* Defs.' Opp'n at 22-23, 37-40.

Like *New York* and *City of San Jose*, we disagree with the government's contentions.   We may assume that the government's premise is correct, and "persons in each state" means only "inhabitants," or perhaps "usual residents."   But that makes no difference because undocumented immigrants are "inhabitants" of the states where they live as surely as they are "persons in" those states.

25a

The ordinary meaning of an inhabitant is "one that occupies a particular place regularly, routinely, or for a period of time." *Inhabitant*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/inhabitant. "[H]owever ambiguous the term may be on the margins, it surely encompasses illegal aliens who live in the United States—as millions of illegal aliens indisputably do, some for many years or even decades." *New York*, 2020 WL 5422959, at *29. Indeed, a "clear majority of undocumented immigrants have lived in the United States for over five years and have families, hold jobs, own houses, and are part of their community." ECF No. 19-6 ("Barreto Decl.") ¶ 17. Put simply, a person's immigration status is irrelevant to the state which she regularly occupies or to her "usual residence." *See City of San Jose*, 2020 WL 6253433, at *43-45; *New York*, 2020 WL 5422959, at *29.[7]

The historical context in which Section 2a was passed and subsequent historical practice confirm this common-sense conclusion. In 1929, when Congress first provided that the apportionment base is the total of the

---

[7] In the alternative, the government argues that *some* undocumented immigrants—for instance, those in immigration detention—would not fall within the normal definition of "inhabitant" and could be excluded from the apportionment. But if this were so, it would be because of a construction of the Residence Rule, and not the immigrants' legal status as undocumented persons. In any event, we are not called upon to decide whether a narrow subset of undocumented immigrants may be excluded from the apportionment base. As we have explained, the Presidential Memorandum's plain terms and evident purpose contemplate *wholesale* exclusion of undocumented immigrants, not some targeted refinement of the Census Bureau's Residence Rule. *See New York*, 2020 WL 5422959, at *29 n.16.

26a

"whole number of persons in each State," *see* Act of June 18, 1929, Pub. L. No. 71-13 § 22, 46 Stat. 21, 26, the Senate and House voted down amendments that would have excluded non-citizens. *See New York*, 2020 WL 5422959, at *30-31 & n.17. The Senate even put aside the argument, as true but irrelevant, that the bill would include in the apportionment base several million non-citizens who had entered unlawfully "without the consent of the American people." 71 Cong. Rec. 1919 (1929) (statement of Sen. Heflin). And since that bill became law, no branch of the federal government *ever* has taken the position—prior to the Presidential Memorandum—that the Executive's discretion to define "the whole number of persons in each State" includes the discretion to exclude undocumented immigrants. *See New York*, 2020 WL 5422959, at *32. Quite the opposite, Congress repeatedly has rejected bills to exclude non-citizens from the apportionment base. *See* H.R. Rep. No. 76-1787, at 1 (1940); *1980 Census: Counting Illegal Aliens: Hearing Before the S. Subcomm. on Energy, Nuclear Proliferation & Fed. Servs. of the Comm. on Governmental Affs.*, 96th Cong. 10 (1980). And the Executive Branch always has taken the view, until now, that the 1929 Act, if not the Constitution, *prohibits* excluding undocumented immigrants from the apportionment based on legal status alone. *New York*, 2020 WL 5422959, at *31-32.[8]

---

[8] Because it is clear that "persons in each State" included undocumented immigrants when Section 2a's predecessor was enacted in 1929, we need not look to the meaning of the term at the Founding nor at the time of the Fourteenth Amendment. *See New York*, 2020 WL 5422959, at *30 n.17 ("For this reason, we need not and do not delve into the meaning of the terms 'inhabitant' and 'usual residence' at the time of the Founding or of the Reconstruction Amendments,

27a

Against this unbroken history, the government points us to past occasions—recited by the Presidential Memorandum—in which "aliens who are only temporarily in the United States" and "certain foreign diplomatic personnel" have been excluded from the apportionment base. Presidential Memorandum, 85 Fed. Reg. at 44,679. But under the Census Bureau's Residence Rule and irrespective of the Presidential Memorandum, persons visiting the United States or certain diplomatic personnel would be excluded from the apportionment base because they are not *usual* residents of any state. The opposite is true for many undocumented immigrants living in the United States who indisputably are usual residents with deep ties to their states. *See City of San Jose*, 2020 WL 6253433, at *29. Nor, contrary to the government's position, is this common-sense conclusion disturbed by the fact that undocumented immigrants "have not legally entered and as a matter of law may be removed from the country at any time." Defs.' Opp'n at 36. To state the obvious, a person "living in a State but facing future removal is no less a 'person[] in that State' than someone living in the State without the prospect of removal." *New York*, 2020 WL 5422959, at

_____

or consider whether the concept of unlawful status was known to the Framers of Article I or the Fourteenth Amendment. There is no dispute that the concept of 'illegal aliens' existed in 1929, when Section 2a was enacted."). In any event, the government's citation to Chief Justice Marshall's partial concurrence and partial dissent in *The Venus*, 12 U.S. (8 Cranch) 253, 289 (1814), dealing with war prizes—which itself cites the theorist Emmerich de Vattel's 1760 definition of "inhabitants" as "strangers who are permitted to settle and stay in the country"—does nothing to disturb the long-understood meaning that an inhabitant for purposes of the census is defined by his or her usual residence, not immigration status. *See* Defs.' Opp'n at 29, 35.

28a

*30 (alteration in original) (citation omitted); *see also City of San Jose*, 2020 WL 6253433, at *45.

For that reason, the government's heavy reliance on *Kaplan v. Tod*, 267 U.S. 228 (1925) is misplaced. There, a non-citizen minor had been denied access to the United States in 1914 but was paroled in the country to wait out the First World War. *See id.* at 230. The Court held the minor had not "bec[o]me a citizen" during that time because she was not "dwelling within the United States." *Id.* To be sure, as *Kaplan* suggests, immigration status is relevant to *citizenship* status. But *Kaplan* says nothing about whether a person is an "inhabitant" for purposes of the census when residing on American soil. If anything, *Kaplan* cuts against the government—the minor in *Kaplan* actually was *included* in the 1920 census while paroled. *See* Decl. of Jennifer Mendelsohn ¶ 3, *New York*, No. 20-CV-5770 (S.D.N.Y. Aug. 25, 2020), ECF No. 149-2.

"With neither text nor history on [its] side," *New York*, 2020 WL 5422959, at *32, the government is left to argue that excluding undocumented immigrants from apportionment is "more consonant with the principles of representative democracy underpinning our system of Government." Presidential Memorandum, 85 Fed. Reg. at 44,680. That is contested, at a minimum; as the Supreme Court has explained, the congressional seats apportioned under 2 U.S.C. § 2a(a) "serve all residents, not just those eligible or registered to vote." *See Evenwel v. Abbott*, 136 S. Ct. 1120, 1132 (2016). But whatever the merits of the Memorandum's theory of representative democracy, Congress adopted a different one when it directed that apportionment be based on the "whole number of persons in each State." 2 U.S.C.

29a

§ 2a(a).   Because the Memorandum deviates from that command, it is unlawful.

**B.**

Like the *City of San Jose* and *New York* courts, we also conclude that the Presidential Memorandum violates a second statutory requirement:   that the congressional apportionment be based on the results of the census and *only* the results of the census.   *See City of San Jose*, 2020 WL 6253433, at *45-46; *New York*, 2020 WL 5422959, at *25-29.

The statutory command is clear.   Section 141(b) requires the Secretary to report to the President one set of numbers:   "[t]he tabulation of total population by States under subsection (a) of this section"—that is, as counted under the decennial census—"as required for the apportionment of Representatives in Congress." 13 U.S.C. § 141(b); *see also id.* § 141(a) (providing for the taking of the decennial census).   Section 2a also requires the President to "transmit to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, *as ascertained under the . . . decennial census* of the population, and the number of Representatives to which each State would be entitled."   2 U.S.C. § 2a(a) (emphasis added).   In short, and as neither party disputes, Section 2a "expressly require[s] the President to use   . . .   the data from the 'decennial census'" for apportionment.   *See Franklin*, 505 U.S. at 797.

As the court in *New York* explained at length, this is not some empty formality.   Congress intended to create a "virtually self-executing" apportionment scheme, *see id* at 792, under which the President would be left

30a

without "discretionary power" to choose his own numbers for purposes of apportionment, and would instead be required to use the numbers collected and reported by the census. *See New York*, 2020 WL 5422959, at *26 (internal quotation marks omitted); *see also Franklin*, 505 U.S. at 799 (once the President is provided with the final decennial census data, the apportionment calculation is "admittedly ministerial"). And until now, the Department of Justice has acknowledged as much, consistently taking the position that the "President's statement to Congress regarding apportionment has to be based solely on the tabulation of total population produced by the census." *See New York*, 2020 WL 5422959, at *26.

The Presidential Memorandum flouts this statutory requirement. Under the Memorandum, the Secretary is directed to give the President one set of numbers derived from the census and tabulated according to the Census Bureau's Residence Rule, which does not take account of citizenship status. *See* Presidential Memorandum, 85 Fed. Reg. at 44,680. But now the Secretary must also provide a "second" number as well: "the population of each State 'exclud[ing]' illegal aliens." *See New York*, 2020 WL 5422959, at *27 (alteration in original) (citation omitted). And wherever that second number comes from—a matter over which the Secretary is given discretion—it will not be a product of the census. The Memorandum in this respect is clear. It contemplates two *separate* tabulations, one derived from the census and one not. *Id.*; *see* Presidential Memorandum, 85 Fed. Reg. at 44,680; Defs.' Opp'n at 4 (describing "two tabulations" to be provided by the Secretary). Because the Memorandum would have the President base apportionment on the second number, in order to

31a

exclude undocumented immigrants counted by the first, *see* Presidential Memorandum, 85 Fed. Reg. at 44,680, it is unlawful.

The government does not dispute that the President must base the apportionment on numbers derived from the decennial census. Instead, it argues that the President has the "authority to direct the Secretary in making policy judgments that result in 'the decennial census,'" which allowed the President in *Franklin* to order the counting of overseas federal employees as part of the census. *See Franklin*, 505 U.S. at 799-800, 806. It follows, the government contends, that the President here can choose to adopt the second set of numbers provided by the Secretary—a tabulation from which undocumented immigrants have been subtracted—as the "decennial census" upon which he will rely for apportionment.

We disagree. This case is not about the extent of the President's discretion to order the exclusion of a class of people from the census, because that is not what the Presidential Memorandum does. *See* Opinion and Order Denying Stay at 6-7, *New York*, No. 20-CV-2770. The Memorandum does *not* direct that undocumented immigrants be subtracted from the census count. Instead, the Memorandum carefully specifies that undocumented immigrants are to be excluded from the "apportionment base," as *distinct* from the census itself. *See*, *e.g.*, Presidential Memorandum, 85 Fed. Reg. at 44,679 ("Excluding Illegal Aliens from the Apportionment Base *Following the 2020 Census*" (emphasis added)); *id.* ("Although the Constitution requires the 'persons of each State, excluding Indians not taxed,' to be *enumerated in the census*, that requirement has

32a

never been understood to *include in the apportionment base* every individual physically present within a State's boundaries. . . . " (emphases added)). The government's consistent litigating position echoes this directive, emphasizing that the "Presidential Memorandum does not purport to change the conduct of the census itself." *See* Defs.' Opp'n at 11; Fontenot Decl. ¶ 13 ("The Presidential Memorandum . . . has had no impact on the design of field operations for [the] decennial census, or on the Census Bureau's commitment to count each person in their usual place of residence, as defined in the Residence Criteria.").

The Presidential Memorandum in this regard does not implicate the President's authority to oversee the conduct of the census, as articulated in *Franklin*. Rather, the Memorandum separates the final census tabulation—to be delivered to the President unaffected by anything in the Memorandum—from the second set of non-census numbers also to be delivered and on which the President will base the apportionment. Nothing in *Franklin* "suggest[s], let alone hold[s], that the President has authority to use something other than the census when calculating the reapportionment." *New York*, 2020 WL 5422959, at *28. Nor does *Franklin* permit the Secretary to transmit a number other than the total population as derived by the census in his Section 141(b) report. But that is precisely what the Presidential Memorandum directs, and for that reason, it violates Section 141(b) and Section 2a.[9]

---

  [9] It is true but beside the point that the Census Bureau may use administrative records and data as part of the actual enumeration. *See* Defs.' Opp'n at 39–40; *see also Utah*, 536 U.S. at 457; *Franklin*, 505 U.S. at 79–496, 803–06. We do not conclude that the Presidential

33a

## IV.

For the foregoing reasons, we grant summary judgment to the plaintiffs on the statutory claims under 2 U.S.C. § 2a and 13 U.S.C. § 141.  We must therefore assess whether the plaintiffs are entitled to the permanent injunction and declaratory relief they seek.

To warrant a permanent injunction, the plaintiffs must show (1) that they otherwise will suffer an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for their injury; (3) that, considering the balance of hardships between them and the government, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 38586 (4th Cir. 2017).  Where, as here, "the Government is the opposing party," the balance of the hardships and public interest merge together.  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020).

The plaintiffs easily meet this standard.  Their apportionment harm would "irreparably dilute[] voting power and the allocation of political representation" in a way that cannot be remedied by monetary damages.  *City of San Jose*, 2020 WL 6253433, at *50.  And the plaintiffs would suffer those irreparable injuries in, at the very least, every congressional and presidential

---

Memorandum is *ultra vires* because it requires the use of administrative records.  It is *ultra vires* because it requires the administrative records be used to calculate a number other than the actual census enumeration upon which apportionment will be based.

34a

election until the next reapportionment following the next decennial census.  *See New York*, 2020 WL 5422959, at *33.

The balance of hardships and the public interest also favor granting a permanent injunction.  The public interest is served by a valid reapportionment and is harmed when the government acts contrary to federal law.  *See id.*  In comparison, the government's only alleged hardship—that "an injunction would impede the Executive's historic discretion in conducting both the census and the apportionment," Defs.' Opp'n at 49—is illusory.  The government has repeatedly stated that the Presidential Memorandum has not and will not impact the conduct of the census, and any impediment to the apportionment would do no more than ensure that the government acts lawfully.  *Id.* at 11.

We therefore enjoin all of the defendants except the President from including in the Secretary's Section 141(b) report any "information permitting the President . . .  to exercise [his] discretion to carry out the policy set forth in section 2" of the Presidential Memorandum —that is, any information concerning the number of non-citizens in each state "who are not in a lawful immigration status under the Immigration and Nationality Act."  Presidential Memorandum, 85 Fed. Reg. at 44,680.  The Secretary must include only one number in his Section 141(b) report:   "[t]he tabulation of total population by States" as derived by the decennial census, which includes undocumented immigrants who are inhabitants of the United States.  *See* 13 U.S.C. § 141(b). And in light of the Census Bureau's stated plan to send "other Presidential Memorandum-related outputs" to

35a

the President after the statutory deadline for the Section 141(b) report, *see* Fontenot Decl. ¶ 8, *La Unión Del Pueblo Entero*, No. 8:19-cv-2710, ECF No. 126-1, the government also is enjoined from transmitting to the President any data or information on the number of undocumented immigrants in each state intended for use in apportionment.   The government may, however, continue to collect data regarding the number of undocumented immigrants in each state if it so chooses.

Finally, and for similar reasons, we grant the plaintiffs' request for declaratory relief.   Granting declaratory relief often "serve[s] a useful purpose in clarifying and settling the legal relations in issue." *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996) (citation omitted).   This is particularly important here because we decline to grant injunctive relief against the President, even though he is the central actor in reapportionment.   And granting declaratory relief firmly settles the legal questions at issue for the governmental actors who may continue to collect data relevant to counting the number of undocumented immigrants in each state.   Accordingly, we declare that the Presidential Memorandum is *ultra vires,* in violation of 2 U.S.C. § 2a and 13 U.S.C. § 141, to the extent it directs or permits the exclusion of undocumented immigrants from the total population to be used for reapportionment and because it directs the Secretary to include in his Section 141(b) report, and the President to base reapportionment on, data collected outside the decennial census.

36a

**V.**

For the reasons given above, we grant the plaintiffs' motion for partial summary judgment.   We need not and do not reach the merits of plaintiffs' other claims.[10]

<u>11/06/2020</u>
Date

$$\frac{\text{/s/}}{\text{P{\small AMELA} A. H{\small ARRIS}}}$$
United States Circuit Judge

$$\frac{\text{/s/}}{\text{E{\small LLEN} L. H{\small OLLANDER}}}$$
United States Circuit Judge

$$\frac{\text{/s/}}{\text{P{\small AULA} X{\small INIS}}}$$
United States Circuit Judge

---

[10] We believe that this matter was properly heard by a three-judge panel for the reasons set forth in Judge Xinis's request to Chief Judge Gregory for the appointment of such a panel.   ECF No. 21. Nevertheless, we follow the lead of prior three-judge panels by certifying that Judge Xinis, to whom this case was originally assigned, individually arrived at the same conclusions that we have reached collectively.   *See, e.g.*, *New York*, 2020 WL 5422959, at *36 n.21.

37a

**APPENDIX B**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

————

No. 8:20-cv-02225-PX-PAH-ELH

Natalia Useche, et al., plaintiffs

*v.*

Donald J. Trump, et al., defendants

————

Filed:   Nov. 6, 2020

————

**ORDER**

————

For the reasons stated in the foregoing Memorandum Opinion, it is this 6th of November 2020, by the United States District Court for the District of Maryland ORDERED that:

1.   The motion of Natalia Useche *et al.* for partial summary judgment and for declaratory relief (ECF No. 19), as set out in Counts IV and V of the amended complaint (ECF No. 18 ¶¶ 134–36, 142–47) is GRANTED;

2.   The Court hereby DECLARES that the Presidential Memorandum and the policy announced and directed therein is *ultra vires*, in violation of 2 U.S.C. § 2a and 13 U.S.C. § 141 to the extent it directs or permits the exclusion of undocumented immigrants from the total population to be used for reapportionment and because it directs the Secretary to include in his Section

38a

141(b) report, and the President to base reapportion-
ment on, data collected outside the decennial census.

3.    Defendants, except the President himself, are
hereby ENJOINED from transmitting to the President
any data or information on the number of undocumented
immigrants in each state to be used for reapportion-
ment.

4.    The Clerk is directed to TRANSMIT copies of
the foregoing Memorandum Opinion and this Order to
counsel for the parties.

5.    The Clerk is directed to close the case.

IT IS SO ORDERED.

<u>11/06/2020</u>
Date

_____/s/_____
PAMELA A. HARRIS
United States Circuit Judge

_____/s/_____
ELLEN L. HOLLANDER
United States Circuit Judge

_____/s/_____
PAULA XINIS
United States Circuit Judge

39a

**APPENDIX C**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

————

No. 8:20-cv-02225-PX-PAH-ELH

Natalia Useche, et al., plaintiffs

*v.*

Donald J. Trump, et al., defendants

————

Filed:   Nov. 6, 2020

————

**NOTICE OF APPEAL**

————

Notice is hereby given that all defendants in the above-named case hereby appeal to the Supreme Court of the United States from the final judgment entered on November 6, 2020.   This appeal is taken under 28 U.S.C. § 1253.

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JOHN V. COGHLAN
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

40a

DIANE KELLEHER
BRAD P. ROSENBERG
Assistant Branch Directors

/s/    <u>ELLIOTT M. DAVIS</u>
Elliott M. Davis
DANIEL D. MAULER
ELLIOTT M. DAVIS
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC 20005
Phone:    (202) 514-4336
Fax:    (202) 616-8470
E-mail:    elliott.m.davis@usdoj.gov

*Counsel for Defendants*

41a

**APPENDIX D**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

—————

No. 8:20-cv-02225-PX

NATALIA USECHE, ET AL., PLAINTIFFS

*v.*

DONALD J. TRUMP, ET AL., DEFENDANTS

—————

Filed:   Aug. 26, 2020

—————

**ORDER**

—————

The Honorable Paula Xinis has requested appoint-ment of a three-judge district court in the above-cap-tioned case, in which plaintiffs challenge, on constitu-tional and other grounds, the exclusion of undocumented non-citizens from the apportionment base to be deter-mined by the 2020 Decennial Census.   *See* Presidential Memorandum of July 21, 2020, Excluding Illegal Aliens from the Apportionment Base Following the 2020 Cen-sus, 85 Fed. Reg. 44,679, 44,680 (July 23, 2020).

A district court of three judges is to be convened "when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the appor-tionment of any statewide legislative body."   28 U.S.C. § 2284(a).   When a request for a three-judge panel is received, "the judge to whom the request is presented shall, unless [the judge] determines that three judges

42a

are not required, immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge." 28 U.S.C. § 2284(b)(1).

NOW THEREFORE, I DO HEREBY DESIG-NATE AND ASSIGN the Honorable Pamela A. Harris, United States Circuit Judge for the Fourth Circuit, and the Honorable Ellen L. Hollander, United States District Judge for the District of Maryland, to sit with the Honorable Paula Xinis, the three to constitute a district court of three judges to hear and determine this matter as provided by 28 U.S.C. § 2284.

This 26th day of August, 2020.

/s/ ROGER L. GREGORY

ROGER L. GREGORY
Chief Judge, U.S. Court of Appeals
For the Fourth Circuit

43a

**APPENDIX E**



UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

CHAMBERS OF

| | |
|---|---|
| Paula Xinis | 6500 Cherrywood Lane |
| UNITED STATES | Greenbelt, MD 20770 |
| DISTRICT JUDGE | (301) 344-0653 |

Aug. 17, 2020

**Via email & Filed On ECF**
Honorable Roger L. Gregory
Chief Judge
United States Court of Appeals
For the Fourth Circuit
Lewis F. Powell, Jr. U. S. Courthouse
1000 East Main Street, Suite 212
Richmond, VA 23219-3518

    Re:   *Useche et al. v. Trump et al.*
         District Court Case No. PX-8:20-02225

Dear Chief Judge Gregory,

    This letter requests appointment of a three-judge panel in the above-captioned case, pursuant to 28 U.S.C. § 2284(a).

    On July 21, 2020, the President of the United States issued a memorandum directing the exclusion of undocumented non-citizens from the apportionment base to be determined by the United States 2020 Decennial Cen-

44a

sus.  *See* Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census, 85 Fed. Reg. 44,679, 44,680 (July 23, 2020) ("the Memorandum").  Plaintiffs challenge the Memorandum on various grounds, including that it unconstitutionally eliminates undocumented non-citizens from the count of whole persons used for the apportionment of congressional districts, in violation of the Enumeration and Equal Protection Clauses of the United States Constitution (Counts I, II, III).[1]  ECF No. 18.  Plaintiffs also allege that Defendants' adherence to the Memorandum is *ultra vires* in that it disregards the limitations established by Congress and pertinent to the 2020 Decennial Census.  *See* 13 U.S.C.

_____

[1]  Several other District Courts are presiding over similar challenges to the Memorandum.  *See California v. Trump*, 20-CV-5169 (J. Koh) (N.D. Cal. filed July 28, 2020); *City of San Jose v. Trump*, 20-CV-5167 (J. Koh) (N.D. Cal. filed July 27, 2020); *Haitian-Americans United, Inc. v. Trump*, 20-CV-11421 (J. Woodlock) (D. Mass. filed July 27, 2020); *New York v. Trump*, 20-CV-5770, and *New York Immigration Coalition v. Trump*, 20-CV-5781, (J. Furman) (consolidated) (S.D.N.Y. both filed July 24, 2020); *Common Cause v. Trump*, 20-CV-2023 (J. Cooper) (D.D.C. filed July 23, 2020).  As here, two of these matters have been referred to the Chief Judges of their respective Circuits for three-judge panel appointments pursuant to § 2284(a), and there is an unopposed pending request for referral in another.  *See* Panel Referral, *New York v. Trump*, 20-CV-5770 and *New York Immigration Coalition v. Trump* (S.D.N.Y. Aug. 20, 2020), ECF No. 68; Motion to Convene Three-Judge Court, *Common Cause v. Trump*, 20-CV-2023 (J. Cooper) (D.D.C. Aug. 11, 2020), ECF No. 29.  This Court is also presiding over *La Union Pueblo Entero, et al. v. Trump et al.*, No. 8:19-CV-2710-PX ("*LUPE*"), in which Plaintiffs' Second Amended Complaint, filed August 13, 2020, raises near identical constitutional and *ultra vires* challenges to the Memorandum.  This Court intends to refer *LUPE* to Your Honor for similar consideration by separate correspondence.

45a

§ 141, 13 U.S.C. § 195, 2 U.S.C. § 2a (Counts IV and V).
ECF No. 18.

On August 13, 2020, Plaintiffs filed an unopposed letter-motion requesting that the matter be referred to a three-judge panel pursuant to 28 U.S.C. § 2284(a). ECF No. 17.   Section 2284(a) provides that "a district court of three judges shall be convened" when an action challenges "the constitutionality of the apportionment of congressional districts."   28 U.S.C. § 2284(a); *see also Shapiro v. McManus*, 136 S. Ct. 450, 451 (2015).   Further, Plaintiffs' *ultra vires* claim challenges the "use of [a] statistical method in violation of the Constitution or any provision of law" which "shall be heard and determined by a district court of three judges in accordance with section 2284."   Departments of Commerce, Justice, and State, The Judiciary, and Related Agencies Appropriations Act, 1998, § 209(b), (e)(1) Pub. L. No. 105-119, 111 Stat. 2440, 2481-82 (1997) ("1998 Appropriations Act") (codified at 13 U.S.C. § 141 note).

Accordingly, and based on a careful review of the Amended Complaint, this Court concludes that Plaintiffs present non-frivolous challenges to the Memorandum that fall within the ambit of 28 U.S.C. § 2284.   This Court respectfully requests that you, as Chief Judge of this Circuit, promptly appoint a three-judge panel to preside over the claims presented by this litigation.

Thank you for your consideration.   Should you require any additional information, please do not hesitate to contact me.

_____/S/_____
Paula Xinis
United States District Judge

46a

cc:  Chief Judge James Bredar, United States District
     Court

     Kimberly Smith, Law Clerk to the Hon. Chief
     Judge Roger Gregory

     Thelma Evans, Judicial Assistant to the Hon. Chief
     Judge Roger Gregory

     Patricia Connor, Clerk, United States Fourth Cir-
     cuit Court of Appeals

47a

## APPENDIX F

1.    U.S. Const. Art. I, § 2 provides:

The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen.

Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons.   The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct.   The Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative; and until such enumeration shall be made, the State of New Hampshire shall be entitled to chuse three, Massachusetts eight, Rhode-Island and Providence Plantations one, Connecticut five, New-York six, New Jersey four, Pennsylvania eight, Delaware one, Maryland six, Virginia ten, North Carolina five, South Carolina five, and Georgia three.

48a

When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies.

The House of Representatives shall chuse their Speaker and other Officers; and shall have the sole Power of Impeachment.

2.    U.S. Const. Art. II, § 2, cl. 2-3 provides:

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law:    but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.

49a

3.   U.S. Const. Amend. XIV, § 2 provides:

Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed.   But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the member of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other rime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

4.   2 U.S.C. 2a provides:

**Reapportionment of Representatives; time and manner; existing decennial census figures as basis; statement by President; duty of clerk**

(a)   On the first day, or within one week thereafter, of the first regular session of the Eighty-second Congress and of each fifth Congress thereafter, the President shall transmit to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the seventeenth and each subsequent decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method

50a

known as the method of equal proportions, no State to receive less than one Member.

(b) Each State shall be entitled, in the Eighty-third Congress and in each Congress thereafter until the taking effect of a reapportionment under this section or subsequent statute, to the number of Representatives shown in the statement required by subsection (a) of this section, no State to receive less than one Member. It shall be the duty of the Clerk of the House of Representatives, within fifteen calendar days after the receipt of such statement, to send to the executive of each State a certificate of the number of Representatives to which such State is entitled under this section. In case of a vacancy in the office of Clerk, or of his absence or inability to discharge this duty, then such duty shall devolve upon the Sergeant at Arms of the House of Representatives.

(c) Until a State is redistricted in the manner provided by the law thereof after any apportionment, the Representatives to which such State is entitled under such apportionment shall be elected in the following manner: (1) If there is no change in the number of Representatives, they shall be elected from the districts then prescribed by the law of such State, and if any of them are elected from the State at large they shall continue to be so elected; (2) if there is an increase in the number of Representatives, such additional Representative or Representatives shall be elected from the State at large and the other Representatives from the districts then prescribed by the law of such State; (3) if there is a decrease in the number of Representatives but the number of districts in such State is equal to such de-

51a

creased number of Representatives, they shall be elected from the districts then prescribed by the law of such State; (4) if there is a decrease in the number of Representatives but the number of districts in such State is less than such number of Representatives, the number of Representatives by which such number of districts is exceeded shall be elected from the State at large and the other Representatives from the districts then prescribed by the law of such State; or (5) if there is a decrease in the number of Representatives and the number of districts in such State exceeds such decreased number of Representatives, they shall be elected from the State at large.

5.   13 U.S.C. 141(a)-(b) provides:

**Population and other census information**

(a)   The Secretary shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year, which date shall be known as the "decennial census date", in such form and content as he may determine, including the use of sampling procedures and special surveys.   In connection with any such census, the Secretary is authorized to obtain such other census information as necessary.

(b)The tabulation of total population by States under subsection (a) of this section as required for the apportionment of Representatives in Congress among the several States shall be completed within 9 months after the census date and reported by the Secretary to the President of the United States.