# EXHIBIT A

No. 20-366

IN THE

# Supreme Court of the United States

DONALD J. TRUMP,
PRESIDENT OF THE UNITED STATES, ET AL.,

—v.—

*Appellants,*

NEW YORK, ET AL.,

*Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLEES NEW YORK IMMIGRATION COALITION, MAKE THE ROAD NEW YORK, ARAB-AMERICAN ANTI-DISCRIMINATION COMMITTEE, ADC RESEARCH INSTITUTE, CASA, FIEL HOUSTON, INC., AND AHRI FOR JUSTICE

John A. Freedman
Elisabeth S. Theodore
R. Stanton Jones
Daniel F. Jacobson
ARNOLD & PORTER KAYE
   SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001

Perry Grossman
Christopher Dunn
Arthur N. Eisenberg
NEW YORK CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street
New York, NY 10004

Dale E. Ho
   *Counsel of Record*
Adriel I. Cepeda Derieux
Davin Rosborough
Sophia Lin Lakin
Theresa J. Lee
My Khanh Ngo
Cecillia D. Wang
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street
New York, NY 10004
(212) 549-2693
dho@aclu.org

(*Counsel continued on inside cover*)

Andre I. Segura
Edgar Saldivar
Thomas Buser-Clancy
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288

Julia A. Gomez
Peter J. Eliasberg
ACLU FOUNDATION OF
   SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017

David D. Cole
Sarah Brannon
Ceridwen Cherry
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
915 15th Street, NW
Washington, D.C. 20005

Emily Rong Zhang
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111

## QUESTIONS PRESENTED

1.     Whether Plaintiffs have Article III standing to challenge the Presidential Memorandum excluding undocumented immigrants from the population base used for the apportionment of the House of Representatives.

2.     Whether excluding undocumented immigrants from the apportionment base violates the constitutional and statutory requirements to apportion based on the "whole number of persons in each State." U.S. Const., amend. XIV, sec. 2; 2 U.S.C. § 2a(a).

3.     Whether subtracting undocumented immigrants from the total population count under the census to create a second and distinct population tabulation for apportionment purposes violates the constitutional and statutory requirements to apportion based on "the actual Enumeration," U.S. Const., art. I, sec. 2, defined by statute as the "tabulation of total population by States," 13 U.S.C. § 141(b).

i

## TABLE OF CONTENTS

QUESTION PRESENTED ........................................... i

TABLE OF CONTENTS.............................................. ii

TABLE OF AUTHORITIES ...................................... iv

INTRODUCTION ...................................................... 1

STATEMENT OF THE CASE.................................... 2

SUMMARY OF ARGUMENT .................................. 10

ARGUMENT............................................................ 13

   I.   PLAINTIFFS HAVE STANDING ................. 13

       A.   The Memorandum Will Reduce
           Representation and Federal Resources
           in States where Plaintiffs' Members
           Reside ...................................................... 13

       B.   The Memorandum Injured Plaintiffs by
           Chilling Participation in the Census..... 20

  II.  THE MEMORANDUM VIOLATES
       CONSTITUTIONAL AND STATUTORY
       REQUIREMENTS TO INCLUDE ALL
       PERSONS IN EACH STATE IN THE
       APPORTIONMENT REGARDLESS OF
       IMMIGRATION STATUS.............................. 23

       A.   The Constitution Requires
           Including Undocumented Immigrants
           Residing in Each State in the
           Apportionment Base .............................. 24

       B.   The Census Act and Apportionment Act
           Require Including Undocumented
           Immigrants Residing in this Country
           in the Apportionment Base.................... 34

  C. The Government Does Not Have
   Discretion to Exclude Usual Residents of
   a State from the Apportionment. .......... 36

 III. THE MEMORANDUM VIOLATES THE
  CONSTITUTIONAL AND STATUTORY
  REQUIREMENTS TO BASE APPORTION-
  MENT ON THE DECENNIAL CENSUS
  ALONE .......................................................... 44

  A. The Constitution Requires Using the
   Decennial Census Enumeration as the
   Apportionment Base. ............................ 44

  B. The Text of the Census and
   Reapportionment Acts Require
   Apportionment Based on the
   Decennial Census ................................... 46

  C. The Memorandum Bases Apportionment
   on Data Other Than the Decennial
   Census in Violation of the Constitution
   and Federal Statutes ............................. 48

CONCLUSION.......................................................... 54

iii

## TABLE OF AUTHORITIES

### CASES

*Baldrige v. Shapiro*, 455 U.S. 345 (1982) .................3

*Blanchette v. Conn. Gen'l Ins. Corps.*,
   419 U.S. 102 (1974) .............................................17

*Bostock v. Clayton Cty., Ga.*,
   140 S. Ct. 1731 (2020) ........................................35

*Cannon v. Univ. of Chicago*,
   441 U.S. 677 (1979) .............................................29

*City of San Jose v. Trump*, — F. Supp. 3d —,
   No. 20-CV-05167, 2020 WL 6253433
   (N.D. Cal. Oct. 22, 2020) ............................*passim*

*Clapper v. Amnesty Int'l, USA*,
   568 U.S. 398 (2013) .............................................15

*Dep't of Commerce v. Montana*,
   503 U.S. 442 (1992) .............................................47

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ................................*passim*

*Dep't of Commerce v. U.S. House of
Representatives*, 525 U.S. 316 (1999)..........*passim*

*Dep't of Homeland Security v. Regents of the
Univ. of Cal.*, 140 S. Ct. 1891 (2020) ............15, 43

*Department of Homeland Security v.
Thuraissigiam*, 140 S. Ct. 1959 (2020) ...............43

*Dist. of Columbia v. Heller*,
   554 U.S. 570 (2008) .......................................39, 40

*Evenwel v. Abbott*,
   136 S. Ct. 1120 (2016) .......................27, 28, 30, 31

iv

*Fed. Election Comm'n v. Wis. Right To Life,*
*Inc.*, 551 U.S. 449 (2007) ...............................21, 22

*Fed'n for Am. Immigration Reform v.*
*Klutznick*, 486 F. Supp. 564 (1980).............*passim*

*First Nat'l Bank of Boston v. Bellotti*,
435 U.S. 765 (1978) .............................................21

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ....................................*passim*

*Friends of the Earth, Inc. v. Laidlaw Envtl.*
*Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ........10, 21

*Garza v. Cty. of Los Angeles*,
918 F.2d 763 (9th Cir. 1990) ...............................27

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982) .............................................41

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .............................................20

*Kaplan v. Tod*, 267 U.S. 228 (1925) .........................41

*Kingdomware Techs., Inc. v. United States*,
136 S. Ct. 1969 (2016) .........................................21

*McDonald v. Chicago*, 561 U.S. 742 (2010) .............25

*Mellouli v. Lynch*, 575 U.S. 798 (2015) ....................43

*Michigan v. Long*, 463 U.S. 1032 (1983) ..................20

*Moncrieffe v. Holder*, 569 U.S. 184 (2013) ...............43

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) .............................................13

*Moore v. Ogilvie*, 394 U.S. 814 (1969) ......................23

*Morse v. Republican Party of Va.*,
517 U.S. 186 (1996) .............................................22

*New York v. Dep't of Commerce*,
  351 F. Supp. 3d 502 (S.D.N.Y. 2019) ..................26

*Nielsen v. Preap*, 139 S. Ct. 954 (2019) ....................42

*NLRB v. Noel Canning*, 573 U.S. 513 (2014)...........48

*Plyler v. Doe*, 457 U.S. 202 (1982) ............................24

*Reynolds v. Sims*, 377 U.S. 533 (1964).....................27

*Roe v. Wade*, 410 U.S. 113 (1973).............................23

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018).......42, 43

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) .............................................14

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) .............................................13

*The Venus*, 12 U.S. (8 Cranch.) 253 (1814) ..............40

*United States v. Vonn*, 535 U.S. 55 (2002)...............26

*United States v. W.T. Grant Co.*,
  345 U.S. 629 (1953) .............................................22

*Useche v. Trump*, No. 20-cv-02225,
  2020 WL 6545886 (D. Md. Nov. 6, 2020)....*passim*

*Utah v. Evans*, 536 U.S. 452 (2002) .................*passim*

*Whitman v. Am. Trucking Ass'n*,
  531 U.S. 457 (2001) .............................................17

*Whole Woman's Health v. Hellerstedt*,
  136 S. Ct. 2292 (2016) .........................................23

*Wisconsin v. City of New York*,
  517 U.S. 1 (1996) ....................................19, 31, 44

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ..................42

## CONSTITUTION & STATUTES

U.S Const. art. I, § 2, cl. 3.................................*passim*

U.S. Const. amend. XIV, § 2.............................*passim*

13 U.S.C. § 141................................................*passim*

2 U.S.C. § 2a...................................................*passim*

44 U.S.C. § 1505(a) ...................................................15

Act of May 20, 1852, ch. 275, § 7,
    1852 Mass. Acts & Resolves 190.........................30

Act of Mar. 21, 1821, ch. 122, § 18,
    1821 Me. Laws 422.............................................30

Act of May 5, 1847, ch. 195, § 3,
    1847 N.Y. Laws 184............................................30

## LEGISLATIVE MATERIALS

71 Cong. Rec. 1910 (May 25, 1929) .........................31

71 Cong. Rec. 1919 (May 25, 1929) ..............11, 31, 36

71 Cong. Rec. 2078-83 (May 28, 1929) ...............31, 36

86 Cong. Rec. 4372 (April 11, 1940) ........................32

135 Cong. Rec. 12234 (June 16, 1989) ...............29, 33

135 Cong. Rec. 14539 (July 13, 1989) .....................32

*1980 Census: Counting Illegal Aliens: Hearing
    Before the S. Subcomm. on Energy, Nuclear
    Proliferation, & Fed. Services of the Comm.
    on Gov'tal Affairs* (*1980 Census*),
    96th Cong. 10 (1980) ...........................................32

*1990 Census Procedures and Demographic Impact on the State of Michigan: Hearing Before the Committee on Post Office and Civil Service, House of Representatives*, 100th Cong. 240–44 (1988) .................................. 33

Benjamin B. Kendrick, *The Journal of the Joint Committee of Fifteen on Reconstruction, 39th Congress, 1865-1867* ......... 28

Census Act of 1790, S. 101, 1st Cong., § 5, (1790) .................................................................. 34

Cong. Globe, 39th Cong., 1st Sess. (1865)................ 28

Cong. Globe, 39th Cong., 1st Sess. (1866)....28, 29, 30

*Enumeration of Undocumented Aliens in the Decennial Census: Hr'g on S. 99-314 Before the Subcomm. on Energy, Nuclear Proliferation, & Gov't Processes of the S. Comm. on Governmental Affairs,* 99th Cong. 19 (1985) ........................................... 33

H.R. Rep. No. 1787 (1940) ........................................ 31

*Hr'g Before the H. Comm. on Oversight & Reform*, 116th Cong. 12 (Feb. 12, 2020) ............. 34

S. Rep. No. 71-2 (1929) ...................................... 48, 51

**REGULATIONS & RULES**

83 Fed. Reg. 5525 (Feb. 8, 2018) ...................... *passim*

84 Fed. Reg. 33,821 (July 11, 2019) .................... 5, 16

85 Fed. Reg. 44,679 (July 21, 2020) ................. *passim*

7 C.F.R. § 246.16(c)(3)(i)(A) ...................................... 19

8 C.F.R. § 1.2........................................................... 42

8 C.F.R. § 212.5(d) ..................................................15

8 C.F.R. § 274A.12(C) ............................................. 43

**OTHER AUTHORITIES**

A. Reamer, *Role of 2020 Census in the
    Geographic Allocation of Federal Spending*,
    March 2020 ..........................................................19

Brian Richardson, *The Use of Vattel in the
    American Law of Nations*,
    106 Am. J. Int'l L. 547 (2012).............................. 40

Clarke and Hall, *Cases of Contested Elections
    in Congress* (1834) .........................................37, 39

David Ramsay, *A Dissertation on the Manners
    of Acquiring the Character and Privileges of
    a Citizen of the United States* (1789) ..................37

Decl. of Jennifer Mendelsohn, *New York v.
    Trump*, No. 20-cv-5770-JMF
    (S.D.N.Y. Aug. 25, 2020), ECF No. 149-2 ........... 41

Decl. of Albert E. Fontenot, Jr., *Nat'l Urb.
    League v. Ross*, No. 5:20-cv-05799
    (N.D. Cal. Oct. 1, 2020), ECF No. 284-1 .............16

Decl. of Albert E. Fontenot, Jr., *La Union Del
    Pueblo Entero v. Ross*, No. 8:19-cv-02710-
    PX-PAH-ELH (D. Md. Oct. 2, 2020), ECF
    No. 126-1............................................................16

Emmerich de Vattel, *The Law of Nations*
    (1760) .............................................................39, 40

*Funk & Wagnall's Dictionary* (1923) .......................35

Henry W. Halleck & Sherston Baker,
    *Halleck's International Law*
    (K. Paul, et al. eds., 3d ed. 1893) ........................39

ix

L.F.L. Oppenheim, *Oppenheim's International Law* (2d. ed. 1912) ...............................................39

N. Bailey, *An Etymological English Dictionary* (20th ed. 1763) ..............................................25, 37

Pew Res. Ctr., *5 Facts about Illegal Immigration in the U.S.* (June 12, 2019)............44

*Remarks by President Trump on Citizenship and the Census*, White House (July 11, 2019)..................................................................5

S. Johnson, *A Dictionary of the English Language* (6th ed. 1785)..........................24, 25, 37

*Statement from the President Regarding Apportionment* (July 21, 2020)..............................6

*The Federalist* (N.Y. Heritage Press ed., 1945).....................27, 46

*The Founders' Constitution* (P. Kurland & R. Lerner eds. 1987) ...................45

The Records of the Federal Convention of 1787 (Max Farrand ed., 1911) (J. Wilson)..............27, 38

U.S. Br., *Dep't of Homeland Security v. Thuraissigiam*, No. 19-161, 140 S. Ct. 1959 (2020) ..................................................................43

U.S. Census Bureau, *Frequently Asked Questions on Congressional Apportionment*, https://www.census.gov/topics/public-sector/congressional-apportionment/about/faqs.html#Q6 (last updated Mar. 30, 2020)...............................34

x

U.S. Immigration & Customs Enforcement,
    Fiscal Year 2019 Enforcement and
    Removal Operations Report (2019).....................15

*Webster's Complete Dictionary of the English
    Language* (1864) ...........................................25, 35

## INTRODUCTION

Every apportionment since 1790 has included all people residing in the United States, regardless of citizenship or immigration status. That is what the Constitution and federal statutes demand. Under the Constitution, apportionment must be based on "the whole number of persons in each State," as ascertained by an "actual Enumeration" of the population. U.S. Const. amend. XIV, § 2. Federal statutes likewise require apportionment to be based on the "total population by States," 13 U.S.C. § 141(b), and the "whole number of persons in each State," 2 U.S.C. § 2a.

The terms in these provisions—"persons," "in," and "total population"—are not ambiguous. Every human being who resides in a State must be enumerated, and every enumerated person must be counted toward apportionment. The Fourteenth Amendment's Framers retained the requirement to count all "persons" living in this country precisely to ensure that all immigrants who reside here are counted.

Disregarding the clear constitutional and statutory text, and two centuries of congressional understanding and historical practice, the President issued a Memorandum declaring it the "policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status." Presidential Mem., 85 Fed. Reg. 44,679, 44,680 (July 21, 2020) ("Memorandum"). The Memorandum anticipates that excluding undocumented immigrants from the apportionment will shift representation in Congress; indeed, that is its express purpose. It specifically notes that "one State … home to more than

1

2.2 million illegal aliens" will likely lose "two or three" congressional seats. *Id.*

The three-judge district court below unanimously held that Plaintiffs have standing and that the Memorandum violates federal law. Since that decision, two other three-judge district courts have also unanimously held that the Memorandum is unlawful.

The issues here are "not particularly close or complicated." J.S.App.6a. This Court should affirm.

## STATEMENT OF THE CASE

### A.    Constitutional and Statutory Framework

Seats in the House of Representatives must "be apportioned among the several States according to their respective numbers, counting the *whole number of persons* in each State," ascertained by a decennial "actual Enumeration" of the population. U.S. Const. amend. XIV, § 2 (emphasis added); *id.* art. I, § 2, cl. 3. "[T]he Framers [made] an 'actual Enumeration' part of our constitutional structure" to prevent "political manipulation." *Utah v. Evans*, 536 U.S. 452, 510 (2002) (Thomas, J., concurring in part and dissenting in part).

The Founders and the Framers of the Fourteenth Amendment decided that all people living in the United States must be part of the apportionment base. The Constitution originally counted "the whole Number of free Persons," and discounted only two groups: "Indians not taxed" and slaves, who were infamously counted as "three fifths" of a person. U.S. Const. art. I, § 2, cl. 3. The Fourteenth Amendment revoked the

latter exception; the former was made moot by the Indian Citizenship Act of 1924.

The actual Enumeration must be taken in "such Manner as [Congress] by Law direct[s]." *Id.* In 1929, Congress established a "virtually self-executing," "automatic reapportionment" scheme, proceeding in three steps. *Franklin v. Massachusetts*, 505 U.S. 788, 791-92 (1992). First, the Commerce Secretary must "take a decennial census of population." 13 U.S.C. § 141(a). Second, the Secretary must report to the President "[t]he tabulation of total population by States." *Id.* § 141(b). And third, the President must transmit to Congress "a statement showing the whole number of persons in each State … as ascertained under the … decennial census of the population, and the number of Representatives to which each State would be entitled." 2 U.S.C. § 2a(a).

Census data are also the "linchpin of the federal statistical system." *Dep't of Commerce v. U.S. House of Representatives* ("*U.S. House*"), 525 U.S. 316, 341 (1999) (quotation marks omitted). They are used for myriad purposes, including "computing federal grant-in-aid benefits." *Baldrige v. Shapiro*, 455 U.S. 345, 353-54, n.9 (1982).

## B. The Unbroken History of Including Undocumented Immigrants in the Census.

Congress and "the Executive Branch ha[ve] … always taken the view" that federal law "prohibit[s] [the] exclusion of illegal aliens from the apportionment base due to legal status alone." J.S.App.90a. Accordingly, "[t]he Census Bureau has always attempted to count every person residing in a State on Census

Day, and the population base for purposes of appor-
tionment has always included all persons, including
aliens both lawfully and unlawfully within our bor-
ders." *Fed'n for Am. Immigration Reform v. Klutznick*,
486 F. Supp. 564, 576 (1980) ("*FAIR*") (three-judge
court), *appeal dismissed*, 447 U.S. 916 (1980).

Under the Census Bureau's current "Residence
Rule," *Final 2020 Census Residence Criteria and Res-
idence Situations*, 83 Fed. Reg. 5525 (Feb. 8, 2018),
"[c]itizens of foreign countries living in the United
States" are to be "[c]ounted at the U.S. residence
where they live and sleep most of the time." *Id.* at
5533.

## C.    The Citizenship Question and the 2019
Executive Order

In March 2018, the Commerce Secretary an-
nounced that a citizenship question would be part of
the 2020 Census questionnaire. He claimed to act "at
the request of the Department of Justice," which pur-
portedly sought "data about citizen voting-age popula-
tion for purposes of enforcing the Voting Rights Act (or
VRA)." *Dep't of Commerce v. New York*, 139 S. Ct.
2551, 2562 (2019). This Court held that "the VRA en-
forcement rationale" was "contrived" as a "distraction"
from the agency's real reason, and vacated the Secre-
tary's decision as pretextual. *Id.* at 2575-76.

Shortly afterwards, on July 11, 2019, the President
issued Executive Order 13,880, *Collecting Information
About Citizenship Status in Connection with the De-
cennial Census*, 84 Fed. Reg. 33, 821. It requires that
"every department and agency in the federal govern-
ment … provide the Department of Commerce with …

4

records regarding the number of citizens and non-citizens in our country … immediately," which the President described as "relevant to "representation in Congress," and a necessary response to "the Supreme Court's decision" in the citizenship question case.[1]

The Order explained that the Census Bureau already "had access" to administrative records that "would enable it to determine citizenship status for approximately 90 percent of the population." 84 Fed. Reg. 33,821. Those records, the Order said, could be "combine[d]" to "generate a more reliable count of the unauthorized alien population in the country," and "the aggregate number of aliens unlawfully present in each State." *Id.* at 33,823.

### D.    The Presidential Memorandum

One year later, on July 21, 2020, the President issued a Memorandum titled "Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census." 85 Fed. Reg. 44,679.

The Memorandum declares, for the first time in history, that "the policy of the United States [is] to exclude from the apportionment base aliens who are not in a lawful immigration status." *Id*. at 44,680. It asserts that "States adopting policies that encourage illegal aliens to enter this country … should not be rewarded with greater representation in the House of Representatives." *Id.* And it "anticipates that excluding illegal aliens from the apportionment count could reduce the number of representatives in States with

---

[1] *Remarks by President Trump on Citizenship and the Census*, White House (July 11, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-citizenship-census/.

large immigrant populations, noting explicitly that in 'one State … home to more than 2.2 million illegal aliens'—apparently, California—the inclusion of illegal aliens could 'result in the allocation of two or three more congressional seats than would otherwise be allocated.'" J.S.App.19a (quoting 85 Fed. Reg. at 44,680).

The Memorandum issued while "the census was in full swing," *id*. at 46a, without notice to the public or the Census Bureau. The President described it as fulfilling his "commitment" "to determine the citizenship status of the United States population."[2]

Defendants subsequently told Congress and the district court that the Memorandum would not affect "the actual census, but an apportionment number … chosen by the President *after the census is complete*." Supp.App.110a-11a (emphasis added). Defendants described the Memorandum as directing the Commerce Secretary to report "two sets of numbers" to the President: the census-enumerated total population tallied according to the "Residence Rule," which includes undocumented immigrants; and a "second tabulation" excluding undocumented immigrants. *Id*. at 28a; *see also id*. at 79a. The "President will choose [the latter] to plug into the 'method of equal proportions'" to determine the apportionment. *Id*.

### E.    Proceedings Below

On July 24, 2020, Plaintiffs—a group of States, localities, and non-governmental organizations

---

[2] *Statement from the President Regarding Apportionment* (July 21, 2020), https://www.whitehouse.gov/briefings-statements/statement-president-regarding-apportionment/.

engaged in census outreach—sued, raising constitu-
tional and statutory claims. A three-judge panel was
convened under 28 U.S.C. § 2284(b).

Plaintiffs moved for partial summary judgment,
presenting dozens of declarations describing ongoing
and imminent injuries caused by the Memorandum.
On September 10, the court unanimously granted
Plaintiffs' motion.

First, the court concluded that Plaintiffs had
standing. It cited "undisputed evidence" that the
Memorandum caused "widespread confusion among
illegal aliens and others as to whether they should
participate in the census." J.S.App.44a, 35a. Those
"deterrent effects … increase[d] costs for census out-
reach programs run by [Plaintiff] NGOs and govern-
ments." *Id.* at 35a. The court did not decide whether
Plaintiffs also have standing based on the Memoran-
dum's effect on apportionment or federal funding. *Id*.
at 43a.

On the merits, the court ruled that the Memoran-
dum violated the statutes governing apportionment—
2 U.S.C. § 2a and 13 U.S.C. § 141—in two ways.

First, it concluded that the Memorandum violates
the requirement to base apportionment on the
decennial census. The statutes require the Secretary
to report to the President a single "tabulation of total
population by States under the 'decennial  census'—
and the President is required to use those same fig-
ures to determine apportionment." J.S.App.78a. The
district court held that the President's plan to
"choos[e]" a different "apportionment number … after
the census is complete" violates "Congress's mandate
to use the results of the census—and only the results

7

of the census—in connection with the apportionment." *Id.* at 79a, 82a (quoting Supp.App.110a-11a).

Second, the court determined that by excluding "illegal aliens," the Memorandum violates statutory directives to base apportionment on the "total population by States," 13 U.S.C. § 141(b), and "the whole number of persons in each State," 2 U.S.C. § 2a. "[L]ook[ing] to 1929, when Section 2a was enacted," J.S.App.87a, the court concluded that Congress understood the phrase "whole number of persons in each State" to include all persons living in the country—regardless of immigration status—because "the Constitution mandated inclusion of illegal aliens residing in the United States." *Id.* at 88a.

The court did not reach Plaintiffs' constitutional claims. *Id*. at 102a.

The court enjoined the Commerce Secretary from including "any information concerning the number of aliens in each State 'who are not in a lawful immigration status," and ordered that the apportionment report include only the results of the 2020 decennial census. *Id*. at 99a. The court also issued a "declaration that the Presidential Memorandum is unlawful." *Id.* at 102a.

### F.    Related Proceedings

On October 22, a three-judge court in the Northern District of California also ruled that "apportionment must be based on all persons residing in each state, including undocumented immigrants." *City of San Jose v. Trump*, — F. Supp. 3d —, No. 20-CV-05167, 2020 WL 6253433, at *25 (N.D. Cal. Oct. 22, 2020) (per curiam).

8

*San Jose* found standing based on the apportionment injury that the court below did not reach, determining that several States suffered a "substantial risk of the loss of a congressional seat." *Id.* at \*20. The court reached that conclusion based on, *inter alia*: (1) defendants' access to citizenship status records for almost 90 percent of the population; (2) the Memorandum's clear intent to "have 'maximum' exclusion" of undocumented immigrants, to reallocate two or more congressional seats; (3) expert evidence showing likely shifts in apportionment; and (4) the lack of any evidence that the Secretary would face obstacles implementing the Memorandum's policy to exclude all undocumented immigrants from the apportionment base. *Id.* at \*34-35.

The court then held that the Memorandum was unconstitutional. Analyzing "the Constitution's text, drafting history, 230 years of historical practice, and Supreme Court case law," *id.* at \*45, it determined that "[t]he Constitution used the term 'persons,' … to describe those who were to be included in the apportionment base…. [and that term] includes undocumented immigrants." *Id.* at \*28. The court further concluded that "undocumented immigrants who regularly reside in each state are 'inhabitants' with their 'usual residence' in their state of residence," and must be part of the apportionment base. *Id.*

On November 6, another three-judge court found standing to challenge the Memorandum based on its effect on apportionment, and held that it violates federal statutes. *Useche v. Trump*, No. 20-cv-02225, 2020 WL 6545886, at \*5 (D. Md. Nov. 6, 2020) (per curiam).

9

## SUMMARY OF ARGUMENT

I.    Plaintiffs have standing to challenge the Memorandum.  The policy of excluding undocumented immigrants from the apportionment base puts Plaintiffs at a "substantial risk" of harm.  *New York*, 139 S. Ct. at 2565.  The Memorandum's stated purpose and anticipated effect is to deprive States in which Plaintiffs' members live of congressional seats.  That harm is not speculative; Defendants have confirmed that they will implement the Memorandum's policy in January, less than two months from now.

The Memorandum's deterrent effect on census response also injured Plaintiffs, by depressing the count and forcing Plaintiffs to divert resources to encourage participation.  That census outreach is complete does not moot this aspect of the case.  Excluding undocumented immigrants from apportionment is now national policy; thus, the controversy is capable of repetition yet otherwise likely to evade review.  "[A]bandon[ing] the case at this stage" would prove "more wasteful than frugal." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191-92 (2000).

II.    The Memorandum violates constitutional and statutory requirements that the apportionment base include all persons in each State, without regard to immigration status.  The Enumeration Clause and the Fourteenth Amendment are clear: *all* "persons in each State" must be included "according to their respective numbers" in apportionment.  U.S. Const. amend. XIV, § 2; *id.* art. I, § 2, cl. 3.  This command is clear by design.  The Founders and the Fourteenth Amendment's Framers intended for the total population of each

State to be the apportionment lodestar. That under-
standing was critical to ratification at the Founding
and in 1868. The Fourteenth Amendment's drafters
in fact stated that they retained total population as
the measure specifically to ensure that all immigrants
would be counted.

The statutory scheme that implements these con-
stitutional commands reflects the same understand-
ing. Its history confirms that Congress intended to in-
clude all immigrants, even those who "are not legally
or properly here." 71 Cong. Rec. 1919 (1929). The
Memorandum also contradicts more than two centu-
ries of consistent understanding and practice by all
branches of Government, including every court to con-
sider the question. Indeed, the Census Bureau has al-
ways recognized that "[f]oreign citizens are considered
to be 'living' in the United States if, at the time of the
census, they are living and sleeping most of the time
at a residence in the United States." 83 Fed. Reg.
at 5530.

III.    The Memorandum separately violates con-
stitutional and statutory requirements that appor-
tionment be based solely on the results of the decen-
nial census, and not on any other number. The Found-
ers tethered apportionment to the decennial census to
forestall "manipulation" of the apportionment base for
political advantage. *Utah*, 536 U.S. at 510 (Thomas,
J., concurring in part and dissenting in part). The
Census and Reapportionment Acts fulfill that purpose
through a simple, interlocking structure requiring
that apportionment use the total population from the
decennial census.

11

The decennial census has been the sole basis of every reapportionment since 1790. The Memorandum's policy of subtracting undocumented immigrants who were actually enumerated means that, for the first time in history, apportionment will not be based on "total population," and will instead be based on something other than the decennial census results. The President's supervisory powers over the census cannot and do not include unfettered discretion to remove enumerated persons from the apportionment base. Permitting otherwise would license the very "political chicanery" that the Founders sought to prevent. *Id*. at 500.

12

## ARGUMENT

### I.   PLAINTIFFS HAVE STANDING

The Memorandum's stated aim is to reduce the congressional representation of States with relatively large numbers of undocumented residents. Defendants have been actively working to carry out that goal for months, and will issue their report within weeks, creating more than a "substantial risk" that Plaintiffs' members will lose representation. Moreover, given Defendants' new position on appeal that the Memorandum will alter the census itself, the Memorandum will also reduce federal funding to States with undocumented immigrant residents. And, as the court below found, the Memorandum chilled the census count—a repeatable injury that evades review. Plaintiffs therefore have standing.

### A. The Memorandum Will Reduce Representation and Federal Resources in States where Plaintiffs' Members Reside.

Future injury suffices for Article III standing if "there is a 'substantial risk' that [it] will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted).  The "substantial risk" of reduced representation and federal resources "are readily attributable to" the Memorandum.  *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 155 (2010).

1.  There is a "substantial risk" that the Memorandum's "goal of excluding undocumented immigrants from the census count" will diminish the congressional representation of States in which Plaintiffs' members live.  *San Jose*, 2020 WL 6253433, at \*18.  The Mem-

13

orandum makes it official policy to exclude *all* undoc-
umented immigrants from the apportionment base "to
the maximum extent." 85 Fed. Reg. at 44,680. Its ex-
press purpose is to deprive States of what the Presi-
dent views as unwarranted representation, and it an-
ticipates that its implementation will deprive "one
State"—California—of "two or three more congres-
sional seats than would otherwise be allocated." 85
Fed. Reg. at 44,680. Two Plaintiff organizations have
members in California. J.A.123, 197. Undisputed ex-
pert evidence shows that Texas, home to many of the
organizational Plaintiffs' members, *id.* at 110, 123,
has a 98.3% chance of losing a congressional seat un-
der Defendants' policy. *Id.* at 366-67.

Because it is "virtually certain" that California and
Texas will "lose a seat … under the [challenged] Plan,"
Plaintiffs have standing. *U.S. House*, 525 U.S. at 330
(affirming standing on summary judgment in pre-ap-
portionment challenge). *Any* shift in apportionment
would suffice. Plaintiff American-Arab Anti-Discrim-
ination Committee (ADC) has members in all 50
States, J.A.123, so if any State loses a seat, then "all
the members of" ADC in that State would be "af-
fected." *Summers v. Earth Island Inst.*, 555 U.S. 488,
498-99 (2009). Standing thus does not turn on "spec-
ulation" about the precise effects on apportionment.
Appellants' Br. ("Br.") 19. The undisputed evidence
and the Memorandum itself confirm that removing
undocumented immigrants from apportionment will
deprive certain States of representation.

Caveats to the Memorandum's feasibility do not
defeat standing. The "government cannot [] evade ju-
dicial review by invoking qualifying language such as
'to the extent feasible,'" or claiming uncertainty as to

14

exactly how many persons will be excluded. *San Jose*, 2020 WL 6253433, at \*17. The Memorandum commands excluding undocumented immigrants from the apportionment base to the "maximum" extent. It was published in the Federal Register, 85 Fed. Reg. 44,679, giving it "general applicability and legal effect." 44 U.S.C. § 1505(a). Unlike the surveillance statute in *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398 (2013), *see* Br. 18, the Memorandum does not simply "authorize[]," but "*mandate*[*s*]" and "*direct*[*s*]," excluding undocumented immigrants to alter apportionment. 568 U.S. at 412.

Defendants' unsubstantiated speculation that the Government *might* fail to carry out the Memorandum's explicit purpose does not make this case nonjusticiable. Defendants have acknowledged the Government can individually identify "significant populations" of undocumented immigrants. J.S.29 n.4 (50,000 ICE detainees, and 3.2 million individuals on ICE's "non-detained docket"); *see also Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1901 (2020) (referencing "[s]ome 700,000" DACA recipients). The ICE report that Defendants cite, J.S.29 n.4, notes that the 3.2 million individuals on ICE's non-detained docket were released on parole, bond or order of supervision.[3] Most would have accordingly provided address information to the Government as a condition of release. *See, e.g.*, 8 C.F.R. § 212.5(d) (parolees must name a sponsor with an address).

---

[3] *See* U.S. Immigration & Customs Enforcement, *Fiscal Year 2019 Enforcement and Removal Operations Report* 10-11 (2019), https://go.usa.gov/xG8vT.

15

Moreover, as of July 2019, Defendants "ha[d] access" to administrative records that "would enable [them] to determine citizenship status for approximately 90 percent of the population." 84 Fed. Reg. at 33,821-22. Under the 2019 Executive Order, Defendants are combining this information with additional records to "generate a more reliable count of … the aggregate number of aliens unlawfully present in each State." *Id.* at 33,823. *See also San Jose*, 2020 WL 6253433, at \*20 (Defendants acknowledged that, since July 2019, they have been "obtain[ing] administrative records" to attempt "to ascertain the illegal alien population.").

Defendants admit that, by December 31, the Census Bureau will provide data sufficient to "exclude from the apportionment base" undocumented immigrants "in ICE Detention Centers." Appellants' Supp.Br. 5. Defendants also admit that the Bureau will provide "other Presidential Memorandum-related outputs by January 11,"[4] as "necessary to *fully implement* the Presidential Memorandum."[5] Given that "the Bureau is certain enough … that it can quantify—to the day—how long [it] will take" to implement the Memorandum, Defendants' litigation-posture protestations of uncertainty ring hollow. *Useche*, 2020 WL 6545886, at \*6.

---

[4] Decl. of Albert E. Fontenot, Jr. ¶ 8, *La Union Del Pueblo Entero v. Ross*, No. 8:19-cv-02710-PX-PAH-ELH (D. Md. Oct. 2, 2020), ECF No. 126-1.

[5] Decl. of Albert E. Fontenot, Jr. ¶ 26, *Nat'l Urb. League v. Ross*, No. 5:20-cv-05799 (N.D. Cal. Oct. 1, 2020), ECF No. 284-1 (emphasis added)).

More telling is the fact that Defendants do not identify a single obstacle that would stop them from excluding undocumented immigrants from the apportionment base.   The Secretary's report is due one month after the Court hears argument, and Defendants have specified precise dates in December and January by which the Census Bureau will deliver data on the undocumented population.  Defendants clearly know by now how they intend to implement the Memorandum.  Given the Memorandum's explicit goal, Defendants' actions to implement it, the absence of any evidence of obstacles, and unrebutted expert evidence, there is a "substantial risk" that implementing the Memorandum will shift the allocation of at least one House seat.  That is enough for standing.

2.  Defendants' real objection is not so much that Plaintiffs' apportionment-related injuries are not concrete, but that their claims are unripe.  That argument fails too.  The case is fit for judicial decision now, and delay will cause substantial hardship.  *See Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 479 (2001).

First, the constitutional and statutory questions are purely legal, and "would not 'benefit from further factual development.'"  *Id.* at 458 (citation omitted). As in *U.S. House*, where the Court adjudicated the legality of a plan to use statistical sampling before the census took place, Plaintiffs' claims here are ripe. J.S.App.24a.  Either the President may lawfully exclude people based solely on their status as "illegal aliens," or not.  More facts or new developments cannot conceivably change the answer.  *Cf. Blanchette v. Conn. Gen'l Ins. Corps.*, 419 U.S. 102 (1974) (purely legal challenge to specialized railroad reorganization

17

process was ripe, notwithstanding lack of final plan to restructure assets).

Second, withholding review would needlessly cause severe hardship to Plaintiffs and the public. Defendants themselves have argued that "a post-apportionment remedy … would undermine the point of the deadlines established by Congress … to provide prompt notice to the Nation about the new apportionment." Mot. for Expedited Consideration at 6. They maintained that *any* delay in finalizing census data will make it "impossible to meet" as many as "24 state[s'] [redistricting] deadlines." *San Jose*, 2020 WL 6253433, at \*25 (citation omitted). "States usually receive data by the end of March to use in their redistricting cycles." *Id*. Some—like Texas, where many non-governmental Plaintiffs' members reside, J.A.110—have deadlines as early as May 2021, and would have to redistrict without knowing how many congressional districts they will ultimately have. *San Jose*, 2020 WL 6253433, at \*24. "[I]t is hard to see why it would be desirable" to defer resolution, risking "the efforts of states to complete their own redistricting on schedule." *Useche*, 2020 WL 6545886, at \*8 (citing *U.S. House*, 525 U.S. at 328-34). Having granted Defendants' request to hear this case on an expedited basis now, the Court should reject their opportunistic ripeness argument.

3. Defendants' new representations on appeal, if credited, also establish a "substantial risk" of federal funding-related injuries. Below, Defendants insisted that the Memorandum would not affect the "census itself." J.S.App.97a. They now imply that the Memorandum *will change* the census, by "remov[ing] per-

18

sons from 'the census'" who purportedly "were improperly included in questionnaire responses." Br. 29. *See also* J.S.19 (representing that undocumented immigrants will be eliminated from the "census tabulation").

If the Memorandum alters the decennial census, then it will necessarily injure Plaintiffs, as "the census is used … to allocate federal funds to the States." *New York*, 139 S. Ct. at 2561 (citing *Wisconsin v. City of New York*, 517 U.S. 1, 5-6 (1996)). Funding will be affected even in States where apportionment is unchanged, because even "one missed person" can cause a reduction in federal funding.[6] *Cf. New York*, 139 S. Ct. at 2565 (undercounting "by as little as 2%" will cause a loss of "federal funds that are distributed on the basis of state population"). Many federal programs, including those on which Plaintiffs' members rely, distribute funding based on per State census population counts. *See* 7 C.F.R. § 246.16(c)(3)(i)(A) (WIC grants distributed based in part on a State's share of the total population*); see also* J.A.242 (Plaintiff CASA members rely upon WIC), *id.* at 129-30 (Plaintiff ADC members in New Jersey rely on federal funding). Excluding *any* undocumented immigrants from the census substantially risks a funding reduction.

---

[6] A. Reamer, *Role of 2020 Census in the Geographic Allocation of Federal Spending* 11 (March 2020), at https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/Reamer%20COPAFS%2003-06-20%20rev2.pdf.

### B. The Memorandum Injured Plaintiffs by Chilling Participation in the Census.

Plaintiffs also have standing based on the Memorandum's chilling effect on the census count—an injury that satisfies Article III, and fits within the capable-of-repetition-yet-evading-review exception to mootness.

1. The record contains "undisputed evidence that the Memorandum [was] affecting the census count," J.S.App.44a, by causing "widespread confusion among illegal aliens and others as to whether they should participate in the census." *Id.* at 35a. As a result, Plaintiffs were forced to divert substantial resources "in response to the Presidential Memorandum's chilling effects on participation in the census." *Id.* at 57a. *Cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Plaintiffs' injuries stemmed from "the predictable effect of government action on the decisions of third parties." *New York*, 139 S. Ct. at 2566. They were sufficient to establish standing in *New York*, and they are sufficient here.[7]

Defendants argue these injuries no longer suffice now that census outreach is over, but they bear a "heavy burden" of establishing that the case is moot. *Michigan v. Long*, 463 U.S. 1032, 1042 n.8 (1983). This is because, "by the time mootness is an issue, the

---

[7] Defendants object to a purported "mismatch" between relief and injury. But nothing forecloses relief for present injury caused by a threat to take future adverse action. If a secretary of state publicly planned to throw out all ballots cast by Republican voters in an election, surely a court could provide relief *before* the election based on the chilling effect on turnout.

case has been brought and litigated," and "[t]o aban-
don the case at an advanced stage may prove more
wasteful than frugal." *Friends of the Earth*, 528 U.S.
at 191-92. That is particularly so here, given that the
Memorandum's implementation is merely weeks
away.

2. Moreover, Plaintiffs' chilling-effect injuries are
exempt from mootness because they are "capable of
repetition, yet evading review." *First Nat'l Bank of
Boston v. Bellotti*, 435 U.S. 765, 774 (1978).

First, the census count runs for eight or nine
months—"too short" to allow a challenge based on
chilling participation "to be fully litigated prior to ces-
sation or expiration." *Fed. Election Comm'n v. Wis.
Right To Life, Inc.* ("*FEC*"), 551 U.S. 449, 462 (2007);
*cf. Kingdomware Techs., Inc. v. United States*, 136 S.
Ct. 1969, 1976 (2016) ("two years is too short to com-
plete judicial review").

Defendants argue that this matter will not evade
review because a different injury—to apportion-
ment—could be reviewed after the President submits
his statement to Congress. Br. 16. But Defendants
also posit that there may be no apportionment injury
at all. *Id.* at 19. Defendants cannot simultaneously
argue that the Memorandum's effect on apportion-
ment is at once too speculative for standing, yet cer-
tain enough to ensure that this dispute will not escape
review. If there is substantial risk of *any* change to
apportionment, then Plaintiffs (who have members in
every State) have standing on that basis. If there is
no such risk, then the requirements for the capable-of-
repetition exception are satisfied, and the policy inter-
ests underlying it apply with full force.

21

Second, "there is a reasonable expectation that the same complaining party will be subject to the same action again." *FEC*, 551 U.S. at 462. The Memorandum is the "policy of the United States," was published in the Federal Register, and has the force of law. The government has not "disavowed" it. *Morse v. Republican Party of Va.*, 517 U.S. 186, 235 n.48 (1996) (plurality op. of Stevens, J.). Defendants' speculation that the policy might change in 2030 is irrelevant: the possibility that a later legislature might repeal a challenged statute does not preclude application of the capable-of-repetition exception. Even when the government ceases a challenged policy, it bears the "heavy burden" of demonstrating that there is "no reasonable expectation that the wrong will be repeated" to establish mootness. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). If the Government generally cannot avoid review on mootness grounds by *actual* voluntary cessation, it surely cannot avoid review by speculating that the law *might* change in the future.

Absent relief, Plaintiffs face recurring injuries. The non-governmental Plaintiffs are well-established organizations that reasonably expect to conduct similar work for the 2030 census. The New York Immigration Coalition, for example, was founded in 1987. And the State and local governmental Plaintiffs will clearly be subject to the 2030 Census. If the judgment below is reversed, the challenged policy will chill participation in the 2030 Census, injuring Plaintiffs in precisely the same way it harmed them this year. But by Defendants' logic, a challenge in 2030 would not be ripe until that census and the apportionment were complete. By then, any injuries to the count would again evade review.

The fact that the 2030 Census is ten years away does not render the exception inapplicable. This Court has never held that the "capable of repetition" exception requires an injury to repeat within a particular time period. It has applied the exception to injuries that would not recur for at least four years—conceptually, no different from ten. *See Moore v. Ogilvie*, 394 U.S. 814, 816 (1969) (applying exception to challenge to rules for nominating candidates for president). And pregnant women challenging an abortion restriction—the exception's paradigmatic application—need not "show[] that they intend[] to become pregnant and seek an abortion again," *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2323 (2016) (Thomas, J., dissenting), let alone within any particular timeframe, in order to invoke it. *See also Roe v. Wade*, 410 U.S. 113, 125 (1973). Here, there will surely be another census.

## II. THE MEMORANDUM VIOLATES CONSTITUTIONAL AND STATUTORY REQUIREMENTS TO INCLUDE ALL PERSONS IN EACH STATE IN THE APPORTIONMENT REGARDLESS OF IMMIGRATION STATUS.

The Memorandum's policy of excluding undocumented immigrants from the apportionment base contravenes constitutional and statutory mandates to apportion representatives based on all persons who live in a State.

23

## A. The Constitution Requires Including Undocumented Immigrants Residing in Each State in the Apportionment Base.

The Constitution's text, history, and consistent interpretation by all three branches of Government over more than two centuries all point to a single conclusion: the Constitution requires counting all "persons in each State" in the apportionment base—including undocumented immigrants.

1. Defendants devote little attention to the actual constitutional text. Article I requires that apportionment be based on the "whole Number of free Persons" counted in the "actual Enumeration." U.S Const. art. I, § 2, cl. 3. The Fourteenth Amendment similarly mandates apportionment based on "the whole number of persons in each State." *Id.* amend. XIV, § 2. "[This] language of the Constitution is not ambiguous." *FAIR*, 486 F. Supp. at 576. As the Court has explained, "an alien is surely a 'person' in any ordinary sense of that term," "[w]hatever his status under the immigration laws." *Plyler v. Doe*, 457 U.S. 202, 210 (1982).

Defendants do not dispute that undocumented immigrants are "persons." Br. 29. Instead, they assert that undocumented immigrants are not "in" a State, because they are not *lawfully* present. *Id.* at 37. That tortures the plain meaning of "in," and adds an atextual requirement of lawful presence. At the Founding, "in" referenced "the place where any thing is present." S. Johnson, *A Dictionary of the English Language* (6th ed. 1785). It had the same meaning when the Fourteenth Amendment was ratified, and the phrase "persons in each State" was added to the Constitution. *See*

*Webster's Complete Dictionary of the English Language* 692 (1864) ("Within, inside of, surrounded by"). The Framers employed simple, straightforward language in the Fourteenth Amendment. *See McDonald v. Chicago*, 561 U.S. 742, 813 (2010) (Thomas, J., concurring) (in interpreting the Fourteenth Amendment, the Court "discern[s] what 'ordinary citizens' at the time of ratification would have understood"). Undocumented persons living in each State are covered by that plain language.

The "gloss given the constitutional phrase 'in each State'" has consistently been "usual residence." *Franklin*, 505 U.S. at 804. "Usual" has always meant "Common; frequent; customary; frequently occurring." S. Johnson, 2 *A Dictionary of the English Language* (6th rev. ed. 1785).[8] "Residence" has long meant the "Act of dwelling in a place. 2. Place of abode; dwelling." *Id.*[9] Thus, a person's "usual residence" is their common dwelling—where they live and sleep. And "a person's immigration status is irrelevant to the state which she regularly occupies or to her 'usual residence.'" *Useche*, 2020 WL 6545886, at *10. While "foreign tourists" temporarily present within the United States are not "usual residents," no plausible understanding of the term excludes persons who actually live in the United States simply because they are not in lawful status.

---

[8] *See also* N. Bailey, *An Etymological English Dictionary* (20th ed. 1763) ("one that serves for use, common, ordinary.").

[9] *See also* N. Bailey, *supra* n.8 ("continual dwelling or sojourning in a Place, Abode, or Dwelling-Place.").

That the Framers included two explicit excep-
tions—neither of which turned on immigration sta-
tus—confirms that all persons residing in the United
States must count toward apportionment. The origi-
nal Apportionment Clause excluded "Indians not
taxed," and infamously counted slaves as only three-
fifths of a person for apportionment. U.S. Const.
art. I, § 2, cl. 3. "By making express provision for In-
dians and slaves, the Framers demonstrated their
awareness that" the provision's otherwise "all-inclu-
sive" language does not permit the exclusion of any
other residents. *FAIR*, 486 F. Supp. at 576; *cf. United
States v. Vonn*, 535 U.S. 55, 65 (2002) (citing *expressio
unius* canon).

Every federal judge to consider the question has
agreed that "the federal government [must] endeavor
to count every single person residing in the United
States, whether citizen or noncitizen, whether living
here with legal status or without," and must "appor-
tion Representatives among the states" on that basis.
*New York v. Dep't of Commerce*, 351 F. Supp. 3d 502,
514 (S.D.N.Y. 2019). Four different three-judge pan-
els, including the court below, have unanimously
reached that conclusion. *See FAIR*, 486 F. Supp. at
576; J.S.App.83a-92a; *San Jose,* 2020 WL 6253433, at
*27-*28; *Useche*, 2020 WL 6545886, at *9.

2. If any doubt remains, the constitutional history
resolves it. Both the Founders and the Fourteenth
Amendment's Framers debated the proper basis for
apportionment, and concluded that it must be the to-
tal population, including noncitizens, residing in the
United States.

"At the time of the founding, the Framers con-
fronted the question" of how to allocate seats in the

new Government to the States. *Evenwel v. Abbott*, 136 S. Ct. 1120, 1127 (2016). Their compromise was to "provide each State the same number of seats in the Senate, and to allocate House seats based on States' total population," that is, "'*according to their respective Numbers*.'" *Id.* (quoting U.S. Const. art. I, § 2, cl. 3) (emphasis added). Rejecting proposals to allocate House representation based on wealth or property, they opted instead for total population, making the House "the most exact transcript of the whole Society," 1 *The Records of the Federal Convention of 1787* ("Farrand's Records"), 132 (Max Farrand ed., 1911) (J. Wilson), and representative of "every individual of the community at large," *id.* at 473 (A. Hamilton). They insisted that all people would "be included in the census by which the federal Constitution apportions the representatives," even though most were "deprived of [the] right" to vote, *The Federalist* No. 54 (Madison), at 368 (N.Y. Heritage Press ed., 1945) ("*The Federalist*"), including "women, children, bound servants, convicts, the insane, and … aliens," *Garza v. Cty. of Los Angeles*, 918 F.2d 763, 774 (9th Cir. 1990).

The Fourteenth Amendment's Framers reaffirmed the "basic constitutional standard" contemplating "equal representation for equal numbers of people." *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). They considered and rejected proposals to base the apportionment on other metrics, but retained total population to ensure that *all* immigrants, as well as formerly enslaved persons, would be included.

"Concerned that Southern States would not willingly enfranchise freed slaves," the Framers "considered at length the possibility of allocating House seats

to states on the basis of voter[s]" or citizens, but ultimately rejected those options. *Evenwel*, 136 S. Ct. at 1127 (quotations omitted). Thaddeus Stevens proposed apportioning Representatives "according to their respective legal voters," which would have excluded those "who [we]re not either natural-born citizens or naturalized foreigners." Cong. Globe, 39th Cong., 1st Sess. 10 (1865). The Joint Committee of Fifteen on Reconstruction initially voted to base apportionment on "the whole number of *citizens* of the United States in each state." Benjamin B. Kendrick, *The Journal of the Joint Committee of Fifteen on Reconstruction, 39th Congress, 1865-1867*, 49-52 (emphasis added).

Representative Conkling, however, "moved to amend the proposed article by striking out the words 'citizens … in each state,' and inserting in lieu thereof the words, 'persons in each State, including Indians not taxed." *Id.* at 52. Conkling's purpose was to ensure that all noncitizens living in the country would count. Using "citizens" instead of "persons," he argued, would "cause considerable inequalities …, [as] the number of aliens in some States [was] very large, and growing larger." Cong. Globe, 39th Cong., 1st Sess. 359 (1866). "[M]any of the large States [held] their representation in part by reason of their aliens," Conkling added, and the Fourteenth Amendment had to "be acceptable to them" to ensure ratification. *Id.*

The Joint Committee adopted Conkling's amendment, which he explained was consistent with the Founders' vision that "representation … was to be based upon population, independent of the franchise,

28

independent of citizenship." *Id.* at 2944.[10] As Senator Howard said in introducing the final version of the Fourteenth Amendment, "numbers" remained the "basis of representation." *Id.* at 2766-67. "Numbers, not voters; numbers not property; this is the theory of the Constitution." *Id.*

3. Defendants' suggestion that the Framers of the Fourteenth Amendment could not foresee that the Amendment's broad and unequivocal language would embrace undocumented immigrants, Br. 35, is irrelevant. It is also incorrect. Congress is presumed to understand the "contemporary legal context" in which it acts, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 699 (1979), and as the Justice Department explained in opposing a 1988 bill to excise undocumented immigrants from the census, "[i]t was … possible to be an illegal alien in 1866," because "[t]he United States has had a statute since 1798 governing arrest and exclusion of aliens from hostile countries," which "had been exercised prior to 1866."[11]  Various State laws simi-

---

[10] *See, e.g.*, Cong. Globe, 39th Cong., 1st Sess. 141 (1866) (Rep. Blaine) ("[N]o one will deny that population is the true basis of representation; for women, children, and other non-voting classes may have as vital an interest in the legislation of the country as those who actually deposit the ballot"); *id.* at 2944 (Sen. Edmunds) ("The fathers who founded this Government acted upon the idea ... that the representation … was to be based upon population, independent of the franchise, independent of citizenship.").

[11] Letter from Carol T. Crawford, Ass't Attorney Gen., to Sen. Bingaman (Sept. 22, 1989) ("Crawford Letter"), *in* 135 Cong. Rec. 12234 (1989).

larly prohibited entry by or presence of certain migrants.[12] Nevertheless, as Representative John Bingham, the Fourteenth Amendment's principal drafter, insisted, the "*whole immigrant population* should be numbered with the people and counted as part of them," because "[u]nder the Constitution as it now is and as it always has been, *the entire immigrant population* of this country is included in the basis of representation." Cong. Globe, 39th Cong., 1st Sess. 432 (1866) (emphases added).

The Court confirmed this understanding in *Evenwel*, a case Defendants tellingly fail even to cite. *Evenwel* addressed whether the Fourteenth Amendment prohibited Texas's use of "total population" as the base for drawing districts within the State, 136 S. Ct. at 1128, which included "undocumented aliens." *Evenwel*, Oral Arg. Tr. at 44; *see also id.* at 51. The Court held that intra-state redistricting based on "total population" is permissible *because* the Fourteenth Amendment "retained total population as the congressional apportionment base." 136 S. Ct. at 1128. *Evenwel* reasoned that it cannot be "that the Fourteenth Amendment calls for the apportionment of congressional districts based on total population, but simultaneously prohibits States from apportioning their own legislative districts on the same basis." *Id.* at 1129.

---

[12] *See, e.g.*, Act of May 5, 1847, ch. 195, § 3, 1847 N.Y. Laws 182, 184 (banning "infirm persons" from entry); Act of Mar. 21, 1821, ch. 122, § 18, 1821 Me. Laws 422, 433 (allowing removal of "pauper[s] to be sent and conveyed by land or water to any State, or to any place beyond sea, where [they] belong[]"); Act of May 20, 1852, ch. 275, § 7, 1852 Mass. Acts & Resolves 190. § 7 (authorizing state officials to remove those without a settlement "to the place and country from which they came").

*Evenwel* thus confirms that the Fourteenth Amendment requires the inclusion of undocumented immigrants in the apportionment base, and resolves the issue presented here.

4. "Every Congress [has] acted … and every apportionment [has been] made in reliance upon" the understanding that the Constitution requires including all people living in the United States in the apportionment, regardless of immigration status. J.S.App.88a-89a (internal quotation marks and citation omitted). Judicial "interpretation of the Constitution" may be "guided by a Government practice that has been open, widespread, and unchallenged since the early days of the Republic." *New York*, 139 S. Ct. at 2567 (internal quotation marks and citations omitted); *Wisconsin*, 517 U.S. at 21.

a. Congress has repeatedly considered and rejected proposals to exclude noncitizens or undocumented immigrants from the apportionment, precisely because it understood that doing so would violate the Constitution.

In 1929, Congress rejected proposals to amend the Census Act after members declared that "the plain mandate of the Constitution" requires counting all persons, including all noncitizens, for apportionment. 71 Cong. Rec. 1910 (1929) (Sen. Bratton); *see, e.g.*, *id.* at 1958 (Sen. Reed), 2451-52 (Rep. Griffith). Congress understood that these noncitizens included people who were "not legally or properly here." *Id.* at 1919 (Sen. Heflin); *see also id.* at 1822, 2078-83.

In 1940, Congress again rejected a proposal to exclude noncitizens from apportionment. *See* H.R. Rep. No. 1787, at 1 (1940). Representative Celler stated

31

that "the fathers agreed some 150 years ago" that "[w]hen we use the word 'persons' we include all peoples." 86 Cong. Rec. 4372 (1940); *see also id.* at 4384-86 (voting 209-23 to strike exclusion).

In 1980, a bill to exclude undocumented immigrants from the apportionment base failed after Senator Javits explained that the Constitution's words cannot be construed to mean "anything other than as described in Federalist papers, the aggregate number of inhabitants, which includes aliens, legal and illegal." *1980 Census: Counting Illegal Aliens: Hearing Before the S. Subcomm. on Energy, Nuclear Proliferation, & Fed. Services of the Comm. on Gov'tal Affairs* (*1980 Census*), 96th Cong. 10 (1980).

And in 1989, Congress rejected a proposal to exclude "aliens in the United States in violation of the immigration laws" from apportionment. 135 Cong. Rec. 14539-40 (1989). Senator Bumpers said: "I wish the Founding Fathers had said you will only enumerate 'citizens,' but they did not. They said 'persons.'" *Id.* at 14551.

b. The Executive Branch has until now likewise consistently maintained that the Constitution requires counting all persons, regardless of immigration status. In *FAIR*, the Justice Department urged the district court to reject claims to exclude undocumented immigrants from the apportionment base because "the plain language of the Constitution, as well as the intent of its framers, establishes that all inhabitants, including illegal aliens, must be enumerated for [apportionment]." Defs.' Mem. of Points & Authorities in Support of Mot. to Dismiss or for Summary Judgment, No. 79-3269 (D.D.C.), *reprinted in 1980 Census*, *supra*.

In 1985, the Census Bureau Director told Congress that ever since 1790, the census has included all people regardless of immigration status, pursuant to "the Constitution and the legal direction provided by the Congress."[13]

In 1988, the Justice Department told Congress that a bill to exclude "illegal aliens" from the apportionment base was "unconstitutional," and that DOJ "ha[d] advised previous Congresses considering identical legislation that aliens must be included within the census for purposes of apportioning congressional Representatives."[14]

And in 1989, the Justice Department advised Congress that the Constitution "require[s] that inhabitants of States who are illegal aliens be included in the census count."[15]

Defendants themselves have acknowledged *for the 2020 Census* that the enumeration and apportionment base must include undocumented immigrants living here. Under the current "Residence Rule," the Census

---

[13] *Enumeration of Undocumented Aliens in the Decennial Census: Hr'g on S. 99-314 Before the Subcomm. on Energy, Nuclear Proliferation, & Gov't Processes of the S. Comm. on Governmental Affairs,* 99th Cong. 19 (1985) (Census Director John Keane).

[14] Letter from Thomas M. Boyd, Acting Ass't Attorney Gen., to Rep. William D. Ford, Chairman, Comm. on the Post Office & Civil Serv., House of Representatives, at 1, 4-5 (June 29, 1988), *reprinted in 1990 Census Procedures and Demographic Impact on the State of Michigan: Hearing Before the Committee on Post Office and Civil Service, House of Representatives*, 100th Cong. 240-44 (1988).

[15] Crawford Letter, *supra* n.11.

33

Bureau formally decided to count undocumented immigrants for apportionment purposes. 83 Fed. Reg. at 5533. Rejecting comments urging the exclusion of undocumented immigrants, the Bureau retained the definition of usual residence under which all "[f]oreign citizens are considered to be 'living' in the United States if, at the time of the census, they are living and sleeping most of the time at a residence in the United States." *Id.* at 5530. In February 2020, the Bureau's Director confirmed that the census will "count everyone, wherever they are living," including undocumented immigrants.[16] And public guidance currently represents that all "undocumented residents" with "a usual residence in the 50 states," are "included in the apportionment population counts."[17]

In short, since 1790, "the population base for purposes of apportionment has always included all persons, including aliens both lawfully and unlawfully within our borders." *FAIR*, 486 F. Supp. at 576; *see, e.*g., Census Act of 1790, S. 101, 1st Cong., § 5, (1790). That is precisely what the Constitution requires.

## B. The Census Act and Apportionment Act Require Including Undocumented Immigrants Residing in this Country in the Apportionment Base.

The district court correctly concluded that the Memorandum also violates statutes requiring the

---

[16] *Hr'g Before the H. Comm. on Oversight & Reform*, 116th Cong. 12 (Feb. 12, 2020) (Census Director Dillingham).

[17] U.S. Census Bureau, *Frequently Asked Questions on Congressional Apportionment*, https://www.census.gov/topics/public-sector/congressional-apportionment/about/faqs.html#Q6 (Mar. 30, 2020).

Commerce Secretary to report to the President "[t]he tabulation of total population by States," 13 U.S.C. § 141(b), and requiring the President to transmit to Congress "a statement showing the whole number of persons in each State," 2 U.S.C. § 2a. Interpreting these statutes "in accord with the ordinary public meaning of [their] terms at the time of [their] enactment," their meaning is clear. *Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1738 (2020).

With respect to Section 141(b), in 1929, the term "population" meant "[t]he whole number of a people." *Funk & Wagnall's Dictionary* (1923).[18] And "total" meant "[t]he whole sum or amount; the whole." *Id*.[19] Those are still their ordinary meanings. When the sign upon entering a town lists its "total population," everyone knows that it reflects all human beings living there, not an unidentified subset. There is no reasonable way to read "total population" to exclude persons based on immigration status.

As for Section 2a, "persons" and "in" meant in 1929 what they did at the time of the constitutional debates and what they do today. Like the constitutional text it effectuates, Section 2a requires that the President's apportionment statement to Congress include all persons who live in each State, including undocumented immigrants.

Congress was aware that the statutes would include undocumented immigrants in apportionment. "There is no dispute that the concept of 'illegal aliens'

---

[18] *See also Webster's Dictionary* (1927) ("The whole number of people, or inhabitants, in a country, section, or area.").

[19] *See also Webster's supra* n. 18 ("Comprising or constituting a whole; whole; undivided; lacking no part; entire.").

existed in 1929 when Section 2a was enacted."
J.S.App.88a n.17. At the time, members of Congress
proposed distinguishing between immigrants on the
basis of legal status. One unsuccessful amendment
sought to include in the census "an enumeration of al-
iens *lawfully* in the United States and of aliens *unlaw-
fully*" present (emphasis added)). 71 Cong. Rec. 2078-
83 (1929). And Senator Heflin lamented that five mil-
lion "aliens" who had entered unlawfully and "ha[d] no
right to be here," would be "counted just as Americans
are counted in the matter of fixing the basis for send-
ing Representatives to Congress." *Id.* at 2054; *see also
id.* at 2057 (objecting that Act will enable "'smuggled-
in' aliens to make the basis for representation in the
American Congress"); *id.* at 1919 (objecting that "al-
iens" who "are not legally or properly here … have no
right to be counted in our population and Members of
Congress sent here based upon such a population").
Congress overrode those objections to enact the statu-
tory language that remains operative today.

## C. The Government Does Not Have Discretion to Exclude Usual Residents of a State from the Apportionment.

Defendants argue that the phrase "persons in each
state" has "long been understood" to cover only a
State's "inhabitants." Br. 29. Relying on a foreign in-
ternational law treatise, they then reason that the
term "inhabitants" incorporates a notion of Govern-
ment permission to be in a place. *Id.* at 33. Their ap-
proach is wrong at every turn.

1. To start, while "inhabitant" appears in the pe-
nultimate draft of the Constitution, it is the actual
"words of the adopted Constitution" that are disposi-
tive. *Utah*, 536 U.S. at 496 (Thomas, J., concurring in

part and dissenting in part). As explained above, the actual words of the Fourteenth Amendment and 2 U.S.C. § 2a—"persons in each State"—are crystal clear, and the "old soil," Br. 30 (quotations and citations omitted), from which they came admits but one conclusion: that all people usually residing in the United States, regardless of immigration status, must be included in the apportionment base.

In any event, Plaintiffs would prevail even if the Constitution actually said "inhabitants." Undocumented immigrants living here are plainly "inhabitants," as that term was ordinarily understood at the Founding. "Any person living within a country or state, is an inhabitant of it, or resident in it." David Ramsay, *A Dissertation on the Manners of Acquiring the Character and Privileges of a Citizen of the United States* 3 (1789).[20] As explained in Clarke and Hall, *Cases of Contested Elections in Congress* 415 (1834) (distinguishing "inhabitant from citizen"), cited in Defendants' Brief at 42, "[t]he word inhabitant comprehends a simple fact, locality of existence." "Inhabitant" would ordinarily have been understood at the Founding as including all persons dwelling in the United States, without regard to citizenship or legal status. *See* S. Johnson, 1 *A Dictionary of the English Language* (6th ed. 1785) ("Dweller; one that lives or resides in a place."); N. Bailey, *An Etymological English Dictionary* (20th ed. 1763) ("one who dwells or lives in a Place."). Indeed, in earlier drafts, the Apportionment Clause referenced a Direct Taxation Clause,

---

[20] Ramsay's *History of the American Revolution* was cited by Justice Scalia in dissent in *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 253 (2003), *overruled by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

which provided that "direct taxation shall be regulated by the whole number of free citizens and inhabitants of *every* age, sex, *and condition*." Farrand's Records, vol. 2, at 566, 571 (emphases added).

2. Defendants nonetheless assert that the President has discretion to declare that certain persons who are in fact living and sleeping in a State are not "inhabitants," and need not be counted as "persons in each State." They cite *Franklin*'s approval of *including* in the apportionment federal personnel who, pursuant to their service, are temporarily overseas. But *Franklin* simply recognized that a temporary sojourn abroad need not disqualify one as a "usual resident." It did not authorize Defendants to *exclude* persons who usually reside here.

*Franklin* started from the baseline that all persons living in the United States are included in the apportionment, and simply held that "usual residence" may include "*more* than mere physical presence." 505 U.S. at 804-06 (emphasis added). That was so because "usual residence" could be understood "broadly" to encompass people who ordinarily reside here but were "temporarily stationed abroad" by the Government, and who still "retained their ties to the States." *Id.* Madison's description of "inhabitant" in the context of Article I's residence qualification similarly presumed a baseline including people physically residing in a place, as well as other "persons *absent occasionally* for a considerable time on public or private business." *Id.* at 805 (quoting Farrand's Records, vol. 2, at 217) (emphasis added).

But it does not follow that Defendants can *exclude* people who live here. Under Defendants' self-described "indeterminate" conception of "inhabitant,"

Br. 33, the President could exclude from the appor-
tionment base *any and all noncitizens*—or any other
residents whom the President feels lack sufficient "al-
legiance." Br. 38. That position is as dangerous as it
is absurd.

Defendants note that "foreign diplomats" have
sometimes been left out of the census as non-inhabit-
ants. Br. 34. But diplomats are *sui generis*. They
"*represent*[] the State or sovereign by whom [they are]
sent." Henry W. Halleck & Sherston Baker, 1 *Hal-
leck's International Law* 327, ch. x, § 4 (K. Paul, et al.
eds., 3d ed. 1893). While an "inhabitant" is "subject to
all the requisitions of [a State's] laws," Clarke & Hall,
*supra* p. 37, at 415, a diplomat, "though actually in a
foreign country, is considered still to remain within
the territory of his own State," Halleck & Baker at
332, ch. x, § 12, and consequently enjoys a wide range
of legal immunities. *See also* L.F.L. Oppenheim, 1 *Op-
penheim's International Law* 461-64, § 390; 464-65,
§ 391; 465-66, § 392; 466-67, § 393; 467, § 394; 467-68,
§ 395; 468-69, § 396 (2d. ed. 1912) (exemptions from
domicile, criminal and civil jurisdiction, subpoena as
witnesses, police, and taxes).

3. Lacking support in the text, history, or execu-
tive practice, Defendants insist that a person must
have government permission to be in a place to be an
"inhabitant," invoking Swiss theorist Emmerich de
Vattel's definition from the 1758 treatise, *The Law of
Nations*. Br. 35-36. But "[t]he Constitution was writ-
ten to be understood by the voters," *Dist. of Columbia
v. Heller*, 554 U.S. 570, 576 (2008) (quotations and ci-
tation omitted), and there is no indication that Vat-
tel's international law treatise reflects how "voters" at

the Founding understood "inhabitant" in the context of apportionment.

Defendants cannot offer any evidence that the Founders relied on Vattel's definition of "inhabitant." It was never cited in the Constitutional Convention, the Reconstruction Debates, or the 1929 Congress. The best Defendants can do is note that Chief Justice Marshall cited Vattel's definition of "inhabitant" in an 1814 concurrence discussing war prizes—an international law context far afield from apportionment. *See The Venus*, 12 U.S. (8 Cranch.) 253, 288-89 (1814) (Marshall, C.J., concurring). The Constitution's "words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 576 (quotations and citation omitted). The Framers did not ascribe, *sub silentio*, specialized meanings concerning the international law of war to terms otherwise in contemporary common use. *Cf.* Brian Richardson, *The Use of Vattel in the American Law of Nations*, 106 Am. J. Int'l L. 547, 547-60 (2012) ("Vattel was never taken to be the cynosure of the U.S. law of nations").

Moreover, Defendants' reliance on Vattel fails on its own terms. Vattel defined "inhabitants" as "distinguished from citizens"—*i.e.*, in his lexicon, only *noncitizens* were classified as "inhabitants." 1 *The Law of Nations*, ch. xix, § 213 (1760).[21] Applying that definition for apportionment purposes would nonsensically *exclude all citizens* from the population base. Such

---

[21] The same is true of the use of the word "inhabitant" in the John Adams letter that Defendants cite. *See* Br. 34 (quoting a letter by Adams referring to "[b]oth Citizens *and* Inhabitants") (emphasis added, citation omitted).

"interpretations … [that] would produce absurd re-
sults are to be avoided." *Griffin v. Oceanic Contrac-
tors, Inc.*, 458 U.S. 564, 575 (1982).

*Kaplan v. Tod*, 267 U.S. 228 (1925), is similarly un-
availing. That case addressed the "narrow question of
whether Ms. Kaplan was 'dwelling in the United
States' for the purposes of naturalization under the
immigration laws in effect at the time." *San Jose*,
2020 WL 6253433, at \*40 (quoting *Kaplan*, 267 U.S.
at 230)). "*Kaplan* says nothing about whether a per-
son is an 'inhabitant' for purposes of the census when
residing on American soil." *Useche*, 2020 WL
6545886, at \*11. Indeed, Ms. Kaplan was actually
counted in the 1920 Census. *See id.* (citing Decl. of
Jennifer Mendelsohn ¶ 3, *New York v. Trump*, No. 20-
cv-5770-JMF (S.D.N.Y. Aug. 25, 2020), ECF No. 149-
2).

4. Defendants' theory that "certain categories of
illegal aliens" could be cut from the apportionment
base, J.S.29, such as "aliens living in a detention facil-
ity" or those with "pending removal proceedings,"
Br. 40, is incorrect. The decennial enumeration is, as
it must be, a snapshot. And for purposes of that snap-
shot, a person in detention or removal proceedings re-
sides—like anyone else—where they live as of Census
Day, April 1. Simply being in detention or removal
does not mean that a person "usually resides" *outside*
of a State.

In any event, the Memorandum does not purport
to exclude *some* subcategories of undocumented immi-
grants from the apportionment based on their partic-
ular residential circumstances. Rather, it makes it
the categorical "policy of the United States to exclude
from the apportionment base aliens who are not in a

41

lawful immigration status," solely *because* of that "status." 85 Fed. Reg. at 44,680. That is flatly inconsistent with the concept of usual residence. If Defendants announced that they intended to exclude people in New York City from the apportionment "to the maximum extent," they could not defend it as facially valid by arguing that tourists staying in midtown Manhattan hotels could be excluded.

Moreover, the fact that a person is currently in detention or removal proceedings does not even denote their *current immigration status* or their permission to live here. Many people in immigration detention or pending removal proceedings are *lawful* permanent residents or otherwise have lawful status. *See, e.g.*, *Nielsen v. Preap*, 139 S. Ct. 954, 961 (2019); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1224 (2018) (Gorsuch, J., concurring in part and concurring in the judgment). They retain the right to reside here unless and until they are ordered removed. 8 C.F.R. § 1.2. And many noncitizens in removal proceedings are never removed, either because they ultimately prevail, thereby retaining (or obtaining) lawful status, J.S.App.86a-87a, or because they cannot be deported, even after subject to a final order of removal, *see Zadvydas v. Davis*, 533 U.S. 678, 684-86 (2001).

In fact, "illegal aliens" as Defendants use that term, include individuals with "the sovereign's permission" to remain in the country.[22] Br. 35. Many

---

[22] The Memorandum does not even define "illegal alien," a term not defined in the Immigration and Nationality Act or elsewhere in federal law. Immigration status is often a complex question of law and fact, involving considerable ambiguity—and litigation—as to the status of immigrants. *See, e.g.*, *Dimaya*, 138 S. Ct. at

noncitizens alleged to be removable are eligible for work authorization—indicating the Government's acknowledgment that they are living *in* the United States, and must support themselves accordingly. DACA recipients may be placed in removal proceedings, yet qualify for work authorization and certain federal benefits. *See Regents*, 140 S. Ct. at 1902, 1911. Noncitizens "detained for illegal entry and paroled into the country" to live with sponsors pending a decision on their asylum claims, Br. 40, are similarly permitted to live here while their cases are being decided, and granted work authorization, 8 C.F.R. § 274a.12(c) (listing additional categories of noncitizens eligible for employment authorization pending removal proceedings). All of these people live here until actually removed.[23]

In sum, "usual residence," not immigration status, is the touchstone for inclusion in the apportionment base. And "[a] person living in a State but facing future removal is no less a 'person[] in that State' … than someone living in the State without the prospect of removal." J.S.App.86a (alteration in original) (citation omitted). As of 2017, the median undocumented

---

1224; *Mellouli v. Lynch*, 575 U.S. 798, 1990-91 (2015); *Moncrieffe v. Holder*, 569 U.S. 184, 206 (2013).

[23] Defendants are wrong to rely on *Department of Homeland Security v. Thuraissigiam*, 140 S. Ct. 1959 (2020). *Thuraissigiam* asked only how an asylum seeker stopped 25 yards from the border ought be "treated" for due process purposes in removal, *id.* at 1982, not whether he would count in the census. Thuraissigiam, like many other asylum seekers, was paroled into the country pending proceedings. *See* U.S. Br., *Dep't of Homeland Security v. Thuraissigiam*, No. 19-161, 140 S. Ct. 1959 (2020), at *13 n.6. During that time, he had "permission" to live here, and no residence outside of the United States.

adult in the country had lived "in" the United States for 15.1 years, and 66% of them had lived here more than 10 years. Pew Res. Ctr., *5 Facts about Illegal Immigration in the U.S.* (June 12, 2019), https://www.pewresearch.org/fact-tank/2019/06/12/5-facts-about-illegal-immigration-in-the-u-s. The fact that some noncitizens who live here may have only recently arrived—or may someday depart—does not make them any different from students who recently moved to a college dormitory, or who will soon depart after graduating; or people convicted of a crime and recently incarcerated, or who are nearing end of sentence and will soon be discharged. All such persons are enumerated in the census where they reside as of April 1. *See* 83 Fed. Reg. at 5534-35.

## III. THE MEMORANDUM VIOLATES THE CONSTITUTIONAL AND STATUTORY REQUIREMENTS TO BASE APPORTIONMENT ON THE DECENNIAL CENSUS ALONE.

The Census and Reapportionment Acts create a simple, interlocking structure to fulfill the constitutional command "that the results of the census *shall* be used to apportion the Members of the House of Representatives among the States." *Wisconsin*, 517 U.S. at 5 (emphasis added). The Memorandum violates that dictate by using numbers and data other than the results of the decennial census for apportionment.

### A. The Constitution Requires Using the Decennial Census Enumeration as the Apportionment Base.

The Enumeration Clause requires that "[r]epresentatives shall be apportioned among the several

44

States according to their respective numbers," determined under the "actual Enumeration," "counting the whole number of persons in each State"—*i.e.,* the decennial census.  U.S. Const. amend. XIV, § 2; *id.* art. 1, § 2, cl. 3.  This Court has affirmed that the "decennial census is the *only census* that is used for apportionment purposes." *U.S. House*, 525 U.S. at 341 (quotation marks omitted and emphasis added).

"[T]his is not some empty formality." *Useche*, 2020 WL 6545886, at *12.  The Framers required Congress to use the decennial census as the apportionment base "[a]fter much debate and faced with a long history of political manipulation." *Utah*, 536 U.S. at 510 (Thomas, J., concurring in part and dissenting in part).  By strictly tying apportionment to the "actual Enumeration," the Framers sought to "establish a standard resistant to manipulation," *id.* at 503—a fixed rule "that would limit political chicanery." *Id.* at 500.

As Roger Sherman put it, "the *rule* of revising the Representation ought to be fixt by the Constitution." *Id.* at 502 (quoting *The Founders' Constitution* 104 (P. Kurland & R. Lerner eds. 1987)).  The Framers foresaw moments where, as George Mason remarked, "those who have power in their hands will not give it up while they can retain it." *Id.* (quoting *The Founders' Constitution* 102-03).  The potential to misuse apportionment necessitated a "permanent [and] precise standard as essential to fair representation." *Id.*  As Alexander Hamilton wrote, an "*actual Census or enumeration of the people must furnish the rule,*" so as to "shut[] the door to partiality or oppression." *The Federalist* No. 36 (Hamilton), at 226 (emphasis added).

**B. The Text of the Census and Reapportionment Acts Require Apportionment Based on the Decennial Census.**

1.  The Census Act, 13 U.S.C. § 141, and the Reapportionment Act, 2 U.S.C. § 2a, "create[] an interlocking set of responsibilities for the Secretary and the President," with the decennial census as the basis for apportionment. *Franklin*, 505 U.S. at 810 (Stevens, J., concurring in part and concurring in the judgment). Section 141(a) provides that the Commerce Secretary "shall … take a decennial census of population …." 13 U.S.C. § 141(a).  Section 141(b) directs the Secretary to report this tabulation to the President "as required for the apportionment of Representatives in Congress among the several States." *Id*. § 141(b).  Section 2a in turn requires the President to provide Congress an apportionment report based solely on the census's tabulation of population: "[T]he President shall transmit to the Congress a statement showing the whole number of persons in each State, … *as ascertained under the … decennial census of the population*." 2 U.S.C. § 2a (emphasis added).

This statutory language denies the President discretion to use any numbers besides the census to calculate the apportionment.  As this Court has explained, federal law "mandat[es]" that the decennial census result in "a population count that *will be used* to apportion representatives." *New York*, 139 S. Ct. at 2568-69 (citing 13 U.S.C. § 141(b), 2 U.S.C. § 2a) (emphasis added).  Section 2(a) "expressly require[s] the President to use … the data from the 'decennial census,'" and to apply a strict mathematical formula to that data to determine the apportionment. *Franklin*,

46

505 U.S. at 797. *See also U.S. House*, 525 U.S. at 321-22 ("[u]sing *this information* [from the Census], the President *must* then 'transmit to the Congress a statement showing the whole number of persons in each State … and the number of Representatives to which each State would be entitled.'") (emphases added). Indeed, Defendants acknowledge that the President's role in calculating apportionment is "ministerial": applying the method of equal proportions to the final population totals ascertained under the census. J.S.5; *see also Franklin*, 505 U.S. at 799.

2. The "historical background of the decennial census and the Act that governs it" also demonstrate Congress's intent to base apportionment solely on the decennial census results. *U.S. House*, 525 U.S. at 335. In 1920, for the first time, Congress failed to reapportion itself. *See Dep't of Commerce v. Montana*, 503 U.S. 442, 451-52 (1992). Responding to a "10-year stalemate," Congress reshaped the reapportionment scheme in 1929 to "make it virtually self-executing." *Franklin*, 505 U.S. at 792. The result was "an 'automatic connection between the census and the reapportionment'; [] that was 'the key innovation of the [Census] Act.'" J.S.App.75a (quoting *Franklin*, 505 U.S. at 809 (Stevens, J., concurring in part and concurring in the judgment)).

After the taking of the census, "*with these figures in hand*, the President would report the census figures, together with a table showing how, *under these figures*, the House would be apportioned." S. Rep. No. 71-2, at 4 (1929) (emphases added). Thus, "[t]he Department of Commerce counts the people," and "the President reports upon a problem in mathematics which is standard, and for which rigid specifications

47

are provided by Congress itself, and to which there can be but *one mathematical answer*." *Id.* at 4-5 (emphasis added).

The exclusive use of the decennial census for apportionment "'has been open, widespread, and unchallenged'" under the Census and Reapportionment Acts. *New York*, 139 S. Ct. at 2567 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)). There is an unbroken "historical precedent of using the actual Enumeration for purposes of apportionment." *U.S. House*, 525 U.S. at 340 (quotation marks omitted). As the Government told the Court in *Franklin*, "[t]he law directs [the President] to apply … a particular mathematical formula to the population figures," and "[i]t would be unlawful … to say, these are the figures, they are right, but I am going to submit a different statement." Oral Arg. Tr., 505 U.S. 788 (1992) (No. 91-1502), 1992 WL 687824, at *12 (Deputy Solicitor General Roberts).

## C. The Memorandum Bases Apportionment on Data Other Than the Decennial Census in Violation of the Constitution and Federal Statutes.

Contrary to these constitutional and statutory mandates, the Memorandum calls for the use of population numbers that "will necessarily be derived from something *other than* the census itself." J.S.App.78a-79a (emphasis added). Defendants repeatedly represented to the district court that the Memorandum will not affect "the actual census" population count, but will instead require the Commerce Secretary to generate a second and distinct population number, which the President will use for the apportionment. Supp.App.110a-11a. That is illegal.

48

1. The decennial census' enumeration of the population is tabulated under the Residence Rule, which counts all people—including undocumented immigrants—who "live and sleep most of the time" in the United States. 83 Fed. Reg. at 5533. Defendants explained below that the Memorandum does not affect "the actual census" enumeration. Supp.App.110a-11a. As Census Bureau Associate Director Fontenot testified, "[t]he Presidential Memorandum … has had no impact on … the Census Bureau's commitment to count each person in their usual place of residence, as defined in the Residence Criteria." *Id.* at 102a. Accordingly, the Secretary will report to the President the total population "tabulated according to [that] methodology." 85 Fed. Reg. at 44,680.

But in *addition* to the census enumeration of the total population, the Secretary will also report data necessary "to carry out the policy" of excluding undocumented immigrants from the apportionment. 85 Fed. Reg. at 44,680. As Defendants explained below, the Memorandum requires the Secretary to provide the President "two sets of numbers": the actual enumeration, tabulated according to the Residence Rule; and a "second [set of numbers], 'permitting the President, to the extent practicable,' to carry out the stated policy of excluding illegal aliens from the apportionment base." Supp.App.28a; *see also id.* at 79a (quoting 85 Fed. Reg. at 44,680). Thus, the Memorandum provides for a separate "apportionment number that will be chosen by the President *after the census is complete*." Supp.App.110a-11a (emphasis added). That is, the President will "choose" a "number[]" for the apportionment base that differs from the "complete enumeration of the total population." *Id.* at 79a, 120a.

49

Defendants have also confirmed that they intend to alter the apportionment base even after the Secretary submits the census report, using additional data received *after* the census has concluded. The Commerce Secretary will submit his census report by December 31, a deadline Defendants described as "mandatory" and "unconditional." *San Jose*, 2020 WL 6253433, at \*46. But the Census Bureau "plans" to provide additional data to implement the Memorandum more than a week later, "by January 11, 2021." Appellants' Supp.Br. 5. The apportionment will therefore necessarily be based on data that are not part of the "decennial census of population" that the Commerce Secretary reports under 13 U.S.C. § 141.

2. Defendants contend that *Franklin* gives the President "virtually unfettered discretion" to "reform the census" according to his "policy judgment[s]." Br. 22, 26, 25. While *Franklin* acknowledged Presidential authority "to direct the Secretary in making policy judgments that result in 'the decennial census,'" 505 U.S. at 799, "that is not what the President['s Memorandum] did." J.S.App.81a-82a.

*Franklin* involved the actual "conduct of the census." *Id.* at 79a. The Secretary decided "nine months before the census taking was to begin … to allocate overseas federal employees to their home states for purposes of congressional apportionment" by including them "in the state population counts." 505 U.S. at 793. The result was an "amendment of the 'decennial census' itself," allocating these employees to their respective States—a choice this Court held was "consonant with, though not dictated by, the text and history of the Constitution." *Id.* at 797-98, 806.

50

By contrast, the Memorandum "does not purport to change the conduct of the census itself." Supp.App.34a-35a, 88a. It takes the final, completed census as a starting point, and then, *ex post*, departs from the actual enumeration by removing people already counted, for the express purpose of diminishing the representation of specific "States adopting policies" with which the Administration disagrees. 85 Fed. Reg. at 44,680.

That violates the Constitution, which requires that the "actual Enumeration," art. I, § 2, cl. 3, be used for apportionment as a "permanent [and] precise standard," to guard against "political chicanery." *Utah*, 536 U.S. at 500, 502 (Thomas, J., concurring in part and dissenting in part). And it violates the statutory scheme requiring the President to apply a formula to the census to produce the apportionment, for which there can be "but one mathematical answer." S. Rep. No. 71-2, at 4-5 (1929). Disregarding that mandate would improperly "give the party controlling [the Presidency] the power to distort representation in its own favor," *U.S. House*, 525 U.S. at 348 (Scalia, J., concurring in part), and invite the very "manipulation" that the Framers sought to prevent. *Utah*, 536 U.S. at 503 (Thomas, J., concurring in part and dissenting in part).

Defendants' observation that the Census Bureau has previously used "administrative records" in addition to "information obtained from the census questionnaire," Br. 12, "is true but beside the point." *Useche*, 2020 WL 6545886, at *13 n.9. The Census Bureau can use administrative data or imputation to "fill in … blanks," and even then, only "sparingly," such as when enumerators are unable to reach an "individual

household." *Utah*, 536 U.S. at 477. That limited use of administrative data to gap-fill is part and parcel of enumerating the total population. *Id.* at 457. It is another thing entirely to use administrative data, *post hoc*, to remove millions of persons who were actually enumerated as part of our "total population."

That "the 'decennial census'" might "present[] a moving target, even after the Secretary reports to the President," does not help Defendants. *Franklin*, 505 U.S. at 797. The question in *Franklin* was "whether the census count is final before the President" sends the apportionment statement to Congress for purposes of Administrative Procedure Act review. *Id.* at 798 n.1. This Court concluded it was not, because of the possibility of "correction[s]" to the final census data. *See id.* at 797-99. Notwithstanding the chance of such corrections, however, *Franklin* explained that Section 2a "require[s] the President to use … the data from the 'decennial census'" for the apportionment. *Id.* at 797. Thus, although *Franklin* held that the President may exercise "supervisory powers over" the Commerce Secretary in conducting the census, *id.* at 800, it did not empower the President to subtract people from the apportionment base after the actual enumeration is finalized.

Finally, Defendants' conflicting representations as to whether the Memorandum changes the actual census itself are unavailing. Despite acknowledging that "some funding statutes" rely on data "derived from the decennial census," Defendants assert that the Memorandum will not affect federal funding, because such funds are not "distributed based on the specific decennial census data set that tabulates each State's population for apportionment." Br. 20. *This* is "wordplay."

52

*Id.* at 27.  The Memorandum either changes the census, or it does not.  If the Memorandum does not change the census, then it requires that apportionment be based on something *other* than the census—which the Constitution and federal statutes forbid.

And if the Memorandum changes the census itself, not only would Plaintiffs have standing based on reduced federal funding, but this would be unconstitutional as well.  "The Constitution describes the process both as 'counting the whole numbers of persons' and as an 'actual Enumeration.'"  *Utah*, 536 U.S. at 492 (Thomas, J., concurring in part and dissenting in part).  It would mock the constitutional text for Defendants to use data *not* derived from the "the count itself," *id.* at 510 (Thomas, J.), to subtract persons *actually* enumerated.  If that scheme is allowed to proceed, the foundational requirement of a decennial "actual Enumeration" would cease to have meaning.

## CONCLUSION

The judgement below should be affirmed.

Respectfully Submitted,

John A. Freedman
Elisabeth S. Theodore
R. Stanton Jones
Daniel F. Jacobson
ARNOLD & PORTER KAYE
  SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001

Perry Grossman
Christopher Dunn
Arthur N. Eisenberg
NEW YORK CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street
New York, NY 10004

Andre I. Segura
Edgar Saldivar
Thomas Buser-Clancy
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288

Dale E. Ho
  *Counsel of Record*
Adriel I. Cepeda Derieux
Davin Rosborough
Sophia Lin Lakin
Theresa J. Lee
My Khanh Ngo
Cecillia D. Wang
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street
New York, NY 10004
(212) 549-2693
dho@aclu.org

David D. Cole
Sarah Brannon
Ceridwen Cherry
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
915 15th Street, NW
Washington, D.C. 20005

Julia A. Gomez
Peter J. Eliasberg
ACLU FOUNDATION OF
  SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017

Emily Rong Zhang
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111

*Counsel for Appellees*
*New York Immigration*
*Coalition, et al.*

Date: November 16, 2020