# EXHIBIT B

No. 20-366

IN THE

# Supreme Court of the United States

———❖———

DONALD J. TRUMP,
President of the United States, et al.,

*Appellants,*

v.

STATE OF NEW YORK, et al.,

*Appellees.*

———————

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

**BRIEF FOR STATE OF NEW YORK
AND OTHER GOVERNMENT APPELLEES**

---

<table>
<tr><td></td><td>LETITIA JAMES<br><i>Attorney General<br>State of New York</i><br>BARBARA D. UNDERWOOD*<br><i>Solicitor General</i></td></tr>
<tr><td>MATTHEW COLANGELO<br><i>Chief Counsel for<br>Federal Initiatives</i><br>ELENA GOLDSTEIN<br><i>Deputy Chief<br>Civil Rights Bureau</i><br>FIONA J. KAYE<br><i>Assistant Attorney General</i></td><td>STEVEN C. WU<br><i>Deputy Solicitor General</i><br>JUDITH N. VALE<br><i>Senior Assistant<br>Solicitor General</i><br>ERIC R. HAREN<br><i>Special Counsel</i><br>28 Liberty Street<br>New York, New York 10005<br>(212) 416-8020<br>barbara.underwood@ag.ny.gov<br><b>*Counsel of Record</b></td></tr>
</table>

*(Counsel list continues on signature pages.)*

*i*

## QUESTIONS PRESENTED

The Constitution requires apportionment of seats in the House of Representatives based on the "whole number of persons in each State." U.S. Const. amend. XIV, § 2; *see also id.* art. I, § 2, cl. 3. Congress has required the Secretary of Commerce to send to the President a report of the census's "tabulation of total population by States," 13 U.S.C. § 141(b); the President then transmits to Congress "a statement showing the whole number of persons in each State" under the "decennial census," and the number of Representatives each State will receive, 2 U.S.C. § 2a(a).

In July 2020, the President issued a Memorandum directing the exclusion of all aliens who are not in a lawful immigration status from the apportionment base. The Memorandum orders the Secretary to include in the Section 141(b) report: (i) the census's counts of total population for each State, which will include undocumented immigrants; and (ii) separate figures that will allow the President to excise persons who are not in a lawful immigration status from the apportionment base. The questions presented are:

1. Whether Government Appellees' challenge to the Memorandum satisfies Article III.

2. Whether the Memorandum's direction to exclude persons who are not in a lawful immigration status from the apportionment base violates the Constitution and the Census Act.

3. Whether the Memorandum's direction to base apportionment on figures other than the total-population count established by the decennial census violates the Constitution and the Census Act.

*ii*

## TABLE OF CONTENTS

**Page**

Introduction ....................................................................1

Jurisdiction ....................................................................2

Statement ....................................................................2

   A.  Constitutional and Statutory Background .........2

   B.  Factual Background ..........................................5

   C.  Procedural History ...........................................7

Summary of Argument............................................10

Argument ....................................................................13

   I.  This Case Presents a Live Case or
Controversy That Satisfies the
Requirements of Article III..............................13

     A.  The Memorandum Threatens Concrete
and Imminent Harm to Government
Appellees' Representation and Federal
Funding.......................................................13

     B.  The Memorandum's Harms to the
Census Count Provided the District
Court with Jurisdiction and Fall
Within the Evading-Review Exception
to Mootness.................................................19

   II.  Appellants' Reliance on Immigration
Status Alone to Subtract Residents from
the Apportionment Base Violates Both the
Constitution and the Census Act....................23

*iii*

**Page**

A. The Constitution's Inclusion of All "Persons in Each State" in the Apportionment Base Encompasses Undocumented Immigrants Who Reside in a State..........................................25

B. The Census Act Independently Prohibits Appellants from Excluding Usual Residents from the Apportionment Base Due Solely to Their Immigration Status..........................32

C. Appellants' Arguments in Support of the Memorandum Are Meritless................37

III. The Memorandum Violates the Constitutional and Statutory Requirements to Base Apportionment Solely on the Census's Enumeration. ....................................44

Conclusion.................................................................50

*iv*

## TABLE OF AUTHORITIES

**Cases**                                    **Page(s)**

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013)......... 19

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ........................................................... 30,31,34

*Carey v. Klutznick*, 508 F. Supp. 404 (S.D.N.Y. 1980) .................................................................... 16

*Carpenters Indus. Council v. Zinke*, 854 F.3d 1 (D.C. Cir. 2017).................................................... 20

*Central Delta Water Agency v. United States*, 306 F.3d 938 (9th Cir. 2002) ................................ 16

*Chafin v. Chafin*, 568 U.S. 165 (2013)................ 18,19

*Chiafalo v. Washington*, 140 S. Ct. 2316 (2020)....... 27

*City of San Jose v. Trump*, No. 20-cv-5167, 2020 WL 6253433 (N.D. Cal. Oct. 22, 2020).. 9,16,36

*Clinton v. City of New York*, 524 U.S. 417 (1998) .... 21

*Cuomo v. Clearing House Ass'n*, 557 U.S. 519 (2009) ................................................................... 35

*Department of Commerce v. Montana*, 503 U.S. 442 (1992) ........................................................... 46

*Department of Commerce v. New York*, 139 S. Ct. 2551 (2019) ............................. 5,17,20,24

*Department of Commerce v. United States House of Representatives*, 525 U.S. 316 (1999)............... 16

*Department of Homeland Security v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) .................................................................... 48

*Department of Homeland Security v. Thuraissigiam*, 140 S. Ct. 1959 (2020)............... 39

*v*

| Cases | Page(s) |
|---|---|
| *District of Columbia v. Heller*, 554 U.S. 570 (2008)... 39 | |
| *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016)........ passim | |
| *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) ............................................................ 21 | |
| *Franklin v. Massachusetts*, 505 U.S. 788 (1992)..passim | |
| *Friends of the Earth, Inc. v. Laidlow Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000)............... 18 | |
| *Gamble v. United States*, 139 S. Ct. 1960 (2019) ..... 39 | |
| *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990) .................................................... 28 | |
| *Honig v. Doe*, 484 U.S. 305 (1988) ........................... 22 | |
| *Kaplan v. Tod*, 267 U.S. 228 (1925) .......................... 39 | |
| *Knox v. Service Employees*, 567 U.S. 298 (2012) ...... 22 | |
| *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490 (7th Cir. 2005) .................................................... 21 | |
| *Legislature of California v. Padilla*, 9 Cal. 5th 867 (2020) ........................................................... 16 | |
| *Manufacturers Hanover Tr. Co. v. Yanakas*, 11 F.3d 381 (2d Cir. 1993) ........................................ 23 | |
| *McQuiggin v. Perkins*, 569 U.S. 383 (2013)............... 34 | |
| *Montana v. Wyoming*, 563 U.S. 368 (2011) ............. 41 | |
| *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)..... 49 | |
| *National Urban League v. Ross*, No. 20-cv-5799, 2020 WL 5739144 (N.D. Cal. Sept. 24, 2020)..... 8,9 | |
| *New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019) .......................................................... 34,35 | |

*vi*

**Cases**                                                    **Page(s)**

*New York v. Trump*, No. 20-cv-5770, 2020 WL
    5796815 (S.D.N.Y. Sept. 29, 2020) ................ 47,48

*New York v. United States Department of
    Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y.
    2019) .................................................................. 16

*Perrin v. United States*, 444 U.S. 37 (1979)............. 32

*Plyler v. Doe*, 457 U.S. 202 (1982)............................ 25

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020)............. 35

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149
    (2014) ............................................................ 14,16

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153
    (1978) ................................................................. 34

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*,
    513 U.S. 18 (1994) .......................................... 22,23

*United States v. Johnson*, 529 U.S. 53 (2000) .......... 34

*Useche v. Trump*, No. 20-cv-2225, 2020 WL
    6545886 (D. Md. Nov. 6, 2020) .................... passim

*Utah v. Evans*, 536 U.S. 452 (2002)......................... 44

*The Venus*, 12 U.S. (8 Cranch) 253 (1814)............... 38

**Constitutional Provisions**

U.S. Const.
    art. I, § 2, cl. 2...................................................... 29
    art. I, § 2, cl. 3............................................... passim
    art. I, § 3, cl. 3...................................................... 29
    art. II, § 1, cl. 5 ................................................... 27
    amend. XIV, § 2 .......................................... passim

*vii*

**Laws**                                                    **Page(s)**

*Session Laws (by year)*

Census Act of 1790, Ch. 2, 1 Stat. 101.............. 4,26,27

Act of Mar. 26, 1790, Ch. 3, 1 Stat. 103................... 34

Act of June 25, 1798, Ch. 58, 1 Stat. 570................. 30

Chinese Exclusion Act, Ch. 126, 22 Stat. 58 (1882).... 34

Immigration Act of 1924, Ch. 190, 43 Stat. 153....... 34

Census Act of 1929, Ch. 28, 46 Stat. 21................ 4,32

Census Act of 1940, Ch. 152, 54 Stat. 162................. 5

Census Act of 1941, Ch. 470, 55 Stat. 761................. 5

Pub. L. No. 94-521, 90 Stat. 2461 (1976)................ 4,5

Federal Reports Elimination and Sunset Act of
    1995, Pub. L. No. 104-66, 109 Stat. 707.............. 46

*U.S. Code*

2 U.S.C. § 2a ................................................... passim

8 U.S.C. § 1154 ............................................... 41

13 U.S.C. § 141 .............................................. passim

28 U.S.C. § 2201 ...................................... 20

49 U.S.C.
    § 5305.................................................... 17
    § 5336.................................................... 17
    § 47114................................................... 17

*States*

29 Del. Code § 805 .................................... 16

N.Y. Legislative Law § 93 ........................ 16

**Executive & Administrative**

8 C.F.R. § 214.14.......................................... 41

*viii*

**Executive & Administrative**                    **Page(s)**

Excluding Illegal Aliens from the Apportionment
    Base Following the 2020 Census, 85 Fed. Reg.
    44,679 (July 23, 2020)................................... passim

Exec. Order 13,880, 84 Fed. Reg. 33,821
    (July 16, 2019)................................................6,14

Final 2020 Census Residence Criteria and
    Residence Situations, 83 Fed. Reg. 5,525 (Feb.
    8, 2018) ..........................................................6,26

**Congressional Authorities**

*Debates*

Cong. Globe, 39th Cong., 1st Sess. (1866)
    359 ......................................................................30
    411 ......................................................................29
    432 ......................................................................29
    705 ......................................................................31
    1,256....................................................................29
    2,962....................................................................31
    2,987....................................................................29

71 Cong. Rec. (1929)
    1,822....................................................................35
    1,912....................................................................37
    1,958....................................................................37
    1967......................................................................35
    1,971....................................................................35
    1,973....................................................................35
    2,055-58 ..............................................................36
    2,266....................................................................35
    2,270....................................................................37
    2,276....................................................................36
    2,338....................................................................36
    2,339....................................................................36

*ix*

| **Congressional Authorities** | **Page(s)** |
|---|---|

*Debates* (*cont'd*)

86 Cong. Rec. 4,384-86 (1940) ................................... 37

*Hearings*

*1980 Census: Counting Illegal Aliens: Hearing Before the S. Subcomm. on Energy, Nuclear Proliferation, and Fed. Servs. of the Comm. on Gov'tal Affairs*, 96th Cong. (1980) ....................... 37

*Counting Every Person: Hearing Before H. Comm. on Oversight & Reform*, 116th Cong. (2020) ................................................... 49

*Reports*

H.R. Rep. No. 70-2010 (1929) ................................... 46

S. Rep. No. 71-2 (1929) .......................................... 4, 46

**Miscellaneous**

Alex Nowrasteh, *Deportation Rates in Historical Perspective* (Cato at Liberty, Sept. 16, 2019), https://tinyurl.com/y6qmavg9 .............................. 40

Emmerich de Vattel, *The Law of Nations* (Chitty 6th Am. ed. 1844) ............................................ 38

Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833 (1993) ................................. 30

James J. Davis, *One Hundred Years of Immigration*, N.Y. Times at XX1 (Feb. 17, 1924) ................................................... 36

Letter from John Adams to the President of Congress (Nov. 3, 1784), https://tinyurl.com/y2v58o8a ............................. 38

*x*

**Miscellaneous**                                    **Page(s)**

Noah Webster, *An American Dictionary of the
    English Language* (1828) .....................................26

Pew Research Center, *Five Facts about Illegal
    Immigration in the U.S.* (June 12, 2019),
    https://tinyurl.com/yxzgranr..........................26,40

*Reapportionment Plan Debated on Radio*, Sunday
    Star (Wash. D.C.) pt. 1, at 11 (June 9, 1929) ......35

*The Federalist* No. 54 (Avalon Project),
    https://tinyurl.com/y54kpd4h..............................28

*The Records of the Federal Convention of 1787*
    (Max Farrand ed., 1911) ............................. passim

Samuel Johnson, *A Dictionary of the English
    Language* (6th ed. 1785) .....................................26

Texas Legislative Council, Redistricting Process
    Timeline, https://tinyurl.com/y6yf2wwx..............16

## INTRODUCTION

The apportionment of seats in the House of Representatives has always been based on the total population of each State, without regard to immigration status. This unbroken practice is compelled by constitutional and statutory mandates to count, for purposes of apportionment, the "whole Number of . . . Persons," U.S. Const. art. I, § 2, cl. 3; the "whole number of persons in each State," U.S. Const. amend. XIV, § 2; 2 U.S.C. § 2a(a); and the "total population," 13 U.S.C. § 141(b). Those commands have been understood since their adoption to encompass all immigrants, including undocumented immigrants—the result of a clear choice to provide representation in the House to all persons affected and served by the federal government, and not only to citizens or voters.

The Presidential Memorandum at issue here defies these unambiguous mandates and breaks with more than two hundred years of history by excluding from the apportionment base millions of undocumented immigrants who indisputably reside in a State. The Memorandum bases this policy on purported "principles of representative democracy" (U.S. Br. App. ("App.") 8a (reprinting Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census, 85 Fed. Reg. 44,679 (July 23, 2020)), but the policy contravenes the actual "principle of representational equality" that was chosen by the Founders, reaffirmed by the Fourteenth Amendment's framers, and codified by the Congress that enacted the 1929 Census Act: that "the basis of *representation* in the House" should be "every individual of the community at large." *Evenwel v. Abbott*, 136 S. Ct. 1120, 1127 (2016*)* (quotation marks omitted).

2

A three-judge court in the Southern District of New York declared the Memorandum unlawful and enjoined its implementation. Since that ruling, two other three-judge courts have reached a similar conclusion. This Court should affirm the judgment below. The plain meaning of both the Constitution and the Census Act requires the inclusion in the apportionment base of all persons who usually reside here, regardless of immigration status. Appellants' contrary arguments misread the constitutional and statutory texts and cannot overcome the historical and common-sense understanding that a person's immigration status does not determine where the person lives.

## JURISDICTION

A three-judge court was convened under 28 U.S.C. § 2284. On September 10, 2020, the court entered final judgment. (Jurisdictional Statement App. (J.S.App.) 105a-107a.) The notice of appeal was timely filed on September 18, 2020. (J.S.App.108a-109a.) This Court's jurisdiction is invoked under 28 U.S.C. § 1253.

## STATEMENT

### A.  Constitutional and Statutory Background

1. The Constitution requires that Representatives "be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2. The "respective numbers" of "persons in each State" are determined by the decennial "actual Enumeration" of all persons living here. *Id.* art. I, § 2, cl. 3. The decennial enumeration is

3

made "in such Manner as [Congress] shall by Law direct." *Id.*

The Framers deliberately chose to require apportionment based on residence alone rather than narrower legal categories such as citizenship or voting eligibility. That choice was part of "the Great Compromise," which resolved deep disputes about representation in the new government by providing each State two Senate seats and allocating "House seats based on States' total populations," excepting only slaves under the Three-Fifths Clause and Indians not taxed. *Evenwel*, 136 S. Ct. at 1127. The Framers chose total population as the apportionment base to ensure that "equal numbers of people" had an equal number of representatives. 1 *The Records of the Federal Convention of 1787*, at 179 (Max Farrand ed., 1911) (James Wilson).

When drafting the Fourteenth Amendment, Congress reaffirmed that apportionment must be based on all persons usually residing in each State— regardless of their citizenship, immigration status, or other legal status. "Concerned that Southern States would not willingly enfranchise freed slaves, and aware that a slave's freedom could swell his state's population" for apportionment, the Fourteenth Amendment's framers "considered at length the possibility of allocating House seats to States on the basis of voter population" or citizen population. *Evenwel*, 136 S. Ct. at 1127 (quotation marks omitted). But Congress rejected these proposals, *id.* at 1128, and instead broadly required that apportionment be based on all "persons in each State."

2. Since the Census Act of 1790, Congress has mandated that the decennial census of population and

4

corresponding apportionment base include all persons who usually reside (i.e., usually live and sleep) in a State. *See, e.g.*, Census Act of 1790, Ch. 2, § 5, 1 Stat. 101, 103 (counting "inhabitants" at "usual place of abode" or "usual residence"). Accordingly, every decennial enumeration and apportionment base in our Nation's history has counted all usual residents, including undocumented immigrants, with the exceptions of slaves and Indians not taxed. (J.S.App.90a-92a.)

The current statutory scheme governing the census and apportionment was enacted in 1929, after Congress had failed for nearly a decade to reapportion itself following the 1920 census. *See* Ch. 28, §§ 2, 22, 46 Stat. 21 (1929) ("1929 Census Act" or "1929 Act"). To prevent another such lapse, Congress made apportionment a "virtually self-executing scheme" that follows immediately from the decennial census's tabulation of total population. *See Franklin v. Massachusetts*, 505 U.S. 788, 791-92 (1992); S. Rep. No. 71-2, at 4 (1929). In the 1929 Act, Congress required the Secretary to conduct the decennial census of population and report a single set of numbers—"the tabulation of total population by States as required for the apportionment of Representatives"—to the President. Ch. 28, § 2, 46 Stat. at 21; *see* Pub. L. No. 94-521, § 7, 90 Stat. 2461, 2459 (1976) (codified at 13 U.S.C. § 141(a)). The Act required that the President then transmit to Congress a statement showing the "whole number of persons in each State, excluding Indians not taxed, as ascertained under . . . the decennial census of the population, and the number of Representatives to which each State would be entitled" under the apportionment formula. Ch. 28, § 22(a), 46 Stat. at 26; *accord* 2 U.S.C. § 2(a). In

5

enacting the 1929 Act, Congress rejected proposals to exclude immigrants—including undocumented immigrants—from the apportionment base.[1] (J.S.App.88a.)

The relevant statutory provisions have remained essentially unchanged, except for amendments that set deadlines, *see* Census Act of 1940, Ch. 152, § 1, 54 Stat. 162, 162; Pub. L. No. 94-521, § 7, 90 Stat. at 2459, and altered the formula for calculating the apportionment figures, Census Act of 1941, Ch. 470, § 2(a), 55 Stat. 761, 762. The statutes provide that the Secretary of Commerce "shall . . . take a decennial census of population" as of April 1, 2020, and report the tabulation of each State's total population to the President by December 31, 2020. 13 U.S.C. § 141(a)-(b). Between January 3 and January 10, 2021, the President "shall transmit" the apportionment statement to Congress. 2 U.S.C. § 2a(a). Within fifteen days of receiving the President's statement, "[i]t shall be the duty of the Clerk of the House" to transmit to "each State a certificate of the number of Representatives to which such State is entitled." *Id.* § 2a(b).

### B. Factual Background

1. More than two years ago, the Secretary of Commerce announced his plan to include a citizenship question on the decennial census questionnaire. In June 2019, this Court held that the Secretary's professed reason for adding a citizenship question was pretextual and thus violated the Administrative Procedure Act, 5 U.S.C. § 706. *Department of Commerce v.*

---

[1] Appellants use "Census Act" to refer to 13 U.S.C. § 141, and "Reapportionment Act" to refer to 2 U.S.C. § 2a. But these two provisions were enacted together in 1929. This brief accordingly uses "Census Act" to refer to both provisions.

6

*New York*, 139 S. Ct. 2551, 2574-75 (2019). A few weeks later, in July 2019, the President issued an Executive Order directing federal agencies to assist the Census Bureau in compiling "accurate citizenship data" about "the number of citizens and non-citizens in the country" by means other than a citizenship question. Exec. Order 13,880, § 1, 84 Fed. Reg. 33,821, 33,821-22 (July 16, 2019).

The decennial census of population began in January 2020 (J.S.App.15a.), and since then the Census Bureau has been working to enumerate every person at their usual residence—i.e., where they lived and slept most of the time as of April 1. Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5,525, 5,526 (Feb. 8, 2018). That enumeration indisputably includes undocumented immigrants. *See id.* at 5,530.

Shortly after the census began, Appellants extended the census's operational deadlines due to the COVID-19 pandemic to continue field operations until October 31 rather than September 30, 2020. Appellants also announced that the Secretary would send the Section 141(b) report to the President by April 30, 2021, rather than December 31, 2020. (J.S.App.16a.)

2. On July 21, 2020, with only three months remaining for census field operations, the President issued the Memorandum at issue here. The Memorandum declares that "[f]or the purpose of the reapportionment of Representatives following the 2020 census, it is the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status" (hereinafter "undocumented immigrants") "to the maximum extent feasible and

7

consistent with the discretion delegated to the executive branch." (App.8a.)

The Memorandum explains that its policy is intended to reduce the House representation of States with larger populations of undocumented immigrants. Referring to the more than two million undocumented immigrants who live in California, the Memorandum states that "[i]ncluding these illegal aliens in the population of the State for the purpose of apportionment could result in the allocation of two or three more congressional seats than would otherwise be allocated." (App.9a.) The Memorandum asserts that "States adopting policies . . . that hobble Federal efforts to enforce" immigration laws "should not be rewarded with greater representation." (App.8a.)

The Memorandum directs the Secretary to send two different sets of numbers to the President in the Section 141(b) report: (a) the tabulation of each State's total population as determined by the decennial census, which will indisputably include undocumented immigrants (J.S.App.19a); and (b) separate "information permitting the President," "following the 2020 census," to carry out the policy of excluding undocumented immigrants from the apportionment figures that the President transmits to Congress under Section 2a(a). (App.8a.)

## C. Procedural History

1. On July 24, 2020, Government Appellees—twenty-two States, the District of Columbia, fifteen local governments, and the U.S. Conference of Mayors—filed a lawsuit in the U.S. District Court for the Southern District of New York. They alleged that the Memorandum violates, inter alia, Article I of the

8

Constitution, the Fourteenth Amendment, and the Census Act. Government Appellees' case was consolidated with a similar case filed by private organizations serving immigrant communities. A three-judge court was convened under 28 U.S.C. § 2284. (J.S.App.21a-22a.)

A few days after this lawsuit was filed, Appellants announced that they were accelerating their operational deadlines to complete census field operations and submit the Secretary's Section 141(b) report. Appellants rescheduled the end of field operations to September 30, and shortened the deadline for submitting the Section 141(b) report to December 31, 2020. *See National Urban League v. Ross*, No. 20-cv-5799, 2020 WL 5739144, at *6-7 (N.D. Cal. Sept. 24, 2020).

2. On September 10, 2020, the district court granted summary judgment to Government Appellees on their statutory claims, entered final judgment declaring the Memorandum unlawful, and permanently enjoined Appellants, except for the President, from including in the Section 141(b) report information about the number of undocumented immigrants in each State. (J.S.App.94a-107a.)

The court determined that Government Appellees had standing because the Memorandum was interfering with the census count by deterring immigrant households from responding to the census. (J.S.App.25a-35a, 44a-48a.) The court further determined that this reduction in census participation injures Government Appellees by, inter alia, degrading the accuracy of census data used to distribute federal funding and relied on by Government Appellees for important government functions. (J.S.App.48a-59a.) The court did not reach Appellees'

9

separate argument that they have standing due to the imminent loss of House representation that will be inflicted on them through the subtraction of undocumented immigrants from the apportionment base.

On the merits, the court held that the Memorandum violated the Census Act in "two independent ways." (J.S.App.93a.) First, the Memorandum's categorical exclusion of millions of undocumented immigrants who indisputably reside in a State violated Congress's command to include in the apportionment base all "persons in each State" "as ascertained under . . . the decennial census of the population," regardless of immigration status. (J.S.App.83a-92a.) Second, the Memorandum contravened the Act's mandate "to use the results of the census—and only the results of the census—in connection with the apportionment." (J.S.App.79a.)

Shortly after the district court invalidated the Memorandum, the U.S. District Court for the Northern District of California (Koh, J.) issued a preliminary injunction in a different case reinstating the October 31 deadline for census field operations. *National Urban League*, 2020 WL 5739144, at *48. After this Court stayed that preliminary injunction, Appellants ended census field operations on October 15. *See City of San Jose v. Trump*, No. 20-cv-5167, 2020 WL 6253433, at *11 (N.D. Cal. Oct. 22, 2020) (per curiam).

3. Two other three-judge courts have since found the Memorandum's policy to be unlawful. *See id.* at *26-49 (finding violations of both Census Act and Constitution); *Useche v. Trump*, No. 20-cv-2225, 2020 WL 6545886, at *9-14 (D. Md. Nov. 6, 2020) (per curiam) (finding violation of Census Act).

10

## SUMMARY OF ARGUMENT

I. This case presents a live case or controversy that satisfies the requirements of Article III. The Memorandum's direction to subtract undocumented immigrants from the apportionment base threatens several Government Appellees with the concrete and imminent injury of losing seats in the House of Representatives. Appellants' own representations and actions establish that they will fully implement the Memorandum's directive in just a few weeks and accomplish the Memorandum's explicit goal of taking representation away from Government Appellees. Moreover, the Memorandum separately threatens Government Appellees with loss of federal funding if, as Appellants contend, they will subtract undocumented immigrants from the census population counts often used to allocate such funds. Even if these representational and funding injuries were not concrete enough to provide standing at the outset, they have become sufficiently imminent to provide standing now and defeat Appellants' assertion that the case became moot when the Memorandum's harms to census participation ended.

The Memorandum's deterrent effect on census participation also harmed Government Appellees and conferred jurisdiction on the district court below. Although that injury is now past, the mootness exception for disputes that are capable of repetition yet evade review applies because Appellants' own actions ensured that the census-count harms would end before appellate review could be completed.

II. The Memorandum's directive to exclude all undocumented immigrants from the apportionment base violates the constitutional and statutory

11

commands to apportion based on all "persons in each State" and the "total population" of each State.

The Constitution requires apportionment based on all "persons in each State." The drafters explicitly carved out specific exemptions from this broad language (slaves under the Three-Fifths Clause and Indians not taxed) but said nothing about immigration status or any other legal status. As a result, since the founding, this expansive language has always been understood to mean that all persons who have a usual abode or home in a State must be counted without regard to legal status such as citizenship, voter eligibility, or immigration status. Both the Founders and the Fourteenth Amendment's framers understood that the broad language they chose would include the entire immigrant population: they considered and rejected apportionment bases that would have used immigration status to exclude usual residents. That conscious decision reflected a fundamental policy choice to use an apportionment base that includes all persons living here, to provide equal representation in the House for all persons affected and served by the government.

The Census Act's mandate to apportion based on all "persons in each State" "as ascertained under the . . . decennial census of the population" independently imposes a statutory requirement that the apportionment base include all undocumented immigrants who usually reside in a State. When this operative language was first enacted in 1929, its common public meaning incorporated the 150-year understanding, supported by unbroken historical and legislative practice, that these broad words encompassed all persons actually living here, including undocumented immigrants. And history and context

12

further establish that the Act's apportionment mandate was commonly understood to include undocumented immigrants specifically.

The Memorandum squarely violates these constitutional and statutory requirements by excising from the apportionment base millions of undocumented immigrants who have lived here for decades, intend to remain, and will in fact stay, and who the Census Bureau will already have determined are in fact usual residents under the traditional criteria. Nothing in the text or history of the Constitution or Census Act suggests that Appellants may treat millions of people who undisputedly live here as if they were not here, solely because of their immigration status.

III. The Memorandum separately violates constitutional and statutory requirements to use the decennial census's total-population counts as the apportionment base. The Memorandum and Appellants' statements make clear that Appellants will produce completed decennial census total-population counts that include undocumented immigrants who usually reside in a State, and then excise all undocumented immigrants from those counts to calculate the apportionment. Such post-census alteration of the apportionment base would allow precisely the kind of political manipulation that the Framers and Congress sought to avoid by tying apportionment to the census. Appellants' defense of the Memorandum as an exercise of the President's power to make policy judgments about the census itself does not describe the actual authority that the Memorandum purports to exercise.

13

## ARGUMENT

### I. This Case Presents a Live Case or Controversy That Satisfies the Requirements of Article III.

From the outset of this litigation, Government Appellees suffered three distinct injuries from the Memorandum: harm to their share of Representatives in the House ("representation harm"); potential reduction of federal funding ("funding harm"); and distortion of the census count by immigrants deterred from responding ("census-count harms"). Appellants argue that the representation and funding harms are too speculative to support standing, and the census-count harms are now moot because field-data collection has ended. But each of those injuries continues to satisfy Article III. The representation and funding harms were concrete from the outset, and they are even more concrete now because Appellants have admitted that they are working assiduously to fully implement the Memorandum and intend to do so in just a few weeks. The census-count harms provided undisputed standing at the outset of this case; and Appellants' own actions to end the count before meaningful appellate review do not deprive the Court of jurisdiction.

### A. The Memorandum Threatens Concrete and Imminent Harm to Government Appellees' Representation and Federal Funding.

1. The express purpose and effect of the Memorandum is to reduce certain States' "congressional representation based on the presence of aliens who are not in a lawful immigration status." (App.8a.) Appellants argue that such injury is currently "too

14

speculative" because it is "unknown" whether Appellants will in practice be able to excise undocumented immigrants from the population count in sufficient numbers to affect apportionment. (Br. 19.) But a future injury need not be guaranteed to provide standing; there need be only a "substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Here, the risk of apportionment injury is substantial given that such injury is the express purpose of the Memorandum, Appellants are working to implement the Memorandum right now, and Appellants expect to implement the Memorandum fully in a few weeks.

The Memorandum announces that its implementation will cause and is intended to cause certain States to lose "representation in the House of Representatives." (App.8a.) It predicts the loss of "two or three . . . congressional seats" from a State identifiable as California (where two Government Appellees are located) if undocumented immigrants are excluded from the apportionment base. (App.9a.) And the unrebutted evidence below confirms that several other States are exceedingly likely to lose representation under Appellants' policy to exclude from the apportionment base, "to the maximum extent feasible," all "aliens who are not in lawful immigration status." (App.8a; *see* J.A.344-345, 367 (identifying Texas and New Jersey).)

Ample evidence from Appellants establishes that they are already executing "concrete plans to implement fully the Memorandum." *Useche*, 2020 WL 6545886, at *4. Appellants have been collecting "data on the number of citizens, non-citizens, and illegal aliens in the country" for over a year. Exec. Order No. 13,880, 84 Fed. Reg. at 33,821, 33,824. During the

15

jurisdictional phase of this appeal, Appellants noted statements from the Associate Director of Decennial Census Programs explaining the steps the Bureau is taking "to fully implement the Presidential Memorandum." (Supp. Br. 4.) Appellants have represented that the Bureau "fully anticipates being able to" implement the Memorandum successfully. (Oral Argument Tr. 7:25-8:1 (Oct. 14, 2020), *Useche*.) And the Maryland three-judge court found that the record there was "replete with evidence of concrete plans to provide the President with a number approximating the total number of undocumented immigrants in each state." *Useche*, 2020 WL 6545886, at *6. For example, the Bureau announced "exact dates," *id.*, to complete providing tranches of information to implement the Memorandum, including an initial submission of the number of "unlawful aliens in ICE Detention Centers," followed by "other Presidential Memorandum-related outputs," *id.* (quotation marks omitted).

Appellants nonetheless assert that "[i]t remains uncertain" whether it will be "feasible" to exclude enough undocumented immigrants to affect apportionment. (Br. 19.) But Appellants cite no evidence to support this claim and have identified no obstacle to "fully implementing" the Memorandum and thus achieving its stated goal of altering apportionment. (Supp. Br. 4.) That silence is conspicuous given that the December 31 statutory deadline for the Section 141(b) report is weeks away, so Appellants must by now have considerable information about the extent to which they will implement the Memorandum. Absent any further disclosure from Appellants, the one-sided evidence that Appellants will fully implement the Memorandum's policy in a few weeks establishes a

16

substantial risk of representation injury to Government Appellees. *See Central Delta Water Agency v. United States*, 306 F.3d 938, 948 (9th Cir. 2002).

To the extent that prudential ripeness factors warrant consideration, they do not favor delaying adjudication here. *See Susan B. Anthony*, 573 U.S. at 167. No factual development is needed to review the purely legal issue of whether the Memorandum is unlawful. And deferring adjudication of this dispute would cause substantial harm by delaying final resolution of the new apportionment that will govern the next congressional elections, as Appellants have argued. (Mot. to Expedite 6.) Deferred adjudication would also prejudice Government Appellees by interfering with redistricting efforts, which begin shortly after the apportionment.[2] *See Useche*, 2020 WL 6545886, at *8; *San Jose*, 2020 WL 6253433, at *24-25.

There is thus no merit to Appellants' assertion (Br. 21) that "judicial review of the Memorandum" should wait "until it is implemented." Courts have regularly considered challenges to apportionment- or census-related policies before they were fully implemented. *See Department of Commerce v. United States House of Representatives*, 525 U.S. 316, 331-32 (1999); *New York v. United States Department of Commerce*, 351 F. Supp. 3d 502, 573-74 (S.D.N.Y. 2019); *Carey v. Klutznick*, 508 F. Supp. 404, 407, 411-12 (S.D.N.Y.

---

[2] *E.g.*, Texas Legislative Council, Redistricting Process Timeline (May 31 deadline for Legislature to enact state legislative maps during regular session), https://tinyurl.com/y6yf2wwx; 29 Del. Code § 805 (Delaware legislative redistricting completed by June 30, 2021); N.Y. Legislative Law § 93(2) (twelve public hearings before proposed redistricting plan due September 15); *Legislature of California v. Padilla*, 9 Cal. 5th 867, 881 (2020) (proposed map to public by November 1, 2021).

17

1980). "And while it may be *possible* to remedy a harm to representation after the fact, it is not required, and it is hard to see why it would be desirable here." *Useche*, 2020 WL 6545886, at *8 (citations omitted)

2. Government Appellees separately face potential injury from loss of federal funding. Although the Memorandum on its face purports to exclude undocumented immigrants only for apportionment purposes (App.8a), Appellants' argument on the merits is that the President's authority to do so rests on the purportedly untrammeled executive authority to determine "the contents of the decennial census" itself. (Br. 23.) But if the effect of the Memorandum is to excise undocumented immigrants from the census itself, then that modification puts Government Appellees at risk of losing funding from programs that distribute funds based on, e.g., "the most recent decennial census," 49 U.S.C. § 5336(a)(1), (c)(1); the "latest available decennial census," *id.* § 5305(d)-(e); or "the population stated in the latest decennial census," *id.* § 47114(d). Such funding injuries satisfy Article III. *See Department of Commerce*, 139 S. Ct. at 2565.

Appellants claim that any funding injury is "speculative" and fault Government Appellees for failing to "demonstrate[] that the [federal] entities that administer any particular funding statute" will reduce funding based on the Memorandum. (Br. 19-20.) But those "entities" are under the direct control of Appellants, who have conspicuously not committed to insulate Government Appellees from any funding injury. Absent such reassurances, the risk that Appellants' own legal arguments may cause an adverse impact on federal funding is substantial enough to support standing.

18

3. The Memorandum's imminent harms to representation and federal funding provided Government Appellees with standing from the outset of the case. But even if these harms were not concrete enough at the outset, they have become sufficiently imminent and concrete to provide standing now and thus provide one reason to reject Appellants' assertion that the case became moot when field-data collection ended. (For other reasons, see *infra* at 19-22.)

"[T]here are circumstances in which the prospect that a defendant will engage in . . . harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Friends of the Earth, Inc. v. Laidlow Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). That is because "by the time mootness is an issue, the case has been brought and litigated," and "abandon[ing] the case at an advanced stage may prove more wasteful than frugal." *Id.* at 191-92. Here, at this advanced stage of the litigation, the imminent and likely injuries to representation and funding are sufficient to overcome mootness, *see Chafin v. Chafin*, 568 U.S. 165, 1712 (2013), particularly given that Appellants' own words and actions have confirmed their dedication to fully implementing the Memorandum.

Contrary to Appellants' argument, nothing prevents this Court from rejecting mootness based on an injury different from the one that initially conferred standing below—particularly when, as here, the challenged conduct has not ceased and the passage of time has made that injury even more likely. *Friends of the Earth* stated that a case is not moot if the same "allegedly unlawful *conduct*" is likely to recur, 528 U.S. at 184 (emphasis added)—not, as Appellants claim, only when the "same injury" will recur (Br. 21).

19

And *Already, LLC v. Nike, Inc.* held only that the
"alternative theories" there were insufficient because
the conduct that had triggered the lawsuit had ceased
and could not reasonably be expected to recur. 568
U.S. 85, 96-97 (2013).

Here, while the harms may have changed,
Appellants' conduct has not. Their continued dedica-
tion to implement the Memorandum thus forecloses
any argument that the dispute here is merely "a
matter of academic debate," *Chafin*, 568 U.S. at 176,
in which it is "impossible for a court to grant any
effectual relief," *id.* at 172 (quotation marks omitted).
A decision from this Court would directly affect the
parties by determining whether Appellants can in fact
implement the Memorandum and thereby reduce the
representation of certain States in the House. (App.8a.)

## B. The Memorandum's Harms to the Census Count Provided the District Court with Jurisdiction and Fall Within the Evading-Review Exception to Mootness.

1. The district court found that the Memorandum
was having an immediate "deterrent effect on census
participation" that directly injured Government
Appellees by, among other things, degrading the
census data that Government Appellees rely on for
redistricting and many other critical decisions.
(J.S.App.38a-43a.) Appellants assert that Appellees
failed to provide concrete evidence of this "chilling
effect." (Br. 17-18.) But that argument ignores the
extensive and unrebutted expert and fact witness
submissions that explained how the Memorandum's
policy "engenders fear and distrust" among immi-
grants and their families (J.S.App.31a) and suppresses
participation by communicating that "they will not

20

count for apportionment purposes" (J.S.App.65a; *see* J.S.App.30a-43a). "[T]he undisputed facts in the record" (J.S.App.47a) thus established the requisite causal connection between Appellants' actions and Government Appellees' harms through the Memorandum's predictable deterrent effect on census participants. *See Department of Commerce*, 139 S. Ct. at 2566.

The same uncontested evidence established redressability. That evidence and simple logic demonstrate that when immigrants are deterred from census participation by a government policy to disregard their responses, eliminating that policy will remove the deterrent and restore participation. (J.S.App.42a-43a.) Moreover, it is hardly "implausible" (Br. 18) that immigrants would be more likely to participate if a court were to hold that their responses matter for the census's principal function (J.S.App.65a). *Cf. Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017) (Kavanaugh, J.) ("common sense" is "useful tool" in predicting causal effects).

2. There was no "mismatch" (Br. 14) between the census-count injury and the district court's relief. Appellants mistakenly characterize the judgment as awarding only "*future* relief against the Secretary's report." (Br. 17 (emphasis added).) The judgment below actually ordered *immediate* relief to redress the harms to then-ongoing data collection. The declaration that the Memorandum is unlawful immediately affected the parties' "rights and other legal relations," 28 U.S.C. § 2201(a), and the injunction immediately began constraining the Secretary from including

21

information about undocumented immigrants in the Section 141(b) report.[3] (J.S.App.106a-107a.)

Even if the judgment below concerned only future relief, "the present impact of a future though uncertain harm may establish injury in fact." *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 498 (7th Cir. 2005). For example, in *Clinton v. City of New York*, this Court held that New York City had standing to challenge a line-item veto that exposed the City to potential future liability because the prospect of liability "immediately and directly affect[ed] the [City's] borrowing power, financial strength, and fiscal planning." 524 U.S. 417, 431 (1998). No principle of law disables a court from redressing present harm inflicted by an imminent future event.

3. Although the census-count harms have ended, this Court has jurisdiction to redress the imminent harms to representation and federal funding. See *supra* at 13-19. And focusing solely on the census-count harms, this case is not moot because that injury "fit[s] comfortably within the established exception to mootness for disputes capable of repetition, yet evading review." *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 462 (2007). Appellants' own actions ensured that there would be insufficient time for appellate review before the census count ended: Appellants issued the Memorandum three months before the scheduled end of field-data collection, then abruptly shortened that schedule. Having given the courts almost no time to address harm to the census count, Appellants cannot now rely on the end of that

---

[3] The Secretary is permitted to issue the report earlier than December 31.

22

count to generate mootness. *See Knox v. Service Employees*, 567 U.S. 298, 307 (2012) ("maneuvers designed to insulate a decision from review by this Court must be viewed with a critical eye").

Appellants contend that the mootness exception does not apply because a future administration might not readopt the Memorandum's policy. (Br. 16.) But for purposes of the mootness exception, the question is "whether the controversy was *capable* of repetition," not whether "a recurrence of the dispute was more probable than not." *Honig v. Doe*, 484 U.S. 305, 319 n.6 (1988). Here, the capability of recurrence of a similar dispute over harm to census participation is demonstrated by the regular conducting of the census; the brief duration of field-data collection; and the likelihood of litigation over subjects as important as the enumeration and apportionment. *Cf. Franklin*, 505 U.S. at 790 ("As one season follows another, the decennial census has again generated a number of reapportionment controversies.").

4. Even if this dispute were moot, vacatur of the judgment below would not be appropriate. (Br. 16-17.) Because Appellants lost below, it is their burden to establish "equitable entitlement to the extraordinary remedy of vacatur," *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994). They have not met that burden because it was their own actions that "caused the mootness" that they now cite to vacate an adverse decision. *See id.* at 24.

Nothing compelled Appellants to issue the Memorandum mid-census and then abruptly end field-data collection. They could have issued the Memorandum either well before field-data collection began, or after it concluded. (J.S.App.67a.) But having

23

instead chosen a course that both inflicted census-count injury and then guaranteed that it would end before this Court's review, Appellants should not be able to use their own actions "to eliminate [their] loss without an appeal," *Manufacturers Hanover Tr. Co. v. Yanakas*, 11 F.3d 381, 383 (2d Cir. 1993).

The public interest also weighs heavily against vacatur here. Because "[j]udicial precedents are presumptively correct and valuable," they "should stand unless a court concludes that the public interest would be served by a vacatur." *U.S. Bancorp*, 513 U.S. at 26 (quotation marks omitted). The ruling below canvassed hundreds of years of precedent and concluded that Appellants had exceeded their authority by adopting a policy that, for the first time in this Nation's history, would exclude persons who live here from the apportionment base solely because of their immigration status. The court's considered decision on this important issue should not be discarded simply because Appellants left no time for appellate review.

## II. Appellants' Reliance on Immigration Status Alone to Subtract Residents from the Apportionment Base Violates Both the Constitution and the Census Act.

The Constitution and the Census Act both require that all "persons in each State" be included in the apportionment base. U.S. Const. amend. XIV, § 2; 2 U.S.C. § 2a(a). Since the founding, every branch of the federal government has understood that language to encompass, at minimum, all persons who usually reside in a State—i.e., those who usually live and sleep there and intend to remain—regardless of citizenship or immigration status, with the only exceptions being the Constitution's explicit carve-outs for slaves and

24

Indians not taxed. The requirement to include all residents in the apportionment base reflected the foundational principle that representation in the House should be provided to all persons affected and served by the federal government, rather than to a subset of the population with particular legal status. Every decennial census and corresponding apportionment in this Nation's history has indisputably included all such residents, including undocumented immigrants.

The Memorandum breaks with this "open, widespread, and unchallenged" understanding and practice, *Department of Commerce*, 139 S. Ct. at 2567, and defies the principles of representational government embodied in both the Constitution and the Census Act. To comply with the policy set forth in the Memorandum, the Census Bureau will first complete an enumeration of all persons who usually reside in each State, including undocumented immigrants. But rather than using that enumeration for apportionment, Appellants will then identify and excise from that population all "aliens who are not in a lawful immigration status" (App.8a)—even if they have lived here for years and indisputably intend to remain. (J.S.App.84a.)

Nothing in the Constitution or the Census Act authorizes Appellants to disregard every indicator of usual residence in this manner and exclude immigrants from the apportionment base due solely to their undocumented status. At multiple points in history, this Nation has confronted the question of whether to excise certain residents from the apportionment base. As this Court explained in *Evenwel*, the consistent answer has been to reject such efforts and include the total population residing here, without regard to legal status or rights—whether citizenship, voter eligibility,

25

or immigration status. There is no indication that in resolving this foundational dispute, the Founders, the Fourteenth Amendment's framers, or the Congress that enacted the 1929 Census Act included in the discretion it gave the Executive Branch the authority to excise millions of longstanding residents from the apportionment base and thus to alter the balance of political power among the States. (Br. 22.)

The district court correctly found that the Memorandum's unprecedented policy violates the Census Act. (J.S.App.93a.) For similar reasons, the Memorandum's policy violates the Constitution. This Court may affirm on either ground.

### A. The Constitution's Inclusion of All "Persons in Each State" in the Apportionment Base Encompasses Undocumented Immigrants Who Reside in a State.

The Memorandum's exclusion of undocumented immigrants from the apportionment base violates two related provisions of the Constitution. Article I requires that apportionment be based on the "respective Numbers" of "persons" in each State, U.S. Const. art. I, § 2, cl. 3, and the Fourteenth Amendment mandates apportionment based on "the whole number of persons in each State," *id.* amend. XIV, § 2. Appellants concede (J.S.App.83a) that undocumented immigrants are "persons." *Plyler v. Doe*, 457 U.S. 202, 210-216 (1982). And, as this Court has held, the phrase "in each State" includes all "usual resident[s]" of a State, *Franklin*, 505 U.S. at 804-05—a term understood since the founding to include all individuals, regardless of immigration status, who

26

"live and sleep most of the time" in a State, 83 Fed. Reg. at 5,533 (recounting history).

The Memorandum flouts these constitutional mandates by relying on immigrants' undocumented status alone to exclude them from the apportionment base—even when they otherwise satisfy all of the traditional criteria for usual residence by, for example, living in a State for years and manifesting every intent to stay. *See* Pew Research Center, *Five Facts about Illegal Immigration in the U.S.* (June 12, 2019) (66% of undocumented adults have lived in United States for more than ten years), https://tinyurl.com/yxzgranr. Nothing in Article I or the Fourteenth Amendment authorizes Appellants to thus disregard the fact of undocumented immigrants' actual and long-term residence here.

To the contrary, since the founding, Article I's reference to the "respective Numbers" of "Persons" in each State has been understood to refer to all persons whose "usual place of abode" is in the State, a concept that is independent of any legal status that such an individual might have. *Franklin*, 505 U.S. at 804-05. The first Census Act—which is "persuasive" on the Constitution's meaning, *id.* at 803—referred to individuals' "usual place of abode" or "settled place of residence," Census Act of 1790, § 5, 1 Stat. at 103; and contemporaneous dictionaries likewise defined related terms like "inhabitant" to mean "one that lives or resides in a place," 1 Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785). The key inquiry was thus to determine the State that could be considered each person's actual home, as opposed to a State where the person was just "an occasional lodger or visitor," 1 Noah Webster, *An American Dictionary of the English Language* (1828) (defining "inhabitant").

27

Founding-era sources consistently reflected this common understanding that "in a State" means the State where a person regularly lives and considers her home, even if she was "occasionally absent" and thus temporarily sleeping elsewhere on Census Day. Census Act of 1790 § 5, 1 Stat. at 103; *see Franklin*, 505 U.S. at 805; 2 Farrand, *Records*, *supra*, at 217.

Absent from the text of these constitutional provisions is any indication that a person with a "usual place of abode" in a State could nonetheless be excluded from the apportionment base because of his legal status alone. In only two circumstances were such exclusions authorized, and both appeared explicitly in the Constitution: Article I provided that slaves would count as only three-fifths of a person for apportionment, and Article I and the Fourteenth Amendment excluded "Indians not taxed" from the apportionment base, U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2. And in other provisions of the Constitution, the drafters used express terms when they wanted to refer to a subcategory of "persons" residing here. *E.g.*, *id.* art. II, § 1, cl. 5 ("No Person except a natural-born Citizen . . . shall be eligible" to be President). The use of such explicit language elsewhere shows that the drafters knew how to limit the apportionment base when they intended to do so, and accordingly preclude any inference of additional implied exclusions based on immigration status. *See Chiafalo v. Washington*, 140 S. Ct. 2316, 2325 (2020).

History, including the drafting history that Appellants cite (Br. 31-32), confirms this point. The draft of Article I submitted to the Committee of Style adopted for apportionment the same expansive definition of "inhabitants" used for direct taxes, i.e., all individuals "of every age, sex and condition," 2 Farrand,

28

*Records*, *supra*, at 571; *id.* at 566—broad language that barred exclusion of individuals for factors unrelated to their usual residence. And the Founders and the Fourteenth Amendment's framers persistently declined to adopt narrower apportionment bases that would have excluded certain residents because they lacked legal rights or privileges. For example, James Madison supported reapportionment based on "the aggregate number of inhabitants," *The Federalist* No. 54 (Avalon Project), https://tinyurl.com/y54kpd4h, to *reject* the idea that it should be based on voting eligibility. *See Evenwel*, 136 S. Ct. at 1128. The Founders also knew that the use of total population would include indentured servants, convicts, and persons with mental illness, who lacked not only voting rights but also many other legal freedoms. *See* U.S. Const. art. I, § 2, cl. 3 ("free persons" included "those bound to service for a term of years"); *Garza v. County of Los Angeles*, 918 F.2d 763, 774 (9th Cir. 1990). There is no dispute that the broad language chosen by the Constitution's drafters requires inclusion of all of these residents in the apportionment base, notwithstanding their legal status. Article I and the Fourteenth Amendment likewise do not permit the exclusion of immigrants whose "usual place of abode" is in a State, solely because they may be undocumented.

In *Evenwel*, this Court examined this constitutional language and history and squarely held that both the Founders and the Fourteenth Amendment's framers deliberately chose to use "total population as the congressional apportionment base," rather than some subset of the population based on legal status. 136 S. Ct. at 1128. The history discussed in *Evenwel* showed how total population was selected over voter

29

population as a basis for congressional apportionment. *Id.* at 1127-29. Debates over excising immigrants from the apportionment base led to the same result.

For example, during the Constitutional Convention, the Founders discussed the "danger" that noncitizens living here might have "foreign predilections," 2 Farrand, *Records*, *supra*, at 268-69, or "insidious purposes," *id.* at 216. They addressed such concerns in other parts of the Constitution—for example, by requiring that a "person" must, among other things, be a United States citizen for several years to be a member of Congress. U.S. Const. art. I, § 2, cl. 2; *id.* § 3, cl. 3; *see* 2 Farrand, *Records*, *supra*, at 216-18, 268-69. But they placed no similar limitations on the apportionment base.

Similarly, the Fourteenth Amendment's framers openly debated and ultimately chose to retain the inclusion of all immigrants living here in the apportionment base. *See Evenwel*, 136 S. Ct. at 1127; Cong. Globe, 39th Cong., 1st Sess. 432 (1866) (Representative Bingham) ("[u]nder the Constitution as it now is and as it always has been, the entire immigrant population of this country is included in the basis of representation"). Proponents of retaining total population as the apportionment base repeatedly declared their refusal to "throw[] out of the basis at least two and a half millions of unnaturalized foreignborn" persons. Cong. Globe, 39th Cong., 1st Sess. 1,256 (Senator Wilson); *see id.* at 2,987 (Senator Wilson) (refusing to "strike[] the two million one hundred thousand unnaturalized foreigners who are now counted in the basis of representation"); *id.* at 411 (Representative Cook) (representation based on voters improperly "takes from the basis of representation all unnaturalized foreigners"). And the inclusion of all

30

immigrants in the total-population apportionment base was essential to securing the support of States with large immigrant populations: as Representative Conkling explained, "the number of aliens in some States is very large" and "the large States now hold their representation in part by reason of their aliens." *Id.* at 359.

Appellants attempt to dismiss all of this history as irrelevant because it preceded "the first federal immigration restrictions . . . in 1875" and thus could not be referring to "the subset of *illegal* aliens." (Br. 35.) But 1875 was not the first time that this Nation denied certain immigrants permission to enter or remain. For example, the Alien and Sedition Acts in 1798 provided for the arrest and deportation of noncitizens living here. *E.g.*, Act of June 25, 1798, Ch. 58, 1 Stat. 570. And before the Fourteenth Amendment's enactment, many States had prohibited entry by immigrants who had been convicted of crimes, had illnesses or disabilities, or were public charges. *See* Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833 (1993). The broad language about including *all* immigrants in the apportionment base thus necessarily encompassed immigrants who resided here in violation of the law.

In any event, the "limits of the drafters' imagination" about future immigration law "supply no reason to ignore," *Bostock v. Clayton County*, 140 S. Ct. 1731, 1737 (2020), the plain meaning of the Constitution's expansive requirement to apportion based on all "persons in each State." Broadly worded provisions often apply to "situations not expressly anticipated" by the drafters. *Id.* at 1749. Such applications "demonstrate[] the breadth" of the language

31

chosen by the drafters; they do not provide a reason to disregard the plain meaning of a constitutional command. *Id.* (original brackets omitted).

The broad inclusiveness of the constitutional provisions governing the apportionment base was no accident. By requiring apportionment based on all persons living here, regardless of immigration or other legal status, the drafters understood themselves to be establishing a particular principle of representative government: equal representation in the House to "the whole population." Cong. Globe, 39th Cong., 1st Sess. 705 (Senator Fessenden); 1 Farrand, *Records*, *supra*, at 132 (James Wilson) (total-population base ensures that House is "most exact transcript of the whole Society"). Rather than giving representation to only those persons with certain legal status or rights, such as citizenship or suffrage, the drafters instead established a government that represents all persons who live here and who are served and affected by that government. *See Evenwel*, 136 S. Ct. at 1127-28; *e.g.*, Cong. Globe, 39th Cong., 1st Sess. 705 (Senator Fessenden) ("The principle of the Constitution, with regard to representation, is that it shall be founded on population . . . . [W]e are attached to that idea, that the whole population is represented; that although all do not vote, yet all are heard."). As the drafters emphasized, regardless of a person's legal status, "[a]ll the people, or all the members of a State or community, are equally entitled to protection; they are all subject to its laws; they must all share its burdens, and they are all interested in its legislation." Cong. Globe, 39th Cong., 1st Sess. 2,962 (Senator Poland).

The Memorandum cannot be reconciled with the Constitution's original meaning and unbroken application because it subtracts from the apportionment base

32

an entire category of persons who are not mere transients but instead live in a State under any understanding of usual residence that has ever been applied, notwithstanding their undocumented status. The text and history of the Constitution bar Appellants from disregarding the fact that millions of such immigrants indisputably live here, have lived here for a long time, and intend to and will in fact remain. And the Memorandum's claim that excluding such immigrants "is more consonant with the principles of representative democracy underpinning our system of Government" (App.8a) is flatly contrary to the actual "principle of representational equality" chosen by the Founders and reaffirmed by the framers of the Fourteenth Amendment: that "*every individual* of the community at large has an equal right" to representation in the House. *Evenwel*, 136 S. Ct. at 1126-27 (emphasis added).

## B. The Census Act Independently Prohibits Appellants from Excluding Usual Residents from the Apportionment Base Due Solely to Their Immigration Status.

As the district court correctly concluded, the Memorandum's exclusionary policy separately violates the Census Act. The Act requires the President to use as the apportionment base the "whole number of persons in each State, excluding Indians not taxed, as ascertained under the . . . decennial census of the population." 2 U.S.C. § 2a(a); *see* Census Act of 1929, Ch. 28, § 22(a), 46 Stat. at 26. Enacted in 1929, the "ordinary, contemporary, common meaning" of Section 2a's language, *Perrin v. United States*, 444 U.S. 37, 42 (1979) (citations omitted), plainly required the President to include all usual residents in the

33

apportionment base, including undocumented immigrants.

Appellants are wrong to treat this statutory command as necessarily coextensive with the constitutional one. (Br. 46-47.) Even if the Constitution could be interpreted to allow the exclusion of undocumented immigrants, the Census Act would separately forbid such a policy. First, far from "parrot[ing]" the Fourteenth Amendment's language (Br. 47), the 1929 Act includes additional language that reinforces the requirement that all usual residents, regardless of immigration status, be included in the apportionment base. Second, that inclusive policy is confirmed by additional indicators of statutory meaning specific to the 1929 enactment. The Census Act would thus make the Memorandum's policy unlawful even if the Constitution did not.

1. Section 2a does not simply borrow the Fourteenth Amendment's requirement that the apportionment base consist of the "whole number of persons in each State," 2 U.S.C. § 2a(a). Congress also went further to require that the count of the "whole number of persons" and corresponding apportionment base be "ascertained under the . . . decennial census of the population." By 1929, the "decennial census of the population" had for 150 years encompassed all usual residents, including undocumented immigrants. This language thus explicitly tied the apportionment base to the census's inclusive count.

The absence of any immigration-based restriction of the apportionment base further confirms that Congress's broad language did not authorize the exclusion of undocumented immigrants. By 1929, Congress had enacted numerous statutes restricting

34

immigration. *See, e.g.*, Act of Mar. 26, 1790, Ch. 3, 1 Stat. 103; Chinese Exclusion Act, Ch. 126, § 12, 22 Stat. 58, 61 (1882); Immigration Act of 1924, Ch. 190, 43 Stat. 153, 162. Congress thus easily could "have written the law differently," *Bostock*, 140 S. Ct. at 1740, to exclude the "aliens" or "noncitizens" referenced in these other statutes. But Congress did not do so, instead reaffirming the longstanding practice of basing apportionment on all "persons in each State," without any exception for undocumented immigrants. By contrast, the 1929 Act did explicitly exclude "Indians not taxed" from the apportionment base. Congress's specific exception from an otherwise broad statutory definition precludes any implication of further exclusions. *See United States v. Johnson*, 529 U.S. 53, 58 (2000); *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 188 (1978).

2. History and context provide further reason to understand Congress's broad language in the 1929 Census Act to forbid the subtraction of usual residents based solely on their immigration status. "Congress legislates against the backdrop of existing law," *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013), and it is "a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute," *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (quotation and alteration marks omitted). Here, as Appellants concede, the decennial census and apportionment base have *never* excluded residents based solely on their immigration status. (J.S.App.91a-92a.) By 1929, that principle was already part of the long-settled public understanding of the mandates in Article I and the Fourteenth Amendment.

35

The Congress that enacted the 1929 Act was keenly aware of the historical consensus about these constitutional provisions' meaning. *See, e.g.*, 71 Cong. Rec. 1,822 (1929) (Senate Legislative Counsel memorandum stating "apportionment legislation has been uniformly in favor of inclusion of aliens"; "[n]o exception of noncitizens from the enumeration has been made under any past apportionment"); *id.* at 1,971 (Senator Blaine) (member of Congress represents "every single human being residing within the State"). Congress's adoption of the same language in the Census Act thus incorporated the contemporaneous public understanding of the language's "meaning at the time of the Act's adoption," *New Prime*, 139 S. Ct. at 539. *See also Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020) (interpreting constitutional language to be consistent with "long and widely accepted" requirements); *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 525-29 (2009) (interpreting National Bank Act based on historical meaning and understanding leading up to enactment).

The commonly understood meaning of the language enacted by the 1929 Congress included undocumented immigrants specifically. News articles and legislative debates about the 1929 Act included multiple references to the fact that the Act's broad language would encompass millions of immigrants who had arrived or remained without complying with federal law. *E.g.*, *Reapportionment Plan Debated on Radio*, Sunday Star (Wash. D.C.) pt. 1, at 11 (June 9, 1929) (estimated "3,000,000 aliens in this country now unlawfully"); 71 Cong. Rec. 1,973 (Senator Barkley); 71 Cong. Rec. 1,967 (Senator Heflin) (1929 Act counts "in our population" "aliens [who] were smuggled into" United States); 71 Cong. Rec. 2,266 (Representative Rankin) ("3,000,000 of these people here... have

36

violated the law to get in. Are you going to give them representation in Congress and take it from old-line Americans?"); *see also* James J. Davis, *One Hundred Years of Immigration*, N.Y. Times at XX1 (Feb. 17, 1924) (estimated "100 individuals a day" enter United States "in violation of the law"). These comments were not mere asides; to the contrary, legislators repeatedly raised the number of undocumented immigrants living here as a reason to use different language in the 1929 Act to exclude immigrants from the apportionment count. *E.g.*, 71 Cong. Rec. 2,276 (Representative Romjue) ("It is admitted that there are two or three million aliens unlawfully in the United States, and yet some take a position against the proposed amendment and do not want to exclude aliens.").

Congress rejected all of those efforts. For example, the House rejected a proposed amendment under which census enumerators would have obtained "a statement by each alien showing by what right or authority of law he had entered the United States," *id.* at 2,338—an amendment offered to help pass legislation to exclude immigrants from the apportionment base, *id.* at 2,339 ("upon the summing up of this illegal representation you will be unwilling to have those 2,000,000 or 3,000,000 men accorded representation"). The House and Senate also each rejected several proposed amendments that would have excluded immigrants not naturalized from the apportionment base (J.S.App.88a) due in part to the fear that Catholic immigrants remained allegiant to the Vatican rather than the United States. *See San Jose*, 2020 WL 6253433, at *5-6; 71 Cong. Rec. 2,055-58 (Senator Heflin). Instead, Congress codified its longstanding policy of requiring that, no matter a person's immigration status, "every man, woman, and child" residing

37

"within the confines of this Republic" must be included in the apportionment base. 71 Cong. Rec. 2,270 (Representative Lea); *see id.* at 1,912 (Senator Bratton) ("although a foreigner could not vote . . . so long as he was compelled to pay tribute to the Government through taxation, he was entitled to be represented"). This history thus confirms that the broad language implemented Congress's "continuous and consistent" policy to require apportionment based on all residents, without regard to immigration status.[4] *Id.* at 1,958 (Senator Reed).

## C. Appellants' Arguments in Support of the Memorandum Are Meritless.

None of Appellants' arguments in support of the Memorandum overcome the plain meaning and history of the Constitution or the Census Act, or provide support for their unprecedented policy of excluding all undocumented immigrants from the apportionment base.

First, Appellants rely (Br. 33-37) on a hodgepodge of historical materials that purportedly characterized immigrants as requiring "the sovereign's permission to remain" to be classified as "inhabitants" of this country (Br. 35). But none of these sources involved apportionment or the distinct inquiry into whether a

---

[4] After 1929, Congress continued to reject legislative proposals to exclude undocumented immigrants from the apportionment base due to the common public understanding that the Constitution forbids it. *E.g.*, 86 Cong. Rec. 4,384-86 (1940) (Representative Celler); *1980 Census: Counting Illegal Aliens: Hearing Before the S. Subcomm. on Energy, Nuclear Proliferation, and Fed. Servs. of the Comm. on Gov'tal Affairs*, 96th Cong. 10 (1980).

38

State could be considered an immigrant's "usual place of abode," *Franklin*, 505 U.S. at 804.

For example, Appellants rely heavily on a treatise by Swiss theorist Emmerich de Vattel. (*E.g.*, Br. 35.) But Vattel was not discussing American law at all; rather, he was describing the theoretical powers of any sovereign (including monarchies) under his view of the law of nations, including the sovereign's authority to distinguish between citizens and noncitizens and between different types of noncitizens. *See* 1 Emmerich de Vattel, *The Law of Nations* § 213 (Chitty 6th Am. ed. 1844) (noncitizens "enjoy only the advantages which the law or custom gives them"). Vattel said nothing about the nature of any specific exercise of that power—including the considered choices that our Founders, the Fourteenth Amendment's framers, or the 1929 Congress made regarding apportionment. And although Vattel may have been discussed in other contexts, Appellants have identified no reliance on Vattel in the extensive debates over apportionment.[5]

Similarly, Appellants' reliance on cases interpreting naturalization or asylum statutes is inapt because those statutes are not at issue here, and concerned Congress's distinct choices to require more than usual

---

[5] Appellants' other historical materials are further afield, discussing such irrelevant topics as shipping with Holland, Letter from John Adams to the President of Congress (Nov. 3, 1784) (attaching copy of response to questions by C.W.F. Dumas), https://tinyurl.com/y2v58o8a, and property seized during war, *The Venus*, 12 U.S. (8 Cranch) 253, 289 (1814) (Marshall, C.J. concurring and dissenting in part). In any event, the majority opinion in *The Venus* and Adams' letter merely reaffirm that temporary presence for business or trade did not render a person an "inhabitant" if he did not intend to remain. *The Venus*, 12 U.S. (8 Cranch) at 278; Letter from John Adams, *supra*.

39

abode to obtain certain procedural rights or naturalization. *E.g.*, *Department of Homeland Security v. Thuraissigiam*, 140 S. Ct. 1959, 1981-83 (2020) (asylum); *Kaplan v. Tod*, 267 U.S. 228, 229-230 (1925) (naturalization). When it came to apportionment, however, Congress made a different choice: to include all persons who actually reside here. There is no basis to ignore the directly applicable sources about Congress's specific policy judgment regarding apportionment in favor of extraneous materials concerning unrelated matters. *See Gamble v. United States*, 139 S. Ct. 1960, 1965 n.2 (2019); *District of Columbia v. Heller*, 554 U.S. 570, 587-88 (2008).

Second, Appellants attempt to justify the Memorandum under the traditional criteria for usual residence by claiming that immigration status can be "a proxy for whether [an immigrant] intends to, and will in fact, remain here." (Br. 38.) But that rationale is not contained in the Memorandum, and in any event is unfounded.

The Memorandum excludes undocumented immigrants from the apportionment base *regardless* of whether they intend to, or will in fact, remain here. Rather than rely on any supposed empirical connection between undocumented status and residence, the Memorandum instead relies on a claimed "principle[] of representative democracy" under which States that purportedly "encourage illegal aliens to enter this country" "should not be rewarded with greater representation in the House." (App.8a.) But no such principle has ever been recognized in the apportionment context. To the contrary, the actual "principle of representational equality" reflected in the Constitution and the Census Act provides representation in the House to "the whole population," not just residents

40

with particular legal status. *Evenwel*, 136 S. Ct. at 1128. Appellants have no authority to impose their own policy preferences about representational equality in place of those established by the Constitution and governing statutes.

In any event, Appellants' litigation-driven claim that undocumented status can be a "proxy" for determining an immigrant's usual residence (Br. 28) is unsupported by any facts and contradicted by common experience. The majority of undocumented immigrants in this country have been here for more than ten years. *See* Pew Research Center, *supra*. And Appellants have no support for their bare assertion that these residents do not "intend[] to . . . remain here." (Br. 38.) To the contrary, as several amici explain, millions of undocumented immigrants have established roots, invested in our communities, and raised families here. *See* Amcius Br. for LatinoJustice PRLDEF 5-17; Amicus Br. for Local Governments 12-23.

Appellants also claim that undocumented immigrants may not "remain here indefinitely" because they may in theory be removed in the future. (Br. 38.) But speculation about a person's future residence has never been a basis for ignoring their current residence for apportionment purposes. And the annual rate of removal is so low—at most four percent of the estimated undocumented population, and usually less—that it does not provide a reasonable basis to presume that all undocumented immigrants will soon be absent. *See* Alex Nowrasteh, *Deportation Rates in Historical Perspective* (Cato at Liberty, Sept. 16, 2019), https://tinyurl.com/y6qmavg9. Moreover, many persons who lack legal immigration status are currently applying for it, and there is no plausible reason to conclude that they are all likely to have their

41

applications rejected and then be removed. *See, e.g.*, 8 C.F.R. § 214.14 (U-visas for victims of crimes); 8 U.S.C. § 1154 (status for victims of domestic violence).

Third, Appellants miss the point in arguing that the President has "discretion" to determine whether a particular individual usually resides in a State. (Br. 30-34.) While the President may have discretion to determine how to apply the criteria for usual residence to borderline situations, that discretion does not extend to excluding undocumented immigrants who indisputably live and sleep here and intend to remain, and who will already be counted as usual residents by the Census Bureau when the exclusion occurs. *See Montana v. Wyoming*, 563 U.S. 368, 387 (2011) (rejecting interpretation that "drastically redefine[d]" term from "longstanding meaning"). Any authority the President has to determine usual residence does not authorize him to *ignore* all indicia of usual residence and exclude persons for reasons unrelated to the facts that demonstrate where they live.

Appellants can draw no support for such unprecedented authority from *Franklin*. In *Franklin*, the Court determined that the Executive Branch had properly included overseas federal personnel in the enumeration precisely because they were reasonably considered "usual residents of the United States" under the traditional factors that had been applied for nearly two centuries to determine usual residence. 505 U.S. at 806. Although such personnel were "*temporarily* stationed abroad" for government work, they had maintained "ties to their home States" and indisputably intended to resume living in their home States when their temporary assignments ended. *Id.* (emphasis added); *see id.* at 793-94. This treatment of overseas workers' temporary absence from home was consistent

42

with the meaning of usual residence since the founding, when members of Congress and federal officials were often absent from their home States for months at a time but were nonetheless counted as residents of those States. *Id.* at 804-05. The policy in *Franklin* thus comported with the Constitution's "text and history." *Id.* at 806.

Here, by contrast, Appellants seek to disregard the traditional factors for usual residence, and to adopt an unprecedented practice of excluding individuals from the apportionment base due to immigration status alone. *Franklin* nowhere endorses such a striking break from the meaning and tradition of the Constitution. (J.S.App.85a-86a.) And *Franklin* did not hold that the President has any greater discretion than the rest of the Executive Branch to depart from the Constitution's mandates about the makeup of the apportionment base. The requirement that the apportionment base consist of all persons residing here, without regard to immigration or other legal status, constrains the President as much as it does other executive officers and agencies.[6]

Fourth, Appellants are wrong to assert that the relevant question is whether the Census Act or

---

[6] Appellants' reliance (Br. 38) on instructions from censuses in the decades surrounding both World Wars is unavailing. These instructions provided that a citizen "abroad *temporarily*" should be counted at their usual residence if there was evidence that he "*intends to return* to the United States." The rule did not apply to noncitizens already living outside the country because enumerators lacked evidence about whether they intended to return. As in *Franklin*, this policy relied on traditional elements of usual residence, including whether a person was physically residing here on Census Day and, if not, whether their absence was merely temporary.

43

Constitution requires including *all* undocumented immigrants who are physically present here, and that Appellants thus prevail so long as some hypothetical subset of undocumented immigrants could be excluded. (Br. 30.) That argument simply does not describe the Memorandum. Instead of excluding any particular subcategory of undocumented immigrants, the Memorandum expressly states, without limitation, a categorical "policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status." (App.8a.) Appellants' defense of some nonexistent narrower policy provides no support for the Memorandum's actual categorical exclusion.

Finally, Appellants' arguments for the President's "virtually unfettered discretion" to determine the apportionment base (Br. 22)—and thus directly affect the States' political power—would have dangerous consequences if accepted. Allowing the President to use an alien's status as a proxy for lack of intent to remain here (Br. 38) has no foundation in fact (see *supra* at 40-41), and would seem to authorize the exclusion even of lawfully present immigrants on the theory that their lack of citizenship may be used as a proxy for ties to their country of origin and thus lack of intent to stay here. Appellants' claim that excluding undocumented immigrants is appropriate because they have "flouted" the sovereign's prerogative to exclude them (Br. 39) ignores the fact that federal immigration laws already spell out the consequences of such noncompliance, up to and including removal— but they do not include a refusal to count persons who are actually living here. And Appellants' reservation of power to the President to exclude from the apportionment base immigrants who have resided here for years on the theory that they may not have

44

sufficient "allegiance" to this country (*e.g.*, Br. 38) disregards the consistent refusals of the drafters of the Constitution and the 1929 Act to allow concerns about the "foreign predilections" of immigrants to alter the broadly inclusive nature of the apportionment base, 2 Farrand, *Records*, *supra*, at 268-69. See *supra* at 36 (1929 Congress rejecting similar concerns about Catholic immigrants' loyalties).

Nothing in the Constitution or the 1929 Census Act conferred such sweeping powers on the Executive Branch. To the contrary, the Framers used the objective measure of total population as the "permanent & precise standard" for apportionment to protect the distribution of representation in the House from manipulation and to prevent situations where "biases influence the manner of apportionment." *Utah v. Evans*, 536 U.S. 452, 500, 502 (2002) (Thomas, J., concurring in part and dissenting in part) (quotation marks omitted). And the 1929 Act was designed "to make the apportionment proceed automatically based on the census" in a way that would also be free of contentious political debates. *Franklin*, 505 U.S. at 810 (Stevens, J., concurring). The "unfettered discretion" that Appellants claim here (Br. 12) would reopen the apportionment process to the very "political chicanery" that both the Constitution and the Census Act sought to prevent. *Utah*, 536 U.S. at 500 (Thomas, J., concurring in part and dissenting in part).

### III. The Memorandum Violates the Constitutional and Statutory Requirements to Base Apportionment Solely on the Census's Enumeration.

The Memorandum also violates both the Constitution and the Census Act on an independent ground: it directs that apportionment be based on

45

population figures that are separate from, and indeed alter, the enumeration of total population produced by the decennial census.

Article 1, § 2 mandates apportionment of House seats based on the "numbers" determined by the decennial census's "actual Enumeration" of total population in each State. U.S. Const. art. I, § 2, cl. 3. The Census Act implements this constitutional requirement by mandating precise steps to conduct reapportionment based solely on the census's total-population counts. Section 141(a) requires the Secretary to conduct the "decennial census of population." Section 141(b) directs the Secretary to report to the President "[t]he tabulation of total population by States under subsection (a)"—i.e., the "decennial census of population"— for purposes of apportionment. 13 U.S.C. § 141(a)-(b). And the Act requires the President to then transmit to Congress "a statement showing the whole number of persons in each State" "ascertained under the. . . decennial census of the population," along with the number of Representatives each State receives under the apportionment formula. 2 U.S.C. § 2a(a). The statutes thus require the Secretary to report a single set of numbers to the President—"the tabulation of total population" in each State under the census—and require the President to use solely the census's total-population counts to calculate the apportionment. (J.S.App.75a.)

Congress's decision to compel both the Secretary and the President to rely solely on the decennial census, rather than some other figures of the Secretary's or President's political devising, was a deliberate choice. Prior to the 1929 Census Act, reapportionment required an act of Congress following the completion of the census. But after the 1920 census, Congress

46

failed to pass a statute providing for reapportionment, and for nearly a decade States did not receive the House representation to which they were entitled. *See Department of Commerce v. Montana*, 503 U.S. 442, 451-52 (1992). To prevent another such failure, Congress enacted Section 2a to make reapportionment a "virtually self-executing scheme" that would follow automatically from the decennial census's tabulation of total population. *Franklin*, 505 U.S. at 791-92. The key to that scheme was the *absence* of discretion in the Executive Branch over the apportionment calculations. S. Rep. No. 71-2, at 4-5 ("President reports upon a problem in mathematics . . . for which rigid specifications are provided by Congress"); H.R. Rep. No. 70-2010, at 7 (1929) (Secretary lacks "discretionary power" and "must use absolutely, without deviation, the population of each State as gathered and reported by the Director of the Census"). The Act thus tasked the Executive Branch with the "purely ministerial" duty of applying a set formula to the census total-population counts to calculate the apportionment figures for Congress. S. Rep. No. 71-2, at 4; *see Franklin*, 505 U.S. at 797, 799.[7]

---

[7] Government Appellees have recently become aware of a statute providing that certain laws "requiring the submittal to Congress . . . of any annual, semiannual, or other regular periodic report" listed on a chart prepared by the House for other purposes "shall cease to be effective, with respect to that requirement." Federal Reports Elimination and Sunset Act of 1995 ("FRESA"), Pub. L. No. 104-66, § 3003, 109 Stat. 707, 734 (codified at 31 U.S.C. § 1113 note). Although the Section 2a(a) statement appears on the cross-referenced chart, Section 2a(a) was not repealed by FRESA. FRESA covers only purely informational "report[s]"— not, as here, a presidential "statement" to Congress that triggers important legal consequences. *See generally* Amicus Br. for

47

The Memorandum violates these constitutional and statutory mandates. First, the Memorandum requires the Secretary to report "two sets of numbers" (Br. 22) rather than the single "tabulation of total population" required by the Act. Second, although one of those tabulations will be the decennial census's total-population count, the Memorandum contemplates that the President will use the other set of numbers to exclude undocumented immigrants and generate the apportionment base. (App.8a-9a; *see* J.S.App.78a.) But these numbers will necessarily be a modification, rather than a reflection, of the total population counted by the decennial census—in violation of both the Constitution and the Census Act. (J.S.App.78a.)

Appellants' argument in response is that, under *Franklin*, the President has discretion to direct the conduct of the decennial census itself. (Br. 23-25.) But "that is not what the Presidential Memorandum does." *New York v. Trump*, No. 20-cv-5770, 2020 WL 5796815, at *3 (S.D.N.Y. Sept. 29, 2020) (denying motion for a stay). Instead, it directs the Secretary to complete the decennial census and report total-population counts. (App.8a-9a.) It then explicitly states that "*following the 2020 Census*"—not as part of the 2020 census—the President will use a different population count that excludes undocumented immigrants as the apportionment base. (App.8a (emphasis added).) Appellants confirmed this point below when they explained to the district court that the Memorandum did not concern any "procedure that will be used in the actual census,

---

House of Representatives 17 n.4. In any event, if FRESA applied, the only effect would be to eliminate the *requirement* that a Section 2a(a) statement be submitted; if the President chooses to submit that statement, its content still must adhere to the substantive provisions of Section 2a(a) that FRESA did not affect.

48

but an apportionment number that will be chosen by the President *after the census is complete*." (J.S.App.82a (quoting joint pre-conference letter; emphasis added).)

Contrary to Appellants' claim (Br. 25-26), *Franklin* did not endorse any comparable procedure. The count of overseas employees at issue in *Franklin* took place as part of the census itself and was ultimately included as part of the single tabulation of total population that the Secretary submitted to the President under Section 141(b). *See* 505 U.S. at 793-95. But *Franklin* did not consider, let alone approve, the choice made by the Memorandum to base apportionment on population figures other than those produced by the census itself.[8]

Appellants criticize this argument as "wordplay" and insist that, although the Memorandum says otherwise, its policy should be understood as one that modifies the census itself, rather than deviating from it. (Br. 27.) But the Memorandum's characterization of its policy is no accident, and Appellants should be held to the consequences of that choice. *See Department of Homeland Security v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1908 (2020). Indeed, in defending the Memorandum, Appellants have repeatedly promised

---

[8] Appellants' assertion that they may "use administrative records as part of the form and content of the census" (Br. 27) is also a red herring. Nothing in the judgment below bars Appellants from conducting the census's count of total population through both in-person enumeration and administrative records. (J.S.A.81a-82a.) *See New York*, 2020 WL 5796815, at *3. But once the decennial census count is completed, Appellants may not take the further step of using a *different* set of numbers to apportion House seats—regardless of whether Appellants use administrative records or other means to derive that different set of numbers.

49

that, regardless of the Memorandum's apportionment policy, the Census Bureau will "count each person in their usual place of residence" in completing the decennial census. (Decl. of Albert Fontenot Jr. ¶ 12 (SDNY ECF No. 120).) *see also Counting Every Person: Hearing Before H. Comm. on Oversight & Reform*, 116th Cong. 3:14:55 (2020) (Director of Census Bureau testifying that Memorandum has "nothing to do with our operation right now with the census. We're counting everyone.")

Although Appellants have not disclosed the strategic reason for their choice, altering the actual decennial census count would have both political and legal consequences that Appellants may have sought to avoid. First, after making multiple public statements that the Memorandum was not altering the census itself, including to Congress, Appellants may have wanted to avoid the consequences of breaking that commitment. Second, because Appellants were already months into the enumeration process by the time the Memorandum was issued, it was likely too late to adapt field-data collection—and certainly too late to promulgate revisions to the Residence Rule under which the 2020 census is being conducted. Third, altering the actual decennial census count risks changing the distribution of federal funding and state redistricting, whether or not that consequence was intended. See *supra* at 17.

The precise reason for Appellants' choice is immaterial. The point is that the Memorandum's description of its policy is a meaningful one, and "appellate counsel's *post hoc* rationalizations" may not simply discard it as inconvenient, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Because the Memorandum

50

describes its policy as adopting apportionment figures "[f]ollowing the 2020 Census" that will necessarily be different from the total-population figures produced by the census itself (App.6a, 8a), it improperly deviates from the process prescribed by both the Constitution and the Census Act.

## CONCLUSION

The Court should affirm the final judgment below.

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
BARBARA D. UNDERWOOD\*
  *Solicitor General*

MATTHEW COLANGELO
  *Chief Counsel for*
  *Federal Initiatives*
ELENA GOLDSTEIN
  *Deputy Chief*
  *Civil Rights Bureau*
FIONA J. KAYE
  *Assistant Attorney General*

STEVEN C. WU
  *Deputy Solicitor General*
JUDITH N. VALE
  *Senior Assistant*
    *Solicitor General*
ERIC R. HAREN
  *Special Counsel*
barbara.underwood@ag.ny.gov

November 2020

\* *Counsel of Record*

(*Counsel list continues on next page.*)

51

PHILIP J. WEISER
  *Attorney General*
  *State of Colorado*
136 State Capitol Bldg.
Denver, CO 80203

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Ave.,
Hartford, CT 06106

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French St., 6th Fl.
Wilmington, DE 19801

CLARE E. CONNORS
  *Attorney General*
  *State of Hawai'i*
425 Queen St.
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
100 W. Randolph St.
Chicago, IL 60601

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Sta.
Augusta, ME 04333

BRIAN E. FROSH
  *Attorney General*
  *State of Maryland*
200 St. Paul Pl., 20th Fl.
Baltimore, MD 21202

MAURA HEALEY
  *Attorney General*
  *Commonwealth of*
  *Massachusetts*
One Ashburton Pl.
Boston, MA 02108

DANA NESSEL
  *Attorney General*
  *State of Michigan*
525 W. Ottawa St.
Lansing, MI 48934

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther
King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
  *Attorney General*
  *State of Nevada*
555 E. Washington Ave.
Las Vegas, NV 89101

GURBIR S. GREWAL
  *Attorney General*
  *State of New Jersey*
25 Market St., 8th Fl.
Trenton, NJ 08625

52

HECTOR H. BALDERAS
  *Attorney General*
  *State of New Mexico*
408 Galisteo St.
Santa Fe, NM 87501

JOSHUA H. STEIN
  *Attorney General*
  *State of North Carolina*
114 W. Edenton St.
Raleigh, NC 27603

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court St. N.E.
Salem, OR 97301

JOSH SHAPIRO
  *Attorney General*
  *Commonwealth of*
  *Pennsylvania*
Strawberry Sq., 16th Fl.
Harrisburg, PA 17120

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 S. Main St.
Providence, RI 02903

THOMAS J. DONOVAN, JR.
  *Attorney General*
  *State of Vermont*
109 State St.
Montpelier, VT 05609

MARK R. HERRING
  *Attorney General*
  *Commonwealth of Virginia*
202 N. Ninth St.
Richmond, VA 23219

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
800 Fifth Ave., Ste. 2000
Seattle, WA 98104

JOSHUA L. KAUL
  *Attorney General*
  *State of Wisconsin*
P.O. Box 7857
Madison, WI 53707

KARL A. RACINE
  *Attorney General*
  *District of Columbia*
400 6th St., NW
Washington, DC 20001

MATTHEW JERZYK
  *City Solicitor*
  *City of Central Falls*
580 Broad St.
Central Falls, RI 02863

MARK A. FLESSNER
  *Corporation Counsel*
  *City of Chicago*
2 N. LaSalle St., Ste. 580
Chicago, IL 60602

53

ZACHARY M. KLEIN
   *City Attorney*
   *City of Columbus*
77 N. Front St., 4th Fl.
Columbus, OH 43215

JAMES E. JOHNSON
   *Corporation Counsel*
   *City of New York*
100 Church St.
New York, NY 10007

MARCEL S. PRATT
   *City Solicitor*
   *City of Philadelphia*
1515 Arch St., 17th Fl.
Philadelphia, PA 19102

CRIS MEYER
   *City Attorney*
   *City of Phoenix*
200 W. Washington
Suite 1300
Phoenix, AZ 85003

YVONNE S. HILTON
   *City Solicitor*
   *City of Pittsburgh*
414 Grant St., Rm. 323
Pittsburgh, PA 15219

JEFFREY DANA
   *City Solicitor*
   *City of Providence*
444 Westminster St.
Providence, RI 02903

DENNIS J. HERRERA
   *City Attorney*
   *City and County of*
    *San Francisco*
1 Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102

PETER S. HOLMES
   *City Attorney*
   *City of Seattle*
701 Fifth Ave., Ste. 2050
Seattle, WA 98104

JO ANNE BERNAL
   *County Attorney*
   *County of El Paso*
500 E. San Antonio, Rm. 503
El Paso, TX 79901

ROLANDO L. RIOS
   *Special Counsel*
   *Counties of Hidalgo*
    *and Cameron*
110 Broadway, Ste. 355
San Antonio, TX 78205

GARY W. KUC
   *County Solicitor*
   *Howard County*
3450 Court House Dr.
Ellicott City, MD 21043

LESLIE J. GIRARD
   *County Counsel*
   *County of Monterey*
168 West Alisal St. 3rd Fl.
Salinas, CA 93901

54

JOHN DANIEL REAVES
  *General Counsel*
  *U.S. Conference of Mayors*
1750 K St., N.W., 11th Fl.
Washington, DC 20006