# EXHIBIT A

No. 20-366

# In the Supreme Court of the United States

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL., APPELLANTS

*v.*

STATE OF NEW YORK, ET AL.

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK*

**REPLY BRIEF FOR THE APPELLANTS**

JEFFREY B. WALL
  *Acting Solicitor General
    Counsel of Record
  Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

**TABLE OF CONTENTS**

Page

I.   Appellees fail to satisfy Article III ............................... 2

    A.   The "chilling effect" injury is moot and no
        exception to vacatur applies .................................... 2

    B.   The purported apportionment and funding
        injuries are too speculative to sustain the
        judgment .................................................................... 4

II.  The Presidential Memorandum does not violate
    the legal provisions governing the apportionment ...... 8

    A.   The Memorandum does not violate the
        procedural requirement that apportionment
        be based on the results of the census ..................... 8

    B.   There is no substantive requirement
        compelling the President to include all illegal
        aliens in the apportionment base ........................... 12

**TABLE OF AUTHORITIES**

Cases:

*Bruesewitz* v. *Wyeth LLC*, 562 U.S. 223 (2011) ................. 21

*Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398 (2013) ........... 5

*Department of Commerce* v. *New York*, 139 S. Ct.
   2551 (2019) ......................................................... 11

*Department of Commerce* v. *United States House of
   Representatives*, 525 U.S. 316 (1999) ................................. 5

*Department of Homeland Sec.* v. *Thuraissigiam*,
   140 S. Ct. 1959 (2020) ......................................... 17

*Evenwel* v. *Abbott*, 136 S. Ct. 1120 (2016) .......................... 19

*Franklin* v. *Massachusetts*, 505 U.S. 788 (1992) ....... *passim*

*Friends of the Earth, Inc.* v. *Laidlaw Envtl. Servs.
   (TOC), Inc.*, 528 U.S. 167 (2000) ...................................... 7

*Kaplan* v. *Tod*, 267 U.S. 228 (1925) ..................................... 17

*Reno* v. *Flores*, 507 U.S. 292 (1993) ..................................... 22

*Summers* v. *Earth Island Inst.*, 555 U.S. 488 (2009) ........... 6

(I)

II

Cases—Continued:                                                    Page

    *U.S. Bancorp Mortg. Co.* v. *Bonner Mall P'ship*,
      513 U.S. 18 (1994) ................................................................ 3

    *United States* v. *Sanchez-Gomez*, 138 S. Ct. 1532
      (2018) ............................................................................... 2, 3

    *Utah* v. *Evans*, 536 U.S. 452 (2002)..................................... 12

Constitution and statutes:

    U.S. Const.:

        Art. III.....................................................................2, 6, 7

        Amend. XIV ........................................................... 18, 19

            § 1 ............................................................................ 13

            § 2 ............................................................................ 13

            Apportionment Clause .............................................. 13

            Equal Protection Clause ........................................... 13

    Act of Mar. 1, 1790, ch. 2, § 5, 1 Stat. 103 ..................... 13, 15

    2 U.S.C. 2a(a) .................................................................... 20

    13 U.S.C. 141(a) .................................................................. 8

    13 U.S.C. 141(b) ................................................................ 20

Miscellaneous:

    M. St. Clair Clarke & David A. Hall, *Cases of
      Contested Elections in Congress, from the Year
      1789 to 1834, Inclusive* (1834)............................................ 14

    Cong. Globe, 39th Cong., 1st Sess. (1866) ........................... 18

    71 Cong. Rec. 2343 (1929) .................................................. 21

    1 Emmerich de Vattel, *The Law of Nations* (1760) ........... 16

    85 Fed. Reg. 44,679 (July 23, 2020)................... 3, 5, 6, 11, 22

    Andrew Reamer, *Role of the 2020 Census in the
      Geographic Allocation of Federal Spending*
      (Mar. 6, 2020), https://gwipp.gwu.edu/sites/g/files/
      zaxdzs2181/f/downloads/Reamer%20COPAFS%
      2003-06-20%20rev2.pdf ...................................................... 7

III

Miscellaneous—Continued:                          Page

*The Federalist No. 42* (James Madison)
  (Jacob E. Cooke ed., 1961)................................................. 16

# In the Supreme Court of the United States

————————

No. 20-366

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL., APPELLANTS

*v.*

STATE OF NEW YORK, ET AL.

————————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK*

————————

**REPLY BRIEF FOR THE APPELLANTS**

————————

Appellees' responses confirm that this case should be over. They do not dispute that the sole injury found below is no longer being redressed by the judgment, and instead rely on alleged harms that the district court itself suggested are too speculative. On the merits, appellees relegate to the back of their briefs their defense of the court's lead holding—that the Memorandum is procedurally flawed because it will result in an apportionment not based on the results of the census. That is understandable because both the governing provisions and *Franklin* v. *Massachusetts*, 505 U.S. 788 (1992), plainly allow the President to request two sets of numbers from the Census Bureau. Appellees instead devote the bulk of their briefs to defending the district court's substantive objection that the Memorandum will not include in the apportionment base all "persons in each State." J.S. App. 83a. But nothing in text, history, or precedent requires the President to include all illegal

(1)

2

aliens "actually living here," even those whose only connection to this country is a stay in an ICE detention facility. N.Y. Br. 11.

## I. APPELLEES FAIL TO SATISFY ARTICLE III

Appellees have not demonstrated the existence of an Article III case or controversy. Any injury related to the Memorandum's supposed "chilling effect" on census participation has long ceased, and appellees' alternative theories premised on apportionment and funding harms are speculative.

### A. The "Chilling Effect" Injury Is Moot And No Exception To Vacatur Applies

1. Even assuming any "chilling" injury supported standing at the outset, but see Gov't Br. 17-18; J.S. Reply Br. 1-3, it has since ceased, mooting the claim for relief granted by the district court. Appellees do not dispute that any "chilling" injuries have concluded and thus the court's judgment is not currently redressing any such injuries. Instead, they assert that this case fits within the exception to mootness for claims that are capable of repetition yet evading review, but they meet neither of the requirements for that limited exception.

First, appellees have not demonstrated that "the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration." *United States* v. *Sanchez-Gomez*, 138 S. Ct. 1532, 1540 (2018) (citation omitted). This Court looks to the duration of the government's "*challenged action*," *ibid.* (emphasis added; citation omitted), not plaintiffs' particular alleged *injuries*, see ACLU Br. 21. Here, the challenged conduct is the Executive Branch's implementation of the Memorandum, which plainly can be litigated after

3

the implementation, even if on the basis of different injuries. Appellees therefore cannot show that any viable challenge will evade review.

Second, appellees likewise fail to demonstrate a "reasonable expectation" that they "will be subjected to the same action again." *Sanchez-Gomez*, 138 S. Ct. at 1540 (citation omitted). Appellees' suggestion that the Memorandum will apply of its own force in future censuses, ACLU Br. 22, is contradicted by the Memorandum itself, which repeatedly makes clear that the policy is limited to "*the 2020 census*." 85 Fed. Reg. 44,679, 44,679, 44,680 (July 23, 2020) (emphasis altered; capitalization omitted). Appellees are of course correct that censuses will occur in the future and that field-data collection is inherently limited in duration, N.Y. Br. 22, but none of that shows that appellees will be subjected to the *same action* a decade or more from now. It is anyone's guess how a future Executive will choose to conduct a future census.

2. Because the judgment has become moot on appeal, the Court normally would vacate it. Appellees invoke the exception to vacatur that applies when the party seeking review *caused* the mootness *after* the adverse judgment was entered. See *U.S. Bancorp Mortg. Co.* v. *Bonner Mall P'ship*, 513 U.S. 18, 24-26 (1994). But neither of the two circumstances on which they rely—the timing of the Memorandum's issuance and the conclusion of field-data collection, see N.Y. Br. 22-23— is the type of post-judgment conduct that triggers the exception. Rather, mootness here is the inevitable result of the fact that appellees alleged, and the district court rested on, a "chilling" injury that was guaranteed to cease when field operations ended—which itself was guaranteed to occur before the judgment could have

4

any coercive effect.  The mismatch between appellees'
past injury and the court's future relief—which has
nothing to do with the government's post-judgment
conduct—is why vacatur is now necessary.

### B. The Purported Apportionment And Funding Injuries Are Too Speculative To Sustain The Judgment

Appellees assert that their purported apportionment
and funding injuries are sufficiently imminent to sus-
tain the judgment on alternative grounds.  But the dis-
trict court itself correctly noted that such injuries are
"likely too speculative for Article III."  J.S. App. 43a
(citation and internal quotation marks omitted).

1.  Appellees have not overcome the inherent uncer-
tainty about how many illegal aliens will be excluded
from the apportionment under the Memorandum.  Ap-
pellees assert that the government "clearly know[s] by
now how [it] intend[s] to implement the Memorandum,"
ACLU Br. 17, but the government's plan depends on
various unknowable contingencies about the data.

To feasibly exclude illegal aliens under the Memo-
randum, the Secretary must be able to match individual
persons identified through census questionnaires and
field-data collection with individual persons identifiable
through administrative records as illegal aliens as of
April 1, 2020 (census day).  This Office is informed by
the Census Bureau's experts that (1) the Bureau is still
processing data and compiling the master Census Un-
edited File; (2) the Bureau is still gathering administra-
tive records pertaining to immigration status; and (3)
the Bureau is still developing procedures, in conjunc-
tion with other agencies, to compare the data sets to
identify and match individual illegal aliens.  Until that
comparison is performed later in December or January,
the Bureau cannot predict or even estimate the results,

5

which depend on (1) how many illegal aliens were counted as a result of questionnaire responses and field-data collection; (2) how many of them are identified in administrative records possessed by the Bureau; and (3) whether sufficient personal information is contained in the census data and administrative records to identify and match individual illegal aliens.

Moreover, once the Executive Branch has run the comparison and determined the number and types of illegal aliens who can "feasibl[y]" be excluded, the Memorandum further requires a determination of the "extent" to which doing so is "consistent with the discretion delegated to the executive branch."  85 Fed. Reg. at 44,680.  Appellees persistently disregard that built-in limitation, but it is a meaningful one given that the Executive has broad but not unfettered discretion to make "judgment[s] consonant with * * * the text and history of the Constitution" with respect to the apportionment base.  *Franklin*, 505 U.S. at 806.

Given all of that, it is far from a "virtual certainty" that any appellee will "lose a [House] seat" when the Memorandum is implemented.  *Department of Commerce* v. *United States House of Representatives*, 525 U.S. 316, 330 (1999) (citation omitted).  Indeed, appellees "fall short" of establishing even a "'substantial risk'" of decreased representation, "in light of the attenuated chain of inferences necessary to find harm here."  *Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 415 n.5 (2013).  According to appellees, the Memorandum "specifically notes that" California "will likely lose 'two or three' congressional seats," ACLU Br. 1-2 (citation omitted); see *id.* at 13-14; N.Y. Br 14-15, but the Memorandum actually says only that it "could" have that effect if *all* of the "estimate[d]" "2.2 million illegal aliens"

6

in California can be identified and excluded, 85 Fed. Reg. at 44,680. That result is not merely speculative but quite unlikely.

Appellees are correct that, as the government has previously indicated, it likely will be feasible to exclude illegal aliens housed in ICE detention centers as of April 1. N.Y. Br. 15; ACLU Br. 15-16. But the estimated number of illegal aliens in that narrow category is likely in the tens of thousands, spread out over multiple States. Even appellees do not argue that excluding such a small number of aliens would likely change the apportionment, let alone identify in which particular State. See *Summers* v. *Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("[S]peculation" that a plaintiff may meet Article III's requirements "does not suffice," regardless of "statistical probabilities."). In the end, appellees have not pointed to any good reason why the Court can or should adjudicate the merits of this case in such a hypothetical posture. The Court can decide these questions after apportionment, if they even arise.

2. Appellees' alleged funding injury presents a yet more fundamental problem: the Memorandum does not concern funding *at all*. By its terms, the Memorandum is limited to "exclud[ing] from the apportionment base aliens who are not in lawful immigration status" "[f]or the purpose of the reapportionment of Representatives." 85 Fed. Reg. at 44,680.

Appellees nevertheless argue that, because the government's defense of the Memorandum is that it reforms the content of the "decennial census" itself, the Memorandum necessarily will affect funding statutes that are based on the census. N.Y. Br. 17 (citation omitted); see ACLU Br. 18-19 Setting aside that establishing standing on this basis would doom their procedural

7

claim on the merits, see pp. 9-12, *infra*, appellees have identified no statute that requires funds to be distributed based on the specific decennial census dataset that is used to tabulate each State's population for apportionment. Instead, like the government (Br. 20), appellees are aware only of certain funding statutes that require the Bureau to provide datasets *derived from* the decennial census. See, *e.g.*, N.Y. Br. 17. Such datasets, by definition, are not identical to the one used for apportionment. See Andrew Reamer, *Role of the 2020 Census in the Geographic Allocation of Federal Spending* (Mar. 6, 2020), https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/Reamer%20COPAFS%2003-06-20%20rev2.pdf (referring repeatedly to "census-derived data"). Nor do appellees identify any reason why illegal aliens could not be added back for purposes of such statutes.

3. Perhaps recognizing that they cannot show Article III standing based on their alleged apportionment and funding injuries, appellees argue that they have a lower burden because they are responding to the mootness of their alleged "chilling effect" injuries. N.Y. Br. 18-19. But this Court applied a lower standard in *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000), because the defendant there voluntarily ceased engaging in the challenged conduct. *Id.* at 189. Here, by contrast, the government has not stopped enforcing the Memorandum *at all*, and the fact that one of appellees' *injuries* is moot does not lessen their burden in establishing standing for alternative injuries. Gov't Br. 20-21.

8

## II. THE PRESIDENTIAL MEMORANDUM DOES NOT VIOLATE THE LEGAL PROVISIONS GOVERNING THE APPORTIONMENT

### A. The Memorandum Does Not Violate The Procedural Requirement That Apportionment Be Based On The Results Of The Census

Appellees argue that an apportionment pursuant to the Memorandum would not be based on the results of the census. That procedural objection is baseless. The President plainly possessed and exercised the authority to direct the Secretary concerning the form and content of the decennial census, including the sources of information used to ascertain the number of persons in the apportionment base.

1. Like the district court, appellees acknowledge that the Executive may use administrative records when conducting the decennial census enumeration for purposes of apportionment. See N.Y. Br. 48 n.8; ACLU Br. 51-52. After all, *Franklin* condoned the practice of counting hundreds of thousands of individuals based on administrative records. See Gov't Br. 27-29. Appellees briefly suggest (ACLU Br. 52) that using administrative records to *include* persons is somehow different from using those records to *exclude* them, but there is no legal or practical basis for that distinction. The use of administrative records in either context reflects the Secretary's authority to take the decennial census "in such form and content as he may determine." 13 U.S.C. 141(a). And appellees do not explain why the Secretary must or should blind himself to administrative records if those records show that the Bureau has improperly included certain non-inhabitants (for instance, foreign tourists or diplomats).

9

Like the district court, appellees' main objection is instead how the Memorandum uses administrative records: to generate a second set of numbers that are purportedly distinct from the first set of numbers based on the "actual" census. N.Y. Br. 49; see *id.* at 47-50; ACLU Br. 48-53. Appellees' precise reasoning is not entirely clear. At times, they suggest that the President is required to take as given the Secretary's calculation of the population; at other times, they suggest that the Memorandum chose to accept that calculation for census purposes but then to deviate from it for apportionment purposes. The first misunderstands the President's powers, while the second misreads the Memorandum.

a. Appellees appear to concede that, under *Franklin*, the President could have instructed the Secretary to send him only a single set of numbers that excludes illegal aliens. See N.Y. Br. 47-50; ACLU Br. 49-50. Appellees object, however, that the President instead instructed the Secretary to count illegal aliens and then provide two sets of numbers, so that the President could decide the extent to which illegal aliens should be excluded. See N.Y. Br. 47-50; ACLU Br. 50-51. Appellees point to nothing in law or logic for the notion that the President may exercise his discretion only before rather than after the Secretary sends out questionnaires and enumerators.

With respect to law, *Franklin* confirmed that the President is "not" "require[d] * * * to use the data in the Secretary's report" and may instruct the Secretary to "reform the census[] even after the data are submitted to him." 505 U.S. at 797-798. The Court explained that "the 'decennial census' still presents a moving target[] even after the Secretary reports to the President," and "the target stops moving" only once the President

10

says so. *Ibid.* Given that the President may demand a second set of data after the fact, it follows *a fortiori* that he may demand both sets of data at the same time. Appellees' form-over-substance argument has no basis even in form, because the Secretary can *always* determine the form of the census and the President is *always* entitled to direct the Secretary in so doing.

With respect to logic, requiring the President to direct the exclusion of illegal aliens from the outset of the census would be worse for everyone involved. For the government, it would require the President to decide the extent of his legal authority to exclude illegal aliens before knowing the extent to which it is feasible to identify various categories of illegal aliens. There is no reason why the Executive Branch should be compelled to confront constitutional and statutory questions unnecessarily. For appellees, it would mean that the Secretary would not count illegal aliens, so that if appellees eventually were to prevail on a substantive challenge to the President's front-end instruction, they could obtain relief only if a court ordered the Secretary to somehow redo the census, rather than simply ordering him to use the first set of numbers instead of the second.

b. Appellees fall back on an even more formalistic position: that while the Memorandum *could* have ordered the Secretary to exclude illegal aliens from the census even on the back end, it did not *actually* do so, because it instead took the Secretary's initial calculation to be the "census" and then departed from it for purposes of apportionment. See N.Y. Br. 47-50; ACLU Br. 50-53. But appellees provide no reason why this Court should strain to read the Memorandum to create a legal problem. Indeed, appellees' reading reduces to wordplay over the term "census." See Gov't Br. 27.

11

Appellees are taking advantage of the fact that the term "census" can be used in two different ways. Sometimes it refers to the process of enumerating the population via questionnaires and other measures (*e.g.*, "[T]he Federal Government used enumerators * * * to conduct the census by going door to door," *Department of Commerce* v. *New York*, 139 S. Ct. 2551, 2586 (2019) (Breyer, J., concurring in part and dissenting in part)). Other times it more broadly refers to the results of that process after further adjustments by the Secretary or the President (*e.g.*, "[T]here is no statute that rules out an instruction by the President to the Secretary to reform the census, even after the data are submitted to him," *Franklin*, 505 U.S. at 798).

Appellees are correct that the Memorandum and the government's district-court briefing occasionally use the term "census" in the former sense to refer to the counting process. For instance, the Memorandum says that "the President's discretion to settle the apportionment" is exercised "following the 2020 census," *i.e.*, after counting has concluded. 85 Fed. Reg. at 44,679-44,680. In context, the President obviously was not using the term "census" in its broader sense as the final results of the entire process, such that any subsequent exclusion of illegal aliens is "not as part of the 2020 census." N.Y. Br. 47. The President was quite explicit that, once he receives the Secretary's report, he will "make[] the final determination regarding the 'whole number of persons in each State,'" which "requires the exercise of judgment." 85 Fed. Reg. at 44,679. Appellees' semantics aside, the President has never abdicated his authority under *Franklin* to direct the form and content of the census.

12

2. As a last-ditch effort, appellees contend that it would be unconstitutional for the President to exercise his statutory authority to "change[] the census itself." ACLU Br. 53. They rely on Justice Thomas's dissenting opinion in *Utah* v. *Evans*, 536 U.S. 452 (2002), but that opinion objected to the use of "imputation" in the census because it does not involve the "counting" of *actual individuals* as part of an "actual Enumeration." *Id.* at 492 (citations omitted). That objection in no way implies that administrative records cannot be used to exclude actual individuals who were improperly counted by the Bureau, just as *Franklin* allowed the use of administrative records to include actual individuals whom the Bureau had failed to count through questionnaires and field operations. See Gov't Br. 46-47.

**B. There Is No Substantive Requirement Compelling The President To Include All Illegal Aliens In The Apportionment Base**

Appellees are incorrect that constitutional and statutory provisions command the President to include "all people living in the United States [as] part of the apportionment base." ACLU Br. 2; see N.Y. Br. 11. The text, history, and purposes of those provisions confirm that the President has discretion in determining whether to include illegal aliens in the apportionment base.

1. Starting with constitutional text, appellees briefly suggest that the "plain meaning" of the phrase "persons *in* each State" is any persons "'present'" in the United States on April 1. ACLU Br. 24 (emphasis added; citation omitted). A test that made physical presence sufficient, however, would include aliens who even appellees recognize should be excluded, such as tourists and diplomats. *Id.* at 25, 39. Appellees' related suggestion that

13

the Apportionment Clause sweeps in all "persons" pro-
tected by the Equal Protection Clause, *id.* at 24, would
lead to the same result (and include corporations to
boot), despite key textual differences between the pro-
visions. Compare U.S. Const. Amend. XIV, § 2 (using
"persons *in* each State" for apportioning Representa-
tives "among the several States according to *their* re-
spective numbers") (emphases added), with Amend.
XIV, § 1 (providing that no State shall deny equal pro-
tection "to any person *within its jurisdiction*") (empha-
sis added).

Appellees therefore quickly acknowledge that, as
both the First Congress and this Court have estab-
lished, a person is "in" a State for apportionment pur-
poses only if he is a "'usual resident'" or "'inhabitant'"
of the State. *Franklin*, 505 U.S. at 804 (quoting Act of
Mar. 1, 1790 (first enumeration act), ch. 2, § 5, 1 Stat.
103) (brackets omitted); see ACLU Br. 25, 37-38; N.Y.
Br. 25-26. But they then insist that "usual residents"
and "inhabitant[s]" are "all individuals, regardless of
immigration status, who 'live and sleep most of the time'
in a State." N.Y. Br. 25-26 (brackets and citations omit-
ted); see ACLU Br. 34. That is appellees' key interpre-
tive move, and it suffers from three fatal defects: it con-
flicts with settled practice, is contrary to the original
understanding of the relevant terms, and cannot be
squared with the structural purpose of apportionment.

a. Appellees' expansive construction of "usual resi-
dence" essentially collapses into physical presence. If
merely being held in a detention facility located in a
State on census day after unlawfully crossing the bor-
der is sufficient to qualify as "usually resid[ing]" there,
ACLU Br. 41, then appellees' test is nothing more than
a snapshot of those physically present in America on

14

April 1. There is no reason why aliens in a border detention facility are necessarily more or less transient than foreign tourists staying in a nearby hotel. And if illegal aliens in detention facilities are *not* usual residents, then that alone is sufficient basis to reverse the district court's judgment, which prevents the President from excluding even those illegal aliens from the apportionment base.

Even if appellees meant that inhabitants actually must "'live and sleep *most of the time*' in a State," N.Y. Br. 26 (emphasis added; citation omitted), their test still would depart from established norms. Foreign diplomats "live and sleep most of the time" in our country, while federal personnel serving overseas do not. Appellees' only answer for diplomats is that they "are *sui generis*" and should be "'considered still to remain within the territory of [their] own State.'" ACLU Br. 39 (citation omitted). If that *ipse dixit* were true, it could equally be said of illegal aliens. But it is not true. The historical reason for excluding diplomats was that "foreign ministers" were not "inhabitants" of the United States because "the mere living in a place" does not "constitute[] *inhabitancy*, in the sense of the constitution." M. St. Clair Clarke & David A. Hall, *Cases of Contested Elections in Congress, from the Year 1789 to 1834, Inclusive* 497 (1834); see *Franklin*, 505 U.S. at 805; Gov't Br. 42. Merely living and sleeping in a place—even most of the time—is not sufficient to establish inhabitancy.

As for federal overseas personnel, appellees contend that their inclusion can be justified by the "temporary" nature of their absence. N.Y. Br. 41. But service overseas can last years, and appellees wisely do not suggest that there is a cutoff point. See *Franklin*, 505 U.S. at

15

804 (noting that the first enumeration act "placed no limit on the duration of the absence, which, considering the modes of transportation available at the time, may have been quite lengthy"). Federal overseas personnel may be included in the apportionment base not because they live and sleep most of the time here, but because they have an "allegiance or enduring tie to" the United States, *ibid.*—the same allegiance and ties that foreign diplomats presumably have to their home countries. Appellees' test cannot make sense of diplomats or overseas personnel because it omits a key element of usual residence or inhabitancy.

b. The original understanding of usual residence or inhabitancy confirms *Franklin*'s holding. The various terms used by the first enumeration act to define the necessary connection to a State for apportionment purposes—"inhabitant," "usual place of abode," "settled place of residence," or "usual[] reside[nce]"—all have one thing in common: permanence. Ch. 2, § 5, 1 Stat. 103; see Gov't Br. 37-38. One who is not permitted to live in the United States, and hence may be removed by the government, is not reasonably described as having a "usual" or "settled place of residence" here. Appellees assume that those terms refer only to "frequen[cy]" of residence, ACLU Br. 25 (citation omitted), but the terms also connote "regularity," Gov't Br. 42. And appellees never explain how there is anything "regular" or "customary" about residing in this country in ongoing violation of its laws. *Ibid.* To be sure, illegal aliens may subjectively intend to remain here, but (unlike in a typical domicile context) that intent is objectively unlawful until the sovereign grants permission to do so. That is why *Franklin* correctly looked not just

16

to where one is living, but also to where one has an "allegiance or enduring tie." 505 U.S. at 804.

It is not as if the Founders plucked these concepts out of thin air. Emmerich de Vattel, the most influential international-law expert of the founding era, defined "inhabitants" as aliens "who are permitted to settle and stay in the country." 1 Emmerich de Vattel, *The Law of Nations* § 213, at 92 (1760). Appellees' only response is that Vattel "distinguished" inhabitants "from citizens." ACLU Br. 40 (citation omitted). That is true but irrelevant. As appellees acknowledge, the draft Constitution also used the phrase "citizens and inhabitants" to describe the apportionment base. *Id.* at 38 (citation omitted). The Framers eventually used the term "inhabitants" more broadly to cover the entire category of people with sufficient ties to America—whether through citizenship or another enduring connection. But the point is that Vattel was focused on the same question presented here: when an alien should be deemed an inhabitant. And his answer was: when the alien has the sovereign's permission to settle and stay.

In *Franklin*, this Court looked to historical evidence of how the general term "inhabitant" was specifically applied to federal officials serving overseas. 505 U.S. at 805. So too here, it should consider historical evidence of how the general term "inhabitant" was specifically applied to aliens. Appellees do not dispute that prominent jurists, including Marshall and Story, applied Vattel's understanding of inhabitants. And they ignore no less a figure than Madison, who recognized that a State under the Articles of Confederation could "allow" aliens "to become inhabitants" of that jurisdiction. *The Federalist No. 42*, at 286 (James Madison) (Jacob E. Cooke ed., 1961); see Oral Arg. Tr. at 7, *Franklin, supra*

17

(No. 91-1502) (Apr. 21, 1992) ("Madison knew what an inhabitant was.  He was involved in drafting the Census Act.").  Appellees dismiss all of that evidence as drawn from "other contexts."  N.Y. Br. 38.  But this Court has not hesitated to draw on evidence outside the "debates over apportionment," *ibid.*, including Madison's understanding of the "term 'inhabitant'" in the "context of congressional residence qualifications," *Franklin*, 505 U.S. at 805 (citation omitted).

Indeed, this Court's precedent reflects the same understanding of "inhabitance" and "residence."  Appellees agree that founding-era dictionaries defined "[r]esidence" as the "[a]ct of dwelling in a place."  ACLU Br. 25 (citation omitted); see Gov't Br. 37 (noting similar definition of "'inhabitant'" as one who "dwells or resides permanently in a place") (citation omitted).  Yet appellees barely engage with the settled rule established by this Court almost a century ago that illegal aliens paroled into the country pending removal proceedings are legally deemed *not* to be "dwelling," or "resid[ing] permanently," in the United States.  *Kaplan* v. *Tod*, 267 U.S. 228, 230 (1925).  Appellees say that while such aliens may be treated as if stopped at the border for purposes of "naturalization" or "certain procedural rights," Congress "made a different choice" when it came to apportionment.  N.Y. Br. 38-39.  That is another *ipse dixit*.  Appellees cannot identify any textual basis across these statutes for attributing different choices to Congress.  And in all of these contexts, construing terms like "residence" or "dwelling" to apply to aliens who have violated immigration laws "would undermine the 'sovereign prerogative' of governing admission to this country."  *Department of Homeland Sec.* v. *Thuraissigiam*, 140 S. Ct. 1959, 1983 (2020) (citation omitted).

18

c. Appellees' problem is not only textual but conceptual. They still have offered no good reason *why* those who adopted the Constitution or the Fourteenth Amendment would have mandated that apportionment include aliens remaining in this country in defiance of federal law. Appellees suggest that the relevant "total population" is "all persons affected and served by the federal government," N.Y. Br. 1, but that expansive description encompasses virtually everyone physically present in this country (and many who are not). Appellees come closer to a viable theory of representation in asserting that apportionment should include "all the members of a State or community" who "must all share its burdens," *id.* at 31 (citation omitted), but of course illegal aliens might not shoulder common federal-law burdens like military service or taxation. At bottom, appellees simply have not offered any persuasive account of why those in the United States illegally must be treated as members of the political community entitled to be counted in the division of political power among the States. See Gov't Br. 38-39.

2. Turning to constitutional history, appellees make much of the fact that the Framers of the Fourteenth Amendment failed to enact proposals that would have excluded *all* aliens from the apportionment base, and that Representative Bingham stated "the entire immigrant population of this country is included in the basis of representation." Cong. Globe, 39th Cong., 1st Sess. 432 (1866); see N.Y. Br. 29-30. But the failure to enact amendments *requiring* the exclusion of *all* aliens from the apportionment base says nothing about whether the President is *permitted* to exclude *illegal* aliens. Indeed, in 1866, the immigrant population did not include aliens living in the country in violation of federal immigration

19

restrictions (which did not yet exist). See Gov't Br. 35, 43-44.[*]

Appellees likewise misread *Evenwel* v. *Abbott*, 136 S. Ct. 1120 (2016), which addressed only whether Texas could use its "total population" for intrastate redistricting without excluding those ineligible to vote, *id.* at 1123, not who must be included in the "total population" itself. Appellees observe (ACLU Br. 30) that Texas had included illegal aliens in its total population, but of course this Court did not address whether a State may exclude illegal aliens from intrastate redistricting, let alone whether the President may exclude them from interstate apportionment.

In the end, appellees do not have any meaningful evidence that the Framers of the Constitution or the Fourteenth Amendment considered and rejected excluding illegal aliens from the apportionment base. So appellees return again and again to the fact that the Executive Branch has never sought to exclude illegal aliens from the apportionment before. See, *e.g.*, N.Y. Br. 1, 23, 31, 34; ACLU Br. 1, 11, 24, 34. Even setting aside that there were no general federal immigration restrictions until 1875, there are both legal and practical reasons not to freeze in place past practice. As to law, this Court in *Franklin* upheld the Executive Branch's

---

[*] Appellees suggest that, even before the Fourteenth Amendment, there were aliens whose presence violated early state immigration laws or the Alien and Sedition Acts. N.Y. Br. 30; ACLU Br. 29-30. It hardly follows that because the Executive Branch during the early decades of the Republic did not attempt to identify and exclude the narrow categories of aliens who violated those particular laws, the Executive forever surrendered any discretion to exclude the far more significant class of illegal aliens present in violation of the comprehensive federal immigration scheme since established by Congress.

20

decision to reverse a nearly unbroken practice from 1790 to 1990 of excluding federal overseas personnel from the apportionment base. 505 U.S. at 790-793, 806. Here as there, past practice shows what the Executive Branch *may* do, not necessarily what it *must* do. As to practical realities, it is hardly surprising that a different approach was taken during many decades when the number of illegal aliens, and their likely effect on apportionment, was much smaller. The question is far more significant now—and as in *Franklin*, its answer should turn on the historical meaning of inhabitancy, not the Executive's past practice.

3. Because appellees are wrong that the Constitution requires including illegal aliens, their statutory arguments add nothing. The private appellees emphasize the phrase "total population" in the Census Act, ACLU Br. 35 (quoting 13 U.S.C. 141(b)), while the governmental appellees emphasize the phrase "decennial census of the population" in the Reapportionment Act, N.Y. Br. 33 (quoting 2 U.S.C. 2a(a)). That appellees do not even agree on the relevant text is telling; both phrases beg the question whether illegal aliens are part of the "total population" or census "population." The governmental appellees go so far as to suggest that the population must include all those who had been counted in the census "[b]y 1929." *Ibid.* But if Congress meant to ossify the prevailing practice as of 1929, this Court could not have held in *Franklin* that the Executive Branch has the discretion to include (or exclude) federal overseas personnel. See 505 U.S. at 792-793.

Ultimately, appellees' statutory arguments rest not on any enacted text but on failed legislative proposals and floor statements by legislators. See ACLU Br.

21

35-36; N.Y. Br. 35-36. Once again, however, these proposals would have required the exclusion of *all* aliens from the apportionment base, or provided for illegal aliens to be counted in order to facilitate their *removal*. None of that shows illegal aliens must be included in the apportionment base. See Gov't Br. 43-44; see, *e.g.*, 71 Cong. Rec. 2343 (1929) (Statement of Rep. Oliver). Appellees also rely (ACLU Br. 31-33) on various pieces of post-enactment legislative history—namely, failed legislative proposals and statements from legislators and Executive Branch officials from 1940 through the 1980s. But such evidence "is not a legitimate tool of statutory interpretation." *Bruesewitz* v. *Wyeth LLC*, 562 U.S. 223, 242 (2011). And appellees never explain why that evidence should be treated as any more probative than Congress's failure to pass "[s]everal bills requiring the Secretary to include overseas military" personnel in the apportionment base, *Franklin*, 505 U.S. at 793, or the Executive Branch's "doubts about the constitutionality" of such legislation, J.A. at 113, *Franklin*, *supra* (No. 91-1502); see Gov't Br. 44.

4. Finally, it warrants emphasis that the judgment below—which prohibits the Secretary from including in his report "any information" concerning the number of illegal aliens in each State, J.S. App. 106a—must be reversed so long as the President has the discretion to exclude *some* illegal aliens whom the Bureau will count under the Residence Criteria. And at a minimum, the President has the discretion to exclude (i) illegal aliens detained immediately after crossing the border and before being expeditiously removed to their home countries, who are materially indistinguishable from foreign tourists, see pp. 13-14, *supra*; (ii) illegal aliens paroled

22

into this country, who are deemed not to dwell here under this Court's own precedent, see p. 17, *supra*; and (iii) illegal aliens subject to final orders of removal, who cannot be presumed to remain here for much longer.

Appellees protest that they should not be required to address "hypothetical subset[s]" of illegal aliens because the Memorandum establishes a policy of "categorical exclusion." N.Y. Br. 43. In fact, the Memorandum excludes illegal aliens only "to the maximum extent feasible and consistent with the discretion delegated to the executive branch." 85 Fed. Reg. at 44,680. And regardless, in this facial pre-enforcement challenge, appellees must "'establish that no set of circumstances exists under which the [Memorandum] would be valid.'" *Reno* v. *Flores*, 507 U.S. 292, 301 (1993) (citation omitted). Appellees suggest they have satisfied that standard on the theory that immigration status is *always* an impermissible consideration, even if some illegal aliens may be excluded on the basis of other criteria (such as transience). See ACLU Br. 42. But as the examples above demonstrate, unlawful immigration status is at least a material factor to consider in *some* cases when ascertaining "usual residence" or "inhabitance," whether or not it is necessarily dispositive in *all* cases. The district court therefore erred in categorically enjoining the President from considering such information.

23

\*   \*   \*   \*   \*

The judgment below should be vacated or reversed.

Respectfully submitted.

JEFFREY B. WALL
*Acting Solicitor General*

NOVEMBER 2020