# EXHIBIT B

No. 20-561

# In the
# Supreme Court of the United States

DONALD J. TRUMP, PRESIDENT OF
THE UNITED STATES, ET AL.,
*Appellants*,

v.

CITY OF SAN JOSE, CALIFORNIA, ET AL.,
*Appellees.*

DONALD J. TRUMP, PRESIDENT OF
THE UNITED STATES, ET AL.,
*Appellants*,

v.

STATE OF CALIFORNIA, ET AL.,
*Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

## MOTION TO AFFIRM FOR APPELLEES
## CITY OF SAN JOSE, ET AL.

STEVEN M. BAUER
SADIK HUSENY
SHANNON D. LANKENAU
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 1900
San Francisco, CA 94111

RICHARD P. BRESS
  *Counsel of Record*
CAROLINE A. FLYNN
GREGORY B. IN DEN BERKEN
CHRISTINE C. SMITH
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
rick.bress@lw.com

(*additional counsel on inside cover*)

KRISTEN CLARKE
JON M. GREENBAUM
EZRA D. ROSENBERG
DORIAN L. SPENCE
MARYUM JORDAN
AJAY SAINI
LAWYERS' COMMITTEE FOR
  CIVIL RIGHTS UNDER LAW
1500 K Street, NW
Suite 900
Washington, DC 20005

*Counsel for Appellees City of San Jose, et al.*

## QUESTIONS PRESENTED

The Constitution provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2. To carry out this apportionment, the Census Act directs the Secretary of Commerce to "take a decennial census of population" and report the "tabulation of total population by States" to the President. 13 U.S.C. § 141. The Reapportionment Act, in turn, directs the President to "transmit to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the . . . decennial census of the population." 2 U.S.C. § 2a(a).

In July 2020, the President issued a Memorandum directing the categorical exclusion of undocumented immigrants from the apportionment base. *See* Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census, 85 Fed. Reg. 44,679, 44,680 (July 23, 2020). A three-judge district court held the Presidential Memorandum unconstitutional and in violation of the statutory mandates. The questions presented are:

1. Whether Appellees' challenge satisfies the requirements of Article III of the U.S. Constitution.

2. Whether the Presidential Memorandum's policy of categorically excluding undocumented immigrants from the apportionment base violates the

ii

Fourteenth Amendment and Article I of the Constitution.

3. Whether the Presidential Memorandum's policy of categorically excluding undocumented immigrants from the apportionment base violates the Census Act and Reapportionment Act.

4. Whether the Presidential Memorandum's policy of basing apportionment on figures other than the total population count established by the decennial census violates the Census Act and Reapportionment Act.

iii

## TABLE OF CONTENTS

**Page**

QUESTIONS PRESENTED ....................................... i

TABLE OF AUTHORITIES .................................... iv

INTRODUCTION ......................................................1

STATEMENT ............................................................2

ARGUMENT ...........................................................14

CONCLUSION........................................................18

iv

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Department of Commerce v. New York,*
  139 S. Ct. 2551 (2019).............................................4

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992).............................................10

*South Central Bell Telephone Co. v.*
  *Alabama,*
  526 U.S. 160 (1999).............................................17

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const. amend. XIV, § 2 ............................. i, 1, 2

U.S. Const., art. I, § 2, cl. 3 ....................................2, 3

2 U.S.C. § 2a(a).................................................. i, 1, 3

8 U.S.C. § 1101 *et seq.* .................................................4

13 U.S.C. § 141 ...................................................... i, 3

13 U.S.C. § 141(b)..............................................14, 16

28 U.S.C. § 1253 .....................................................14

Act of Mar. 1, 1790, ch. 2, 1 Stat. 101 .................3, 11

v

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

**OTHER AUTHORITIES**

83 Fed. Reg. 5525 (Feb. 8, 2018)...............................3

84 Fed. Reg. 33,821 (July 16, 2019)...........................4

85 Fed. Reg. 44,679 (July 23, 2020)...........i, 1, 4, 5, 14

Sup. Ct. R. 18.10 ......................................................17

The White House, Statement from the
    Press Secretary (Sept. 18, 2020),
    https://www.whitehouse.gov/
    briefings-statements/statement-
    press-secretary-091820.........................................5

## INTRODUCTION

Since the Founding, persons who reside in the United States have *never* been excluded from the apportionment base due to their lack of legal status. But that is exactly what the President has now directed the Executive Branch to do. *See* Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census, 85 Fed. Reg. 44,679, 44,680 (July 23, 2020) ("Presidential Memorandum" or "Memorandum"). This new exclusion policy is forbidden by the plain text of the Constitution and its implementing statutes.

The Fourteenth Amendment and the Reapportionment Act provide that apportionment of seats in the House of Representatives shall be based on "the whole number of persons in each State." U.S. Const. amend. XIV, § 2; 2 U.S.C. § 2a(a). For 230 years, this language has been understood to encompass all of a State's "inhabitants" or "usual residents." And under any ordinary understanding of those terms, undocumented immigrants who live, work, sleep, and raise their families in a State are "inhabitants" and "usual residents" of that place, as Congress and presidential administrations of both political parties have uniformly recognized.

This case arises from one of several three-judge district court opinions enjoining the Secretary of Commerce and his delegates from fulfilling the President's unlawful directive to categorically exclude undocumented immigrants from the apportionment base.[1] This Court previously postponed consideration

---

[1] The district court's opinion below addressed two cases that were considered together as related cases: one brought by Appellees here, and the other by the State of California and local

2

of its jurisdiction and expedited the appeal of one of the parallel cases, *Trump v. New York*, No. 20-366. Like the *New York* district court, the district court in the present case held that the Presidential Memorandum violates the Census Act and the Reapportionment Act. And the district court's opinion in this case went further, in two primary respects: It held that Appellees have Article III standing on alternative grounds that the *New York* court left undecided, and it held that the President's exclusion policy violates the Constitution, an issue that the *New York* court did not address.

The Government has appealed the district court's decision, but requests that the Court hold its jurisdictional statement pending disposition of *New York*. Appellees agree that a hold is appropriate. If the Court finds jurisdiction and affirms the judgment in *New York*—as it should—the Court should summarily affirm the judgment in this case as well. If the Court does not affirm in *New York*, Appellees respectfully request that the Court provide the parties an opportunity to address that decision prior to disposing of this jurisdictional statement.

## STATEMENT

1. The Constitution provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2; *see also id.* art. I, § 2, cl. 3. To effect this apportionment, the Constitution directs Congress to

---

jurisdictions. The Government's jurisdictional statement addresses both cases.

3

enact legislation providing for an "actual Enumeration" of the population once every "ten Years." *Id.* art. I, § 2, cl. 3.

Congress has carried out that constitutional obligation by passing the Census and Reapportionment Acts. The Census Act directs the Secretary of Commerce to "take a decennial census of population" and report the "tabulation of total population by States" to the President. 13 U.S.C. § 141. The Reapportionment Act, in turn, requires the President to "transmit to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the . . . decennial census of the population." 2 U.S.C. § 2a(a).

The Secretary of Commerce has delegated the task of conducting the decennial census to the Census Bureau. In 2018, the Census Bureau promulgated its Residence Criteria, which it based off of the very first Census Act of 1790. *See* Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5525, 5526 (Feb. 8, 2018). Those Criteria direct enumerators to count persons at their "usual residence," defined as "the place where a person lives and sleeps most of the time." *Id.* at 5526; *see also* Act of Mar. 1, 1790, ch. 2, § 5, 1 Stat. 101, 103 (directing enumerators to count persons at their "usual place of abode," defined as their "settled place of residence"). Under the Residence Criteria, "[c]itizens of foreign countries living in the United States," including those held at detention facilities by Immigration and Customs Enforcement (ICE), are "[c]ounted at the U.S. residence where they live and sleep most of the time." 83 Fed. Reg. at 5533, 5535.

4

2. In March 2018, the Secretary announced his decision to include a citizenship question on the decennial census questionnaire. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2562 (2019). In June 2019, this Court held that the Secretary's explanation for that decision was "contrived" and violated the Administrative Procedure Act. *Id.* at 2575-76. A month later, the President issued Executive Order 13,880, which directed all executive agencies to assist the Department "in determining the number of citizens and non-citizens in the country," including by providing any relevant administrative records. Collecting Information About Citizenship Status in Connection With the Decennial Census, Executive Order No. 13,880, 84 Fed. Reg. 33,821, 33,821 (July 16, 2019).

On July 21, 2020, the President issued the Presidential Memorandum at issue in this case, declaring that it is now "the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act, as amended (8 U.S.C. § 1101 *et seq.*), to the maximum extent feasible and consistent with the discretion delegated to the executive branch." 85 Fed. Reg. at 44,680. The Memorandum states, without qualification, that the "discretion delegated to the executive branch to determine who qualifies as an 'inhabitant' includes authority to exclude from the apportionment base aliens who are not in a lawful immigration status." *Id.* at 44,679. And to effectuate the President's chosen policy, the Memorandum directs the Secretary to provide the President with two sets of numbers: a tabulation of the total population based on the Census Bureau's ordinary Residence Criteria, and a set of

5

figures that would enable the President to exclude undocumented immigrants from apportionment "to the maximum extent of [his] discretion under the law." *Id.* at 44,680.

The explicit purpose of this policy, as expressed in the Memorandum itself, is to weaken the political influence of States with large populations of undocumented immigrants. *See id.* Indeed, the Memorandum identifies "one State"—California—as "home to more than 2.2 million illegal aliens." *Id.* According to the Memorandum, "[i]ncluding those illegal aliens in the population of the State for the purpose of apportionment could result in the allocation of two or three more congressional seats than would otherwise be allocated." *Id.*

There is every indication that the Secretary and the Census Bureau intend to fully implement the President's categorical directive. They began work on that task long before the Memorandum issued. Pursuant to Executive Order 13,880, the Secretary and Census Bureau "entered into memoranda of understanding with agencies and states to obtain administrative records" to determine the citizenship status of many U.S. residents. J.S. App. 47a-48a. On September 18, 2020, the Administration reaffirmed to the American people its determination "to vindicate [the Memorandum's] policy" of excluding undocumented immigrants from the apportionment base. The White House, Statement from the Press Secretary (Sept. 18, 2020), https://www.whitehouse.gov/briefings-statements/ statement-press-secretary-091820. And on October 6, the Government represented to this Court that the Census Bureau "anticipates" providing the President "with information regarding any 'unlawful aliens in

6

ICE Detention Centers'" by the statutory December 31 deadline and all "'[o]ther [Presidential Memorandum] related outputs'" by January 11. *New York* Appellants' Suppl. Br. 5 (Oct. 2, 2020) (alterations in original) (citation omitted).[2]    The Government explained that it needed the additional period between December 31 and January 11 "to *fully implement* the Presidential Memorandum." *Id*. at 3-4 (emphasis added) (citation omitted).

3.  Appellees are a California city; counties in Texas, Virginia, and Washington; individual voters in California, Florida, Georgia, and Texas; and a civic organization dedicated to advancing immigrant and refugee rights.    Appellees brought suit in the Northern District of California to challenge the Presidential Memorandum's new policy of excluding undocumented immigrants from the apportionment base, and moved for partial summary judgment on the grounds that the policy violates the Constitution, the Census Act, and the Reapportionment Act.    In a painstaking decision spanning over a hundred pages, the three-judge district court agreed.    J.S. App. 1a-131a.

a.  The district court first held that Appellees had Article III standing based on two types of impending harm: (1) apportionment injuries based on the likely loss of seats in Congress, and (2) a "census degradation injury" based on the exclusion's negative impact on state and local governments' share of federal funding and intrastate redistricting.  *Id*. at

---

[2] Citations to "*New York* [ ]" refer to filings in *Trump v. New York*, No. 20-366.  Citations to "Dkt." refer to district court filings in *City of San Jose v. Trump*, No. 5:20-cv-05167 (N.D. Cal.).

7

35a. With respect to the former, the court relied on Appellees' uncontroverted expert testimony that "removing undocumented immigrants from the population for the purposes of congressional redistricting is highly likely to cause California and Texas to each lose a congressional seat." *Id.* at 36a (quoting Ruth Gilgenbach Decl. ¶ 5, Dkt. 63-2). As to the latter, the court again relied on uncontested expert testimony in concluding that excluding undocumented immigrants from the census is substantially likely to reduce the "federal funding received by one or more of the government entity plaintiffs." *Id.* at 50a-53a.

The district court rejected the Government's argument that these harms were "speculative" because (according to the Government) it is "'not yet known whether the President will be able to exclude any, some, or all aliens from the apportionment base.'" *Id.* at 39a-41a (citation omitted). As the court explained, "the determination of the President to accomplish the memorandum's explicit and singular goal of excluding undocumented immigrants from the census count is abundantly clear." *Id.* at 44a; *see also id.* at 50a (referring to "the President's clear intent to have 'maximum' exclusion"). In light of the Memorandum's "clear commanding language" and the President's determination that he had the power to "direct[] that all undocumented immigrants—without exception—be excluded," *id.* at 44a, 50a, the court found that the Government could not "categorically evade judicial review simply by invoking qualifying language such as 'to the extent feasible'" and "'consistent with the discretion

8

delegated to the executive branch,'" *id.* at 41a-43a (emphasis and citation omitted).[3]

The court determined, moreover, that the Government's actions and representations, both before and after the Memorandum, consistently indicated that it would in fact implement the Memorandum's binding directive to exclude undocumented aliens "to the maximum extent." *See id.* at 43a-50a (citation omitted). And the court found it significant that the Government "ha[d] not offered any evidence that there are any significant impediments to fulfilling the Presidential Memorandum." *Id.* at 48a; *see also id.* at 50a (again noting "the lack of any evidence of any significant barriers to the Secretary's ability to carry out the Presidential Memorandum").

The court thus held that Appellees had shown a "substantial risk" that at least one of their States would lose a representative in Congress as a result of the exclusion policy. *Id.* at 49a-50a. And the court found that, in any event, Appellees were substantially

_____

[3] The Government's attempt to use the Memorandum's "consistent with the [President's] discretion" language to delay review rang especially hollow, given the Government's clear position on the merits—in the lower court and again before this Court—that the President has the discretion to exclude *all* undocumented immigrants based on their lack of legal status alone. *See* J.S. App. 72a, 94a, 101a, 109a, 111a; *New York* Br. for Appellants 33 (Oct. 30, 2020), ("The President's discretion encompasses the policy judgment that illegal aliens should be excluded from the term 'inhabitant' to the maximum extent possible."); *New York* Reply Br. for Appellants 15 (Nov. 23, 2020) ("One who is not permitted to live in the United States, and hence may be removed by the government, is not reasonably described as having a 'usual' or 'settled place of residence' here.").

9

likely to suffer a funding injury even if not *all* undocumented immigrants were excluded; the court pointed to, among other things, Government counsel's "effective[] conce[ssion]" at the summary judgment hearing that the funding harm could "arise without the same magnitude of exclusion necessary for a loss of a congressional seat." *Id.* at 52a.

b. The district court also rejected the Government's argument that it should delay adjudication until after the apportionment takes place due to prudential ripeness concerns. To the contrary, the court concluded that prudential concerns counseled *in favor* of hearing the suit pre-apportionment. The court found that Appellees had brought "purely legal" claims that would not "'benefit from further factual development.'" *Id.* at 57a (citation omitted). Moreover, because relief could be limited to enjoining the Secretary from providing the President with the requested information on citizenship status, deciding the case would "not affect the actual conduct of the census." *Id.* at 58a. On the other hand, "[d]elaying judicial review" *would* harm Appellees and others as it would "impact[] the states' ability to do redistricting for upcoming elections in 2021 and 2022." *Id.* at 60a. "Indeed," the court observed, "the government has represented to the United States Supreme Court that a delay in redistricting" of even a few months could make as many as 24 state deadlines "'impossible to meet.'" *Id.* at 61a-62a (emphasis omitted) (quoting Gov't Reply Br. in Supp. of Application for Stay, *Ross v. National Urban League*, No. 20A62 (Oct. 10, 2020)).

c. On the merits, the court ruled for Appellees across the board. It held that the Presidential Memorandum violates the Constitution and the

10

governing statutes by excluding persons residing in the United States from the apportionment base solely based on their legal immigration status. *Id.* at 62a-111a, 116a-20a. And it held that the Memorandum additionally violates those statutes by basing apportionment on figures other than the "decennial census." *Id.* at 112a-15a. The court also determined that the Memorandum violates the constitutional separation of powers. *Id.* at 120a-21a.

i. The district court held that "[t]he Constitution's text, drafting history, 230 years of historical practice, and Supreme Court case law all support the conclusion that apportionment must be based on all persons residing in each state, including undocumented immigrants." *Id.* at 64a. Starting with the text, the court explained that the Constitution establishes a baseline rule of *inclusion*, requiring the enumeration of "all 'persons'" not specifically *excluded* by the text, such as "'Indians not taxed.'" *Id.* at 65a-69a (citation omitted).

Addressing the Government's argument that the constitutional term "persons" has historically been understood to refer to "inhabitants" or those who maintain their "usual residence" in a place, the court determined that "[u]ndocumented immigrants who regularly reside in each state" undoubtedly qualify. *Id.* at 71a-72a. Such immigrants "have the requisite 'enduring tie to a place' to make them usual residents under *Franklin* [*v. Massachusetts*], since they live and sleep most of the time in that state." *Id.* at 72a (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 804 (1992)); *see also id.* (quoting the Census Bureau's Residence Criteria as counting persons "where they live and sleep most of the time"). Indeed, the court observed, "89 percent [of undocumented immigrants]

11

have lived in the United States for at least five years." *Id.* The court also rejected the Government's argument that because such immigrants may be removed from this country in the future, they lack a usual residence here. "[T]he term 'usual residence' refers to an individual's usual residence on 'Census Day,' without regard to where that individual might move afterwards." *Id.* at 72a-73a.

Turning to the Constitution's drafting history, the court found that the historical record revealed "the Framers' clear intent to apportion based on the number of persons residing in each state, not the number of voters." *Id.* at 74a-77a. Likewise, in later drafting the Fourteenth Amendment, the drafters rejected a proposal to apportion based on the number of "voters" instead of "persons." *Id.* at 78a-79a. During those debates, "the drafters explicitly acknowledged the consequences of their choice—the inclusion of noncitizens in the apportionment base." *Id.* at 78a.

The district court emphasized that historical practice has been uniform too: "Congress and the Executive Branch have consistently interpreted the Constitution as including in the apportionment base all persons residing in a state, including undocumented immigrants." *Id.* at 80a. From the very first Census Act of 1790, Congress directed enumerators "to count 'the number of the inhabitants within their respective districts.'" *Id.* at 82a (emphasis omitted) (quoting Act of Mar. 1, 1790, ch. 2, § 1, 1 Stat. 101, 101). And throughout the twentieth century, the court noted, Congress and the Executive Branch have declined numerous invitations to read the Constitution's text more narrowly. *Id.* at 83a-90a. When enacting the

12

Reapportionment Act of 1929, for instance, Congress concluded that it would be unconstitutional to exclude noncitizens—including three to four million undocumented immigrants—from the apportionment base. *Id.* at 11a-14a, 85a-86a. And Congress rejected similar proposals to exclude undocumented immigrants in 1940 and 1989. *Id.* at 16a, 86a. Likewise, the Carter, Reagan, and H.W. Bush Administrations all affirmed that the Constitution "require[s]" the enumeration of "illegal aliens." *Id.* at 87a-88a (citation omitted); *see also id.* at 17a-19a.

Finally, the court rejected the Government's argument that the term "inhabitants" can be read narrowly to include *only* those persons residing in a State with permission. That argument, the court found, was contrary to the plain meaning of the constitutional text, contrary to the ordinary meaning of "inhabitants," and based on "irrelevant sources that have nothing to do with apportionment or the census." *Id.* at 94a-99a. The court also rejected the Government's argument that *Franklin* "gives the President discretion to overcome the [Constitution's] text and history" on this question; to the contrary, the court held, "*Franklin* makes clear that 'usual residence' should be interpreted broadly for the purposes of apportionment." *Id.* at 99a-102a.

ii. For many of the same reasons—and consistent with the holding of the *New York* court—the district court concluded that the Presidential Memorandum violates the Census and Reapportionment Acts by excluding "undocumented immigrants who would, but for their immigration status, be considered residents" of their States. *Id.* at 102a-11a. The court again emphasized that, "since the time of the Reapportionment Act's enactment," "the ordinary

13

meaning of the phrase 'persons in each state' has never been 'lawful inhabitants.'" *Id.* at 105a. That "both houses of Congress considered and rejected amendments" to the Reapportionment Act that "would have excluded 'aliens' from the apportionment base" serves only to reinforce how far the Memorandum strays from the statutory text and congressional intent. *Id.* at 116a-17a.

iii. The court next held—again in accord with the *New York* court—that the Presidential Memorandum violates the Census and Reapportionment Acts by "basing an apportionment on something other than the 'decennial census of the population,' as that term is used in the Reapportionment Act." *Id.* at 112a. The statutes provide that "the numbers used to apportion House seats will come from the decennial census." *Id.* at 115a. But the Presidential Memorandum "directs the Secretary 'to report two sets of numbers,'" the total population as tabulated by the Bureau's ordinary Residence Criteria (i.e., the decennial census) and the adjusted population as tabulated by excluding undocumented immigrants. *Id.* at 113a (citation omitted). Because the latter "cannot be properly understood as part of the decennial census," basing apportionment on that would violate the statutes. *Id.* at 114a.

iv. Finally, the court held that the Memorandum violates the separation of powers by seeking to do "what the President does not have the power to do" under the governing law, thereby usurping Congress's constitutional power to direct the taking of the census. *Id.* at 120a-22a.

d. Finding that the factors for permanent injunctive relief favored Appellees, the court enjoined the Government defendants from providing the

14

President with "any information concerning the number of aliens in each State 'who are not in a lawful immigration status under the Immigration and Nationality Act'" in the Secretary's report under 13 U.S.C. § 141(b) "or otherwise as part of the decennial census." J.S. App. 130a-31a (quoting Presidential Memorandum, 85 Fed. Reg. at 44,680).[4] It also entered a declaratory judgment that the Memorandum's policy is unlawful. *Id.* at 130a.

On October 23, 2020, the Government filed notices of appeal to this Court and the U.S. Court of Appeals for the Ninth Circuit. On October 29, 2020, the Government filed a jurisdictional statement with this Court.

## ARGUMENT

1. The Government has requested that the Court hold the jurisdictional statement in this case pending disposition of *Trump v. New York*, No. 20-366. J.S. 10. As Appellees stated in their brief to the Court as *amici curiae* in the *New York* appeal, they do not oppose that request. *See New York* Br. for City of San Jose et al. as Amici Curiae Supporting Appellees 3 & n.4 (Nov. 16, 2020).

Given the timing of the district court's decision in this case (October 22), the date of the Government's jurisdictional statement (October 29), and the Court's highly expedited schedule for resolving the appeal in *New York* (which required briefing to be completed by November 23 and set oral argument for November 30), Appellees did not seek to have the Court note probable jurisdiction and set this appeal for briefing

---

[4] The district court did not enter an injunction against the President. J.S. App. 126a.

15

and argument alongside *New York*. But Appellees acknowledge that this Court's decision in *New York* may, as a practical matter, decide this case as well. Appellees agree with the Government that the constitutional issues decided in this case are fairly presented in *New York*, even though the *New York* district court elected not to rule on them. *See* J.S. 10-11. Appellees also agree that certain grounds on which the district court found Appellees had Article III standing—namely, the apportionment and funding injuries—were properly presented by the *New York* plaintiffs. This Court therefore may find standing in *New York* on those alternative grounds even if it determines that the plaintiffs' "chilling effect" injury is now moot. *See id.* at 11; *New York* Br. for Appellees New York Immigration Coalition et al. 13-19 (Nov. 16, 2020); *New York* Br. for State of New York et al. 13-19 (Nov. 16, 2020).

2. Appellees nonetheless note, for this Court's awareness, that the records in the two appeals are not identical. For instance, Appellees here include individual plaintiffs who vote in California and Texas, and who will therefore be directly affected by the loss of political representation should the Presidential Memorandum's exclusion policy be substantially carried out. *See* Sam Liccardo Decl. ¶¶ 2-4, Dkt. 63-5; Zerihoun Yilma Decl. ¶¶ 2-4, Dkt. 63-6; Rodney Ellis Decl. ¶¶ 2, 4-5, Dkt. 63-7. In addition, Appellees submitted an uncontested expert declaration by economist Ruth Gilgenbach, who concluded, *inter alia*, that "removing undocumented immigrants from the population for the purposes of congressional redistricting is highly likely to cause California and Texas to each lose a congressional seat." Gilgenbach Decl. ¶ 5, Dkt. 63-2. The *New York* plaintiffs rely on

16

different (though similar) expert testimony, also uncontested, regarding the likely effects of the Memorandum on congressional apportionment. *See New York* J.A. 367 ¶ 43 (expert declaration of Dr. Christopher Warshaw).

Appellees in this case additionally submitted an uncontested expert declaration by Andrew Reamer, a public policy scholar whose work concerns "the roles and functioning of the federal statistical system," addressing more specifically the issue of whether state and local governments will lose federal program funding as a result of the Presidential Memorandum. *See* Andrew Reamer Decl. ¶¶ 3, 17-22, Dkt. 86-1. Professor Reamer concludes that if all or a subset of immigrants are excluded from the decennial census, States with above-average populations of such immigrants may lose some amount of federal funding; as he explains, "a change in the degree of the differential undercount would only affect the magnitude of the losses," not their existence. *Id.* ¶¶ 17-22.[5]

To be clear, Appellees do not believe that these distinctions cast any doubt whatsoever on the

---

[5] Professor Reamer has also filed an amicus brief before this Court in *New York*, where he reaffirms that States "with a higher-than-average percentage of undocumented immigrants in their population . . . can be expected to lose funding," including eleven States who are parties in *New York*. *New York* Br. of Professor Andrew Reamer, Ph.D., as Amicus Curiae 3 (Nov. 16, 2020). Professor Reamer's amicus brief also explains that because "the apportionment tabulation" reported pursuant to 13 U.S.C. § 141(b) "is the only official tabulation, statutes that require federal funds to be allocated on the basis of the decennial census may require that funds be allocated on the basis of the apportionment tabulation." *Id.* at 6.

17

plaintiffs' showing of standing in *New York*. Appellees note these aspects of the record solely out of an abundance of caution, in case they prove material to the Court's Article III analysis.

3. If the Court finds jurisdiction and affirms the district court's judgment in *New York*, the judgment here should be summarily affirmed as well. The Government does not dispute that this would be the proper course. *See* J.S. 11 (explaining that the Court "can resolve each of" the additional grounds for the district court's decision in this case "in *New York*"). Because the Court already set the parallel *New York* appeal for briefing and argument, Appellees will not separately set forth their arguments for affirmance here; all parties are on notice of the legal issues in this case and in that parallel appeal. *Cf. S. Cent. Bell Tel. Co. v. Alabama*, 526 U.S. 160, 171 (1999). To be clear, however, Appellees maintain that the district court's thorough analysis on each of the questions presented was correct for the reasons further explained by the *New York* appellees and by Appellees in their amicus brief in *New York*. *See generally New York* Br. for Appellees New York Immigration Coalition et al.; *New York* Br. for State of New York et al.; *New York* Br. for City of San Jose et al. as Amici Curiae Supporting Appellees.

4. Should the Court not affirm in *New York*, however, Appellees respectfully request that the Court afford the parties an opportunity to respond to that decision and its ramifications for this case prior to the Court's disposition of the Government's jurisdictional statement. *See* Sup. Ct. R. 18.10.

18

## CONCLUSION

The Court should hold the Government's jurisdictional statement pending disposition of *Trump v. New York*, No. 20-366. Should the Court affirm the judgment in *New York*, the Court should summarily affirm the judgment in this case. Should the Court not affirm in *New York*, Appellees respectfully request that the Court provide the parties the opportunity to address that decision prior to disposing of this jurisdictional statement.

19

Respectfully submitted,

STEVEN M. BAUER                   RICHARD P. BRESS
SADIK HUSENY                        *Counsel of Record*
SHANNON D. LANKENAU               CAROLINE A. FLYNN
LATHAM & WATKINS LLP              GREGORY B. IN DEN BERKEN
505 Montgomery Street            CHRISTINE C. SMITH
Suite 1900                       LATHAM & WATKINS LLP
San Francisco, CA 94111          555 Eleventh Street, NW
                                 Suite 1000
                                 Washington, DC 20004
                                 (202) 637-2200
                                 rick.bress@lw.com

KRISTEN CLARKE
JON M. GREENBAUM
EZRA D. ROSENBERG
DORIAN L. SPENCE
MARYUM JORDAN
AJAY SAINI
LAWYERS' COMMITTEE FOR
  CIVIL RIGHTS UNDER LAW
1500 K Street, NW
Suite 900
Washington, DC 20005

*Counsel for Appellees City of San Jose, et al.*

November 25, 2020