# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**COMMON CAUSE, et al.**,

             Plaintiffs,

             v.

**DONALD J. TRUMP, et al.**,

             Defendants.

Case No. 1:20-cv-02023 (CRC) (GGK) (DLF)

## MEMORANDUM OPINION

Before:  KATSAS, *Circuit Judge*, COOPER and FRIEDRICH, *District Judges*.

Opinion of the Court filed by *Circuit Judge* KATSAS.

Dissenting opinion filed by *District Judge* COOPER.

KATSAS, *Circuit Judge*:  President Trump issued a memorandum directing the Secretary of Commerce to provide him with information to support excluding illegal aliens, to the extent feasible, from the enumeration used to apportion the House of Representatives.  The Secretary has not yet determined what information he can provide, and the President has not yet determined which illegal aliens, if any, he can feasibly exclude.  The plaintiffs seek to enjoin the Secretary from complying with the memorandum and to enjoin the President from excluding any illegal aliens from the apportionment base.  We consider whether this lawsuit is ripe for review.

I

A

The Enumeration Clause of the Constitution requires an "actual Enumeration" of the population every ten years "in such Manner as [Congress] shall by Law direct."  U.S. Const. art. I, § 2, cl. 3 (second sentence).  This enumeration determines the number of seats for each State in the House of Representatives.  As originally ratified, the Apportionment Clause provided that

representatives "shall be apportioned among the several States ... according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons." *Id.* (first sentence). Under the Fourteenth Amendment, the Constitution now apportions representatives "among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." *Id*. amend. XIV, § 2.

Congress has established procedures for the necessary enumeration and apportionment, which require sequential action by the Secretary of Commerce and the President. To begin, the Secretary must "take a decennial census of population as of the first day of April" of each census year, "in such form and content as he may determine." 13 U.S.C. § 141(a). By the end of the year, the Secretary must complete the census and report to the President the resulting "tabulation of total population by States ... as required for the apportionment." *Id.* § 141(b). For purposes of apportionment, the census count may not use "the statistical method known as 'sampling,'" *id.* § 195, which involves the practice of inferring information about the entire population from a representative sample, *see Utah v. Evans*, 536 U.S. 452, 467–68 (2002). The Bureau of the Census, an agency within the Department of Commerce, assists the Secretary in conducting the census. *See* 13 U.S.C. §§ 2, 21.

In turn, the President must perform three distinct tasks. First, he must determine "the whole number of persons in each State, excluding Indians not taxed, as ascertained under the ... decennial census of the population." 2 U.S.C. § 2a(a). From that population base, the President then must use the "method of equal proportions" to calculate "the number of Representatives to which each State would be entitled." *Id.* Finally, by January 10 of the year after the census year,

the President must "transmit to the Congress a statement" showing both the population base and the ensuing apportionment. *Id.* The clerk of the House of Representatives then must notify each State of its number of representatives. *Id.* § 2a(b).

The Executive Branch has broad discretion over the enumeration process. As the Supreme Court twice has explained, the Enumeration Clause "'vests Congress with virtually unlimited discretion in conducting the decennial actual Enumeration,' and 'Congress has delegated its broad authority over the census to the Secretary.'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (quoting *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996)) (cleaned up). This discretion extends to the President, who, as the head of the Executive Branch, may "direct the Secretary in making policy judgments that result in 'the decennial census.'" *Franklin v. Massachusetts*, 505 U.S. 788, 799 (1992). Further, the President need not "adhere to the policy decisions reflected in the Secretary's report"; even after receiving the report, the President may change the census or direct the Secretary to "reform" it. *Id.* at 797–99. Only after the President determines the final population count does the remainder of the process, including the apportionment calculation and the notifications, become "ministerial." *See id.* at 799.

B

The 2020 census remains ongoing. The Secretary's report to the President is due on December 31, 2020, *see* 13 U.S.C. § 141(b), and the President's statement to Congress is due on January 10, 2021, *see* 2 U.S.C. § 2a(a). Census Bureau field operations have now ceased, *see Ross v. Nat'l Urban League*, No. 20A62, 2020 WL 6041178 (Oct. 13, 2020) (mem.), but the Bureau continues to analyze and compile the data that it has collected.

For the 2020 census, the Bureau promulgated "Residence Criteria" to determine whether and where to count various categories of individuals. *Final 2020 Census Residence Criteria and Residence Situations*, 83 Fed. Reg. 5525 (Feb. 8, 2018). In general, the Bureau seeks to count people at their "usual residence," which is "where a person lives and sleeps most of the time." *Id.* at 5526. But the Residence Criteria also set forth specific counting rules. For example, federal employees living outside the United States are counted at their usual domestic residence, as determined by records from the employing agency, whereas other United States citizens living outside the country are not counted at all. *See id.* at 5533. As to foreigners, individuals living in the United States are counted "where they live and sleep most of the time"; diplomats are counted at the embassy or consulate where they are stationed; and visitors—such as foreigners "on a vacation or business trip" in the United States on the census day—are not counted. *Id.* Individuals "in federal detention centers on Census day," including facilities run by the U.S. Immigration and Customs Enforcement (ICE), are counted at the detention facility. *Id.* at 5535. College students are counted where they live at college, whereas boarding-school students are counted at their parents' homes. *Id.* at 5534.

To collect data for the 2020 census, the Bureau proceeded in several steps. First, it invited every household in the United States to respond to a survey. *See Proposed Information Collection*, 83 Fed. Reg. 26,643-02, 26,645 (June 8, 2018). Officials then visited nonresponsive households and attempted to conduct the survey in person. *Id.* Next, the Bureau sought any missing information from federal agency records and from proxies such as neighbors or landlords. *Id.* As a last resort, the Bureau imputed information to missing households based on data from the surrounding area. Hillygus Decla., ECF No. 31-24, ¶ 9; *see also Utah v. Evans*, 536 U.S. at 457–58 (describing imputation methods used in the 2000 census).

C

This case concerns the role of immigration status in the enumeration and apportionment processes. In 2018, the Secretary decided to include a citizenship question in the survey for the 2020 census. The Supreme Court held that doing so violated neither the Enumeration Clause nor the Census Act and was supported by the record before the Secretary. *See New York*, 139 S. Ct. at 2566–73. But the Court held that the Secretary's stated reasons for asking the citizenship question were pretextual, so it set aside his decision. *See id.* at 2573–76.

Two weeks later, the President issued an Executive Order seeking to compile citizenship data by other means. This order directed all executive agencies to help the Commerce Department to the "maximum assistance permissible, consistent with law, in determining the number of citizens, non-citizens, and illegal aliens in the country, including by providing any access that the Department may request to administrative records that may be useful in accomplishing that objective." Exec. Order No. 13880 § 3(a), 84 Fed. Reg. 33,821, 33,824 (July 11, 2019).

In July 2020, the President issued a memorandum seeking to facilitate the exclusion of illegal aliens from the apportionment base. The memorandum announced a policy "to exclude from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act ... to the maximum extent feasible and consistent with the discretion delegated to the executive branch." *Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census* § 2, 85 Fed. Reg. 44,679, 44,680 (July 21, 2020) (*Excluding Illegal Aliens*). The memorandum directed the Secretary, in preparing his census report, to "take all appropriate action, consistent with the Constitution and other applicable law, to provide information permitting the President, to the extent practicable, to exercise the President's

discretion to carry out the policy." *Id.* § 3, 85 Fed. Reg. at 44,680.  It further provided that the Secretary "shall also include in that report information tabulated according to" the *Residence Criteria*. *Id.*  By its terms, the memorandum must be "implemented consistent with applicable law." *Id.* § 4(b), 85 Fed. Reg. at 44,680.

## D

The plaintiffs—a group of local governments, nonprofit organizations, and voters—filed this lawsuit two days after the presidential memorandum issued.  They raise five challenges to it. Count I of their complaint alleges that the memorandum, in seeking to exclude illegal aliens from the apportionment base, violates the Apportionment Clauses of Article I and the Fourteenth Amendment.  Counts II and III allege that the memorandum will dilute their votes and that it discriminates based on race, in violation of equal-protection principles.  Count IV alleges that the memorandum violates the governing statutes by seeking to exclude illegal aliens from the apportionment base and by providing for apportionment based on figures other than those produced by the census itself.  Count V alleges that the memorandum will require the Secretary to estimate the number of illegal aliens in the country through statistical sampling, thus violating the Enumeration Clause and the statutory prohibition on the use of sampling for apportionment. The plaintiffs ask this Court to declare the memorandum invalid, to enjoin the Secretary from collecting any data about citizenship or immigration status, and to enjoin the President from excluding any illegal aliens from the apportionment base on account of their immigration status. The judge initially assigned to this case granted the plaintiffs' motion to convene a three-judge district court.[1]

---

[1]  We agree with that decision.  Congress requires a three-judge court "when an action is filed challenging the constitutionality of the apportionment of congressional districts."  28 U.S.C. § 2284(a).  This case is such an

The plaintiffs moved for partial summary judgment, and the defendants moved to dismiss the complaint for lack of standing, lack of ripeness, and failure to state a claim.  As to ripeness, the defendants contend that the memorandum requires the exclusion of illegal aliens only to the extent that it may feasibly be accomplished through lawful methods, which prevents us from knowing which or how many aliens the Secretary will propose to exclude, much less which or how many aliens the President then will decide to exclude.

## II

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Under this standard, we must accept a complaint's factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *City of Harper Woods Emps. Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009).  We also may consider undisputed facts in the record.  *See Simon v. Republic of Hungary*, 911 F.3d 1172, 1180 (D.C. Cir. 2018).  A motion to dismiss on ripeness grounds is governed by Federal Rule of Civil Procedure 12(b)(1).  *See Venetian Casino Resort, L.L.C. v. EEOC*, 409 F.3d 359, 363–64 (D.C. Cir. 2005).

## III

Consistent with the judiciary's obligation to "exercise power only in the last resort," *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (quotation marks omitted), the Supreme Court has long

---

action, for the plaintiffs contend that implementation of the presidential memorandum will violate the Apportionment Clauses of the Constitution.

held that suits must be "ripe for court review" in order to be justiciable. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732 (1998). This requirement "prevent[s] the courts … from entangling themselves in abstract disagreements over administrative policies, and … protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967).

The ripeness requirement stems from both Article III limits on our jurisdiction and prudential considerations. Constitutional ripeness turns on whether the plaintiff has established "an injury-in-fact that is imminent or certainly impending." *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012) (quotation marks omitted). In the administrative-law context, prudential ripeness reflects the inherently discretionary nature of the governing injunctive, declaratory, or mandamus remedies. *Abbott Labs.*, 387 U.S. at 148; *see, e.g., Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–13 (1982) (injunctions); *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 241 (1952) (declaratory judgments); *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380–81 (2004) (mandamus writs). Prudential ripeness balances "the fitness of the issues for judicial decision" against "the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 148–49.[2] In applying this balance, the Supreme Court has held that courts "must consider" three factors: (1) "whether judicial intervention would inappropriately interfere with further administrative action," (2) "whether the courts would benefit from further

---

[2] The Supreme Court recently commented that prudential ripeness is "in some tension with … the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quotation marks omitted). Still, neither that Court nor the D.C. Circuit has abandoned the doctrine, so we remain bound to apply it. *See, e.g., Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003); *Sanchez v. Office of the State Superintendent of Educ.*, 959 F.3d 1121, 1124 (D.C. Cir. 2020).

factual development of the issues presented," and (3) "whether delayed review would cause hardship to the plaintiffs." *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48–49 (D.C. Cir. 1999) (quoting *Ohio Forestry Ass'n*, 523 U.S. at 733).[3]

Because prudential ripeness is a threshold justiciability doctrine, we may address it before considering other justiciability doctrines, including Article III standing. *See In re Aiken Cnty.*, 645 F.3d 428, 434 (D.C. Cir. 2011).

A

Judicial intervention at this time would inappropriately interfere with ongoing action within the Executive Branch. A claim is unripe "where the possibility that further [administrative] consideration will actually occur before implementation is not theoretical, but real." *Wyo. Outdoor Council*, 165 F.3d at 50 (quoting *Ohio Forestry Ass'n*, 523 U.S. at 735) (cleaned up); *see also Sprint Corp. v. FCC*, 331 F.3d 952, 956 (D.C. Cir. 2003) ("Final agency action … is a crucial prerequisite to ripeness." (cleaned up)). In allowing ongoing administrative proceedings to be completed, we respect the Executive Branch's interest in "crystallizing its policy before that policy is subjected to judicial review." *Am. Petrol. Inst.*, 683 F.3d at 387 (quotation marks omitted).

Here, administrative action remains ongoing. As the Supreme Court held in *Franklin*, the process underlying enumeration and apportionment is not final until the President transmits his statement to Congress. 505 U.S. at 797. The presidential memorandum is several steps removed

---

[3] The D.C. Circuit has formulated the test for prudential ripeness in slightly different ways. Some decisions frame the inquiry around the three factors highlighted in *Wyoming Outdoor Council* and *Ohio Forestry Association. See, e.g., Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1353 (D.C. Cir. 2014); *Sprint Corp. v. FCC*, 331 F.3d 952, 956 (D.C. Cir. 2003). Other decisions consider whether the agency action at issue is "sufficiently final," whether the disputed issue is "purely legal," whether its consideration "would benefit from a more concrete setting," and whether the plaintiff would suffer hardship from delayed review. *Am. Petrol. Inst.*, 683 F.3d at 387 (quotation marks omitted). Regardless of exactly how the test is formulated, "the fundamentals of the analysis remain the same." *Sprint Corp.* 331 F.3d at 956.

from that action. It neither demands any particular apportionment base nor excludes any specific categories of aliens from the enumeration. Instead, it simply directs the Secretary to determine which illegal aliens may feasibly and lawfully be excluded based on available information. To make that determination, the Secretary will need to assess the scope and reliability of such information. Even then, his assessment will be only a "tentative recommendation" to the President, who will make the final decision regarding the apportionment base. *See Franklin*, 505 U.S. at 798. By seeking judicial intervention at this stage, the plaintiffs ask us to disturb the ongoing and reticulated process for enumeration and apportionment.

The remedies sought here provide an additional ground for delaying judicial intervention. The plaintiffs ask us to enjoin the Secretary from giving the President "any data or analysis regarding citizenship or immigration status" and to declare that the Constitution prohibits any consideration of immigration status in apportionment. Second Am. Compl., ECF No. 70 at 64–65. The Constitution itself authorizes the President to "require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices." U.S. Const. art. II, § 2, cl. 1. Yet the plaintiffs would have us not only prevent the President from receiving an opinion from his Secretary of Commerce on important matters regarding the census, but also replace that opinion with one of our own. Obliging this request would substantially interfere with ongoing Executive Branch decision-making.[4]

---

[4] In resolving challenges to the memorandum in other cases, some courts have concluded that reaching the merits would not inappropriately interfere with ongoing administrative processes because judicial review "aims to achieve a constitutionally and legally correct apportionment" and because relief could be tailored so as not to bar the Secretary "from continuing to count" illegal aliens. *City of San Jose v. Trump*, No. 20-cv-05167, 2020 WL 6253433 at *23 (N.D. Cal. Oct. 22, 2020); *see Useche v. Trump*, No. 8:20-cv-02225, 2020 WL 6545886 at *8 (D. Md. Nov. 6, 2020) (tailored relief would avoid interfering with ongoing administrative action); *New York v. Trump*, No. 20-CV-5770, 2020 WL 5422959 (Sept. 10, 2020) (same). We respectfully disagree. The first rationale—that courts aim to get the law right—would justify any challenge to ongoing agency action regardless of its maturity. And it overlooks that the Executive Branch has its own independent obligation to get the law right, in the apportionment

B

Judicial review in this case would benefit from further factual development.  Just as the Executive Branch has an interest in avoiding premature judicial interference, courts have an interest in not "entangling themselves in abstract disagreements over administrative policies." *Abbott Labs.*, 387 U.S. at 148.  By waiting to decide issues "in a concrete setting," we avoid potentially unnecessary rulings, *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1353 (D.C. Cir. 2014) (quotation marks omitted), and we enhance our ability to decide cases more "intelligently," *Sprint Corp.*, 331 F.3d at 958 (quotation marks omitted); *see Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967) (judicial review "is likely to stand on a much surer footing in the context of a specific application").  These considerations are "particularly salient" in cases presenting novel or "sensitive" issues.  *Amerijet*, 753 F.3d at 1353.  But even in run-of-the-mill cases, the Supreme Court has instructed that "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation marks omitted).

1

A significant contingency plagues this case right now:  We do not know which aliens the Secretary will propose excluding from the apportionment base, much less which aliens the President ultimately will exclude.  The memorandum announces a general policy to exclude illegal aliens, but only "to the maximum extent feasible and consistent with the discretion

---

context as elsewhere.  *See*, *e.g.*, U.S. Const. art. II, § 3 (President "shall take Care that the Laws be faithfully executed"); *United States v. Morrison*, 529 U.S. 598, 616 n.7 (2000) ("In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution …." (quotation marks omitted)).  As to the second rationale, the courts enjoined the Secretary from providing the President with any count of illegal aliens in "any reports … as part of the decennial census."  *City of San Jose*, 2020 WL 6253433 at *51; *see also Useche*, 2020 WL 6545886 at *14.  By design, these injunctions prevent any counting of illegal aliens from translating into any concrete decision about apportionment.  Such injunctions intrude into ongoing apportionment decisions, even if a broader injunction (such as one prohibiting the counting itself) would be more intrusive.

delegated to the executive branch." *Excluding Illegal Aliens* § 2, 85 Fed. Reg. at 44,680.  It then reiterates that the policy warrants exclusion only "to the extent feasible and to the maximum extent of the President's discretion under the law."  *Id.*  It orders the Secretary to take "appropriate action, consistent with the Constitution and other applicable law," providing information permitting the President to carry out the policy "to the extent practicable."  *Id.* § 3, 85 Fed. Reg. at 44,680.  And it ends with a general instruction that "[t]his memorandum shall be implemented consistent with applicable law."  *Id.* § 4, 85 Fed. Reg. at 44,680.  We cannot ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing the memorandum.  *See Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

Nor can we predict which illegal aliens the Secretary (or the President) will determine may lawfully and feasibly be excluded based on available information.  As to lawfulness, the memorandum does definitively state that excluding illegal aliens from the enumeration would be consistent with the Apportionment Clauses, with 13 U.S.C. § 141, and with 2 U.S.C. § 2(a). *Excluding Illegal Aliens* § 1, 85 Fed. Reg. at 44,679.  We agree with the plaintiffs and with our dissenting colleague that the Secretary, in seeking to implement the memorandum, will be bound to follow these legal conclusions made by his boss, the President.  Nonetheless, other uncertainties abound.  In particular, the memorandum does not take any position on which counting methods are lawful enumerations as opposed to unlawful sampling, or on the extent of exclusion that is feasible.  Accordingly, the memorandum's own instructions that any exclusion

12

must be legal and feasible reflect genuinely open questions about how the Secretary will decide to implement it.[5]

Start with the jumble of possible data that the parties suggest the Secretary may provide to the President. In their various submissions, the parties assert that there are about 10.5 million aliens unlawfully present in the United States, Warshaw Decla., ECF No. 31-23, ¶ 30; 3.2 million aliens on the "non-detained" docket of ICE, Warshaw Supp. Decla., ECF No. 67-3, ¶ 10; Gov't Br., ECF No. 60, at 32 n.5; 188,000 aliens subject to final orders of removal, Hillygus Supp. Decla., ECF No. 67-4, ¶ 11; 50,000 aliens held in ICE detention facilities, *id.* ¶ 2 n.1; Gov't Br., ECF No. 60, at 31 n.4; and 10,000 aliens held in detention facilities run by the U.S. Customs and Border Protection (CBP), Gov't Br., ECF No. 60, at 31 n.4. Which of these data sets might the Secretary choose to provide to the President? In their primary submissions, the parties agree that we do not yet know: The Census Bureau's Associate Director for Research and Methodology informed us that the Bureau is still "continuing its process of determining the appropriate methodologies" for implementing the memorandum "to the extent possible." Abowd Decla., ECF No. 60-1, ¶ 11. The plaintiffs' expert on this point, a former Director of the Census Bureau, understandably could shed no further light on this question. Thompson Decla., ECF No. 31-25, ¶¶ 13–21. More recent information is only slightly more helpful: According to evidence developed in the *National Urban League* litigation, the Bureau is currently planning to provide data about "unlawful aliens in ICE Detention Centers" by the Secretary's deadline of December 31; the Bureau cannot provide any further information by that deadline; and it may provide other,

---

[5] Our dissenting colleague posits that the memorandum establishes both a policy favoring exclusion of all illegal aliens from the apportionment base and a legal judgment that such a categorical exclusion would not violate the Apportionment Clauses. *Post*, at 1–3. From this premise, our colleague reasons that the Secretary has no realistic choice but to exclude all, or at least most, illegal aliens. *Id.* at 5–6. As explained above, we read the memorandum differently, given its express caveats as to lawful implementation and feasibility and its failure to take a position on whether any particular exclusions would rest on unlawful sampling.

unspecified "PM related output" (referring to the presidential memorandum) by January 11, 2021.  Memo Supp. Auth., ECF No. 80-1, Exh. A.  Just last week, the government further represented to the Supreme Court that the Census Bureau is continuing to assess which illegal aliens may feasibly be excluded from the apportionment base, and the Census Bureau "cannot predict or even estimate the results" of its ongoing efforts to implement the memorandum.  Reply Br. of Appellants at 4–5, *Trump v. New York*, S. Ct. No. 20-366 (Nov. 23, 2020) (*New York Reply Brief*).

Consider also the legal and practical difficulties, which the plaintiffs themselves highlight, with any attempt to exclude all the 10.5 million illegal aliens.  According to the plaintiffs, that figure represents an estimate—not an actual enumeration that could lawfully be used for apportionment.  Likewise, the plaintiffs contend that any other attempt to count all illegal aliens in the United States at this late stage would require the use of statistical sampling, in violation of both the Enumeration Clause and 13 U.S.C. § 195.  Although the Census Bureau predicted in 2018 that it could determine the citizenship status for around 90 percent of the total population, *see* Exec. Order No. 13880 § 1, 84 Fed. Reg. at 33,821, that data would tell the Secretary precious little about the number and location of illegal aliens, a small minority of the population that is disproportionately part of the remaining 10 percent.  For example, birth records alone could likely establish the citizenship status of all citizens born in the United States, without suggesting anything about the number of aliens unlawfully present in the country, much less the number present in specific states.  The 90 percent figure thus provides no reason to doubt the plaintiffs' own evidence that "[t]here is no official estimate from the Census Bureau or any other federal government agency of the number of undocumented immigrants in each state that would be affected by the Memorandum."  Warshaw Decla., ECF No. 31-23, ¶ 26.

At this time, we have no basis to conclude that the Secretary nonetheless would recommend excluding all illegal aliens in the country.  The plaintiffs allege that the Secretary will do so through statistical sampling.  But the memorandum itself bars any unlawful method of enumeration, *see Excluding Illegal Aliens* § 4, 85 Fed. Reg. at 46,680, and the use of sampling for apportionment clearly would violate section 195, *see Utah v. Evans*, 536 U.S. at 467–68, if not the Enumeration Clause itself, *see id.* at 488–510 (Thomas, J., concurring in part and dissenting in part).  Moreover, the memorandum takes no position on which counting methods might or might not constitute sampling, and the Secretary has not suggested that a full count of illegal aliens is still possible without it.  Under these circumstances, we cannot simply assume that the Secretary will recommend excluding all illegal aliens despite section 195 and the memorandum's own requirement of lawful implementation.  *See NARA v. Favish*, 541 U.S. 157, 174 (2002) ("in the absence of clear evidence to the contrary, courts presume that [public officials] have properly discharged their official duties" (cleaned up)).  To the contrary, the government has categorically represented that "any methodology or methodologies ultimately used by the Census Bureau to implement the PM will not involve the use of statistical sampling for apportionment."  Abowd Decla., ECF No. 60-1, ¶ 14.  And its recent implementation activity, apparently focused on the ICE detainee population, suggests the Secretary is seeking primarily to exclude some number of that population—which is measured in the tens of thousands rather than the tens of millions.[6]

---

[6] Our dissenting colleague highlights a statement in Executive Order 13880 that administrative records could be used to "generate an *estimate* of the aggregate number of aliens unlawfully present in each state."  84 Fed. Reg. at 33,823 (emphasis added); *see post*, at 7.  But despite addressing at length the importance of "accurate data concerning the total number of citizens, non-citizens, and illegal aliens in the country," 84 Fed. Reg. at 33,824, the Executive Order said not a word about apportionment—the one context in which federal law prohibits the use of statistical sampling.  We thus do not read the Executive Order as compelling the Secretary, in addressing apportionment matters under a different memorandum issued a year later, to make aggregate population estimates without considering whether the methods for doing would constitute unlawful sampling.

Moreover, feasibility questions would remain even as to smaller possible adjustments. According to the plaintiffs, *none* of the available information—including data on the 3.2 million aliens in ICE's non-detention docket, the 188,000 aliens subject to final orders of removal, or the 50,000 aliens in ICE detention facilities—is reliable enough to support the exclusion even of those aliens specifically enumerated in these data. Hillygus Supp. Decla., ECF No. 67-4, ¶ 2 ("these sources do not provide reliable, accurate, or timely information that would allow 'actual enumeration' of undocumented immigrants for exclusion from the 2020 apportionment count"). Moreover, even if administrative records did reliably identify specific categories of illegal aliens, the Secretary still would have to reliably match those individuals with individuals previously enumerated through the census. *New York* Reply Brief, *supra*, at 4. But until the Secretary recommends specific sets of illegal aliens for exclusion, we cannot even know what data to consider. And until the Secretary explains the basis for any recommended exclusion, we cannot fairly assess the force of any objection to it.

2

This basic uncertainty, about how the Secretary will implement the memorandum, impacts each of the plaintiffs' claims. On the merits, each claim may depend on, or at least be affected by, which categories of illegal aliens are ultimately excluded. And on all claims, the plaintiffs' standing itself may depend on how broadly the memorandum is implemented.

The plaintiffs' principal claim is that excluding illegal aliens from the enumeration would violate the Fourteenth Amendment requirement to apportion based on "the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2. In *Franklin*, the Supreme Court held that this reference to "in each State" comes with a historical "gloss"— the phrase "can mean more than mere physical presence, and has been used broadly enough to

include some element of allegiance or enduring tie to a place." 505 U.S. at 804. It thus gives rise to a "usual residence" or "inhabitant" standard, terms that have been used in enumeration and apportionment decisions since the Founding of the Republic. *See id.* at 804–05. Further, the Court held that the Executive Branch enjoys a degree of discretion to apply this standard in ways "consonant with, though not dictated by, the text and history of the Constitution." *Id.* at 806. And it may do so by crafting rules applying the concepts of "usual residence" and "inhabitant" to specific groups, such as federal employees stationed overseas. *Id.* The *Residence Criteria* themselves, with which the plaintiffs have no quarrel, are an extended exercise of this discretion. And the same discretion is vested in the President no less than the Census Bureau. *Id.* at 796–99.

Under this governing legal framework, not all illegal aliens are identically situated. To the contrary, the case for not counting aliens caught and detained while attempting to enter the United States shortly before the census day would be different from—and stronger than—the case for not counting aliens who have lived and worked in the United States for decades. And the legal analysis may vary depending on which categories of aliens are at issue. For example, if the President concluded that he could feasibly count and exclude all illegal aliens from the census without resort to statistical sampling, our analysis might consider the word "inhabitant," which the plaintiffs say bears its ordinary meaning and which the government says is a term-of-art that historically excluded illegal aliens. If the President excluded aliens already subject to final orders of removal, our analysis might consider whether allegiance and enduring ties are better assessed looking forward or backward from the census day. If the President excluded aliens caught and detained while trying to enter the country illegally, our analysis might consider the relevance of a settled rule in immigration law that "the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry" into the United

States, *Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958), which is sometimes necessary to vest the alien with constitutional rights, *see DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982–83 (2020).

Without any sense of which or how many illegal aliens the President will exclude, the parties are left to spar over a wide range of legal issues that may or may not arise.  They offer competing interpretations of *Franklin*.  They parse the etymology of "inhabitant."  And they dispute whether immigration doctrines like the so-called entry fiction extend to census law.  But unlike the parties, we "cannot—and should not—spend ... scarce resources in what amounts to shadow boxing," *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 537 (1st Cir. 1995), particularly over issues as unsettled and important as the ones presented here.  The Apportionment Clause challenge thus needs further factual development before we can confidently decide it.[7]

The vote-dilution claim fares no better.  For present purposes, we may assume that a diluted vote in this context establishes an equal-protection violation, *cf. Wesberry v. Sanders*, 376 U.S. 1 (1964), as well as an injury sufficient to confer Article III standing, *see Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331–32 (1999).  Nonetheless, the plaintiffs still must show that implementation of the memorandum is reasonably likely to cause a change in apportionment that will dilute their votes.  But the likelihood of such a change depends substantially on which aliens the Secretary may propose to exclude from the enumeration and whether the President accepts the Secretary's proposal.  Greater exclusions concentrated in fewer

---

[7]  Our dissenting colleague reasons that the likely exclusion of ICE detainees is enough to tee up this full range of legal issues because that population by itself likely includes illegal aliens ranging from ones who have not yet made an entry to ones who have lived in the United States for several years.  *Post*, at 3–4, 6.  But without any sense of the makeup of that population, we would be hard-pressed to assess whether a rule of exclusion, limited to that population, would bear a "reasonable relationship" to the actual enumeration.  *See Dep't of Commerce v. New York*, 139 S. Ct. at 2566.  Moreover, the parties estimate the entire population of ICE detainees to number only about 50,000, and the plaintiffs make no argument that an exclusion of that magnitude would suffice to inflict any apportionment-related injury or otherwise establish their Article III standing.

states will be more likely to cause a shift than smaller or more diffuse exclusions. According to the plaintiffs, if the President should exclude all illegal aliens, then the House almost certainly will be reapportioned. Warshaw Decla., ECF No. 31-23, ¶ 12. Similarly, if the President should exclude the 3.2 million aliens on the non-detained ICE docket, and if those individuals are distributed throughout the country in the same proportion as other illegal aliens, then the House likely will be reapportioned. *Id.* ¶ 11. But these two decisions are not the only possible ones for the apportionment base. For example, the President could choose to exclude only the 188,000 aliens subject to final orders of removal, the 50,000 aliens detained by ICE, or the 10,000 aliens detained by CBP. Even if we could ascertain in advance the full range of possible exclusions that the Secretary might recommend, we could not sift through each permutation to determine the likelihood of vote dilution—particularly because the plaintiffs make no attempt to show that any of the smaller exclusions would be reasonably likely to change the House's apportionment. The vote-dilution claim thus presents "the classic institutional reason to postpone review: we need to wait for a rule to be applied to see what its effect will be." *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 285 (D.C. Cir. 2003) (cleaned up).

The same uncertainty, over the extent of any impact, confounds the plaintiffs' claim of racial discrimination. To prevail on that claim, the plaintiffs must prove "both that [the memorandum] had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608–09 (1985); *see, e.g.*, *Lewis v. Ascension Parish Sch. Bd.*, 806 F.3d 344, 362 (5th Cir. 2015); *Antonelli v. New Jersey*, 419 F.3d 267, 276 (3d Cir. 2005). Moreover, the extent of any discriminatory effect is "[t]he important starting point" for proving discriminatory intent. *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 489 (1997) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266

(1977)).  Because the Secretary has not determined which aliens to exclude from the census, we cannot yet know the extent to which the exclusion might affect apportionment or funding decisions in the future, much less the extent to which any such effects might correlate to race. And those questions might be important, given the practical difficulty of proving that an impermissible intent motivated a facially neutral action by the President related to immigration. *See*, *e.g.*, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915–16 (2020) (plurality); *Trump v. Hawaii*, 138 S. Ct. 2392, 2416–18 (2018).

Next up are the statutory claims.  The plaintiffs contend that any exclusion of illegal aliens from the apportionment base would violate requirements to apportion based on "total population by States," 13 U.S.C. § 141(b), and on "the whole number of persons in each State, excluding Indians not taxed," 2 U.S.C. § 2a(a).  The first provision summarizes, and the second repeats verbatim, the operative language of the Fourteenth Amendment Apportionment Clause. The statutory claim is thus unripe for the same reason that makes the constitutional claim unripe—the analysis of whether illegal aliens are "persons in each State" may depend on which illegal aliens are at issue, a presently unknown contingency.  To resist this conclusion, the plaintiffs suggest that section 2a(a), which was enacted in 1929, might mean something different from the Apportionment Clauses ratified in 1788 and 1868.  But "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it."  *Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018) (quotation marks omitted).  And in any event, if the plaintiffs were correct that these textually identical provisions mean something different, that would only add another level of complexity to the question of what historical gloss the words have acquired over time.

The plaintiffs further argue that any information about illegal aliens that the Secretary may give the President will be neither part of the "decennial census" that the Secretary must prepare under 13 U.S.C. § 141 nor part of the statement that the President must transmit to Congress under 2 U.S.C. § 2a(a) regarding the population count "as ascertained under the ... decennial census." This argument would require us to opine in the abstract on the scope of authority that Congress delegated to the Executive Branch to determine the "form and content" of the census. 13 U.S.C. § 141(a). Although sections 141 and 2a(a) require the President to base apportionment on the "decennial census," they do not clarify what constitutes that "census," much less establish that the one true "census" is the Bureau's tabulation pursuant to its *Residence Criteria*. And the President may both "direct the Secretary in making policy judgments that result in the 'decennial census'" and depart from "policy decisions reflected in the Secretary's report," *see Franklin*, 505 U.S. at 799, which suggests that the Bureau's calculations do not necessarily make up the entire census. In any event, in considering whether sections 141 and 2a(a) limit what data may be used in apportionment, the particulars may matter, for we cannot decide in the abstract which combinations of enumerations and exclusions might or might not constitute the statutory "decennial census."

Finally, the plaintiffs allege that implementing the memorandum will require the Secretary to violate the Enumeration Clause and 13 U.S.C. § 195 because any complete count of illegal aliens at this point would require statistical sampling. This claim assumes that the memorandum directs the Secretary to exclude every illegal alien from the apportionment base. But as explained above, the memorandum does not impose that requirement if, as the plaintiffs allege, there is no feasible way to do so without the use of sampling. And if the Secretary seeks to implement the memorandum by providing information about some smaller set of countable

illegal aliens (such as those subject to ICE or CBP detention), and by proposing to exclude only

those aliens, then no question about sampling will arise. Finally, the line between lawful

imputation and unlawful sampling is itself debatable, at least on the margins. *Compare Utah v.*

*Evans*, 536 U.S. at 466–68, *with id.* at 487–88 (O'Connor, J., concurring in part and dissenting in

part). Without knowing how the Secretary may seek to implement the memorandum, we cannot

guess as to whether the implementation might cross that line.

Like the Executive Branch, we have a substantial interest in postponing review in this

case. Although we "are not faced with a serious doubt as to whether the [memorandum] will

ever translate into action at all," we have "doubts about *how* the [Secretary and President] may

make that translation." *Office of Commc'n of United Church of Christ v. FCC*, 826 F.2d 101,

105 (D.C. Cir. 1987) (cleaned up). And, as explained above, how they do so will substantially

shape the important legal questions that the plaintiffs would have us decide in the abstract.[8]

C

To counter the institutional interests in postponing review, the plaintiffs must establish

that doing so would cause "immediate and significant" hardship. *Devia v. Nuclear Regulatory*

---

[8] Three district courts recently adjudicated challenges to the presidential memorandum like the ones raised here. These courts concluded that the challenges turn on a discrete, purely legal question whether the President may exclude illegal aliens from the apportionment base. They reasoned that the memorandum unambiguously commands the Secretary to do so, notwithstanding its provisos regarding lawfulness and feasibility. *See Useche*, 2020 WL 6545886 at \*6; *City of San Jose*, 2020 WL 6253433 at \*17–18; *New York*, 2020 WL 5422959 at \*25. We readily agree with a key premise of these decisions: that laws (or executive orders) "cannot be held to destroy themselves through saving clauses." *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 775 (7th Cir. 2019) (cleaned up). But as we have explained, the memorandum does not command any action that a savings clause purports to negate; instead, it imposes on the Secretary an open-ended instruction to take "appropriate" action, "consistent with the Constitution and other applicable law," to help the President implement the exclusion policy "to the extent practicable." *Excluding Illegal Aliens* § 3, 85 Fed. Reg. at 46,680. Nor does the memorandum attempt to resolve in advance any question about how many illegal aliens may *feasibly* be excluded, based on existing information, through *legal* methods other than sampling. These district courts further suggested that the governing legal analysis would be the same regardless of which specific categories of illegal aliens the President might seek to exclude. *See Useche*, 2020 WL 6545886 at \*7; *City of San Jose*, 2020 WL 6253433, at \*23; *New York*, 2020 WL 5422959 at 24–25. We also disagree with that conclusion, for reasons we have explained at length above.

22

*Comm'n*, 492 F.3d 421, 427 (D.C. Cir. 2007). "Considerations of hardship that might result from delaying review will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions." *Am. Petrol. Inst.*, 683 F.3d at 389 (quotation marks omitted).

The plaintiffs claim that delayed adjudication would harm state redistricting, which begins shortly after apportionment ends. Even though no states are plaintiffs in this case, we will assume that an adverse impact on redistricting constitutes a "hardship to the parties" for ripeness purposes. *Abbott Labs.*, 387 U.S. at 149. But apportionment challenges often are adjudicated after the apportionment is complete, *see Wisconsin*, 517 U.S. at 4; *Utah v. Evans*, 536 U.S. at 458–49; *Dep't of Commerce v. Montana*, 503 U.S. 442, 445–46 (1992); *Franklin*, 505 U.S. at 790–91, and we are aware of no instance in which this has prevented the affected states from finishing their redistricting in time for the next election cycle. To be sure, the potential for disruption would be substantial if a successful challenge would require a re-do of any counting procedures. *See Dep't of Commerce v. House of Reps.*, 525 U.S. at 332. But here, the memorandum requires the Secretary to provide the President with all the data necessary to perform the apportionment calculation *without* considering immigration status. *See Excluding Illegal Aliens* § 3, 85 Fed. Reg. at 44,680 ("The Secretary shall also include in that report [to the President] information tabulated according to the methodology set forth in the Final 2020 Census Residence Criteria and Residence Situations...."). So once the legal dispute about excluding illegal aliens is settled one way or the other, and the apportionment base is thus fixed, the "ministerial" apportionment calculation can be quickly performed. *Franklin*, 505 U.S. at 799; *see also Utah v. Evans*, 536 U.S. at 463 ("Should the new report contain a different conclusion about the relative populations of North Carolina and Utah, the relevant calculations and consequent apportionment-related steps would be purely mechanical ....").

The plaintiffs also claim that deferring review until after the President has acted would jeopardize our ability to provide effective relief. As a general matter, courts cannot enjoin the President to perform an official act. *See Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867). Nonetheless, in *Franklin*, four justices assumed it "substantially likely" that the President would "abide by an authoritative interpretation of the census statute and constitutional provision" by a district-court order directed to the Secretary of Commerce, even though the President "would not be directly bound by such a determination." 505 U.S. at 803 (plurality opinion). On that basis, they rejected a contention that apportionment injuries are not redressable once the President has acted. *See id.* Four other justices in *Franklin* also reached the merits, *see id.* at 807 (Stevens, J., concurring in part and concurring in the judgment), and the Court later treated the redressability analysis of the *Franklin* plurality as a binding holding. *See Utah v. Evans*, 536 U.S. at 459–64. Given this precedent, we cannot assume that the President would refuse to revise the apportionment calculation in response to an authoritative judicial decision.

In sum, we see no legal or practical hardship from deferring judicial review until after the Secretary and the President have fixed the apportionment base. For now, the memorandum creates no legal rights or obligations, and it does not require the plaintiffs to do anything. *See Ohio Forestry Ass'n*, 523 U.S. at 733; *Texas*, 523 U.S. at 301. Once we know how the Secretary will seek to implement the memorandum and whether the President will accept his recommendations, the plaintiffs may raise any challenges (subject to other justiciability constraints such as standing) in that concrete context. Delayed adjudication thus imposes no

significant hardship. *See, e.g.*, *Atl. States Legal Found.*, 325 F.3d at 285; *Util. Air Regulatory Grp. v. EPA*, 320 F.3d 272, 279 (D.C. Cir. 2003); *Wyo. Outdoor Council*, 165 F.3d at 50–51.[9]

<h2 style="text-align:center">D</h2>

The plaintiffs contend that Congress has abrogated prudential ripeness requirements in the context of challenges to the use of sampling for apportionment. Congress has created a cause of action for "[a]ny person aggrieved by the use of any statistical method in violation of the Constitution or any other provision of law ... in connection with the 2000 or any later decennial census." Pub. L. No. 105-119, § 209(b), 111 Stat. 2440, 2482 (1998). It has also required the courts to "expedite" such actions "to the greatest possible extent." *Id.* § 209(e)(2), 111 Stat. at 2482. We disagree that these provisions compel us to resolve the plaintiffs' statistical-sampling claim. For one thing, the existence of an express cause of action does not itself establish prudential ripeness. To the contrary, the doctrine was most famously summarized, and is still routinely applied, in cases arising under the ubiquitous, express cause of action provided by the Administrative Procedure Act. *See, e.g.*, *Abbott Labs*, 387 U.S. at 140–41; *Toilet Goods*, 387 U.S. at 162–63. Moreover, the D.C. Circuit has held that an express cause of action with language identical to section 209(b), 2 U.S.C. § 437h (1976), does not abrogate prudential ripeness requirements. *Clark v. Valeo*, 559 F.2d 642, 650 & n.11 (D.C. Cir. 1977) (en banc), *aff'd sub nom. Clark v. Kimmitt*, 431 U.S. 950 (1977) (mem.). Nor does an expedition clause require any "change in ruling." *Id.* at 661 (Leventhal, J., concurring).

---

[9] The plaintiffs' complaint alleged various injuries insofar as the memorandum assertedly depressed the census response rate among aliens, leading to an undercount regardless of any later decision regarding the appropriate apportionment base. But the plaintiffs have withdrawn these allegations. *See Plaintiff's Post-Hearing Response*, ECF No. 75. Additionally, the Census Bureau has now concluded field operations, *see Nat'l Urban League*, 2020 WL 6041178, so there is no continuing risk of an undercount.

The plaintiffs respond that the Supreme Court, in *Department of Commerce v. House of Representatives*, construed section 209(b) to abrogate the prudential ripeness doctrine. They highlight a sentence from that opinion stating that section 209(b) "eliminated any prudential concerns" about the sampling claim at issue. 525 U.S. at 328. But the only "prudential concerns" raised in that case were ones of standing. *See id.* And the prudential standing and ripeness doctrines are distinct. "Prudential standing" refers to a "misleading" way of asking whether a plaintiff has a cause of action; accordingly, the existence of an express cause of action eliminates any "prudential standing" issue. *See Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1302–03 (2017). In contrast, "prudential ripeness" analysis flows from the discretionary nature of injunctive, declaratory, and mandamus relief, so the existence of an express cause of action says nothing about whether its requirements have been or must be met. *See Abbott Labs.*, 387 U.S. at 148–49. Indeed, the Supreme Court in *Commerce v. House* separately addressed standing and ripeness: Although ripeness was "not challenged" by the parties, the Court did separately note that the case was ripe, and, in doing so, it cited the very page of *Abbott Laboratories* setting forth the canonical test for prudential ripeness. *See* 525 U.S. at 329 (citing *Abbott Labs*, 387 U.S. at 149). For these reasons, we do not read *Commerce v. House* as holding that a section 209(b) plaintiff need not satisfy the *Abbott Laboratories* test.

Finally, it is unclear whether the plaintiffs can even invoke section 209. By its terms, that provision requires the plaintiff to have been "aggrieved" by an allegedly unlawful use of statistical methods such as sampling. Here, as explained above, the plaintiffs have not alleged any facts supporting a plausible inference that the defendants have engaged in, or likely will engage in, any unlawful sampling.

IV

The Supreme Court has explained that the census "presents a moving target" until the President submits apportionment information to Congress. *Franklin*, 505 U.S. at 797–98. The plaintiffs' attempt to shoot at this moving target implicates substantial institutional interests that favor waiting until the contours of the dispute become more certain. We therefore hold that this suit is not ripe for review. The defendants' motion to dismiss is granted. The plaintiffs' motions for partial summary judgment, for an expedited trial, and for expedited proceedings are denied as moot. An order consistent with this opinion follows.

GREGORY G. KATSAS
United States Circuit Judge

DABNEY L. FRIEDRICH
United States District Judge

Date: November 25, 2020

COOPER, *District Judge*, dissenting:

I agree with my colleagues that the prudential ripeness doctrine remains viable in this Circuit despite its recent questioning by the Supreme Court. Maj. Op. at 8 n.2. But I do not think the requirements of the doctrine are met in this case. Therefore, I respectfully dissent.

Starting with the second and most pertinent prudential ripeness consideration—whether our review would benefit from further factual development, *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48–49 (D.C. Cir. 1999)—I disagree with the majority that we need to know which precise categories of undocumented immigrants will ultimately be excluded from the apportionment base to assess the lawfulness of the Presidential Memorandum, *see* Maj. Op. at 11–16.

The Memorandum rests on a singular legal proposition: that "[t]he discretion delegated to the executive branch to determine who qualifies as an 'inhabitant' [for purposes of the census] includes authority to exclude from the apportionment base aliens who are not in a lawful immigration status." *Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census*, 85 Fed. Reg. 44,679, 44,679 (July 21, 2020) (*Excluding Illegal Aliens*). Building from that proposition, the Memorandum establishes a national policy of excluding not just some, but *all* undocumented immigrants from the apportionment base. *Id.* at 44,680 ("[f]or the purpose of the reapportionment of Representatives following the 2020 census, it is the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act"). It proclaims two reasons for the policy: (1) "protection of the integrity of the democratic process" (because excluding those in the country unlawfully is purportedly "more consonant with the principles of representative democracy") and (2) "respect for the law" (because, in the President's view, "[i]ncreasing congressional

representation based on the presence of aliens who are not in a lawful immigration status would also create perverse incentives encouraging violations of Federal law"). *Id.* Like the legal basis for the policy, these reasons apply to every undocumented immigrant present in the country on census day. And to illustrate its intended purpose, the Memorandum estimates that one state— which we now know to be California, *see Useche v. Trump*, No. 20-cv-02225-PX-PAH-ELH, 2020 WL 6545886 at *6 (D. Md. Nov. 6, 2020)—is home to more than 2.2 million undocumented immigrants whose inclusion in the apportionment base "could result in the allocation of two or three more congressional seats than would otherwise be allocated," *Excluding Illegal Aliens*, 85 Fed. Reg. at 44,680.

Because the Memorandum expressly seeks to exclude all undocumented immigrants from the apportionment base due to their immigration status alone, the plaintiffs' challenge presents a purely legal question: Is unlawful immigration status a permissible criterion for determining whether a class of persons are "inhabitants" of the United States for apportionment purposes? We can answer that question now without additional facts.

The majority opinion nonetheless concludes that knowing which sub-categories of undocumented immigrants are ultimately excluded from the apportionment base will inform our analysis of whether the exclusion is lawful. Maj. Op. at 16–22. Its reasoning is straight-forward: The Constitutional term "persons in each State" has been historically interpreted to mean "inhabitant," as defined by one's "usual residence" or "allegiance or enduring tie to a place." *Id.* at 16–17 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 804–05 (1992)). The executive branch enjoys a degree of discretion to fashion rules applying these standards to particular groups of people and situations—which it has done through the Census Bureau's Residence Criteria. *Id.* at 16. Application of the standards to various immigrant categories could yield different results;

2

undocumented immigrants who have lived and worked in the United States for decades, for example, may have a stronger claim to inhabitancy than those apprehended crossing the border just before census day. *See id.* For us to assess the relative merits of excluding differently-situated immigrants, we need more information about their residency situations and other ties to the country. *See id.* We should therefore stand down until we know which sub-categories of immigrants are ultimately left out. *See, e.g.*, *id.* at 16, 21.

The majority's wait-and-see approach might be warranted if the Memorandum differentiated among undocumented immigrants based on any inhabitancy characteristics. But it does not. Again, the Memorandum expressly aims to exclude all undocumented immigrants based on their immigration status alone. *See Excluding Illegal Aliens*, 85 Fed. Reg. at 44,680. And the government has nowhere suggested that the Secretary is attempting to identify categories of immigrants for exclusion, let alone unique "persons in each State," U.S. Const. amend. XIV, § 2, based on anything other than their unlawful status. That the categories the Secretary ultimately reports might happen to include immigrants (such as recent border crossers) who arguably could be deemed excludable based on historical notions of inhabitancy is beside the point. For example, the Census Bureau has indicated that it will report the number of undocumented immigrants who are in Immigration and Customs Enforcement detention centers. Decl. of Albert E. Fontenot, Jr. ¶ 8, *La Unión Del Pueblo Entero v. Trump*, No. 19-cv-2710-PX-PAH-ELH (D. Md. Oct. 2, 2020), ECF No. 126-1. That population is far from homogenous, however. It may well include recent entrants across the southwestern border; but it also surely includes people detained in other parts of the country, many of whom have lived and worked in the United States for years. *See, e.g.*, *Arana v. Decker*, No. 20-cv-04104-LTS, 2020 WL 3833459 at *1 (S.D.N.Y. July 8, 2020) (enjoining removal of habeas petitioner in ICE detention

3

who is a "38-year-old citizen of Guatemala" who "first entered the United States in 2000, and has lived in New York since that time" working in construction, living "with his U.S. citizen partner, her thirteen-year-old U.S. citizen daughter, and his partner's elderly, bedridden Lawful Permanent Resident mother").  The same is true for other subsets of immigrants that the Secretary might include in his report, such as those subject to final orders of removal.  *See, e.g.*, Shoba Sivaprasad Wadhia, *Immigration Enforcement and the Future of Discretion*, 23 Roger Williams U. L. Rev. 353, 358 (2018) (noting that immigrants subject to final removal orders include "those who have resided in the United States for lengthy periods of time").  Knowing exactly which categories the Secretary reports will add little to the analysis of whether the blanket exclusion of all immigrants from the apportionment base is lawful.  The Memorandum's wholesale treatment of the undocumented immigrant population as excludable supports wholesale adjudication of its legality.

Nor should the Memorandum's qualifying language delay our review.  As the majority notes, the Memorandum seeks to exclude undocumented immigrants from the apportionment base only "to the maximum extent feasible and consistent with the discretion delegated to the executive branch."  *Excluding Illegal Aliens*, 85 Fed. Reg. at 44,680.  And it directs the Secretary to provide information on the unlawful immigrant population "consistent with the Constitution and other applicable law."  *Id.*  The majority views these lawfulness and feasibility caveats as "reflect[ing] genuinely open questions about how the Secretary will implement [the Memorandum]" that counsel against adjudicating the case.  Maj. Op. at 13.  I see them differently.

The fact that any action by the Secretary must be "consistent with the Constitution and other applicable law," *Excluding Illegal Aliens*, 85 Fed. Reg. at 44,680, is hardly an impediment

to the Memorandum's implementation. The Executive is doubtless subject to a general obligation to act within the law. But, again, the Memorandum categorically asserts that it is within the President's lawful discretion to exclude all undocumented immigrants from the apportionment base on account of their status alone, *id.*, a legal conclusion that, as the majority acknowledges, the Secretary is bound to follow, Maj. Op. at 12. It is therefore hard to fathom that Secretary Ross will disregard the legal foundation of the Memorandum—not to mention the Department of Justice's current litigating position in this and similar cases across the country— and report a smaller subset of immigrants conforming to his contrary interpretation of the President's lawful authority. Indeed, with the exception of certain concerns expressed about statistical sampling, nothing in the record before us remotely suggests that the Secretary is conducting an independent analysis of the legality of the wholesale exclusion envisioned by the Memorandum.

As for the feasibility of collecting the data requested by the Memorandum, no one disputes that the Secretary plans to report at least some number of undocumented immigrants who would not have been subject to exclusion but for their immigration status. The legal question before us would therefore remain regardless of which specific categories the Secretary reports.

The majority fairly observes that knowing the actual reported number of excludable immigrants for each state would crystalize our assessment of whether any of the plaintiffs have suffered an apportionment-related injury. *Id.* at 17–19. To be sure, the government has been stingy with details about where the Secretary's analysis of the undocumented immigrant population stands. *See, e.g.*, Defs.' Mot. to Dismiss at 7, ECF No. 59 (noting that "[t]he extent to which it will be feasible for the Census Bureau to provide the Secretary of Commerce a second

5

tabulation is, at this point, unknown") (citing *id.*, Ex. 1, Decl. of John M. Abowd at ¶ 11, ECF No. 59-1). And the plaintiffs have not sought jurisdictional discovery to pinpoint his progress.

Yet we know that the Secretary has been busy implementing the President's directive. The Census Bureau's Associate Director for Decennial Census Programs has indicated that the Bureau is taking the "processing steps necessary to fully implement the Presidential Memorandum . . . ." Pls.' Notice of Suppl. Authority, Ex. A, Decl. of Albert E. Fontenot, Jr. at ¶ 26, ECF No. 76-1. And the Bureau's Deputy Director has committed to Secretary Ross that the Bureau will report the number of undocumented immigrants in ICE custody by December 31, 2020 and "[o]ther [Presidential Memorandum] related outputs" eleven days later. Pls.' Notice of Supplemental Authority, Ex. A, Email Exchange between Ron S. Jarmin and Wilbur Ross at 1, ECF No. 80-1. Granted, we do not know what these "outputs" are. But as the three-judge court in the District of Maryland observed, "[t]he meticulousness of the agency's calculations belies any suggestion that the Bureau has yet to determine whether and how it will transmit to the Secretary the data necessary to fully implement the Presidential Memorandum." *Useche*, 2020 WL 6545886 at *6 (cleaned up).

The government's actions leading up to the issuance of the Presidential Memorandum bolster the inference that it is within striking distance of substantially implementing the Memorandum. In July 2019, a year before the Memorandum materialized, the President issued an Executive Order in response the Supreme Court's ruling in *Department of Commerce v. New York*, 139 S. Ct. 2251, 2575–76 (2019), which prohibited the Secretary from adding a citizenship question to the census, Exec. Order No. 13880, 84 Fed. Reg. 33,821 (July 11, 2019). The EO indicates that, based on administrative records in the Bureau's possession at the time the Secretary decided to include a citizenship question, the Bureau was able to determine the

6

citizenship status of ninety percent of the U.S. population. *Id.* at 33,821. The EO sought to increase that percentage by directing all federal agencies to share their administrative records with the Commerce Department "to the maximum extent permissible under law." *Id.* The EO further ordered that access be given to specifically-identified data files in the Department of Homeland Security, the Department of State, the Social Security Administration, and the Department of Health and Human Services. *Id.* at 33,824. As the majority correctly notes, Maj. Op. at 14, determining a person's citizenship status is not the same as determining whether that person is in the country legally. Nevertheless, the government's effort to collect administrative data on the citizenship status of every person living in the U.S. is a significant step toward ascertaining how many undocumented immigrants live in each state. Indeed, EO 13880 explicitly contemplates one possible way it could lead to that result: "Data tabulating both the overall population and the citizen population could be combined with records of aliens lawfully present in the country to generate an estimate of the aggregate number of aliens unlawfully present in each State." 84 Fed. Reg. at 33,823.

Given what we know about the Census Bureau's ongoing effort to fully implement the Memorandum, and its widespread collection of administrative records that it believes will enable it to ascertain the number of undocumented immigrants in each state, it is substantially likely that the Secretary will report large enough numbers of undocumented immigrants to affect apportionment of the House of Representatives. *See* Pls.' Suppl. Decl. to Reply, Ex. 3, Decl. of Dr. Christopher Warshaw at ¶ 6, ECF No. 67-3. That is the stated purpose of the Memorandum after all, and the Memorandum itself estimates that the exclusion of these immigrants is likely to reduce the number of House seats allocated to California. *See Excluding Illegal Aliens*, 85 Fed. Reg. at 44,680. So, while we cannot ignore the Memorandum's qualifying language, *see* Maj.

Op. at 12 (citing *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002)),

nor may we let it trump the explicit purpose of the Memorandum, *see, e.g.*, *City of San Jose v.*

*Trump*, No. 20-cv-05167-RRC-LHK-EMC, 2020 WL 6253433 at *17 (N.D. Cal. Oct. 22, 2020)

("[s]avings clauses are read in their context, and they cannot be given effect when the Court, by

rescuing the constitutionality of a measure, would override clear and specific language")

(quoting *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018)); *New York*

*v. Trump*, No. 20-cv-5770-RCW-PWH-JMF, 2020 WL 5422959 at *25 (S.D.N.Y. Sept. 10,

2020) (same); *HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 676 n.11 (D. Md. 2020) (same); *cf.*

*Shomberg v. United States*, 348 U.S. 540, 547–48 (1955) (declining to "nullify . . . clear

legislative purpose" to give effect to a savings clause).  The record is clear enough to me that any

remaining questions about the Secretary's ability to ascertain the full population of unlawful

immigrants in each state should not forestall our review of the legal question before us.[1]

Less need be said about the first and third factors in the prudential ripeness inquiry.

The first factor—"whether judicial intervention would inappropriately interfere with

further administrative action," *Wyo. Outdoor Council*, 165 F.3d at 48 (cleaned up)—favors

deciding the case.  Census field operations have ceased, and the Secretary is due to report the

count and the information requested in the Memorandum in a matter of weeks.  At that point, the

President's role in the process will be largely a matter of arithmetic.  Given that we could tailor a

remedy that would allow the Secretary to continue to collect data and prepare a report of the

undocumented immigrant population that he could immediately transmit to the President were

---

[1]My conclusion that the plaintiffs' constitutional and statutory challenges to the blanket exclusion of undocumented immigrants (Counts I and IV, respectively) are prudentially ripe should not be taken to mean that all aspects of their claims are ripe for review.  The majority is correct, in my view, that those claims challenging the means by which the exclusion is accomplished (such as the plaintiffs' challenge to statistical sampling) do turn on facts that require further development.  *See* Maj. Op. at 14.  As to the crux of plaintiffs' challenge, however, the present facts and legal obligations imposed by the Memorandum are sufficiently clear as to enable our review.

the government ultimately to defeat the plaintiffs' challenge, our review would not meaningfully interfere with the ongoing process. That is especially true now that three other courts have enjoined the inclusion of the information sought by the Memorandum in the Secretary's report to the President. *See Useche*, 2020 WL 6545886 at *14; *City of San Jose*, 2020 WL 6253433 at *51; *New York*, 2020 WL 5422959 at *34–35. Any intrusion by us would be marginal.

The third factor—"whether delayed review would cause hardship to the plaintiffs," *Wyo. Outdoor Council*, 165 F.3d at 48–49 (cleaned up)—need not be applied given that the case can be decided without further factual development or inappropriate interference with agency action. But it too counsels against dismissal. The fact that we could wait until after the January apportionment to consider plaintiffs' request for relief, *see* Maj. Op at 23–24, does not mean that we should. As both the District of Maryland and the Northern District of California courts have found, adjudicating plaintiffs' claim after the January apportionment would needlessly jeopardize states' ability to meet their own redistricting timetables. *See Useche*, 2020 WL 6545886 at *8; *City of San Jose*, 2020 WL 6253433 at *24 (noting that many states have redistricting deadlines in the May-July 2021 period). Waiting until after the Secretary's role in apportionment is over would also unnecessarily complicate ensuring compliance with any order of relief, should we hesitate to take the extraordinary step of enjoining the President. While *Franklin*, 505 U.S. at 803 (plurality opinion), might well prohibit us from "assum[ing] that the President would refuse to revise the apportionment calculation in response to an authoritative judicial decision," Maj. Op. at 24, we would be wise to avoid even the prospect of that unwelcome occurrence.

In sum, and with all due consideration of the majority's carefully-crafted opinion, I would decide the plaintiffs' core challenges to the Presidential Memorandum's exclusion of undocumented immigrants from the apportionment base.

_Christopher R. Cooper_
_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  November 25, 2020

10