# EXHIBIT A

No. 20-561

# In the Supreme Court of the United States

---

DONALD J. TRUMP, PRESIDENT OF THE
UNITED STATES, *et al.*,

*Appellants,*

v.

STATE OF CALIFORNIA, *et al.*,

*Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

---

## MOTION TO AFFIRM OR DISMISS OF THE STATE OF CALIFORNIA, THE COUNTY OF LOS ANGELES, THE CITIES OF LONG BEACH, LOS ANGELES, AND OAKLAND, AND THE LOS ANGELES UNIFIED SCHOOL DISTRICT

---

XAVIER BECERRA
 *Attorney General of California*
ANTHONY R. HAKL
 *Supervising Deputy*
 *Attorney General*
R. MATTHEW WISE
GABRIELLE D. BOUTIN
KRISTIN A. LISKA
 *Deputy Attorneys General*

November 30, 2020

MICHAEL J. MONGAN
 *Solicitor General*
AIMEE FEINBERG*
JOSHUA PATASHNIK
 *Deputy Solicitors General*
KIMBERLY M. CASTLE
 *Associate Deputy*
 *Solicitor General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
(916) 210-6003
Aimee.Feinberg@doj.ca.gov
*Counsel of Record*

(*Additional caption on inside cover and counsel on signature page*)

———————————

Donald J. Trump, President of the
United States, *et al.*,

*Appellants,*

v.

City of San Jose, *et al.*,

*Appellees.*

———————————

i

## QUESTIONS PRESENTED

1. Whether appellees have Article III standing to challenge the President's decision to categorically exclude undocumented immigrants from the apportionment count.

2. Whether the President's decision violates the Constitution or federal statutes governing the census and reapportionment.

ii

## TABLE OF CONTENTS

**Page**

Statement ..................................................................... 1

Argument .................................................................... 6

Conclusion.................................................................. 24

iii

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ariz. State Legislature v. Ariz. Indep.*
   *Redistricting Comm'n*
   576 U.S. 787 (2015) .............................................. 20

*Dep't of Commerce v. Montana*
   503 U.S. 442 (1992) .............................................. 19

*Dep't of Commerce v. New York*
   139 S. Ct. 2551 (2019) ............................. 17, 22, 23

*Dep't of Commerce v. U.S. House of*
   *Representatives*
   525 U.S. 316 (1999) ................................... 8, 11, 18

*Evenwel v. Abbott*
   136 S. Ct. 1120 (2016) .......................................... 22

*Franklin v. Massachusetts*
   505 U.S. 788 (1992) ....................................... 16, 18

*Friends of the Earth, Inc. v.*
   *Laidlaw Envt'l Servs., Inc.,*
    528 U.S. 167 (2000) ............................................ 12

*King v. Burwell*
   576 U.S. 473 (2015) .............................................. 17

*Kingdomware Techs., Inc. v.*
   *United States*
   136 S. Ct. 1969 (2016) .......................................... 12

iv

## TABLE OF AUTHORITIES
### (continued)

Page

*Lujan v. Defs. of Wildlife*
    504 U.S. 555 (1992) ...............................................7

*New York v. Trump*
    __ F. Supp. 3d __, 2020 WL 5422959
    (S.D.N.Y. Sept. 10, 2020)
    (per curiam) ...........................................................5

*NLRB v. Noel Canning*
    573 U.S. 513 (2014) .............................................22

*Parishes of St. Mary Colechurch and
    Radcliffe*
    1 Strange, 60. Eng. Rep. 385 ..............................15

*Plyler v. Doe*
    457 U.S. 206 (1982) .............................................20

*Shelby Cty. v. Holder*
    570 U.S. 529 (2013) .............................................24

*Smith v. Barry*
    502 U.S. 244 (1992) ...............................................7

*Susan B. Anthony List v. Driehaus*
    573 U.S. 149 (2014) ....................................7, 8, 13

*Thomas v. Union Carbide
    Agric. Prods. Co.*
    473 U.S. 568 (1985) .............................................13

*Torres v. Oakland Scavenger Co.*
    487 U.S. 312 (1988) ...............................................7

v

## TABLE OF AUTHORITIES
### (continued)

Page

*U.S. Term Limits, Inc. v. Thornton*
    514 U.S. 779 (1995) .............................................. 20

*Yick Wo v. Hopkins*
    118 U.S. 356 (1886) .............................................. 20

*Youngstown Sheet & Tube Co. v. Sawyer*
    343 U.S. 579 (1952) .............................................. 23

STATUTES

2 U.S.C. § 2a(a) ................................................ 4, 13, 17

13 U.S.C.
    § 141 .................................................................. 18
    § 141(a) ........................................................ 17, 18
    § 141(b) ..................................................... *passim*

28 U.S.C. § 2284 ...................................................... 2

Fugitive Slave Act of 1850
    31 Cong. Ch. 60
    9 Stat. 462............................................................ 22

CONSTITUTIONAL PROVISIONS

Cal. Const. art. 21, § 2 .............................................. 12

U.S. Const.
    Amendment XIV, § 2 ........................................... 19
    Article I, § 2, cl. 3 ............................... 17, 19, 20, 23

vi

# TABLE OF AUTHORITIES
## (continued)

Page

**OTHER AUTHORITIES**

1 Records of the Federal Convention of
   1787 (M. Farrand ed. 1911) .................................. 21

4 Judicial and Statutory Definitions of
   Words and Phrases (West 1st ed.
   1904) .................................................................... 15

71 Cong. Rec. (1929) .................................................. 14

Collecting Information About
   Citizenship Status in Connection
   With the Decennial Census
   84 Fed. Reg. 33,821 (July 11, 2019)........... 9, 10, 18

Cong. Globe, 39th Cong.,
   1st Sess. (1866)..................................................... 21

Fed. R. Civ. P. 56(a).................................................... 11

Final 2020 Census Residence Criteria
   and Residence Situations
   83 Fed. Reg. 5525 (Feb. 8, 2018)............... 1, 14, 15

Memorandum on Excluding Illegal
   Aliens from the Apportionment Base
   Following the 2020 Census
   85 Fed. Reg. 44,679 (July 21, 2020)............. *passim*

Noah Webster, A Dictionary of the
   English Language (1867) ...................................... 20

vii

## TABLE OF AUTHORITIES
### (continued)

**Page**

Random House Webster's Unabridged
    Dictionary (2d ed. 1997).......................................15

Samuel Johnson, A Dictionary of the
    English Language (3d ed. 1766) ..........................20

Shapiro, et al., Supreme Court Practice
    (11th ed. 2019)...........................................................7

Statement from the President
    Regarding Apportionment (July 21,
    2020) .....................................................................10

Sup. Ct. R. 18.1............................................................7

U.S. Census Bureau, 1860 Census:
    Population of the United States
    (1864) .............................................................22, 23

Webster's Practical Dictionary (1931) ......................14

Zuckerman, A Consideration of the
    History and Present Status of
    Section 2 of the Fourteenth
    Amendment
    30 Fordham L. Rev. 93 (1961) ......................21, 22

1

## STATEMENT

1. For 230 years, since the first national census in 1790, individuals have been included in the apportionment count without regard to their citizenship or legal immigration status. Consistent with that longstanding practice, in 2018, the Census Bureau issued its Residence Rule providing that, for the 2020 census, the Bureau would count all persons at their usual place of residence. *See* Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5525, 5526 (Feb. 8, 2018). Noncitizens are counted at "the U.S. residence where they live and sleep most of the time." *Id.* at 5533.

On July 21, 2020, President Trump issued his Memorandum on Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census. *See* 85 Fed. Reg. 44,679 (July 21, 2020). The Memorandum declares it to be the "policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status … to the maximum extent feasible and consistent with the discretion delegated to the executive branch." *Id.* at 44,680. It directs the Secretary of Commerce, when preparing his report under 13 U.S.C. § 141(b), to "take all appropriate action" to provide the President with the information necessary to carry out his policy. 85 Fed. Reg. at 44,680.

The Memorandum recognizes that "one State is home to more than 2.2 million" undocumented individuals and that including these individuals in the apportionment base "could result in the allocation of two or three more congressional seats than would otherwise be allocated." 85 Fed. Reg. at 44,680. According to the Memorandum, "States adopting policies that encourage illegal aliens to enter this country and

that hobble Federal efforts to enforce the immigration laws … should not be rewarded with greater representation in the House of Representatives." *Id.*

2.  One week after the President issued the Memorandum, appellees the State of California, the Cities of Long Beach, Los Angeles, and Oakland, and the Los Angeles Unified School District filed suit. The suit alleges that the Memorandum violates the Constitution, the Census Act, the Reapportionment Act, and the Administrative Procedure Act. D. Ct. Dkt. 1.[1] Appellee the County of Los Angeles subsequently joined the action as a plaintiff. *See* D. Ct. Dkt. 28. A group of other plaintiffs led by the City of San Jose filed a similar action challenging the Memorandum. *See City of San Jose v. Trump*, No. 20-5167 (N.D. Cal.). A three-judge district court was convened under 28 U.S.C. § 2284 to consider both actions. J.S. App. 134a-135a.

3.  The district court granted a partial final judgment in favor of both the California and San Jose appellees. J.S. App. 1a-127a, 129a.

a.  The court first held that appellees satisfied Article III standing requirements. J.S. App. 35a-53a. It concluded that appellees had established a substantial risk that the President's decision would cost them representation in Congress. *Id.* at 49a-50a. A declaration from an expert economist demonstrated that subtracting undocumented individuals from the apportionment base was "highly likely" to cause California to lose a congressional seat. *Id.* at 36a (internal quotation marks omitted); *see also* D. Ct. Dkts. 37-1, 39 (Gilgenbach Decl.). The court concluded that this

---

[1] Citations to D. Ct. Dkt. are to the docket in *California v. Trump*, No. 20-5169 (N.D. Cal.).

3

injury was not speculative, notwithstanding appellants' claim that it was "'unknown'" to what extent it would be "'feasible'" to exclude undocumented immigrants from the apportionment base. J.S. App. 41a. The court determined that there was a substantial risk that appellees would suffer apportionment harm based on California's expert evidence, appellants' access to citizenship records for the vast majority of the population, appellants' clear intent to maximally exclude undocumented immigrants, and the absence of significant impediments to accomplishing that goal. *Id.* at 49a-50a.

The court further concluded that appellees had standing based on injuries arising from excluding undocumented immigrants from the census, including the loss of federal funds and harm to intrastate redistricting efforts. J.S. App. 50a-53a. Appellants did not dispute that a reduction in funding qualifies as a cognizable injury or that funding losses and impairments to intrastate redistricting efforts could occur even if a relatively smaller number of undocumented individuals were excluded. *Id.* at 50a, 52a. The court determined that there was a substantial risk that appellees would suffer these harms. *Id.* at 53a.

The court declined to decide whether appellees' third alleged harm—a population undercount caused by the Memorandum's deterrent effect on census participation—was sufficient to confer jurisdiction. J.S. App. 38a. The court recognized that census field operations had concluded, ending any ongoing chilling effect. *See id.* at 37a. The court acknowledged the possibility that such chilling-effect injury could be capable of repetition yet evade review, but it declined to resolve that question. *Id.* at 37a-38a.

4

Finally, the court rejected appellants' arguments based on prudential ripeness. J.S. App. 53a-62a. The court explained that appellees' statutory and constitutional challenges raised purely legal questions. *Id.* at 57a-58a. It also reasoned that delaying judicial review would impede States' ability to timely complete their redistricting processes. *Id.* at 60a-62a.

b. Turning to the merits, the court concluded that the Memorandum violated the Constitution and two federal statutes. With respect to the Constitution, the court recognized that the drafters of the Constitution and of the Fourteenth Amendment required apportionment to be based on the whole number of "persons" in each State. J.S. App. 66a-69a. The court explained that the Constitution's text, original meaning, and drafting history, along with judicial precedent and over two hundred years of historical practice, all confirmed that the apportionment base must include individuals without regard to their citizenship or legal status. *Id.* at 64a-102a.

With respect to appellees' statutory claims, the court held that the Memorandum violated the similar requirement in 2 U.S.C. § 2a(a) that apportionment be based on the whole number of persons in each State. J.S. App. 102a. The text of the statute speaks of "persons," and does not draw distinctions based on citizenship or legal status. *Id.* at 103a-106a. When Congress adopted this provision, moreover, it expressly considered and rejected proposals to exclude noncitizens from the statute's scope. *Id.* at 116a-117a.

The court further held that the President's decision was contrary to the statutory requirement that apportionment be based on the results of the decennial census. J.S. App. 112a-115a (discussing 2 U.S.C. § 2a(a); 13 U.S.C. § 141(b)). Under the Memorandum, the

5

President will calculate each State's allocation of congressional seats based not on the census count itself, but rather on a wholly separate tabulation that excludes undocumented immigrants. *Id.* at 113a. "That is not a normal understanding of the decennial census tabulation." *Id.* at 113a-114a.

The court additionally held that the Memorandum transgressed separation of powers principles. J.S. App. 120a-121a. The court explained that the Constitution vests the power to enumerate the population and reapportion "solely in Congress." *Id.* at 121a. Because the President's Memorandum is incompatible with the limits Congress set out in the Reapportionment and Census Acts, it oversteps the President's constitutional authority. *See id.*

c. Based on these conclusions, the court entered partial summary judgment on appellees' claims under the Constitution, the Census Act, and the Reapportionment Act and denied appellants' motion to dismiss or in the alternative for partial summary judgment. J.S. App. 126a. It entered declaratory relief that the President's Memorandum is unlawful. *Id.* at 123a.

After weighing the equitable factors, the court issued a permanent injunction against all appellants except for President Trump. J.S. App. 123a-126a. The court enjoined appellants from including information needed to carry out the Memorandum's directive in the Commerce Secretary's report to the President under 13 U.S.C. § 141(b) or as part of the decennial census. J.S. App. 126a. The court explained that its injunction was broader than that entered by the three-judge court in a similar action, *New York v. Trump*, __ F. Supp. 3d __, 2020 WL 5422959 (S.D.N.Y. Sept. 10, 2020) (per curiam), *appeal docketed Trump v. New York*, No. 20-366 (U.S.). Whereas the "*New York*

6

court's permanent injunction was limited to the Secretary's December 31, 2020 Section 141(b) report to the President," the California injunction extends "to any reports otherwise provided by the Secretary as part of the decennial census." J.S. App. 125a. Finding no reason for delay, the court entered final judgment under Rule 54(b) in favor of appellees. *Id.* at 129a.

## ARGUMENT

Appellants ask the Court to hold their jurisdictional statement pending its decision in *Trump v. New York*, No. 20-366, which involves a parallel challenge to the President's Memorandum. J.S. 10. The arguments and record in this case and in *New York* differ in certain respects. In particular, different evidence supports appellees' standing in each case; and the district court here (unlike in *New York*) addressed constitutional challenges to the Memorandum.

Under the circumstances here, however, appellees agree that the Court should defer consideration of the jurisdictional statement until after deciding *New York*. Both cases present the question whether the President's decision to categorically exclude undocumented immigrants from the apportionment base is lawful. If the Court affirms in *New York*, it should summarily affirm here. If it declines to reach any issue in *New York*, the Court should either summarily affirm or note probable jurisdiction and then affirm. If the Court reverses in *New York*, it should permit the parties here an opportunity to file a supplemental brief under Rule 18.10 to address the effect of the *New York* decision should the parties conclude that such a brief would be helpful to the Court.[2]

---

[2] Before reaching the merits, the Court would first need to satisfy

7

In their amicus curiae brief in *New York*, appellees explained in detail why the plaintiffs in both the New York and California actions have justiciable claims and why the Memorandum violates applicable federal statutes and the Constitution. No. 20-366 California, et al. Br. 5-33. Appellees briefly state here the grounds supporting the judgment below.

1. The district court correctly determined that appellees have standing to challenge the Memorandum. Article III requires a plaintiff to demonstrate an injury in fact that is caused by the challenged action and that would be redressed by a favorable decision. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-561 (1992). A future injury is sufficient to confer standing when it "is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony*

---

itself that it had jurisdiction over appellants' appeal. Under this Court's Rule 18.1, "[t]he notice of appeal shall specify the parties taking the appeal." This Court has construed this requirement in a prior version of the Federal Rules of Appellate Procedure as jurisdictional and as demanding that all parties be specifically named in the notice of appeal. *See Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 314-317 (1988); *but cf. Smith v. Barry*, 502 U.S. 244, 245 (1992) (recognizing that a "document intended to serve as an appellate brief may qualify as the notice of appeal required by [Appellate] Rule 3"). Resort to "et al." is not sufficient. *Torres*, 487 U.S. at 317-318. Here, the notice of appeal does not specifically name each defendant. *See* J.S. App. 132a ("all defendants in the above-named cases hereby appeal"); *id.* (caption describing defendants as "Donald J. Trump, et al., Defendants") (capitalization omitted). Although an amendment to the Federal Rules of Appellate Procedure "liberalized" this requirement for appeals to the courts of appeals, "[n]o similar amendment has been made to Supreme Court Rule 18.1." Shapiro, et al., Supreme Court Practice 7-15 n.12 (11th ed. 2019). Accordingly, the "failure to specifically name a party taking an appeal in the notice of appeal may be fatal." *Id.*

8

*List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). The "expected" diminishment of political representation through the loss of a House seat is a sufficient injury for Article III purposes, as is the threat of vote dilution from an improper apportionment. *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331-332 (1999).

a. The record here demonstrates that appellees face, at a minimum, a substantial risk of losing representation in Congress under the Memorandum. In the proceedings below, California presented a declaration from an expert economist who performed a statistical analysis of population data and calculated the effect of the Memorandum on the allocation of congressional seats. J.S. App. 36a; D. Ct. Dkts. 37-1, 39 (Gilgenbach Decl.). Based on that analysis, the expert concluded that, under a wide range of assumptions, California and Texas are each "highly likely" to lose a seat in the House of Representatives if undocumented immigrants are excluded from the apportionment tabulation. D. Ct. Dkt. 37-1 (¶¶ 5, 22). That conclusion was with "90% confidence." *Id.* ¶ 22. Appellants did not question the validity of the expert's methodology or her conclusion that, if the Memorandum were implemented, California would almost certainly see a reduction in the size of its congressional delegation. J.S. App. 36a (expert declaration "is not contested"); *id.* at 39a (appellants did not "contest[] the facts put forward by" plaintiffs).

Nor did appellants dispute that appellees' apportionment injury is traceable to the President's decision or that a favorable ruling would redress that harm. J.S. App. 53a. Appellants argued instead that it is

9

"unknown" whether any appellees will suffer apportionment injury because it purportedly is uncertain to what extent it "will be feasible" to exclude undocumented immigrants from the apportionment base. *Id.* at 41a (internal quotation marks omitted). But they did not support their assertion of uncertainty, and it is belied by the facts.

To start, appellants themselves expect that California will lose congressional representation as a result of the President's decision. The Memorandum explains that "one State is home to more than 2.2 million" undocumented individuals. 85 Fed. Reg. at 44,680. And it predicts that including these individuals in that State's population for apportionment purposes "could result in the allocation of two or three more congressional seats than would otherwise be allocated." *Id.* Appellants have conceded that California is that State. J.S. App. 56a.

Appellants' other actions confirm the substantial risk that California will lose representation under the President's decision. The Memorandum declares it to be the "policy of the United States" to exclude all undocumented immigrants from the apportionment count and promises to carry out the President's directives "to the maximum extent of the President's discretion under the law." 85 Fed. Reg. at 44,680. In addition, more than a year ago, the President issued an Executive Order explaining that the Census Bureau had determined "that administrative records to which it had access would enable it to determine citizenship status for approximately 90 percent of the population." *See* Collecting Information About Citizenship Status in Connection With the Decennial Census, 84 Fed. Reg. 33,821, 33,821 (July 11, 2019). The order directed other federal agencies to share with the

10

Commerce Department information and administrative records about the citizenship status of the United States population to "ensure that the Department will have access to all available records in time for use in conjunction with the census." *Id.* Since then, appellants have made clear, including in representations before the court below, that this information sharing is underway. D. Ct. Dkt. 33 (Tr. 31:17-32:21); *see also* J.S. App. 47a-48a; Statement from the President Regarding Apportionment (July 21, 2020).[3]

In filings in this Court, appellants have confirmed their intent to fully implement the Memorandum and have explained their plans to do so. They sought expedited treatment in *New York* precisely to ensure that they could carry out the President's policy of maximal exclusion of undocumented immigrants. *See* No. 20-366 Mot. for Expedited Consideration 2, 6 (Sept. 22, 2020). They also informed the Court that, "by December 31, [the Census Bureau] will provide the President with information regarding any unlawful aliens in [Immigration and Customs Enforcement] Detention Centers whom the President could" then "exclude from the apportionment base, thereby partially implementing his Memorandum." No. 20-366 Supp. Br. 5 (Oct. 2, 2020) (internal quotation marks omitted). The additional "processing steps required *for fully implementing*" the Memorandum apparently would take place immediately thereafter. *Id.* at 3-4 (emphasis added). Specifically, the Bureau plans to provide "other Presidential Memorandum related outputs by Monday, January 11, 2021, and would continue to work on a quicker timetable to implement

---

[3] *Available at* https://www.whitehouse.gov/briefings-statements/statement-president-regarding-apportionment/ (last visited Nov. 24, 2020).

11

that aspect of the Memorandum sooner if feasible." *Id.* at 5 (alterations and internal quotation marks omitted). That timeline appears to be aimed at allowing the President to submit an apportionment count to Congress that maximally excludes undocumented immigrants.

Moreover, appellants' assertions of uncertainty are insufficient to overcome appellees' evidentiary showing. The district court entered summary judgment in favor of appellees, and appellants have not established that there is any genuine dispute of fact that appellees will suffer apportionment harm, *see* Fed. R. Civ. P. 56(a); J.S. App. 41a. Below appellants submitted a declaration stating that the "Bureau does not know exactly what numbers the Secretary may report to the President." D. Ct. Dkt. 61-1 (Abowd Decl. ¶ 15); *see also id.* ("impossible to assess precisely the effects of the [Memorandum] on apportionment"). That vague assertion does not negate the concrete evidence of appellants' efforts to carry out the President's policy of maximal exclusion of undocumented immigrants or appellees' expert testimony that the State is highly likely to lose representation if the Memorandum is implemented. *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. at 331 (standing satisfied where defendants failed to support challenge to plaintiffs' evidence); J.S. App. 48a-49a n.11 (appellants failed to satisfy burden of production to establish infeasibility of implementing Memorandum).

b. Appellees have standing based on two other types of injury as well. The court below concluded that appellees demonstrated a substantial risk that the Memorandum would cause appellees to lose federal funding. J.S. App. 36a-37a. It also explained how

12

state redistricting efforts and other vital governmental functions depend on federal census data. *Id.* On its face, the Memorandum directs exclusion of undocumented immigrants only from the apportionment count and not from other census datasets used to allocate federal funding or to draw district maps. 85 Fed. Reg. at 44,680; *see also* No. 20-366 Appellants Br. 19-20. If the President's decision were read more broadly to direct exclusion of undocumented immigrants for other purposes, however, it would deprive California of critical federal funds, impede other governmental services, and impair the State's ability to draw district lines based on total population as state law requires. J.S. App. 50a-53a; Cal. Const. art. 21, § 2; *see also* J.S. App. 36a-37a (appellees' declarations regarding effects on funding, redistricting, and other governmental functions were "uncontested").

In addition, the record below demonstrated that the President's Memorandum had a chilling effect on census participation. *See* D. Ct. Dkt. 62-3 (Barreto Decl. ¶ 14). Although the census count has concluded for 2020, appellants bear a "heavy burden" of demonstrating that the challenged conduct cannot reasonably be expected to recur. *See Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks omitted). Harm from a census undercount may also be capable of repetition yet evade review. *See Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016). Appellants claim broad authority to exclude individuals from the apportionment base, *see* No. 20-366 Appellants Br. 22, 32-33; and generally the census is in the field for periods shorter than would be needed to complete judicial review, *see Kingdomware Techs.*, 136 S. Ct. at 1976.

13

c. Prudential considerations also support the district court's decision to address appellees' claims. To the extent that appellants would ask the Court "to deem [appellees'] claims nonjusticiable on grounds that are prudential rather than constitutional," any such request would be in "some tension" with the principle "that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony*, 573 U.S. at 167 (internal quotation marks omitted). In any event, the issues here are fit for resolution because appellees' challenge to the Memorandum is "purely legal, and will not be clarified by further factual development." *Id.* (internal quotation marks omitted). Delaying consideration of appellees' claims, moreover, could lead to prolonged uncertainty and unnecessary disruption of state redistricting processes—a concern that the federal defendants have themselves recognized. *See Ross v. Nat'l Urban League*, No. 20A62 Reply in Support of Stay Application 11-12 (Oct. 10, 2020). In contrast, appellants face no prospect of hardship from pre-apportionment resolution of challenges to the Memorandum, because the district court's injunction allows them to continue preparing to implement the Memorandum. J.S. App. 124a. Under these circumstances, "the public interest would be well served by a prompt resolution" of appellees' claims. *See Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 582 (1985).

2. The district court correctly held that the Memorandum's exclusion of undocumented immigrants from the apportionment base violates Congress's directive that apportionment be based on "the whole number of persons in each State." 2 U.S.C. § 2a(a); *see also* 13 U.S.C. § 141(b) (requiring that the Secretary of Commerce report to the President, as the basis for apportionment, the "total population" of each State).

14

Like the constitutional provision from which it is adapted, *see infra* pp. 19-20, the statutory text forecloses any attempt to exclude a class of persons based on their immigration status. When Section 2a(a) was enacted in 1929, the term "person" referred to "human being," just as it does now. Webster's Practical Dictionary 518 (1931). And "in" meant "within" or "inside." *Id.* at 379. Undocumented immigrants indisputably are persons located within the physical boundaries of their respective States.

This reading of the statute is supported by long historical practice. Since the first census, persons residing in the United States have been included in the apportionment base without regard to immigration status. J.S. App. 118a. Appellants have acknowledged as much. *See id.* at 81a. And the Census Bureau has read the statute as including undocumented immigrants. 83 Fed. Reg. at 5533 (noncitizens "living in the United States" are "[c]ounted at the U.S. residence where they live and sleep most of the time").

The legislative history of the 1929 Act confirms that the statute does not permit the categorical exclusion of undocumented immigrants. The Senate expressly considered and rejected a proposal to exclude noncitizens from the apportionment base, with many legislators concluding that such a change would be unconstitutional. 71 Cong. Rec. 1971 (1929) (Sen. Blaine), 1912 (Sen. Bratton), 1958 (Sen. Reed), 2270 (Rep. Lea); *see also id.* at 1821-1822 (Senate Legislative Counsel). Members of Congress voting on the 1929 Act were also well aware of the issue of immigrants who had arrived "illegally" being counted as "persons" for apportionment purposes. *See, e.g., id.* at 1973, 1976 (Sen. Barkley); *id.* at 2283 (Rep. Robsion);

15

*see also* J.S. App. 11a. Congress's express considera-
tion of this issue and its decision to retain the statu-
tory language requiring inclusion of the "whole
number of persons" strongly indicate that it did not in-
tend to exclude undocumented immigrants from the
apportionment count.

The district court was also correct in concluding
that, even if the statutory phrase "persons in each
State" were equivalent to "inhabitants," undocu-
mented immigrants would be "inhabitants" for appor-
tionment purposes. J.S. App. 106a-107a. An
inhabitant is a person who "live[s] or dwell[s] in (a
place)." Random House Webster's Unabridged Dic-
tionary 982 (2d ed. 1997). That definition has not
changed since the founding. *See* 4 Judicial and Statu-
tory Definitions of Words and Phrases (West 1st ed.
1904) ("As where one sleeps. In a case involving the
settlement of a man, it was said that 'a man properly
inhabits where he lies[.]'") (quoting *Parishes of St.
Mary Colechurch and Radcliffe* [1760], 1 Strange, 61
Eng. Rep. 385). And it aligns with the understanding
reflected in the Census Bureau's "usual residence"
standard. 83 Fed. Reg. at 5526.

Most undocumented immigrants meet that stand-
ard. As California's expert explained, "[r]esearch and
statistical reports have repeatedly found that undocu-
mented immigrants see themselves as part of Ameri-
can society and indeed have longstanding ties in the
cities and towns in which they permanently live."
D. Ct. Dkt. 62-3 (Barreto Decl. ¶ 18). He noted that "a
clear majority of undocumented immigrants have
lived in the United States for over five years and have
families, hold jobs, own houses, and are part of the
community." *Id.* Appellants did not dispute that evi-

16

dence. J.S. App. 90a ("undisputed that most undocumented immigrants live and sleep most of the time at a residence in the United States").

The district court also correctly concluded that this Court's decision in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), does not support the President's unprecedented decision to categorically exclude undocumented immigrants from the apportionment count. J.S. App. 109a-111a. In *Franklin*, the Court upheld the Secretary of Commerce's allocation of approximately 900,000 "overseas military personnel to the State designated in their personnel files as their 'home of record'" for apportionment purposes. 505 U.S. at 790-791. The Court explained that the term "usual residence" "can mean more than mere physical presence, and has been used broadly enough to include some element of allegiance or enduring tie to a place." *Id.* at 804. Thus, individuals temporarily absent from their home State, especially for reasons of national service, can be included in their State's apportionment base. *See id.* But it does not follow that an individual's extended, indefinite physical presence is insufficient on its own to establish "usual residence." *Franklin* thus provides no basis for excluding undocumented immigrants who are physically present in their State.

There is likewise no basis to conclude that Congress impliedly delegated to the Executive the discretion to determine whether to exclude noncitizens (or undocumented noncitizens) from the apportionment base. In 1929, no less than today, the question whether to remove noncitizens from the apportionment base was of substantial economic and political importance. Had Congress wanted to assign that question to the Executive, "it surely would have done

17

so expressly." *See King v. Burwell*, 576 U.S. 473, 485-486 (2015). Instead, Congress resolved that question itself by expressly rejecting attempts to eliminate undocumented immigrants from the apportionment base, in part because of concerns that doing so would run afoul of the Constitution. Neither the statutory phrase "persons in each State" nor the term "inhabitants" can plausibly be understood to confer on the President discretion to make the highly consequential decision to subtract individuals on the basis of their immigration status.

3. The President's Memorandum also violates the requirement that reapportionment be based on census data. In the Reapportionment Act, Congress provided that "the President shall transmit to the Congress a statement showing the whole number of persons in each State … *as ascertained under the … decennial census of the population*." 2 U.S.C. § 2a(a) (emphasis added). The President must also spell out "the number of Representatives to which each State would be entitled under an apportionment … by the method known as the method of equal proportions[.]" *Id.*; *see also* 13 U.S.C. § 141(a)-(b) (mandating that "[t]he tabulation of total population by States" under the census is "required for the apportionment of Representatives in Congress among the several States"); U.S. Const., art. I, § 2, cl. 3 (requiring "actual Enumeration" of population).

The Memorandum proposes to base apportionment in part on data regarding citizenship and legal status. But the census itself does not include that information. *See generally Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019). Appellants have not disputed that undocumented immigrants will be counted as part of the census enumeration, notwithstanding the

18

Memorandum. *See* J.S. App. 100a-101a; D. Ct. Dkt. 33 (Tr. 33:5-33:9). And appellants acknowledge that the Memorandum directs that information regarding citizenship and legal status be obtained from non-census data sources. No. 20-366 Appellants Br. 4-5; *see also* D. Ct. Dkt. 33 (Tr. 31:21-32:21). The Memorandum refers to a separate executive order, described above, that directs federal agencies to share non-census data regarding "the number of citizens, non-citizens, and illegal aliens in the country." 85 Fed. Reg. at 44,680; *see* 84 Fed. Reg. 33,821.

That approach cannot be squared with constitutional and statutory requirements. Under 13 U.S.C. § 141, the Secretary of Commerce must provide to the President "the tabulation of total population by States under subsection (a)"—*i.e.*, the decennial census—"as required for the apportionment of Representatives." 13 U.S.C. § 141(a)-(b). Section 2a, in turn, "require[s] the President to use … the data from the 'decennial census.'" *Franklin*, 505 U.S. at 797. "The decennial census is the only census that is used for apportionment purposes." *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. at 341 (internal quotation marks omitted). Once the census data are complete for apportionment purposes, "the President exercises no discretion in calculating the numbers of Representatives"; rather, his role is of a "ministerial nature." *Franklin*, 505 U.S. at 799; *see also id.* at 809 (Stevens, J., concurring in part) ("The automatic connection between the census and the reapportionment was the key innovation of the [1929] Act."). In contrast, the Memorandum requires the Commerce Secretary to provide the President with a separate tabulation that excludes undocumented immigrants—despite their inclusion in the regular census tabulation. "That is not

19

a normal understanding of the decennial census tabulation." J.S. App. 113a-114a.

Similarly, the Memorandum violates Section 2a(a) because it envisions an apportionment that is not based on "the method of equal proportions." That method, selected by Congress in 1941 and used for apportioning congressional seats ever since, "minimize[s] the relative difference both between the size of congressional districts and between the number of Representatives per person." *Dep't of Commerce v. Montana*, 503 U.S. 442, 455 (1992). Its starting point is "the population of each State." *Id.* at 452 n.26; *see also* Appellants Br. 9-11, *Montana*, 503 U.S. 442 (No. 91-860) ("[T]he formula … has as its numerator the population of the State."). Because the Memorandum seeks to use something other than "the population" of each State as the apportionment base, it departs from the method of equal proportions.

4. The Memorandum also violates the Constitution's requirement that the apportionment base include persons without regard to legal status. Prior to 1868, representatives were "apportioned among the several States … according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons … and excluding Indians not taxed, three fifths of all other Persons." U.S. Const. art. I, § 2, cl. 3. After the adoption of the Fourteenth Amendment, representatives must be "apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2.

Undocumented immigrants are "persons" within the meaning of those provisions. Founding-era dictionaries defined "person" as an "[i]ndividual or

20

particular man or woman," and also as a "human be-
ing." Samuel Johnson, A Dictionary of the English
Language (3d ed. 1766). The same is true of diction-
aries from the time the Fourteenth Amendment was
ratified. Noah Webster, A Dictionary of the English
Language 314 (1867); *see also* J.S. App. 69a-70a. In-
deed, appellants have conceded that undocumented
immigrants are "persons" under the ordinary meaning
of that term. J.S. App. 70a.

That interpretation is consistent with how this
Court has interpreted the word "person" in other sec-
tions of the Fourteenth Amendment. *See Yick Wo v.
Hopkins*, 118 U.S. 356, 368-369 (1886); *Plyler v. Doe*,
457 U.S. 206, 210 (1982). This Court ordinarily as-
sumes that the same terminology conveys the same
meaning, particularly when used in the same section
of the Constitution. *See, e.g., Ariz. State Legislature v.
Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 829
(2015) (Roberts, C.J., dissenting).

Moreover, the text demonstrates that "[w]hen the
Founders chose to exclude specific subsets of persons
… they did so." J.S. App. 68a-69a. The
Apportionment Clause originally excluded "Indians
not taxed" and specified that slaves would be counted
as only three-fifths of a person. U.S. Const. art. I, § 2,
cl. 3. The Fourteenth Amendment, of course, elimi-
nated the latter provision but retained the exclusion
of "Indians not taxed." Under the *expressio unius*
canon, which applies to the interpretation of the Con-
stitution as well as statutes, that is powerful evidence
that the drafters did not intend for there to be other
exceptions. *See U.S. Term Limits, Inc. v. Thornton*,
514 U.S. 779, 793 n.9 (1995).

The history of both the original Constitution and
the Fourteenth Amendment confirms that noncitizens

21

must be included in the apportionment base. As Alexander Hamilton explained during the drafting process, "apportionment was to be based on the number of persons residing in each state because 'every individual of the community at large has an equal right to the protection of government.'" J.S. App. 76a (quoting 1 Records of the Federal Convention of 1787, at 472-473 (M. Farrand ed. 1911); *see also id*. at 74a-77a.

The drafters of the Fourteenth Amendment made a conscious decision to retain that basis for apportionment. One of the debates during the drafting was over what to use as the apportionment base. *See* J.S. App. 78a (discussing historical materials); Zuckerman, *A Consideration of the History and Present Status of Section 2 of the Fourteenth Amendment*, 30 Fordham L. Rev. 93, 94-107 (1961). The drafters considered and rejected several proposals that would have based apportionment on a subset of persons that did not include immigrants, such as the number of citizens, voters, or male voters over 21. Zuckerman, *supra*, at 95, 96, 101-102. Ultimately, they settled on "the principle upon which the Constitution itself was originally framed, that the basis of representation should depend upon numbers … not voters." Cong. Globe, 39th Cong., 1st Sess. 2767 (1866) (Sen. Howard).

In doing so, the drafters acknowledged that including noncitizens and immigrants could have a dramatic impact on the apportionment totals. Senator Wilson of Massachusetts, for instance, noted that in 1860 "there were 3,856,628 unnaturalized persons of foreign birth" in the northern states and excluding them from apportionment "would cause Massachusetts to lose one or perhaps two Representatives, Pennsylvania two, and New York as many as four." Zuckerman,

22

*supra*, at 100; *see also id.* at 95, 105 (discussing similar predictions).  As the district court observed, the drafters ultimately "found it important to include noncitizens and other non-voters … because even nonvoters' interests would be represented by the elected government."  J.S. App. 79a.

Finally, consistent practice since the founding confirms that the Constitution requires undocumented immigrants to be counted for apportionment purposes.  Although the constitutional text is clear, *supra* pp. 19-20, were that not so, this Court's interpretation would be "informed by long and consistent historical practice."  *Dep't of Commerce v. New York*, 139 S. Ct. at 2567; *see also Evenwel v. Abbott*, 136 S. Ct. 1120, 1132 (2016) (looking to "settled practice" to resolve constitutional dispute regarding apportionment); *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) ("this Court has treated practice as an important interpretive factor").  Since the time of the founding, Congress and the Executive Branch have uniformly agreed that immigrants, including undocumented immigrants, are included in the apportionment base.  *See* J.S. App. 81a-82a.  Indeed, appellants have "conceded that historical practice does not support their argument" and were unable to identify any historical precedent for excluding undocumented immigrants.  *Id.* at 81a.

Ever since the first census in 1790, the enumeration has counted individuals without regard to citizenship or legal status.  In the 1850s, for example, escaped slaves in the northern states were not citizens, and their very presence was unlawful.  *See, e.g.*, Fugitive Slave Act of 1850, 31 Cong. Ch. 60, 9 Stat. 462.  Yet they were counted in the 1860 census as part of the apportionment base.  *See* U.S. Census Bureau, 1860 Census: Population of the United States at vi-vii,

23

xv-xvi (1864). In more recent years, the Executive Branch has continued to adhere to this approach. J.S. App. 17a-19a, 87a-88a (compiling examples). This un-broken history confirms that appellants' novel reading of the Constitution is unsustainable.

5. Finally, the district court correctly held that the Memorandum is contrary to principles of separation of powers. J.S. App. 120a-122a. The Constitution vests Congress with the power to enumerate and reapportion. U.S. Const. art. I, § 2, cl. 3; *see also Dep't of Commerce v. New York*, 139 S. Ct. at 2566. Congress has exercised that authority by requiring the apportionment tabulation to be based on all persons without regard to legal status. By categorically excluding undocumented immigrants from the apportionment count, the Memorandum is incompatible with Congress's will and oversteps the authority that Congress delegated to the Executive Branch to conduct the decennial census. *Supra* pp. 13-17; *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) (when Executive acts in ways "incompatible" with will of Congress, its "power is at its lowest ebb").

The Memorandum also implicates federalism concerns. As noted above, *supra* pp. 1-2, the Memorandum expressly singles out States that adopt policies with which the President disagrees. 85 Fed. Reg. at 44,680 ("States adopting policies that encourage illegal aliens to enter this country and that hobble Federal efforts to enforce the immigration laws … should not be rewarded with greater representation in the House of Representatives"); *id.* (predicting that exclusion of undocumented immigrants will cost California congressional seats). This explicit targeting of individ-

24

ual States for diminution of political power in the national government is difficult to reconcile with the principle that each State enjoys equal sovereignty under the Constitution. *Cf. Shelby Cty. v. Holder*, 570 U.S. 529, 544 (2013). These federalism concerns only confirm that the Memorandum's unprecedented break with centuries of practice cannot be sustained.

## CONCLUSION

After resolving *New York*, the Court should summarily affirm or note probable jurisdiction and then affirm.

Respectfully submitted,

XAVIER BECERRA
  *Attorney General of California*
MICHAEL J. MONGAN
  *Solicitor General*
AIMEE FEINBERG
JOSHUA PATASHNIK
  *Deputy Solicitors General*
ANTHONY R. HAKL
  *Supervising Deputy*
   *Attorney General*
R. MATTHEW WISE
GABRIELLE D. BOUTIN
KRISTIN A. LISKA
  *Deputy Attorneys General*
KIMBERLY M. CASTLE
  *Associate Deputy Solicitor General*

November 30, 2020

(*Additional counsel listed on the following page*)

25

DAVID I. HOLTZMAN
HOLLAND & KNIGHT LLP
*Counsel for the County of*
  *Los Angeles*

CHARLES PARKIN
  *City Attorney*
*Counsel for the City of Long Beach*

MIKE FEUER
  *City Attorney*
VALERIE FLORES
  *Managing Senior Assistant*
    *City Attorney*
MICHAEL J. DUNDAS
  *Assistant City Attorney*
*Counsel for the City of Los Angeles*

BARBARA J. PARKER
  *City Attorney*
*Counsel for the City of Oakland*

SUE ANN SALMON EVANS
KEITH A. YEOMANS
DANNIS WOLIVER KELLEY
*Counsel for the Los Angeles Unified*
  *School District*