# EXHIBIT A

No. 20-662

IN THE

# Supreme Court of the United States

———————

DONALD J. TRUMP, *ET AL.*,

*Appellants,*

v.

NATALIA USECHE, *ET AL.*,

*Appellees.*

———————

On Appeal from the United States District Court
for the District of Maryland

———————

## APPELLEES' MOTION TO AFFIRM

———————

Shankar Duraiswamy
Daniel T. Grant
Carlton E. Forbes
Jeffrey Cao
Morgan E. Saunders
Patricio G. Martínez-
 Llompart
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001


December 14, 2020

P. Benjamin Duke
 *Counsel of Record*
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
pbduke@cov.com
(212) 841-1000

Morgan E. Lewis
COVINGTON & BURLING LLP
415 Mission Street,
 Suite 5400
San Francisco, CA 94105

*Counsel for Appellees*

i

## QUESTIONS PRESENTED

1.  Whether the district court correctly found that, in light of recent developments, there is a "substantial risk" that Appellees "will suffer the very apportionment harms the Memorandum is intended to inflict," and that Appellees therefore have standing and their claims are ripe for review. App. 11a.

2.  Whether the exclusion of undocumented immigrants from the apportionment violates the Reapportionment Act's requirement to apportion based on the "whole number of persons in each State." 2 U.S.C. § 2a(a); *see also* 13 U.S.C. § 141(b).

3.  Whether transmitting a "second" tabulation of total population that excludes undocumented immigrants based on records prepared separately from the decennial census violates the Census Act's requirement to apportion based on the "tabulation of total population by States," "as ascertained under the . . . decennial census of the population." 13 U.S.C. § 141(b); 2 U.S.C. § 2a(a).

4.  Whether, in the alternative, the exclusion of undocumented immigrants violates the Constitution's requirement that the House of Representatives be apportioned based on an "actual Enumeration" of the "whole number of persons in each State." U.S. Const., art. I, § 2, cl. 3; U.S. Const., amend. XIV, § 2.

ii

## TABLE OF CONTENTS

QUESTIONS PRESENTED ........................................ i

TABLE OF AUTHORITIES.................................... iii

STATEMENT OF THE CASE .................................3

ARGUMENT ...........................................................14

CONCLUSION ........................................................22

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019)............................................5

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992)..............................................13

*Lexmark Int'l, Inc. v. Static Control*
   *Components, Inc.,*
   572 U.S. 118 (2014)..............................................21

*Miller v. Brown,*
   462 F.3d 312 (4th Cir. 2006)...............................19

*Ohio Forestry Ass'n v. Sierra Club,*
   523 U.S. 726 (1998).............................................19

**Constitution & Statutes**

U.S. Const. amend. XIV, § 2 ....................................i, 3

U.S. Const. art. I, § 2, cl. 3 ......................................i, 3

2 U.S.C. § 2a ....................................................*passim*

13 U.S.C. §§ 1-402 .....................................................3

13 U.S.C. § 141 ................................................*passim*

**Regulations & Rules**

83 Fed. Reg. 5525 (Feb. 8, 2018)...........................4, 5

iv

84 Fed. Reg. 33821 (July 11, 2019)................5, 17, 18

85 Fed. Reg. 44679 (July 21, 2020)..................*passim*

**Other Authorities**

Sup. Ct. Rule 18.10....................................................22

Mot. for Expedited Consideration of the
　Jurisdictional Stmt. 6,
　*Trump v. New York*,
　No. 20-366 (Sept. 22, 2020).................................20

Decl. of Dr. Christopher Warshaw,
　*Trump v. New York*,
　No. 20-366, J.A. 338...........................................21

Br. for Appellees New York
　Immigration Coalition *et al.*,
　*Trump v. New York*,
　No. 20-366 (Nov. 16, 2020)..................................15

Br. for State of New York *et al.*,
　*Trump v. New York*,
　No. 20-366 (Nov. 16, 2020) .................................15

Appellants' Reply Br. 4,
　*Trump v. New York*,
　No. 20-366 (Nov. 23, 2020)...........................16, 19

Oral Arg. Tr., *Trump v. New York*,
　No. 20-366 (Nov. 30, 2020)..................................17

Appellants' Jurisdictional Stmt.,
　*Trump v. City of San Jose*,
　No. 20-561 (Oct. 29, 2020) ..................................15

v

Declaration of Albert E. Fontenot, Jr.,
   *La Unión del Pueblo Entero v.*
   *Trump*, No. 8:19-cv-2710
   (D. Md. Oct. 2, 2020), Dkt. 126-1...............9, 15, 16

Declaration of Albert E. Fontenot, Jr.,
   *Nat'l Urb. League v. Ross*,
   No. 5:20-cv-05799
   (N.D. Cal. Oct. 1, 2020), Dkt. 284-1 ...............9, 15

## INTRODUCTION

In July 2020, the current President broke with over 230 years of consistent legal interpretation, policy, and practice by announcing a new "policy" to exclude undocumented immigrants from the congressional apportionment solely on the basis of their unlawful immigration status. *See* Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census, 85 Fed. Reg. 44679 (July 21, 2020) (the "Presidential Memorandum" or "Memorandum"). The Presidential Memorandum directed the Secretary of Commerce (the "Secretary") to assemble and provide the President with information enabling him to implement this new policy through the statutory apportionment statement required to be transmitted to Congress in January 2021. The Memorandum violates the Constitution and the statutes governing the apportionment and the decennial census on which it must be based.

Soon after the Memorandum's issuance, numerous parties in multiple jurisdictions challenged it on both constitutional and statutory grounds. The underlying decision in this case is the third three-judge district court opinion holding that the Memorandum violates the Census and Reapportionment Acts and enjoining the Secretary of Commerce and the Census Bureau from complying with its unlawful commands. This Court previously postponed consideration of its jurisdiction and expedited the appeal of one of the parallel cases, *Trump v. New York*, No. 20-366. The government has also appealed from another decision enjoining the Presidential Memorandum, *Trump v. City of San Jose*, No. 20-561, but requested that the

2

Court hold its jurisdictional statement pending disposition of *New York*. Unlike the *New York* decision, the district court in *City of San Jose* held that the plaintiffs in that case had demonstrated a substantial risk of apportionment injury from the Memorandum—the same grounds on which the panel in this case concluded that Appellees had standing and that their claims were ripe for adjudication.

The governmental appellants here—principally the President, the Secretary, and the Census Bureau—have largely avoided any attempt to defend on its own terms the Memorandum's explicit policy and overt objective of categorically excluding all undocumented immigrants residing in the United States solely on the basis that they are "not in a lawful immigration status under the Immigration and Nationality Act, as amended (8 U.S.C. 1101 *et seq.*)." 85 Fed. Reg. at 44680. Instead, they have seized upon a so-called "feasibility" limitation in the Memorandum to contend that the President's punitive goal may yet elude him, while relying upon an ever-changing and inconsistent string of extra-record representations by counsel to claim that the Secretary does not know to what extent the Memorandum can be implemented.

As in *City of San Jose*, the government requests that this Court hold its jurisdictional statement on appeal from the district court's grant of declaratory and injunctive relief against Appellants (other than the President), pending the Court's decision in *New York*. Given the unique exigencies of these cases, Appellees agree that a hold is appropriate. If the Court finds jurisdiction and affirms the judgment in

*New York*—as it should—the Court should summarily affirm the judgment in this case as well. If the Court does not affirm in *New York*, Appellees respectfully request that the Court provide the parties an opportunity to address that decision prior to disposing of this jurisdictional statement.

## STATEMENT OF THE CASE

1. Under the Constitution, congressional representation must be apportioned among the States based on population, "counting the whole numbers of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2. The Constitution further requires that an "actual Enumeration" of the population shall be conducted every ten years, "in such Manner as [Congress] shall by Law direct." U.S. Const. art. I, § 2, cl. 3. Congress has implemented this enumeration requirement through the Census Act, 13 U.S.C. §§ 1-402, which delegates to the Secretary of Commerce the obligation to "take a decennial census of population," *id.* § 141(a), and requires the Secretary to report to the President, by December 31 of the decennial census year, "[t]he tabulation of total population by States . . . as required for the apportionment," *id.* § 141(b).

Under the Reapportionment Act, 2 U.S.C. § 2a, the President must "transmit to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the . . . decennial census of the population, and the number of Representatives to which each State would be entitled" under the prescribed method of "equal proportions." *Id.* § 2a(a). Following his receipt of the

4

decennial census tabulation under Section 141(b) of the Census Act, the President must transmit his statement on the first day of the first regular session of Congress, "or within one week thereafter." *Id.* The Clerk of the House of Representatives then has fifteen calendar days to send to the executive of each state the number of representatives to which his or her state is entitled. *Id.* § 2a(b).

To carry out the Secretary's duty to conduct the 2020 decennial census, the Census Bureau promulgated final rules for the 2020 Census. One of those rules—adopted in 2018 after full notice-and-comment rulemaking procedures—specifies where individuals would be enumerated. *See* Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5525 (Feb. 8, 2018) (the "Residence Rule"). Under the Residence Rule, persons are to be counted at their "usual residence," which the Rule defines as "the place where a person lives and sleeps most of the time." *Id.* at 5526.

By its terms, the Residence Rule applies without regard to immigration status. Under the Rule, "[c]itizens of foreign countries living in the United States" are "[c]ounted at the U.S. residence where they live and sleep most of the time." *Id.* at 5533. In addressing one commenter's concern that this provision would mean undocumented immigrants would be included in the census for purposes of apportionment, the Census Bureau noted that the concept of "usual residence" incorporated in the Rule "is grounded in the law providing for the first census, the Act of March 1, 1790, expressly specifying that persons be enumerated at their 'usual place of abode.'"

5

*Id.* at 5526. The Bureau therefore decided to "retain the proposed residence situation guidance for foreign citizens in the United States." *Id.* at 5530.

2. In June 2019, this Court vacated the Secretary's previously announced decision to add a question concerning citizenship to the 2020 Census questionnaire, holding that the Secretary's stated rationale for that decision was pretextual and therefore arbitrary and capricious in violation of the Administrative Procedure Act. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573-76 (2019). On the heels of this Court's ruling, the President issued Executive Order 13880, directing all executive agencies to provide administrative records to assist the Department of Commerce "in determining the number of citizens, non-citizens, and illegal aliens" in the United States. Executive Order No. 13880, Collecting Information About Citizenship Status in Connection With the Decennial Census, 84 Fed. Reg. 33821, 33824 (July 11, 2019).

In March 2020, the actual enumeration of population for the 2020 decennial census commenced, and Census Day—April 1, 2020, *see* 13 U.S.C. § 141(a)—came and went. Months later, on July 21, 2020, the President issued the Presidential Memorandum at the center of this dispute.

Abandoning 230 years of unbroken practice, the Memorandum decrees that it is now "the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status . . . to the maximum extent feasible and consistent with the discretion delegated to the executive branch." 85

6

Fed. Reg. at 44680. The Memorandum asserts that the phrase "persons in each State" for purposes of congressional apportionment includes only the State's "inhabitants," and it claims that the "discretion delegated to the executive branch to determine who qualifies as an 'inhabitant' includes the authority to exclude from the apportionment base aliens who are not in a lawful immigration status." *Id.* at 44679. The Memorandum states, without qualification, that the President has determined to exclude "illegal aliens" from the apportionment base "*to the maximum extent*" of this asserted discretion. *Id.* at 44680 (emphasis added).

The purpose of the President's unprecedented new policy is explicit and unequivocal: to curtail the political representation of States with large undocumented immigrant populations, and to punish those States for allegedly failing to support "Federal efforts to enforce the immigration laws." *Id.* The Memorandum specifically targets one "State [that] is home to more than 2.2 million" undocumented immigrants, whose inclusion in the apportionment base "could result in the allocation of two or three more congressional seats than would otherwise be allocated." *Id.* At oral argument before the district court, Appellants confirmed that the State referred to above is California, where some Appellees in this case reside. App. 14a. The Memorandum declares that California and other States with many undocumented residents should not be "rewarded with greater

7

representation in the House of Representatives." 85 Fed. Reg. at 44680.

To assist the President in carrying out this exclusionary policy, the Memorandum directs the Secretary to provide "information" in his statement to the President under 13 U.S.C. § 141(b) that will "permit[]" him to implement the announced policy. *Id.* The Secretary is further directed to "also include in that report information tabulated according to the methodology set forth in" the Residence Rule. *Id.*

3. Appellees filed suit against Appellants in the District of Maryland, contending that the Presidential Memorandum violates the Constitution, the Census Act, and the Reapportionment Act.[1] Appellees are individuals and non-profit organizations residing and conducting activities in California and Texas, as well as Arizona, Florida, Nevada, and New Jersey. Shortly after filing their Amended Complaint, Appellees moved for partial summary judgment on their claims under the Enumeration and Apportionment Clauses of the Constitution and their statutory *ultra vires* claims under 13 U.S.C. § 141(b) and 2 U.S.C. § 2a(a). Appellants opposed the motion on both jurisdictional standing and ripeness grounds, as well as on the merits.

4. In a 34-page opinion dated November 6, 2020, the district court granted Appellees' motion, rejecting

---

[1] Appellees also brought other constitutional equal protection and statutory claims under the Fifth Amendment's Due Process clause and the APA but did not move for summary judgment on those claims, and the district court did not address them. *See* App. 7a, 8a & n.2.

8

Appellants' jurisdictional arguments and holding that the Presidential Memorandum violates both 13 U.S.C. § 141(b) and 2 U.S.C. § 2a(a). App. 22a-23a. Although the district court declined to reach the constitutional grounds for granting Appellees' motion, the district court granted summary judgment on Appellees' statutory claims and enjoined the Secretary from providing in his statement under 13 U.S.C. § 141(b) any "'information permitting the President . . . to exercise [his] discretion to carry out the policy set forth in'" the Memorandum and "transmitting to the President any data or information on the number of undocumented immigrants in each state intended for use in apportionment." App. 34a-35a (quoting 85 Fed. Reg. at 44680) (alterations in original).

In concluding that Appellees "face a substantial risk of a direct and imminent apportionment injury" from the Memorandum, App. 18a, the district court noted that Appellants did not even dispute that, "if implemented, the Memorandum would produce the intended apportionment harms," App. 14a. Indeed, Appellants offered no evidence to challenge Appellees' expert declaration demonstrating that "[e]ven under a wide range of assumptions and accounting for statistical uncertainty, California and Texas are 'highly likely to lose a congressional seat if undocumented immigrants [are] removed from congressional apportionment calculations.'" App. 13a (quoting Decl. of Dr. Ruth Gilgenbach ¶ 13, Dkt. 19-7) (alterations in original). That result is the both the

9

stated impetus for and intended goal of the Memorandum. *Id.*

Instead, Appellants hinged their defense on the proposition "that there is no 'substantial risk' that the Memorandum actually *will* be implemented, or at least fully *enough* implemented to bring about the desired shift of congressional seats." App. 14a. The district court squarely rejected this "who-knows-what-will-happen argument," App. 18a-19a, based on "the government's own sworn declarations and filings in parallel litigation" that were "replete with evidence of concrete plans to provide the President with a number approximating the total number of undocumented immigrants in each state," App. 16a. In particular, the declarations of Census Bureau officials affirm that the Secretary will be provided with not only "the number of all 'unlawful aliens in ICE Detention Centers'" but also, by January 11, 2021, additional "'outputs' . . . 'necessary to *fully implement* the Presidential Memorandum.'" App. 16a (quoting Decl. of Albert E. Fontenot, Jr. ¶ 8, *La Unión del Pueblo Entero v. Trump*, No. 8:19-cv-2710 (D. Md. Oct. 2, 2020), Dkt. 126-1 ("Fontenot *LUPE* Decl."); Decl. of Albert E. Fontenot, Jr. ¶ 26, *Nat'l Urb. League v. Ross*, No. 5:20-cv-05799 (N.D. Cal. Oct. 1, 2020), Dkt. 284-1 ("Fontenot *Nat'l Urb. League* Decl.") (emphasis added)). As the district court concluded: "This is not some inchoate plan, so vague that it presents no 'substantial risk' of coming to fruition." App. 16a.

Moreover, against the concrete statements of their own officials, Appellants offered no evidentiary "counterweight" whatsoever to support the

10

"speculative and theoretical possibility that the agency may fall short in its efforts to carry out the Memorandum's announced policy." App. 17a-18a. "If any evidence exists that the Census Bureau or Secretary will not or cannot comply fully with the Memorandum, the government has yet to share such evidence with us." App. 18a. To the contrary, Appellants provided nothing more than unsubstantiated extra-record representations by their counsel that—as the district court noted—were inconsistent with the genuine record. *See* App. 15a-16a. The district court therefore held that Appellees had demonstrated a substantial risk of injury sufficient to establish standing, leaving purely legal issues that "are plainly fit for review now, with no risk that adjudication will interfere with agency efforts and no need for further factual development." App. 20a.

Turning to the merits, the district court held that the Memorandum violated the governing federal statutes by (i) excluding undocumented immigrants from the apportionment base solely because of their legal status, and (ii) directing the use of non-census data for apportionment. App. 22a-23a. The district court agreed with the statutory analysis of the two other three-judge panels (in *New York* and *City of San Jose*) that had ruled before it and incorporated their detailed reasoning to the extent the government presented identical arguments in this case. App. 22a-32a.

In enacting Section 2a, the 1929 Congress instantiated a policy of *including* in the apportionment base all persons residing within the

11

United States, irrespective of their immigration status. App. 25a-26a. The *uncontested* record on Appellees' partial summary judgment motion established that "a 'clear majority of undocumented immigrants have lived in the United States for over five years and have families, hold jobs, own houses, and are part of their community.'" App. 25a (quoting Decl. of Dr. Matthew A. Barreto ¶ 17, Dkt. 19-6). The Presidential Memorandum announces an intention to exclude these (and any other) undocumented immigrants solely based on their immigration status. Even if the phrase "persons in each State" is equivalent in meaning to "inhabitants" or "usual residents," the latter terms are not so manipulable as to allow the categorical exclusion of undocumented immigrants directed by the Memorandum. App. 24a-25a. The "historical context" of 2 U.S.C. § 2a confirms this conclusion. App. 25a.

The district court further held that the Presidential Memorandum violates the "statutory requirement" under the Reapportionment Act "that the congressional apportionment be based on the results of the census and *only* the results of the census." App. 29a. The mechanism for that violation is to expressly direct the Secretary to violate still another "statutory command," namely, the Census Act's requirement to report to the President only "one set of numbers: '[t]he tabulation of total population by States under subsection (a) of [§ 141]'—that is, as counted under the decennial census—'as required for the apportionment of Representatives in Congress.'" App. 29a (quoting 13 U.S.C. § 141(b)). The Presidential Memorandum ignores this requirement by ordering the Secretary not to report the ultimate

12

tabulation alone as Section 141(b) requires, but rather to freight his statement with a second, separately generated set of numbers that will enable the President to subtract undocumented immigrants from the census count. App. 30a-31a.

As the district court concluded, "wherever that second number comes from . . . it will not be a product of the census." App. 30a. The district court emphasized that this demarcation of what is and is not ascertained under "the decennial census" was not in genuine dispute. In fact, it was admitted by Appellants, who not only affirmed in court briefs that the "Presidential Memorandum 'does not purport to change the conduct of *the census itself*,'" App. 32a (emphasis added) (quoting Defs.' Opp'n to Pls.' Mot. for Partial Summ. J. or a Prelim. Inj. 11, Dkt. 36), but also submitted a sworn declaration of a high-level Census Bureau official affirming that the steps taken to comply with the Memorandum have "'had no impact on the design of field operations for [the] decennial census, or on the Census Bureau's commitment to count each person in their usual place of residence, as defined in the Residence Criteria,'" App. 32a (quoting Decl. of Albert E. Fontenot Jr. ¶ 13, Dkt. 36-1). *A fortiori*, the President's reliance upon such extrinsic non-census data to alter the "tabulation" reported under Section 141(b), and to calculate apportionment figures based on such adjustments, contravenes his obligation under Section 2a to transmit to Congress "a statement showing the whole number of persons in each State . . . *as ascertained under the . . . decennial census* of

13

the population." App. 29a (quoting 2 U.S.C. § 2a(a)) (second alteration in original).

Finally, the district court rejected Appellants' attempt to find support for their position in the President's discretion to direct the Secretary's "policy judgments that result in 'the decennial census,'" as recognized in *Franklin v. Massachusetts*, 505 U.S. 788, 799-800, 806 (1992). In *Franklin*, the overseas federal employees at issue had indisputably been counted as part of the decennial census and had been included in the Secretary's reported tabulation of state-by-state population pursuant to Section 141(b). *See id.* at 794-95, 797. Reversal of the Secretary's "policy judgment" by excluding such overseas employees would not have required resort to any data outside the decennial census. The district court held that the Presidential Memorandum does something fundamentally different: it orders the Secretary to collect data outside the Census Bureau's design and conduct of the 2020 Census, and to assist the President in calculating the reapportionment base using that data. App. 31a-32a. For that reason, the Memorandum also violates Section 2a.

In light of the above, the district court granted Appellees a declaratory judgment holding the Presidential Memorandum to be *ultra vires*, in violation of Section 141(b) and Section 2a, "to the extent it directs or permits the exclusion of undocumented immigrants from the total population to be used for reapportionment and because it directs the Secretary to include in his Section 141(b) statement, and the President to base reapportionment on, data collected outside the decennial census." App.

14

35a. The district court further concluded that Appellees "easily meet" the standard for injunctive relief, App. 33a, and entered a permanent injunction prohibiting Appellants, except the President, from including information concerning the number of non-citizens in each state who are not in a "lawful immigration status" in the Secretary's Section 141(b) statement or otherwise transmitting such data to the President "intended for use in apportionment." App. 34a-35a. The district court's injunction, however, expressly allows the government to "continue to collect data regarding the number of undocumented immigrants in each state if it so chooses" and does not bar the provision of such information to the President for other uses. App. 35a.

## ARGUMENT

1. Appellants' jurisdictional statement does not address the merits of their appeal from the district court's order, but instead references Appellants' merits briefing in *Trump v. New York*, No. 20-366 (Oct. 30, 2020), and asks the Court to hold their jurisdictional statement here pending its decision in that case. As stated above, Appellees agree that a hold is appropriate since the *New York* case largely overlaps with the district court's ruling here and the apportionment-injury basis for the district court's standing and ripeness determinations have now been fully presented in *New York*. Moreover, although the district court here did not reach Appellees' constitutional claims, Appellants have acknowledged that those constitutional claims also have been fairly presented to this Court in *New York*, although the *New York* district court (like the district court here)

15

declined to rule on them. *See* Appellants'
Jurisdictional Stmt., *Trump v. City of San Jose*, No.
20-561 (Oct. 29, 2020).

If this Court affirms the judgment in *New York*, it
also should summarily affirm the judgment of the
Maryland district court here. While Appellees will not
fully set forth their arguments for affirmance in this
Motion to Affirm, Appellees submit that the district
court's rulings in this case are correct for the reasons
further explained by the *New York* appellees in their
briefs and at oral argument in *New York*. *See* Br. for
Appellees New York Immigration Coalition *et al.*,
*Trump v. New York*, No. 20-366 (Nov. 16, 2020); Br.
for State of New York *et al.*, *Trump v. New York*, No.
20-366 (Nov. 16, 2020).

2. Appellees note, however, that the district court
in this case concluded that Appellees had standing,
and that their claims were ripe for adjudication, based
in part upon evidence that was not available to the
*New York* court when that earlier decision was issued.
That evidence included sworn declarations of a
Census Bureau official confirming that the Bureau
expects to provide, by January 11, 2021, "Presidential
Memorandum-related outputs" enabling them to
"*fully implement* the Presidential Memorandum,"
App. 16a (quoting Fontenot *LUPE* Decl. ¶ 8; Fontenot
*Nat'l Urb. League* Decl. ¶ 26 (emphasis added)). These
outputs are in addition to data on all "unlawful aliens
in ICE Detention Centers" that the Census Bureau

16

has planned to provide by December 31, 2020. App. 16a (citing Fontenot *LUPE* Decl. ¶ 8).[2]

These sworn declarations of Appellants' own personnel supported the district court's rejection of Appellants' undocumented representations (through their counsel) that the efforts by the Secretary and the Census Bureau to develop the information demanded by the Presidential Memorandum were so dynamic and unpredictable as to preclude any forecast of what will be "feasible." The government's extra-record representations cannot be automatically credited, particularly when they do not align with sworn declarations of its own officials. As the district court observed, the Census Bureau's phased approach to delivering data is so precisely plotted out that it allows Appellants to calculate exactly how many days of work (five) it will save them. App. 16a (citing Fontenot *LUPE* Decl. ¶ 4). "The meticulousness of the agency's calculations belies any suggestion that the Bureau has yet to determine whether and how it will . . . 'fully implement'" the Memorandum. App. 17a.

3. Before this Court, Appellants have proffered a newfound impediment to implementation based on an unsupported representation that "the Secretary must be able to match individual persons identified through census questionnaires and field-data collection with individual persons identifiable through administrative records as illegal aliens." Appellants' Reply Br. 4, *Trump v. New York*, No. 20-366 (Nov. 23,

---

[2] *See also* Dkt. 42-2 (email from Census Deputy Director Ron Jarmin to Secretary Ross conveying the same information, as produced by the government in *National Urban League v. Ross*, No. 5:20-cv-5799 (N.D. Cal.)).

17

2020). However, no statute, regulation, or other support in the record is cited for this claim; nor was such matching confirmed by the government as a mandatory legal constraint or unavoidable practical limitation upon the Secretary's (or the President's) implementation of the policy. *See* Oral Arg. Tr. 21, 28-29, *Trump v. New York*, No. 20-366 (Nov. 30, 2020). Certainly, the Presidential Memorandum does not recognize, let alone impose, any such requirement.

Indeed, the government's confirmation that it is relying on "administrative records" in implementing the Memorandum, *id.* at 21, underscores the likelihood that it will exclude sufficient numbers of undocumented immigrants to fulfill the Presidential Memorandum's stated goal of reallocating congressional representation. As the Memorandum notes, Executive Order 13880 previously directed all executive agencies to assist the Secretary in collecting such administrative data for the stated purpose of "generat[ing] a more reliable count of . . . the *aggregate* number of aliens unlawfully present in each State." 84 Fed. Reg. at 33823 (emphasis added); *see* 85 Fed. Reg. at 44680. As of July 2019, the government had determined that administrative records to which the Census Bureau already had access "would enable it to determine citizenship status for approximately 90 percent of the population." 84 Fed. Reg. at 33821. Nothing in the Memorandum prevents the Secretary from deciding that it is "feasible" to provide those *aggregate* numbers of illegal aliens in each State, so that the President can simply subtract them from the state-by-state tabulation of total population reported to him under Section 141(b). Nor do the extra-record representations by Appellants' counsel about what the

18

Census Bureau has been doing so far to comply with the Memorandum supply any such binding restraint.

Moreover, even if the record allowed the Court to read a "matching" requirement into the Presidential Memorandum, that would be insufficient to refute the clear risk of apportionment injury given the government's own estimate that 90 percent of the population is covered by administrative records. That would include, at a minimum, the tens of thousands of individuals detained in ICE Detention Centers, and the *millions* more on ICE's *non*-detained docket—which, the government has acknowledged, "surpassed 3.2 million cases in fiscal year 2019, a population large enough to fill more than four congressional districts under the 2010 apportionment." Defs.' Opp'n to Pls.' Mot. for Partial Summ. J. or a Prelim. Inj. 31 n.6 (citing U.S. ICE ERO, *U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report*, at 10 (2019)), Dkt. 36. When one adds to this the undocumented immigrants who may be identified from other records—such as DHS records on individuals who have overstayed visas or Social Security beneficiary records, *see* 84 Fed. Reg. at 33824—the possibility that unimpeded implementation of the Memorandum would have no apportionment impact appears remote, if not minuscule.

4. The government's ripeness argument fares no better than its standing argument. The district court correctly held that, because the Memorandum should be taken at its word, this case presents a "'purely legal'" question that "involves no aspect that would 'benefit from further factual development.'" App. 19a

19

(quoting *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir.
2006), and *Ohio Forestry Ass'n v. Sierra Club*, 523
U.S. 726, 733 (1998)). It is therefore ripe for
adjudication.

The government has suggested that those
undocumented immigrants whom it determines to be
"feasible" and within the President's discretion to
exclude may fall within certain categories that are
excludable even under traditional residence criteria or
understandings of "inhabitance," and thus the
contours of the Court's merits inquiry may change
once the government completes its work. *E.g.*,
Appellants' Reply Br. 6, 13-14, *Trump v. New York*,
No. 20-366 (Nov. 23, 2020). But this speculation is at
odds with both the Memorandum itself—which
expressly asserts both the discretion to exclude
everyone "not in a lawful immigration status" and the
President's intention to exercise that discretion to its
"maximum extent"—and with the government's own
recent representations about the nature of the
supposed "feasibility" constraint.

The Memorandum does not ask for tailored
"categories" or impose any criterion other than
unlawful "immigration status." Rather, it directs the
Secretary to identify as many unlawful immigrants of
any kind as he can, and to provide sufficient
"information" to enable the President to subtract
them from the apportionment base. Moreover,
Appellants' counsel has represented that the
government intends to exclude *any* individual whose
identity can be matched by comparing administrative
records with census records—regardless of whether
they have, for example, lived in the country for 20

20

years after overstaying a visa or are being held in an ICE Detention Center. It is therefore highly likely that this Court will be called on to address the merits of excluding undocumented immigrants from the apportionment count based on nothing more than the fact that they "are not in a lawful immigration status," 85 Fed. Reg. at 44680.

5. The government has also contradicted its own prudential ripeness arguments in urging expedited consideration of its appeal from the *New York* judgment and the district court's judgment in this case, on the grounds that "a post-apportionment remedy, while available, would undermine the point of the deadlines established by Congress, which is to provide prompt notice to the Nation about the new apportionment that will govern the next congressional elections." Mot. for Expedited Consideration of the Jurisdictional Stmt. 6, *Trump v. New York*, No. 20-366 (Sept. 22, 2020); *see also* Appellants' Ltr. to the Clerk of the Court (Nov. 16, 2020) (preemptively opposing any request for an extension); Appellants' Mot. for Expedited Consideration of the Jurisdictional Stmt. (Nov. 24, 2020). This logic militates in favor of ripeness and prompt resolution of the controversy presented. Notice to the Nation about a new apportionment that is overshadowed by grave doubt concerning its legality will have little if any salutary effect.

A decision on the merits by this Court will resolve the fundamental legal question and thereby clarify the legal guardrails that will apply to any future action by Appellants with respect to the apportionment base. While the residual possibility of

21

some future litigation can never be eliminated, a decision on the merits here will dramatically reduce it. And, as this Court has held, "a 'federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging.'" App. 22a (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (citation and internal quotation marks omitted)).

6. Finally, Appellees note that the record on this appeal is not identical to the record in *New York*. For example, like the appellees in *City of San Jose*, Appellees here submitted an uncontested expert declaration by economist Dr. Ruth Gilgenbach, who projected the impact of the Memorandum "under a wide range of assumptions and accounting for statistical uncertainty" regarding the number of undocumented immigrants identified by the government. App. 13a (citing Decl. of Dr. Ruth Gilgenbach, Dkt. 19-7). Dr. Gilgenbach concluded that it is highly likely that both California and Texas will lose congressional seats "no matter the precise methodology used by the Secretary or the exact number he provides the President." App. 13a. The *New York* plaintiffs rely on different (though similar) expert testimony, also uncontested, regarding the likely effects of the Memorandum on congressional apportionment. *See* Decl. of Dr. Christopher Warshaw ¶ 43, J.A. 338, 367, *Trump v. New York*, No. 20-366 (concluding that Texas, California, and New Jersey are each likely to lose a congressional seat).

Appellees do not believe that any differences between the record in this case and in *New York* cast any doubt on the plaintiffs' showing of standing in

22

*New York*. Appellees submit that—as the district court in this case agreed—the *New York* district court's thorough analysis on each of the questions presented was correct for the reasons further explained by the *New York* appellees in their briefs before this Court.

Should this Court not affirm the *New York* district court's judgment, however, Appellees respectfully request the opportunity to file a supplemental brief under Rule 18.10 to respond to the Court's decision in *New York* and address its effect on this case.

## CONCLUSION

Appellees consent to the government's request that its jurisdictional statement in this case be held pending disposition of *Trump v. New York*, No. 20-366. Should the Court affirm the judgment in *New York*, the Court should summarily affirm the district court's judgment here. Should the Court not affirm in *New York*, Appellees respectfully request that the Court allow the parties to file written submissions addressing that decision before disposing of this jurisdictional statement.

23

Respectfully submitted,

Shankar Duraiswamy                P. Benjamin Duke
Daniel T. Grant                        *Counsel of Record*
Carlton E. Forbes                  COVINGTON & BURLING LLP
Jeffrey Cao                        620 Eighth Avenue
Morgan E. Saunders                 New York, NY 10018
Patricio G. Martínez-              pbduke@cov.com
    Llompart                       (212) 841-1000
COVINGTON & BURLING LLP
850 Tenth Street, NW               Morgan E. Lewis
Washington, DC 20001               COVINGTON & BURLING LLP
                                   415 Mission Street,
                                       Suite 5400
December 14, 2020                  San Francisco, CA 94105

*Counsel for Appellees*